UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------x
In re:                                    :        Chapter 11
                                          :
Glansaol Holdings Inc., et al.,[1]        :        Case No. 18-14102 (MEW)
                                          :
              Debtors.                    :        (Jointly Administered)
----------------------------------------------------x

---

## DISCLOSURE STATEMENT
### FOR THIRD AMENDED JOINT LIQUIDATING PLAN OF
### <u>THE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>

---

Dated: June 21, 2019

**WILLKIE FARR & GALLAGHER LLP**
Brian S. Lennon
Daniel I. Forman
Andrew S. Mordkoff
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Counsel for the Debtors and Debtors in Possession*

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal taxpayer
       identification number are as follows:  Clark's Botanicals, Inc. (0754); Glansaol Holdings Inc. (9485);
       Glansaol LLC (2012); Glansaol Management LLC (6879); Julep Beauty, Inc. (7984); Laura Geller Beauty,
       LLC (1706); Laura Geller Brands, LLC (7428); and Laura Geller Holdings, LLC (7388).

**IMPORTANT NOTICE**

THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE JOINT LIQUIDATING PLAN OF THE DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (THE "**PLAN**").  NO REPRESENTATIONS HAVE BEEN AUTHORIZED BY THE BANKRUPTCY COURT CONCERNING THE DEBTORS, THEIR BUSINESS OPERATIONS OR THE VALUE OF THEIR ASSETS, EXCEPT AS EXPLICITLY SET FORTH IN THIS DISCLOSURE STATEMENT.

THE PLAN IS FOR THE FOLLOWING DEBTORS:  GLANSAOL HOLDINGS INC., GLANSAOL LLC, GLANSAOL MANAGEMENT LLC, LAURA GELLER BEAUTY, LLC, LAURA GELLER BRANDS, LLC, LAURA GELLER HOLDINGS LLC., CLARK'S BOTANICALS, INC., AND JULEP BEAUTY, INC.

THE DEBTORS URGE YOU TO READ THIS DISCLOSURE STATEMENT CAREFULLY FOR A DISCUSSION OF VOTING INSTRUCTIONS, RECOVERY INFORMATION, CLASSIFICATION OF CLAIMS, THE HISTORY OF THE DEBTORS AND THE CHAPTER 11 CASES, THE DEBTORS' BUSINESS, PROPERTIES AND RESULTS OF OPERATIONS AND A SUMMARY AND ANALYSIS OF THE PLAN.

ALL CAPITALIZED TERMS IN THIS DISCLOSURE STATEMENT NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS GIVEN TO THEM IN THE PLAN, A COPY OF WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS EXHIBIT 1.

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.  THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL, OR THE SOLICITATION OF AN OFFER TO BUY, ANY SECURITIES.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.   THE PLAN AND THIS DISCLOSURE STATEMENT WERE NOT REQUIRED TO BE PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW.  DISSEMINATION OF THIS DISCLOSURE STATEMENT IS CONTROLLED BY BANKRUPTCY RULE 3017.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THIS DISCLOSURE STATEMENT WAS PREPARED TO PROVIDE PARTIES IN INTEREST IN THESE CASES WITH "ADEQUATE INFORMATION" (AS DEFINED IN SECTION 1125 OF THE BANKRUPTCY CODE) SO THAT THOSE CREDITORS WHO ARE ENTITLED TO VOTE WITH RESPECT TO THE PLAN CAN MAKE AN INFORMED JUDGMENT REGARDING SUCH VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS ONLY A SUMMARY OF THE PLAN. THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN; RATHER, THIS DISCLOSURE STATEMENT IS INTENDED ONLY TO AID AND SUPPLEMENT SUCH REVIEW.  THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, THE PLAN SUPPLEMENT (WHICH, UNLESS OTHERWISE SPECIFIED IN THE PLAN, WILL BE FILED NO LATER THAN FIVE (5) BUSINESS DAYS PRIOR TO THE DEADLINE FOR BALLOTS TO BE RECEIVED IN CONNECTION WITH VOTING TO ACCEPT OR REJECT THE PLAN) AND THE EXHIBITS ATTACHED THERETO AND THE AGREEMENTS AND DOCUMENTS DESCRIBED THEREIN.  IF THERE IS ANY CONFLICT BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PROVISIONS OF THE PLAN WILL GOVERN.  YOU ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND PLAN SUPPLEMENT AND TO READ CAREFULLY THE ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS, BEFORE DECIDING HOW TO VOTE WITH RESPECT TO THE PLAN.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS **4:00 P.M. (PREVAILING EASTERN TIME) ON JULY 24, 2019,** UNLESS EXTENDED BY THE BANKRUPTCY COURT (THE "**VOTING DEADLINE**").  TO BE COUNTED, BALLOTS MUST BE RECEIVED BY THE VOTING AGENT (AS DEFINED HEREIN) ON OR BEFORE THE VOTING DEADLINE.

THE EFFECTIVENESS OF THE PLAN IS SUBJECT TO SEVERAL CONDITIONS PRECEDENT, INCLUDING THE EXECUTION OF THE GLOBAL SETTLEMENT.  THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF OR CREATE ANY DUTY TO UPDATE SUCH INFORMATION.

NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS, NOTICES AND SCHEDULES ATTACHED TO OR INCORPORATED BY REFERENCE OR REFERRED TO IN THIS DISCLOSURE STATEMENT AND/OR THE PLAN, AND, IF GIVEN OR MADE, SUCH

INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

IT IS THE DEBTORS' POSITION THAT THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISOR(S) WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

**FORWARD-LOOKING STATEMENTS:**

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTORS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTORS' BUSINESS. IN PARTICULAR, STATEMENTS USING WORDS SUCH AS "BELIEVE," "MAY," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER ARTICLE 11. IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THE DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. CONSEQUENTLY, THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN SHOULD NOT BE REGARDED AS REPRESENTATIONS BY ANY OF THE DEBTORS, THEIR ADVISORS OR ANY OTHER PERSON THAT THE PROJECTED FINANCIAL CONDITIONS OR RESULTS OF OPERATIONS CAN OR WILL BE ACHIEVED. EXCEPT AS OTHERWISE REQUIRED BY LAW, THE DEBTORS DO NOT UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE

FOLLOWING APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY
COURT.

THE  DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE
SPONSOR SUPPORT CONFIRMATION OF THE PLAN AND URGE ALL HOLDERS OF
CLAIMS  WHOSE  VOTES  ARE  BEING  SOLICITED  TO  ACCEPT  THE  PLAN.

## <u>TABLE OF CONTENTS</u>

<div align="right"><u>Page</u></div>

**ARTICLE 1** INTRODUCTION ..................................................................................1

    **1.1**    General. ...........................................................................................1
    **1.2**    Disclosure Statement Order and Confirmation Hearing. ...................2
    **1.3**    Classification of Claims and Interests. ..............................................4
    **1.4**    The Global Settlement ........................................................................4
    **1.5**    Voting; Holders of Claims and Interests Entitled to Vote. ...............5
    **1.6**    Chapter 11 Plan v. Chapter 7 Liquidation ........................................7
    **1.7**    Important Matters. ..............................................................................9

**ARTICLE 2** SUMMARY OF PLAN AND CLASSIFICATION AND TREATMENT
               OF CLAIMS AND INTERESTS THEREUNDER ..........................9

    **2.1**    General. ...............................................................................................9
    **2.2**    Summary of Treatment of Claims and Interests Under the Plan. .........10

**ARTICLE 3** BUSINESS DESCRIPTION; HISTORICAL INFORMATION............15

    **3.1**    The Debtors' Business. .....................................................................15
    **3.2**    The Debtors' Prepetition Capital Structure. ....................................18

**ARTICLE 4** EVENTS LEADING TO CHAPTER 11 FILING................................18

**ARTICLE 5** DESCRIPTION AND HISTORY OF CHAPTER 11 CASES...............19

    **5.1**    General Case Background....................................................................20
    **5.2**    Retention of Professionals. ................................................................20
    **5.3**    Employment Obligations....................................................................20
    **5.4**    Continuing Vendor Relations. ...........................................................20
    **5.5**    Warehouse and Common Carrier.......................................................21
    **5.6**    Cash Management System..................................................................21
    **5.7**    Tax Motion. ........................................................................................21
    **5.8**    Schedules and Statements. .................................................................21
    **5.9**    Bar Dates............................................................................................22
    **5.10**   Use of Cash Collateral and Approval of the DIP Facility. ...............22
    **5.11**   Appointment of a Creditors' Committee. ..........................................22
    **5.12**   Section 341 Meeting. .........................................................................23
    **5.13**   Sale Process. ......................................................................................23
    **5.14**   Filing of the Debtors' Initial Plan and Disclosure Statement ...............24
    **5.15**   Filing of the Debtors' Exclusivity Motion.........................................24
    **5.16**   California Wage and PAGA Action ...................................................25
    **5.17**   Jane Park Claims................................................................................26

**ARTICLE 6** THE GLOBAL SETTLEMENT...........................................................26

**6.1**    Overview of Issues Resolved in the Global Settlement ........................................28
**6.2**    Benefits of the Global Settlement ...........................................................34

**ARTICLE 7** REASONS FOR THE SOLICITATION; RECOMMENDATION .......................34

**ARTICLE 8** THE PLAN ..................................................................................35

**8.1**    Overview of Chapter 11..............................................................................35
**8.2**    Overview of the Plan. ................................................................................36
**8.3**    Acceptance or Rejection of Plan; Effect of Rejection by One or More
Classes of Claims or Interests. .................................................................41
**8.4**    Means for Implementation. ........................................................................41
**8.5**    Plan Administrator. ..................................................................................44
**8.6**    Executory Contracts and Unexpired Leases. ...............................................49
**8.7**    Conditions Precedent to Confirmation of the Plan. ......................................50
**8.8**    Binding Effect. ........................................................................................51
**8.9**    No Discharge in Favor of the Debtor..........................................................51
**8.10**   Term of Pre-Confirmation Injunctions or Stays. ..........................................51
**8.11**   Injunction Against Interference With Plan. ..................................................51
**8.12**   Injunction. .............................................................................................52
**8.13**   Releases.................................................................................................52
**8.14**   Exculpation and Limitation of Liability. .....................................................54
**8.15**   Injunction Related to Releases and Exculpation...........................................55
**8.16**   Termination of Subordination Rights and Settlement of Related Claims.............55
**8.17**   Retention of Causes of Action/Reservation of Rights. ...................................56
**8.18**   Releases of Liens. ....................................................................................56
**8.19**   Indemnification of Directors, Officers and Employees. ..................................56
**8.20**   Scope of Bankruptcy Court Jurisdiction. ....................................................57
**8.21**   Miscellaneous Provisions...........................................................................58

**ARTICLE 9** CONFIRMATION OF THE CHAPTER 11 PLAN ...................................62

**9.1**    Confirmation Hearing. ..............................................................................62
**9.2**    Confirmation. .........................................................................................63
**9.3**    Third Party Releases Under the Plan. ..........................................................67
**9.4**    Classification of Claims and Interests..........................................................68
**9.5**    Consummation. .......................................................................................68

**ARTICLE 10** ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
THE PLAN ..............................................................................................68

**10.1**   Liquidation Under Chapter 7 of the Bankruptcy Code.....................................68
**10.2**   Alternative Chapter 11 Plan(s)....................................................................69
**10.3**   Dismissal of the Chapter 11 Cases...............................................................69

**ARTICLE 11** SUMMARY OF VOTING PROCEDURES ..........................................69

**ARTICLE 12** CERTAIN RISK FACTORS TO BE CONSIDERED ...........................70

**12.1**    Certain Bankruptcy Considerations. ...................................................................70

**12.2**    Risks Relating to Tax and Accounting Consequences of the Plan and
Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal
Issues and Involve Factual Determinations. ..........................................................73

**ARTICLE 13** CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN .....................................................................................................73

**13.1**    Federal Income Tax Consequences to the Debtors. ...............................................74

**ARTICLE 14** PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN .........................76

**14.1**    Disbursing Agent. ..................................................................................................76
**14.2**    Distributions of Cash. ............................................................................................76
**14.3**    Timing of Distributions. .........................................................................................76
**14.4**    Holders as of the Distribution Record Date. ..........................................................76
**14.5**    Distributions to Address of Record. .......................................................................76
**14.6**    No Postpetition Interest on Claims; No More than Payment in Full. ....................77
**14.7**    Minimum Distributions. .........................................................................................77
**14.8**    Withholding Taxes. .................................................................................................77
**14.9**    Time Bar to Cash Payments by Check. ..................................................................78
**14.10**  No Payments of Fractional Dollars. .......................................................................78
**14.11**  Setoff and Recoupment. .........................................................................................78
**14.12**  Unclaimed Distributions. .......................................................................................78

**ARTICLE 15** PROCEDURES FOR RESOLVING CLAIMS .....................................................79

**15.1**    Objections to Claims. ..............................................................................................79
**15.2**    Amendments to Claims. ..........................................................................................79
**15.3**    Estimation of Claims; Certain Reserves. ...............................................................79
**15.4**    Plan Distributions to Holders of Subsequently Allowed Claims. ..........................80
**15.5**    Insurance Preservation and Proceeds. ....................................................................80
**15.6**    Allocation of Plan Distributions Between Principal and Interest. ..........................80
**15.7**    No Recourse. ...........................................................................................................81

Annexed as exhibits (the "**Exhibits**") to this Disclosure Statement are copies of the following documents:

- Plan (Exhibit 1)

- Liquidation Analysis (Exhibit 2)

- Committee Support Letter (Exhibit 3)

- Sponsor Letter (Exhibit 4)

# ARTICLE 1

# INTRODUCTION

### 1.1    *General.*

Glansaol Holdings Inc. and certain of its affiliates, as debtors and debtors in possession (collectively, the "**Debtors**")[2] in the chapter 11 cases pending before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), hereby transmit this disclosure statement (as may be amended, supplemented or otherwise modified from time to time, the "**Disclosure Statement**"), pursuant to section 1125 of title 11 of the United States Code (the "**Bankruptcy Code**"), in connection with the Debtors' solicitation of votes to confirm the Third Amended Joint Liquidating Plan of the Debtors Under Chapter 11 of the Bankruptcy Code, dated as of April 23, 2019 (the "**Plan**").

The purpose of this Disclosure Statement is to set forth information:  (a) regarding the history of the Debtors and their business; (b) describing the Chapter 11 Cases; (c) concerning the Plan; (d) advising the holders of Claims and Interests of their rights under the Plan; and (e) assisting the holders of Claims and Interests entitled to vote on the Plan in making an informed judgment regarding whether they should vote to accept or reject the Plan.

On February 1, 2019, the Bankruptcy Court entered the *Order (A) Authorizing and Approving Sales of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Authorizing and Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Executory Contracts; and (C) Granting Related Relief* [Docket No. 165], authorizing the Debtors to sell substantially all of their assets to AS Beauty LLC.  The Debtors effectuated that sale on February 6, 2019.  Subsequent to the sale, the Debtors' assets are comprised primarily of cash and potential causes of action that the estates may hold against various parties.  Over the past several months, the Debtors, the Committee, and the Debtors' equity sponsor have worked diligently to negotiate a consensual chapter 11 plan that the Debtors and the Committee believe maximizes the value of the estates for the benefit of all creditors.  These negotiations culminated in the Global Settlement described in Article VI hereof.

Pursuant to the Plan, the Debtors will conduct an orderly wind down of their remaining affairs and distribute cash to creditors in accordance with the Allocation Schedule described in section 2.2 hereof.  Pursuant to the Plan and the Global Settlement, the Debtors' equity sponsor will contribute $1.65 million in cash to the estates to resolve any and all claims that the estates may be able to assert against, among others, the Debtors' equity sponsor, directors and officers.  The proposed release provisions are described in greater detail in section 8.13 below.  In addition, the estates will waive preference actions against unsecured creditors.

---

2    A list of the Debtors for whom the Plan (as defined below) pertains is listed as Exhibit A to the Plan, which is Exhibit 1 to this Disclosure Statement.  The last four digits of each Debtor's taxpayer identification number can be found on the cover page to this Disclosure Statement and at http://www.omnimgt.com/glansaol.

1

The alternative to the Plan would be to seek to convert the chapter 11 cases to chapter 7 cases and allow a chapter 7 trustee to wind down the Debtors' affairs. In that scenario, the releases described in section 8.13 would not be effective and the chapter 7 trustee would be authorized to litigate or settle claims, including the alleged claims against the Sponsor and the Avoidance Actions waived pursuant to the Global Settlement, in its discretion. Absent an adverse judgment in a litigation, of which there is no guarantee, there would be no contribution to the estates from the Sponsor and there may be disputes as to how a chapter 7 trustee should allocate value amongst the various Debtors. The Debtors and the Committee believe a chapter 7 liquidation would not be in the best interests of creditors and would diminish the potential recoveries creditors may receive. A more detailed comparison of this Plan to a chapter 7 liquidation is provided in section 1.6 of this Disclosure Statement and the risks associated with the chapter 7 alternative are discussed in greater detail in section 9.2(b) of this Disclosure Statement.

*For these reasons, the Debtors and the Committee believe the Plan is in the best interests of all creditors, including holders of Class 4 General Unsecured Claims, and therefore urge all holders of General Unsecured Claims entitled to vote to accept the Plan.*

All Plan Documents are subject to revision and modification from time to time prior to the Effective Date (subject to the terms of the Plan), which may result in material changes to the terms of the Plan Documents. On the Effective Date, the Plan, all Plan Documents and all other agreements entered into or instruments issued in connection with the Plan and any Plan Document, shall become effective and binding in accordance with their respective terms and conditions and shall be deemed to become effective simultaneously.

### 1.2    *Disclosure Statement Order and Confirmation Hearing.*

On June 24, 2019, after notice and a hearing, the Bankruptcy Court entered an order [Docket No. 369] (the "**Disclosure Statement Order**"), which among other things: (a) scheduled the Confirmation Hearing to consider confirmation of the Plan to be held on July 31, 2019 at 11:00 a.m. (prevailing Eastern Time); (b) approved the adequacy of the Disclosure Statement; and (c) approved solicitation and voting procedures in connection with the Plan. **The Disclosure Statement Order establishes July 24, 2019 at 4:00 p.m. (prevailing Eastern Time) as the Voting Deadline for the return of Ballots accepting or rejecting the Plan. ENTRY OF THE DISCLOSURE STATEMENT ORDER DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan, and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim or Interest entitled to vote on the Plan should read this Disclosure Statement and the exhibits hereto, including the Plan, as well as the instructions accompanying the Ballot, in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes may be made except pursuant to this Disclosure Statement, section 1125 of

the Bankruptcy Code and the Disclosure Statement Order. In voting on the Plan, holders of Claims or Interests entitled to vote should not rely on any information relating to the Debtors and their business other than the information contained in this Disclosure Statement, the Plan and all Exhibits hereto and thereto.

Additional copies of this Disclosure Statement (including Exhibits) are available upon request to the Debtors' claims and voting agent, Omni Management Group ("**Omni**" or the "**Voting Agent**"), at the following address:

<div align="center">

Glansaol Holdings, Inc., et al.
c/o Omni Management Group
5955 De Soto Avenue, Suite 100
Woodland Hills, CA 91367

</div>

Copies may also be obtained by contacting Omni via telephone at (818) 906-8300. Additional copies of this Disclosure Statement (including Exhibits) can also be accessed free of charge from the following website: http://www.omnimgt.com/glansaol.

A Ballot for voting to accept or reject the Plan is enclosed with this Disclosure Statement for the holders of Claims or Interests that are entitled to vote to accept or reject the Plan. If you are a holder of a Claim or Interest entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact Omni at the address above.

In accordance with section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held before the Honorable Michael E. Wiles, United States Bankruptcy Judge for the Southern District of New York, United States Bankruptcy Court, One Bowling Green, New York, New York 10004 on **July 31, 2019 at 11:00 a.m. (prevailing Eastern Time)**, to consider confirmation of the Plan. The Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code, and they have reserved the right to modify the Plan to the extent, if any, that confirmation pursuant to section 1129 of the Bankruptcy Code requires modification, subject to the terms of the Plan. Objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before **July 24, 2019 at 4:00 p.m. (prevailing Eastern Time)**, in the manner set forth in the Disclosure Statement Order. The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjourned date and time at the Confirmation Hearing or any adjournment thereof or an appropriate filing with the Bankruptcy Court.

At the Confirmation Hearing, the Bankruptcy Court will, among other things:

- determine whether sufficient majorities in number and amount from each Class entitled to vote have delivered properly executed Ballots accepting the Plan;

- hear and determine objections, if any, to confirmation of the Plan that have not been previously resolved;

<div align="center">3</div>

- determine whether the Plan meets the confirmation requirements of the Bankruptcy Code; and

- determine whether to confirm the Plan.

**1.3     *Classification of Claims and Interests.***

The following table designates the Classes of Claims against and Interests in the Debtors, and specifies which Classes are:  (a) impaired or unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) deemed to accept or reject the Plan.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Prepetition Secured Lender Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 3 | Priority Non-Tax Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 4 | Intercompany Claims | Impaired | No (conclusively deemed to reject) |
| Class 5 | General Unsecured Claims | Impaired | Yes (entitled to vote) |
| Class 6 | Existing Interests | Impaired | No (conclusively deemed to reject subject to the Global Settlement) |

If a controversy arises regarding whether any Claim or Interest is properly classified under the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing.  If the Bankruptcy Court finds that the classification of any Claim or Interest is improper, then such Claim or Interest shall be reclassified and the Ballot previously cast by the holder of such Claim or Interest shall be counted in, and the Claim or Interest shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim or Interest should have been classified, without the necessity of resoliciting any votes on the Plan.

**1.4     *The Global Settlement***

The Debtors, the Committee and the Sponsor entered into the Global Settlement which compromised and settled numerous inter-Debtor and creditor-Debtor issues and resolved potential litigation and Claims against the Debtors and the Sponsor in connection with these Chapter 11 Cases.  Those disputed issues involved, among other things, whether the Debtors had

viable breach of contract claims against the Sponsor and breach of fiduciary duty claims against the Debtors' officers and directors, whether certain Intercompany Claims were valid and enforceable, the appropriateness of Debtor releases, and the allocation of value among the various Debtors.

The Debtors, the Committee and the Sponsor determined to engage in good faith arms-length negotiations of a settlement in light of the risks, delays, costs and uncertainty associated with a contested confirmation process, protracted litigation to pursue the claims and resolving complex disputes after the Effective Date. Ultimately, the parties believed that a settlement was the best course of action for all parties in these cases, and therefore agreed to the Global Settlement discussed herein. The Global Settlement implemented under the Plan includes a $1.65 million cash contribution to the estates from the Sponsor and substantially improves recoveries to unsecured creditors from the Debtors' Original Plan (as defined herein) and provides more certain recoveries than creditors would likely receive through a chapter 7 liquidation process. In addition, Distributions under a chapter 7 process would be significantly delayed. A detailed description of the terms of the Global Settlement and the numerous and complex disputes and issues it resolves is set forth in Article 6 of this Disclosure Statement.

### 1.5    *Voting; Holders of Claims and Interests Entitled to Vote.*

**General Voting Procedures.**

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are "impaired" and that are not deemed to have rejected a chapter 11 plan are entitled to vote to accept or reject such proposed plan. Generally, a claim or interest is "impaired" under a plan if the holder's legal, equitable or contractual rights are altered under such plan. Classes of claims or equity interests under a chapter 11 plan in which the holders of claims or equity interests are unimpaired are presumed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan.

Under the Plan, Claims in Class 5 are impaired, will receive a distribution of any Available Cash (as defined in the Plan) on account of such Claim or Interest to the extent provided in the Plan and are entitled to vote to accept or reject the Plan. Claims in Classes 1, 2 and 3 are unimpaired and, as a result, holders of such Claims are presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Claims in Class 4 and Class 6 are impaired and will not receive any recovery under the Plan, and, as a result, holders of such Claims are deemed to have rejected the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that holds at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the chapter 11 plan. **Your vote on the Plan is important.** The Bankruptcy Code requires as a condition to confirmation of a chapter 11 plan that each class that is impaired and entitled to vote under a plan vote to accept such plan, unless the requirements of section 1129(b) of the Bankruptcy Code are satisfied.

If a Class of Claims or Interests entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan and/or to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to such Class. Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding non-acceptance of such plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept such plan (excluding any votes of insiders). Under that section, a chapter 11 plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

A Ballot is enclosed for the purpose of voting on the Plan. This Disclosure Statement, the Exhibits attached hereto, the Plan and the related documents are the only materials the Debtors are providing to creditors and equity holders for their use in determining whether to vote to accept or reject the Plan, and it is the Debtors' position that such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan.

If you are entitled to accept or reject the Plan, please complete and sign your Ballot(s) and return such Ballot to the Voting Agent at the address below:

**Glansaol Holdings, Inc., et al.**
**c/o Omni Management Group**
**5955 De Soto Avenue, Suite 100**
**Woodland Hills, CA 91367**

TO BE COUNTED, YOUR ORIGINAL BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN **4:00 P.M., PREVAILING EASTERN TIME ON JULY 24, 2019,** UNLESS SUCH DEADLINE IS EXTENDED BY THE BANKRUPTCY COURT. YOUR BALLOT MAY BE SENT VIA MAIL, OVERNIGHT COURIER, MESSENGER, OR THE VOTING AGENT'S "E-BALLOT" PLATFORM. FAXED OR EMAILED COPIES AND VOTES SENT ON OTHER FORMS WILL NOT BE ACCEPTED EXCEPT IN THE DEBTORS' SOLE DISCRETION. ALL BALLOTS MUST BE SIGNED.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from the Classes entitled to vote thereon. Accordingly, in voting on the Plan, please use only the Ballots sent to you with this Disclosure Statement or provided by the Voting Agent.

The Debtors have fixed **4:00 p.m. (prevailing Eastern Time) on June 20, 2019** (the "**Voting Record Date**") as the time and date for the determination of the Persons who are entitled to receive a copy of this Disclosure Statement and all of the related materials and to vote whether to accept or reject the Plan. Accordingly, only holders of Claims or Interests of record as of the Voting Record Date that are entitled to vote on the Plan will receive a Ballot and may vote on the Plan.

All properly completed and submitted Ballots received prior to the Voting Deadline will be counted for purposes of determining whether a voting Class of impaired Claims or Interest has accepted the Plan. **Under the Bankruptcy Code, for the Plan to be "accepted," a specified majority vote is required for each Class of impaired Claims or Interests entitled**

to vote on the Plan.  **If any impaired Class fails to have any Allowed Claims or Allowed Interests, or Claims or Interests temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing, such Class or Classes will be deemed eliminated from the Plan for all purposes.**  The Voting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Classes entitled to vote.

### 1.6    *Chapter 11 Plan v. Chapter 7 Liquidation*

The Debtors and the Committee believe the Plan is in the best interests of all creditors, including holders of Class 4 General Unsecured Claims, and therefore urge all holders of General Unsecured Claims entitled to vote to accept the Plan.  In the event the Plan is not confirmed, the Debtors may be forced to proceed to a liquidation of their businesses under chapter 7 of the Bankruptcy Code.  The Debtors and the Committee believe this alternative would not be in the best interests of creditors.  This alternative is discussed in greater detail in section 9.2(b) of this Disclosure Statement.  As demonstrated in section 9.2(b) and in the Liquidation Analysis attached hereto as Exhibit 2, the Debtors believe that liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial diminution in the value to be realized by holders of impaired Claims as compared to distributions contemplated under the Plan and would provide for significantly delayed Distributions.

The Plan embodies the Global Settlement, which, as discussed in greater detail in Article 6 of this Disclosure Statement, greatly enhances recoveries to unsecured creditors and resolves numerous complex issues in connection with the Plan and its implementation.  In short, the Plan and the Global Settlement:

(a) Provide for payment in full in Cash of all Administrative Claims at each Debtor on the Plan's Effective Date or as soon as reasonably practicable thereafter;

(b) Implement an orderly and timely Distribution process by the Plan Administrator;

(c) Enhance creditor recoveries by the Sponsor Settlement Amount of $1,650,000, which would be paid by the Sponsor in exchange for the settlement and release of potential litigation claims against the Sponsor and the Debtors' directors and officers, as described in greater detail below;

(d) Resolve numerous complex, costly, and time-consuming issues such as the validity and enforceability of certain disputed Intercompany Claims and allocation of Plan Funding among the various Debtors;

(e) Provide for the Debtors' waiver of all Avoidance Actions against creditors, which will allow for a timely wind-down of the Debtors' businesses and prompt Distributions to creditors; and

(f) Provide for the waiver of recoveries by holders of Existing Interests and the redistribution of such recoveries to creditors.

The Plan would result in the following estimated recoveries to holders of General Unsecured Claims:

| Chapter 11 Distributions | |
| --- | --- |
| **Debtor Entity** | **Expected General Unsecured Claim Recovery** |
| Laura Geller Beauty, LLC | 8.2% - 26.9% |
| Julep Beauty, LLC | 15.2% - 25.7% |
| Clark's Botanicals, Inc. | 25.0% - 32.3% |
| Glansaol Management LLC | 16.9% - 18.4% |

In the alternative, a liquidation under chapter 7 of the Bankruptcy Code would not involve the Global Settlement. As a result, a chapter 7 liquidation would present the following alternatives to the Plan:

(a) Administrative Claims may not be paid in full at each Debtor, and any distribution in a chapter 7 case, including to holders of Administrative Claims, would not occur for a substantial period of time;

(b) Rather than the Plan Administrator, the liquidation would be overseen by an independent chapter 7 trustee, who would be separately compensated from Estate assets and would be required to spend significant time to become familiar with the facts and circumstances of the Debtors' cases, businesses, and Estates;

(c) The value to be distributed to creditors would not include the $1,650,000 Sponsor Settlement Amount under the Global Settlement;

(d) No claims would be released or settled under the Global Settlement and the chapter 7 trustee may choose to litigate or settle the potential claims against the Sponsor and/or the Debtors' directors and officers;

(e) The chapter 7 trustee would be required to resolve the numerous complex, costly, and time-consuming issues resolved by the Global Settlement, such as the validity and enforceability of certain disputed Intercompany Claims and allocation of value among the various Debtors; and

(f) The chapter 7 trustee would retain the authority to litigate or settle Avoidance Actions against creditors, which may result in additional value for distribution to creditors but would significantly delay Distributions because such litigation is typically lengthy and costly.

8

The Liquidation Analysis attached hereto as Exhibit 2 sets forth the Debtors' analysis of expected recoveries to creditors under a chapter 7 liquidation.

| Chapter 7 Liquidation Distributions | |
| --- | --- |
| **Debtor Entity** | **Expected General Unsecured Claim Recovery** |
| Laura Geller Beauty, LLC | 0.1% - 15.5% |
| Julep Beauty, LLC | 1.2% - 12.3% |
| Clark's Botanicals, Inc. | 15.3% - 24.2% |
| Glansaol Management LLC | 6.2% - 8.0% |

Consequently, the Debtors and their management believe that confirmation of the Plan will provide a substantially greater return to holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code and, together with the Committee, which supports the Plan pursuant to the Global Settlement, urge all holders of General Unsecured Claims to vote in favor of the Plan.

**1.7    *Important Matters.***

This Disclosure Statement contains certain forward-looking statements, all of which are based on various estimates and assumptions and will not be updated to reflect events occurring after the date hereof.  Such information and statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, among others, those described herein.  Actual events, circumstances, effects and results may vary significantly from those included in or contemplated by such forward-looking statements.  Consequently, the forward-looking statements contained herein should not be regarded as representations by any of the Debtors, their advisors, or any other Person that the projected financial conditions or results of operations can or will be achieved.

## ARTICLE 2

## SUMMARY OF PLAN AND CLASSIFICATION AND
## TREATMENT OF CLAIMS AND INTERESTS THEREUNDER

**2.1    *General.***

The overall purpose of the Plan is to provide for the liquidation of the Debtors in a manner designed to maximize recovery to stakeholders.

9

Generally, the Plan provides for:[3]

    **(a)**    The Global Settlement by and among the Debtors, the Committee and the Sponsor;

    **(b)**    Holders of Prepetition Secured Lender Claims to receive Cash in an amount equal to such Allowed Secured Claim which pursuant to the terms of the Final DIP Order, occurred upon consummation of the Sale Transaction;

    **(c)**    Holders of Other Secured Claims to receive (i) Cash in an amount equal to such Allowed Other Secured Claim, (ii) the collateral securing such Allowed Other Secured Claim, (iii) reinstatement of such Allowed Other Secured Claim, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Other Secured Claim, and (iv) such other treatment that will render such Allowed Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code;

    **(d)**    Holders of Intercompany Claims are not entitled to receive any distributions under the Plan;

    **(e)**    Holders of Priority Non-Tax Claims to receive (i) Cash in an amount equal to such Allowed Priority Non-Tax Claim, (ii) reinstatement of such Allowed Priority Non-Tax Claim, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the holder of such claim to demand or to receive payment prior to the stated maturity of such Allowed Priority Non-Tax Claim, and (iii) such other treatment that will render such Allowed Priority Non-Tax Claim unimpaired pursuant to section 1124 of the Bankruptcy Code;

    **(f)**    Holders of General Unsecured Claims to receive, subject to the terms of the Plan, its Pro Rata share of the Available Cash; and

    **(g)**    Holders of Existing Interests to receive, subject to holders of Allowed General Unsecured Claims being paid in full, no Distribution because such Distribution, if any, shall be reallocated in accordance with the Allocation Schedule.

**2.2**    *Summary of Treatment of Claims and Interests Under the Plan.*

    The following table classifies Claims against and Interests in the Debtors into separate Classes and summarizes the treatment of each Class under the Plan. The table also identifies which Classes are entitled to vote on the Plan based on the provisions of the Bankruptcy Code. Finally, the table indicates the estimated recovery for each Class. The summaries in this table are qualified in their entirety by the description and the treatment of such

---

3    The summary of the Plan contained herein is qualified in its entirety by the terms of the Plan, and in the event of any inconsistency, the Plan shall control in all respects.

Claims in the Plan.  **The recoveries and estimates described in the table represent the Debtors' best estimates given the information available on the date of this Disclosure Statement.  All statements relating to the aggregate amount of Claims and Interests in each Class are only estimates based on information known to the Debtors as of the date hereof, and the final amounts of Allowed Claims and Interest in any particular Class may vary significantly from these estimates.**

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified.  Except as specifically noted therein, the Plan does not provide for payment of postpetition interest on any Allowed Claims.

---

### Important Note on Estimates

The estimates in the tables and summaries in this Disclosure Statement may differ from actual distributions because of variations in the asserted or estimated amounts of Allowed Claims, Allowed Interests, the existence of Disputed Claims and other factors.  Statements regarding projected amounts of Claims and Interests or distributions (or the value of such distributions) are estimates by the Debtors based on current information and are not representations as to the accuracy of these amounts.  Except as otherwise indicated, these statements are made as of the date of this Disclosure Statement, and the delivery of this Disclosure Statement will not, under any circumstances, imply that the information contained in this Disclosure Statement is correct at any other time.  Any estimates of Claims or Interests in this Disclosure Statement may vary from the final amounts of Claims or Interests allowed by the Bankruptcy Court.

---

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims in Class | Estimated Recovery |
|---|---|---|---|---|---|
| Class 1 | Prepetition Secured Lender Claims | The legal, equitable and contractual rights of the holders of Prepetition Secured Lender Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Prepetition Secured Lender Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, on the Effective Date each holder of an Allowed Prepetition Secured Lender Claim shall receive Cash in an amount equal to such Allowed Prepetition Secured Lender Claim. Pursuant to the terms of the Final DIP Order, all outstanding Prepetition Secured Lender Claims were paid in full upon the consummation of the Sale Transaction. | No | $0 | 100%[4] |
| Class 2 | Other Secured Claims | The legal, equitable and contractual rights of the holders of Other Secured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Secured Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, on the applicable Distribution Date each holder of an Allowed Other Secured Claim shall receive at the election of the Debtors on or before, the later of the Effective Date and thirty (30) days after the date on which a Class 2 Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, (i) Cash in an amount equal to such Allowed Other Secured Claim, (ii) the collateral securing such Allowed Other Secured Claim, or (iii) such other treatment that will render such Allowed Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code. | No | $0 | N/A |
| Class 3 | Priority Non-Tax Claims | The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Non-Tax Claim, shall receive (i) Cash in an amount equal to such Allowed Priority Non-Tax Claim, or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim unimpaired pursuant to section 1124 of | No | $143,000 | 100% |

---

[4]    Pursuant to the terms of the Final DIP Order, all outstanding Prepetition Secured Lender Claims were paid in full upon the consummation of the Sale Transaction.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims in Class | Estimated Recovery |
|-------|-------------|-----------|------------------|-------------------------------------|--------------------|
| | | the Bankruptcy Code on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable. | | | |
| Class 4 | Intercompany Claims | On or after the Effective Date, each holder of an Intercompany Claim shall not receive a distribution on account of such Claims and the Intercompany Claims shall be cancelled as of the Effective Date. | No | $43,746,981 net receivable to Glansaol Management, LLC | 0.0% |
| Class 5 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed General Unsecured Claim shall receive, subject to the terms of the Plan, its Pro Rata share of the Available Cash provided, however, that each holder of an Allowed General Unsecured Claim shall not receive an amount that exceeds 100% of the amount of such Allowed General Unsecured Claim. | Yes | $12,725,000 Consolidated<br><br>$6,000,000 Laura Geller Beauty, LLC<br><br>$3,975,000 Julep Beauty, Inc.<br><br>$750,000 Clark's Botanicals, Inc.<br><br>$2,000,000 Glansaol Management LLC | 21.4% Consolidated<br><br>8.2 – 26.9% Laura Geller Beauty, LLC<br><br>15.2 - 25.7% Julep Beauty, Inc.<br><br>25.0 - 32.3% Clark's Botanicals, Inc.<br><br>16.9 - 18.4% Glansaol Management LLC |
| Class 6 | Existing Company | On or after the Effective Date, each holder of an Existing Interest, to the extent that all Allowed General Unsecured Claims have been satisfied in full against | No | $0 | N/A |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims in Class | Estimated Recovery |
|---|---|---|---|---|---|
| | Interests | such Debtor, shall not receive a Distribution because such Distributions if any, shall be reallocated in accordance with Allocation Schedule. | | | |

The recoveries set forth in the preceding chart are estimates and are contingent upon approval of the Plan as proposed. The Debtors' Allocation Schedule sets forth how the Plan Funding will be divided among each Debtor to satisfy Claims and Interests against that Debtor, and is described in greater detail in Article 6 below.

## ARTICLE 3

## BUSINESS DESCRIPTION; HISTORICAL INFORMATION

**3.1**    ***The Debtors' Business.***

        **(a)**    **The Debtors.**

The Debtors comprised one of the largest independent prestige beauty and personal care companies in the United States. With a portfolio of three highly regarded brands, the Debtors reached their customers through a variety of channels and offer a full spectrum of products, from makeup to skincare.

Headquartered in New York City, the Debtors' primary business operations were comprised of sales of beauty products to wholesale customers and broadcast shopping networks, who in turn sold the Debtors' merchandise to end consumers at the retail level. The Debtors also sold their products directly to consumers through the Debtors' online store and their nail salons in Seattle, Washington. Products were also sold through QVC broadcast shopping network and the wholesale retailer Ulta Salon, Cosmetics & Fragrance, Inc.

        **(b)**    **Formation and Activity of the Debtors.**

The Debtors were formed in October 2015 to serve as a platform company to acquire, integrate and cultivate a portfolio of prestige beauty brands diversified across segments, channels and geographies. This strategy was put into practice in late 2016 and early 2017 when the Debtors acquired a trio of prestige beauty companies — Laura Geller, Julep and Clark's Botanicals. The brands share relatively similar supply chains where it was thought efficiencies could be realized, but they featured different price points and consumer profiles. For example, while Laura Geller appeals to consumers over the age of 35 and was primarily sold through wholesale retailers and broadcast shopping networks, Julep catered to a younger generation through its online business and experience-driven nail salons. The following is a more detailed description of the Debtors.

        **(i)**    **Laura Geller**

On December 13, 2016, the Debtors acquired 100% of the outstanding stock of Laura Geller Holdings, LLC and its wholly owned subsidiaries, Laura Geller Brands, LLC and Laura Geller Beauty, LLC (collectively, "**Laura Geller**"). Originally founded in 1993 as part of the QVC home shopping channel, Laura Geller is a distributor of high quality beauty and personal care products for women, with customers throughout the United States, the United Kingdom, Germany and Australia. Laura Geller has been a highly regarded prestige makeup artist brand and offers a full suite of products, including face products (which include the award-winning Sparkle® collection of primers), eye products, lip products, "kits," and palettes. While

the Debtors sold Laura Geller cosmetic products in retail stores, through e-commerce companies and over the company's website, Laura Geller sales were primarily concentrated at the QVC broadcast shopping network and the wholesale retailer Ulta Salon, Cosmetics & Fragrance, Inc.

### (ii)   Julep

On December 20, 2016, a week after closing the Laura Geller acquisition, the Debtors acquired 100% of the outstanding stock of Julep Beauty, Inc. ("**Julep**"). Founded in 2007 by Jane Park, Julep is a Seattle-based wholesale distributor and online retailer of high-end nail polish, skincare and other cosmetic products. Julep also operated three boutique nail salons (known as "parlors") in the greater Seattle area. Julep operated the largest share of the Debtors' direct-to-consumer presence. Although direct-to-consumer sales constituted a relatively smaller portion of the Debtors' overall business operations, the Debtors were able to expand their brand recognition and attract additional customers through subscriptions, loyalty programs, the Debtors' online store and their nail salons. These channels enabled the Debtors to foster direct relationships with customers, increase consumer trust in the Debtors' brands and display a broader range of products to potential customers than might ordinarily be offered in department stores or on third party operated e-commerce sites.

For example, the Debtors offered a subscription program through Julep's website: "My Maven," where customers received a monthly Julep Beauty Box containing over $40 worth of new beauty, skincare and/or limited-run nail colors. The Debtors offered similar programs in connection with their nail salon parlors where customers could sign up for monthly membership packages to enjoy manicures, pedicures, facials and other spa-related services. The Debtors also maintained gift card, loyalty rewards and other customer programs with respect to Julep's website and nail parlor businesses.

### (iii)   Clark's

On January 19, 2017, approximately one month after the Debtors' acquisitions of Laura Geller and Julep, the Debtors acquired 100% of the outstanding stock of Clark's Botanicals, Inc. ("**Clark's**"), a New York-based manufacturer of luxury skincare products, including cleansers, moisturizers, serums, eye care, masks and scrubs. The company's products — which were primarily sold through its website, Amazon, QVC, and Space NK, a specialty beauty products retailer in the UK — derive from natural, botanical resources.

The Debtors were historically intertwined in many respects, including sharing certain executive management personnel, cash management/financing operations, legal, human resources and IT services.

### (c)   Key Products.

Each of the Debtors' brands featured distinct signature products. Laura Geller was known for its high quality "baked" products and offers a full suite of makeup products, including face products, eye products, lip products, "kits" and palettes. Julep was a wholesale distributor and online retailer of high-end nail polish, skincare and other cosmetic products. Clark's Botanicals focused on skincare, including cleansers, moisturizers, serums, eye care, masks and scrubs.

(d)    **Debtors' Supply Chain.**

The Debtors had a global footprint and delivered goods to a broad wholesale and retail customer base. Because the Debtors did not manufacture their own products, they were highly dependent on their vendor base and third party logistics providers. The Debtors' business was predicated on timeliness, efficiency and synchronization, where one hiccup could derail the entire interdependent manufacturing and distribution process. Generally, the Debtors' supply chain was comprised of several integral stages, which included: *first*, identifying third party beauty and personal care product formulas initially developed by contract manufacturers and customizing them for their own brands; *second*, ordering custom componentry (tubes, compacts, brushes, etc.) from suppliers; *third*, shipping the components to the contract manufacturers who own the formulas and mix, assemble, blend, or otherwise produce the Debtors' custom products and fill the Debtors' componentry; and *fourth*, transporting the assembled products to third party logistics providers to store, package and ship the products to the Debtors' customers. A more detailed summary of the Debtors' supply chain is below.

*Stage 1: Formula Development and Purchase Orders*: The Debtors' product development team, in consultation with third party contract manufacturers, designed and developed a formula for a specific product. The Debtors then issued purchase orders with various componentry suppliers and contract manufacturers to manufacture the Debtors' products, following an extensive, multi-stage internal vetting process that forecasted the quantity, costs, margins and timing needs for the Debtors' new and existing product lines. The Debtors placed purchase orders to componentry suppliers and contract manufacturers up to twelve months in advance of the products ultimately reaching their customers. The purchase orders considered customers' expressed forecasts; however, the Debtors determined the quantities to order based on internal projections and historical sales information. Customers did not place orders until a few weeks before products actually arrived on their shelves.

*Stage 2*: *Componentry Suppliers*: The Debtors issued purchase orders with various domestic and international suppliers (the "**Componentry Suppliers**") who manufactured the basic components that held the Debtors' beauty products. Such components included, among others, tubes, sticks, bottles, compacts, pumps, containers, jars, cartons and kits – all customized to meet the Debtors' exact product specifications. The suppliers then shipped the componentry to the contract manufacturers to assemble the finished products.

*Stage 3: Contract Manufacturers:* Cosmetic contract manufacturers (the "**Contract Manufacturers**") played multiple roles in the Debtors' distribution process. At the outset, the Contact Manufacturers, who owned the underlying formulas to the Debtors' cosmetic products, assisted the Debtors in developing a customized formula for a specific product. Later in the process, once the components had been manufactured by the Componentry Suppliers, the Contract Manufacturers would store componentry inventory in their warehouses and finalize the Debtors' products through a variety of services, including quality control testing, "filling" (i.e., using machines to fill tubes, jars, and bottles with liquid or powder based on the underlying formula), and/or packaging services.

*Stage 4: Third Party Logistics Providers:* Once assembled by the Contract Manufacturers, the final products were transported to various third party logistics providers that

would conduct a variety of services, including product labeling, assembling product "kits" and packaging the products into containers to be shipped to the Debtors' customers.  In instances where the Debtors ordered an excess amount of products above what is ultimately ordered by their primary customers, the products remained in inventory at the third party logistics providers until the Debtors were able to sell them to customers.

### 3.2    *The Debtors' Prepetition Capital Structure*.

Prior to the Petition Date, Debtor Glansaol Management, LLC (the "**Parent Borrower**"), and Debtors Clark's Botanicals, Inc., Julep Beauty, Inc., Laura Geller Holdings, LLC, Laura Geller Beauty, LLC and Laura Geller Brands, LLC, as borrowers, and Debtor Glansaol Holdings Inc., as guarantor, entered into that certain Credit Agreement, dated as of April 21, 2017 (as amended, restated or otherwise modified, the "**Prepetition Credit Agreement**"), secured by substantially all of the Debtors' assets, with certain lenders and SunTrust Bank as Prepetition Agent.  Under the Prepetition Credit Agreement, the Parent Borrower and borrowers had access to a $20,000,000 senior secured asset-based revolving credit facility (the "**Prepetition Secured Credit Facility**").  As of the Petition Date, the Debtors had approximately $7,200,000 in aggregate principal and accrued and unpaid interest owing under the Prepetition Secured Credit Facility.

In addition to the obligations under the Prepetition Secured Credit Facility, the Debtors had approximately $11.3 million in unpaid trade and other ordinary course obligations as of the Petition Date.

Furthermore, as is customary for a company of the Debtors' size, the Debtors were party to a series of ordinary course Intercompany Claims resulting in various intercompany balances, claims and obligations.  However, for purposes of the Plan, all intercompany balances are cancelled and resolved as part of the Global Settlement.  Furthermore, Intercompany Claims will be recharacterized as equity to avoid dilution of the claims of unsecured creditors.

On the Petition Date, Warburg Pincus Private Equity XII Funds held in excess of 95% of the equity in Debtor Glansaol LLC, the Debtors' ultimate parent company.

### ARTICLE 4

### EVENTS LEADING TO CHAPTER 11 FILING

Despite the popularity of the Debtors' underlying brands and management's best efforts to stabilize operations, the Debtors' business performance significantly declined in recent years.  Several factors contributed to the Debtors' recent struggles.

*First*, the Debtors faced the same macro retail market trends that have impacted other consumer products distributors over the last several years, including a general shift away from brick-and-mortar shopping, evolving consumer demographics and changing trends.  Because a substantial portion of the Debtors' profits derive from broadcast shopping networks and wholesale distribution, the Debtors felt the pain of their most significant customers — large retailers and QVC — which, in turn, had a detrimental effect on the bottom line.  Because the Debtors historically relied on their major customers' projections of future demand, which

ultimately proved overly optimistic, the Debtors suffered through a steep and unanticipated cutback in orders. This issue was compounded by the fact that the Debtors' customer base is highly concentrated: their top two customers account for over 60% of the Debtors' total receivables. Similarly, Laura Geller's top ten customers, alone, represent approximately 90% of the brand's total sales.

*Second*, the Debtors were unable to replace key revenue generators due to: (a) the increasingly competitive industry landscape coinciding with the downturn in the brick and mortar retail sector; (b) the decline in broadcast shopping network sales; and (c) the downturn of the Debtors' single-brand subscription business, which faces competition from new entrants that offer subscriptions covering a variety of brands.

*Third*, the decline in sales saddled the Debtors with a significant oversupply of inventory, which forced the Debtors to sell goods at steep markdowns and destroy certain products, further tightening margins and draining liquidity. Oversupply of inventory, coupled with higher returns and chargebacks, also significantly increased the Debtors' costs for warehouses and other third party logistics providers.

*Fourth*, the Debtors' reduced revenue stream was incapable of sustaining operations after accounting for the substantial amount of chargebacks issued by the Debtors' customers, which are netted against — and significantly reduce — the Debtors' accounts receivable. As is common in the industry, the Debtors provide certain of their customers with allowances for markdowns, returns, testers, damages, discounts and cooperative marketing programs (collectively, the "**Chargebacks**"). These programs are dictated in part or in whole by the wholesale customers' legacy shipping and billing guidelines, which shift the entire inventory risk to the Debtors. If the Debtors' customers fail to sell the products they ordered to end-users, they generally have the right to return the products back to the Debtors at cost. In fact, the Debtors' wholesale customers typically do not remit payment on the Debtors' receivables until the Debtors agree to the customers' proposed Chargebacks. Given the Debtors' diminished sales and substantial Chargebacks, maintaining free cash flow has been a challenge.

*Fifth*, the Debtors were never able to achieve significant cost savings related to shared services among their brands. Upon the Debtors' acquisitions of Laura Geller, Julep and Clark's in 2016, the plan was to ultimately consolidate shared services, including supply chain, senior management, administrative support, human resources, information technology support, accounting, finance and legal services. The brands started this process but were never fully integrated. Instead, the Debtors were saddled with a substantial legacy investment in a new ERP system, which was put into place ahead of cross-organizational efficiency initiatives and right-sizing functionality. Accordingly, the cost savings attributed to synergies, which had been a pillar of the Debtors' original business model, were never realized.

## ARTICLE 5

## DESCRIPTION AND HISTORY OF CHAPTER 11 CASES

The following is a brief description of certain significant events that have occurred during the pendency of the Chapter 11 Cases.

### 5.1    *General Case Background.*

On December 19, 2018 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  On December 20, 2018, the Bankruptcy Court entered an order [Docket No. 16] authorizing the joint administration of the Chapter 11 Cases, for procedural purposes only, under Case No. 18-14108.  The Honorable Michael E. Wiles is presiding over the Chapter 11 Cases.  The Debtors continue to operate their business and manage their properties as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  On December 28, 2018, a statutory committee of unsecured creditors was appointed in these cases.

### 5.2    *Retention of Professionals.*

To assist them in carrying out their duties as debtors in possession, and to otherwise represent their interests in the Chapter 11 Cases, on December 31, 2018, the Debtors filed applications with the Bankruptcy Court seeking to retain Willkie Farr & Gallagher LLP ("**WF&G**") as restructuring counsel [Docket No. 51] and Emerald Capital Advisors ("**Emerald**") as financial advisor [Docket No. 50].  On January 22, 2019, the Bankruptcy Court approved WF&G's [Docket No. 108] and Emerald's [Docket No. 119] retention.

In addition, on the Petition Date, the Debtors filed with the Bankruptcy Court an application seeking entry of an order, pursuant to 28 U.S.C. § 156(c), authorizing the Debtors to retain Omni as the Debtors' claims and noticing agent [Docket No. 5], which was approved by the Bankruptcy Court on December 21, 2018 [Docket No. 28].  On December 31, 2018, the Debtors also filed an application with the Bankruptcy Court, pursuant to section 327(a) of the Bankruptcy Code, authorizing the Debtors to retain Omni as administrative agent for the Debtors [Docket No. 49], which was approved by the Bankruptcy Court on January 22, 2019 [Docket No. 109].

### 5.3    *Employment Obligations.*

On December 20, 2018, the Debtors filed with the Bankruptcy Court a motion for an order authorizing the Debtors to pay certain prepetition employee wage and benefit obligations [Docket No. 12] (the "**Employee Wage Motion**").  In the Employee Wage Motion, the Debtors requested, among other things, the ability to satisfy certain of their prepetition obligations to their current employees, reimburse employees for prepetition travel and other business expenses that were incurred on behalf of the Debtors, pay prepetition payroll-related taxes and withholdings associated with the Debtors' employee wage claims and employee benefit obligations and other similar tax obligations and to continue any employee benefit programs in place as of the Petition Date (including satisfying any prepetition obligations associated with such programs).  On January 22, 2019, the Bankruptcy Court entered an order granting final approval of the Employee Wage Motion [Docket No. 112].

### 5.4    *Continuing Vendor Relations.*

In the ordinary course of their business, the Debtors regularly incur obligations to vendors, suppliers and service providers in the United States and abroad.  Accordingly, on the Petition Date, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order

authorizing the Debtors to pay, in the ordinary course of business, prepetition claims of certain critical vendors and foreign creditors [Docket No. 14] (the "**Critical Vendors Motion**"). On December 21, 2018 and January 22, 2019, the Bankruptcy Court entered orders granting interim and final approval of the Critical Vendors Motion, respectively [Docket Nos. 32 and 113].

In addition, to preserve their business relationships with their wholesalers and other business partners, on December 21, 2018, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order authorizing the payment of chargebacks, discounts, credits, subscriptions and other customer programs in the ordinary course of the Debtors' business [Docket No. 8] (the "**Customer Programs Motion**"). On December 21, 2018 and January 22, 2019, the Bankruptcy Court entered orders granting interim and final approval of the Customer Programs Motion, respectively [Docket Nos. 31 and 111].

### 5.5    *Warehouse and Common Carrier.*

In the ordinary course of their business, the Debtors regularly transact with common carriers, warehouse providers and freight forwarders that are essential to the Debtors' supply chain operations. Accordingly, on the Petition Date, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order authorizing the Debtors to pay, in the ordinary course of business, prepetition claims of certain service providers [Docket No. 13] (the "**Common Carrier Motion**"). On December 21, 2018 and January 22, 2019, the Bankruptcy Court entered orders granting interim and final approval of the Common Carrier Motion, respectively [Docket Nos. 29 and 115].

### 5.6    *Cash Management System.*

The Debtors believe it would have been disruptive to their operations if they were forced to change significantly their cash management system upon the commencement of the Chapter 11 Cases. Accordingly, on December 20, 2018, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order authorizing the Debtors to maintain their current cash management system [Docket No. 9] (the "**Cash Management Motion**"). On December 21, 2018 and January 22, 2019, the Bankruptcy Court entered orders granting interim and final approval of the Cash Management Motion, respectively [Docket Nos. 34 and 110].

### 5.7    *Tax Motion.*

On December 20, 2018, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order authorizing them to pay various prepetition sales and use taxes, franchise taxes and other taxes to various federal, state, local and foreign authorities, and certain licensing, permitting and regulatory fees to certain federal, state, local and foreign government agencies on a periodic basis, in each case, as and when such obligations become due [Docket No. 7] (the "**Tax Motion**"). On December 21, 2018 and January 22, 2019, the Bankruptcy Court entered orders granting interim and final approval of the Tax Motion [Docket Nos. 30 and 114].

### 5.8    *Schedules and Statements.*

By order of the Bankruptcy Court dated December 21, 2018 [Docket No. 27], the Debtors obtained an extension of time to file their Schedules of Assets and Liabilities and

Statements of Financial Affairs (collectively, the "**Schedules**") until January 22, 2019. On January 22 and 23, 2019, each Debtor filed its Schedules with the Bankruptcy Court. The Schedules are available electronically free of charge at http://www.omni.com/Glansaol.

### 5.9    *Bar Dates.*

On January 29, 2019, the Bankruptcy Court entered an order [Docket No. 150] (the "**Bar Date Order**") establishing the deadlines (each, a "**Bar Date**") for filing proofs of certain claims against the Debtors that arose on or prior to the Petition Date and approving the form and manner of notice of each Bar Date. The Bar Date Order fixed 5:00 p.m. (prevailing Eastern Time) on March 8, 2019 as the Bar Date to file proofs of claim for all creditors other than governmental units, and June 17, 2019 as the Bar Date for governmental units.

On June 12, 2019, the Debtors filed a motion [Docket No. 350] seeking to establish 5:00 p.m. (prevailing Eastern Time) on July 20, 2019 (the "**Domestic Administrative Bar Date**") and July 29, 2019 (the "**Foreign Administrative Bar Date**" and together with the Domestic Administrative Bar Date, the "**Administrative Bar Dates**") as the deadlines for domestic and foreign creditors respectively to file proofs of claims of administrative expenses pursuant to section 503 of the Bankruptcy Code that arose after the Petition Date and prior to June 29, 2019. Should the Court enter an order approving the Administrative Bar Dates, these will be the last dates on which creditors may file claims for Administrative Expenses arising after the Petition Date and prior to June 29, 2019.

Pursuant to the terms of the Plan, the deadline to file proofs of claims for administrative expenses pursuant to section 503 of the Bankruptcy Code arising after June 29, 2019 shall be thirty (30) days after service of notice of the Effective Date.

### 5.10    *Use of Cash Collateral and Approval of the DIP Facility.*

On December 21, 2018, the Bankruptcy Court entered an interim order [Docket No. 24] approving, on an interim basis, (a) the Debtors' use of cash collateral, and (b) the Debtors' senior secured debtor-in-possession financing facility (the "**DIP Facility**"). On January 25, 2019, the Bankruptcy Court entered an order [Docket No. 142] approving the DIP Facility and the Debtors' use of cash collateral on a final basis.

### 5.11    *Appointment of a Creditors' Committee.*

The Official Committee of Unsecured Creditors was appointed by the United States Trustee pursuant to section 1102(a)(1) of the Bankruptcy Code on December 28, 2018 to represent the interests of the Debtors' unsecured creditors [Docket No. 64]. On January 16, 2019, the Committee filed with the Bankruptcy Court applications seeking entry of an order authorizing the Committee to retain Arent Fox LLP as counsel [Docket No. 93], which the Bankruptcy Court approved on January 30, 2019 [Docket No. 155]. Further, on January 25, 2019, the Committee filed with the Bankruptcy Court an application seeking entry of an order authorizing the Committee to retain CBIZ Accounting, Tax and Advisory of New York, LLC as financial advisor [Docket No. 141], which was approved on February 7, 2019 [Docket No. 179].

The current members of the Committee are set forth below:[5]

1.  Integrated Packaging Industries, Inc.
    45 Carey Avenue
    Butler, New Jersey 07405
    Attention: Keith F. Traub

2.  Hwasung Cosmetics
    216, Oksan-Ro, Bucheon-SI
    Kyunggi-Do, Korea (Postal Code 14521)
    Attention: Jason Choi

3.  World Wide Packaging, LLC
    15 Vreeland Road
    Florham Park, New Jersey 07932
    Attention: Barry Freda

4.  MYC Packaging America Co., Limited
    38 West 21st Street
    New York, New York 10010
    Attention: Olivier Juguet

**5.12**   *Section 341 Meeting.*

On February 5, 2019, the United States Trustee held a meeting of creditors pursuant to section 341(a) of the Bankruptcy Code.

**5.13**   *Sale Process.*

On December 20, 2018, the Debtors filed the *Motion of Debtors for Orders: (I)(A) Authorizing and Approving Bid Procedures in Connection With Sale of Substantially All of the Debtors' Assets, (B) Authorizing and Approving Bid Protections, (C) Scheduling Related Auction and Hearing to Consider Approval of Sale, (D) Approving Procedures Related to Assumption and Assignment of Executory Contracts and Unexpired Leases, (E) Approving Form and Manner of Notice Thereof, and (F) Granting Related Relief; and (II)(A) Authorizing and Approving Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests, (B) Authorizing and Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (C) Granting Related Relief* [Docket No. 15] (the "**Sale Motion**") seeking approval of the sale of substantially all of the Debtors' assets for a purchase price of $16.218 million.

The Debtors subsequently informed the Bankruptcy Court that the Stalking Horse Bidder had increased its bid to $18 million.  On January 18, 2019, the Bankruptcy Court entered

---

5     In addition to the members listed herein, Mana Products Inc. was originally appointed to the Committee and subsequently resigned on May 2, 2019.  The United States Trustee did not thereafter reconstitute the Committee.

an order (the "**Bid Procedures Order**") approving the Debtors' bid procedures (the "**Bid Procedures**"), as set forth in the Sale Motion [Docket No. 104]. The Bid Procedures Order set forth, among other things, customary procedures for parties to access due diligence, the manner in which Potential Bidders (as defined in the Sale Motion) and bids became "qualified," the procedures for receipt and negotiation of competing bids and provided an adequate period of time for the submission of competing bids, the conduct of an auction (if any), the selection and approval of the ultimately successful bidder and related deadlines, all while offering adequate flexibility for potential bidders to submit a bid for all or part of the assets proposed to be sold.

The deadline to submit a Qualified Bid (as defined in the Bid Procedures Order) was January 25, 2019 at 5:00 p.m. (prevailing Eastern Time) (the "**Original Bid Deadline**"), however, in order to ensure that all value maximizing bids had been received, the Debtors, after consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), extended the Original Bid Deadline to January 28, 2019 at 5:00 p.m. (prevailing Eastern Time) (the "**Extended Bid Deadline**"). Prior to the expiration of the Extended Bid Deadline, only two bids were timely submitted to the Debtors (in addition to the Stalking Horse Bid). Following a thorough review of the bids, the Debtors, in consultation with the Committee, and their financial and legal advisors, determined in their business judgment that neither of the competing bids qualified as a Qualified Bid. Accordingly, pursuant to the Bid Procedures Order, the Debtors did not hold an auction and the Stalking Horse Purchaser was deemed the Successful Bidder on the Extended Bid Deadline.

On January 30, 2019, the Debtors filed the *Notice of Successful Bidder and Assumption and Assignment of Certain Purchased Contracts* [Docket No. 156].

Following a hearing on January 31, 2019, the Bankruptcy Court entered an order approving the Sale Motion [Docket No. 165] on February 1, 2019. The sale of the Debtors' assets closed on February 6, 2019, and the Debtors are currently in the process of winding down their estates.

### 5.14    *Filing of the Debtors' Initial Plan and Disclosure Statement*

Pursuant to the terms of the agreement read into the record at the hearing held on January 23, 2019, and the order of the Bankruptcy Court entered on January 30, 2019 approving the agreement [Docket No. 153], the Debtors were required to file their plan of liquidation and corresponding disclosure statement by March 1, 2019, or lose the exclusive right to file a chapter 11 plan pursuant to section 1121(b) of the Bankruptcy Code . Pursuant to this agreement, the Debtors filed an initial version of the Plan and Disclosure Statement on March 1, 2019, noting that both were filed as placeholders, and were to be subject to ongoing negotiations and revisions (the "**Original Plan**").

### 5.15    *Filing of the Debtors' Exclusivity Motion*

On April 1, 2019, the Debtors filed the *Debtors' Motion for Order Extending Debtors' Exclusive Periods to File Chapter 11 Plan and Solicit Acceptances Thereof Pursuant to Section 1121(d) of the Bankruptcy Code* [Docket No. 268]. Through this motion, the Debtors are seeking to extend the exclusive period in which the Debtors may file a chapter 11 plan to June

17, 2019, and the exclusive period in which the Debtors may solicit acceptances of a plan to August 16, 2019.

### 5.16   *California Wage and PAGA Action*

On April 18, 2018, Victoria Rowe ("**Rowe**"), individually and on behalf of other similarly situated individuals (the "**Alleged Rowe Class**" and, together with Rowe, the "**Rowe Group**"), commenced a class action in the Superior Court of California, County of Los Angeles (the "**CA Court**"), Case No. BC702685 (the "**Rowe Action**"). The Rowe Group alleges that the Debtor Laura Geller Beauty, LLC and various unnamed defendants (collectively, the "**CA Defendants**") performed certain unfair competition business practices and violated various provisions of the California Labor Code by: (i) misclassifying the Rowe Group as independent contractors rather than as hourly employees; (ii) willfully withholding outstanding wages after the Rowe Group ceased working for the CA Defendants; (iii) not permitting the Rowe Group to take meal or rest breaks; (iv) failing to provide the Rowe Group with wage statements; and (v) not reimbursing the Rowe Group for travel expenses. The Rowe Group also asserts that the CA Defendants' alleged violations of the California Labor Code also form the basis for penalties under the California Private Attorney General Act ("**PAGA Penalties**"). Discovery in the Rowe Action has yet to begin and the action has been stayed since the commencement of these Chapter 11 Cases.

On March 12, 2019, the Rowe Group filed a total of eighteen proofs of claim (collectively, the "**Rowe Claims**") consisting of six groups of duplicative claims filed against six of the Debtors: Glansaol LLC; Glansaol Holdings Inc.; Glansaol Management LLC; Laura Geller Beauty, LLC; Laura Geller Brands, LLC; and Laura Geller Holdings, LLC. The Rowe Claims assert the following against each of these six Debtors: (i) a general unsecured claim in the amount of $40,484.09 on account of Rowe's alleged individual claims; (ii) a general unsecured claim of $2,489,400.46 and a priority unsecured claim of $245,142.85 on account of the Alleged Rowe Class's alleged claims; and (iii) a general unsecured claim of $772,223.31 on account of the alleged PAGA Penalties. Ignoring the duplicative claims, the Rowe Claims assert an aggregate total of $3,302,107.86 in General Unsecured Claims and $245,142.85 in Priority Non-Tax Claims.

On May 8, 2019, the Rowe Group filed a motion seeking leave to file a class proof of claim on account of the Alleged Rowe Class's alleged claims, or in the alternative, establishment of a process for collective adjudication of the Alleged Rowe Class's alleged claims. A hearing on this motion has been scheduled for June 20, 2019.

The Debtors and the Committee believe that the Rowe Action and Rowe Claims are without merit and intend to object to Allowance of the Rowe Claims for numerous reasons. To the extent the Rowe Claims are Allowed against any of the Debtors against which they are asserted, the size of the Claims pool at such Debtor would increase substantially, resulting in significantly diluted recoveries to holders of Claims at such Debtor.

### 5.17    *Jane Park Claims*

Jane Park, the founder and former owner of Julep Beauty, Inc., has filed proofs of claim against Debtors Julep Beauty, Inc., Glansaol LLC, Glansaol Holdings, Inc., and Glansaol Management LLC based on (i) certain alleged corporate reimbursement obligations of Julep Beauty, Inc. in the approximate amount of $85,000.00, (ii) alleged severance obligations of Julep Beauty, Inc. in the approximate amount of $150,000.00, and (iii) unliquidated amounts against all of the aforementioned Debtors based on certain alleged discrimination, misconduct, and fraudulent inducement related to her sale of the Julep Beauty, Inc. business in 2016. The Debtors believe that Jane Park's allegations regarding discrimination, misconduct, and fraudulent inducement are without merit and are evaluating the validity of her remaining filed proofs of claim. Jane Park also owes certain amounts to the Debtors arising from the Jane Park Promissory Note. The Debtors are currently engaged in settlement negotiations with Jane Park, the outcome of which may affect Distributions under the Plan.

## ARTICLE 6

## THE GLOBAL SETTLEMENT

Throughout these Chapter 11 Cases, the Debtors have strived to work cooperatively with their key stakeholders in seeking an expeditious and value-maximizing path out of bankruptcy. The Debtors believe that it was in the best interest of all parties to move forward with a consensual liquidation plan to ensure the greatest recovery to all stakeholders in these cases.

After closing the Sale on February 6, 2019, the Debtors embarked on an extensive, multi-track negotiation process with their key stakeholders, including the Committee, the United States Trustee and the Sponsor to develop a confirmable chapter 11 plan that maximizes the value of the estates. On March 1, 2019, the Debtors filed the Original Plan and Disclosure Statement, noting that both were filed as placeholders, and were to be subject to ongoing negotiations and revisions. Subsequent to the filing of the Original Plan and Disclosure Statement, the Debtors continued negotiating with their key stakeholders with the goal of achieving consensus. These negotiations ultimately resulted in the Global Settlement among the Debtors, the Committee and the Sponsor, which compromised and settled numerous inter-Debtor and creditor-Debtor issues and resolved potential litigation and Claims against the Debtors and the Sponsor in connection with these Chapter 11 Cases. The Global Settlement represents a series of linked concessions by the parties and will be implemented through the recoveries and allocations provided for in the Plan. The Global Settlement does not seek to adjudicate the disputed issues, but rather the Global Settlement removes risk, provides certainty, and avoids the massive costs and delays of litigating such disputed issues as part of confirmation and post-Effective Date while enhancing recoveries to holders of General Unsecured Claims. The Debtors, the Committee, and the Sponsor believe that the Global Settlement is well within the range of reasonableness, satisfies Bankruptcy Rule 9019, and is in the best interests of the Debtors, their Estates, their creditors, and all parties in interest.

The Global Settlement provides for, among other things:

1. payment on the Effective Date in Cash of the Sponsor Settlement Amount in the amount of $1,650,000 to settle potential litigation claims against the Sponsor and the Debtors' directors and officers, as described in detail below;

2. resolution of the validity and enforceability of certain disputed Intercompany Claims;

3. waiver of Distributions under the Plan on account of Existing Interests of Debtor Glansaol LLC and redistribution of Distributions on account of Existing Interests in the other Debtors, if any, in accordance with the Allocation Schedule;

4. allocation of the Plan Funding in accordance with the Allocation Schedule (as described below) for distribution to creditors;

5. waiver and release of Avoidance Actions;

6. selection and appointment of the Plan Administrator by the Committee, upon consent of the Debtors (which consent cannot be unreasonably withheld), to conduct the Wind Down and implement the Plan;

7. the Committee's support of the Plan and encouragement of general unsecured creditors to vote in favor of the Plan through the Committee Support Letter;

8. the Sponsor's support of the Plan and agreement not to take any action inconsistent with the Plan;

9. Debtor Releases of the Released Parties; and

10. Third Party Releases of the Debtors' equity holders.  For the avoidance of doubt, the Global Settlement does not resolve or in any way release or alter the Debtors' claims to the outstanding amounts owed to the Debtors under the Jane Park Promissory Note. For the avoidance of doubt, the Debtors reserve their right to seek approval from the Bankruptcy Court to grant the Third Party Releases, solely as they relate to Jane Park, on a non-consensual basis, in the event Jane Park refuses to consensually releases her claims against the Released Parties.  As of the date of this Disclosure Statement, the Bankruptcy Court has not ruled on any non-consensual Third Party Release by Jane Park.

The Debtors are seeking approval of the Global Settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code through the Bankruptcy Court's entry of the Confirmation Order, including findings that, among other things, the compromises and settlements under the Plan, including the Global Settlement, are in the best interests of the Debtors, their Estates, their creditors and other parties in interest and are fair, equitable and well within the range of reasonableness.

### 6.1    *Overview of Issues Resolved in the Global Settlement*

The parties considered and analyzed numerous factors in determining to enter into the Global Settlement.  The primary disputes settled under the Global Settlement and the factors and considerations of the parties in determining to settle such disputes are described below.

### (a)    **The Sponsor Funding Letter**

During the course of these Chapter 11 Cases, the Committee reviewed and analyzed available information, including the Debtors' board minutes, presentations to directors, prepetition financing agreements, prepetition sale transaction documents, financial statements, tax returns and other related and available documents.  Through that process, the Committee focused on a letter dated May 4, 2018 (the "**Sponsor Letter**") pursuant to which the Committee alleges the Sponsor agreed to fund Glansaol Management LLC and its Debtor subsidiaries with up to $25 million to the extent needed so that Glansaol Management LLC and its Debtor subsidiaries could meet their financial obligations through May 31, 2019.  Prior to the Petition Date, the Sponsor funded approximately $12 million to Glansaol Management LLC.

The Committee believes the Sponsor Letter may give rise to certain direct claims and causes of action of the Debtors against the Sponsor, including breach of contract and related claims under New York law.  In addition, the Committee also believes the Debtors may be possess potential breach of fiduciary duty claims against the Debtors' current and former directors and officers to the extent they failed to seek to enforce the Sponsor Letter against the Sponsor.  The Debtors disagree with the Committee, but recognizing the potential for conflicts allowed the Committee to analyze the claims and engage in a direct dialogue with the Sponsor.

To assess the viability, enforceability, value, and risks associated with such claims, the Committee and its professionals reviewed and analyzed available information including prepetition documents, the Debtors' organizational documents, various agreements and applicable law.  For example, the Committee considered the nature of the Sponsor Letter, whether or not any demand was made upon the Sponsor to honor the Sponsor Letter and whether the Sponsor Letter was an enforceable contract under applicable New York contract law.  Related, the Committee analyzed the ability to identify and prove damages arising from the Sponsor Letter.  After doing so, while the Committee believes there are likely valid claims, the Committee simultaneously recognizes the potential weaknesses in the claims, including the challenges in demonstrating and identifying the damages arising from the Sponsor Letter, issues related to whether the Sponsor breached its agreement if Glansaol Management LLC and its subsidiaries never requested the funding, and the Sponsor's vigorous contentions that the Sponsor Letter did not give rise to a contractual obligation.

In connection with claims against the Debtors' officers and directors arising from any failure to enforce the Sponsor Letter, the Committee evaluated the necessary elements to prove breaches of fiduciary duties under applicable law in the Debtors' various states of organization (including Delaware, New York, and Washington).  Thus, the Committee conducted a review of the Debtors' organizational documents, some of which purported to waive certain fiduciary duties and other liabilities against directors, management and/or officers (depending on the Debtor) and provide indemnification, as well as the Debtors' management

liability insurance policy.  Further, the Committee considered the costs, delays and uncertainty associated with a contested confirmation process and extended litigation related to the Sponsor Letter, as well as the ability to collect on any successful actions, under the management liability policy or otherwise.

The Committee believes that certain breach of fiduciary claims that were not waived by the Debtors under the operating agreements, may be available for the Debtors to pursue.  For example, in certain cases, the duty of loyalty was not waived and, in other cases, certain fiduciary duties were waived as to managers and members but not directors.  In addition, claims for breach of duty of good faith and fair dealing could be pursued even if a waiver occurred.  However, after conducting its analyses, the Committee also appreciates the difficulty in proving breach of fiduciary duties generally and under these specific circumstances, as well as challenges associated with collecting from individuals and from any insurance policy.  For example, in the event bad faith or intentional misconduct are components of the claims, such facts may undermine the availability of insurance proceeds.  The Debtors' insurance policy was for $5 million, which would likely have been fully utilized in defending such claims.

After the Committee raised its concerns regarding the Sponsor Letter with the Debtors and the Sponsor, the Debtors and their advisors analyzed the Sponsor Letter and concluded that it is unlikely that that the estates would prevail if they were to litigate  potential claims against the Sponsor and the Debtors' current and former officers and directors arising from the Sponsor Letter given the lack of consideration in the letter, the lack of a counter party and the lack of a firm commitment in the letter.  Moreover, the Debtors vigorously dispute that any of the Debtors' former or current directors or officers breached any duty owed to the company.  The Debtors, however, recognized that, given their corporate governance structure and potential conflicts with the Sponsor, that it would be difficult for the Debtors to resolve any issues or claims that may arise out of the Sponsor Letter without the express support of the Committee.  To that end, on March 7, 2019, the Debtors hosted a meeting with the Committee and Sponsor during which the Debtors urged the Committee to engage directly with the Sponsor in a direct dialogue to try to resolve any and all claims related to the Sponsor Letter.

In response to the Committee's allegations, the Sponsor argued that the Sponsor Letter was not a binding, enforceable contract because there was no consideration provided by the Debtors in exchange for the alleged promises made in the Sponsor Letter.  In addition, the Sponsor took the position that, even if the Sponsor Letter was a valid contract, the Sponsor could not have breached it because it was never asked by the Debtors to provide additional funds under the Sponsor Letter.  Finally, the Sponsor contended that, in any event, there could be no provable damages because additional funding would not be traceable to a better result given the Debtors' declining business.

Thereafter, the Committee and Sponsor engaged in several weeks of direct dialogue, which ultimately led to a settlement acceptable to the Debtors.  After extensive negotiations, the Sponsor agreed to pay the Estates the Sponsor Settlement Amount of $1.65 million in cash on the Effective Date in exchange for (a) the full settlement of the potential claims against the Sponsor and the directors and officers, (b) the Debtor Releases of the Released Parties, which include the Sponsor and the Debtors' directors officers, and (c) the Third Party

Releases of the Released Parties as contemplated in the Plan. After considering (a) the strength of the various claims, (b) the potential defenses to such claims, (c) the Debtors' organizational documents, some of which purported to waive claims against directors and officers, and the validity of such waivers under applicable law, (d) the Debtors' indemnification obligations (e) the uncertainty, delay and costs associated with protracted litigation and a highly contested plan confirmation process, and (f) uncertainties regarding available sources for recovery, including potential difficulties recovering from the Debtors' $5 million insurance policy and the directors and officers in their individual capacities, the Committee determined that a settlement with an upfront cash payment of $1.65 million was in the best interests of unsecured creditors. As a condition to providing the Sponsor Settlement Amount, the Sponsor informed the Debtors and the Committee that the payment was predicated on the complete finality and closure of these cases, including releases of directors and officers. Any litigation against directors and officers would likely involve the Sponsor in some capacity given their involvement in the Debtors and Sponsors' participation in the Debtors' board of directors. Without these releases the Sponsor stressed that there is no guarantee that they will contribute the Sponsor Settlement Amount to the Debtors' estates. The Debtors are not aware of any potential claims against directors and officers other than the potential claims related to the Sponsor Letter. Further, the Debtors believe the Sponsor's contribution of $1.65 million to the estates is critical to maximizing value for unsecured creditors and absent the Sponsor Settlement Amount, creditors will be entitled to a materially lower recovery. Accordingly, the Debtors and the Committee agreed to the releases of directors and officers as requested by the Sponsor.

### (b)    Intercompany Claims

Another issue that arose in the context of settlement negotiations between the Committee and the Sponsor related to the validity and enforceability of potential prepetition Intercompany Claims. The potential for a valid Intercompany Claim arose primarily as a result of the Debtors' internal accounting methods to track the Sponsor's equity infusions into the Debtors through Glansaol Management LLC and the daily borrowing from and sweeping of the Debtors' respective bank accounts under the Debtors' cash management system. If valid, the Intercompany Claims, after setoffs, would result in a $44 million net receivable in favor of Debtor Glansaol Management LLC, which would result in full recoveries for unsecured creditors of Glansaol Management LLC and potential equity value for the Sponsor while significantly reducing and potentially eliminating recoveries to unsecured creditors of Debtors Clark Botanicals, Inc., Julep Beauty Inc., and Laura Geller Beauty, LLC. The Sponsor's equity infusions, however, were never recorded or documented as debt. Moreover, the Debtors did not historically treat these Intercompany Claims as debt and did not list these obligations between Glansaol Management LLC and its Debtor subsidiaries as debt on the Debtors' filed Schedules. In line with these practices, the Debtors represented at the beginning of these Chapter 11 Cases that prepetition intercompany claims were minimal or non-existent. Given these facts, the Debtors and the Committee believe that, if litigated, certain of the Intercompany Claims would likely be recharacterized as equity, equitably subordinated or otherwise disallowed because, based on the foregoing, the Committee indicated to the Sponsor that it was prepared to challenge any assertion that the Intercompany Claims are valid and request that holders of Existing Interests waive Distributions under the Plan such that the Distributions, if any, would be reallocated to holders of General Unsecured Claims.

While the Debtors and the Committee believed that litigation seeking to recharacterize, subordinate or otherwise disallow the disputed Intercompany Claims would likely be successful under applicable law based on the factors discussed above, they also recognized that it would be costly and would require significant delays, which would risk significantly reducing any benefits achieved from a successful outcome.  The parties avoided the cost of litigation by providing through the Global Settlement that Glansaol Management LLC would waive any alleged right to a net receivable.  As part of the Global Settlement, the Debtors, the Sponsor and the Committee agreed that Distributions on account of Existing Interests, if any, would be waived and redistributed to creditors.

### (c)    Allocation of Proceeds

Because the Sale Transaction constituted a sale of substantially all assets of the Debtors as a group (other than Glansaol LLC) and not individually, another issue extensively discussed in the negotiations leading to the Global Settlement was how to allocate the Plan Funding and Sale Proceeds among the various Debtors.

The professionals for the Debtors and the Committee have worked diligently to derive an appropriate methodology for achieving an allocation that would result in the most accurate, fair and equitable Distributions to creditors of the respective Debtors.  The Professionals considered and tested numerous potential metrics commonly used in similar circumstances, including each Debtor's revenue, EBITDA, hard asset value (such as inventory and accounts receivable), shareholders' equity, and initial purchase price of the three brands.  Given that there is no exact formula to determine the allocation in these circumstances, there was no single metric that produced a definitively certain, fair, and equitable result.

Several metrics, including revenue and accounts payable produced disparate allocation outcomes, resulting in certain Debtors receiving disproportionately large allocations under some scenarios and disproportionately small (or zero) allocations under others.  In addition, the value of each Debtor's assets sold to the Purchaser was an impracticable metric under the circumstances because, while the valuation of certain hard asset classes such as inventory and accounts receivable can be estimated more easily, the valuation of other asset classes such as intellectual property and goodwill is a complex, uncertain, and costly exercise, often requiring retaining and compensating valuation experts.

After extensive analysis, the Debtors' Professionals, in consultation with the Committee's Professionals, determined that allocating the proceeds based on the initial purchase price the predecessor to Glansaol Management LLC paid for the individual Debtor brands presents an appropriate, accurate and equitable metric because it produces an outcome approximately equal to the average of the other metrics.  Further this methodology is similar to the most common valuation metric for non-EDITDA producing companies (that being revenue) but compensates for the fact that all companies (including the three Debtor operating entities) must be valued by utilizing different revenue multiples.  Given the recent consummation of those acquisitions, and the insignificant changes in operations since then, the Debtors and their professionals believe splitting the value in a ratio consistent with the initial acquisition prices (and taking into consideration the thorough due diligence performed by a very sophisticated acquirer) is the most accurate way to allocate value.

The Debtors and the Committee also extensively discussed which Debtors should receive Sale Proceeds and/or any settlement amount paid to the Estates by the Sponsor. The parties ultimately agreed that each of the Seller entities should receive some part of the allocation as set forth in the proposed Allocation Schedule, using the initial purchase price the predecessor to Glansaol Management LLC paid for each respective Debtor operating subsidiary, with an adjustment to account for the value provided by Glansaol Management on account of the shared services and general expertise of senior management, as well as the integration, legitimacy and synergies created by operating under a single entity. This decision was also informed by both the pre and post-petition Sale processes that proved these businesses were worth more together then apart (i.e. the sum of the parts was less than the whole). The Allocation Schedule addresses the allocation of Plan Funding among the Debtors and is intended to account for, among other things, the Debtors' respective asset values and the reconciliation as to the enforceability and validity of Intercompany Claims and waivers of distributions on account of Existing Interests discussed above.

Specifically, the Allocation Schedule allocates the Plan Funding according to the following methodology:

- The Sale Proceeds are split among the Debtors' operating entities – Laura Geller Beauty, LLC, Julep Beauty, Inc., and Clark's Botanicals, Inc., based on the initial purchase price of each entity. A percentage of the proceeds is then allocated to Glansaol Management LLC on account of the additional value that Glansaol Management LLC created and the fact that the three businesses are worth more when aggregated than in separated in a piecemeal fashion, as evidenced by both the prepetition and the postpetition sale processes.

- The DIP and DIP Lenders' fees are then subtracted from this amount.

- The adjusted allocable total is then adjusted to reflect post-petition events, culminating in the current cash balance.

- The current cash balance is then adjusted to reflect expected post-sale costs. These expected costs are allocated using percentages derived from the initial purchase price of the respective Debtor brands, with adjustments made to provide Glansaol Management fair value.

- Other Chapter 11 costs, including estimated Plan Administrator fees are then accounted for, further reducing the current cash balance.

- The Sponsor Settlement Amount is split among Laura Geller Beauty, LLC, Julep Beauty, Inc., Clark's Botanicals, Inc., and Glansaol Management LLC based on their respective percentages of the initial purchase prices, adjusted for the value allocated to Glansaol Management.

- Finally, all known Administrative Claims and Priority Claims are subtracted on a Debtor by Debtor basis, leaving a figure representing the

32

distributable amount for the recovery of General Unsecured Creditors from each individual Debtor.

- The Debtors' four non-operating entities, Glansaol Holdings, Inc., Glansaol LLC, Laura Geller Brands, LLC, and Laura Geller Holdings, LLC, are excluded from the Allocation Schedule because, according to the Debtors' Schedules, they held insignificant or no assets as of the Petition Date.

The Allocation Schedule resolves numerous issues that could be the subject of dispute among the parties, including (a) the allocation of various sources of funding to the various Debtors and therefore, the amounts available for Distributions to the creditors of each such Debtor, (b) resolution of validity and enforceability of the Intercompany Claims, and (c) the waiver of Distributions by holders of Existing Interests and the redistribution of such Distributions, if any, to General Unsecured Creditors.

### (d)    Avoidance Actions

Finally, the Global Settlement resolves issues related to the Estates' potential Avoidance Actions, which consist of actions to avoid preferential payments made to creditors within the 90 days prior to the Petition Date under section 547 of the Bankruptcy Code. In total, the Debtors made payments totaling approximately $12.6 million to approximately 150 creditors in the 90-day period prior to the filing.[6] However, the Debtors' and Committee's Professionals believe valid defenses under section 547, including the new value and other defenses, are likely to exist, which would reduce the potentially recoverable amounts, if the Plan Administrator were to pursue Avoidance Actions. Based on the available information, the Debtors estimate that potential recoveries if the Plan Administrator were to pursue Avoidance Actions would range between $200,000 and $400,000.

Based on this information, the Committee determined that it would be in the best interest of holders of General Unsecured Claims for the Estates' to waive the potential Avoidance Actions as part of the Plan. In making that determination, the Committee reviewed the potential defenses, including the new value defense and other defenses under section 547 of the Bankruptcy Code. The Committee further considered the costs of pursuing the Avoidance Actions, including attorneys' fees and filing costs. Those costs would be deducted from any recoverable amounts, thereby further reducing the proceeds of Avoidance Actions ultimately available to creditors. The Committee considered the delays associated with pursuing the Avoidance Actions as well as U.S. Trustee fees and other costs associated with keeping the Chapter 11 Cases open pending litigation and resolution of the Avoidance Actions. The Committee also recognized that well over half of the total unsecured creditor body may have been subject to an Avoidance Action and that as a result, pursuing Avoidance Actions would benefit a disproportionately small number of unsecured creditors while subjecting a majority of creditors to additional litigation.

---

[6]     Certain, but not all, members of the Committee are among such creditors and collectively comprise less than 10% of the Debtors' estimated recovery on the Avoidance Actions in their Liquidation Analysis.

Accordingly, after weighing the benefits of the Global Settlement against the possibility of recovering value through Avoidance Actions, the Debtors agreed to waive all Avoidance Actions under the Plan as part of the Global Settlement. The Plan also provides, however, for the Debtors' estates to retain their rights, including under section 502(d) of the Bankruptcy Code, to use the waived Avoidance Actions as a basis to object to all or any part of a Claim against the Estates asserted by a Holder which remains in possession of, or otherwise obtains the benefit of, an avoidable transfer. These defensive rights will be preserved for the Plan Administrator and will benefit the Estates and unsecured creditors by providing the Plan Administrator with additional means for reducing the Claims pool through Claim objections, thereby increasing recoveries to unsecured creditors.

### 6.2    *Benefits of the Global Settlement*

The benefits of the Global Settlement are numerous. The Plan Funding, supplemented by the funds received as a result of the Global Settlement along with the other compromises, concessions and settlements contained in the Global Settlement, substantially improves unsecured creditor recoveries, which are now estimated to be approximately **21**% on a consolidated basis, up from approximately **10**%. Individually, the recoveries of the Debtors are as follows: (i) Laura Geller Beauty, LLC recovery increased from 10% to 22%; (ii) Julep Beauty, Inc. increased from 6% to 21%; (iii) Clark's Botanicals, Inc. increases from 16% to 28%; and (iv) Glansaol Management increases from 7% to 18%. The Global Settlement provides certainty, finality and closure of these Chapter 11 Cases. It also allows the estates to preserve the net Sale Proceeds to distribute to creditors, rather than for funding litigation, while enhancing the Debtors' Cash by the Sponsor Settlement Amount. Moreover, the Global Settlement removes the uncertainty associated with challenging the Intercompany Claims and adjusts the claims pools at the Debtors. Critically, the Global Settlement will enable unsecured creditors, on account of their allowed unsecured claims, to realize Distributions from the Plan Funding within a certain time period after the Effective Date to avoid the uncertainty and risks of recoveries, if any, associated with post-Effective Date litigation as well as the additional costs incurred from keeping the Chapter 11 Cases open.

As a result of the Global Settlement, the Committee supports the Plan. Specifically, in connection with entering into the Global Settlement, the Committee has provided a letter (the "**Committee Support Letter**") urging all holders of General Unsecured Claims to vote their Claims to accept the Plan. The Committee Support Letter further states that it is the view of the Committee that the Global Settlement represents the best path forward for the Debtors, their Estates, their creditors and all other stakeholders in these cases.

The terms of the Global Settlement are embodied in the Plan. The Debtors believe that the Plan, as modified to implement the Global Settlement, greatly enhances recoveries for general unsecured creditors, and paves the path to a fully consensual confirmation process.

# ARTICLE 7

## REASONS FOR THE SOLICITATION; RECOMMENDATION

Chapter 11 of the Bankruptcy Code provides that unless the terms of section 1129(b) of the Bankruptcy Code are satisfied, for the Bankruptcy Court to confirm the Plan, the holders of Claims or Interests in each Class of impaired Claims or Interests entitled to vote on the Plan must accept the Plan by the requisite majorities set forth in the Bankruptcy Code.  An impaired Class of Claims shall have accepted the Plan if: (a) the holders of at least two-thirds (2/3) in amount of the Claims in such Class actually voting on the Plan have voted to accept it, and (b) more than one-half (1/2) in number of the holders of Claims in such Class actually voting on the Plan have voted to accept it (such votes, the "**Requisite Acceptances**").

**BOTH THE DEBTORS AND THE COMMITTEE BELIEVE THE TREATMENT OF HOLDERS OF CLAIMS IN THE IMPAIRED CLASS ELIGIBLE TO VOTE WILL RECEIVE A GREATER RECOVERY FOR SUCH HOLDERS THAN WOULD BE AVAILABLE IN A CHAPTER 7 LIQUIDATION.   SEE THE LIQUIDATION ANALYSIS ANNEXED HERETO AS EXHIBIT 2.  ACCORDINGLY, THE DEBTORS AND THE COMMITTEE BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF HOLDERS OF CLAIMS.  AS STATED IN THE COMMITTEE SUPPORT LETTER, BOTH THE DEBTORS AND THE COMMITTEE RECOMMEND THAT ALL HOLDERS OF CLAIMS IN THE IMPAIRED CLASS VOTE TO ACCEPT THE PLAN.**

# ARTICLE 8

## THE PLAN

### 8.1    *Overview of Chapter 11.*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Under chapter 11, a debtor is authorized to restructure its business for the benefit of itself, its creditors and its equity interest holders.  One primary goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.  Chapter 11 of the Bankruptcy Code may also be used to conduct an orderly wind down of a debtor's affairs.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the bankruptcy filing date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a chapter 11 plan is the principal objective of a chapter 11 case.  A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a chapter 11 plan by the bankruptcy court makes that plan binding upon the debtor, any person acquiring property under the plan and any creditor or equity interest holder of the debtor.

In general, a chapter 11 plan: (a) divides claims and equity interests into separate classes; (b) specifies the property, if any, that each class is to receive under the plan; and (c) contains other provisions necessary to the restructuring of the debtor that are required or permitted by the Bankruptcy Code.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a chapter 11 plan typically may not be solicited after the commencement of a chapter 11 case until such time as the court has approved the disclosure statement as containing adequate information. Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the chapter 11 plan. To satisfy the applicable disclosure requirements, the Debtors submit this Disclosure Statement to holders of Claims that are impaired.

## 8.2    *Overview of the Plan.*

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND THE EXHIBITS AND SCHEDULES THERETO. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THE SUMMARY CONTAINED HEREIN AND THE PLAN, THE PLAN SHALL GOVERN AND CONTROL IN ALL RESPECTS.**

The Plan classifies Claims and Interests separately in accordance with the Bankruptcy Code and provides different treatment for different Classes of Claims and Interests. Claims and Interests shall be included in a particular Class only to the extent such Claims and Interests qualify for inclusion within such Class. The Plan separates the various Claims and Interests (other than those that do not need to be classified) into six (6) separate Classes. These Classes take into account the differing nature and priority of Claims against, and Interests in, the Debtors. Unless otherwise indicated, the characteristics and amounts of the Claims and Interests are based on the books and records of the Debtors.

This Section summarizes the treatment of each of the Classes of Claims and Interests under the Plan and describes other provisions of the Plan. Only holders of Allowed Claims and Interests — Claims and Interests that are not in dispute, contingent or unliquidated in amount and are not subject to an objection or an estimation request — are entitled to receive distributions under the Plan. For a more detailed description of the definition of "Allowed," see Article I of the Plan. Until a Claim or Interest becomes Allowed, no distributions will be made to the holder of such Claim or Interest. The Debtors believe that they will be able to perform their obligations under the Plan. The Debtors also believe that the Plan permits fair and equitable recoveries.

The Confirmation Date will be the date that the Confirmation Order is entered by the Clerk of the Bankruptcy Court. The Effective Date will be the first Business Day as soon as reasonably practicable after all of the conditions to the occurrence of the Effective Date specified in Section 11.01 of the Plan have been satisfied or waived, including the consummation of the

36

transactions contemplated by the Plan. Resolution of any challenges to the Plan may take time and, therefore, the actual Effective Date cannot be predicted with certainty.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Interest will be in settlement and release of all Claims or Interests. The Debtors will make all payments and other distributions to be made under the Plan unless otherwise specified.

The Plan constitutes a joint plan of liquidation for all of the Debtors. All Claims and Interests, except DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article III of the Plan and below. In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims have not been classified, and the holders thereof are not entitled to vote on the Plan. A Claim or Interest is placed in a particular Class only to the extent that such Claim falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest that falls within the description of such other Classes.

A Claim is placed in a particular Class for all purposes, including voting, confirmation and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. However, a Claim is placed in a particular Class for the purpose of receiving Plan Distributions only to the extent that such Claim is an Allowed Claim and has not been paid, released or otherwise settled prior to the Effective Date.

**(a)    DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims.**

**(i)    DIP Claims.**

On the Asset Sale Closing Date the holders of Allowed DIP Claims were paid in full from Sale Proceeds resulting from the Sale Transaction. Upon payment in full of the Allowed DIP Claims, all Liens and security interests granted to secure Allowed DIP Claims against the Debtors in the Chapter 11 Cases were terminated and have no further force or effect.

**(ii)    Administrative Expense Claims.**

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date an Administrative Expense Claim becomes an Allowed Claim, the holder of such Allowed Administrative Expense Claim shall receive from the Plan Funding or the Administrative and Priority Claims Reserve, as applicable, an amount equal to such Allowed Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, shall be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing or other documents relating to, such liabilities; provided, however, that Administrative Expense Claims that have been assumed by the Purchaser pursuant to the Asset

Purchase Agreement shall not be an obligation of the Debtors. For the avoidance of doubt, all tax claims of governmental units arising from and after the date of the closing of the Sale Transaction have been assumed by the Purchaser under the Asset Purchase Agreement and, therefore, do not constitute obligations of the Debtors under the Plan.

### (iii)    Fee Claims.

All Professional Persons seeking allowance by the Bankruptcy Court of a Fee Claim shall: (i) file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is forty-five (45) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court; and (ii) if granted such an award by the Bankruptcy Court, be paid in full in Cash such amount as awarded by the Bankruptcy Court (A) no later than five (5) Business Days after the date an order is entered with respect to such award or (B) upon such other terms as may be mutually agreed upon between such holder of a Fee Claim and the Debtors. On the Effective Date, the Debtors shall deposit Cash in the Professional Expense Escrow in an amount equal to accrued but unpaid Fee Claims as of the Effective Date plus the reasonable, good faith estimate of post-Effective Date Fee Claims to be incurred by each Professional Person (such estimates to be provided to the Debtors at least two (2) Business Days prior to the Effective Date), which Cash shall be used, until all Allowed Fee Claims have been paid in full, solely for the payment of Allowed Fee Claims. Objections to Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty-five (65) days after the Effective Date. The Professional Fee Escrow Account, shall not be, and shall not be deemed to be, property of the Debtors or Wind Down Co; however, to the extent the Cash in the Professional Expense Escrow exceeds the amount of the Allowed Fee Claims, such excess Cash shall be distributed by the Escrow Agent to Wind Down Co. All Professional Persons seeking allowance by the Bankruptcy Court of a Fee Claim shall be paid in full in Cash in such amounts as are approved by the Bankruptcy Court: (i) upon the later of (x) the Effective Date, and (y) fourteen (14) calendar days after the date upon which the order relating to the allowance of any such Fee Claim is entered, or (ii) upon such other terms as may be mutually agreed upon between the holder of such Fee Claim and the Plan Administrator.

### (iv)    U.S. Trustee Fees.

The Debtors shall pay all outstanding U.S. Trustee Fees of the Debtors by the Effective Date. Thereafter U.S. Trustee Fees shall be paid as they become due, until such time as a final decree is entered closing the Chapter 11 Cases, the Chapter 11 Cases are converted or dismissed, or the Bankruptcy Court orders otherwise.

### (v)    Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, first from the Priority Tax Claim Reserve and second, to the extent necessary, from the Plan Funding, at the option of the Debtors or the Plan Administrator either: (i) on, or as soon thereafter as is reasonably practicable, the later of (x) the Effective Date and (y) the first Business Day after the date that is thirty (30) calendar days after

the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Claim, or (ii) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due.

### (b)    Classification and Treatment of Claims and Interests.

### (i)    Prepetition Secured Lender Claims (Class 1)

Impairment and Voting.  Class 1 is unimpaired by the Plan.  Each holder of a Prepetition Secured Lender Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

Treatment.  The legal, equitable and contractual rights of the holders of Prepetition Secured Lender Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Prepetition Secured Lender Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, on the Effective Date each holder of an Allowed Prepetition Secured Lender Claim shall receive Cash in an amount equal to such Allowed Prepetition Secured Lender Claim.  Pursuant to the terms of the Final DIP Order, all outstanding Prepetition Secured Lender Claims were paid in full upon the consummation of the Sale Transaction.

### (ii)    Other Secured Claims (Class 2)

Impairment and Voting.  Class 2 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

Treatment.  The legal, equitable and contractual rights of the holders of Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, on the applicable Distribution Date each holder of an Allowed Other Secured Claim shall receive at the election of the Debtors on or before, the later of the Effective Date and thirty (30) days after the date on which a Class 2 Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, (i) Cash in an amount equal to such Allowed Other Secured Claim, (ii) the collateral securing such Allowed Other Secured Claim, or (iii) such other treatment that will render such Allowed Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.

Separate Classification of Secured Claims.  Although all Other Secured Claims have been placed in one Class for purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on Collateral different than that securing any other Secured Claims,

shall be treated as being in a separate sub-Class for the purpose of voting on the Plan and receiving Distributions.

### (iii)    Priority Non-Tax Claims (Class 3)

*Impairment and Voting*.  Class 3 is unimpaired by the Plan.  Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

*Treatment*.  The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Non-Tax Claim, shall receive (i) Cash in an amount equal to such Allowed Priority Non-Tax Claim, or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim unimpaired pursuant to section 1124 of the Bankruptcy Code on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

### (iv)    Intercompany Claims (Class 4)

*Impairment and Voting*.  Class 4 is impaired by the Plan.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Intercompany Claims are conclusively deemed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the voters of such holders will not be solicited with respect to such Intercompany Claims.

*Treatment*.  On or after the Effective Date, each holder of an Intercompany Claim shall not receive a distribution on account of such Claims and the Intercompany Claims shall be cancelled as of the Effective Date.

### (v)    General Unsecured Claims (Class 5)

*Impairment and Voting*.  Class 5 is impaired by the Plan.  Each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

*Treatment*.  Except to the extent that a holder of an Allowed General Unsecured Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed General Unsecured Claim shall receive, subject to the terms of the Plan, its Pro Rata share of the Available Cash provided, however, that each holder of an Allowed General Unsecured Claim shall not receive an amount that exceeds 100% of the amount of such Allowed General Unsecured Claim.

### (vi)    Existing Company Interests (Class 6)

*Impairment and Voting*.  Class 6 is impaired by the Plan.  Each holder of an Existing Interest is conclusively deemed to reject the Plan provided that the Sponsor is supportive of the Global Settlement.

Treatment.  On or after the Effective Date, each holder of an Existing Interest, to the extent that all Allowed General Unsecured Claims have been satisfied in full against such Debtor, shall not receive a Distribution because such Distributions if any, shall be reallocated in accordance with Allocation Schedule.

**8.3**    *Acceptance or Rejection of Plan; Effect of Rejection by One or More Classes of Claims or Interests.*

**(a)    Class Acceptance Requirement.**

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in dollar amount of the Allowed Claims in such Class and more than one-half (1/2) in number of holders of such Claims that have voted on the Plan.

**(b)    Tabulation of Votes on a Non-Consolidated Basis.**

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfied sections 1129(a)(8) and/or 1129(a)(10) of the Bankruptcy Code.

**(c)    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown".**

With respect to any rejecting Class of Claims or Interests, the Debtors will request confirmation of the Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes.  Subject to Section 14.06 of the Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**(d)    Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**(e)    Voting Classes; Deemed Acceptance by Non-Voting Classes.**

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims or Interests in such Class.

**8.4**    *Means for Implementation.*

**(a)    Non-Substantive Consolidation.**

The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.  The Plan does not provide for substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for purposes hereof.  Except as specifically set forth therein, nothing in the Plan shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor.  Notwithstanding the foregoing, solely for Distribution purposes, holders of Allowed General Unsecured Claims shall be entitled to a single Claim with respect to any particular debt owed against an individual Debtor.

**(b)    Management of Debtors' Assets.**

After the Effective Date, all property of the Debtors shall be managed and administered by the Plan Administrator.  If the Plan Administrator in its discretion decides not to sell any non-Cash property or if such property cannot, in the Plan Administrator's judgment, be sold in a commercially reasonable manner prior to the Final Distribution Date, the Plan Administrator shall have the right to abandon or otherwise dispose of such property in their business judgment.  Absent gross negligence, willful misconduct or fraud in connection therewith, no party in interest shall have a cause of action against the Plan Administrator, the Debtors or each of their respective directors, officers, employees, consultants, trustees or professionals arising from or related to the disposition of non-Cash property in accordance with Section 6.02 of the Plan.

**(c)    Charter and Bylaw Amendments; Other Corporate Action.**

The charter, bylaws and/or other constituent documents and agreements of the Debtors shall be revised as necessary and appropriate to comport with the terms of the Plan.

Any action under the Plan to be taken by or required of the Debtors, including the adoption or amendment of certificates of incorporation and bylaws, the issuance of instruments, and the selection of officers or directors, shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors' equityholders, sole members, boards of directors or boards of managers, or similar body, as applicable.

**(d)    Cancellation of Existing Securities and Agreements.**

Except for the purpose of evidencing a right to distribution under the Plan, on the Effective Date, any document, agreement or instrument evidencing any Claim or Interest shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors under such documents, agreements or instruments evidencing such Claims and Interests, as the case may be, shall be deemed extinguished.

**(e)    Cancellation of Existing Security Interests.**

Upon the full payment or other satisfaction of an Allowed Secured Claim, or promptly thereafter, the holder of such Allowed Secured Claim shall deliver to the Debtors any Collateral or other property of the Debtors held by such holder, and any termination statements, instruments of satisfactions or releases of all security interests with respect to its Allowed Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanic's liens or lis pendens.

**(f)    Payment of Key Executive Incentive Plan.**

On the Effective Date, the Debtors shall make all remaining payments contemplated by the KEIP.

**(g)    Approval of Plan Documents.**

The solicitation of votes on the Plan shall be deemed a solicitation for the approval of the Plan Documents and all transactions contemplated hereunder.  Entry of the Confirmation Order shall constitute approval of the Plan Documents and such transactions.  On the Effective Date, the Debtors shall be authorized to enter into, file, execute and/or deliver each of the Plan Documents and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further corporate, board or shareholder action.

**(h)    Plan Transactions.**

On the Effective Date or as soon thereafter as is reasonably practicable, Wind Down Co, the Debtors and the Plan Administrator may take any and all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary or appropriate to effectuate the Plan (the "**Plan Transactions**"), including, but not limited to, (i) the execution and delivery of appropriate agreements or other documents of financing, merger, consolidation, restructuring, conversion, disposition, transfer, or dissolution, containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (ii) the execution and delivery of any appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, duty or obligation on terms consistent with the Plan; (iii) the filing of appropriate dissolution documents or other corporate filings with the appropriate governmental authorities pursuant to applicable law; (iv) payment of the KEIP; and (v) any and all other actions that Wind Down Co, the Debtors or Plan Administrator determine are necessary or appropriate.

**(i)    Comprehensive Settlement of Claims and Controversies.**

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, the Plan is and shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval as of the Effective Date of the

compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and property, and holders of Claims and Interests and is fair, equitable and reasonable.  The compromises, settlements and releases described in the Plan shall be deemed nonseverable from each other and from all other terms of the Plan.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, Wind Down Co, through the Plan Administrator, may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Persons.

Without limiting the foregoing, entry of the Confirmation Order, to the extent provided in therein, shall constitute approval of the Global Settlement.

### (j)    Vesting of the Debtors' Assets as of the Effective Date.

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property, assets and interests of the Estates shall vest in, and be held in the name of, the applicable Debtor, free and clear of all Claims, Liens, encumbrances, charges and other interests, except as otherwise provided in the Plan or the Confirmation Order including with respect to the rights to receive any Distribution hereunder and the rights to collect under the Debtors' existing insurance policies, including the primary director and officer liability, employment practices liability or fiduciary liability insurance policies and any claims arising thereunder, and all Causes of Action.

### (k)    Avoidance Actions.

As of the Effective Date, the Debtors, on behalf of themselves and their Estates, shall be deemed to waive and release all Avoidance Actions.

### (l)    Plan Funding.

The Plan Funding shall be established in accordance with the terms of the Plan and the Plan Administrator Agreement, to fund the Debtors' obligations under the Plan, the Wind Down of the Debtors' affairs, (including the Plan Administrator Expenses as provided under the Plan Administrator Agreement).

Upon the closing of the Chapter 11 Cases, or such earlier time as it appears, in the reasonable view of the Plan Administrator, that the Debtors' assets have been reduced to Cash, all Available Cash shall be allocated among each of the Debtors in the proportions set forth in the Allocation Schedule to the holders of Claims in Class 5 in satisfaction of such Class members' Claims.

### 8.5    *Plan Administrator.*

### (a)    Appointment of the Plan Administrator.

The Committee has selected Charles Berk as Plan Administrator.  The Plan Administrator Agreement will be filed with the Plan Supplement.  Consistent with Section 7.04

of the Plan, the Plan Administrator may retain advisors, which may include CBIZ Accounting, Tax & Advisory of New York, LLC as financial advisor and Arent Fox LLP as counsel. On the Effective Date, the Plan Administrator shall be appointed pursuant to the Plan and the Plan Administrator Agreement, and shall be authorized to conduct the Wind Down of the Debtors' affairs in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in the Plan. Pursuant to Bankruptcy Code § 1123(b)(3), the Plan Administrator shall be deemed the appointed representative to, and may pursue and litigate Debtor and Estate Claims and Causes of Action and pursue, litigate, compromise and settle any such rights, Claims and Causes of Action in accordance with the best interests of and for the benefit of the holders of Claims and Interests.

In the event that the Plan Administrator resigns, is removed, terminated or otherwise unable to serve as the Plan Administrator, then a successor shall be appointed as set forth in the Plan Administrator Agreement. Any successor Plan Administrator shall be bound by and comply with the terms of the Plan, the Confirmation Order and the Plan Administrator Agreement.

**(b)      Preservation of Rights.**

Under the Plan, the Plan Administrator retains any and all rights of, and on behalf of, the Debtors, the Estates, and Wind Down Co, not released pursuant to the terms of the Plan, to commence and pursue any and all Causes of Action, including, without limitation, setoff, offset and recoupment rights, regardless of whether or not such rights are specifically enumerated in the Plan, Disclosure Statement, Plan Supplement or elsewhere, and all such rights shall not be deemed modified, waived, released in any manner, nor shall confirmation of the Plan or the Confirmation Order act as res judicata or limit any of such rights of the Plan Administrator to commence and pursue any and all Causes of Action, including, without limitation, setoff, offset and recoupment rights, to the extent the Plan Administrator deems appropriate. Any and all Causes of Action, including, without limitation, setoff, offset and recoupment rights, may, but need not, be pursued by the Debtors prior to the Effective Date and by the Plan Administrator after the Effective Date, to the extent warranted.

Unless a Cause of Action against a Creditor or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan, or any Final Order, the Debtors expressly reserve any and all Causes of Action, including, without limitation, setoff, offset and recoupment rights, for later enforcement and prosecution by the Plan Administrator (including, without limitation, any Causes of Action set forth in the Plan Supplement, or not specifically identified in the Plan, in the Disclosure Statement, or otherwise, or which the Debtors may presently be unaware of, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time, or facts or circumstances which may change or be different from those which the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to any and all Causes of Action, including, without limitation, setoff, offset and recoupment rights, upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order.

The Debtors and the Plan Administrator do not intend, and it should not be assumed (nor shall it be deemed) that because any existing or potential Causes of Action, including, without limitation, setoff, offset and recoupment rights, have not yet been pursued by the Debtors or are not set forth in the Plan, in the Disclosure Statement, or otherwise, that any and all Causes of Action, including, without limitation, setoff, offset and recoupment rights, have been waived or expunged.

### (c)    Books and Records.

Books and records, including computer generated or computer maintained books and records for computer data, as well as electronically generated or maintained books and records or data, along with books and records of any Debtors maintained by or in the possession of third parties shall remain property of the Debtors or Wind Down Co, as applicable, to be used by the Plan Administrator to Wind Down the Debtors and their Estates and implement the Plan.

### (d)    Powers and Duties.

From and after the Effective Date, pursuant to the terms and provisions of the Plan, the Plan Administrator shall have the power and authority to perform the acts set forth in the Plan Administrator Agreement (subject to approval by the Bankruptcy Court where applicable), in addition to any powers granted by law or conferred to it by any other provision of the Plan, including without limitation any set forth in the Plan, provided however, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Plan Administrator to act as specifically authorized by any other provision of the Plan, the Plan Administrator Agreement, and/or any applicable law, and to act in such manner as the Plan Administrator may deem necessary or appropriate to take any act deemed appropriate by the Plan Administrator, including, without limitation, to discharge all obligations assumed by the Plan Administrator or provided in the Plan and to conserve and protect the Debtors' assets or to confer on holders of Claims and Interests the benefits intended to be conferred upon them by the Plan.  The Plan Administrator shall be empowered to:  (i) take all steps and execute all instruments and documents necessary to make Distributions to holders of Allowed Claims and to perform the duties assigned to the Plan Administrator under the Plan and/or the Plan Administrator Agreement; (ii) liquidate the assets of the Debtors or as necessary to comply with the Plan and the obligations hereunder; (iii) employ, retain or replace, professionals to represent Wind Down Co; (iv) assert, prosecute, object to, pursue, compromise or settle, in accordance with the Plan Administrator's reasonable business judgment, all matters affecting the Estates, including, Disputed Claims, subordination and recharacterization of Claims by objection, motion or adversary proceeding, to the extent set forth in the Plan Administrator Agreement, and except as provided therein without further order of the Bankruptcy Court; (v) act on behalf of the Debtors in all adversary proceedings and contested matters then pending or that can be commenced in the Bankruptcy Court and in all actions and proceedings pending or commenced elsewhere and to settle, retain, enforce, dispute or adjust any Claim and otherwise pursue actions involving assets of the Debtors that could arise or be asserted at any time under the Bankruptcy Code, unless otherwise, waived, relinquished or transferred in the Plan; (vi) establish, replenish or release reserves as provided in the Plan, as applicable; (vii) seek a determination of tax liability under section 505 of the Bankruptcy Code, file tax returns and pay taxes, if any, related to the Debtors; (viii) abandon in any commercially reasonable manner,

including abandonment or donation to a charitable organization of the Plan Administrator's choice, any assets of the Debtors if they are of no benefit to the Estate or the Debtors; (ix) purchase or create and carry all insurance policies and pay all insurance premiums and costs the Plan Administrator deems necessary or advisable; (x) assert and enforce all legal or equitable remedies or defenses belonging to the Debtors or their Estates, including without limitation, setoff, recoupment and any rights under section 502(d) of the Bankruptcy code; and (xi) exercise such other powers as may be vested in the Plan Administrator pursuant to the Plan, the Plan Administrator Agreement or any other Plan Documents or order of the Bankruptcy Court or otherwise act on behalf of and for the Debtor from and after the Effective Date in a manner consistent with the provisions of the Plan which the Plan Administrator deems reasonably necessary or desirable with respect to administering the Plan.  The reasonable fees and expenses of the professional persons employed by the Plan Administrator (the "**Plan Administrator Professional Fees**") in connection with his or her duties and responsibilities shall be paid as set forth in the Plan.  The Plan Administrator Professional Fees shall be paid within ten (10) Business Days after submission of a detailed invoice therefor to the Plan Administrator.  If the Plan Administrator disputes the reasonableness of any such invoice, the Plan Administrator or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  The undisputed portion of such reasonable fees and expenses shall be paid as provided in the Plan.  Subject to the other terms and provisions of the Plan, the Plan Administrator shall be granted standing, authority, power and right to assert, prosecute and/or settle the Causes of Action and/or make a claim under any primary director and officer liability, employment practices liability, or fiduciary liability insurance policies based upon its powers as a bankruptcy appointed representative of the Debtors' Estates with the same or similar abilities possessed by insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators or similar officials.

Pursuant to the terms and provisions of the Plan, the Plan Administrator shall oversee the required Distributions specified under the Plan, on the Initial Distribution Date, Interim Distribution Date or Final Distribution Date, as the case may be, under the Plan.

### (e)    Resignation, Death or Removal of Plan Administrator.

The Plan Administrator may resign at any time upon application to the Bankruptcy Court.  In the event of any such resignation, or the removal, death or incapacity of the Plan Administrator, the Bankruptcy Court may, upon motion of a party in interest or other request, appoint a new Plan Administrator.  No successor Plan Administrator hereunder shall in any event have any liability or responsibility for the acts or omissions of any of his or her predecessors.  Every successor Plan Administrator appointed pursuant hereto shall execute, acknowledge and file with the Bankruptcy Court, and deliver to the holders of General Unsecured Claims (at the addresses as provided in Section 8.05 of the Plan) an instrument in writing accepting such appointment hereunder, and thereupon such successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor.  Any resigning or removed Plan Administrator (or the executor or other representative of any deceased or incapacitated Plan Administrator) shall transfer, in exchange for consideration of one dollar ($1.00), the common stock of the Debtors owned by such Plan Administrator to the successor Plan Administrator.

47

**(f)        Compensation of Plan Administrator.**

The Plan Administrator shall be compensated as set forth in the Plan Administrator Agreement. The Plan Administrator shall fully comply with the terms, conditions and rights set forth in the Plan, the Confirmation Order and the Plan Administrator Agreement. The Plan Administrator shall not be required to file a fee application to receive compensation.

**(g)        Limitation of Liability.**

Wind Down Co shall indemnify the Plan Administrator and his or her professionals against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits or claims that the Plan Administrator or his or her professionals may incur or sustain by reason of being or having been a Plan Administrator or professionals of the Plan Administrator for performing any functions incidental to such service; provided, however, that the foregoing shall not relieve the Plan Administrator or his or her professionals from liability for bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud or self-dealing, or, in the case of an attorney professional and as required under Rule 1.8(h)(1) of the New York State Rules of Professional Conduct, malpractice.

**(h)        Exculpation Relating to Wind Down Co.**

On and after the Effective Date, the Plan Administrator, the Debtors and Wind Down Co shall not have any liability to holders of Claims or Interests other than as provided for in the Plan. The Plan will be administered and actions will be taken in the name of Wind Down Co through the Plan Administrator. The Plan Administrator shall comply with all applicable provisions of the Plan. On the Effective Date, the Plan Administrator shall assume all of its other obligations, powers and authority under the Plan. No holder of a Claim or Interest or any other party in interest will have, or otherwise pursue, any claim or cause of action against the Plan Administrator, the Debtors, Wind Down Co or the employees or professionals thereof (solely in the performance of their duties), for making payments and Distributions in accordance with the Plan or for fulfilling any functions incidental to implementing the provisions of the Plan, except for any acts or omissions to act that are the result of bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud or self-dealing, or, in the case of an attorney professional and as required under Rule 1.8(h)(1) of the New York State Rules of Professional Conduct, malpractice.

**(i)        Privileges.**

On and subject to the terms of the Plan, all of the Debtors' privileges including, but not limited to, corporate privileges, confidential information, work product protections, attorney-client privileges, and other immunities or protections relating to the Causes of Action shall be vested in the Debtors or Wind Down Co, as applicable, without waiver, limitation or release on the Effective Date.

**(j)        Dissolution of the Debtors.**

On the Effective Date, the members of the board of directors or managers, as the case may be, of each of the Debtors and each of the Debtors' management teams shall be deemed

48

to have resigned without the necessity of any act on the part of such parties. Nothing contained in the Plan shall prevent the Plan Administrator from seeking to employ such persons on behalf of Wind Down Co. Upon completion of the Debtors' final federal, state and local tax returns by the Plan Administrator, a determination (if any) pursuant to section 505(b) of the Bankruptcy Code of any unpaid tax liability of the Debtors or their Estates for any tax incurred during the administration of the Chapter 11 Cases, as determined under applicable tax laws, and the entry of a final decree closing the Chapter 11 Cases, each of the Debtors shall be deemed dissolved for all purposes in accordance with applicable state law.

### (k)    Termination of Wind Down Co.

Wind Down Co shall be dissolved upon the earlier of the distribution of all of its assets to the holders of Claims and the third anniversary of the creation of the Wind Down Co; <u>provided</u> that the Plan Administrator shall, in its sole discretion, be authorized to extend the dissolution date to the fifth anniversary of the creation of Wind Down Co with prior Bankruptcy Court approval. If warranted by the facts and circumstances involved in resolving any Causes of Action, upon application to, and if approved by, the Bankruptcy Court upon a finding that such further extension is necessary for purposes of resolving such Causes of Action and distributing the proceeds to holders of Allowed Claims, the term of Wind Down Co may be further extended by the Plan Administrator for a specified, finite term. Notwithstanding the foregoing, Wind Down Co shall be automatically terminated in the event that the Chapter 11 Cases are converted or dismissed.

### 8.6    *Executory Contracts and Unexpired Leases.*

### (a)    Rejection of Executory Contracts and Unexpired Leases.

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases of the Debtors not previously rejected by the Debtors pursuant to an order of the Bankruptcy Court shall be deemed to be rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease: (x) that previously has been assumed and/or assigned pursuant to an order of the Bankruptcy Court entered prior to the Effective Date; (y) as to which a motion for approval of the assumption and/or assignment of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date; or (z) that is specifically designated as a contract or lease to be assumed and/or assigned by the Debtors. Any order entered after the Confirmation Date by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an executory contract or unexpired lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered prior to the Confirmation Date. All Claims arising from the rejection of executory contracts or unexpired leases, if any, will be treated as General Unsecured Claims. Notwithstanding anything in the Plan to the contrary, all compensation and benefits programs shall continue in effect until there are no employees of the Debtors, at which time all compensation and benefit programs shall be deemed terminated.

Any Claim listed in the Schedules and any Proofs of Claim filed with respect to any executory contract or unexpired lease that has been assumed prior to the Effective Date shall

be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Person or Entity.

### (b) Approval of Rejections by Confirmation Order.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections contemplated by the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code to the extent provided for in the Confirmation Order. Notwithstanding anything in the Plan to the contrary, any agreement, obligation, security interest, transaction or similar undertaking that the Debtors believe is not executory or a lease that is later determined by the Bankruptcy Court to be an executory contract or unexpired lease that is subject to assumption or rejection under section 365 of the Bankruptcy Code, shall be subject to assumption or rejection within thirty (30) days of any such determination or such longer period as may be authorized by the Bankruptcy Court.

### (c) Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.

**Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 10.01 of the Plan must be filed with the Bankruptcy Court and served upon the Debtors no later than thirty (30) days after the earlier of: (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease; and (ii) notice of occurrence of the Effective Date. All such Claims not filed within such time will be forever barred from assertion against the Debtors and their Estates.**

### 8.7 *Conditions Precedent to Confirmation of the Plan.*

### (a) Conditions Precedent to the Effective Date.

The following are conditions precedent to confirmation of the Plan that may be satisfied or waived in accordance with Section 11.01 of the Plan:

**(i)** the Disclosure Statement Order and Confirmation Order, in form and substance reasonably satisfactory to the Debtors, the Committee, and the Sponsor, having been entered and shall not have been stayed, modified, vacated or appealed;

**(ii)** the Debtors having obtained all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan and the transaction contemplated thereunder;

**(iii)** the absence of any pending or threatened government action or any law that has the effect of or actually does prevent consummation of any Plan transactions; and

**(iv)** the Plan Documents having been executed and delivered, and any conditions (other than the occurrence of the Effective Date or

certification by the Debtors that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith.

**(b)    Waiver of Conditions Precedent and Bankruptcy Rule 3020(e) Automatic Stay.**

The Debtors shall have the right, upon consent of the Committee and with respect to Section 11.01(a), the Sponsor, to waive one or more of the conditions precedent set forth in Sections 11.01 and 11.02 of the Plan at any time without leave of or notice to the Bankruptcy Court and without formal action other than proceeding with consummation of the Plan. If any condition precedent to the Effective Date is waived pursuant to Section 11.02 of the Plan and the Effective Date occurs, the waiver of such condition shall benefit from the "mootness doctrine," and the act of consummation of the Plan shall foreclose any ability to challenge the Plan in any court. Unless otherwise provided in the Plan, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

Pursuant to Bankruptcy Rule 3020(e), the Confirmation Order shall be immediately effective upon its entry and shall not be subject to the stay provided in Bankruptcy Rule 3020(e).

**8.8    *Binding Effect.***

The Plan shall be binding and inure to the benefit of the Debtors, the Plan Administrator, Wind Down Co, the Released Parties, all present and former holders of Claims and Interests and their respective successors and assigns.

**8.9    *No Discharge in Favor of the Debtor.***

Pursuant to Bankruptcy Code §1141(d)(3), Confirmation of the Plan will not discharge claims against the Debtor; provided, however, that no holder of a claim against the Debtor may, on account of such claim, seek or receive any payment or other distribution from, or seek recourse against, property of any Debtor's estate, except as expressly provided in the Plan.

**8.10    *Term of Pre-Confirmation Injunctions or Stays.***

Unless otherwise provided in the Plan, all injunctions or stays arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

**8.11    *Injunction Against Interference With Plan.***

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

**8.12    *Injunction.***

*Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in any of the Debtors or the Estates are, with respect to any such Claims or Interests, permanently enjoined from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Plan Administrator, Wind Down Co or any of their respective property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Plan Administrator, Wind Down Co, the Estates or any of their respective property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Plan Administrator, Wind Down Co, the Estates or any of their respective property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained in the Plan shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan.*

*Each holder of an Allowed Claim or Allowed Interest shall be deemed to have specifically consented to the injunctions set forth therein.*

**8.13    *Releases.***

*Releases by the Debtors.  Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Debtors, as, debtors in possession, and any person seeking to exercise the rights of the Debtors Estates, including without limitation, any successor to the Debtors, including the Plan Administrator, Wind Down Co or any representative of the Debtors' Estates appointed or selected pursuant to sections 1103, 1104 or 1123(b)(3) of the Bankruptcy Code or under chapter 7 of the Bankruptcy Code, shall be deemed to forever release and waive all claims (as such term "claim" is defined in section 101(5) of the Bankruptcy Code), obligations, suits, judgments, damages, demands, debts, rights, causes of action (including, but not limited to, the Causes of Action) and liabilities (other than the rights of the Debtors to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered thereunder) against any Released Party, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence*

*taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors or their Estates, whether directly, indirectly, derivatively or in any representative or any other capacity.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases in the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the releases in the Plan are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases in the Plan; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors asserting any claim released by the releases in the Plan against any of the Released Parties; <u>provided, however,</u> that nothing contained in the Plan shall release Jane Park on account of the Jane Park Promissory Note.* [7]

*       <u>Third Party Releases</u>.    Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, each Releasing Party, in consideration for the obligations of the Debtors under the Plan, the Distributions under the Plan and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, will be deemed to have consented to the Plan and the restructuring and liquidation embodied in the Plan for all purposes and deemed to forever release and waive all claims (as such term is defined in section 101(5) of the Bankruptcy Code), including but not limited to any claim sounding in law or equity or asserting a tort, breach of any duty or contract, violations of the common law, any federal or state statute, any federal or state securities laws or otherwise, demands, debts, rights, causes of action (including without limitation, the Causes of Action) or liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan), including, without limitation, any*

---

[7]    As used herein and in the Plan, the term "**Releasing Parties**" means, collectively, (a) the Debtors, (b) each of the Estates, (c) the Committee, (d) the members of the Committee, (e) the DIP Administrative Agent and the DIP Lenders, (f) the Plan Administrator, (g) the Sponsor, (h) the Prepetition Secured Lenders, (i) Wind Down Co, (j) with respect to each of the foregoing Persons in clauses (a)-(i), such Person's current and former officers, directors, principals, members, employees, agents, shareholders, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective predecessors, successors and assigns, in each case in their capacity as such, and only if serving in such capacity, (k) holders of Claims who vote to accept the Plan, (l) holders of Claims who vote to reject the Plan but who vote to "opt in" to the Third Party Release, (m) Jane Park and (n) all holders of Claims and Interests not described in clauses (a)-(m) who elect to opt-in to the Third Party Release; <u>provided however</u>, that the Debtors' current director, managers and officers that are holders of Interests shall be deemed a "Releasing Party" regardless of whether such party submits a duly completed opt-in form; <u>provided further however</u>, that any holder of a Claim or Interest that is deemed to have granted the Third Party Release in the Confirmation Order (which holders have been expressly identified in the Disclosure Statement and the Ballots of such holders) shall be deemed a "Releasing Party" regardless of whether such holder elected to opt into the Third Party Releases; <u>provided further</u> <u>however</u>, that notwithstanding anything to the contrary in the Plan, the scope of the "Releasing Parties" shall be subject to the limitations set forth in Plan Section 12.06(b).

*claims for any such loss such Releasing Party may suffer, have suffered or be alleged to suffer as a result of the Debtors commencing the Chapter 11 Cases or as a result of the Plan being consummated, against any Released Party, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the releases in the Plan are (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims therein; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any holder of a Claim or Interest asserting any Claim released by the releases therein against any of the Released Parties.[8]*

*Notwithstanding anything to the contrary contained in the Plan: (i) except to the extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, the releases provided for in Section 12.06 of the Plan shall not release any non-Debtor entity from any liability arising under (x) the Internal Revenue Code or any state, city or municipal tax code, (y) any criminal laws of the United States or any state, city or municipality, or (z) any environmental laws of the United States or any state, city or municipal tax code; and (ii) the releases set forth in Section 12.06 of the Plan shall not release any (x) claims, right, or Causes of Action for money borrowed from or owed to the Debtors by any of their directors, officers or former employees, as set forth in the Debtors' books and records, and (y) any claims against any Person to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against a Debtor or any of its officers, directors or representatives.*

### 8.14    *Exculpation and Limitation of Liability.*

*To the extent permitted by Section 1125(c) of the Bankruptcy Code, none of the Debtors, the Plan Administrator, Wind Down Co or the Released Parties shall have or incur any liability to any holder of any Claim or Interest for any act or omission in connection with, or arising out of the Debtors' restructuring and liquidation, including without limitation the negotiation and execution of the Plan, the Chapter 11 Cases, the Disclosure Statement, the*

---

[8]    As used herein and in the Plan, the term "**Released Parties**" means, collectively, (a) the Debtors, (b) each of the Estates, (c) the Committee, (d) the members of the Committee, (e) the DIP Administrative Agent and the DIP Lenders, (f) the Plan Administrator, (g) the Sponsor, (h) the Prepetition Secured Lenders, (i) Wind Down Co and (j) with respect to each of the foregoing Persons in clauses (a)-(i), such Person's current and former officers, directors, principals, members, employees, agents, shareholders, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective predecessors, successors and assigns, in each case in their capacity as such, and only if serving in such capacity; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Chapter 11 Cases and the transactions contemplated by the Plan.

*Global Settlement, the solicitation of votes for and the pursuit of the Plan (including that solicitation of acceptances of the Plan was not conducted in good faith nor in compliance with the applicable provisions of the Bankruptcy Code), the consummation of the Plan, contract, instrument, document or any other agreement contemplated by the consummation or administration of the Plan or the property to be distributed under the Plan, including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition activities leading to the promulgation and confirmation of the Plan except fraud, gross negligence, misuse of confidential information, ultra vires acts or willful misconduct as determined by a Final Order of the Bankruptcy Court. For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute gross negligence, or willful misconduct. The Debtors, the Plan Administrator, Wind Down Co and the Released Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities with respect to the Chapter 11 Cases, the Plan and the administration thereof.*

#### 8.15    *Injunction Related to Releases and Exculpation.*

*The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to the Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released under Article XII of the Plan.*

#### 8.16    *Termination of Subordination Rights and Settlement of Related Claims.*

Except as expressly provided in the Plan, the classification and manner of satisfying all Claims and Interests and the respective distributions, treatments and other provisions under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a) and 510(b) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan. The Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Persons and entities from enforcing or attempting to enforce any such contractual, legal and equitable rights satisfied, compromised and settled pursuant to the Plan. Any disagreement with the priorities or distributions set forth in the Plan or any right to assert contractual subordination shall be raised on or prior to the deadline to object to the Plan, and decided at or prior to the Confirmation Hearing, and all issues with respect to contractual subordination not raised or resolved at the Confirmation Hearing shall be governed pursuant to the Plan or, if the decision of the Bankruptcy Court at the Confirmation Hearing differs from the Plan, then such decision shall govern.

**8.17**    *Retention of Causes of Action/Reservation of Rights.*

Except with respect to the Released Parties or any other beneficiary of the releases, injunctions and exculpations contained in Article XII of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims or Causes of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Effective Date, on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. The Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff or other legal or equitable defenses which the Debtors had immediately prior to the Petition Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and/or equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced. Except as otherwise provided in the Plan, Confirmation Order or the Plan Administrator Agreement, after the Effective Date, the Debtors, through the Plan Administrator, shall have the exclusive right to institute, prosecute, abandon, settle or compromise all Causes of Action (excluding those Causes of Action released pursuant to Article XII of the Plan), in their sole discretion and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases.

**8.18**    *Releases of Liens.*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, in consideration for the Distributions granted hereunder, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of any of the Estates shall be fully released and deemed satisfied and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens, pledges or other security interest shall revert to the Debtors. On the Effective Date, the holder of each such mortgage, deed of trust, lien, pledge or other security interest against property of the Estates shall be deemed to have appointed the Debtors as agent to such holder for the purpose of filing and recording all releases with respect to each such mortgage, deed of trust, lien, pledge or other security interest held against property of the Estates.

**8.19**    *Indemnification of Directors, Officers and Employees.*

For purposes of the Plan, the obligation of the Debtors to indemnify and reimburse any Person or entity serving at any time on or after the Petition Date as one of its directors, officers or employees by reason of such Person's or entity's service in such capacity, or as a director, officer or employee of any of the Debtors or any other corporation or legal entity, to the extent provided in such Debtor's constituent documents, a written agreement with the Debtor(s), in accordance with any applicable law, or any combination of the foregoing, shall survive confirmation of the Plan and the Effective Date, remain unaffected thereby, become an obligation of the Debtors solely to the extent of available insurance, and not be released, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on or after the Petition Date. For the avoidance of doubt, nothing in the Plan shall be construed as the Debtors assuming any obligation with respect to any self-insured retention for which the applicable insurer has the ability to assert a prepetition Claim against the

applicable Debtor in accordance with the order setting the Bar Date or other order of the Court. On and after the Effective Date, the coverage under any directors' and officers' insurance policies in effect on the Petition Date shall not be terminated or otherwise reduced by or on behalf of the Debtors, and all directors and officers of the Debtors at any time shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

**8.20** *Scope of Bankruptcy Court Jurisdiction.*

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under or related to the Chapter 11 Cases for, among other things, the following purposes:

**(1)** To hear and determine pending applications for the assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of cure amounts if any, and Claims resulting therefrom or from the assumption, assumption and assignment or rejection of executory contracts or unexpired leases pursuant to the Plan;

**(2)** To hear and determine any and all adversary proceedings, applications and contested matters, and to order appropriate relief in connection therewith (including issuance and/or enforcement of releases);

**(3)** To consider and resolve any Claims or Interests, or the allowance, classification, priority, compromise, estimation or payment of any Claim or Interest;

**(4)** To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

**(5)** To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

**(6)** To consider any amendments to, or modifications of, the Plan and the Plan Supplement, and any dispute or controversy relating to execution, delivery or compliance with any document included in the Plan Supplement, and to cure any defect or omission, or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

**(7)** To hear and determine all Fee Claims;

**(8)** To resolve disputes concerning any reserves, including with respect to Disputed Claims or the administration thereof;

**(9)** To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

**(10)** To recover all assets and property of the Debtor, wherever located;

**(11)** To hear and determine matters concerning state, local and federal taxes, including as provided by sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

**(12)** To hear any disputes arising out of, and to enforce any order approving alternative dispute resolution procedures to resolve, personal injury, employment litigation, and similar claims pursuant to section 105(a) of the Bankruptcy Code;

**(13)** To consider requests for extensions of the term of Wind Down Co as provided in the Plan;

**(14)** To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan;

**(15)** To hear any other matter not inconsistent with the Bankruptcy Code; and

**(16)** To enter a final decree closing the Chapter 11 Cases.

**8.21**   *Miscellaneous Provisions.*

**(a)**   **Effectuating Documents and Further Transactions.**

The Debtors are authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

**(b)**   **Corporate Action.**

On the Effective Date, all matters provided for under the Plan that would otherwise require approval of the stockholders, directors, members, managers or partners of the Debtors, including: (i) the effectiveness of the certificates of incorporation and bylaws of the Debtors, (ii) the election or appointment, as the case may be, of directors and officers of the Debtors, and (iii) qualification of the Debtors as foreign corporations wherever the conduct of business by the Debtors requires such qualification, shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to section 303 of the Delaware General

Corporation Law, without any requirement of further action by the stockholders, directors, members, managers or partners of the Debtors. On the Effective Date, or as soon thereafter as is practicable, the Debtors or Plan Administrator shall, if required, file their respective certificates of incorporation with the Secretary of State of the state in which each such entity is incorporated, in accordance with the applicable general corporation law of each such state.

### (c)       Exemption from Transfer Taxes.

To the fullest extent permitted by applicable law, any transfer or encumbrance of assets or any portion(s) of assets pursuant to, or in furtherance of, or in connection with, the Plan shall constitute a "transfer under a plan" within the purview of section 1146(a) of the Bankruptcy Code and shall not be subject to transfer, stamp or similar taxes.

### (d)       Post-Effective Date Fees and Expenses.

From and after the Effective Date, the Debtors, or the Plan Administrator, as the case may be, shall in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of Professional Persons thereafter incurred by the Debtors, including those fees and expenses incurred in connection with the implementation and consummation of the Plan.

### (e)       Amendment or Modification of the Plan.

Alterations, amendments or modifications of or to the Plan (including to provide for treatment different than that set forth in the Plan with respect to any Class of Claim or Interest, including the establishment of subclasses of Classes of Claims or Interests to the extent required if so elected by the Debtors, the unimpairment of Classes that are impaired hereunder, and the impairment of Classes that are unimpaired under the Plan) may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications. A holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such holder. Notwithstanding anything in Plan Section 14.05 to the contrary, any alteration, modification or amendment under Plan Section 14.05 shall not be made without the consent of the Committee.

### (f)       Revocation or Withdrawal of the Plan.

The Debtors, with consent of the Committee, reserve the right to revoke or withdraw the Plan prior to the Effective Date, in whole or in part. If the Debtors revoke or withdraw the Plan prior to the Effective Date, then except as set forth in Plan Section 14.06, the

Plan shall be deemed null and void. In the event of any such waiver or revocation, nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims by or against any Debtor or any other Person or to prejudice in any manner the rights of any Debtor or any Person in any further proceedings involving the Debtors.

### (g)    Dissolution of the Committee.

On the first (1st) Business Date following the Effective Date, the Committee shall be dissolved and the Committee, its members, and professionals retained by the Committee in accordance with Bankruptcy Code § 1103 shall be deemed released from their respective fiduciary obligations, duties, and responsibilities arising from or related to the Chapter 11 Cases, except with respect to: (i) prosecuting applications for professionals' compensation or reimbursement of expenses incurred as a member of the Committee; (ii) asserting, disputing and participating in the resolution of Fee Claims; and (iii) prosecuting or participating in any appeal of the Confirmation Order or any request for reconsideration thereof. Upon the conclusion of (i) through (iii) above, the Committee shall be immediately dissolved and released. The Professional Persons retained by the Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred after the first (1st) Business Day on behalf of the Committee following the Effective Date, except for services rendered and expenses incurred, as approved by the Court, in connection with: (i) prosecuting applications for or objections to professionals' compensation; (ii) asserting, disputing and participating in the resolution of Fee Claims or reimbursement of expenses incurred as a member of the Committee; and (iii) prosecuting or participating in any appeal of the Confirmation Order or any request for reconsideration thereof.

### (h)    Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### (i)    Inconsistency.

In the event of any inconsistency among the Plan, the Disclosure Statement, the Plan Documents, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

**(j)      Governing Law.**

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit or schedule to the Plan or in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to any contrary result otherwise required under applicable choice or conflict of law rules.

**(k)      Exhibits/Schedules.**

All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full therein.

**(l)      Filing of Additional Documents.**

On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any such agreements or other documents relating specifically to the terms and conditions of the Plan.

**(m)      Notices.**

All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

<div align="center">

**WILLKIE FARR & GALLAGHER LLP**
Brian S. Lennon
Daniel I. Forman
Andrew S. Mordkoff
Derek M. Osei-Bonsu
787 Seventh Avenue
New York, New York  10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
(As Counsel to the Debtors)

**ARENT FOX LLP**
Andrew I. Silfen
George P. Angelich
Beth M. Brownstein
1301 Avenue of the Americas, Floor 42
New York, New York  10019-6099
Telephone: (212) 484-3900
(As Counsel to the Committee)

</div>

- and –

**CBIZ INC.**
Charles Berk
1065 Avenue of the Americas, Floor 11
New York, New York 10018-0863
Telephone: (212) 790-5700
(As Plan Administrator)

### (n)     Reservation of Rights.

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan shall be, or shall be deemed to be, an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

## ARTICLE 9

## CONFIRMATION OF THE CHAPTER 11 PLAN

### 9.1     *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan.  The Confirmation Hearing with respect to confirmation of the Plan is scheduled to commence on **July 31, 2019 at 11:00 a.m. (prevailing Eastern Time)**.  The hearing may be adjourned or continued from time to time by the Debtors or the Bankruptcy Court without further notice by an announcement of the adjourned or continued date made at the Confirmation Hearing (or an appropriate filing with the Bankruptcy Court) or any subsequent adjourned or continued Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a chapter 11 plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Clerk of the Bankruptcy Court electronically using the Bankruptcy Court's Case Management/Electronic Case File ("**CM/ECF**") System at https://ecf.nysb.uscourts.gov (a CM/ECF password will be required),[9] and served upon: (i) counsel to the U.S. Trustee for Region 2, 201 Varick Street, Room 1006, New York, NY 10014 (Attn.: Serene Nakano, Esq. and Greg M. Zipes, Esq.); (ii) counsel to the Debtors, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019 (Attn.: Brian S. Lennon, Esq., Daniel I. Forman, Esq., and Andrew S. Mordkoff, Esq.); (iii) counsel to the Official Committee of Unsecured Creditors, Arent Fox LLP, 1301 Sixth Avenue, 42nd Floor, New York, NY 10019 (Attn: Beth Brownstein,

---

9       A CM/ECF password may be obtained via the Bankruptcy Court's CM/ECF website at https://ecf.nysb.uscourts.gov.

Esq. and George Angelich, Esq.); and (iv) counsel to the Sponsor, Kirkland & Ellis LLP, 601 Lexington Avenue, New York, NY 10022 (Attn.: Jonathan S. Henes, P.C. and Matthew Fagen, Esq.).

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**9.2    *Confirmation.***

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan.

**(a)    Confirmation Requirements.**

Confirmation of a chapter 11 plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

**(i)**    the plan complies with the applicable provisions of the Bankruptcy Code;

**(ii)**    the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

**(iii)**    the plan has been proposed in good faith and not by any means forbidden by law;

**(iv)**    any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

**(v)**    the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor or a successor to the debtor under the plan.  The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

**(vi)**    with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not

less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

    **(vii)**    subject to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, each class of claims or interests has either accepted the plan or is not impaired under the plan;

    **(viii)**    except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that holders of priority tax claims may receive deferred Cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such Claims deferred Cash payments, over a period not exceeding five years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such claims;

    **(ix)**    if a class of claims is impaired, at least one impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

    **(x)**    confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

The Debtors believe that:

    **(i)**    the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

    **(xi)**    the Debtors, as the proponents of the Plan, have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

    **(xii)**    the Plan has been proposed in good faith.

Set forth below is a summary of certain relevant statutory confirmation requirements.

### (A) Acceptance.

Claims in Class 5 impaired under the Plan and are entitled to vote to accept or reject the Plan. Classes 1, 2 and 3 are unimpaired and, therefore, are conclusively presumed to have voted to accept the Plan pursuant to section 1126(f) of the Bankruptcy Code. Claims and Interests in Class 4 and Class 6 are impaired and will not receive a recovery, and as a result,

holders of such Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

The Debtors also will seek confirmation of the Plan over the objection of any individual holders of Claims or Interests who are members of an accepting Class. There can be no assurance, however, that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

### (B) Fair and Equitable Test and Unfair Discrimination.

To obtain non-consensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan is "fair and equitable" and "does not discriminate unfairly" with respect to each impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if that class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan.

A chapter 11 plan does not "discriminate unfairly" with respect to a non-accepting class if the value of the cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class.

### (C) Feasibility.

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the Plan. The Plan provides for the liquidation of the Debtors' businesses. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### (b) Best Interests Test.

The "best interests" test requires that the Bankruptcy Court find either:

- that all members of each impaired class have accepted the Plan; or

- that each holder of an allowed Claim or Interest in each impaired class of Claims or Interests will receive or retain under the Plan on account of such Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date.

To determine what the holders of Claims the impaired Class would receive if the Debtors were liquidated under chapter 7 on the Confirmation Date, the Bankruptcy Court must

determine the dollar amount that would have been generated from the liquidation of the Debtors' assets and properties in a liquidation under chapter 7 of the Bankruptcy Code.

The Cash that would be available for satisfaction of Claims would consist of the Available Cash, comprised of all Available Cash (including the Plan Funding) not used for the winding-down of the affairs of the Debtors or to satisfy the Distributions contemplated under Article II of the Plan and provided for unimpaired creditors pursuant to Article III of the Plan. Available Cash shall also include the applicable portions of (i) excess amounts retained for Disputed Claims that become available in accordance with Section 9.04 of the Plan, (ii) excess amounts retained for Fee Claims that become available in accordance with Section 2.04 of the Plan, and (iii) amounts represented by undeliverable Distributions in accordance with Section 8.12 of the Plan.

To determine if the Plan is in the best interests of each impaired Class, the value of the distributions from the proceeds of a liquidation of the Debtors' assets and properties, after subtracting the amounts discussed above, must be compared with the value of the property offered to each such Class of Claims under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim or Interest with a recovery that is not less than such holder would have received pursuant to the liquidation of the Debtors under chapter 7.

Moreover, the Debtors believe that the value of distributions to each Class of Allowed Claims in a chapter 7 case would be materially less than the value of distributions under the Plan and any distribution in a chapter 7 case would not occur for a substantial period of time. It is likely that a liquidation of the Debtors' assets could take more than three (3) months to complete, and distribution of the proceeds of the liquidation could be delayed for up to three (3) months after the completion of such liquidation to resolve claims and prepare for distributions. In the likely event litigation was necessary to resolve claims asserted in the chapter 7 case, the delay could be prolonged.

The Debtors, with the assistance of their advisors, have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by creditors and equity interest holders in the event of liquidation as of May 6, 2019 (the "**Liquidation Analysis**," which is attached hereto as Exhibit 2). The Liquidation Analysis provides: (i) a summary of the liquidation values of each of the operating Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of each of the Debtors' estates; and (ii) the expected recoveries of the respective Debtors' creditors and equity interest holders under the Plan.

The Liquidation Analysis contains a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is predicated on the fact that in the event of a chapter 7 liquidation, the Sponsor Settlement Amount of $1,650,000 would

not be paid to the Debtors and therefore does not include the Sponsor Settlement Amount in the recoveries of the Debtors' creditors. The Liquidation Analysis is also based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management, such as the resolution of numerous complex, costly and time-consuming issues which were previously resolved by the Global Settlement, which would need to be revisited by the chapter 7 trustee. Accordingly, the values reflected might not be realized. The chapter 7 liquidation period is assumed to last one (1) year following the appointment of a chapter 7 trustee, allowing for, among other things, the discontinuation and wind-down of operations, the sale of the Debtors' remaining assets, the collection of receivables and the finalization of tax affairs. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

### 9.3    *Third Party Releases Under the Plan.*

As set forth above, Section 12.06 of the Plan provides for releases for certain claims against non-Debtor parties in consideration of services provided to the Debtors and the contributions made by the Released Parties to the Debtors' chapter 11 cases. The Plan provides that all holders of Claims or Interests who are entitled to vote on the Plan who vote to accept the Plan, and all holders of Claims or Interests who abstain from voting, or reject the Plan and check the box to "opt-in" to the Third Party Release will grant a release of any claims or rights they have or may have against certain parties. The Plan also provides that all holders of Claims or Interests who are not entitled to vote, and who elect to "opt in", will grant a release of any claims or rights they have or may have against certain parties. The release that these holders of Claims or Interests will be giving is broad and it includes any and all claims that such holders may have against the Released Parties, which in any way relate to the Debtors, their operations taking place on or prior to the Effective Date, and any transaction that these Released Parties had with the Debtors. Various holders of Claims or Interests who are entitled to vote on the Plan may have claims against a Released Party and the Debtors express no opinion on whether a holder has a claim or the value of the claim nor do the Debtors take a position as to whether a holder should consent to grant the release.

The Third Party Releases are consensual and, therefore, appropriate. Moreover, the Third Party Releases are an integral part of the Plan and a material inducement to the Released Parties pledging their support and making the value-maximizing transaction contemplated by the Plan possible. Under these circumstances, the Third Party Releases are appropriate.

While the Debtors are seeking the consensual release of claims against the Released Parties, the Debtors reserve the right to seek approval from the Bankruptcy Court to grant the Third Party Releases on a non-consensual basis solely as they relate to Jane Park in the event Jane Park refuses to consensually releases her claims against the Released Parties. **As of the date of this Disclosure Statement, the Bankruptcy Court has not ruled on any non-consensual Third Party Release by Jane Park.** The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things, each of the Released Parties has afforded value to the Debtors. More specifically, pursuant to the

Global Settlement, the Sponsor provided a material value, increasing the recovery of General Unsecured Creditors approximately by approximately 15%. The releases, exculpations and injunctions provisions, and the release of claims by Jane Park in particular, were a material inducement for the Sponsor to enter into the Global Settlement. Without these releases the Sponsor stressed that there is no guarantee that they will contribute the Sponsor Settlement Amount to the Debtors' estates. The Debtors believe that the releases, exculpations, and injunctions are a necessary part of the Plan.

The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party as part of Confirmation of the Plan. Among other things, the Debtors will demonstrate at the Confirmation Hearing that, given the significant consideration being provided by the Released Parties to the Debtors and other Releasing Parties, the Debtors' releases in favor of the Released Parties are appropriate and within their reasonable business judgment.

### 9.4    *Classification of Claims and Interests.*

The Debtors believe that the Plan complies with the classification requirements of the Bankruptcy Code, which require that a chapter 11 plan place each claim and interest into a class with other claims or interests that are "substantially similar."

### 9.5    *Consummation.*

The Plan will be consummated on the Effective Date. The Effective Date will occur after the conditions precedent to the effectiveness of the Plan, as set forth in Article XI of the Plan, have been satisfied or waived pursuant to the Plan.

The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

## ARTICLE 10

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives include:

### 10.1    *Liquidation Under Chapter 7 of the Bankruptcy Code.*

The Debtors believe that failure to confirm the Plan inevitably will lead to a liquidation under chapter 7 of the Bankruptcy Code. A discussion of the effect a chapter 7 liquidation would have on the recoveries of the holders of Claims is set forth in Article VII of this Disclosure Statement. The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in lower aggregate distributions being made to creditors than those distributions provided for in the Plan, which is demonstrated by the Liquidation Analysis set forth in Article VIII and attached as Exhibit 2 to this Disclosure Statement.

### 10.2    *Alternative Chapter 11 Plan(s).*

The Debtors believe that failure to confirm the Plan inevitably will lead to expensive and protracted Chapter 11 Cases, whereas the Plan will enable the Debtors to liquidate expeditiously and allow their creditors to realize the highest recoveries under the circumstances. So long as the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the Chapter 11 Cases. The Debtors believe that not only does the Plan fairly adjust the rights of various Classes of Claims and Interests, but also that the Plan provides superior recoveries over any alternative capable of rational consideration, thus enabling stakeholders to maximize their returns. Rejection of the Plan in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time-consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class of Claims or Interests.

THE DEBTORS AND THE COMMITTEE BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES. THEREFORE, THE DEBTORS AND THE COMMITTEE RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

### 10.3    *Dismissal of the Chapter 11 Cases.*

Dismissal of the Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*. Upon dismissal of the Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiations with their creditors, possibly resulting in costly and protracted litigation in various jurisdictions. Moreover, holders of Other Secured Claims may be permitted to foreclose upon the assets that are subject to their Liens, which is likely all of the Debtors' assets. Dismissal may also permit certain unpaid unsecured creditors to obtain and enforce judgments against the Debtors. The Debtors believe that these actions would lead ultimately to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that dismissal of the Chapter 11 Cases is not a viable alternative to the Plan.

## ARTICLE 11

## SUMMARY OF VOTING PROCEDURES

This Disclosure Statement, including all exhibits hereto and the related materials included herewith, is being furnished to the holders of Claims in Class 5 are the only Class entitled to vote on the Plan.

All votes to accept or reject the Plan must be cast by using the Ballot(s) enclosed with this Disclosure Statement. No other votes will be counted. Consistent with the provisions

of Bankruptcy Rule 3018, the Debtors have fixed **June 20, 2019**, **at 4:00 p.m. (prevailing Eastern Time)** as the Voting Record Date. Ballots must be **RECEIVED** by the Voting Agent no later than the Voting Deadline, **4:00 p.m. (prevailing Eastern Time) on July 24, 2019**, unless extended by the Bankruptcy Court. See Section 1.4, "*Voting; Holders of Claims and Interests Entitled to Vote*" above for additional disclosures regarding voting.

In order for a creditor to change its vote in a previously cast ballot from acceptance to rejection or from rejection to acceptance, the creditor must first obtain authority from the Bankruptcy Court pursuant to the requirements of and in compliance with Bankruptcy Rule 3018(a). Accordingly, a ballot changing a vote in a previously submitted ballot without authority from the Bankruptcy Court will not be counted. In addition, neither the Debtors nor the Voting Agent shall have any obligation to recognize any change to, modification, withdrawal or revocation of a Ballot occurring after the commencement of the Confirmation Hearing.

## ARTICLE 12

## CERTAIN RISK FACTORS TO BE CONSIDERED

| **Important Risks to Be Considered** |
| --- |
| Holders of Claims should read and consider carefully the following risk factors and the other information in this Disclosure Statement, the Plan, the Plan Supplement and the other documents delivered or incorporated by reference in this Disclosure Statement and the Plan, before voting to accept or reject the Plan.<br><br>These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation. |

**12.1**     *Certain Bankruptcy Considerations.*

**(a)**     **General.**

Although the Plan is designed to implement the transactions contemplated thereby and provide distributions to creditors in an expedient and efficient manner, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.

If the Debtors are unable to obtain confirmation of the Plan on a timely basis because of a challenge to confirmation of the Plan or a failure to satisfy the conditions to consummation of the Plan, they may be forced to operate in bankruptcy for an extended period while they try to develop a different chapter 11 plan that can be confirmed, or may be forced to liquidate pursuant to chapter 7 of the Bankruptcy Code.

**(b)** **Failure to Receive Requisite Acceptances.**

Claims in Class 5 are the only Claims that are entitled to vote to accept or reject the Plan. Although the Debtors believe they will receive the requisite acceptances, the Debtors cannot provide assurances that the requisite acceptances to confirm the Plan will be received. If the requisite acceptances are not received, the Debtors will not be able to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code because at least one impaired Class will not have voted in favor of the Plan as required by section 1129(a)(10) of the Bankruptcy Code. In such a circumstance, the Debtors may seek to accomplish an alternative restructuring of their capitalization and obligations to creditors and obtain acceptances of an alternative plan of reorganization for the Debtors, or otherwise may be required to liquidate their estates under chapter 7 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to, or as favorable to the Debtors' creditors, as those proposed in the Plan.

**(c)** **Failure to Secure Confirmation of the Plan.**

Even if the requisite acceptances are received, the Debtors cannot provide assurances that the Bankruptcy Court will confirm the Plan. A non-accepting creditor or equity security holder of the Debtors might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or the Bankruptcy Rules. Even if the Bankruptcy Court determined that this Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met. Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, that the value of distributions to non-accepting holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such holders would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. The Debtors cannot provide assurances that the Bankruptcy Court will conclude that the requirements have been met. However, the Debtors believe that non-accepting holders within each Class under the Plan will receive distributions at least as great as would be received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

If the Plan is not confirmed, the Plan will need to be revised and it is unclear what distribution holders of Claims ultimately would receive with respect to their Claims. If an alternative restructuring could not be agreed to, it is possible that the Debtors would have to liquidate their assets under chapter 7 of the Bankruptcy Code, in which case it is likely that holders of Claims would receive substantially less favorable treatment than they would receive under the Plan. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

**(d)** **Failure to Consummate the Plan.**

Section 11.01 of the Plan contains various conditions to consummation of the Plan, including: (a) the Disclosure Statement Order and Confirmation Order, in form and

substance satisfactory to the Debtors and the Committee, having been entered and shall not have been stayed, modified, vacated or appealed; (b) the Debtors having obtained all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan and the transaction contemplated hereunder; (c) the absence of any pending or threatened government action or any law that has the effect of or actually does prevent consummation of any Plan transactions; and (d) the Plan Documents having been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith.  As of the date of this Disclosure Statement, there can be no assurance that these or the other conditions to consummation will be satisfied or waived. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the liquidation completed.  If the Plan is not consummated and the liquidation completed, these Chapter 11 Cases will be prolonged and the Debtors may lack sufficient liquidity to implement a plan of liquidation under chapter 11 of the Bankruptcy Code.

### (e)    Objections to Treatment of Claims.

Section 1129(b) of the Bankruptcy Code provides that a plan must not discriminate unfairly with respect to each class of Claims or Interests.  Holders of Claims or Interests may argue that the Plan discriminates unfairly with respect to their Claims or Interests. The Debtors believe that the treatment of each class of Claims or Interests complies with the requirements set forth in the Bankruptcy Code.  There can be no assurance, however, that the Bankruptcy Court will reach the same conclusion.

### (f)    Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  There can be no assurance, however, that the Bankruptcy Court will reach the same conclusion.

### (g)    The Debtors May Object to the Amount or Classification of Your Claim.

The Debtors reserve the right to object to the amount or classification of any Claim.  It is the Debtors' position that the estimates set forth in this Disclosure Statement cannot be relied on by any creditor whose Claim or Interest is subject to an objection.  Any such Claim holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

### (h)    The Debtors May Adjourn Certain Deadlines.

In certain circumstances, the Debtors may deem it appropriate to adjourn either or both of the Voting Deadline and/or the Confirmation Hearing.  While the Debtors estimate that the Effective Date will occur no later than thirty (30) days after the entry by the Bankruptcy

Court of the Confirmation Order, they cannot provide assurances that applicable dates related to the foregoing will not be extended and the Effective Date will not be delayed.

### (i) The Debtors May Adjourn Certain Deadlines.

The recoveries contemplated in the Plan are predicated on the occurrence on the Global Settlement. While the Debtors, the Committee and the Sponsor are dedicated to working towards a consensual liquidation, there is no guarantee the Global Settlement will occur. In the event the Global Settlement does not occur, the holders of Claims may be entitled to substantially diminished recoveries.

### 12.2 *Risks Relating to Tax and Accounting Consequences of the Plan and Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Factual Determinations.*

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors currently do not intend to seek any ruling from the Internal Revenue Service ("**IRS**") on the tax consequences of the Plan. Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge

## <u>ARTICLE 13</u>

## <u>CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN</u>

The following discussion summarizes some of the more significant United States federal income tax consequences of the Plan to certain holders of Claims entitled to vote on the Plan. The analysis contained in the Plan is based upon the Internal Revenue Code of 1986, as amended ("**Tax Code**"), the Treasury Regulations promulgated and proposed thereunder ("**Regulations**"), judicial decisions and published administrative rulings and pronouncements of the IRS as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations hereafter enacted or promulgated could alter or modify the analysis and conclusions set forth below. Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below. This summary does not address foreign, state or local income tax, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as foreign companies, nonresident alien individuals, accrual method taxpayers that file applicable financial statements as described in section 451(b) of the Tax Code, S corporations, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, broker-dealers and tax-exempt organizations). Accordingly, it should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular holder of a Claim.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN

DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE LAW.  NO RULING HAS BEEN APPLIED FOR OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN REQUESTED OR OBTAINED BY THE PLAN PROPONENT WITH RESPECT THERETO.  THIS DISCUSSION DOES NOT CONSTITUTE TAX ADVICE OR A TAX OPINION CONCERNING THE MATTERS DESCRIBED.  THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES DESCRIBED IN THE PLAN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, FOREIGN OR OTHER TAX CONSEQUENCES OF THE PLAN.

      **13.1**   *Federal Income Tax Consequences to the Debtors.*

             **\Sale of Substantially All of the Debtors' Assets.**

The sale of substantially all of the Debtors' assets closed on February 6, 2019.

The sales of assets are taxable transactions.  Thus, the Debtors must recognize any gain or loss realized on such sale.  The gain or loss realized with respect to each asset is equal to the difference between the selling Debtors' tax basis in such asset and the fair market value of such asset.  To the extent that the Debtors recognized a net gain from the asset sales, such gain may, subject to certain restrictions, be offset either by operating losses that accrue during the current tax year or by the Debtors' net operating loss and/or capital loss carryforwards.  Any resulting tax will be paid by the Debtors.

Federal Income Tax Consequences to Holders of Claims.

      **(a)**      **In General.**

The federal income tax consequences of the Plan to a holder of a Claim will depend upon several factors, including but not limited to: (i) whether the holder's Claim (or a portion thereof) constitutes a Claim for principal or interest; (ii) the origin of the holder's Claim; (iii) whether the holder is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above); (iv) whether the holder reports income on the accrual or cash basis method; (v) whether the holder has taken a bad debt deduction or worthless security deduction with respect to this Claim; and (vi) whether the holder receives distributions under the Plan in more than one taxable year.  HOLDERS ARE STRONGLY ADVISED TO CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.

Generally, a holder of a Claim will recognize gain or loss equal to the difference between the amount realized by such holder and such holder's adjusted tax basis in the Claim.  The amount realized will equal the amount of Cash received under the Plan in respect of a

holder's Claim (to the extent that such Cash is not allocable to any portion of the Claim representing accrued but unpaid interest as discussed below).

The character of any recognized gain or loss (e.g., ordinary income, short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the Claim, the purpose and circumstances of its acquisition, the holder's holding period of the Claim, and the extent to which the holder previously claimed a deduction for the worthlessness of all or a portion of the Claim.  If the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the holder has held such Claim from more than one year.  There are limitations on the deduction of capital losses by both corporate and non-corporate taxpayers. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.

### (b)    Market Discount.

A holder that acquires a debt instrument at a market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of accrued market discount not previously included in gross income by the holder.

### (c)    Information Reporting and Backup Withholding.

The Debtors (or an applicable paying agent) may be obligated to furnish information to the IRS regarding the consideration received by holders (other than corporations and other exempt holders) pursuant to the Plan.

Holders may be subject to backup withholding on the consideration received pursuant to the Plan.  A holder that is not otherwise exempt generally may avoid backup withholding by furnishing to Wind Down Co (or its paying agent) its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the holder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax.  Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

THE FOREGOING IS INTENDED TO BE ONLY A SUMMARY OF CERTAIN OF THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED ON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM.  ACCORDINGLY, EACH HOLDER OF A CLAIM IS STRONGLY URGED TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE AND LOCAL INCOME AND OTHER TAX CONSEQUENCES UNDER THE PLAN.

## ARTICLE 14

## PROCEDURES FOR DISTRIBUTIONS UNDER THE PLAN

**14.1    *Disbursing Agent.***

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Debtors.  Furthermore, any such entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.  For the avoidance of doubt, (i) the Debtors, or such other entity designated by the Debtors or Wind Down Co, shall act as Disbursing Agent with respect to all Effective Date Distributions, and (ii) the Debtors, Wind Down Co, or such other entity designated by the Plan Administrator, shall act as Disbursing Agent with respect to all other Claims, including General Unsecured Claims.

**14.2    *Distributions of Cash.***

Any payment of Cash made by the Disbursing Agent pursuant to the Plan shall, at the Disbursing Agent's option, be made by check drawn on a domestic bank or wire transfer.

**14.3    *Timing of Distributions.***

In the event that any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  Any requirement under the Plan that the Debtors or Disbursing Agent make a payment or Distribution on a date shall mean that such party is required to commence the process of making a payment or Distribution on such date.

**14.4    *Holders as of the Distribution Record Date.***

As of the close of business on the Distribution Record Date: (i) the claims register maintained in the Chapter 11 Cases shall be closed; and (ii) any transfer of any Claim or any Interest therein shall not be recognized by the Debtors.  The Debtors shall have no obligation to recognize any transfer of any Claim occurring after 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under the Plan with only those holders of record as of 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date.

**14.5    *Distributions to Address of Record.***

Subject to Bankruptcy Rule 9010, and except as set forth in Section 8.05 of the Plan, all Distributions under the Plan to holders of Allowed Claims shall be made to the holder of each Allowed Claim at the address of such holder as listed on the Schedules as of the

Distribution Record Date, unless the Debtors have been notified in writing of a change of address, including, without limitation, by the timely filing of a proof of claim by such holder that provides an address for such holder different from the address reflected on the Schedules. In the event that any distribution to any such holder is returned as undeliverable, the Disbursing Agent shall have no obligation to determine the correct current address of such holder, and no distribution to such holder shall be made unless and until the appropriate Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter, such Distribution shall be made to such holder without interest; provided, however, that, at the later of the expiration of sixty (60) days AFTER: (a) the Effective Date, or (b) the first Distribution Date after a Claim becomes an Allowed Claim, such Distributions shall be deemed unclaimed property and shall revest in the applicable Debtor and be distributed to other holders of Allowed Claims, in accordance with the Plan or as otherwise ordered by the Bankruptcy Court, as set forth in Section 8.12 of the Plan.

**14.6    *No Postpetition Interest on Claims; No More than Payment in Full.***

Unless otherwise specifically provided for in the Plan, Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

No holder of an Allowed Claim shall be entitled to receive more than payment in full of such Allowed Claim (plus postpetition interest, if and to the extent provided in the Plan), and such Claims will be administered and treated in the manner provided in the Plan.

**14.7    *Minimum Distributions.***

No payment of Cash of less than two hundred dollars ($200) shall be made by the Debtors to any holder of an Allowed Claim unless a request therefor is made in writing to the Debtors. If no request is made as provided in the preceding sentence within sixty (60) days of the later of: (a) the Effective Date and (b) the first Distribution Date such Claim is Allowed, all such distributions shall be distributed to other holders of Allowed Claims in accordance with the Plan or as otherwise ordered by the Bankruptcy Court. Notwithstanding anything contained in the Plan to the contrary, if, on any Distribution Date there remains $50,000 or less available for Distribution to holders of Allowed General Unsecured Claims, in lieu of making any further Distributions to the holders of such Claims, the Disbursing Agent may distribute such Cash to the charity of its choice.

**14.8    *Withholding Taxes.***

Any federal or state withholding taxes or other amounts required to be withheld under any applicable law shall be deducted and withheld from any Distributions hereunder, and any property so withheld will then be paid by the Debtors to the appropriate authority. All Persons holding Claims shall be required to provide any information necessary to effect the withholding of such taxes. The Debtors may, if necessary or appropriate to comply with applicable withholding requirements imposed on them, withhold the entire Distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary

information to comply with any withholding requirements of any governmental unit.  Any property so withheld will then be paid by the Debtors to the appropriate authority.  If the holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within sixty (60) days from the date of first notification to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such holder's Distribution shall be treated as unclaimed property in accordance with Plan Section 8.12 or the amount required to be withheld may be so withheld and turned over to the applicable authority.

### 14.9    *Time Bar to Cash Payments by Check.*

Checks issued by the Debtors on account of Allowed Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof.  Requests for the reissuance of any check that becomes null and void pursuant to Plan Section 8.09 may be made directly to the Debtors by the holder of the Allowed Claim to whom the check was originally issued.  Any Claim in respect of such voided check must be made in writing on or before the later of (a) the Effective Date and (b) sixty (60) days after the date on which the Distribution was made.  After that date, all Claims in respect of void checks shall be released and forever barred and the proceeds of those checks shall be deemed unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed as provided in Plan Section 8.12.

### 14.10   *No Payments of Fractional Dollars.*

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

### 14.11   *Setoff and Recoupment.*

The Debtors or Plan Administrator may, pursuant to the Bankruptcy Code (including § 553 of the Bankruptcy Code), applicable bankruptcy or nonbankruptcy law, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that the Debtors or their Estates may have against the holder of such Claim; provided that neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, the Plan Administrator, the respective Estates or any of their respective successors of any right of setoff, recoupment claims or other rights or Causes of Action that the Debtors, the Plan Administrator or the respective Estates or any of their respective successors may possess against such holder.

### 14.12   *Unclaimed Distributions.*

All distributions to holders of Allowed Claims under the Plan that are unclaimed for a period of sixty (60) days after distribution thereof shall be deemed unclaimed property under Bankruptcy Code section 347(b), and any entitlement of any holder of any Claim to such distributions shall be extinguished and forever barred.  All such unclaimed property shall revest

in the Debtors and, subject to Plan Section 8.07, be distributed to other holders of Allowed Claims in accordance with the Plan or as otherwise ordered by the Bankruptcy Court.

## ARTICLE 15

## PROCEDURES FOR RESOLVING CLAIMS

### 15.1    *Objections to Claims.*

Other than with respect to Fee Claims, only the Plan Administrator shall be entitled to object to Claims after the Effective Date.  Any objections to Claims (other than Fee Claims), which Claims have been filed on or before the later of the Confirmation Date and the applicable Bar Date, if any, shall be served and filed on or before the Claims Objection Deadline. Any Claims filed after the applicable Bar Date shall be deemed Disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors or the Plan Administrator unless the Person or entity wishing to file such Claim has received prior Bankruptcy Court authority to file such Claim after the applicable Bar Date.  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the Debtors or the Plan Administrator effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (c) by (i) first class mail, postage prepaid, or (ii) if available, electronic mail, on any counsel that has appeared on the claimant's behalf in the Chapter 11 Cases (so long as such appearance has not been subsequently withdrawn).  From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim without approval of the Bankruptcy Court in accordance with the Plan Administrator Agreement and the Plan.  After the Effective Date, the Plan Administrator shall be entitled to determine, in its reasonable discretion, that the cost and expense of pursuing Claims objections outweighs the benefits to be advanced by filing one or more objections.

### 15.2    *Amendments to Claims.*

After the Confirmation Date, a proof of Claim may not be amended without the authorization of the Bankruptcy Court.  Any Claim amended after the Confirmation Date shall be deemed Disallowed in full and expunged without any action by the Debtors, unless the holder of the Claim has obtained prior Bankruptcy Court authorization to file the amendment.

### 15.3    *Estimation of Claims; Certain Reserves.*

For purposes of calculating and making Distributions under the Plan, the Plan Administrator shall be entitled to estimate, in good faith and with due regard to litigation risks associated with Disputed Claims, the maximum dollar amount of Allowed and Disputed Claims, inclusive of contingent and/or unliquidated Claims in a particular Class.  The Plan Administrator shall also be entitled to seek one or more Estimation Orders from the Bankruptcy Court for such purposes, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain

jurisdiction to estimate any Claim for purposes of determining the Allowed amount of such Claim at any time. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Appropriate Disputed Claims reserves shall be established for each category of Claims as to which estimates are utilized or sought. Unless otherwise expressly set forth in the Plan, the Plan Administrator shall not be obligated to physically segregate and maintain separate accounts for reserves. Accordingly, reserves may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time, as appropriate. Unless otherwise ordered by the Bankruptcy Court, no reserves shall be required to be established or maintained with respect to Claims filed after the applicable Bar Date.

### 15.4    *Plan Distributions to Holders of Subsequently Allowed Claims.*

On each Distribution Date (or such earlier date as determined by the Debtors in their sole discretion), the Disbursing Agent will make distributions or payments on account of any Disputed Claim that has become an Allowed Claim since the occurrence of the previous Distribution Date. The Disbursing Agent shall distribute in respect of such newly Allowed Claims the Pro Rata Distributions to which holders of such Claims would have been entitled under the Plan if such newly Allowed Claims were fully or partially Allowed, as the case may be, on the Effective Date, less direct and actual expenses, fees or other direct costs.

### 15.5    *Insurance Preservation and Proceeds.*

Except with regard to claims against the Released Parties that are released hereunder, nothing in the Plan shall diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors or any related Person. Notwithstanding anything to the contrary contained in the Plan to the extent the Debtors have insurance with respect to an Allowed Claim, such Allowed Claim shall: (a) be paid from the proceeds of insurance to the extent that the Claim is insured, and (b) receive the treatment provided for in the Plan to the extent the applicable insurance policy does not provide coverage with respect to any portion of the Allowed Claim. Holders of Claims which are eligible to be satisfied, in whole or in part, through any such policy shall be obligated, as a condition to receiving any Distributions under the Plan, to seek recovery (or, if applicable, assist the Debtors in seeking recovery) under such policies with regard to such Claims.

### 15.6    *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### 15.7    *No Recourse.*

Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Disbursing Agent, the Debtors, the Plan Administrator, Released Party or any of their respective professionals, consultants, officers, directors, employees or members or their successors or assigns, or any of their respective property.  **THE ESTIMATION OF CLAIMS AND THE ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.**

## <u>CONCLUSION</u>

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described in the Plan because it will provide the greatest recovery to holders of Claims.  Other alternatives would involve significant delay, uncertainty and substantial administrative costs and are likely to reduce any return to holders of Claims and Interests.  **The Debtors urge the holders of impaired Claims in Class 5 to vote to accept the Plan and to evidence such acceptance by returning their Ballots to the Voting Agent so that they will be received not later than 4:00 p.m. (prevailing Eastern Time) on July 24, 2019.**

Dated:  June 21, 2019
       New York, New York

Respectfully submitted,

Glansaol Holdings Inc., <u>et al.</u>,
Debtors and Debtors in Possession


/s/  Nancy Bernardini
Nancy Bernardini
Authorized Signatory of Debtors and
Debtors in Possession

Counsel:

WILLKIE FARR & GALLAGHER LLP

Brian S. Lennon, Esq.
Daniel I. Forman, Esq.
Andrew S. Mordkoff, Esq.
787 Seventh Avenue
New York, NY 10019
(212) 728-8000


*Counsel for the Debtors and Debtors in Possession*

**<u>EXHIBIT 1</u>**

**Plan**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Glansaol Holdings Inc., et al.,[1] | : | Case No. 18-14102 (MEW) |
| | : | |
| Debtors. | : | (Jointly Administered) |

-------------------------------------------------------x

## THIRD AMENDED JOINT LIQUIDATING PLAN OF THE
## DEBTORS UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**WILLKIE FARR & GALLAGHER LLP**
Brian S. Lennon
Daniel I. Forman
Andrew S. Mordkoff
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

*Counsel for the Debtors and Debtors in Possession*

Dated:    June 21, 2019

---

[1]    The Debtors in these chapter 11 cases and the last four digits of each Debtor's federal taxpayer identification number are as follows: Clark's Botanicals, Inc. (0754); Glansaol Holdings Inc. (9485); Glansaol LLC (2012); Glansaol Management LLC (6879); Julep Beauty, Inc. (7984); Laura Geller Beauty, LLC (1706); Laura Geller Brands, LLC (7428); and Laura Geller Holdings, LLC (7388).

# **TABLE OF CONTENTS**

ARTICLE I      DEFINITIONS AND CONSTRUCTION OF TERMS .................................. 1
    A.     Definitions ........................................................................ 1
    B.     Interpretation; Application of Definitions and Rules of Construction .............. 11
    C.     Reference to the Debtors or Wind Down Co. .................................... 12
    D.     Appendices and Plan Documents ............................................. 12

ARTICLE II     DIP CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS, FEE
                  CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS ............ 12
    2.01.    DIP Claims ................................................................... 13
    2.02.    Administrative Expense Claims ................................................ 13
    2.03.    Time for Filing Administrative Expense Claims: ............................... 13
    2.04.    Fee Claims .................................................................... 14
    2.05.    U.S. Trustee Fees .............................................................. 15
    2.06.    Quarterly Filing Reports ....................................................... 15
    2.07.    Priority Tax Claims ............................................................ 15

ARTICLE III     CLASSIFICATION OF CLAIMS AND INTERESTS ................................. 16

ARTICLE IV     TREATMENT OF CLAIMS AND INTERESTS ......................................... 17
    4.01.    CLASS 1 – PREPETITION SECURED LENDER CLAIMS ......................... 17
    4.02.    CLASS 2 – OTHER SECURED CLAIMS ......................................... 17
    4.03.    CLASS 3 - PRIORITY NON-TAX CLAIMS ...................................... 17
    4.04.    CLASS 4 – INTERCOMPANY CLAIMS .......................................... 18
    4.05.    CLASS 5 - GENERAL UNSECURED CLAIMS ................................... 18
    4.06.    CLASS 6 – EXISTING INTERESTS ............................................. 18

ARTICLE V     ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF
                  REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR
                  INTERESTS .................................................................... 18
    5.01.    Class Acceptance Requirement ................................................ 19
    5.02.    Tabulation of Votes on a Non-Consolidated Basis ............................. 19
    5.03.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or
           "Cramdown" ................................................................. 19
    5.04.    Elimination of Vacant Classes ................................................ 19
    5.05.    Voting Classes; Presumed Acceptance by Non-Voting Classes ................ 19

ARTICLE VI     IMPLEMENTATION OF THE PLAN ............................................ 19
    6.01.    Non-substantive Consolidation ............................................... 19
    6.02.    Management of Debtors' Assets ............................................... 19
    6.03.    Charter and Bylaw Amendments .............................................. 20
    6.04.    Cancellation of Existing Securities and Agreements ......................... 20
    6.05.    Cancellation of Existing Security Interests ................................... 20
    6.06.    Approval of Plan Documents ................................................. 20
    6.07.    Plan Transactions ............................................................. 20
    6.08.    Comprehensive Settlement of Claims and Controversies .................... 21

6.09.    Vesting of the Debtors' Assets as of the Effective Date ................................... 21
6.10.    Avoidance Actions ........................................................................................... 21
6.11.    Plan Funding ................................................................................................... 21

ARTICLE VII    PLAN ADMINISTRATION.......................................................... 22
7.01.    Appointment of the Plan Administrator ........................................................ 22
7.02.    Preservation of Rights .................................................................................... 22
7.03.    Books and Records ......................................................................................... 23
7.04.    Powers and Duties .......................................................................................... 23
7.05.    Resignation, Death or Removal of Plan Administrator.................................. 24
7.06.    Compensation of Plan Administrator ............................................................ 25
7.07.    Limitation of Liability .................................................................................... 25
7.08.    Exculpation Relating to Wind Down Co ....................................................... 25
7.09.    Privileges ........................................................................................................ 25
7.10.    Dissolution of the Debtors.............................................................................. 26
7.11.    Termination of Wind Down Co ..................................................................... 26

ARTICLE VIII    PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN ...... 26
8.01.    Disbursing Agent............................................................................................ 26
8.02.    Distributions of Cash...................................................................................... 26
8.03.    Timing of Distributions .................................................................................. 26
8.04.    Holders as of the Distribution Record Date ................................................... 27
8.05.    Distributions to Address of Record ................................................................ 27
8.06.    No Postpetition Interest on Claims; No More than Payment in Full.............. 27
8.07.    Minimum Distributions .................................................................................. 27
8.08.    Withholding Taxes .......................................................................................... 28
8.09.    Time Bar to Cash Payments by Check ........................................................... 28
8.10.    No Payments of Fractional Dollars ................................................................ 28
8.11.    Setoff and Recoupment .................................................................................. 28
8.12.    Unclaimed Distributions................................................................................. 29
8.13.    Distributions Free and Clear........................................................................... 29

ARTICLE IX    PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT  AND
UNLIQUIDATED CLAIMS OR EQUITY INTERESTS ............................. 29
9.01.    Allowed Claims .............................................................................................. 29
9.02.    Objections to Claims....................................................................................... 29
9.03.    Amendments to Claims ................................................................................... 30
9.04.    Estimation of Claims; Certain Reserves......................................................... 30
9.05.    Plan Distributions to Holders of Subsequently Allowed Claims ................... 30
9.06.    Insurance Preservation and Proceeds ............................................................. 30
9.07.    Allocation of Plan Distributions Between Principal and Interest.................... 31
9.08.    No Recourse .................................................................................................... 31
9.09.    Disallowed Claims.......................................................................................... 31

ARTICLE X    EXECUTORY CONTRACTS AND UNEXPIRED LEASES...................... 31
10.01.    Rejection of Executory Contracts and Unexpired Leases ................................ 31
10.02.    Approval of Rejections by Confirmation Order ............................................... 32

10.03. Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan ............................................... 32

10.04. Insurance Policies ................................................................................ 32

10.05. Reservation of Rights ........................................................................... 33

10.06. Indemnification of Directors, Officers and Employees .................................... 33

ARTICLE XI    CONDITIONS PRECEDENT ......................................................... 33

11.01. Conditions Precedent to the Effective Date .................................................. 33

11.02. Waiver of Conditions Precedent and Bankruptcy Rule 3020(e) Automatic Stay ............................................................................................... 34

11.03. Effect of Failure of Conditions ................................................................ 34

ARTICLE XII    EXCULPATION, INJUNCTION AND RELATED PROVISIONS EFFECT OF CONFIRMATION ................................................... 34

12.01. Binding Effect ................................................................................... 34

12.02. No Discharge in Favor of the Debtor ......................................................... 34

12.03. Term of Pre-Confirmation Injunctions or Stays ............................................. 35

12.04. Injunction Against Interference With Plan .................................................... 35

12.05. Injunction ........................................................................................ 35

12.06. Releases ........................................................................................... 36

12.07. Exculpation and Limitation of Liability ...................................................... 37

12.08. Injunction Related to Releases and Exculpation ............................................. 38

12.09. Termination of Subordination Rights and Settlement of Related Claims ................ 38

12.10. Retention of Causes of Action/Reservation of Rights ...................................... 38

12.11. Releases of Liens ................................................................................ 38

ARTICLE XIII    RETENTION OF JURISDICTION .................................................. 39

13.01. Scope of Bankruptcy Court Jurisdiction ...................................................... 39

ARTICLE XIV    MISCELLANEOUS PROVISIONS .................................................. 40

14.01. Effectuating Documents and Further Transactions .......................................... 40

14.02. Corporate Action ................................................................................ 40

14.03. Exemption from Transfer Taxes ............................................................... 41

14.04. Post-Effective Date Fees and Expenses ...................................................... 41

14.05. Amendment or Modification of this Plan ..................................................... 41

14.06. Revocation or Withdrawal of this Plan ....................................................... 41

14.07. Dissolution of the Committee .................................................................. 41

14.08. Severability ...................................................................................... 42

14.09. Governing Law .................................................................................. 42

14.10. Inconsistency .................................................................................... 42

14.11. Binding Effect ................................................................................... 42

14.12. Exhibits/Schedules .............................................................................. 42

14.13. Filing of Additional Documents ............................................................... 42

14.14. Notices ........................................................................................... 43

14.15. Reservation of Rights ........................................................................... 43

## LIQUIDATING PLAN OF THE DEBTORS
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Glansaol Holdings Inc., and each of its debtor affiliates listed on Exhibit A hereto, as debtors and debtors in possession, propose the following liquidating plan under section 1121(a) of title 11 of the United States Code:

## ARTICLE I

## DEFINITIONS AND CONSTRUCTION OF TERMS

A.    Definitions.  As used herein, the following terms have the respective meanings specified below (such meanings to be equally applicable to both the singular and plural):

1.01    503(b)(9) Claims means Claims that have been timely and properly filed prior to the Bar Date and that are granted administrative expense priority treatment pursuant to section 503(b)(9) of the Bankruptcy Code.

1.02    Administrative and Priority Claims Reserve means the account to be established by the Debtors or Plan Administrator, as applicable, and funded with the Administrative and Priority Claims Reserve Amount pursuant to Section 2.02 of this Plan.

1.03    Administrative and Priority Claims Reserve Amount means Cash, in the amount of $[_____], to be funded from the Plan Funding.

1.04    Administrative Bar Date has the meaning set forth in Section 2.03 of this Plan.

1.05    Administrative Expense Claim means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of the kind specified in section 503(b) of the Bankruptcy Code, and entitled to priority pursuant to sections 328, 330, 363, 364(c)(1), 365, 503(b), 507(a)(2) or 507(b) of the Bankruptcy Code (other than a DIP Claim, Fee Claim or U.S. Trustee Fees) for the period from the Petition Date to the Effective Date, including, without limitation: (a) any actual and necessary costs and expenses of preserving the Estates, any actual and necessary costs and expenses of operating the Debtors' business, and (b) any indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases.

1.06    Allocation Schedule means the schedule attached to this Plan as Exhibit B providing the proposed allocation of Available Cash among each of the Debtor entities.

1.07    Allowed means any Claim (or portion thereof) (a) either (i) proof of which has been timely filed with the Bankruptcy Court or has been deemed timely filed by a Final Order; or (ii) if not so filed, scheduled by the Debtors (as the Schedules have been or may be amended from time to time in accordance with Bankruptcy Rule 1009) other than as disputed, contingent or unliquidated; and (b) allowed by a Final Order, by this Plan, or because no party in interest timely has filed an objection, including an Omnibus Claims Objection, filed a motion to equitably subordinate, or otherwise sought to limit recovery or alter priority on such Claim; provided, however, that any Claim listed in the Schedules that has been paid by the Debtors (x)

1

after the Petition Date pursuant to order of the Bankruptcy Court, (y) before the Petition Date and was inadvertently listed in the Schedules, or (z) paid by the Debtors or the Bankruptcy Court-approved purchaser pursuant to a Bankruptcy Court-approved purchase agreement or order approving the sale of all or substantially all of the Debtors' assets during the course of these Chapter 11 Cases as an assumed liability, shall not be considered an Allowed Claim. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated or disputed, and for which no Proof of Claim has been timely filed, is not considered Allowed and shall be expunged on the Effective Date without further action by the Debtors or the Plan Administrator and without any further notice to or action, order or approval of the Bankruptcy Court. Notwithstanding anything herein to the contrary, Claims allowed solely for the purpose of voting to accept or reject this Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under this Plan, include interest on such Administrative Expense Claim or Claim from and after the Petition Date.

1.08    Allowed [Class Designation/Type] Claim/Interest means a Claim or Interest that is Allowed in a specified class or of a specified type.

1.09    Allowed Secured Claim means an Allowed Prepetition Secured Lender Claim and/or an Allowed Other Secured Claim, as the context requires, in each case, to the extent such Claim is secured by Collateral.

1.10    Asset Purchase Agreement means that certain Asset Purchase Agreement, dated as of December 19, 2018, as amended, including all schedules, exhibits and ancillary documents.

1.11    Asset Sale Closing Date means February 6, 2019.

1.12    Available Cash means the Plan Funding as of the Effective Date *plus* Cash received by Wind Down Co thereafter, *less*: (a) Estimated Fee Claims; (b) Allowed Administrative Expense Claims; (c) Allowed Priority Tax Claims; (d) Allowed Priority Non-Tax Claims; (e) Allowed Other Secured Claims; and (f) the amounts necessary to fund the Plan Administrator Expenses and other costs related to the Wind Down as set forth in the Plan Administrator Agreement.  For the avoidance of doubt, Available Cash shall also include the applicable portions of: (i) excess amounts retained for Disputed Claims that become available in accordance with Section 9.04 of this Plan; (ii) excess amounts retained for Fee Claims that become available in accordance with Section 2.04 of this Plan; and (iii) amounts represented by undeliverable Distributions in accordance with Section 8.12 of this Plan.

1.13    Avoidance Actions means any avoidance, equitable subordination or recovery actions or proceedings under chapter 5 of the Bankruptcy Code or similar applicable state law, provided, however, that the Debtors and the Plan Administrator, as applicable, reserve all rights, including the right under section 502(d) of the Bankruptcy Code, to use defensively the waived Avoidance Actions as a basis to object to all or any part of a Claim against the Estates asserted by a Holder which remains in possession of, or otherwise obtains the benefit of, an avoidable transfer.

1.14    Ballot means the form distributed to each holder of an impaired Claim that is entitled to vote to accept or reject this Plan, on which is to be indicated acceptance or rejection of this Plan.

1.15    Bankruptcy Code means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.16    Bankruptcy Court means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

1.17    Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and the Local Rules of the Bankruptcy Court.

1.18    Bar Date means the applicable deadline for filing proofs of Claim, including, without limitation, Claims arising prior to the Petition Date (including 503(b)(9) Claims) and Administrative Expense Claims, as established by order of the Bankruptcy Court [Docket No. 150] or under this Plan.

1.19    Business Day means any day other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

1.20    Cash means legal tender of the United States of America and equivalents thereof.

1.21    Causes of Action means, without limitation, any and all actions, causes of action, Avoidance Actions, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims and demands whatsoever owned by the Debtors, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, whether assertable directly, indirectly, derivatively or in any representative or other capacity, existing or hereafter arising, in law, equity or otherwise, based in whole or in part upon any act, failure to act, error, omission, transaction, occurrence or other event arising or occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.  For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any Claim pursuant to section 362 of the Bankruptcy Code; and (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

1.22    Chapter 11 Cases means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors, which cases are jointly administered under case caption Glansaol Holdings Inc., et al., Chapter 11, Case No. 18-14102 (MEW) and is currently pending before the Bankruptcy Court.

1.23    Claim means any "claim" (as defined in section 101(5) of the Bankruptcy Code) against the Debtors, including, without limitation, any Claim arising after the Petition Date.

1.24    Claims Agent means Omni Management Group Inc., or any other entity approved by the Bankruptcy Court to act as the Debtors' claims and noticing agent pursuant to 28 U.S.C. § 156(c).

1.25    Claim Objection Deadline means the deadline for objecting to Claims other than Fee Claims, which shall be on the date that is the later of (a) 180 days after the Effective Date and, (b) such later date as may be fixed by the Bankruptcy Court.  For the avoidance of doubt, this objection deadline may be extended one or more times by the Bankruptcy Court.

1.26    Class means each category of Claims or Interests established under Article III of this Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.27    Collateral means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable non-bankruptcy law.

1.28    Committee means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases on January 3, 2019 pursuant to section 1102 of the Bankruptcy Code, as the same may be reconstituted from time to time.

1.29    Confirmation Date means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket of the Bankruptcy Court.

1.30    Confirmation Hearing means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to Bankruptcy Code section 1129 as such hearing may be adjourned or continued from time to time.

1.31    Confirmation Order means the order of the Bankruptcy Court confirming the Plan pursuant to Bankruptcy Code section 1129.

1.32    Debtor(s) means, individually or collectively, as the context requires, the entities listed on Exhibit A annexed hereto prior to the Effective Date, and Wind Down Co and the Plan Administrator from and after the Effective Date, as the context requires.

1.33    DIP Administrative Agent means SunTrust Bank, solely in its capacity as administrative agent under the DIP Credit Agreement.

1.34    DIP Claim means a Claim of the DIP Administrative Agent and/or DIP Lenders in respect of the obligations of the Debtors arising under the DIP Credit Agreement and Final DIP Order.

1.35    DIP Credit Agreement means that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of December 20, 2018, by and among the Debtors, the DIP Administrative Agent and the DIP Lenders, as the same may have been modified and amended from time to time, in accordance with the terms thereof.

1.36    DIP Facility means the senior, secured superpriority debtor-in-possession asset-based revolving credit facility provided to the Debtors pursuant to the DIP Credit Agreement, by

and among the Debtors, the DIP Administrative Agent and the DIP Lenders, as the same may have been modified and amended from time to time, in accordance with the terms thereof.

1.37    <u>DIP Lender</u> means SunTrust Bank, solely in its capacity as lender under the DIP Credit Agreement.

1.38    <u>Disallowed</u> means a finding of the Bankruptcy Court in a Final Order, which may include one or more orders granting one or more Omnibus Claims Objections, or provision in the Plan providing that a Disputed Claim shall not be an Allowed Claim.

1.39    <u>Disbursing Agent</u> means, for purposes of making distributions under the Plan, the Debtors or a designee thereof (including the Plan Administrator).

1.40    <u>Disclosure Statement</u> means the disclosure statement relating to this Plan, as such disclosure statement may be amended, modified or supplemented from time to time (including, without limitation, all exhibits and schedules thereto).

1.41    <u>Disclosure Statement Order</u> means the order of the Bankruptcy Court approving the Disclosure Statement as having adequate information in accordance with Bankruptcy Code section 1125.

1.42    <u>Disputed</u> means, as of any relevant date, any Claim or Interest, or any portion thereof: (a) that is not an Allowed Claim, Allowed Interest, Disallowed Claim or Disallowed Interest as of the relevant date; or (b) for which a proof of Claim or Interest has been timely filed with the Bankruptcy Court or a written request for payment has been made, to the extent the Debtors or any party in interest has interposed a timely objection including, an Omnibus Claims Objection or request for estimation, which objection, or request for estimation has not been withdrawn or determined by a Final Order as of the relevant date.

1.43    <u>Distribution</u> means a distribution of Cash or other property pursuant to this Plan.

1.44    <u>Distribution Date</u> means any date that is: (a) the Effective Date; (b) the Initial Distribution Date; (c) any Interim Distribution Date; or (d) the Final Distribution Date, as the context requires.

1.45    <u>Distribution Record Date</u> means the Confirmation Date or such other later date as shall be established by the Bankruptcy Court in the Confirmation Order.

1.46    <u>Effective Date</u> means the first Business Day as soon as reasonably practicable after all conditions to the occurrence of the Effective Date set forth in Section 11.01 hereof have been satisfied or waived, and no stay of the Confirmation Order is in effect.

1.47    <u>Effective Date Distributions</u> means all the Distributions required to be made on the Effective Date under this Plan to the holders of Claims that are Allowed as of the Effective Date.

1.48    Escrow Agent means the disinterested Person selected by the Debtors after consultation with the Committee for purposes of making distributions from the Professional Fee Escrow pursuant to Section 2.04 of the Plan.

1.49    Estate means the estate created in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

1.50    Estimation Order means an order or orders of the Bankruptcy Court estimating for voting and/or distribution purposes (under section 502(c) of the Bankruptcy Code) the allowed amount of any Claim. The defined term Estimation Order includes the Confirmation Order if the Confirmation Order grants the same relief that would have been granted in a separate Estimation Order.

1.51    Existing Interests means the Interests in the Debtors, including Intercompany Interests, outstanding immediately prior to the Effective Date.

1.52    Fee Claim means a Claim by a Professional Person for compensation, indemnification or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103(a) of the Bankruptcy Code in connection with the Chapter 11 Cases, including, without limitation, in connection with the final fee applications of such Professional Person.

1.53    Final Distribution means the distribution to be made by the Disbursing Agent after the Debtors' assets have been reduced to Cash, abandoned or otherwise disposed of, and the Debtors have resolved all Disputed Claims and paid all Fee Claims approved by the Bankruptcy Court by Final Order.

1.54    Final Distribution Date means the date upon which the Final Distribution occurs.

1.55    Final DIP Order means the Final Order authorizing the Debtors to, among other things, obtain postpetition financing  pursuant to the DIP Credit Agreement and DIP Facility [Docket No. 143].

1.56    Final Order means an order or judgment, as entered on the docket of the applicable court that has not been reversed, stayed, modified or amended, and as to which: (a) the time to appeal, seek review or rehearing or petition for certiorari has expired and no timely-filed appeal or petition for review, rehearing, remand or certiorari is pending; or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, however, that the possibility that a motion under Rule 50 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Civil Procedure or Bankruptcy Rules, may be filed relating to such order, ruling or judgment shall not cause such order, ruling or judgment not to be a Final Order; provided, further, that no order or judgment shall fail to be a Final Order solely because of the susceptibility of a Claim to a challenge under section 502(j) of the Bankruptcy Code.

1.57    General Unsecured Claim means any claim against the Debtors, other than: (a) a Prepetition Secured Lender Claim; (b) an Other Secured Claim; (c) a DIP Claim; (d) an Administrative Expense Claim; (e) a Fee Claim; (f) a Priority Tax Claim; (g) U.S. Trustee Fees;

(h) a Priority Non-Tax Claim; or (i) Intercompany Claims, and shall not include Claims that are not Allowed or are released, whether by operation of law or pursuant to order of the Bankruptcy Court, written release or settlement, the provisions of the Plan or otherwise.

1.58    Global Settlement means the global settlement by and among the Debtors, the Committee and the Sponsor which compromises and settles numerous inter-Debtor and creditor-Debtor issues and resolves potential litigation and Claims against the Debtors and the Sponsor in connection with these Chapter 11 Cases, providing for, among other things: (a) payment of the Sponsor Settlement Amount; (b) allocation of asset value among the Debtors; (c) resolution of the validity and enforceability of Intercompany Claims; (d) allocation of Available Cash in accordance with the Allocation Schedule for distribution to holders of General Unsecured Claims; (e) waiver and release of Avoidance Actions to the extent set forth in the Plan; (f) the Committee's selection and appointment of the Plan Administrator to conduct the Wind Down and implement the Plan; (g) waiver of Distributions under the Plan on account of Existing Interests of Debtor Glansaol LLC and re-distribution of Distributions on account of Existing Interests, if any, in accordance with Allocation Schedule; (h) the Committee's support of the Plan and encouragement of creditors to vote in favor of the Plan through the Committee Support Letter (as defined in the Disclosure Statement); (i) the Sponsor's support of the Plan and agreement not to take any action inconsistent with the Plan; (j) Debtor Releases of the Released Parties; and (k) Third-Party Releases of the Sponsor.

1.59    Initial Distribution Date means, except as set forth in this Plan, the first Business Day twenty (20) days after the Effective Date, or such longer or shorter period as may be reasonably determined by the Debtors or the Plan Administrator, as applicable, to make initial Distributions under this Plan.

1.60    Intercompany Claims means collectively, any Claim, Cause of Action or remedy held by a Debtor against another Debtor.

1.61    Intercompany Interest means any Interest held by a Debtor in another Debtor subsidiary.

1.62    Interest means the interest (whether legal, equitable, contractual or other rights) of any holders of any class of equity securities of any Debtor represented by shares of common or preferred stock or other instruments evidencing an ownership interest in any of the Debtors, whether or not certificated, transferable, voting or denominated "stock" or a similar security, and any Claim or Cause of Action related to or arising from the foregoing, or any option, warrant or right, contractual or otherwise, to acquire any such interest.

1.63    Interim Distribution Date means any date, other than the Final Distribution Date, after the Initial Distribution Date on which the Debtors or the Plan Administrator, as applicable, determine that an interim Distribution should be made to holders of Allowed Claims in light of, inter alia, resolutions of Disputed Claims and the administrative costs of such a Distribution.

1.64    Jane Park Promissory Note means that certain promissory note, dated as of December 20, 2016, by and between Debtor Glansaol LLC and Jane Park.

1.65    KEIP means the Key Executive Incentive Plan summarized in the Debtors' Motion for Order Authorizing Implementation of (A) Key Executive Incentive Plan and (B) Key Employee Retention Plan [Docket No. 52], as approved by the Bankruptcy Court.

1.66    Lien shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

1.67    Omnibus Claims Objection means one or more omnibus objections to Claims pursuant to Bankruptcy Rule 3007 or other applicable law objecting to or otherwise reconciling Claims filed against the Debtors.

1.68    Other Secured Claims means any Secured Claim against a Debtor other than a Prepetition Secured Lender Claim.

1.69    Person means any individual, corporation, partnership, association, indenture trustee, limited liability company, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, Interest holder or any other entity or organization of whatever nature.

1.70    Petition Date means December 19, 2018.

1.71    Plan means this chapter 11 liquidating plan, including the Plan Supplement and all exhibits, supplements, appendices and schedules hereto, either in its present form or as the same may be altered, amended or modified from time to time.

1.72    Plan Administrator means Charles Berk of CBIZ Inc., or such other person as appointed by the Committee with the consent of the Debtors pursuant to Section 7.01 hereof and approved by the Bankruptcy Court as Plan Administrator pursuant to Article VII of the Plan.

1.73    Plan Administrator Agreement means that certain agreement establishing and delineating the retention, terms and duties of the Plan Administrator, substantially in the form to be filed as a part of the Plan Supplement, which shall be in form and substance acceptable to the Debtors and the Committee.

1.74    Plan Administrator Expenses means all actual and necessary costs and expenses incurred on or after the Effective Date in connection with the Wind Down and the administration of this Plan including, but not limited to the Debtors' costs, expenses and legal fees incurred related to: (a) making Distributions in accordance with and otherwise administrating this Plan; (b) merging and/or dissolving the Debtors in accordance with the Plan; (c) winding down the Debtors' Estates; (d) performing the duties set forth in Section 7.04 of this Plan and the Plan Administrator Agreement; and (e) paying all fees payable pursuant to section 1930 of title 28 of the United States Code with respect to dissolving the Debtors.

1.75    Plan Administrator Professional Fees has the meaning set forth in Section 7.04(a) of the Plan.

1.76    Plan Documents means those documents necessary to effectuate this Plan following entry of the Confirmation Order, including the Plan Administrator Agreement, which

shall be contained in the Plan Supplement (also which shall be subject to revision and modification prior to the Effective Date).

1.77    <u>Plan Funding</u> means the Cash of the Debtors on the Effective Date, including the Sponsor Settlement Amount.

1.78    <u>Plan Supplement</u> means the supplemental appendix to this Plan, to be filed no later than five (5) Business Days prior to the deadline for Ballots to be received in connection with voting to accept or reject the Plan, which will contain, among other things, draft forms, signed copies, or summaries of material terms, as the case may be, of the Plan Documents, each of which shall be subject to revision and modification prior to the Effective Date.

1.79    <u>Plan Transaction</u> has the meaning set forth in Section 6.07 of the Plan.

1.80    <u>Preference Action</u> means any avoidance or recovery actions or proceedings under chapter 547, 550 through 553 of the Bankruptcy Code or applicable state law.

1.81    <u>Prepetition Secured Lender Claim</u> means any Claim arising under the Prepetition Secured Credit Agreement.

1.82    <u>Prepetition Secured Credit Agreement</u> means that certain Credit Agreement dated as of April 21, 2017 (as amended, restated, supplemented or otherwise modified).

1.83    <u>Prepetition Secured Loan</u> means the loan made in connection with the senior secured asset-based revolving credit facility pursuant to the Prepetition Secured Credit Agreement in the aggregate principal amount of $20,000,000.

1.84    <u>Priority Non-Tax Claim</u> means any Claim, other than an Administrative Expense Claim, a DIP Claim, a Fee Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.85    <u>Priority Tax Claim</u> means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind specified in Bankruptcy Code sections 502(i) and 507(a)(8).

1.86    <u>Priority Tax Claim Reserve</u> means the account to be established by the Debtors and funded with the Priority Tax Claim Reserve Amount pursuant to Section 2.07 of this Plan.

1.87    <u>Priority Tax Claim Reserve Amount</u> means Cash, estimated by the Debtors to be in the amount of $548,833.24, which estimate is based on the amounts of (a) timely filed Priority Tax Claims, (b) Priority Tax Claims listed in the Schedules, and (c) given the June 17, 2019 deadline for governmental units to file proofs of claim, the Debtors' estimated Priority Tax Claims for the years 2018 and 2019.

1.88    <u>Privileges</u> has the meaning set forth in Section 7.09 of the Plan.

1.89    <u>Professional Expense Escrow</u> means the segregated account maintained by the Debtors funded pursuant to the terms of the Final DIP Order.

9

1.90    Professional Persons means all Persons retained by order of the Bankruptcy Court in connection with the Chapter 11 Cases, pursuant to sections 327, 328, 330 or 1103 of the Bankruptcy Code.

1.91    Pro Rata means proportionate, so that, for example, the ratio of (a) the amount of all consideration distributed on account of an Allowed Claim against a particular Debtor to (b) the amount of such Allowed Claim against such Debtor is the same as the ratio of (a) the amount of all consideration distributed on account of all Allowed Claims against such Debtor in the Class in which such Claim is classified to (b) the amount of all Allowed Claims in such Class against such Debtor.

1.92    Released Parties means, collectively, (a) the Debtors, (b) each of the Estates, (c) the Committee, (d) the members of the Committee, (e) the DIP Administrative Agent and the DIP Lenders, (f) the Plan Administrator, (g) the Sponsor, (h) the Prepetition Secured Lenders, (i) Wind Down Co and (j) with respect to each of the foregoing Persons in clauses (a)-(i), such Person's current and former officers, directors, principals, members, employees, agents, shareholders, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective predecessors, successors and assigns, in each case in their capacity as such, and only if serving in such capacity; provided, however, that such attorneys and professional advisors shall only include those that provided services related to the Chapter 11 Cases and the transactions contemplated by the Plan.

1.93    Releasing Parties means, collectively, (a) the Debtors, (b) each of the Estates, (c) the Committee, (d) the members of the Committee, (e) the DIP Administrative Agent and the DIP Lenders, (f) the Plan Administrator, (g) the Sponsor, (h) the Prepetition Secured Lenders, (i) Wind Down Co, (j) with respect to each of the foregoing Persons in clauses (a)-(i), such Person's current and former officers, directors, principals, members, employees, agents, shareholders, advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, together with their respective predecessors, successors and assigns, in each case in their capacity as such, and only if serving in such capacity, (k) holders of Claims who vote to accept the Plan, (l) holders of Claims who vote to reject the Plan but who vote to "opt in" to the Third Party Release, (m) Jane Park and (n) all holders of Claims and Interests not described in clauses (a)-(m) who elect to opt-in to the Third Party Release; provided however, that the Debtors' current director, managers and officers that are holders of Interests shall be deemed a "Releasing Party" regardless of whether such party submits a duly completed opt-in form; provided further however, that any holder of a Claim or Interest that is deemed to have granted the Third Party Release in the Confirmation Order (which holders have been expressly identified in the Disclosure Statement and the Ballots of such holders) shall be deemed a "Releasing Party" regardless of whether such holder elected to opt into the Third Party Releases; provided further however, that notwithstanding anything to the contrary herein, the scope of the "Releasing Parties" shall be subject to the limitations set forth in Section 12.06(b) herein.

1.94    Sale Proceeds means all proceeds from the Sale Transaction.

1.95    Sale Transaction means the sale of all or substantially all of the Debtors' assets pursuant to the Asset Purchase Agreement and approved by order of the Bankruptcy Court [Docket No. 165].

1.96    Schedules means the schedules of assets and liabilities, the lists of holders of Interests, and the statements of financial affairs filed by each of the Debtors pursuant to Bankruptcy Code section 521 and Bankruptcy Rule 1007, and all amendments and modifications thereto filed with the Bankruptcy Court through and including the Confirmation Date.

1.97    Secured Claim means a Claim, either as set forth in this Plan, as agreed to by the holder of such Claim and the Debtors or as determined by a Final Order in accordance with sections 506(a) or 1111(b) of the Bankruptcy Code: (a) that is secured by a valid, perfected and enforceable Lien on Collateral that is not subject to avoidance under bankruptcy or nonbankruptcy law, to the extent of the value of the Claim holder's interest in such Collateral as of the relevant date; or (b) to the extent that the holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

1.98    Sponsor means Warburg Pincus Private Equity XII, L.P.; Warburg Pincus Private Equity XII-B, L.P.; Warburg Pincus Private Equity XII-D, L.P.; Warburg Pincus Private Equity XII-E, L.P.; WP XII Partners, L.P.; Warburg Pincus XII Partners, L.P.; Warburg Pincus LLC and their respective affiliates.

1.99    Sponsor Settlement Amount means $1,650,000.00 funded by the Sponsor on the Effective Date pursuant to the Global Settlement.

1.100    Third Party Release means the releases under Section 12.06(b) of the Plan.

1.101    U.S. Trustee means the United States Trustee for the Southern District of New York.

1.102    U.S. Trustee Fees means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

1.103    Wind Down means the work necessary to administer and implement the Plan, liquidate the Debtors' remaining assets, collect or recover the Debtors' assets and claims, prosecute Claims and Causes of Action, pay the Plan Administrator Expenses and other costs and expenses and take all other actions contemplated or required under Articles VI and VII of the Plan and the Plan Administrator Agreement necessary to administer and close the Chapter 11 Cases.

1.104    Wind Down Co means the Debtors after the Effective Date, whose primary responsibility will be to Wind Down the Estates.

B.    Interpretation; Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection or clause contained therein. Whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code

or the Bankruptcy Rules, as applicable. The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Plan. The word "including" as used in this Plan means "including, without limitation" regardless of whether so specified. Any reference in this Plan to a contract, instrument, release, indenture or other agreement or documents being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, and any reference in this Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented. Subject to the provisions of any contract, certificates or articles of incorporation, by-laws, instruments, releases or other agreements or documents entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules. The captions and headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Any reference to an entity as a holder of a Claim or Interest includes that entity's successors and assigns.

      C.     <u>Reference to the Debtors or Wind Down Co</u>.

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or Wind Down Co shall mean the Debtors and the Wind Down Co as applicable, to the extent the context requires.

      D.     Appendices and Plan Documents.

All Plan Documents and appendices to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein. The documents contained in the exhibits and Plan Supplement shall be approved by the Bankruptcy Court pursuant to the Confirmation Order. Holders of Claims may inspect copies of the Plan Documents, once filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or via the Claims Agent's website at https://omnimgt.com/glansaol, or obtain a copy of the Plan Documents by a written request sent to the Claims Agent at the following address:

<div align="center">

Glansaol Holdings Inc., et. al. Claims
Processing c/o Omni Management Group
5955 De Soto Avenue, Suite 100 Woodland
Hills, CA 91367

**ARTICLE II**

**DIP CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS,
FEE CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS**

</div>

All Claims and Interests, except DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article III below. In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims of the Debtors have not been classified, and the holders thereof are not entitled to vote on this Plan. A

<div align="center">12</div>

Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

A Claim or Interest also is placed in a particular Class for all purposes, including voting, confirmation and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code. However, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

2.01.    DIP Claims.  In settlement and release of the Allowed DIP Claims, on the Asset Sale Closing Date the holders of Allowed DIP Claims were paid in full from Sale Proceeds resulting from the Sale Transaction.  Upon payment in full of the Allowed DIP Claims, all Liens and security interests granted to secure Allowed DIP Claims against the Debtors in the Chapter 11 Cases were terminated and have no further force or effect.

2.02.    Administrative Expense Claims.  Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date an Administrative Expense Claim becomes an Allowed Claim, the holder of such Allowed Administrative Expense Claim shall receive from the Plan Funding or the Administrative and Priority Claims Reserve, as applicable, an amount equal to such Allowed Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession, shall be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing or other documents relating to, such liabilities; provided, however, that Administrative Expense Claims that have been assumed by the purchaser pursuant to the Asset Purchase Agreement shall not be an obligation of the Debtors. For the avoidance of doubt, all tax claims of governmental units arising from and after the date of the closing of the Sale Transaction have been assumed by the Purchaser under the Asset Purchase Agreement and, therefore, do not constitute obligations of the Debtors under this Plan.

2.03.    Time for Filing Administrative Expense Claims.  The holder of an Administrative Expense Claim, other than:

(a)    a DIP Claim;

(b)    a Fee Claim;

(c)    an Administrative Expense Claim that has been Allowed on or before the Effective Date;

(d)    an Administrative Expense Claim held by an officer, director or employee of any of the Debtors employed as of the Petition Date for indemnification, contribution or advancement of expenses pursuant to: (A) any Debtor's certificate of

13

incorporation, by-laws or similar organizational document, or (B) any indemnification or contribution agreement approved by the Bankruptcy Court;

(e)    an Administrative Expense Claim arising, in the ordinary course of business, out of the employment by any of the Debtors of an individual from and after the Petition Date, but only to the extent that such Administrative Expense Claim is solely for outstanding wages, commissions, accrued benefits or reimbursement of business expenses; or

(f)    an Administrative Expense Claim that arose on or before June 29, 2019 that is subject to an existing order of the Bankruptcy Court fixing an earlier deadline for filing such Administrative Expense Claim; or

(g)    U.S. Trustee Fees,

must file with the Bankruptcy Court and serve on the Debtors, the Claims Agent and the Office of the United States Trustee, **notice of such Administrative Expense Claim so as to be received by 5:00 p.m. prevailing Eastern time on the date that is thirty (30) days after service of notice of occurrence of the Effective Date (the "Administrative Bar Date")**. Such notice must include at a minimum: (i) the name of the applicable Debtor that is purported to be liable for the Administrative Expenses Claim; (ii) the name of the holder of the Administrative Expense Claim; (iii) the amount of the Administrative Expense Claim; (iv) the basis of the Administrative Expense Claim; and (v) supporting documentation for the Administrative Expense Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND RELEASED.**

    2.04.    <u>Fee Claims</u>. All Professional Persons seeking allowance by the Bankruptcy Court of a Fee Claim shall: (i) file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is forty-five (45) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court; and (ii) if granted such an award by the Bankruptcy Court, be paid in full in Cash such amount as awarded by the Bankruptcy Court (A) no later than five (5) Business Days after the date an order is entered with respect to such award or (B) upon such other terms as may be mutually agreed upon between such holder of a Fee Claim and the Debtors. On the Effective Date, the Debtors shall deposit Cash in the Professional Expense Escrow in an amount equal to accrued but unpaid Fee Claims as of the Effective Date plus the reasonable, good faith estimate of post-Effective Date Fee Claims to be incurred by each Professional Person (such estimates to be provided to the Debtors at least two (2) Business Days prior to the Effective Date), which Cash shall be used, until all Allowed Fee Claims have been paid in full, solely for the payment of Allowed Fee Claims. Objections to Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty-five (65) days after the Effective Date. The Professional Fee Escrow Account shall not be, and shall not be deemed to be, property of the Debtors or Wind Down Co, however, to the extent the Cash in the Professional Expense Escrow exceeds the amount of the Allowed Fee

Claims, such excess Cash shall be distributed by the Escrow Agent to Wind Down Co.  All Professional Persons seeking allowance by the Bankruptcy Court of a Fee Claim shall be paid in full in Cash in such amounts as are approved by the Bankruptcy Court: (i) upon the later of (x) the Effective Date, and (y) fourteen (14) calendar days after the date upon which the order relating to the allowance of any such Fee Claim is entered, or (ii) upon such other terms as may be mutually agreed upon between the holder of such Fee Claim and the Plan Administrator.

2.05.   U.S. Trustee Fees.  The Debtors shall pay all outstanding U.S. Trustee Fees of the Debtors by the Effective Date.  Thereafter, U.S. Trustee Fees shall be paid as they become due, until such time as a final decree is entered closing the Chapter 11 Cases, the Chapter 11 Cases are converted or dismissed, or the Bankruptcy Court orders otherwise.

2.06.   Quarterly Filing Reports.  After the Effective Date, the Plan Administrator shall file with the Bankruptcy Court and serve on the U.S. Trustee a quarterly financial report, in accordance with Rule 3021-1 of the Local Bankruptcy Rules for the Southern District of New York, regarding all income and disbursements, including all Plan Distributions, for each financial quarter (or portion thereof) until such time as a final decree is entered closing the Chapter 11 Cases, the Chapter 11 Cases are converted or dismissed, or the Bankruptcy Court orders otherwise.

2.07.   Priority Tax Claims.  Except to the extent that a holder of an Allowed Priority Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, first from the Priority Tax Claim Reserve and second, to the extent necessary, from the Plan Funding, at the option of the Debtors or the Plan Administrator either: (i) on, or as soon thereafter as is reasonably practicable, the later of (x) the Effective Date and (y) the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Claim, or (ii) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Petition Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim (with any interest to which the holder of such Priority Tax Claim may be entitled calculated in accordance with section 511 of the Bankruptcy Code); provided, however, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business as they become due.

# ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

This Plan constitutes a separate chapter 11 plan for each Debtor. Except for the Claims addressed in Article II (or as otherwise set forth herein), all Claims against and Interests in a particular Debtor are placed in Classes for each of the Debtors.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Expense Claims, DIP Claims, U.S. Trustee Fees, Priority Tax Claims and Fee Claims as described in Article II:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Prepetition Secured Lender Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 3 | Priority Non-Tax Claims | Unimpaired | No (conclusively presumed to accept) |
| Class 4 | Intercompany Claims | Impaired | No (conclusively deemed to reject) |
| Class 5 | General Unsecured Claims | Impaired | Yes (entitled to vote) |
| Class 6 | Existing Interests | Impaired | No (conclusively deemed to reject subject to the Global Settlement) |

If a controversy arises regarding whether any Claim is properly classified under the Plan, the Bankruptcy Court shall, upon proper motion and notice, determine such controversy at the Confirmation Hearing.  If the Bankruptcy Court finds that the classification of any Claim is improper, then such Claim shall be reclassified and the Ballot previously cast by the holder of such Claim shall be counted in, and the Claim shall receive the treatment prescribed in, the Class in which the Bankruptcy Court determines such Claim should have been classified, without the necessity of resoliciting any votes on the Plan.

## ARTICLE IV

## TREATMENT OF CLAIMS AND INTERESTS

### 4.01.    CLASS 1 – PREPETITION SECURED LENDER CLAIMS.

(a)    _Impairment and Voting_.  Class 1 is unimpaired by the Plan.  Each holder of a Prepetition Secured Lender Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    _Treatment_.  The legal, equitable and contractual rights of the holders of Prepetition Secured Lender Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Prepetition Secured Lender Claim has been paid by the Debtor prior to the Effective Date or agrees to a different treatment, on the Effective Date each holder of an Allowed Prepetition Secured Lender Claim shall receive Cash in an amount equal to such Allowed Prepetition Secured Lender Claim.  Pursuant to the terms of the Final DIP Order, all outstanding Prepetition Secured Lender Claims were paid in full upon the consummation of the Sale Transaction.

### 4.02.    CLASS 2 – OTHER SECURED CLAIMS.

(a)    _Impairment and Voting_.  Class 2 is unimpaired by the Plan.  Each holder of an Allowed Other Secured Claim is not entitled to vote to accept or reject the Plan because it is unimpaired and conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    _Treatment_.  The legal, equitable and contractual rights of the holders of Other Secured Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Other Secured Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, on the applicable Distribution Date each holder of an Allowed Other Secured Claim shall receive at the election of the Debtors on or before, the later of the Effective Date and thirty (30) days after the date on which a Class 2 Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter, (i) Cash in an amount equal to such Allowed Other Secured Claim, (ii) the collateral securing such Allowed Other Secured Claim, or (iii) such other treatment that will render such Allowed Other Secured Claim unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)    _Separate Classification of Secured Claims_.  Although all Other Secured Claims have been placed in one Class for purposes of nomenclature, each Other Secured Claim, to the extent secured by a Lien on Collateral different than that securing any other Secured Claims, shall be treated as being in a separate sub-Class for the purpose of voting on the Plan and receiving Distributions.

### 4.03.    CLASS 3 - PRIORITY NON-TAX CLAIMS.

(a)    _Impairment and Voting_.  Class 3 is unimpaired by the Plan.  Each holder of an Allowed Priority Non-Tax Claim is not entitled to vote to accept or reject the Plan because

it is unimpaired and conclusively presumed to have accepted the Plan, pursuant to section 1126(f) of the Bankruptcy Code.

(b)    _Treatment_.  The legal, equitable and contractual rights of the holders of Priority Non-Tax Claims are unaltered by this Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Non-Tax Claim, shall receive (i) Cash in an amount equal to such Allowed Priority Non-Tax Claim, or (ii) such other treatment that will render such Allowed Priority Non-Tax Claim unimpaired pursuant to section 1124 of the Bankruptcy Code on the later of the Effective Date and the date such Allowed Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon thereafter as is practicable.

4.04.    CLASS 4 – INTERCOMPANY CLAIMS.

(a)    _Impairment and Voting_.  Class 4 is impaired by the Plan.  In accordance with section 1126(g) of the Bankruptcy Code, the holders of Intercompany Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan, and such holders will not be solicited with respect to such Intercompany Claims.

(b)    _Treatment_.  On or after the Effective Date, each holder of an Intercompany Claim shall not receive a distribution on account of such Claims and the Intercompany Claims shall be cancelled as of the Effective Date.

4.05.    CLASS 5 - GENERAL UNSECURED CLAIMS.

(a)    _Impairment and Voting_.  Class 5 is impaired by the Plan.  Each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)    _Treatment_.  Except to the extent that a holder of an Allowed General Unsecured Claim has been paid by the Debtors prior to the Effective Date or agrees to a different treatment, each holder of an Allowed General Unsecured Claim shall receive, subject to the terms of the Plan, its Pro Rata share of the Available Cash _provided_, _however_, that each holder of an Allowed General Unsecured Claim shall not receive an amount that exceeds 100% of the amount of such Allowed General Unsecured Claim.

4.06.    CLASS 6 – EXISTING INTERESTS.

(a)    _Impairment and Voting_.  Class 6 is impaired by the Plan.  Each holder of an Existing Interest is conclusively deemed to reject the Plan.

(b)    _Treatment_.  On or after the Effective Date, each holder of an Existing Interest, to the extent that all Allowed General Unsecured Claims have been satisfied in full against such Debtor, shall not receive a Distribution because such Distributions if any, shall be reallocated in accordance with Allocation Schedule.

## **ARTICLE V**

## **ACCEPTANCE OR REJECTION OF**

18

## THE PLAN; EFFECT OF REJECTION BY ONE
## OR MORE CLASSES OF CLAIMS OR INTERESTS

5.01.    Class Acceptance Requirement.  A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in dollar amount of the Allowed Claims in such Class and more than one-half (1/2) in number of holders of such Claims that have voted on the Plan.

5.02.    Tabulation of Votes on a Non-Consolidated Basis.  All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfied sections 1129(a)(8) and/or 1129(a)(10) of the Bankruptcy.

5.03.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown".  With respect to any rejecting Class of Claims or Interests, the Debtors will request confirmation of this Plan, as it may be modified and amended from time to time, under section 1129(b) of the Bankruptcy Code with respect to such Classes.  Subject to Section 14.06 of the Plan, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

5.04.    Elimination of Vacant Classes.  Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

5.05.    Voting Classes; Presumed Acceptance by Non-Voting Classes.  If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims or Interests in such Class.

## ARTICLE VI

## IMPLEMENTATION OF THE PLAN

6.01.    Non-substantive Consolidation.  The Plan is a joint chapter 11 plan for each of the Debtors, with the Plan for each Debtor being non-severable and mutually dependent on the Plan for each other Debtor.  The Plan does not provide for substantive consolidation of the Debtors' Estates, and on the Effective Date, the Debtors' Estates shall not be deemed to be substantively consolidated for purposes hereof.  Except as specifically set forth herein, nothing in this Plan shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor.  Notwithstanding the foregoing, solely for Distribution purposes, holders of Allowed General Unsecured Claims shall be entitled to a single Claim with respect to any particular debt owed against an individual Debtor.

6.02.    Management of Debtors' Assets.  After the Effective Date, all property of the Debtors shall be managed and administered by the Plan Administrator.  If the Plan Administrator in its discretion decides not to sell any non-Cash property or if such property cannot, in the Plan

Administrator's judgment, be sold in a commercially reasonable manner prior to the Final Distribution Date, the Plan Administrator shall have the right to abandon or otherwise dispose of such property in their business judgment.  Absent gross negligence, willful misconduct or fraud in connection therewith, no party in interest shall have a cause of action against the Plan Administrator, the Debtors or each of their respective directors, officers, employees, consultants, trustees or professionals arising from or related to the disposition of non-Cash property in accordance with this Section.

      6.03.   <u>Charter and Bylaw Amendments</u>.

      (a)   The charter, bylaws and/or other constituent documents and agreements of the Debtors shall be revised as necessary and appropriate to comport with the terms of the Plan.

      (b)   Any action under the Plan to be taken by or required of the Debtors, including the adoption or amendment of certificates of incorporation and bylaws, the issuance of instruments, and the selection of officers or directors, shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors' equityholders, sole members, boards of directors or boards of managers, or similar body, as applicable.

      6.04.   <u>Cancellation of Existing Securities and Agreements</u>.  Except for the purpose of evidencing a right to distribution under this Plan, on the Effective Date, any document, agreement or instrument evidencing any Claim or Interest, shall be deemed cancelled without further act or action under any applicable agreement, law, regulation, order or rule and the obligations of the Debtors under such documents, agreements or instruments evidencing such Claims and Interests, as the case may be, shall be deemed extinguished.

      6.05.   <u>Cancellation of Existing Security Interests</u>.  Upon the full payment or other satisfaction of an Allowed Secured Claim, or promptly thereafter, the holder of such Allowed Secured Claim shall deliver to the Debtors any Collateral or other property of the Debtors held by such holder, and any termination statements, instruments of satisfactions or releases of all security interests with respect to its Allowed Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanic's liens or lis pendens.

      6.06.   <u>Approval of Plan Documents</u>.  The solicitation of votes on the Plan shall be deemed a solicitation for the approval of the Plan Documents and all transactions contemplated hereunder.  Entry of the Confirmation Order shall constitute approval of the Plan Documents and such transactions.  On the Effective Date, the Debtors shall be authorized to enter into, file, execute and/or deliver each of the Plan Documents and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further corporate, board or shareholder action.

      6.07.   <u>Plan Transactions</u>.  On the Effective Date or as soon thereafter as is reasonably practicable, Wind Down Co, the Debtors and the Plan Administrator may take any and all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary or appropriate to effectuate this Plan (the "<u>Plan Transactions</u>"), including, but not limited to, (i) the execution and delivery of appropriate agreements or other documents of financing, merger, consolidation, restructuring, conversion, disposition, transfer, or

dissolution, containing terms that are consistent with the terms of this Plan and that satisfy the requirements of applicable law; (ii) the execution and delivery of any appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt, duty or obligation on terms consistent with this Plan; (iii) the filing of appropriate dissolution documents or other corporate filings with the appropriate governmental authorities pursuant to applicable law; (iv) payment of the KEIP; and (v) any and all other actions that Wind Down Co, the Debtors or Plan Administrator determine are necessary or appropriate.

6.08.    <u>Comprehensive Settlement of Claims and Controversies</u>.  Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the Distributions and other benefits provided under the Plan, the Plan is and shall constitute a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal and subordination rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval as of the Effective Date of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates and property, and holders of Claims and Interests and is fair, equitable and reasonable.  The compromises, settlements and releases described herein shall be deemed nonseverable from each other and from all other terms of the Plan.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, Wind Down Co, through the Plan Administrator, may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Persons.

Without limiting the foregoing, entry of the Confirmation Order, to the extent provided in therein, shall constitute approval of the Global Settlement.

6.09.    <u>Vesting of the Debtors' Assets as of the Effective Date</u>.  On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property, assets and interests of the Estates shall vest in, and be held in the name of, the applicable Debtor, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as otherwise provided herein or the Confirmation Order including with respect to the rights to receive any Distribution hereunder and the rights to collect under the Debtors' existing insurance policies, including the primary director and officer liability, employment practices liability, or fiduciary liability insurance policies and any claims arising thereunder, and all Causes of Action.

6.10.    <u>Avoidance Actions</u>.  As of the Effective Date, the Debtors, on behalf of themselves and their Estates, shall be deemed to waive and release all Avoidance Actions.

6.11.    <u>Plan Funding</u>.

(a)    The Plan Funding shall be established in accordance with the terms of the Plan and the Plan Administrator Agreement, to fund the Debtors' obligations under the Plan, and the Wind Down of the Debtors' affairs (including the Plan Administrator Expenses as provided under the Plan Administrator Agreement).

(b)    Upon the closing of the Chapter 11 Cases, or such earlier time as it appears, in the reasonable view of the Plan Administrator that the Debtors' assets have been reduced to Cash, all Available Cash shall be allocated among each of the Debtors in the proportions set forth in the Allocation Schedule to the holders of Claims in Class 5 in satisfaction of such Class members' Claims.

## ARTICLE VII

## PLAN ADMINISTRATION

7.01.    Appointment of the Plan Administrator.

(a)    On the Effective Date, the Plan Administrator shall be appointed pursuant to the Plan and the Plan Administrator Agreement, and shall be authorized to conduct the Wind Down of the Debtors' affairs in accordance with section 1123 of the Bankruptcy Code and shall have all powers, authority and responsibilities specified in the Plan.  Pursuant to Bankruptcy Code § 1123(b)(3), the Plan Administrator shall be deemed the appointed representative to, and may pursue and litigate Debtor and Estate Claims and Causes of Action and pursue, litigate, compromise and settle any such rights, Claims and Causes of Action in accordance with the best interests of and for the benefit of the holders of Claims and Interests.

(b)    In the event that the Plan Administrator resigns, is removed, terminated or otherwise unable to serve as the Plan Administrator, then a successor shall be appointed as set forth in the Plan Administrator Agreement.  Any successor Plan Administrator shall be bound by and comply with the terms of the Plan, the Confirmation Order and the Plan Administrator Agreement.

7.02.    Preservation of Rights.

(a)    Under the Plan, the Plan Administrator retains any and all rights of, and on behalf of, the Debtors, the Estates, and Wind Down Co, not released pursuant to the terms of this Plan, to commence and pursue any and all Causes of Action, including, without limitation, setoff, offset and recoupment rights, regardless of whether or not such rights are specifically enumerated in the Plan, Disclosure Statement, Plan Supplement, or elsewhere, and all such rights shall not be deemed modified, waived, released in any manner, nor shall confirmation of the Plan or the Confirmation Order act as res judicata or limit any of such rights of the Plan Administrator to commence and pursue any and all Causes of Action, including, without limitation, setoff, offset and recoupment rights, to the extent the Plan Administrator deems appropriate.  Any and all Causes of Action, including, without limitation, setoff, offset and recoupment rights, may, but need not, be pursued by the Debtors prior to the Effective Date and by the Plan Administrator after the Effective Date, to the extent warranted.

(b)    Unless a Cause of Action against a Creditor or other Entity is expressly waived, relinquished, released, compromised or settled in this Plan, or any Final Order, the Debtors expressly reserve any and all Causes of Action, including, without limitation, setoff, offset and recoupment rights, for later enforcement and prosecution by the Plan Administrator (including, without limitation, any Causes of Action set forth in the Plan Supplement, or not

specifically identified herein, in the Disclosure Statement, or otherwise, or which the Debtors may presently be unaware of, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time, or facts or circumstances which may change or be different from those which the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such any and all Causes of Action, including, without limitation, setoff, offset and recoupment rights, upon or after the confirmation or consummation of this Plan based on the Disclosure Statement, this Plan or the Confirmation Order.

(c)    The Debtors and the Plan Administrator do not intend, and it should not be assumed (nor shall it be deemed) that because any existing or potential Causes of Action, including, without limitation, setoff, offset and recoupment rights, have not yet been pursued by the Debtors or are not set forth herein, in the Disclosure Statement, or otherwise, that any and all Causes of Action, including, without limitation, setoff, offset and recoupment rights, has been waived or expunged.

7.03.    <u>Books and Records</u>.  Books and records, including computer generated or computer maintained books and records for computer data, as well as electronically generated or maintained books and records or data, along with books and records of any Debtors maintained by or in the possession of third parties shall remain property of the Debtors or Wind Down Co as applicable to be used by the Plan Administrator to Wind Down the Debtors and their Estates and implement the Plan.

7.04.    <u>Powers and Duties</u>.

(a)    <u>General Powers and Duties</u>.  From and after the Effective Date, pursuant to the terms and provisions of this Plan, the Plan Administrator shall have the power and authority to perform the acts set forth in the Plan Administrator Agreement (subject to approval by the Bankruptcy Court where applicable), in addition to any powers granted by law or conferred to it by any other provision of the Plan, including without limitation any set forth herein, <u>provided</u> <u>however</u>, that enumeration of the following powers shall not be considered in any way to limit or control the power and authority of the Plan Administrator to act as specifically authorized by any other provision of this Plan, the Plan Administrator Agreement, and/or any applicable law, and to act in such manner as the Plan Administrator may deem necessary or appropriate to take any act deemed appropriate by the Plan Administrator, including, without limitation, to discharge all obligations assumed by the Plan Administrator or provided herein and to conserve and protect the Debtors' assets or to confer on holders of Claims and Interests the benefits intended to be conferred upon them by this Plan.  The Plan Administrator shall be empowered to:  (i) take all steps and execute all instruments and documents necessary to make Distributions to holders of Allowed Claims and to perform the duties assigned to the Plan Administrator under this Plan and/or the Plan Administrator Agreement; (ii) liquidate the assets of the Debtors or as necessary to comply with this Plan and the obligations hereunder; (iii) employ, retain or replace, professionals to represent Wind Down Co; (iv) assert, prosecute, object to, pursue, compromise or settle in accordance with the Plan Administrator's reasonable business judgment, all matters affecting the Estates, including, Disputed Claims, including subordination and recharacterization of Claims by objection, motion

23

or adversary proceeding, to the extent set forth in the Plan Administrator Agreement, and except as provided therein without further order of the Bankruptcy Court; (v) act on behalf of the Debtors in all adversary proceedings and contested matters then pending or that can be commenced in the Bankruptcy Court and in all actions and proceedings pending or commenced elsewhere and to settle, retain, enforce, dispute or adjust any Claim and otherwise pursue actions involving assets of the Debtors that could arise or be asserted at any time under the Bankruptcy Code, unless otherwise, waived, relinquished or transferred in the Plan; (vi) establish, replenish or release reserves as provided in this Plan, as applicable; (vii) seek a determination of tax liability under section 505 of the Bankruptcy Code, file tax returns and pay taxes, if any, related to the Debtors; (viii) abandon in any commercially reasonable manner, including abandonment or donation to a charitable organization of the Plan Administrator's choice, any assets of the Debtors if they are of no benefit to the Estate or the Debtors; (ix) purchase or create and carry all insurance policies and pay all insurance premiums and costs the Plan Administrator deems necessary or advisable; (x) assert and enforce all legal or equitable remedies or defenses belonging to the Debtors or their Estates, without limitation setoff, recoupment and any rights under section 502(d) of the Bankruptcy code; and (xi) exercise such other powers as may be vested in the Plan Administrator pursuant to the Plan, the Plan Administrator Agreement or any other Plan Documents or order of the Bankruptcy Court or otherwise act on behalf of and for the Debtor from and after the Effective Date in a manner consistent with the provisions of the Plan which the Plan Administrator deems reasonably necessary or desirable with respect to administering the Plan.  The reasonable fees and expenses of the professional persons employed by the Plan Administrator (the "Plan Administrator Professional Fees") in connection with his or her duties and responsibilities shall be paid as set forth in this Plan.  The Plan Administrator Professional Fees shall be paid within ten (10) Business Days after submission of a detailed invoice therefor to the Plan Administrator.  If the Plan Administrator disputes the reasonableness of any such invoice, the Plan Administrator or the affected professional may submit such dispute to the Bankruptcy Court for a determination of the reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.  The undisputed portion of such reasonable fees and expenses shall be paid as provided herein.  Subject to the other terms and provisions of this Plan, the Plan Administrator shall be granted standing, authority, power and right to assert, prosecute and/or settle the Causes of Action and/or make a claim under any primary director and officer liability, employment practices liability, or fiduciary liability insurance policies based upon its powers as a bankruptcy appointed representative of the Debtors' Estates with the same or similar abilities possessed by insolvency trustees, receivers, examiners, conservators, liquidators, rehabilitators or similar officials.

        (b)     Distributions.  Pursuant to the terms and provisions of the Plan, the Plan Administrator shall oversee the required Distributions specified under the Plan, on the Initial Distribution Date, Interim Distribution Date or Final Distribution Date, as the case may be, under the Plan.

        7.05.   Resignation, Death or Removal of Plan Administrator.  The Plan Administrator may resign at any time upon application to the Bankruptcy Court.  In the event of any such resignation, or the removal, death or incapacity of the Plan Administrator, the Bankruptcy Court may, upon motion of a party in interest or other request, appoint a new Plan Administrator.  No successor Plan Administrator hereunder shall in any event have any liability or responsibility for the acts or omissions of any of his or her predecessors.  Every successor Plan Administrator

appointed pursuant hereto shall execute, acknowledge and file with the Bankruptcy Court, and deliver to the holders of General Unsecured Claims (at the addresses as provided in Section 8.05) an instrument in writing accepting such appointment hereunder, and thereupon such successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties and obligations of his or her predecessor.  Any resigning or removed Plan Administrator (or the executor or other representative of any deceased or incapacitated Plan Administrator) shall transfer, in exchange for consideration of one dollar ($1.00), the common stock of the Debtors owned by such Plan Administrator to the successor Plan Administrator.

7.06.    Compensation of Plan Administrator.  The Plan Administrator shall be compensated as set forth in the Plan Administrator Agreement.  The Plan Administrator shall fully comply with the terms, conditions and rights set forth in this Plan, the Confirmation Order and the Plan Administrator Agreement.  The Plan Administrator shall not be required to file a fee application to receive compensation.

7.07.    Limitation of Liability.  Wind Down Co shall indemnify the Plan Administrator and his or her professionals against any losses, liabilities, expenses (including attorneys' fees and disbursements), damages, taxes, suits or claims that the Plan Administrator or his or her professionals may incur or sustain by reason of being or having been a Plan Administrator or professionals of the Plan Administrator for performing any functions incidental to such service; provided, however, the foregoing shall not relieve the Plan Administrator or his or her professionals from liability for bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud or self-dealing, or, in the case of an attorney professional and as required under Rule 1.8(h)(1) of the New York State Rules of Professional Conduct, malpractice.

7.08.    Exculpation Relating to Wind Down Co.  On and after the Effective Date, the Plan Administrator, the Debtors and Wind Down Co shall not have any liability to holders of Claims or Interests other than as provided for in the Plan.  The Plan will be administered and actions will be taken in the name of Wind Down Co through the Plan Administrator.  The Plan Administrator shall comply with all applicable provisions of the Plan.  On the Effective Date, the Plan Administrator shall assume all of its other obligations, powers and authority under the Plan.  No holder of a Claim or Interest or any other party in interest will have, or otherwise pursue, any claim or cause of action against the Plan Administrator, the Debtors, Wind Down Co or the employees or professionals thereof (solely in the performance of their duties), for making payments and Distributions in accordance with this Plan or for fulfilling any functions incidental to implementing the provisions of this Plan, except for any acts or omissions to act that are the result of bad faith, willful misconduct, reckless disregard of duty, criminal conduct, gross negligence, fraud or self-dealing, or, in the case of an attorney professional and as required under Rule 1.8(h)(1) of the New York State Rules of Professional Conduct, malpractice.

7.09.    Privileges.  On and subject to the terms of this Plan, all of the Debtors' privileges (the "Privileges"), including, but not limited to, corporate privileges, confidential information, work product protections, attorney-client privileges, and other immunities or protections relating to the Causes of Action shall be vest in the Debtors or Wind Down Co as applicable without waiver, limitation or release on the Effective Date.

7.10.    Dissolution of the Debtors.  On the Effective Date, the members of the board of directors or managers, as the case may be, of each of the Debtors and each of the Debtors' management teams shall be deemed to have resigned without the necessity of any act on the part of such parties.  Nothing contained herein shall prevent the Plan Administrator from seeking to employ such persons on behalf of Wind Down Co.  Upon completion of the Debtors' final federal, state and local tax returns by the Plan Administrator, a determination (if any) pursuant to section 505(b) of the Bankruptcy Code of any unpaid tax liability of the Debtors or their Estates for any tax incurred during the administration of the Chapter 11 Cases, as determined under applicable tax laws, and the entry of a final decree closing the Chapter 11 Cases, each of the Debtors shall be deemed dissolved for all purposes in accordance with applicable state law.

7.11.    Termination of Wind Down Co.  Wind Down Co shall be dissolved upon the earlier of the distribution of all of its assets to the holders of Claims and the third anniversary of the creation of the Wind Down Co, provided that the Plan Administrator shall, in its sole discretion, be authorized to extend the dissolution date to the fifth anniversary of the creation of Wind Down Co with prior Bankruptcy Court approval.  If warranted by the facts and circumstances involved in resolving any Causes of Action, upon application to, and if approved by, the Bankruptcy Court upon a finding such further extension is necessary for purposes of resolving such Causes of Action and distributing the proceeds to holders of Allowed Claims, the term of Wind Down Co may be further extended by the Plan Administrator for a specified, finite term.  Notwithstanding the foregoing, Wind Down Co shall be automatically terminated in the event that the Chapter 11 Cases are converted or dismissed.

## ARTICLE VIII

## PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE PLAN

8.01.    Disbursing Agent.  Except as otherwise provided herein, all distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court and, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Debtors.  Furthermore, any such entity required to give a bond shall notify the Bankruptcy Court and the U.S. Trustee in writing before terminating any such bond that is obtained.  For the avoidance of doubt, (i) the Debtors, or such other entity designated by the Debtors or Wind Down Co, shall act as Disbursing Agent with respect to all Effective Date Distributions, and (ii) the Debtors, Wind Down Co, or such other entity designated by the Plan Administrator, shall act as Disbursing Agent with respect to all other Claims, including General Unsecured Claims.

8.02.    Distributions of Cash.  Any payment of Cash made by the Disbursing Agent pursuant to the Plan shall, at the Disbursing Agent's option, be made by check drawn on a domestic bank or wire transfer.

8.03.    Timing of Distributions.  In the event that any payment, distribution or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to

have been completed as of the required date. Any requirement under the Plan that the Debtors or Disbursing Agent make a payment or Distribution on a date shall mean that such party is required to commence the process of making a payment or Distribution on such date.

8.04.    <u>Holders as of the Distribution Record Date</u>.  As of the close of business on the Distribution Record Date: (i) the claims register maintained in the Chapter 11 Cases shall be closed; and (ii) any transfer of any Claim or any Interest therein shall not be recognized by the Debtors.  The Debtors shall have no obligation to recognize any transfer of any Claim occurring after 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date, and shall instead be entitled to recognize and deal for all purposes under this Plan with only those holders of record as of 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date.

8.05.    <u>Distributions to Address of Record</u>.  Subject to Bankruptcy Rule 9010, and except as set forth in this Section 8.05 of the Plan, all Distributions under the Plan to holders of Allowed Claims shall be made to the holder of each Allowed Claim at the address of such holder as listed on the Schedules as of the Distribution Record Date, unless the Debtors have been notified in writing of a change of address, including, without limitation, by the timely filing of a proof of claim by such holder that provides an address for such holder different from the address reflected on the Schedules.  In the event that any distribution to any such holder is returned as undeliverable, the Disbursing Agent shall have no obligation to determine the correct current address of such holder, and no distribution to such holder shall be made unless and until the appropriate Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter, such Distribution shall be made to such holder without interest; <u>provided</u>, <u>however</u>, that, at the later of the expiration of sixty (60) days AFTER: (a) the Effective Date and (b) the first Distribution Date after a Claim becomes an Allowed Claim, such Distributions shall be deemed unclaimed property and shall revest in the applicable Debtor and be distributed to other holders of Allowed Claims, in accordance with the Plan or as otherwise ordered by the Bankruptcy Court, as set forth in Section 8.12 of the Plan.

8.06.    <u>No Postpetition Interest on Claims; No More than Payment in Full</u>.

(a)    Unless otherwise specifically provided for in the Plan, Confirmation Order or other order of the Bankruptcy Court, or required by applicable bankruptcy or non-bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

(b)    No holder of an Allowed Claim shall be entitled to receive more than payment in full of such Allowed Claim (plus postpetition interest, if and to the extent provided in this Plan), and such Claims will be administered and treated in the manner provided in this Plan.

8.07.    <u>Minimum Distributions</u>.  No payment of Cash of less than two hundred dollars ($200) shall be made by the Debtors to any holder of an Allowed Claim unless a request therefor is made in writing to the Debtors.  If no request is made as provided in the preceding sentence within sixty (60) days of the later of:  (a) the Effective Date and (b) the first Distribution Date such Claim is Allowed, all such distributions shall be distributed to other holders of Allowed Claims in accordance with the Plan or as otherwise ordered by the Bankruptcy Court. Notwithstanding anything contained herein to the contrary, if, on any Distribution Date there

remains $50,000 or less available for Distribution to holders of Allowed General Unsecured Claims, in lieu of making any further Distributions to the holders of such Claims, the Disbursing Agent may distribute such Cash to the charity of its choice.

8.08.    <u>Withholding Taxes</u>.  Any federal or state withholding taxes or other amounts required to be withheld under any applicable law shall be deducted and withheld from any Distributions hereunder, and any property so withheld will then be paid by the Debtors to the appropriate authority.  All Persons holding Claims shall be required to provide any information necessary to effect the withholding of such taxes.  The Debtors may, if necessary or appropriate to comply with applicable withholding requirements imposed on them, withhold the entire Distribution due to any holder of an Allowed Claim until such time as such holder provides the necessary information to comply with any withholding requirements of any governmental unit. Any property so withheld will then be paid by the Debtors to the appropriate authority.  If the holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within sixty (60) days from the date of first notification to the holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such holder's Distribution shall be treated as unclaimed property in accordance with Section 8.12 herein or the amount required to be withheld may be so withheld and turned over to the applicable authority.

8.09.    <u>Time Bar to Cash Payments by Check</u>.  Checks issued by the Debtors on account of Allowed Claims shall be null and void if not negotiated within sixty (60) days after the date of issuance thereof.  Requests for the reissuance of any check that becomes null and void pursuant to this Section 8.09 may be made directly to the Debtors by the holder of the Allowed Claim to whom the check was originally issued.  Any Claim in respect of such voided check must be made in writing on or before the later of (a) the Effective Date and (b) sixty (60) days after the date on which the Distribution was made.  After that date, all Claims in respect of void checks shall be released and forever barred and the proceeds of those checks shall be deemed unclaimed property in accordance with section 347(b) of the Bankruptcy Code and be distributed as provided in Section 8.12 herein.

8.10.    <u>No Payments of Fractional Dollars</u>.  Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

8.11.    <u>Setoff and Recoupment</u>.  The Debtors or Plan Administrator may, pursuant to the Bankruptcy Code (including § 553 of the Bankruptcy Code), applicable bankruptcy or nonbankruptcy law, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that the Debtors or their Estates may have against the holder of such Claim; provided that neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, Plan Administrator or the respective Estates of any right of setoff, recoupment claims or other rights or Causes of Action that the Debtors, the Plan Administrator or the respective Estates or any of their respective successors may possess against such holder.

8.12.    <u>Unclaimed Distributions</u>.  All distributions to holders of Allowed Claims under the Plan that are unclaimed for a period of sixty (60) days after distribution thereof shall be deemed unclaimed property under Bankruptcy Code section 347(b), and any entitlement of any holder of any Claim to such distributions shall be extinguished and forever barred.  All such unclaimed property shall revest in the Debtors and, subject to Section 8.07, be distributed to other holders of Allowed Claims in accordance with the Plan or as otherwise ordered by the Bankruptcy Court.

8.13.    <u>Distributions Free and Clear</u>.  Except as otherwise provided in this Plan, any Distribution or transfer made under this Plan, including, without limitation, Distributions to any holder of an Allowed Claim, shall be free and clear of any Liens, Claims, encumbrances, charges and other interests, and no other entity shall have any interest, whether legal, beneficial or otherwise, in property distributed or transferred pursuant to this Plan.

## <u>ARTICLE IX</u>

## <u>PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS</u>

9.01.    <u>Allowed Claims</u>.  Except as expressly provided herein, or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall be deemed Allowed unless and until such Claim or Interest is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim or Interest.  On or after the Effective Date, Wind Down Co shall be vested with any and all rights and defenses each Debtor has with respect to any Claim or Interest immediately prior to the Effective Date.

9.02.    <u>Objections to Claims</u>.  Other than with respect to Fee Claims, only the Plan Administrator shall be entitled to object to Claims after the Effective Date.  Any objections to Claims (other than Fee Claims), which Claims have been filed on or before the later of the Confirmation Date and the applicable Bar Date, if any, shall be served and filed on or before the Claims Objection Deadline.  Any Claims filed after the applicable Bar Date shall be deemed Disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors or the Plan Administrator unless the Person or entity wishing to file such Claim has received prior Bankruptcy Court authority to file such Claim after the applicable Bar Date.  Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the Debtors or the Plan Administrator effect service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (c) by (i) first class mail, postage prepaid, or (ii) if available, electronic mail, on any counsel that has appeared on the claimant's behalf in the Chapter 11 Cases (so long as such appearance has not been subsequently withdrawn).  From and after the Effective Date, the Plan Administrator may settle or compromise any Disputed Claim without approval of the Bankruptcy Court in accordance with the Plan Administrator Agreement and the Plan.  After the Effective Date, the Plan Administrator

shall be entitled to determine, in its reasonable discretion, that the cost and expense of pursuing Claims objections outweighs the benefits to be advanced by filing one or more objections.

9.03.    Amendments to Claims.  After the Confirmation Date, a proof of Claim may not be amended without the authorization of the Bankruptcy Court.  Any Claim amended after the Confirmation Date shall be deemed Disallowed in full and expunged without any action by the Debtors, unless the holder of the Claim has obtained prior Bankruptcy Court authorization to file the amendment.

9.04.    Estimation of Claims; Certain Reserves.  For purposes of calculating and making Distributions under the Plan, the Plan Administrator shall be entitled to estimate, in good faith and with due regard to litigation risks associated with Disputed Claims, the maximum dollar amount of Allowed and Disputed Claims, inclusive of contingent and/or unliquidated Claims in a particular Class.  The Plan Administrator shall also be entitled to seek one or more Estimation Orders from the Bankruptcy Court for such purposes, regardless of whether the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim for purposes of determining the Allowed amount of such Claim at any time.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim.  All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.  Appropriate Disputed Claims reserves shall be established for each category of Claims as to which estimates are utilized or sought.  Unless otherwise expressly set forth herein, the Plan Administrator shall not be obligated to physically segregate and maintain separate accounts for reserves.  Accordingly, reserves may be merely bookkeeping entries or accounting methodologies, which may be revised from time to time, as appropriate.  Unless otherwise ordered by the Bankruptcy Court, no reserves shall be required to be established or maintained with respect to Claims filed after the applicable Bar Date.

9.05.    Plan Distributions to Holders of Subsequently Allowed Claims.  On each Distribution Date (or such earlier date as determined by the Debtors in their sole discretion), the Disbursing Agent will make distributions or payments on account of any Disputed Claim that has become an Allowed Claim since the occurrence of the previous Distribution Date.  The Disbursing Agent shall distribute in respect of such newly Allowed Claims the Pro Rata Distributions to which holders of such Claims would have been entitled under this Plan if such newly Allowed Claims were fully or partially Allowed, as the case may be, on the Effective Date, less direct and actual expenses, fees or other direct costs.

9.06.    Insurance Preservation and Proceeds.  Except with regard to claims against the Released Parties that are released hereunder, nothing in the Plan shall diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors or any related Person.  Notwithstanding anything to the contrary contained herein to the extent the Debtors have insurance with respect to an Allowed Claim, such Allowed Claim shall: (a) be paid from the proceeds of insurance to the extent that the Claim is insured, and (b) receive the treatment

provided for herein to the extent the applicable insurance policy does not provide coverage with respect to any portion of the Allowed Claim.  Holders of Claims which are eligible to be satisfied, in whole or in part, through any such policy shall be obligated, as a condition to receiving any Distributions under the Plan, to seek recovery (or, if applicable, assist the Debtors in seeking recovery) under such policies with regard to such Claims.

9.07.    Allocation of Plan Distributions Between Principal and Interest.  To the extent that any Allowed Claim entitled to a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

9.08.    No Recourse.  Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by this Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no Claim holder shall have recourse against the Disbursing Agent, the Debtors, the Plan Administrator, Released Party or any of their respective professionals, consultants, officers, directors, employees or members or their successors or assigns, or any of their respective property.  **THE ESTIMATION OF CLAIMS AND THE ESTABLISHMENT OF RESERVES UNDER THE PLAN MAY LIMIT THE DISTRIBUTION TO BE MADE ON INDIVIDUAL DISPUTED CLAIMS, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIMS.**

9.09.    Disallowed Claims.  All Claims held by Persons or Entities against whom or which any Debtor has commenced a proceeding asserting a cause of action under §§ 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code or that is a transferee of a transfer avoidable under § 522(f), 522(h), 544, 545, 548, 549 or 724(a) of the Bankruptcy Code shall be deemed disallowed Claims pursuant to § 502(d) of the Bankruptcy Code and holders of such Claims shall not be entitled to vote to accept or reject this Plan.  No reserve or Distribution will be provided to any holder of Claim who is indebted to any of the Debtors' Estates in an amount that is unliquidated or that exceeds the value of such holder's Claim against the Debtors, and any such Claim shall be disallowed.  Claims deemed disallowed pursuant to this Section 9.10 shall continue to be disallowed for all purposes until the Avoidance Action against such party has been settled or resolved by Final Order and any sums due to the Debtors or the Plan Administrator from such party have been paid.

## ARTICLE X

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

10.01.    Rejection of Executory Contracts and Unexpired Leases. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases of the Debtors not previously rejected by the Debtors pursuant to an order of the Bankruptcy Court shall be deemed to be rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease: (x) that previously has been assumed and/or assigned pursuant to an

order of the Bankruptcy Court entered prior to the Effective Date; (y) as to which a motion for approval of the assumption and/or assignment of such executory contract or unexpired lease has been filed and served prior to the Confirmation Date; or (z) that is specifically designated as a contract or lease to be assumed and/or assigned by the Debtors.  Any order entered after the Confirmation Date by the Bankruptcy Court, after notice and a hearing, authorizing the rejection of an executory contract or unexpired lease shall cause such rejection to be a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code, as if such relief was granted and such order was entered prior to the Confirmation Date.  All Claims arising from the rejection of executory contracts or unexpired leases, if any, will be treated as General Unsecured Claims.  Notwithstanding anything herein to the contrary, all compensation and benefits programs shall continue in effect until there are no employees of the Debtors, at which time all compensation and benefit programs shall be deemed terminated.

Any Claim listed in the Schedules and any Proofs of Claims filed with respect to any executory contract or unexpired lease that has been assumed prior to the Effective Date shall be deemed disallowed and expunged without further notice to or action, order or approval of the Bankruptcy Court or any other Person or Entity.

10.02.  <u>Approval of Rejections by Confirmation Order</u>.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the rejections contemplated by this Plan pursuant to sections 365 and 1123 of the Bankruptcy Code.  Notwithstanding anything herein to the contrary, any agreement, obligation, security interest, transaction or similar undertaking that the Debtors believe is not executory or a lease that is later determined by the Bankruptcy Court to be an executory contract or unexpired lease that is subject to assumption or rejection under section 365 of the Bankruptcy Code, shall be subject to assumption or rejection within thirty (30) days of any such determination or such longer period as may be authorized by the Bankruptcy Court.

10.03.  **<u>Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.</u>  Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 10.01 of the Plan must be filed with the Bankruptcy Court and served upon the Debtors no later than thirty (30) days after the earlier of: (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease; and (ii) notice of occurrence of the Effective Date.  All such Claims not filed within such time will be forever barred from assertion against the Debtors and their Estates.**

10.04.  <u>Insurance Policies</u>.  To the extent that any and all of the Debtors' insurance policies that were not transferred to the purchaser pursuant to the Asset Purchase Agreement, including any primary director and officer liability, employment practices liability, or fiduciary liability insurance policies, are considered executory contracts, then notwithstanding anything contained in the Plan to the contrary, such insurance policies, shall be deemed assumed and assigned to the Debtors or Wind Down Co as applicable.  Unless otherwise determined by the Bankruptcy Court, pursuant to a Final Order, no payments are required to cure any defaults of the Debtors existing as of the Confirmation Date with respect to each such policy.  For the avoidance of any doubt, all rights under any insurance policy that is not an executory contract and was not transferred to the purchaser pursuant to the Asset Purchase Agreement, and all rights

under any other insurance policies that were not transferred to the purchaser pursuant to the Asset Purchase Agreement and under which the Debtors may be beneficiaries, shall be preserved and shall vest with the Debtors or Wind Down Co as applicable and shall remain in full force and effect after the Effective Date for the term thereof; and nothing herein shall alter or adversely affect the rights of any non-Debtor beneficiaries of or covered Persons or Entities under such insurance policies.

10.05.  Reservation of Rights.  Neither the exclusion nor inclusion of any contract or lease in this Plan or Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that such contract or lease is in fact an executory contract or unexpired lease or that any Debtor has any liability thereunder.

10.06.  Indemnification of Directors, Officers and Employees.  For purposes of the Plan, the obligation of the Debtors to indemnify and reimburse any Person or entity serving at any time on or after the Petition Date as one of its directors, officers or employees by reason of such Person's or entity's service in such capacity, or as a director, officer or employee of any of the Debtors or any other corporation or legal entity, to the extent provided in such Debtor's constituent documents, a written agreement with the Debtor(s), in accordance with any applicable law, or any combination of the foregoing, shall survive confirmation of the Plan and the Effective Date, remain unaffected thereby, become an obligation of the Debtors solely to the extent of available insurance, and not be released, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Petition Date.  For the avoidance of doubt, nothing herein shall be construed as the Debtors assuming any obligation with respect to any self-insured retention for which the applicable insurer has the ability to assert a prepetition Claim against the applicable Debtor in accordance with the order setting the Bar Date or other order of the Court.  On and after the Effective Date, the coverage under any directors' and officers' insurance policies in effect on the Petition Date shall not be terminated or otherwise reduced by or on behalf of the Debtors, and all directors and officers of the Debtors at any time shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and/or officers remain in such positions after the Effective Date.

## **ARTICLE XI**

## **CONDITIONS PRECEDENT**

11.01.  Conditions Precedent to the Effective Date. The occurrence of the Effective Date is subject to:

(a)  the Disclosure Statement Order and Confirmation Order, in form and substance satisfactory to the Debtors, the Committee, and the Sponsor, having been entered and shall not have been stayed, modified, vacated or appealed;

(b)  the Debtors having obtained all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan and the transaction contemplated hereunder;

(c)    the absence of any pending or threatened government action or any law that has the effect of or actually does prevent consummation of any Plan transactions; and

(d)    the Plan Documents having been executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith.

11.02.    <u>Waiver of Conditions Precedent and Bankruptcy Rule 3020(e) Automatic Stay</u>.

(a)    The Debtors shall have the right, upon consent of the Committee and with respect to Section 11.01(a), the Sponsor, to waive one or more of the conditions precedent set forth in Sections 11.01 and 11.02 of the Plan at any time without leave of or notice to the Bankruptcy Court and without formal action other than proceeding with consummation of the Plan.  If any condition precedent to the Effective Date is waived pursuant to this Section 11.02 and the Effective Date occurs, the waiver of such condition shall benefit from the "mootness doctrine," and the act of consummation of the Plan shall foreclose any ability to challenge the Plan in any court.  Unless otherwise provided herein, any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

(b)    Pursuant to Bankruptcy Rule 3020(e), the Confirmation Order shall be immediately effective upon its entry and shall not be subject to the stay provided in Bankruptcy Rule 3020(e).

11.03.    <u>Effect of Failure of Conditions</u>.  If the conditions precedent specified in Section 11.01 hereof have not been satisfied or waived by the Debtors within 90 days after the Confirmation Date, which period may be extended by the Debtors, with the consent of the Committee, then (i) the Confirmation Order shall be vacated; (ii) no Distributions under this Plan shall be made; (iii) the Debtors and all holders of Claims and Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; and (iv) all of the Debtors' obligations with respect to Claims and Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any claims or interests by or against the Debtors or any other Person or Entity or to prejudice in any manner the rights of the Debtors or any other Person or Entity in any further proceedings involving the Debtors or otherwise.

## ARTICLE XII

### EXCULPATION, INJUNCTION AND
### RELATED PROVISIONS EFFECT OF CONFIRMATION

12.01.    <u>Binding Effect</u>.  This Plan shall be binding and inure to the benefit of the Debtors, the Plan Administrator, Wind Down Co, the Released Parties, all present and former holders of Claims and Interests and their respective successors and assigns.

12.02.    <u>No Discharge in Favor of the Debtor</u>. Pursuant to Bankruptcy Code §1141(d)(3), Confirmation of the Plan will not discharge claims against the Debtor; provided, however, that

no holder of a claim against the Debtor may, on account of such claim, seek or receive any payment or other distribution from, or seek recourse against, property of any Debtor's estate, except as expressly provided in the Plan.

12.03.  Term of Pre-Confirmation Injunctions or Stays.  Unless otherwise provided herein, all injunctions or stays arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

12.04.  Injunction Against Interference With Plan.  Upon the entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

12.05.  *Injunction.*

(a)     *Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in any of the Debtors or the Estates are, with respect to any such Claims or Interests, permanently enjoined from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Plan Administrator, the Wind Down Co, the Estates or any of their respective property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Plan Administrator, Wind Down Co, the Estates or any of their respective property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Plan Administrator, Wind Down Co, the Estates or any of their respective property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan.*

(b)     *Each holder of an Allowed Claim or Allowed Interest shall be deemed to have specifically consented to the injunctions set forth herein.*

35

12.06.    _**Releases**_.

(a)    _**Releases by the Debtors**_.  **Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, the Debtors, as, debtors in possession, and any person seeking to exercise the rights of the Debtors Estates, including without limitation, any successor to the Debtors, including the Plan Administrator, Wind Down Co or any representative of the Debtors' Estates appointed or selected pursuant to sections 1103, 1104 or 1123(b)(3) of the Bankruptcy Code or under chapter 7 of the Bankruptcy Code, shall be deemed to forever release, waive and discharge all claims (as such term "claim" is defined in section 101(5) of the Bankruptcy Code), obligations, suits, judgments, damages, demands, debts, rights, causes of action (including, but not limited to, the Causes of Action) and liabilities (other than the rights of the Debtors to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered thereunder) against any Released Party, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors or their Estates, whether directly, indirectly, derivatively or in any representative or any other capacity.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases herein, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the releases herein are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the releases herein; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after reasonable investigation by the Debtors and after notice and opportunity for hearing; and (6) a bar to any of the Debtors asserting any claim released by the releases herein against any of the Released Parties; _provided, however_, that nothing contained herein shall release Jane Park on account of the Jane Park Promissory Note.**

(b)    _**Third Party Releases**_.  **Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, each Releasing Party, in consideration for the obligations of the Debtors under the Plan, the Distributions under the Plan and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, will be deemed to have consented to the Plan and the restructuring and liquidation embodied herein for all purposes and deemed to forever release and waive all claims (as such term is defined in section 101(5) of the Bankruptcy Code), including but not limited to any claim sounding in law or equity or asserting a tort, breach of any duty or contract, violations of the common law, any federal or state statute, any federal or state securities laws or otherwise, demands, debts, rights, causes of action (including without limitation, the Causes of Action) or liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan), including, without limitation, any claims for any such loss such Releasing Party may suffer, have suffered or be alleged to suffer as a result of the Debtors commencing the Chapter 11 Cases or as a result of the Plan being**

*consummated, against any Released Party, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Chapter 11 Cases, the Plan or the Disclosure Statement. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases of holders of Claims and Interests, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the releases herein are (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims herein; (3) in the best interests of the Debtors and all holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after notice and opportunity for hearing; and (6) a bar to any holder of a Claim or Interest asserting any Claim released by the releases herein against any of the Released Parties.*

*(c)     Notwithstanding anything to the contrary contained herein: (i) except to the extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, the releases provided for in this Section 12.06 of the Plan shall not release any non-Debtor entity from any liability arising under (x) the Internal Revenue Code or any state, city or municipal tax code, (y) any criminal laws of the United States or any state, city or municipality, or (z) any environmental laws of the United States or any state, city or municipal tax code; and (ii) the releases set forth in this Section 12.06 shall not release any (x) claims, right, or Causes of Action for money borrowed from or owed to the Debtors by any of their directors, officers or former employees, as set forth in the Debtors' books and records, and (y) any claims against any Person to the extent such Person asserts a crossclaim, counterclaim and/or claim for setoff which seeks affirmative relief against a Debtor or any of its officers, directors or representatives.*

*12.07.  <u>Exculpation and Limitation of Liability</u>.  To the extent permitted by Section 1125(c) of the Bankruptcy Code, none of the Debtors, the Plan Administrator, Wind Down Co, or the Released Parties shall have or incur any liability to any holder of any Claim or Interest for any act or omission in connection with, or arising out of the Debtors' restructuring and liquidation, including without limitation the negotiation and execution of the Plan, the Chapter 11 Cases, the Disclosure Statement, the Global Settlement, the solicitation of votes for and the pursuit of the Plan (including that solicitation of acceptances of the Plan was not conducted in good faith nor in compliance with the applicable provisions of the Bankruptcy Code), the consummation of the Plan, any contract, instrument, document or any other agreement contemplated by the consummation or administration of the Plan or the property to be distributed under the Plan, including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition activities leading to the promulgation and confirmation of the Plan except fraud, gross negligence, misuse of confidential information, ultra vires acts or willful misconduct as determined by a Final Order of the Bankruptcy Court.  For purposes of the foregoing, it is expressly understood that any act or omission effected with the approval of the Bankruptcy Court conclusively will be deemed not to constitute gross negligence, or willful misconduct. The Debtors, the Plan Administrator, Wind Down Co and the Released Parties shall be*

*entitled to rely upon the advice of counsel with respect to their duties and responsibilities with respect to the Chapter 11 Cases, the Plan and the administration thereof.*

12.08.    ___Injunction Related to Releases and Exculpation.___  *The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released pursuant to the Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released under this Article XII of the Plan.*

12.09.    Termination of Subordination Rights and Settlement of Related Claims.  Except as expressly provided herein, the classification and manner of satisfying all Claims and Interests and the respective distributions, treatments and other provisions under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, sections 510(a) and 510(b) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan.  The Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Persons and entities from enforcing or attempting to enforce any such contractual, legal and equitable rights satisfied, compromised and settled pursuant to the Plan. Any disagreement with the priorities or distributions set forth in the Plan or any right to assert contractual subordination shall be raised on or prior to the deadline to object to the Plan, and decided at or prior to the Confirmation Hearing, and all issues with respect to contractual subordination not raised or resolved at the Confirmation Hearing shall be governed pursuant to the Plan or, if the decision of the Bankruptcy Court at the Confirmation Hearing differs from the Plan, then such decision shall govern.

12.10.    Retention of Causes of Action/Reservation of Rights.  Except with respect to the Released Parties or any other beneficiary of the releases, injunctions and exculpations contained in this Article XII, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims or Causes of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Effective Date, on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law.  The Debtors shall have, retain, reserve and be entitled to assert all such claims, Causes of Action, rights of setoff or other legal or equitable defenses which the Debtors had immediately prior to the Petition Date as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and/or equitable rights respecting any Claim may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.  Except as otherwise provided in the Plan, Confirmation Order or the Plan Administrator Agreement, after the Effective Date, the Debtors, through the Plan Administrator, shall have the exclusive right to institute, prosecute, abandon, settle or compromise all Causes of Action (excluding those Causes of Action released pursuant to this Article XII), in their sole discretion and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in the Chapter 11 Cases.

12.11.    Releases of Liens.  Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, in consideration

for the Distributions granted hereunder, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of any of the Estates shall be fully released and deemed satisfied and all of the right, title and interest of any holder of such mortgages, deeds of trust, liens, pledges or other security interest shall revert to the Debtors.  On the Effective Date, the holder of each such mortgage, deed of trust, lien, pledge or other security interest against property of the Estates shall be deemed to have appointed the Debtors as agent to such holder for the purpose of filing and recording all releases with respect to each such mortgage, deed of trust, lien, pledge or other security interest held against property of the Estates.

## ARTICLE XIII

## RETENTION OF JURISDICTION

13.01.  <u>Scope of Bankruptcy Court Jurisdiction</u>.  On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    To hear and determine pending applications for the assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of cure amounts if any, and Claims resulting therefrom or from the assumption, assumption and assignment or rejection of executory contracts or unexpired leases pursuant to this Plan;

(b)    To hear and determine any and all adversary proceedings, applications and contested matters, and to order appropriate relief in connection therewith (including issuance and/or enforcement of releases);

(c)    To consider and resolve any Claims or Interests, or the allowance, classification, priority, compromise, estimation or payment of any Claim or Interest;

(d)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

(e)    To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(f)    To consider any amendments to, or modifications of, the Plan and the Plan Supplement, and any dispute or controversy relating to execution, delivery or compliance with any document included in the Plan Supplement, and to cure any defect or omission, or reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(g)    To hear and determine all Fee Claims;

(h)    To resolve disputes concerning any reserves, including with respect to Disputed Claims or the administration thereof;

39

(i)      To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order or any other order of the Bankruptcy Court;

(j)      To recover all assets and property of the Debtor, wherever located;

(k)      To hear and determine matters concerning state, local and federal taxes, including as provided by sections 346, 505 and 1146 of the Bankruptcy Code (including the expedited determination of tax under section 505(b) of the Bankruptcy Code);

(l)      To hear any disputes arising out of, and to enforce any order approving alternative dispute resolution procedures to resolve personal injury, employment litigation, and similar claims pursuant to section 105(a) of the Bankruptcy Code;

(m)      To consider requests for extensions of the term of Wind Down Co as provided in the Plan;

(n)      To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan;

(o)      To hear any other matter not inconsistent with the Bankruptcy Code; and

(p)      To enter a final decree closing the Chapter 11 Cases.

## ARTICLE XIV

## MISCELLANEOUS PROVISIONS

14.01.  <u>Effectuating Documents and Further Transactions</u>.  The Debtors are authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to this Plan.

14.02.  <u>Corporate Action</u>.  On the Effective Date, all matters provided for under this Plan that would otherwise require approval of the stockholders, directors, members, managers or partners of the Debtors, including: (i) the effectiveness of the certificates of incorporation and bylaws of the Debtors, (ii) the election or appointment, as the case may be, of directors and officers of the Debtors, and (iii) qualification of the Debtors as foreign corporations wherever the conduct of business by the Debtors requires such qualification, shall be deemed to have occurred and shall be in effect from and after the Effective Date pursuant to Section 303 of the Delaware General Corporation Law, without any requirement of further action by the stockholders, directors, members, managers or partners of the Debtors.  On the Effective Date, or as soon thereafter as is practicable, the Debtors or Plan Administrator shall, if required, file their respective certificates of incorporation with the Secretary of State of the state in which each such entity is incorporated, in accordance with the applicable general corporation law of each such state.

14.03.  Exemption from Transfer Taxes.  To the fullest extent permitted by applicable law, any transfer or encumbrance of assets or any portion(s) of assets pursuant to, or in furtherance of, or in connection with the Plan shall constitute a "transfer under a plan" within the purview of section 1146(a) of the Bankruptcy Code and shall not be subject to transfer, stamp or similar taxes.

14.04.  Post-Effective Date Fees and Expenses.  From and after the Effective Date, the Debtors, or the Plan Administrator, as the case may be, shall in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of Professional Persons thereafter incurred by the Debtors, including those fees and expenses incurred in connection with the implementation and consummation of this Plan.

14.05.  Amendment or Modification of this Plan.  Alterations, amendments or modifications of or to the Plan (including to provide for treatment different than that set forth herein with respect to any Class of Claim or Interest, including the establishment of subclasses of Classes of Claims or Interests to the extent required if so elected by the Debtors, the unimpairment of Classes that are impaired hereunder, and the impairment of Classes that are unimpaired hereunder) may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  This Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided that this Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments or modifications.  A holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim or Interest of such holder.  Notwithstanding anything in this Section 14.05 to the contrary, any alteration, modification, or amendment under this Section 14.05 shall not be made without the consent of the Committee.

14.06.  Revocation or Withdrawal of this Plan.  The Debtors, with the consent of the Committee, may right to revoke or withdraw the Plan prior to the Effective Date, in whole or in part.  If the Debtors revoke or withdraw the Plan prior to the Effective Date, then except as set forth in this Section 14.06 of the Plan, the Plan shall be deemed null and void.  In the event of any such waiver or revocation, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against any Debtor or any other Person or to prejudice in any manner the rights of any Debtor or any Person in any further proceedings involving the Debtors.

14.07.  Dissolution of the Committee.  On the first (1st) Business Date following the Effective Date, the Committee shall be dissolved and the Committee, its members, and professionals retained by the Committee in accordance with Bankruptcy Code § 1103 shall be deemed released from their respective fiduciary obligations, duties, and responsibilities arising from or related to the Chapter 11 Cases, except with respect to: (i) prosecuting applications for professionals' compensation or reimbursement of expenses incurred as a member of the Committee; (ii) asserting, disputing and participating in the resolution of Fee Claims; and (iii)

prosecuting or participating in any appeal of the Confirmation Order or any request for reconsideration thereof.  Upon the conclusion of (i) through (iii) above, the Committee shall be immediately dissolved and released.  The Professional Persons retained by the Committee and the members thereof shall not be entitled to compensation or reimbursement of expenses for any services rendered or expenses incurred after the first (1st) Business Day on behalf of the Committee following the Effective Date, except for services rendered and expenses incurred, as approved by the Court, in connection with: (i) prosecuting applications for or objections to professionals' compensation; (ii) asserting, disputing and participating in the resolution of Fee Claims or reimbursement of expenses incurred as a member of the Committee; and (iii) prosecuting or participating in any appeal of the Confirmation Order or any request for reconsideration thereof.

14.08.  <u>Severability</u>.  If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

14.09.  <u>Governing Law</u>.  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit or schedule hereto or in the Plan Supplement provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to any contrary result otherwise required under applicable choice or conflict of law rules.

14.10.  <u>Inconsistency</u>.  In the event of any inconsistency among the Plan, the Disclosure Statement, the Plan Documents, any exhibit to the Plan or any other instrument or document created or executed pursuant to the Plan, the provisions of the Plan shall govern.

14.11.  <u>Binding Effect</u>.  The Plan shall be binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests and their respective successors and assigns.

14.12.  <u>Exhibits/Schedules</u>.  All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

14.13.  <u>Filing of Additional Documents</u>.  On or before substantial consummation of the Plan, the Debtors shall file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any such agreements or other documents relating specifically to the terms and conditions of the Plan.

14.14.  <u>Notices</u>.  All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

**WILLKIE FARR & GALLAGHER LLP**
Brian S. Lennon
Daniel I. Forman
Andrew S. Mordkoff
787 Seventh Avenue
New York, New York  10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
(As Counsel to the Debtors)

**ARENT FOX LLP**
Andrew I. Silfen
George P. Angelich
Beth M. Brownstein
1301 Avenue of the Americas, Floor 42
New York, New York  10019-6099
Telephone: (212) 484-3900
(As Counsel to the Committee)

– and –

**CBIZ INC.**
Charles Berk
1065 Avenue of the Americas, Floor 11
New York, New York 10018-0863
Telephone: (212) 790-5700
(As Plan Administrator)

14.15.  <u>Reservation of Rights</u>.  Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of this Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect to this Plan shall be or shall be deemed to be, an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

Dated: New York, New York
          June 21, 2019

                              Respectfully submitted,

                              Glansaol Holdings Inc.
                              On behalf of itself and its
                              affiliated Debtors

                              By:      /s/ Nancy Bernardini
                              Name: Nancy Bernardini
                              Title:   Authorized Signatory

**Exhibit A**

| Debtor | Case No. |
|---|---|
| Glansaol Holdings Inc. | 18-14102 (MEW) |
| Glansaol LLC | 18-14103 (MEW) |
| Glansaol Management LLC | 18-14104 (MEW) |
| Julep Beauty, Inc. | 18-14105 (MEW) |
| Laura Geller Beauty, LLC | 18-14106 (MEW) |
| Laura Geller Brands, LLC | 18-14107 (MEW) |
| Laura Geller Holdings, LLC | 18-14108 (MEW) |
| Clark's Botanicals, Inc. | 18-14109 (MEW) |

**<u>Exhibit B</u>**

**Allocation Schedule**

**Glansaol Holdings et al.**
**Allocation of Sales Proceeds**
(in 000's)

| | Total | Laura Geller | | | | Julep | | | | Clark's | | | | Glansaol Management | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mid | Low | Mid | High | | Low | Mid | High | | Low | Mid | High | | Low | Mid | High | |
| **Initial Allocation of Sale Proceeds** | $18,000 | $9,191 | $9,191 | $9,191 | 51.06% | $7,643 | $7,643 | $7,643 | 42.46% | $1,166 | $1,166 | $1,166 | 6.48% | $-- | $-- | $-- | 0.00% |
| Adjustment for value allocation to Glansaol Management | - | (1,149) | (1,149) | (1,149) | 51.06% | (955) | (955) | (955) | 42.46% | (146) | (146) | (146) | 6.48% | 2,250 | 2,250 | 2,250 | 0.00% |
| Post Adjustment Allocation[1] | 18,000 | 8,042 | 8,042 | 8,042 | 44.68% | 6,688 | 6,688 | 6,688 | 37.15% | 1,020 | 1,020 | 1,020 | 5.67% | 2,250 | 2,250 | 2,250 | 12.50% |
| **SunTrust Paydown:** | | | | | | | | | | | | | | | | | |
| ABL Obligations | (7,055) | (3,152) | (3,152) | (3,152) | 44.68% | (2,621) | (2,621) | (2,621) | 37.15% | (400) | (400) | (400) | 5.67% | (882) | (882) | (882) | 12.50% |
| Lenders' Legal Fees | (364) | (163) | (163) | (163) | | (135) | (135) | (135) | | (21) | (21) | (21) | | (46) | (46) | (46) | |
| | (7,419) | (3,315) | (3,315) | (3,315) | | (2,756) | (2,756) | (2,756) | | (420) | (420) | (420) | | (927) | (927) | (927) | |
| **Post-Sale Receipts (Payments):** | | | | | | | | | | | | | | | | | |
| Emerald Capital Advisors Transaction Fee | (540) | (241) | (241) | (241) | 44.68% | (201) | (201) | (201) | 37.15% | (31) | (31) | (31) | 5.67% | (68) | (68) | (68) | 12.50% |
| Restructuring Professionals | (2,000) | (894) | (894) | (894) | 44.68% | (743) | (743) | (743) | 37.15% | (113) | (113) | (113) | 5.67% | (250) | (250) | (250) | 12.50% |
| KEIP/KERP | (905) | (404) | (404) | (404) | 44.68% | (336) | (336) | (336) | 37.15% | (51) | (51) | (51) | 5.67% | (113) | (113) | (113) | 12.50% |
| Post-close Ordinary Course Payments[2] | (816) | (341) | (341) | (341) | 41.79% | (325) | (325) | (325) | 39.83% | (50) | (50) | (50) | 6.13% | (100) | (100) | (100) | 12.25% |
| Cash On-Hand | 730 | 326 | 326 | 326 | 44.68% | 271 | 271 | 271 | 37.15% | 41 | 41 | 41 | 5.67% | 91 | 91 | 91 | 12.50% |
| | (3,531) | (1,554) | (1,554) | (1,554) | | (1,334) | (1,334) | (1,334) | | (204) | (204) | (204) | | (441) | (439) | (441) | |
| **Cash Balance - May 6, 2019** | $7,050 | | | | | | | | | | | | | | | | |
| **Potential Recoveries and Post-Sale/Confirmation Costs:** | | | | | | | | | | | | | | | | | |
| Preference Claims[3] | - | - | - | - | 44.68% | - | - | - | 37.15% | - | - | - | 5.67% | - | - | - | 12.50% |
| Insider Preference Claims | - | - | - | - | | - | - | - | | - | - | - | | - | - | - | |
| Prepetition Note Receivable[4] | TBD | - | - | - | | - | - | - | | - | - | - | | - | - | - | |
| Remaining Restructuring Professional Fees | (1,360) | (608) | (608) | (608) | 44.68% | (505) | (505) | (505) | 37.15% | (77) | (77) | (77) | 5.67% | (170) | (170) | (170) | 12.50% |
| Chapter 11 UST Fees | (215) | (96) | (96) | (96) | | (80) | (80) | (80) | | (12) | (12) | (12) | | (27) | (27) | (27) | |
| | (1,575) | (704) | (704) | (704) | | (585) | (585) | (585) | | (89) | (89) | (89) | | (197) | (197) | (197) | |
| **Chapter 11 Confirmation Costs** | | | | | | | | | | | | | | | | | |
| Plan Administrator Costs[5] | (200) | (89) | (89) | (89) | 44.68% | (74) | (74) | (74) | 37.15% | (11) | (11) | (11) | 5.67% | (25) | (25) | (25) | 12.50% |
| Counsel to Plan Administrator | (300) | (134) | (134) | (134) | | (111) | (111) | (111) | | (17) | (17) | (17) | | (38) | (38) | (38) | |
| | (500) | (223) | (223) | (223) | | (186) | (186) | (186) | | (28) | (28) | (28) | | (63) | (63) | (63) | |
| Estimated Funds Available before Global Settlement | 4,975 | 2,246 | 2,246 | 2,246 | 44.68% | 1,827 | 1,827 | 1,827 | 37.15% | 278 | 278 | 278 | 5.67% | 622 | 624 | 622 | 12.50% |
| Sponsor Settlement (proposed Global Settlement)[6] | 1,650 | 737 | 737 | 737 | | 613 | 613 | 613 | | 93 | 93 | 93 | | 206 | 206 | 206 | |
| **Estimated Funds Available Post Global Settlement** | $6,625 | $2,984 | $2,984 | $2,984 | | $2,440 | $2,440 | $2,440 | | $372 | $372 | $372 | | $828 | $830 | $828 | |
| **Post-Petition Income (Expenses) - Direct:** | | | | | | | | | | | | | | | | | |
| Landlord Deposits | 210 | - | 161 | 161 | | - | 49 | 49 | | - | - | - | | - | - | - | |
| Accounts Payable | (2,270) | (1,230) | (1,155) | (1,105) | | (1,045) | (985) | (935) | | (60) | (55) | (50) | | (80) | (75) | (70) | |
| 503(b)(9) Creditors | (731) | (375) | (375) | (375) | | (326) | (326) | (326) | | (30) | (30) | (30) | | - | - | - | |
| KEIP / KERP - Outstanding Balance | (350) | - | - | - | | - | - | - | | - | - | - | | (350) | (350) | (350) | |
| Taxes / VAT (Anticipated by Debtors) | (282) | (272) | (172) | (72) | | (100) | (90) | (80) | | (20) | (20) | (20) | | - | - | - | |
| Taxes / VAT (Scheduled/Filed) | (180) | (75) | (65) | (55) | | (50) | (40) | (30) | | (25) | (20) | (15) | | (60) | (55) | (50) | |
| Founder and Former Employee - Severance[6] | (50) | - | - | - | | - | - | - | | - | - | - | | - | - | - | |
| Post-Close Operations through Confirmation (estimate) | (100) | (36) | (33) | (30) | | (36) | (33) | (30) | | (36) | (33) | (30) | | - | - | - | |
| | (3,753) | (1,988) | (1,639) | (1,476) | | (1,657) | (1,475) | (1,352) | | (171) | (158) | (145) | | (490) | (480) | (470) | |
| **Priority Claims:** | | | | | | | | | | | | | | | | | |
| Class Action Litigation ($245,000 asserted) | (30) | (245) | (30) | - | | - | - | - | | - | - | - | | - | - | - | |
| Gift Cards | (125) | - | - | - | | (150) | (125) | (110) | | - | - | - | | - | - | - | |
| | (155) | (245) | (30) | - | | (150) | (125) | (110) | | - | - | - | | - | - | - | |
| **Estimated Funds Available to Unsecured Claimants** | $2,717 | $750 | $1,314 | $1,507 | | $632 | $839 | $977 | | $200 | $213 | $226 | | $338 | $350 | $358 | |

**Glansaol Holdings et al.**
**Allocation of Sales Proceeds**

(in 000's)

| | Total | Laura Geller | | | Julep | | | Clark's | | | Glansaol Management | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mid | Low | Mid | High | Low | Mid | High | Low | Mid | High | Low | Mid | High |
| **Allocation of Funds Available to Unsecured Claimants:** | | | | | | | | | | | | | |
| Distribution of Allowed Unsecured Claims, by Debtor | $2,717 | $750 | $1,314 | $1,507 | $632 | $839 | $977 | $200 | $213 | $226 | $338 | $350 | $358 |
| Percentage Recovery, by Debtor | 21.4% | 8.2% | 21.9% | 26.9% | 15.2% | 21.1% | 25.7% | 25.0% | 28.4% | 32.3% | 16.9% | 17.5% | 18.4% |
| **Unsecured Claims:** | | | | | | | | | | | | | |
| Per Schedule F | 12,600 | 6,700 | 6,700 | 6,700 | 4,700 | 4,700 | 4,700 | 300 | 300 | 300 | 900 | 900 | 900 |
| Adjustments for No Liability Scheduled Claims[7] | (2,850) | (1,650) | (1,650) | (1,650) | (1,200) | (1,200) | (1,200) | - | - | - | - | - | - |
| Adjusted Scheduled Claim Amount | 9,750 | 5,050 | 5,050 | 5,050 | 3,500 | 3,500 | 3,500 | 300 | 300 | 300 | 900 | 900 | 900 |
| POC Adjustments | 2,600 | 750 | 650 | 550 | 500 | 400 | 300 | 500 | 450 | 400 | 1,100 | 1,100 | 1,050 |
| Jane Park Claim | 75 | - | - | - | 150 | 75 | - | - | - | - | - | - | - |
| Class Action Claim | 300 | 3,300 | 300 | - | - | - | - | - | - | - | - | - | - |
| | $ 12,725 | $ 9,100 | $ 6,000 | $ 5,600 | $ 4,150 | $ 3,975 | $ 3,800 | $ 800 | $ 750 | $ 700 | $ 2,000 | $ 2,000 | $ 1,950 |

Notes:
(1) Glansaol Management provided operational, technical, and strategic support to the three brands. Additionally, it functioned to help realize the synergies and cost savings between brands as well as integration through the ERP system.
(2) Ordinary course payments made from February 7th to May 6th, directly allocated to the brands.
(3) As discussed further in the Disclosure Statement, the Debtors and the Committee believe waiving all preference actions is in the best interests of the unsecured creditors and will avoid costly litigation and a prolonged wind-down period.
(4) The Debtor continues to negotiate towards a settlement with the borrower (Jane Park, Founder of Julep) under a $1.15 million prepetition promissory note payable to Glansaol LLC; the outcome of any settlement may affect distributions under the plan.
(5) As discussed further in the Disclosure Statement, Jane Park has filed claims against the Debtors, including a $150,000 claim relating to alleged severance obligations of Julep.
(6) As discussed further in the Plan, the Global Settlement includes a $1.65 million payment from the equity sponsor in exchange for releases of certain claims; it has been agreed to solely in the context of a confirmable Chapter 11 plan.
(7) The Debtor continues to negotiate towards a settlement with the borrower (Jane Park, Founder of Julep) of a $1.15 million prepetition promissory note payable to Glansaol LLC; the outcome of any settlement may affect distributions under the plan.
(8) Certain claims listed on Schedule F are no longer an unsecured liability of the Debtor. Those claims include certain chargebacks and amounts owed to certain trade partners that were paid under the Common Carrier/Warehouse Order.

**Glansaol Holdings** *et al.*

**Allocation Methodology**

**(in 000's)**

**I**  **Allocation of $18.0 million purchase price by Debtor, based on initial brand acquisition prices**

| | Initial Purchase Price | Respective Debtor's % | Respective Debtor's $ |
|---|---|---|---|
| **Laura Geller Beauty, LLC** | $71,105,000 | 51.06% | $9,191 |
| **Julep Beauty, LLC** | $59,130,000 | 42.46% | $7,643 |
| **Clarks Botanicals, Inc.** | $9,018,000 | 6.48% | $1,166 |
| **Glansaol Management LLC** | $0 | 0.00% | $0 |
| | $139,253,000 | 100.00% | $18,000 |

**II**  **Allocation of $18.0 million after value adjustment to Glansaol Management**

| | Respective Debtor's $ | Respective Debtor's % |
|---|---|---|
| **Laura Geller Beauty, LLC** | $8,042 | 44.68% |
| **Julep Beauty, LLC** | $6,688 | 37.15% |
| **Clarks Botanicals, Inc.** | $1,020 | 5.67% |
| **Glansaol Management LLC** | $2,250 | 12.50% |
| | $18,000 | 100.00% |

**<u>EXHIBIT 2</u>**

**Liquidation Analysis**

Glansaol Holdings et al.
Liquidation Analysis
(in 000's)

| | Total | Laura Geller | | | | Julep | | | | Clark's | | | | Glansaol Management | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Mid | Low | Mid | High | | Low | Mid | High | | Low | Mid | High | | Low | Mid | High | |
| **Cash Balance - May 6, 2019**[1] | $7,050 | 3,150 | 3,150 | 3,150 | 44.68% | 2,619 | 2,619 | 2,619 | 37.15% | 399 | 399 | 399 | 5.67% | 881 | 881 | 881 | 12.50% |
| **Potential Recoveries and Post-Sale/Confirmation Costs:** | | | | | | | | | | | | | | | | | |
| Preference Claims[2] | - | 97 | 145 | 193 | 48.32% | 70 | 105 | 141 | 35.13% | 21 | 32 | 42 | 10.57% | 12 | 18 | 24 | 5.98% |
| Insider Preference Claims[3] | TBD | - | - | - | | - | - | - | | - | - | - | | - | - | - | |
| Prepetition Note Receivable[3] | TBD | - | - | - | | - | - | - | | - | - | - | | - | - | - | |
| Remaining Restructuring Professional Fees | (1,360) | (608) | (608) | (608) | 44.68% | (505) | (505) | (505) | 37.15% | (77) | (77) | (77) | 5.67% | (170) | (170) | (170) | 12.50% |
| Chapter 11 UST Fees | (125) | (56) | (56) | (56) | | (46) | (46) | (46) | | (7) | (7) | (7) | | (16) | (16) | (16) | |
| | (1,185) | (567) | (519) | (470) | | (481) | (446) | (411) | | (63) | (52) | (42) | | (174) | (168) | (162) | |
| **Chapter 7 Post Conversion Costs:** | | | | | | | | | | | | | | | | | |
| Estimated Chapter 7 Trustee Costs[4] | (353) | (157) | (157) | (157) | 44.68% | (131) | (131) | (131) | 37.15% | (20) | (20) | (20) | 5.67% | (44) | (44) | (44) | 12.50% |
| Estimated fees for Chapter 7 Trustee's Counsel | (400) | (179) | (179) | (179) | | (149) | (149) | (149) | | (23) | (23) | (23) | | (50) | (50) | (50) | |
| | (753) | (336) | (336) | (336) | | (280) | (280) | (280) | | (43) | (43) | (43) | | (94) | (94) | (94) | |
| **Estimated Funds Available to Admin Claimants** | $5,113 | $2,247 | $2,295 | $2,343 | | $1,858 | $1,893 | $1,929 | | $294 | $304 | $315 | | $614 | $619 | $625 | |
| **Post-Petition Income (Expenses) - Direct:** | | | | | | | | | | | | | | | | | |
| Landlord Deposits | 210 | - | 161 | 161 | | - | 49 | 49 | | - | - | - | | - | - | - | |
| Accounts Payable | (2,270) | (1,230) | (1,155) | (1,105) | | (1,045) | (985) | (935) | | (60) | (55) | (50) | | (80) | (75) | (70) | |
| 503(b)(9) Creditors | (731) | (375) | (375) | (375) | | (326) | (326) | (326) | | (30) | (30) | (30) | | - | - | - | |
| KEIP / KERP - Outstanding Balance | (350) | - | - | - | | - | - | - | | - | - | - | | (350) | (350) | (350) | |
| Taxes / VAT (Anticipated by Debtors) | (282) | (272) | (172) | (72) | | (100) | (90) | (80) | | (20) | (20) | (20) | | - | - | - | |
| Taxes / VAT (Scheduled/Filed) | (180) | (75) | (65) | (55) | | (50) | (40) | (30) | | (25) | (20) | (15) | | (60) | (55) | (50) | |
| Jane Park - Severance | (50) | - | - | - | | (100) | (50) | - | | - | - | - | | - | - | - | |
| Post-Close Operations thru Confirmation (estimate) | (100) | (36) | (33) | (30) | | (36) | (33) | (30) | | (36) | (33) | (30) | | - | - | - | |
| | (3,753) | (1,988) | (1,639) | (1,476) | | (1,657) | (1,475) | (1,352) | | (171) | (158) | (145) | | (490) | (480) | (470) | |
| **Priority Claims:** | | | | | | | | | | | | | | | | | |
| Class Action Litigation [$245,000 asserted] | (30) | (245) | (30) | - | | - | - | - | | - | - | - | | - | - | - | |
| Gift Cards | (125) | - | - | - | | (150) | (125) | (110) | | - | - | - | | - | - | - | |
| | (155) | (245) | (30) | - | | (150) | (125) | (110) | | - | - | - | | - | - | - | |
| **Estimated Funds Available to Unsecured Claimants** | $1,205 | $13 | $626 | $867 | | $51 | $293 | $466 | | $123 | $146 | $170 | | $124 | $139 | $155 | |
| | Mid | Low | Mid | High | | Low | Mid | High | | Low | Mid | High | | Low | Mid | High | |
| **Allocation of Funds Available to Unsecured Claimants:** | | | | | | | | | | | | | | | | | |
| Distribution of Allowed Unsecured Claims, by Debtor | $1,205 | $13 | $626 | $867 | | $51 | $293 | $466 | | $123 | $146 | $170 | | $124 | $139 | $155 | |
| Percentage Recovery, by Debtor | 9.5% | 0.1% | 10.4% | 15.5% | | 1.2% | 7.4% | 12.3% | | 15.3% | 19.5% | 24.2% | | 6.2% | 7.0% | 8.0% | |
| **Unsecured Claims:** | | | | | | | | | | | | | | | | | |
| Per Schedule F | 12,600 | 6,700 | 6,700 | 6,700 | | 4,700 | 4,700 | 4,700 | | 300 | 300 | 300 | | 900 | 900 | 900 | |
| Adjustments for No Liability Scheduled Claims(7) | (2,850) | (1,650) | (1,650) | (1,650) | | (1,200) | (1,200) | (1,200) | | 0 | 0 | 0 | | 0 | 0 | 0 | |
| Adjusted Scheduled Claim Amount | 9,750 | 5,050 | 5,050 | 5,050 | | 3,500 | 3,500 | 3,500 | | 300 | 300 | 300 | | 900 | 900 | 900 | |
| POC Adjustments | 2,600 | 750 | 650 | 550 | | 500 | 400 | 300 | | 500 | 450 | 400 | | 1,100 | 1,100 | 1,050 | |
| Jane Park Claim | 75 | - | - | - | | 150 | 75 | - | | - | - | - | | - | - | - | |
| Class Action Claim | 300 | 3,300 | 300 | - | | - | - | - | | - | - | - | | - | - | - | |
| | $ 12,725 | $ 9,100 | $ 6,000 | $ 5,600 | | $ 4,150 | $ 3,975 | $ 3,800 | | $ 800 | $ 750 | $ 700 | | $ 2,000 | $ 2,000 | $ 1,950 | |

Notes:
(1) The estate's cash is initially split following the same percentages found in Section One of the allocation methodology chart; we assume that a Chapter 7 Trustee would agree with the use of initial acquisition price to allocate value.
(2) After reviewing all 90 day payments to non-insiders and making assumptions for (a) defenses under section 547 and (b) collection efforts, the Debtors estimate recoveries from preference actions in the $200,000 to $400,000 range.
(3) The Debtor continues to negotiate towards a settlement with the borrower (Jane Park, Founder of Julep) under a $1.15 million prepetition promissory note payable to Glansaol LLC; the outcome of any settlement may affect distributions under the plan.
(4) Chapter 7 Trustee fees are estimated to be 5.0% of the total available proceeds for distribution.
(5) Certain claims listed on Schedule F are no longer an unsecured liability of the Debtor. Those claims include certain chargebacks and amounts owed to certain trade partners that were paid under the Common Carrier/Warehouse Order.

## __EXHIBIT 3__

**Committee Support Letter**

The Official Committee of Unsecured Creditors
of Glansaol Holdings, Inc. *et al.*
c/o Arent Fox LLP

June 24, 2019

**To: The Unsecured Creditors of Glansaol Holdings, Inc. et al.:[1]**

The Official Committee of Unsecured Creditors (the "Committee") of Glansaol Holdings, Inc. (together with its affiliated debtors, the "Debtors" or "Glansaol") writes this letter to recommend unsecured creditors to vote in favor of the Debtors' *Third Amended Joint Liquidating Plan of the Debtors under Chapter 11 of the Bankruptcy Code* (the "Plan").[2] Together with this letter, you are receiving a copy of the Plan, the *Joint Disclosure Statement for the Third Amended Joint Liquidating Plan of the Debtors under Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"), various related documents, and a ballot allowing you to vote to either accept or reject the Plan.

The Plan represents the culmination of extensive and good faith negotiations among the Committee, the Debtors, and the Debtors' ultimate parent company, Warburg Pincus Private Equity XII Funds (the "Sponsor"), and reflects compromises and settlements to achieve an economic resolution in a prompt and reasonable manner given the circumstances of these chapter 11 cases.

For the reasons set forth below, the Committee is supportive of the Plan based on the current and known facts and circumstances and **urges all unsecured creditors to vote in favor of the Plan and return your Ballot indicating your acceptance of the Plan in accordance with the voting instructions set forth on the Ballot.**

A.    **Background**

On December 19, 2018, the Debtors filed a voluntary petition for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

On January 3, 2019, the United States Trustee appointed the Committee. The Committee is statutorily charged with representing the interests of all unsecured creditors. Among the duties and powers of an official committee of unsecured creditors is the participation in the formulation of a debtor's plan and the responsibility for advising the debtor's creditors of the committee's determinations regarding the plan. The members of the Committee in these chapter 11 cases

---

[1] The Debtors in these chapter 11 cases are: Clark's Botanicals, Inc.; Glansaol Holdings Inc.; Glansaol LLC; Glansaol Management LLC; Julep Beauty, Inc.; Laura Geller Beauty, LLC; Laura Geller Brands, LLC; and Laura Geller Holdings, LLC. The bankruptcy cases for these debtors and debtors-in-possession are jointly administered under the bankruptcy case and style referenced above.

[2] All Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

have devoted substantial time and attention in carrying out their statutory duties to all unsecured creditors.

On January 3, 2019, the Committee retained the law firm of Arent Fox LLP as bankruptcy counsel and CBIZ Corporate Recovery Services as financial advisor.

On February 1, 2019, the Bankruptcy Court approved the sale of substantially all of the Debtors' assets for a purchase price of $18 million (the "Sale").  The Sale closed on February 6, 2019.

## B.    The Plan and Disclosure Statement

On March 1, 2019, the Debtors filed the *Joint Liquidating Plan of the Debtors under Chapter 11 of the Bankruptcy Code* (the "Original Plan") and the *Joint Disclosure Statement for Joint Liquidating Plan of the Debtors under Chapter 11 of the Bankruptcy Code* (the "Original Disclosure Statement").  The Committee opposed or had issues with numerous provisions in the Original Plan.

Given the costs, delay and uncertainty associate with a contested confirmation process and protracted litigation, and to determine if a consensual resolution could be achieved, the Committee engaged in extensive settlement negotiations with the Debtors and the Sponsor regarding the Original Plan.

Ultimately, the parties were able to achieve a global settlement (the "Global Settlement") which is incorporated into the Plan and Disclosure Statement, which were filed on May 21, 2019 [ECF No. 321 & 323].  The Global Settlement provides for, among other things, the Sponsor to provide an additional $1.65 million for distribution to the Debtors' creditors (the "Sponsor Settlement Amount").

The Plan is a plan of liquidation of the Debtors and is the culmination of the Sale and the Global Settlement. The proceeds from the Sale and Sponsor Settlement Amount, as well as any other Cash on hand, will fund the Plan Administrator's implementation of the Plan and distribution to holders of General Unsecured Claims.

Under the Plan, holders of General Unsecured Claims are placed in Class – 5 and treated in accordance with the terms set forth in Section 4.05 of the Plan, respectively, and as further provided for in Article IV of the Plan and the Disclosure Statement.  Class – 5 is Impaired and entitled to vote to accept or reject the Plan.

On June 24, 2019, the Court entered an Order approving the Debtors' Disclosure Statement and solicitation procedures [ECF No 369].

Under the current and known facts and circumstances, the Committee believes that the Plan is in the best interests of the Debtors' unsecured creditors.  The opinion of the Committee is that other alternatives would involve significant risk, delay, uncertainty and additional administrative costs. The Committee does not believe that further negotiations or litigation will result in materially higher or better recoveries to unsecured creditors and believes that the expected recoveries to holders of General Unsecured Claims represent a fair and equitable outcome.

Accordingly, the Committee recommends that **all unsecured creditors vote in favor** of the Plan by indicating your acceptance of the Plan on the Ballot you will receive from the Debtors. Instructions for submitting your vote are included in the attached Ballot.

Of course, before you cast your Ballot, you should review the enclosed Plan, the Disclosure Statement and the exhibits to the Disclosure Statement in their entirety and you may want to consult your own legal and financial professionals.

**Your vote to accept the Plan is crucial, no matter how large or small your claim may be.**

Although the Committee, by this letter, expresses its support for the Plan, this letter does not necessarily reflect the views of any of the individual Committee members, each of which reserves any and all of its rights.

If you have any questions regarding voting procedures or otherwise, please contact counsel to the Debtors, Brian Lennon, at (212) 728-8000 or counsel to the Committee, Beth M. Brownstein at (212) 728-8000.

<div style="margin-left:40%">Very truly yours,</div>

<div style="margin-left:40%">The Official Committee of Unsecured Creditors of Glansaol Holdings, Inc., *et al*.</div>

**YOU ARE URGED TO CAREFULLY READ THE DISCLOSURE STATEMENT AND PLAN.  THE DESCRIPTION OF THE PLAN IN THIS LETTER IS INTENDED TO BE A SUMMARY ONLY.**

**THIS COMMUNICATION DOES NOT CONSTITUTE, AND SHALL NOT BE CONSTRUED AS, A SOLICITATION BY ANY INDIVIDUAL MEMBER OF THE COMMITTEE.**

**THIS LETTER MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN HOW TO VOTE ON THE PLAN AND THE INFORMATION CANNOT BE RELIED UPON FOR ANY OTHER PURPOSE.**

**THE BANKRUPTCY COURT'S APPROVAL OF THIS SUPPORT LETTER TO BE INCLUDED AS PART OF THE SOLICITATION PACKAGE DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN OR THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.**

**THIS COMMUNICATION DOES NOT CONSTITUTE, AND SHALL NOT BE CONSTRUED AS, A SOLICITATION BY ANY INDIVIDUAL MEMBER OF THE COMMITTEE.**

**THE COMMITTEE DOES NOT REPRESENT INDIVIDUAL HOLDERS OF ANY PARTICULAR CLAIMS AND CANNOT ADVISE UNSECURED CREDITORS REGARDING THE IMPACT OF THE PLAN ON DIRECT CLAIM(S) OR CAUSES OF ACTION, IF ANY, AN INDIVIDUAL UNSECURED CREDITOR MAY HAVE AGAINST ANY OF THE DEBTORS' OFFICERS OR DIRECTORS OR OTHER THIRD PARTIES PROVIDED RELEASES UNDER THE PLAN.  TO THE EXTENT YOU BELIEVE YOU MAY OWN ANY SUCH POTENTIAL CLAIMS, PLEASE CONTACT YOUR OWN INDIVIDUAL COUNSEL TO ASSESS WHETHER ACCEPTANCE OF THE PLAN IS IN YOUR BEST INTERESTS.**

## EXHIBIT 4

**Sponsor Letter**

**WARBURG PINCUS**

WARBURG PINCUS
PRIVATE EQUITY XII,
L.P.

212-878-0600 tel
212-878-9351 fax

450 Lexington Avenue
New York, NY 10017-3911

www.warburgpincus.com

May 4, 2018

Glansaol Management, LLC
575 Lexington Ave
New York, NY 10022

Re: Support Letter

We, the undersigned funds ("Warburg Pincus") are the indirect majority shareholder of Glansaol Management, LLC and Subsidiaries (the "Company"). Warburg Pincus has to date invested approximately $199 million into the Company and remains committed to the continued success of the Company's business. Warburg Pincus has agreed to fund the Company with up to $25 million (the "Commitment") to the extent needed so that the Company can meet its financial obligations through May 31, 2019.

Warburg Pincus has the financial resources to allow it to fund the Commitment if and when needed by the Company, and there are no contractual restrictions on Warburg Pincus that would prevent it from funding the Commitment.

Regards,

WARBURG PINCUS PRIVATE EQUITY XII, L.P.
By: Warburg Pincus XII, L.P., its general partner
By: WP Global LLC, its general partner
By: Warburg Pincus Partners II, L.P., its managing member
By: Warburg Pincus Partners GP LLC, its general partner
By: Warburg Pincus & Co., its managing member

By: _____
Name: David Sreter
Title: Partner