**Hearing Date and Time: January 18, 2019 at 10:00 a.m. (Eastern Time)**
**Objection Deadline: January 11, 2019 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                            :
In re                                       :       **Chapter 11**
                                            :
**SEARS HOLDINGS CORPORATION, *et al.*,**   :       **Case No. 18-23538 (RDD)**
                                            :
          Debtors.[1]                       :       **(Jointly Administered)**
                                            :
------------------------------------------------------------x

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

**NOTICE OF HEARING ON APPLICATION OF DEBTORS FOR
AUTHORITY TO RETAIN DELOITTE & TOUCHE LLP FOR INDEPENDENT AUDIT
AND ADVISORY SERVICES *NUNC PRO TUNC* TO THE COMMENCEMENT DATE**

**PLEASE TAKE NOTICE** that a hearing on the annexed application (the "**Application**"), of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), for entry of an order pursuant to section 327(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2014-1 and 2016-1 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") for authority to retain and employ Deloitte & Touche LLP ("**Deloitte & Touche**") to provide independent audit and advisory services, *nunc pro tunc* to the Commencement Date, all as more fully set forth in the Application, will be held before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, Courtroom 118, 300 Quarropas Street, White Plains, New York, 10601-4140 (the "**Bankruptcy Court**") on **January 18, 2019 at 10:00 a.m. (Eastern Time)** (the "**Hearing**"), or as soon thereafter as counsel may be heard.

**PLEASE TAKE FURTHER NOTICE** that any responses or objections (the "**Objections**") to the Application shall be in writing, shall conform to the Bankruptcy Rules and the Local Rules, shall be filed with the Bankruptcy Court (a) by attorneys practicing in the Bankruptcy Court, including attorneys admitted pro hac vice, electronically in accordance with General Order M-399 (which can be found at www.nysb.uscourts.gov), and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to Chambers), in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable, and shall be served in

2

accordance with the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405), so as to be filed and received no later than **January 11, 2019 at 4:00 p.m. (Eastern Time)** (the "**Objection Deadline**").

        **PLEASE TAKE FURTHER NOTICE** that if no Objections are timely filed and served with respect to the Application, the Debtors may, on or after the Objection Deadline, submit to the Bankruptcy Court an order substantially in the form of the proposed order annexed to the Application, which order may be entered without further notice or opportunity to be heard.

        **PLEASE TAKE FURTHER NOTICE** that any objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

Dated: January 4, 2019
      New York, New York

                    /s/ Garrett A. Fail
                    WEIL, GOTSHAL & MANGES LLP
                    767 Fifth Avenue
                    New York, New York  10153
                    Telephone:  (212) 310-8000
                    Facsimile:  (212) 310-8007
                    Ray C. Schrock, P.C.
                    Jacqueline Marcus
                    Garrett A. Fail
                    Sunny Singh
                    Jessica Liou

                    *Attorneys for Debtors*
                    *and Debtors in Possession*

WEIL:\96792963\4\73217.0004

**Hearing Date and Time:  January 18, 2019 at 10:00 a.m. (Eastern Time)**
**Objection Deadline:  January 11, 2019 at 4:00 p.m. (Eastern Time)**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ray C. Schrock, P.C.
Jacqueline Marcus
Garrett A. Fail
Sunny Singh
Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- x

| | |
|---|---|
| In re | : |
| | : |
| **SEARS HOLDINGS CORPORATION**, *et al.*, | : |
| | : |
| | : |
| Debtors.[1] | : |

| |
|---|
| **Chapter 11** |
| **Case No. 18-23538 (RDD)** |
| **(Jointly Administered)** |

---------------------------------------------------------- x

### APPLICATION OF DEBTORS FOR AUTHORITY
### TO RETAIN DELOITTE & TOUCHE LLP FOR INDEPENDENT AUDIT
### AND ADVISORY SERVICES *NUNC PRO TUNC* TO THE COMMENCEMENT DATE

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365).  The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

TO THE HONORABLE ROBERT D. DRAIN,
UNITED STATES BANKRUPTCY JUDGE:

Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully represent as follows in support of this application (the "**Application**"):

## Background

1.    Beginning on October 15, 2018 (the "**Commencement Date**") and continuing thereafter, each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    On October 24, 2018, the United States Trustee for Region 2 appointed an official committee of unsecured creditors.  No trustee or examiner has been appointed in these chapter 11 cases.

3.    The Debtors' chapter 11 cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

4.    Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Robert A. Riecker Pursuant to Rule 1007-2 of Local Bankruptcy Rules for Southern District of New York*, sworn on October 15, 2018 (ECF No. 3).

## Jurisdiction

5.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012

2

(Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C.  §§ 1408 and 1409.

**Relief Requested**

6.      By this Application, the Debtors request authority, pursuant to section 327(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(a), and Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") 2014-1 and 2016-1, to retain and employ Deloitte & Touche LLP ("**Deloitte & Touche**") to provide independent audit and advisory services (the "**Services**") in accordance with the terms and conditions set forth in the following certain engagement letters (collectively, the "**Engagement Agreements**"):

**Attest Services:**

- that certain engagement letter, dated April 23, 2018 and as amended on November 14, 2018, for the audit of Debtor SHC's financial statements for the year ending February 2, 2019 (the "**Base Audit Engagement Letter**");

- that certain engagement letter, dated November 2, 2018, for the audit of Debtor Sears Protection Company (PR), Inc.'s financial statements for the year ended February 3, 2018 (the "**SPC Audit Engagement Letter**");

- that certain engagement letter, dated August 22, 2018, for the audit of the Sears Holdings Savings Plan's and Sears Holdings Puerto Rico Savings Plan's financial statements for the year ended December 31, 2017 (the "**Savings Plan Audit Engagement Letter**");

- that certain engagement letter, dated July 9, 2018, for the audit of Parts Direct's financial statements for the years ended January 30, 2016, January 28, 2017 and February 3, 2018 (the "**Parts Direct Audit Engagement Letter**");

- those certain engagement letters, dated June 19, 2018 and August 9, 2018, for the audit of Kenmore Direct's and Kenmore's financial statements for the years ended January 30, 2016, January 28, 2017 and February 3, 2018, as applicable (the "**Kenmore Audit Engagement Letters**");

- those certain engagement letters, dated April 26, 2017 and May 16, 2018, for the audit of certain affiliates and/or subsidiaries of SHC for the years ended December 31, 2016, January 28, 2017, and February 3, 2018, respectively (the "**Affiliate/Subsidiaries' Audit Engagement Letters**");

3

- those certain engagement letters, dated June 16, 2017 and June 13, 2018 for the audit of Debtors Kmart Operations LLC – Puerto Rico Division's and Sears Operations LLC – Puerto Rico Division's financial statements for the years ended January 28, 2017 and February 3, 2018 (the "**Kmart PR and Sears PR Audit Engagement Letters**");

- those certain engagement letters, dated May 9, 2016, August 11, 2017, and August 1, 2018, for the audit of Debtor Kmart Corporation – Puerto Rico Division's financial statements for the years ended January 30, 2016, January 28, 2017, and February 3, 2018 (the "**Kmart PR Audit Engagement Letters**"); and

- that certain engagement letter, dated July 9, 2018, for certain attest services related to the examination of SHC's description of the system related to the Financial Reporting, Inventory, Procurement, and Revenue Transactions Processing Services and related General Computer Controls (the "**System Services Engagement Letter**").

**Advisory Services:**

- those certain engagement letters, dated July 13, 2018, July 23, 2018, and September 13, 2018, for certain advisory services in connection with the Debtors' evaluation of proposed divestitures of certain business units (the "**Project Sasset Engagement Letters**");

- that certain engagement letter, dated September 7, 2017, for the provision of software asset management services and the performance of software license analysis services to advise the Debtors on optimizing licenses costs and addressing compliance gaps (the "**SAM Engagement Letter**");

- that certain engagement letter, dated October 29, 2018, for the provision of accounting advisory services in connection with the Debtors' restructuring (the "**Restructuring Accounting Advisory Engagement Letter**"); and

- that certain engagement letter, dated April 3, 2018, for accounting advisory services in connection with Phase II through Phase III of the Debtors' assessment of the New Revenue Standard and Phase II through Phase V of the Debtors' assessment of the New Leases Standard (the "**New Standards Accounting Advisory Engagement Letter**").

7.      In support of this Application, the Debtors submit the Declaration of Jim Berry, a partner at Deloitte & Touche (the "**Berry Declaration**"). The Berry Declaration is annexed hereto as **Exhibit A**. Copies of the Engagement Agreements are annexed to the Berry Declaration as **Exhibits 1-13**. A proposed form of order granting the relief requested in this Application is annexed hereto as **Exhibit B** (the "**Proposed Order**").

4

## Deloitte & Touche's Qualifications

8.      Deloitte & Touche is a public accounting firm with offices across the United States.   Deloitte & Touche has significant experience in providing accounting and advisory services in large and complex chapter 11 cases on behalf of debtors throughout the United States, including numerous large chapter 11 cases in this district.  *See, e.g., In re Tops II Holding Corp.,* Case No. 18-22279 (RDD) (Bankr. S.D.N.Y. May 10, 2018); *Westinghouse Elec. Co., LLC*, Case No. 17-10751 (MEW) (Bank. S.D.N.Y. Nov. 16, 2017) (ECF No. 1585); *In re Sabine Oil & Gas Corp.*, Case No. 15-11835 (SCC) (Bankr. S.D.N.Y. Oct. 16, 2015) (ECF No. 425).  Such experience renders Deloitte & Touche well-qualified and able to provide Services to the Debtors during the pendency of these chapter 11 cases.  Deloitte & Touche's services fulfill an important need and are not provided by any of the Debtors' other professionals.

9.      In addition, since approximately March 2005, Deloitte & Touche has provided professional services to the Debtors.   In providing such prepetition professional services to the Debtors, Deloitte & Touche has become familiar with the Debtors and their business, including the Debtors' financial affairs, debt structure, operations, and related matters. Having worked with the Debtors' management, Deloitte & Touche has developed relevant experience and knowledge regarding the Debtors that will assist it in providing effective and efficient services during these cases.

## Scope of Services

10.      It is proposed that Deloitte & Touche be employed as of the Commencement Date to act as the Debtors' independent auditor and advisor, all as set forth more fully in the Engagement Agreements, including completing work with respect to the Services.

11.      As set forth more fully in the Engagement Agreements, pursuant to the terms of the Engagement Agreements, Deloitte & Touche is assisting the Debtors by performing:

5

A.    ***Attest Services:***  Pursuant to the terms of audit-related Engagement Agreements, for or related to SHC, certain affiliates and/or subsidiaries of SHC, and certain businesses of SHC, Deloitte & Touche will perform audit services, as contemplated therein, and express opinions on (1) the fairness of the presentation of the applicable entity's financial statements for the applicable year ended periods, in conformity with accounting principles generally accepted in the United States of America ("generally accepted accounting principles" or "**GAAP**") or the accrual method of accounting used for income tax reporting purposes, as applicable, in all material respects, as well as (2) the effectiveness of SHC's internal control over financial reporting as of the applicable year ended periods.  Deloitte & Touche will also examine SHC's description and design of the system related to the Financial Reporting and Transaction Processing Services and related General Computer Controls at SHC.

B.    ***Advisory Services***:  Pursuant to the terms of advisory-related Engagement Agreements, Deloitte & Touche will provide the Debtors with advice and recommendations as follows:

(i)    Advise SHC in connection with matters concerning the Debtor's evaluation of proposed divestitures of certain business units, including Kenmore, Kenmore Commercial, Kenmore Direct, SHIP, and Parts Direct;

(ii)    Advise SHC in connection with the provision of software asset management services and the performance of certain software license analysis services, including advice regarding optimizing license costs and addressing compliance gaps;

(iii)    Provide the Debtors with accounting advisory services in connection with the Debtors' restructuring, including: providing training to the Debtors' personnel in the accounting and financial reporting department; reviewing relevant documentation for accounting and financial reporting areas impacted by the Debtors' planned reorganization; researching and communicating relevant accounting literature and guidance under U.S. GAAP and SEC rules and regulations related to the Debtors' planned reorganization; and providing advice and recommendations regarding, among other things, the Debtors' proposed accounting treatment for planned transactions, accounting and reporting matters, required financial statement disclosures in the Form 10-Qs and 10-Ks, and issues related to internal controls over financial reporting; and

(iv)    Provide the Debtors with accounting advisory services in connection with several phases of the Debtors' assessment and implementation of the New Revenue Standard, as defined in Financial Accounting Standards Board Accounting Standards Codification 606 – *Revenue from Contracts with Customers*, and the New Leases Standard, as defined in Financial Accounting Standards Board Accounting Standards Codification 842 – *Leases*.

6

### Efforts to Avoid Duplication of Services

12.     The Services performed by Deloitte & Touche will not unnecessarily duplicate or overlap with the other services performed by the Debtors' other retained professionals and advisors.  Deloitte & Touche understands that the Debtors have retained and may retain additional professionals during the terms of the Engagement Agreements, and has agreed to work cooperatively with the Debtors to avoid unnecessary duplication of services.

### Indemnification Provisions

13.     As part of the overall compensation payable to Deloitte & Touche under the terms of the Engagement Agreements, the Debtors have agreed to certain indemnification provisions set forth in certain of the Engagement Agreements (the "**Indemnification Provisions**"), to the extent permitted by applicable law and by the Proposed Order.

14.     The terms of the Engagement Agreements and the Indemnification Provisions were fully negotiated at arm's length.  The Debtors respectfully submit that the Indemnification Provisions are reasonable and appropriate under the circumstances.

15.     Moreover, consistent with the practice in this jurisdiction, the Debtors request that the Court approve the Indemnification Provision reflected in certain of the Engagement Agreements subject to the modifications reflected in the Proposed Order.  The Debtors believe that the proposed modifications to the Indemnification Provisions are appropriate under the circumstances, consistent with recent orders entered in this jurisdiction, and should be approved.

### Deloitte & Touche's Disinterestedness

16.     To the best of the Debtors' knowledge, information, and belief, and except as disclosed in the Berry Declaration, Deloitte & Touche has represented that it neither holds nor

7

represents any interest that is adverse to the Debtors' estates in connection with any matter on which it would be employed.

17.    Based upon the Berry Declaration, the Debtors submit that Deloitte & Touche is a "disinterested person" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code. If Deloitte & Touche discovers additional material information that it determines requires disclosure, it will file a supplemental disclosure promptly with the Court.

18.    Prior to the Commencement Date, Deloitte & Touche provided certain professional services to the Debtors. In the ninety (90) days prior to the Commencement Date, the Debtors paid Deloitte & Touche approximately $9,000,000 for services rendered in connection with the Engagement Agreements. As of the Commencement Date, no amounts were outstanding with respect to the invoices issued by Deloitte & Touche prior to such date.

19.    Moreover, prior to the Commencement Date, Deloitte Tax ("**Deloitte Tax**"), an affiliate of Deloitte & Touche, provided certain tax-related professional services to the Debtors. In the ninety (90) days prior to the Commencement Date, the Debtors paid Deloitte Tax $21,200 for services performed. As of the Commencement Date, approximately $131,000 was outstanding with respect to the invoices issued by Deloitte Tax prior to such date. The Debtors are advised that Deloitte Tax will not seek a recovery on the amount of such invoices.

20.    Some services incidental to the tasks to be performed by Deloitte & Touche in the chapter 11 cases may be performed by personnel now employed by, or associated with, affiliates of Deloitte & Touche, such as Deloitte Transactions and Business Analytics LLP ("**DTBA**"), Deloitte Financial Advisory Services LLP, Deloitte Tax, and Deloitte Consulting

8

LLP, and/or their respective subsidiaries, including subsidiaries located outside of the United States.

21.    Contemporaneously herewith, the Debtors are also seeking authority to employ and retain Deloitte Tax to act as the Debtors' tax advisor and DTBA to act as the Debtors' advisor with respect to certain bankruptcy matters. *See Application of Debtors for Authority to Retain Deloitte Tax LLP as Tax Services Provider for the Debtors* Nunc Pro Tunc *to the Commencement Date* and *Application of Debtors for Authority to Retain Deloitte Transactions and Business Analytics LLP for Bankruptcy Advisory Services* Nunc Pro Tunc *to October 29, 2018*, respectively.

## Professional Compensation

22.    As set forth in the Berry Declaration, Deloitte & Touche's retention by the Debtors is conditioned upon its ability to be retained in accordance with the terms and conditions of employment, including the proposed compensation arrangements, set forth in the Engagement Agreements.

23.    Pursuant to the Base Audit Engagement Letter, Deloitte & Touche agreed to bill the Debtors periodically with respect to the audit services performed thereunder, except for Out-of-Scope Services (as defined below). Deloitte & Touche estimated that its fees for such services would be approximately $3,935,000, to be billed in ten equal installments on a monthly basis. As of the Commencement Date, Deloitte & Touche received four of the ten installments of such fees (i.e., $1,574,000).

24.    Pursuant to the Base Audit Engagement Letter, Deloitte & Touche will provide audit services that were not contemplated as part of the base audit (collectively, the "**Base Audit Out-of-Scope Services**"), fees for the Base Audit Out-of-Scope Services will be

9

based on actual time spent by professionals on such services, at the individual's applicable professional hourly rate, as follows:

| Professional Level | Hourly Rates |
| --- | --- |
| Partner / Principal / Managing Director | $550 - $600 |
| Senior Manager | $450 - $500 |
| Manager | $350 - $400 |
| Senior | $250 - $300 |
| Staff | $175 - $200 |

25.    Pursuant to the terms of the System Services Engagement Letters, Deloitte & Touche agreed to charge the Debtors fees in the aggregate of approximately $310,000, exclusive of expenses, with respect to the services performed under the System Services Engagement Letters, in accordance with the following billing schedule:

| Engagement Milestone | Estimated Invoice Date | Amount |
| --- | --- | --- |
| Engagement Letter Signed | August 1, 2018 | $160,000 |
| Complete Interim Testing | November 1, 2018 | $100,000 |
| Completion of Engagement | February 1, 2019 | $50,000 |

Prior to the Commencement Date, Deloitte & Touche received $160,000 of the aforementioned fees in connection with the services performed under the System Services Engagement Letters.

26.    Pursuant to the System Services Audit Engagement Letters, Deloitte & Touche will provide audit services that were not contemplated as part of the base audit (collectively, the "**System Services Out-of-Scope Services**"), fees for the System Services Out-of-Scope Services will be based on actual time spent by professionals on such services, at the individual's applicable professional hourly rate, as follows:

10

| Professional Level | Hourly Rates |
|---|---|
| Partner / Principal / Managing Director | $550 - $600 |
| Senior Manager | $450 - $500 |
| Manager | $350 - $400 |
| Senior | $250 - $300 |
| Staff | $175 - $200 |

27.      Pursuant to the terms of the New Standards Accounting Advisory Engagement Letter, Deloitte & Touche agreed to charge the Debtors fees of approximately $850,000, exclusive of expenses, with respect to the services performed under the New Standards Accounting Advisory Engagement Letter, in accordance with the following estimated billing schedule:

| Invoice Date | Amount |
|---|---|
| April 4, 2018 | $350,000 |
| June 6, 2018 | $125,000 |
| August 8, 2018 | $100,000 |
| October 10, 2018 | $100,000 |
| December 12, 2018 | $75,000 |
| May 2, 2019 | $75,000 |

Prior to the Commencement Date, Deloitte & Touche received $390,000 of the aforementioned fees in connection with the services performed under the New Standards Accounting Advisory Engagement Letter.

28.      Pursuant to the terms of the Restructuring Accounting Advisory Engagement Letter, Deloitte & Touche agreed to bill the Debtors fees based on the actual time spent by professionals on such services, at the individual's applicable professional hourly rate. Deloitte & Touche will charge the Debtors the following fees with respect to such services, set forth in the table below:

11

| Professional Level | Hourly Rates |
|---|---|
| Partner / Principal / Managing Director | $775 - $925 |
| Senior Manager | $625 |
| Manager | $525 |
| Senior | $450 |
| Staff | $295 |

29.    In addition to the fees set forth above, the Debtors have agreed to compensate Deloitte & Touche for actual, reasonable, and necessary expenses, including travel, report production, delivery services, and other expenses incurred by Deloitte & Touche in providing the Services.

30.    As set forth in the Berry Declaration, and subject to Court approval, Deloitte & Touche intends to file interim and final fee applications for the allowance of compensation for Services rendered and reimbursement of expenses incurred pursuant to the Engagement Agreements in accordance with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Rules, any applicable orders of the Court, including the *Order Authorizing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (ECF No. 796) (the "**Interim Compensation Order**") and the Order granting this Application, and any applicable guidelines issued by the Office of the United States Trustee.

31.    Deloitte & Touche will maintain records in support of any fees incurred in connection with the services it performs in these chapter 11 cases by category and nature of the Services rendered, and will provide reasonably detailed descriptions of those services rendered on behalf of the Debtors, the time expended in providing those services, and the individuals who provided professional services on behalf of the Debtors.

32.    Deloitte & Touche has received no promises regarding compensation in the chapter 11 cases other than in accordance with the Bankruptcy Code and as set forth in the

12

Berry Declaration.  Deloitte & Touche has no agreement with any nonaffiliated or unrelated entity to share any compensation earned in these chapter 11 cases in accordance with section 504 of the Bankruptcy Code.

### Relief Requested Should Be Granted

33.    Section 327(a) of the Bankruptcy Code, which provides that a debtor is authorized to employ professional persons "that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the [debtors] in carrying out the [debtors'] duties under this title."  11 U.S.C. § 327(a).  As discussed above and as further detailed in the Berry Declaration, to the best of the Debtors' knowledge, Deloitte & Touche is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code, and does not hold or represent an interest adverse to the Debtors' estates.

34.    Moreover, Bankruptcy Rule 2014 requires that an application for retention include:

> [S]pecific facts showing the necessity for the employment, the name of the [firm] to be employed, the reasons for the selection, the professional services to be rendered, [and] any proposed arrangement for compensation . . . .

Fed. R. Bankr. P. 2014.

35.    Deloitte & Touche has significant experience and extensive knowledge in performing the audit and advisory services to be provided to the Debtors.  Moreover, Deloitte & Touche is familiar with the relevant financial information and other data maintained by the Debtors and is qualified and best positioned to provide the Services to the Debtors in an efficient and cost effective manner.  Accordingly, the Debtors believe that Deloitte & Touche's employment is in the best interests of the Debtors, their estates, and their creditors and, therefore, should be approved.

WEIL:\96792963\4\73217.0004

## *Nunc Pro Tunc* Relief Is Warranted

36.     The Debtors believe that employment of Deloitte & Touche effective *nunc pro tunc* to the Commencement Date is warranted under the circumstances of these chapter 11 cases so that Deloitte & Touche may be compensated for its services prior to entry of an order approving Deloitte & Touche's retention.  Further, the Debtors believe that no party in interest will be prejudiced by the granting of the *nunc pro tunc* employment because Deloitte & Touche has provided, and will continue to provide, valuable services to the Debtors' estate in the interim period.

37.     Courts in this jurisdiction routinely approve *nunc pro tunc* employment similar to that requested herein.  *See, e.g.*, *In re Tops Holding II Corp.*, No. 18-22279 (Bankr. S.D.N.Y. March 22, 2018) (ECF No. 194); *In re Westinghouse Elec. Co. LLC*, No. 17-10751 (MEW) (Bankr. S.D.N.Y. Nov. 16, 2017) (ECF No. 1585); *In re Eagle Bulk Shipping Inc.*, No. 14-12303 (SHL) (Bankr. S.D.N.Y. Sept. 19, 2014); *In re MPM Silicones, LLC*, No. 14-22503 (RDD) (Bankr. S.D.N.Y. Apr. 28, 2014) (ECF Nos. 106, 107, 108, and 109).

## Notice

38.     Notice of this Application will be provided in accordance with the procedures set forth in the *Amended Order Implementing Certain Notice and Case Management Procedures*, entered on November 1, 2018 (ECF No. 405) (the "**Amended Case Management Order**").  The Debtors respectfully submit that no further notice is required.

39.     No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

14

WHEREFORE the Debtors respectfully request entry of an order granting the

relief requested herein and such other and further relief as the Court may deem just and

appropriate

Dated: January 4, 2019
      New York, New York

                                            SEARS HOLDINGS CORPORATION
                                            *(for itself and on behalf of its affiliates*
                                            *as Debtors and Debtors in Possession)*

                                              /s/ Mohsin Meghji

                                              NAME: Mohsin Meghji
                                              TITLE:  Chief Restructuring Officer

WEIL:\96792963\4\73217.0004

**<u>Exhibit A</u>**

**Berry Declaration**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x
                                :

In re                             :        **Chapter 11**
                                :

**SEARS HOLDINGS CORPORATION,** *et al.*,  :       **Case No. 18-23538 (RDD)**
                                :

        **Debtors.**[1]               :        **(Jointly Administered)**
                                :

-------------------------------------------------------- x

### DECLARATION OF JIMMY BERRY IN SUPPORT
### OF THE APPLICATION OF DEBTORS FOR AUTHORITY TO
### RETAIN DELOITTE & TOUCHE LLP FOR INDEPENDENT AUDIT AND
### ADVISORY SERVICES *NUNC PRO TUNC* TO THE COMMENCEMENT DATE

I, Jimmy Berry, under penalty of perjury, declares as follows:

       1.     I am a partner of the firm of Deloitte & Touche LLP ("**Deloitte &**

**Touche**"), which has an office at 2200 Ross Avenue, Suite 1600, Dallas, Texas 75201. I am

duly authorized to make and submit this declaration (the "**Declaration**") on behalf of Deloitte &

Touche as independent auditor and advisor for Sears Holdings Corporation ("**SHC**") and certain

of its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

cases (collectively, the "**Debtors**") in support of the *Application of Debtors for Authority to Retain Deloitte & Touche LLP for Independent Audit and Advisory Services* Nunc Pro Tunc *to the Commencement Date* (the "**Application**").[2]

2.    The Debtors seek to have Deloitte & Touche retained as independent auditor and advisor in accordance with the terms and conditions set forth in the following engagement letters (collectively, the "**Engagement Agreements**"):

*Attest Services:*

- that certain engagement letter, dated April 23, 2018 and as amended on November 14, 2018, for the audit of Debtor SHC's financial statements for the year ending February 2, 2019 (the "**Base Audit Engagement Letter**");

- that certain engagement letter, dated November 2, 2018, for the audit of Debtor Sears Protection Company (PR), Inc.'s financial statements for the year ended February 3, 2018 (the "**SPC Audit Engagement Letter**");

- that certain engagement letter, dated August 22, 2018, for the audit of the Sears Holdings Savings Plan's and Sears Holdings Puerto Rico Savings Plan's financial statements for the year ended December 31, 2017 (the "**Savings Plan Audit Engagement Letter**");

- that certain engagement letter, dated July 9, 2018, for the audit of Parts Direct's financial statements for the years ended January 30, 2016, January 28, 2017 and February 3, 2018 (the "**Parts Direct Audit Engagement Letter**");

- those certain engagement letters, dated June 19, 2018 and August 9, 2018, for the audit of Kenmore Direct's and Kenmore's financial statements for the years ended January 30, 2016, January 28, 2017 and February 3, 2018, as applicable (the "**Kenmore Audit Engagement Letters**");

- those certain engagement letters, dated April 26, 2017 and May 16, 2018, for the audit of certain affiliates and/or subsidiaries of SHC for the years ended December 31, 2016, January 28, 2017, and February 3, 2018, respectively (the "**Affiliate/Subsidiaries' Audit Engagement Letters**");

- those certain engagement letters, dated June 16, 2017 and June 13, 2018 for the audit of Debtors Kmart Operations LLC – Puerto Rico Division's and Sears Operations LLC –

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Application.

2

Puerto Rico Division's financial statements for the years ended January 28, 2017 and February 3, 2018 (the "**Kmart PR and Sears PR Audit Engagement Letters**");

- those certain engagement letters, dated May 9, 2016, August 11, 2017, and August 1, 2018, for the audit of Debtor Kmart Corporation – Puerto Rico Division's financial statements for the years ended January 30, 2016, January 28, 2017, and February 3, 2018 (the "**Kmart PR Audit Engagement Letters**"); and

- that certain engagement letter, dated July 9, 2018, for certain attest services related to the examination of SHC's description of the system related to the Financial Reporting, Inventory, Procurement, and Revenue Transactions Processing Services and related General Computer Controls (the "**System Services Engagement Letter**").

*Advisory Services:*

- those certain engagement letters, dated July 13, 2018, July 23, 2018, and September 13, 2018, for certain advisory services in connection with the Debtors' evaluation of proposed divestitures of certain business units (the "**Project Sasset Engagement Letters**");

- that certain engagement letter, dated September 7, 2017, for the provision of software asset management services and the performance of software license analysis services to advise the Debtors on optimizing licenses costs and addressing compliance gaps (the "**SAM Engagement Letter**");

- that certain engagement letter, dated October 29, 2018, for the provision of accounting advisory services in connection with the Debtors' restructuring (the "**Restructuring Accounting Advisory Engagement Letter**"); and

- that certain engagement letter, dated April 3, 2018, for accounting advisory services in connection with Phase II through Phase III of the Debtors' assessment of the New Revenue Standard and Phase II through Phase V of the Debtors' assessment of the New Leases Standard (the "**New Standards Accounting Advisory Engagement Letter**").

Copies of the Engagement Agreements are annexed hereto as **<u>Exhibits 1-13</u>**.

3.    The statements set forth in this Declaration are based upon my personal knowledge, information and belief, and/or client matter records kept in the ordinary course of business that were reviewed by me or other personnel of Deloitte & Touche or its affiliates.

3

### Deloitte & Touche's Qualifications

4.      Deloitte & Touche is a public accounting firm with offices across the United States.   Deloitte & Touche has significant experience in providing accounting and advisory services in large and complex chapter 11 cases on behalf of debtors throughout the United States, including numerous large chapter 11 cases in this district.   Such experience renders Deloitte & Touche well-qualified and able to provide services to the Debtors during the pendency of these chapter 11 cases Deloitte & Touche's services fulfill an important need and are not provided by any of the Debtors' other professionals.

5.      In addition, since approximately March 2005, Deloitte & Touche has provided professional services to SHC and certain of the other Debtors.   In providing such prepetition professional services to certain of the Debtors, Deloitte & Touche is familiar with the Debtors and their business, including the Debtors' financial affairs, debt structure, operations, and related matters.   Having worked with the Debtors' management, Deloitte & Touche has developed relevant experience and knowledge regarding the Debtors that will assist it in providing effective and efficient services during these cases.   Accordingly, Deloitte & Touche is both well-qualified and able to provide the services for the Debtors in the chapter 11 cases in an efficient and timely manner.

### Disinterestedness

6.      Subject to the foregoing, except as set forth herein and in the attachments hereto, to the best of my information, knowledge, and belief based on reasonable inquiry: (a) neither I, Deloitte & Touche, nor any partner, principal, or managing director of Deloitte & Touche that is anticipated to provide the services for which Deloitte & Touche is to be retained (the "**Engagement Partners/Principals/Managing Directors**") holds any interest adverse to the

4

Debtors; and (b) Deloitte & Touche and the Engagement Partners/Principals/Managing Directors have no relationship to the Debtors, their significant creditors, certain other significant parties-in-interest, or to the attorneys that are known to be assisting the Debtors in the chapter 11 cases, except as stated herein or in any attachment hereto.

       7.      In connection with Deloitte & Touche's retention by the Debtors in the chapter 11 cases, Deloitte & Touche undertook searches to determine, and to disclose, whether it or its affiliates is or has been employed by or has other relationships with the Debtors or their affiliates, subsidiaries, directors, or officers, or any of the Debtors' significant creditors, customers, equity security holders, professionals, or other entities with significant relationships with the Debtors (the "**Potential Parties-in-Interest**"), whose specific names were provided to Deloitte & Touche by the Debtors.  To check upon and disclose possible relationships with significant Potential Parties-in-Interest in the chapter 11 cases, Deloitte & Touche researched its client databases and performed reasonable due diligence to determine whether it or its affiliates had any relationships with the Debtors or significant Potential Parties-in-Interest.

       8.      Deloitte & Touche and its affiliates have relationships with thousands of clients, some of which may be creditors of the Debtors or other Potential Parties-in-Interest.  Accordingly, Deloitte & Touche and/or its affiliates have had, currently have and/or may have in the future banking or other relationships with such parties, or provided, may currently provide, and/or may provide in the future professional services to certain of these parties in matters unrelated to the chapter 11 cases.  From time to time, Deloitte & Touche and its affiliates have provided or may currently provide services, and likely will continue to provide services, to certain creditors of the Debtors and various other parties potentially adverse to the Debtors in matters unrelated to the chapter 11 cases, except as set forth herein or in the attachments hereto.

5

Additionally, certain significant Potential Parties-in-Interest have or may have provided goods or services, may currently provide goods or services, and/or may in the future provide goods or services to Deloitte & Touche and/or its affiliates and the Engagement Partners/Principals/Managing Directors in matters unrelated to the chapter 11 cases. A listing of such parties is attached to this Declaration as **Schedule 1**.

9.      Deloitte & Touche believes that the relationships described herein or reflected on **Schedule 1** have no bearing on the services for which Deloitte & Touche's retention is being sought by the Debtors in the chapter 11 cases. Furthermore, such relationships do not impair Deloitte & Touche's disinterestedness, and Deloitte & Touche does not represent an adverse interest in connection with the chapter 11 cases.

10.      Despite the efforts described above to identify and disclose Deloitte & Touche's connections with the significant Potential Parties-in-Interest in the chapter 11 cases, because Deloitte & Touche is a nationwide firm with many employees, Deloitte & Touche is unable to state with certainty that every client relationship or other connection has been disclosed. In this regard, if Deloitte & Touche discovers additional material information that it determines requires disclosure, it will file a supplemental disclosure promptly with the Court.

11.      To the best of my knowledge, based on the internal search discussed above, Deloitte & Touche has determined that certain relationships should be disclosed as follows:

a. Deloitte & Touche and/or its affiliates provide services in matters unrelated to the chapter 11 cases to certain of the Debtors' largest unsecured creditors and other Potential Parties-in-Interest or their affiliates listed on **Schedule 1**.

b. Law firms identified on **Schedule 1**, including Baker & Hostetler LLP; Cleary Gottlieb Steen & Hamilton LLP; DLA Piper US LLP; Haynes & Boone LLP; Morgan Lewis & Bockius LLP; Orrick Herrington & Sutcliffe LLP; Skadden, Arps, Slate, Meagher & Flom LLP; Steptoe & Johnson LLP; Sullivan &

6

Cromwell LLP; Wachtell, Lipton, Rosen & Katz LLP; and Weil Gotshal & Manges LLP, have provided, currently provide and may in the future provide legal services to Deloitte & Touche or its affiliates in matters unrelated to the chapter 11 cases, and/or Deloitte & Touche or its affiliates have provided, currently provide and may in the future provide services to such firms or their clients.

c.   In the ordinary course of its business, Deloitte & Touche and its affiliates have business relationships in unrelated matters with its principal competitors, which together with their affiliates may be Potential Parties-in-Interest in the chapter 11 cases. For example, from time to time, Deloitte & Touche and one or more of such entities may work on assignments for the same client or may otherwise engage each other for various purposes.

d.   Certain financial institutions or their respective affiliates (including Allianz Global Risks US Insurance Company; American Express Prepaid Card Management Corporation; AXA Insurance Company; Bank of America, N.A.; Barclays Capital Inc.; BB&T Bank; Capital One Bank; Citibank, N.A.; Citigroup Global Markets, Inc.; HSBC Bank; JPMorgan Chase Bank, N.A.; KeyBank; Life Insurance Company of North America ("Cigna"); Lloyd's of London; National Union Fire Insurance Company of Pittsburgh, PA; Prudential Insurance Co. of America; TD Bank, N.A.; and Wells Fargo Bank, National Association) listed on **Schedule 1** (i) are lenders to an affiliate of Deloitte & Touche (Deloitte & Touche is a guarantor of such indebtedness) and/or (ii) have financed a portion of the capital and/or capital loan requirements of various partners and principals, respectively, of Deloitte & Touche and its affiliates. In addition, certain institutions or their respective affiliates, including Goldman, Sachs & Co., provide asset management services to Deloitte & Touche, affiliates of Deloitte & Touche and/or certain of their pension funds.

e.   Certain Potential Parties-in-Interest may be adverse to and/or involved in litigation matters with Deloitte & Touche or its affiliates in connection with matters unrelated to the chapter 11 cases.

f.   Deloitte & Touche has provided and continues to provide audit services to certain Potential Parties-in-Interest and/or their affiliates in matters unrelated to these chapter 11 cases. In its capacity as auditor, Deloitte & Touche also provides such clients with ordinary course auditing services and conducts typical audit procedures that may arise from such Potential Parties-in-Interest's business arrangements with the Debtors.

7

g.  Certain firms around the world, including affiliates of Deloitte & Touche, are members of Deloitte Touche Tohmatsu Limited ("**DTTL**"), a United Kingdom company limited by guaranty. Certain of the non-US member firms of DTTL or their affiliates (the "**DTT Member Firms**"), including the DTT Member Firm located in India, have provided, currently provide or may in the future provide professional services to certain of the Debtors or their affiliates.[3] In particular, DTT Member Firm located in Canada performs audit services and tax services in the ordinary course of business for the Debtors' non-debtor affiliate, Sears Canada.

h.  Deloitte & Touche and/or its affiliates, including Deloitte Tax LLP ("**Deloitte Tax**"), performed various professional services for the Debtors in connection with certain prepetition transactions, such as those relating to the separation of Lands' End, Seritage Growth Properties ("**Seritage**"), and Sears Canada and the respective rights offerings associated therewith, as well as debt financing and other transactions. In its capacity as auditor, Deloitte & Touche provided the Debtors with ordinary course auditing services, which included services that arose in connection with the associated transactions. Following the Lands' End and Seritage transactions, Deloitte & Touche was separately retained as the independent auditor of each of Lands' End and Seritage. In addition, Deloitte Tax performed tax-related consulting services for the Debtors related to the aforementioned transactions.

i.  Deloitte Services LP ("**Deloitte Services**"), an affiliate of Deloitte & Touche, is party to an agreement with Debtor Sears Holdings Management Corporation ("**SHMC**"), which permits SHMC to offer its Shop Your Way PERKS program to Deloitte Services' and its affiliates' personnel in the ordinary course of business via Deloitte Services' internal website. Neither Deloitte Services, its affiliates, nor their respective personnel receive compensation from SHMC under this agreement. Additionally, it is likely that personnel of Deloitte & Touche and/or its affiliates, including personnel who may be performing services for the Debtors, have ordinary course consumer relationships with the Debtors, including by being (i) participants in certain customer programs of the Debtors (such as being holders of gift cards or credit accounts or by being participants in the Debtors' Shop Your Way PERKS program) and (ii) the beneficiaries of various warranty arrangements as a result of the purchase of goods or services from the Debtors. Deloitte & Touche has not conducted research into the status of its or its affiliates' personnel as customers of the Debtors or their participation in these ordinary course customer programs.

---

[3] Each of the DTT Member Firms is a separate and independent legal entity. It is not Deloitte & Touche's practice to undertake conflicts checks with DTT Member Firms for the purpose of identifying relationships that they may have with the Debtors and other parties-in-interest and Deloitte & Touche does not maintain a database for the purpose of identifying all such relationships.

WEIL:\96792963\4\73217.0004

j.  Deloitte & Touche and/or its affiliates have provided, currently provide, and will continue to provide financial advisory services to the Pension Benefit Guaranty Corporation (the "**PBGC**"). The Debtors and their pension plans are not the subject of these services for the PBGC.

k.  Deloitte Consulting LLP ("**Deloitte Consulting**"), an affiliate of Deloitte & Touche, and certain of its affiliates, have provided and will continue to provide services to the Executive Office of the United States Trustee in matters unrelated to the chapter 11 cases.

12.    Furthermore, through reasonable inquiry, I do not believe there is any connection between the personnel of Deloitte & Touche or its affiliates who are anticipated to provide services to the Debtors and the United States Bankruptcy Judge presiding in the chapter 11 cases, the U.S. Trustee for Region 2, the Assistant United States Trustee for the Southern District of New York, and the attorney therefor assigned to the chapter 11 cases.

13.    Except as may be disclosed herein, to the best of my knowledge, information, and belief, Deloitte & Touche and the Engagement Partners/Principals/Managing Directors do not hold or represent any interest adverse to the Debtors, and I believe that Deloitte & Touche and the Engagement Partners/Principals/Managing Directors are "disinterested persons" as that term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code

### Scope of Services

14.    As set forth more fully in the Engagement Agreements, Deloitte & Touche has agreed to perform independent audit and advisory services for the Debtors in accordance with the terms and conditions set forth in the Engagement Agreements, as requested by the Debtors and agreed to by Deloitte & Touche, as follows:

A.    *Attest Services:*  Pursuant to the terms of audit-related Engagement Agreements, for or related to SHC, certain affiliates and/or subsidiaries of SHC, and certain businesses of SHC, Deloitte & Touche will perform audit services, as contemplated therein, and express opinions on (1) the fairness of the presentation of the applicable entity's financial

9

statements for the applicable year ended periods, in conformity with accounting principles generally accepted in the United States of America ("generally accepted accounting principles" or "**GAAP**") or the accrual method of accounting used for income tax reporting purposes, as applicable, in all material respects, as well as (2) the effectiveness of SHC's internal control over financial reporting as of the applicable year ended periods. Deloitte & Touche will also examine SHC's description and design of the system related to the Financial Reporting and Transaction Processing Services and related General Computer Controls at SHC.

B.     *Advisory Services*:  Pursuant to the terms of advisory-related Engagement Agreements, Deloitte & Touche will provide the Debtors with advice and recommendations as follows:

   (i)      Advise SHC in connection with matters concerning the Debtor's evaluation of proposed divestitures of certain business units, including Kenmore, Kenmore Commercial, Kenmore Direct, SHIP, and Parts Direct;

   (ii)     Advise SHC in connection with the provision of software asset management services and the performance of certain software license analysis services, including advice regarding optimizing license costs and addressing compliance gaps;

   (iii)    Provide the Debtors with accounting advisory services in connection with the Debtors' restructuring, including: providing training to the Debtors' personnel in the accounting and financial reporting department; reviewing relevant documentation for accounting and financial reporting areas impacted by the Debtors' planned reorganization; researching and communicating relevant accounting literature and guidance under U.S. GAAP and SEC rules and regulations related to the Debtors' planned reorganization; and providing advice and recommendations regarding, among other things, the Debtors' proposed accounting treatment for planned transactions, accounting and reporting matters, required financial statement disclosures in the Form 10-Qs and 10-Ks, and issues related to internal controls over financial reporting; and

   (iv)     Provide the Debtors with accounting advisory services in connection with several phases of the Debtors' assessment and implementation of the New Revenue Standard, as defined in Financial Accounting Standards Board Accounting Standards Codification 606 – *Revenue from Contracts with Customers*, and the New Leases Standard, as defined in Financial Accounting Standards Board Accounting Standards Codification 842 – *Leases*.

   15.     Deloitte & Touche respectfully requests that its retention be made effective *nunc pro tunc* to the Commencement Date so that Deloitte & Touche may be

compensated for the professional services it has provided before the Application is heard by the Court. Deloitte & Touche has provided services to the Debtors in advance of approval of the Application in anticipation that its retention would be approved *nunc pro tunc* to the Commencement Date. Deloitte & Touche submits that these circumstances are of a nature warranting retroactive approval.

## **Professional Compensation**

16.     Deloitte & Touche's retention by the Debtors is conditioned upon its ability to be retained in accordance with its terms and conditions of employment, including the proposed compensation arrangements, set forth in the Engagement Agreements.

17.     As of the Commencement Date, Deloitte & Touche received payment in full for services performed under the following Engagement Agreements:  the SPC Audit Engagement Letter; the Savings Plan Audit Engagement Letter; the Parts Direct Audit Engagement Letter; the Kenmore Audit Engagement Letters; the Subsidiaries' Audit Engagement Letter; the Affiliate/Subsidiaries' Audit Engagement Letter; the Kmart PR and Sears PR Audit Engagement Letters; the Kmart PR Audit Engagement Letter; the Project Sasset Engagement Letters; the SAM Engagement Letter.  Deloitte & Touche will still perform services under the aforementioned Engagement Agreements during the chapter 11 cases but does not intend to bill the Debtors for any fees in connection with such services, and accordingly, such services will not be included in any fee application submitted by Deloitte & Touche in these cases.

18.     There are certain Engagement Agreements under which Deloitte & Touche will perform services for the Debtors during these chapter 11 cases for which Deloitte & Touche will request compensation – namely the Base Audit Engagement Letter, the

11

Restructuring Accounting Advisory Engagement Letter, the System Services Engagement Letters, and the New Standards Accounting Advisory Engagement Letter.

19.    Pursuant to the Base Audit Engagement Letter, Deloitte & Touche agreed to bill the Debtors periodically with respect to the audit services performed thereunder, except for Out-of-Scope Services (as defined below).  Deloitte & Touche estimated that its fees for such services would be approximately $3,935,000, to be billed in ten equal installments on a monthly basis.  As of the Commencement Date, Deloitte & Touche received four of the ten installments of such fees (i.e., $1,574,000).

20.    Pursuant to the Base Audit Engagement Letter,  Deloitte & Touche will provide audit services that were not contemplated as part of the base audit (collectively, the "**Base Audit Out-of-Scope Services**"), fees for the Base Audit Out-of-Scope Services will be based on actual time spent by professionals on such services, at the individual's applicable professional hourly rate, as follows:

| Professional Level | Hourly Rates |
|---|---|
| Partner / Principal / Managing Director | $550 - $600 |
| Senior Manager | $450 - $500 |
| Manager | $350 - $400 |
| Senior | $250 - $300 |
| Staff | $175 - $200 |

21.    Pursuant to the terms of the System Services Engagement Letters, Deloitte & Touche agreed to charge the Debtors fees in the aggregate of approximately $310,000, exclusive of expenses, with respect to the services performed under the System Services Engagement Letters, in accordance with the following billing schedule:

| Engagement Milestone | Estimated Invoice Date | Amount |
|---|---|---|
| Engagement Letter Signed | August 1, 2018 | $160,000 |
| Complete Interim Testing | November 1, 2018 | $100,000 |
| Completion of Engagement | February 1, 2019 | $50,000 |

12

Prior to the Commencement Date, Deloitte & Touche received $160,000 of the aforementioned fees in connection with the services performed under the System Services Engagement Letters.

22.    Pursuant to the System Services Audit Engagement Letters,  Deloitte & Touche will provide audit services that were not contemplated as part of the base audit (collectively, the "**System Services Out-of-Scope Services**"), fees for the System Services Out-of-Scope Services will be based on actual time spent by professionals on such services, at the individual's applicable professional hourly rate, as follows:

| Professional Level | Hourly Rates |
|---|---|
| Partner / Principal / Managing Director | $550 - $600 |
| Senior Manager | $450 - $500 |
| Manager | $350 - $400 |
| Senior | $250 - $300 |
| Staff | $175 - $200 |

23.    Pursuant to the terms of the New Standards Accounting Advisory Engagement Letter, Deloitte & Touche agreed to charge the Debtors fees of approximately $850,000, exclusive of expenses, with respect to the services performed under the New Standards Accounting Advisory Engagement Letter, in accordance with the following estimated billing schedule:

| Invoice Date | Amount |
|---|---|
| April 4, 2018 | $350,000 |
| June 6, 2018 | $125,000 |
| August 8, 2018 | $100,000 |
| October 10, 2018 | $100,000 |
| December 12, 2018 | $75,000 |
| May 2, 2019 | $75,000 |

13

Prior to the Commencement Date, Deloitte & Touche received $390,000 of the aforementioned fees in connection with the services performed under the New Standards Accounting Advisory Engagement Letter.

24.     Pursuant to the terms of the Restructuring Accounting Advisory Engagement Letter, Deloitte & Touche agreed to bill the Debtors fees based on the actual time spent by professionals on such services, at the individual's applicable professional hourly rate. Deloitte & Touche will charge the Debtors the following fees with respect to such services, set forth in the table below:

| Professional Level | Hourly Rates |
|---|---|
| Partner / Principal / Managing Director | $775 - $925 |
| Senior Manager | $625 |
| Manager | $525 |
| Senior | $450 |
| Staff | $295 |

25.     In addition to the fees set forth above, the Debtors have agreed to compensate Deloitte & Touche for actual, reasonable, and necessary expenses, including travel, report production, delivery services, and other expenses incurred by Deloitte & Touche in providing the services.

26.     Deloitte & Touche intends to file interim and final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred pursuant to the Engagement Agreements in accordance with applicable provisions of the Bankruptcy Code, Bankruptcy Rules, Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), any applicable orders of the Court, including the *Order Authorizing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (ECF No. 796) (the "**Interim Compensation Order**") and the Order granting this Application, and

14

any applicable guidelines issued by the Office of the United States Trustee.

27.    Deloitte & Touche will maintain records in support of any fees incurred in connection with the services it performs in the chapter 11 cases by category and nature of the services rendered, and will provide reasonably detailed descriptions of those services rendered on behalf of the Debtors, the time expended in provided those services, and the individuals who provided professional services on behalf of the Debtors. Deloitte & Touche will present such records to the Court in its fee applications to the Court. Deloitte & Touche requests that the invoices, after appropriate review, be paid in a manner consistent with the payment of other retained professionals in this matter, consistent with any administrative orders, if any, that would apply to interim payments. I understand that all payments rendered pursuant to Deloitte & Touche's retention by the Debtors must be approved by an order of this Court and based upon the filing by Deloitte & Touche of appropriate interim and final applications for allowance of compensation and reimbursement of expenses.

28.    As noted above, prior to the Commencement Date, Deloitte & Touche provided certain professional services to the Debtors. In the ninety (90) days prior to the Commencement Date, the Debtors paid Deloitte & Touche approximately $9,000,000 for services rendered in connection with the Engagement Agreements. As of the Commencement Date, no amounts were outstanding with respect to the invoices issued by Deloitte & Touche prior to such date.

29.    Prior to the Commencement Date, Deloitte Tax provided certain tax-related professional services to the Debtors. In the ninety (90) days prior to the Commencement Date, the Debtors paid Deloitte Tax $21,200 for services performed. As of the Commencement Date, approximately $131,000 was outstanding with respect to the invoices issued by Deloitte

15

Tax prior to such date. It is my understanding that Deloitte Tax will not seek a recovery on the amount of such invoices.

30.    Some services incidental to the tasks to be performed by Deloitte & Touche in the chapter 11 cases may be performed by personnel now employed by or associated with affiliates of Deloitte & Touche, such as Deloitte Transactions and Business Analytics LLP, Deloitte Financial Advisory Services LLP, Deloitte Tax, and Deloitte Consulting, and/or their respective subsidiaries, including subsidiaries located outside of the United States.

31.    Deloitte & Touche has received no promises regarding compensation in the chapter 11 cases other than in accordance with the Bankruptcy Code and as set forth in this Declaration. Deloitte & Touche has no agreement with any nonaffiliated or unrelated entity to share any compensation earned in the chapter 11 cases.

### Efforts to Avoid Duplication of Services

32.    The services performed by Deloitte & Touche will not unnecessarily duplicate or overlap with the other services performed by the Debtors' other retained professionals and advisors. Deloitte & Touche understands that the Debtors have retained and may retain additional professionals during the term of the Engagement Letter, and Deloitte & Touche agrees to work cooperatively with the Debtors to avoid unnecessary duplication of services.

16

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 4, 2019
      Dallas, Texas

_____

Jimmy Berry
Partner
Deloitte & Touche LLP

## Schedule 1

## Potential Parties in Interest

Potential parties-in-interest or their affiliates for whom Deloitte & Touche LLP or its affiliates has provided or is currently providing services in matters unrelated to the chapter 11 cases, except as set forth in Paragraph 11 of the Tehan Declaration, or with whom such parties have other relationships, including banking relationships.

| |
|---|
| 123Stores Inc. |
| 3M Company Kbe0561 |
| A&E Factory Service |
| A&E Home Delivery, LLC |
| A&E Lawn & Garden, LLC |
| A&E Signature Service, LLC |
| ABRY Partners II, LLC |
| Acadia Realty Limited Partners |
| ACCO Brands USA LLC |
| ACE American Insurance Company |
| ACE Property and Casualty Insurance Company |
| Active Media Services Inc. |
| Adobe Systems |
| ADP RPO |
| ADP, Inc. |
| AEA Investors LP |
| Aetna |
| AFGlobal |
| AFL-CIO |
| Agree Limited Partnership |
| AIG Europe Limited (Lex London) (ACT) |
| Ainsworth Pet Nutrition LLC |
| Akamai Technologies |
| Alan E Robbins |
| Alcon Laboratories Inc |
| Alexander's Rego Shopping Center Inc. |
| AlixPartners |
| Allianz Global Risks US Insurance Company |
| Allied Trade Group Inc |
| Allied World Assurance Company Ltd. |

| |
|---|
| Allstate |
| Ally Bank |
| Ally Commercial Finance LLC |
| Alta Mont Capital |
| Amazon.com, Inc. |
| AmCap Inc. |
| Ameren Missouri |
| American Apparel |
| American Express Prepaid Card Management Corporation |
| American Greetings Corporation |
| American Guarantee & Liability Insurance Company |
| American National Insurance Company |
| American President Lines |
| American Securities LLC |
| American Tire Distributors Inc. |
| American Trust |
| Angelo Gordon & Co. |
| Aon Hewitt |
| AON Risk Consultants Inc. |
| Aon Risk Services Companies |
| Apex Tool Group LLC |
| Apparel Sourcing (HK) Limited |
| Applewood Shopping Center GP |
| Arcelik A.S. |
| Ares Management |
| Ariba |
| Armored Autogroup |
| Aspen Specialty Insurance Company |
| Associated Hygienic Products |
| Assurant |
| Asurion |
| ASW LLC |
| AT&T |
| AT&T Mobility II, LLC |
| Automotive Rentals Inc. |
| Autozone Parts Inc |
| Avalara |

2

| |
|---|
| AXA Insurance Company |
| AXIS Insurance Company |
| Babcock & Brown (Gregory Greenfield) |
| Baker & Hostetler LLP |
| Banco Popular |
| Bancorpsouth Bank |
| Bank Leumi |
| Bank of America, NA |
| Bank of China |
| Bank of Oklahoma |
| Barclays Capital Inc. |
| Bayer Corporation |
| Bayshore Capital Advisors, LLC |
| BB&T Bank |
| BCBG MaxAzria |
| BDO Seidman |
| Beeline |
| Beeline Settlement Company LLC |
| Benderson |
| Benefit Street Partners L.L.C. |
| Benzalem MZL LLC |
| Berkadia Commercial Mortgage |
| Berkowitz, Bruce R. |
| Berkshire Hathaway International Insurance Limited |
| Best Buy Co., Inc. |
| Bestway (Hong Kong) Int'l Ltd |
| Big Beaver of Caguas Development Corporation |
| Big Lots, Inc. |
| Bissell Homecare International |
| BJ's Wholesale Club |
| Bl Intimate Apparel Canada Inc |
| Black & Decker US Inc. |
| Black & Decker Macao Commerc |
| Black Diamond Capital Management, L.L.C. |
| Blackhawk Marketing Services, Inc. |
| Blackstone/DDR JV |
| BlueLight.com, Inc. |

3

| |
|---|
| BNY Midwest Trust Company, as indenture trustee for the SRAC Unsecured Notes |
| Braun Family LLC |
| BRE DDR BR Whittwood CA LLC |
| BRE RC Retail Parent LLC |
| Brixmor (aka Centro) |
| Broadspire |
| Broan-Nutone LLC |
| Brothers Trading Co Inc |
| Brunswick MZL LLC (Katz Properties) |
| BSH Home Appliances Corporation |
| Burlington Stores, Inc. |
| C H Robinson Worldwide |
| Caleres Inc. |
| California Builder Appliances, Inc. |
| Canon Financial Services, Inc. |
| Caparra Center Associates LLC |
| Capital Brands LLC |
| Capital One Bank |
| Capitol Funds Inc |
| Cardinal Health |
| Carlyle Development Group |
| Carr, Alan J. |
| Cascade Investment, L.L.C. |
| Casto |
| CBL and Associates Properties Inc ("CBL") |
| Cbl/Cherryvale I, LLC |
| CCP Credit Acquisition Holdings, L.L.C. |
| Cede & Co. |
| Centennial Bank |
| Centerbridge |
| Central Plaza |
| Centurylink |
| Chamberlain Manufacturing Corp. |
| Chevron (Hk) Limited |
| China Fortune LLC |
| Chubb Bermuda Insurance Ltd. |
| Chubb Custom Insurance Company |

4

| |
|---|
| Chubb Insurance Hong Kong Limited |
| Cigna |
| Cisco Systems |
| Citibank, N.A. |
| CITIC Capital Partners Management Limited |
| Citigroup Global Markets Inc. |
| Citizens Bank |
| Citizens Business Capital, a division of Citizens Asset Finance Inc. |
| Citizens Insurance Company of America |
| Citizens National Bank |
| CJ Segerstrom & Sons / Henry Segerstrom Family |
| Clayton, Dubilier & Rice, LLC |
| Clearlake Capital Group, L.P. |
| Clearwater Paper Corporation |
| Cleary Gottlieb Steen & Hamilton, LLP |
| Cobblestone Victor NY LLC (Schottenstein) |
| Coca Cola Bottling Co. |
| Commercial International Bank (Egypt) S.A.E. |
| Commission Junction |
| Commonwealth of Massachusetts |
| Compucom Systems |
| Computershare Inc. |
| Conair Corporation- Personal C |
| Conopco Inc. |
| Continental Casualty Company |
| Continental Tire The Americas LLC |
| Cookeville Retail Holdings LLC |
| Cooper Tire & Rubber Company |
| Coral Reef Asia Pacific |
| Costco |
| Cott Beverages USA Inc |
| Coyote Logistics |
| Craftsman |
| CREF II Silver City LLC |
| Criteo |
| Crossfire |
| Crossroads Joint Venture LLC |

5

| |
|---|
| Crown Credit Company |
| CT Corporation System |
| CVS Pharmacy |
| Cymax Stores USA LLC |
| Cyrus Capital Partners, L.P. |
| Dagenais Family |
| Dan Arnold & Fred Keywell Partnership |
| David Hocker & Associates Inc. |
| David Mandelbaum & Peter Levine |
| DDR (SITE Centers Corp) |
| Dell Financial Services L.L.C. |
| Delphi Automotive PLC |
| Demoulas Super Markets Inc. |
| Design International Group Inc. |
| Deutsche Bank Securities Inc. |
| Dillard's, Inc. |
| Direct Energy |
| DLA Piper US LLP |
| D-Link Systems, Inc. |
| Dollar General Corporation |
| Dorel Asia Srl |
| Drivetrain Advisors |
| Duke Realty LP |
| Dunbar Armored |
| Duracell Distributing Inc |
| East Penn Manufacturing Co Inc. |
| Eastland Mall Holdings LLC (Mohammed Al Refaey) |
| Ebay Germany |
| Edwin P. Yates |
| Eldis/ Founder Holdings/Fix.com |
| Electrolux |
| Electrolux Home Products |
| Elizabeth Arden Inc |
| Empire Distributors Ejd Enterp |
| Endurance American Specialty Insurance Company (ACT) |
| Envision Michigan Holdings LLC |
| Equimax/Pentaco Management |

6

| |
|---|
| Equity One Realty & Management Inc. |
| ESL Investments, Inc. |
| ESL Partners, L.P. (73.5%) |
| Euro Pro Sales Company |
| EvCom Holdings LLC & Steadfast Companies |
| Executive Risk Specialty Insurance Company |
| Extell Development Co |
| EyeMed Vision Care |
| F & T Apparel LLC |
| FAA/EyeMed Vision Care, LLC |
| Facebook |
| Fairholme Capital Management, LLC |
| FBA Holdings Inc. |
| Federal Insurance Company |
| Federal Insurance Company (Chubb) |
| Federal Realty Investment Trust |
| Feil Organization, The |
| Ferguson Enterprises, Inc. |
| Ferguson Plc |
| Fifth Third Bank |
| Fila USA Inc. |
| First Allied Corporation |
| First American Title Ins. |
| First Hawaiian Bank |
| First Interstate Bank of Billings |
| First National Bank |
| First Security Bank |
| First State Bank |
| First Tennessee |
| Fisher Price Bds A Div Of Mdii |
| Five Below, Inc. |
| Five Mile Capital / StreetMac / Urban Retail Properties |
| Flagstar |
| Florida Builder Appliances, Inc. |
| Forest City Enterprises |
| Fossil Inc. |
| Fred's Inc. |

7

| |
|---|
| Freeman Spogli Management Co., L.P. |
| FREP Holdings LLC |
| Fulcrum Property (managed by Macerich) |
| G&I VIII CBL Triangle LLC |
| Gap Inc. |
| Garrison (CBL Manages) |
| Gator |
| GBG Beauty LLC |
| Geelong Sales Mco Limited |
| General Electric Capital Corporation |
| General Growth Properties, Inc. |
| General Mills Inc. |
| General Security Indemnity Company of Arizona |
| Genesco Brands, Inc. |
| GFI - c/o Walt Gasser & Associates |
| GGP (Brookfield Properties Retail Group) |
| Ggplp Real Estate Inc. |
| Gibson Brands |
| GK Development |
| Glimcher |
| Global Aerospace, Inc. |
| Golden Gate Capital |
| Goldman, Sachs & Co. |
| Goodyear Tire & Rubber Com, The |
| Google |
| Graham Capital |
| Grand Luck Fujian Footwear Co |
| Great Lakes Reinsurance (UK) PLC (Munich) (ACT) |
| Groupe Seb USA |
| Groupon |
| Grubhub, Inc. |
| GS Portfolio Holdings LLC |
| GVSC LP & Cameo Homes |
| H.I.G. Capital Management, LLC |
| Haddad Apparel Group Ltd. |
| Hallmark Marketing Company LLC |
| Hamilton Beach Brands Inc. |

8

| |
|---|
| Hana Financial Inc. |
| Hanesbrands Inc Bali |
| Hanesbrands Inc. Leggs |
| Hanover Insurance |
| Hansae Co. Ltd. |
| Hart I 55 Industrial LLC |
| Hartz Mountain Corp |
| Harvest Partners, LP |
| Hasbro Inc. |
| Haynes and Boone, LLP |
| HDC Holding Company of Delaware, Inc. |
| Heartland Bank and Trust Company |
| Hershey Chocolate Company |
| Hewitt Associates |
| Hewlett-Packard Financial Services Company |
| Hfc Prestige International U S |
| hhgregg Appliances and Electronics |
| Hilex Poly Co LLC |
| Holmes Group Inc |
| Home Depot, Inc. |
| HomeServe USA Corp. |
| Hoover Inc. |
| Houghton State Bank |
| House of Marley, LLC |
| HSBC Bank |
| Hudson Advisors |
| Hull Property Group |
| Huntington National Bank |
| Husqvarna Outdoor Products |
| Hybrid Promotions LLC |
| ICBC |
| Icon Health and Fitness Inc. |
| Icrossing |
| Illinois National Insurance Company (AIG) |
| Illinois Secretary of State |
| Illinois Union Insurance Company (ACE) |
| Inditex USA |

9

| |
|---|
| Infosys |
| Ingersoll-Rand |
| Inland n/k/a IRC Retail Centers |
| Innovel Solutions, Inc. |
| Insurance Company of the State of Pennsylvania |
| International Brotherhood of Electrical Workers |
| International Brotherhood of Electrical Workers Local #1075 (IBEW) |
| International Union of Operating Engineers |
| International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) |
| Iowa State Bank |
| Ironshore Specialty Insurance Company |
| J B Hunt Transport |
| J.C. Penney Company, Inc. |
| James Campbell |
| James Lewis |
| Jarden Consumer Solutions |
| Johnson & Johnson Consumer Inc. |
| Johnson Controls Inc. |
| Jordache Limited |
| Jordan Company, L.P., The |
| JP Morgan Chase Bank |
| JPP II, LLC |
| Kadish |
| Kamehameha Schools - Bishop Estate |
| Kamlani, Kunal S. |
| KBL Holding Inc. |
| KBS Real Estate Investment Trust Inc. |
| KCD IP, LLC |
| Kelso & Company |
| Keurig Green Mountain Inc. |
| Key Bank |
| Kik International Inc. |
| Kimberly Clark Corp. |
| Kimberly Clark Puerto Rico Inc. |
| Kimco |
| Kiran Jewels, Inc. |
| Kiss Products Inc. |

10

| |
|---|
| Kitchenaid Inc. |
| KLC, Inc. |
| Kmart |
| Kmart Corporation |
| Kohl's Corporation |
| Kohlberg Kravis Roberts & Co. L.P. |
| KRG Sunland LP |
| Kumho Tires USA Inc. |
| L Brands, Inc. |
| Ladley, Greg |
| Lakewood Shopping Center LLC |
| Lampert, Edward S. |
| Land's End, Inc. |
| La-Z-Boy Incorporated |
| LBA Realty |
| Ledvance LLC |
| Level 3 Communications |
| Lexington Corporate Properties Trust |
| LG Electronics |
| LG Electronics Alabama Inc. |
| Liberty Media |
| Liberty Mutual Insurance Company |
| Liberty Surplus Insurance Corporation |
| Lic Limited |
| Life Insurance Company of North America ("Cigna") |
| LightSquared |
| Limited Stores, LLC |
| Lincoln Gen Inc. Co. |
| Link Snacks Inc. |
| Little Caesars |
| Littlejohn & CO. LLC |
| Lloyd's Syndicates 623/2623 |
| Lm Farm LLC Dba Gardens Alive |
| LNR Partners LLC |
| Loreal Cosmetic and Fragrance |
| Lowe's Companies, Inc. |
| LSREF3 Spartan (Genesee) LLC / Lone Star Funds |

11

| |
|---|
| M S Portfolio LLC |
| M&T Bank |
| Macerich Company |
| Macerich Partnership LP/Chesterfield |
| Macy's |
| Maersk |
| Maidenform Inc. |
| Mann Hummel Purolator Filters |
| March of Dimes |
| Mars Petcare US Inc. |
| Mattel Brands A Div Of Mdii |
| Mattel Toys |
| Maurice Sporting Goods |
| MaxServ, Inc. |
| Maynardville Pike LP |
| Maytag Appliances |
| Mckee Foods Corp. |
| Meijer |
| Menard, Inc. |
| Merrill Lynch, Pierce, Fenner & Smith Incorporated |
| MetaScale Technologies India Private Limited |
| MetLife (Metropolitan Life Insurance Company) |
| MFW Associates |
| Michelin North America Inc. |
| Microsoft |
| Midwood Investment & Development |
| ML-CFC 2006-4 Greeley Retail LLC |
| Mondelez Puerto Rico LLC |
| Monomoy Capital Management, L.P. |
| Morgan Lewis & Bockius |
| Morgan Stanley Capital I Trust |
| MORGAN STANLEY SMITH BARNEY |
| Mountain Laurel Plaza |
| MSD Capital |
| Mt Pleasant Shopping LLC |
| MTD Products Inc. |
| Munjal, Leena |

12

| |
|---|
| Mxd Group |
| MyGofer LLC |
| National Fire & Marine Insurance Company |
| National Union Fire Insurance Co. |
| Navigators Insurance Company |
| Nbty Inc. |
| NCH Marketing Inc. |
| NCR Corporation |
| Nestle Purina Pet Care Company |
| New Market Station LP |
| Nexgrill Industries Inc. |
| Niagara Bottling LLC |
| Norcell |
| Northwood Investors |
| Novae |
| Oak Lawn Center 835 LLC |
| Oakbrook Shopping Center, LLC |
| Oaktree Capital Management, L.P. |
| Oaktree Huntington Investment Fund II, L.P. |
| Oaktree Special Situations Fund, L.P. |
| Och-Ziff Capital Structure Arbitrage Master Fund Ltd. |
| Ohio Bureau of Workers Compensation |
| Old Republic Insurance Company |
| Ollie's Bargain Outlet Holdings, Inc. |
| Olshan Properties |
| OMERS Private Equity U.S.A. Inc. |
| One Jeanswear Group Inc. |
| One World Technologies In |
| Oracle America |
| Orrick Herrington & Sutcliffe |
| Outerstuff Ltd. |
| Parfums De Coeur |
| PartnerRe Ireland Insurance Limited (ACT) |
| Payless Shoesource |
| Pcl Co. Limited |
| Peak Rock Capital, LLC |
| PECO Real Estate Partners (CBL manages) |

13

| |
|---|
| Pension Benefit Guarantee Corporation |
| Permira Advisers LLC |
| Phillips Edison Group LLC |
| Pimkie Apparels Ltd. |
| Platinum Equity Advisors, LLC |
| PMB, Inc. |
| PNC Bank, National Association |
| Port Plaza Realty Trust |
| Positec Macao Comm Offshore Lt |
| PREIT |
| Premierbank |
| Presidio Investors LLC |
| PriceSmart, Inc. |
| Prime Clerk LLC |
| Private Brands, Ltd. |
| Procter & Gamble Distributing |
| Prologis Lp Dba Prologis |
| Protection One Alarm Monitoring |
| Prudent International Ltd. |
| Prudential Insurance Co. of America |
| Public Service Electric & Gas Co. |
| Pyramid Management Group, LLC |
| QBE Insurance Corporation |
| Quaker Oats Company |
| Quality King Distributors Inc |
| Ramco-Gershenson Properties |
| Randstad |
| RBS Partners, L.P. |
| Reese, Ann N. |
| Regency Centers |
| Regency Realty Corp |
| Regions Bank |
| Relay LLC |
| Retailnext Inc. |
| Revlon Consumer Products |
| Rhombus Development, LLC |
| Richardson Company |

14

| |
|---|
| Richline Group, Inc. |
| Riecker, Robert A. |
| Roark Capital Acquisition LLC |
| Robbins Company, The |
| Robert Gallant GP (Providence Group Manages) |
| Robinson Family Trust |
| Rollins, Inc. |
| Rosenthal & Rosenthal Inc. |
| Rouse Properties |
| Royal Appliance Mfg. Co. |
| Rubbermaid Inc. |
| Safeco |
| Samsung Electronics |
| Samsung Electronics America HA |
| Samual T Cohen Sara W Cohen & David Cohen |
| Sas Institute |
| Saul Holdings LP |
| Schindler Elevator |
| Schostak Brothers & Co |
| Schottenstein Realty LLC |
| Schumacher Electric Corp |
| Scott Company Jeff Scott |
| Sealy Mattress Company |
| Sears |
| Sears Protection Company/Wisconsin |
| Searsvale |
| Securian |
| Securian Life Insurance |
| Sedgwick Claims Management Services, Inc. |
| Segerstrom Family |
| Seiko Corporation of America |
| Sentinel Capital Partners, L.L.C. |
| Seritage (PREIT-) |
| Seritage / CBL |
| Seritage / CIM Group |
| Seritage / DDR |
| Seritage / Easement Agmt w/ Wal-Mart |

15

WEIL:\96792963\4\73217.0004

| |
|---|
| Seritage / Federal Realty Inv Trust |
| Seritage / Forest City Enterprises |
| Seritage / GGP |
| Seritage / Glimcher |
| Seritage / Howard Hughes Corp |
| Seritage / Inland n/k/a IRC Retail- |
| Seritage / Macerich |
| Seritage / McKinley Inc-US Bank |
| Seritage / Ramco-Gershenson |
| Seritage / Regency Centers |
| Seritage / Rouse Properties |
| Seritage / Simon |
| Seritage / Starwood |
| Seritage / Starwood Capital |
| Seritage / Taubman Company |
| Seritage / The Feil Organization |
| Seritage / US Mall Holdings-Omninet Capital |
| Seritage / Vintage Capital Group |
| Seritage / Vornado |
| Seritage KMT Finance LLC |
| Seritage SRC Finance LLC |
| Serta Incorporated |
| ServiceLive Direct |
| Servicenow |
| Sgg Inc. |
| SHC Desert Springs LLC |
| SHC Desert Springs, LLC |
| SHC Promotions, Inc. |
| Shearers Foods Burlington LLC |
| Sherwin Alumina Company |
| Shidler/West Finance Partners |
| SHMC, Inc. |
| Shop Your Way Local, LLC |
| Siemens Financial Services, Inc. |
| Sierra Management Corp |
| Simmons Bedding Company, LLC |
| Simmons Company |

16

| |
|---|
| Simon / Washington Prime Group |
| Simon Property Group, Inc. ("Simon") |
| Sitel |
| Sitley, Stephen |
| Skadden, Arps, Slate, Meagher & Flom LLP |
| Skechers USA Inc. |
| SOE, Inc. |
| Sony Pictures Home Entertainment |
| Southland Mall Properties, LLC |
| SPE I Partners, LP (.1%) |
| SPE Master I, LP (.2%) |
| Spectrum Brands Inc. |
| Spg International Ltd. |
| Spin Master Toys Far East |
| Springs Global US Inc. |
| Springs Window Fashion LLC |
| SPS Commerce Inc. |
| SRC Facilities LLC |
| SRC O.P. LLC |
| SRC Real Estate (TX), LLC |
| SRC Sparrow 1 LLC |
| St. Jude Children's Research Hospital |
| Standard Bank Ltd. Mauritius |
| Standard Chartered Bank |
| Stanley Black & Decker, Inc. |
| Starr Indemnity & Liability Company |
| Starr Surplus Lines Insurance Company |
| StarWest, LLC |
| Starwood |
| Starwood - Star-West Chicago Ridge LLC |
| Starwood Ceruzzi LLC (Ceruzzi Holdings) |
| State Insurance Fund |
| State of California - Office of Self Insurance Plans |
| State of Florida, Department of Revenue Out of State/Central Collections Unit |
| State Street Bank and Trust Company |
| Steadfast Companies |
| Steptoe & Johnson LLP |

17

| |
|---|
| Stericycle |
| Sterling Organization |
| STI Merchandising, Inc. |
| Stone Point Capital LLC |
| Stop & Shop Supermarket Company LLC, The |
| Studio 1 |
| Sullivan & Cromwell |
| Sutherland Global Services Private-712344 |
| Sycamore Partners Management, L.P. |
| TA Associates Management, L.P. |
| Target Corporation |
| Tata Consultancy Services Ltd. |
| Taubman |
| TD Bank, N.A. |
| Team Beans LLC |
| Telebrands Corporation |
| Telecheck Services |
| Tempur Pedic North America LLC |
| Teneo Holdings |
| Teradata Operations |
| Thanh Cong Text Gmt Invest Tra |
| The Kroger Co. |
| The Service Master Company |
| THL |
| Thompson Tractor Co., Inc. |
| Timberland A Div Of Vf Outdoor |
| TJX Companies, Inc. |
| Tokio Marine America Insurance Company |
| Topshop USA |
| Torin Inc. |
| Towanda PA Holding LLC |
| TowerBrook Capital Partners L.P. |
| Towers Watson & Co. |
| Toyota Industries Commercial Finance, Inc. |
| Toys "R" Us-Delaware |
| Transier, William L. |
| Travelers Casualty and Surety |

18

| |
|---|
| Trident Limited |
| Trilantic Capital Partners VI (North America) L.P. |
| Trinity Reit, Inc. |
| Triple Crown Operating Trust LP |
| Troy Coolidge |
| Troy Coolidge No. 13, LLC |
| True Value Company |
| Tuesday Morning, Corp. |
| Twentieth Century Fox Home Entertainment LLC |
| U S Realty a/k/a Garden Properties |
| U.S. Bank Trust National Association |
| UBS AG, Stamford Branch, LLC |
| UBS Securities LLC |
| UCI International |
| UE Bruckner Plaza LLC |
| Union Bank |
| Union Center Realty LLC |
| Unique Designs, Inc. d/b/a Kiran Jewels, SDIL, InterJewel |
| United Parcel Services |
| Univest-BTC S&R LLC |
| UPS Capital Corporation |
| Urban Edge Properties LP |
| V Suarez & Co |
| Vanity Fair Intimates |
| Verbatim Americas LLC |
| Verizon Wireless |
| Vintage Capital Group |
| Virginia Surety Company, Inc. |
| Vornado |
| Vtech Communications Inc. |
| W P Carey & Co. |
| Wachovia Securities |
| Wachtell, Lipton, Rosen & Katz |
| Wal-Mart Stores, Inc. |
| Walton Street Capital LLC / Brian T Kelly Principal |
| Warburg Pincus |
| Washington Real Estate Investment Trust |

19

| |
|---|
| Waste Management |
| Watsco, Inc. |
| Waypoint Property Group |
| Weil, Gotshal & Manges LLP |
| Weingarten Realty |
| Wells Fargo Bank, National Association |
| Welspun Global Brands Ltd |
| West Plaza Associates |
| Westchester Fire Insurance Company |
| Western Union Financial Services, Inc. |
| Westfield |
| Westport Insurance Corporation |
| Whirlpool Corporation |
| Widewaters Group Inc. |
| Williamson-Dickie Manufacturing |
| WillisTowersWatson |
| Wilmington Trust, National Association |
| Winning Resources Limited |
| Winplus North America Inc |
| Wipro |
| Wolverine World Wide Inc. |
| Woodbury Corporation |
| Woodfield Mall LLC (Simon Property Group - Mall Mgr) |
| Woori Bank |
| World Kitchen LLC |
| World Publication |
| WP Glimcher (Simon / WPG & Glimcher) |
| WRI Golden State LLC |
| WRI/Raleigh LP |
| Wynnchurch Capital |
| XL Insurance (Bermuda) Ltd. |
| XL Specialty Insurance Company |
| Xpo Last Mile |
| Yahoo |
| York International |
| YWCA Metropolitan Chicago |

20

## <u>Exhibit 1</u>

**Base Audit Engagement Letter**

# Deloitte.

Deloitte & Touche LLP

111 S. Wacker Drive
Chicago, IL 60606-4301
USA

Tel: +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

April 23, 2018

Mr. William C. Kunkler
Audit Committee Chair
Audit Committee of Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Mr. Robert A. Riecker
Chief Financial Officer
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Dear Mr. Kunkler and Mr. Riecker:

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as the independent registered public accounting firm for Sears Holdings Corporation (the "Company" or "you" or "your"). Mr. Jim Berry will be responsible for the services that we perform for the Company hereunder.

In addition to the audit and review services we are engaged to provide under this engagement letter, we would also be pleased to assist the Company on issues as they arise throughout the year. Hence, we hope that you will call Mr. Berry whenever you believe D&T can be of assistance. This assistance will require approval by the Company's audit committee (the "Audit Committee") in accordance with its preapproval policies and procedures.

The services to be performed by D&T pursuant to this engagement are subject to the terms and conditions set forth herein and in the accompanying appendices. Such terms and conditions shall be effective as of the date of the commencement of such services.

## Audit of Financial Statements and the Effectiveness of Internal Control over Financial Reporting

Our engagement is to perform an integrated audit in accordance with the standards of the Public Company Accounting Oversight Board (PCAOB) (United States) (the "PCAOB Standards"). The objectives of an integrated audit conducted in accordance with the PCAOB Standards are the expression of opinions on (1) the fairness of the presentation of the Company's financial statements for the year ending  February 2, 2019, in conformity with accounting principles generally accepted in the United States of America ("generally accepted accounting principles"), in all material respects, and (2) the effectiveness of the Company's internal control over financial reporting as of February 2, 2019, based on the criteria established in *Internal Control — Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the "COSO Framework").

Appendix A contains a description of an integrated audit in accordance with the PCAOB Standards.

Our ability to express any opinion or to issue any report as a result of this engagement and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our reports. If, for any reason, we are unable to complete our audit or are unable to form or have not formed any opinion, we may decline to express any opinion or decline to issue any report as a result of this engagement. If we are unable to complete our audit, or if any report to be issued by D&T as a result of this engagement requires modification, the reasons for this will be discussed with the Audit Committee and the Company's management.

Mr. William C. Kunkler
Mr. Robert A. Riecker
April 23, 2018
Page 2

## Reviews of Interim Financial Information

We will also perform a review of the Company's condensed interim financial information (the "interim financial information") in accordance with the PCAOB Standards ("interim review") for each of the quarters in the year ending February 2, 2019, prepared for submission to the Securities and Exchange Commission (SEC). The objective of an interim review is to provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles. The objective of an interim review is also to provide us with a basis for determining whether we are aware of any material modifications that, in our judgment, should be made to management's disclosures about changes in internal control over financial reporting that have materially affected or are reasonably likely to materially affect the Company's internal control over financial reporting for management's certifications to be accurate and to comply with the requirements of Section 302 of the Sarbanes-Oxley Act of 2002 and related SEC rules and regulations.

Appendix A also contains a description of an interim review in accordance with the PCAOB Standards.

If we become aware of material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles, or if we become aware of deficiencies in internal control over financial reporting so significant that they would preclude management's preparation of interim financial information in conformity with generally accepted accounting principles, we may be precluded from completing any of our reviews. If, for any reason, we are unable to complete any of our interim reviews, the reasons for this will be discussed with the Audit Committee and the Company's management.

## Management's Responsibilities

Appendix B describes management's responsibilities.

## Audit Committee's Responsibility and Auditor Communications

As the independent registered public accounting firm of the Company, we acknowledge that the Audit Committee is directly responsible for the appointment, compensation, and oversight of our work, and accordingly, except as otherwise specifically noted, we will report directly to the Audit Committee. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Audit Committee in accordance with the Audit Committee's established preapproval policies and procedures.

Under the PCAOB Standards and SEC Rule 2-07 of Regulation S-X, we are required to communicate with the Audit Committee about various matters in connection with our audit and interim reviews. Appendix C describes such communications.

## Fees

We estimate that our fees for this engagement will be $3,935,000, plus expenses. Based on the anticipated timing of the work our fees will be billed at a rate of $393,500 in 10 monthly invoices, commencing April 23, 2018. Payments are due upon receipt of the invoices.

Engagement-related expenses, such as technology and administrative related charges, will be billed in addition to the fees and will be stated separately on the invoices.

Mr. William C. Kunkler
Mr. Robert A. Riecker
April 23, 2018
Page 3

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms. Our estimated fees are based on certain assumptions, including (1) timely and accurate completion of the requested entity participation schedules and additional supporting information, (2) no inefficiencies during the audit or interim review process or changes in scope caused by events that are beyond our control, (3) the effectiveness of internal control over financial reporting throughout the periods under audit and interim review, (4) a minimal level of audit adjustments (recorded or unrecorded), and (5) no changes to the timing or extent of our work plans. We will notify you promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Company intends to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with the SEC or other regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, the Company agrees that its management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Company also agrees that its management will notify us and obtain our approval prior to including any of our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Company. Any request by the Company to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Company and D&T.

## Requests for Production of Documents or Information

The Company acknowledges its obligations under the waiver agreement relating to D&T's cooperation with the PCAOB and the SEC under Sections 102 and 106 of the Sarbanes-Oxley Act of 2002.

## Business Associate Appendix

Appendix F provides for a business associate appendix as D&T may use, obtain, or have access to Protected Health Information, as defined by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and amended by subtitle D of the Health Information Technology For Economic And Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009 (the "HITECH Act") during the performance of the services described herein.

## Other Services

Other services, including the audits of the financial statements of certain subsidiaries, affiliates, elements of the financial statements, employee benefit plans, and other special reporting situations, as well as tax compliance, planning, and advisory services provided by Deloitte Tax LLP to the Company, will be billed separately to the appropriate entity and such services will be pre-approved by

Mr. William C. Kunkler
Mr. Robert A. Riecker
April 23, 2018
Page 4

the Audit Committee. The terms and conditions of these other services will be subject to separate engagement letters that will be executed with the Company's management and provided to the Audit Committee.

* * * * * *

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should the Company or the Audit Committee request, and should D&T agree to provide, services (including audit services) beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through F attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

Acknowledged and agreed to on behalf of the Audit Committee of Sears Holdings Corporation:

By: _____

Title: Chair, Audit Committee of Sears Holdings Corporation

Date: ____5.2.18____

Accepted and agreed to by
Sears Holdings Corporation:

By: _____

Title: Chief Financial Officer

Date: ____4/23/18____

<strong>APPENDIX A</strong>

## DESCRIPTION OF AN INTEGRATED AUDIT AND INTERIM REVIEW IN ACCORDANCE WITH THE PCAOB STANDARDS

This Appendix A is part of the engagement letter dated April 23, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and acknowledged and agreed to by the Audit Committee of Sears Holdings Corporation.

### Components of an Integrated Audit

An integrated audit includes the following:

- Examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements

- Inquiring directly of the Audit Committee regarding (1) its views about fraud risks in the Company, (2) whether it has knowledge of any actual, suspected, or alleged fraud affecting the Company, and (3) whether it is aware of tips or complaints regarding the Company's financial reporting (including those received through any internal whistleblower program, if such program exists) and, if so, its responses to such tips and complaints

- Assessing the accounting principles used and significant estimates made by management

- Evaluating the overall financial statement presentation

- Examining, on a test basis, evidence supporting the design and operating effectiveness of internal control over financial reporting

- Evaluating the effectiveness of internal control over financial reporting

An integrated audit does not include the performance of any procedures with respect to financial information in an interactive data format using eXtensible Business Reporting Language (XBRL). Any procedures that the Company requests D&T to perform related to any such XBRL interactive data would be described in a separate engagement letter.

### Reasonable Assurance

The PCAOB Standards require that we plan and perform the audit to obtain reasonable, rather than absolute, assurance about (1) whether the financial statements are free of material misstatement, whether caused by error or fraud, and (2) whether effective internal control over financial reporting was maintained in all material respects. However, because of the characteristics of fraud, a properly planned and performed audit may not detect a material misstatement or material weakness. Accordingly, there is some risk that a material misstatement of the financial statements or a material weakness in internal control over financial reporting would remain undetected. Also, an integrated audit is not designed to detect error or fraud that is immaterial to the financial statements or deficiencies in internal control over financial reporting that, individually or in combination, are less severe than a material weakness.

## Inherent Limitations of Internal Control over Financial Reporting

Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may occur and not be detected. Also, projections of any evaluation of the internal control over financial reporting to future periods are subject to the risk that the internal control may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

## Interim Reviews

An interim review is substantially less in scope than an audit in accordance with the PCAOB Standards, the objective of which is to express an opinion on the financial statements taken as a whole. Accordingly, an interim review will not result in the expression of an opinion concerning the fairness of the presentation of the interim financial information in conformity with generally accepted accounting principles and cannot be relied on to reveal all significant matters that would be disclosed in an audit.

An interim review consists principally of applying analytical procedures to pertinent financial data and making inquiries of, and evaluating responses from, certain management personnel of the Company who have responsibility for financial and accounting matters. An interim review also includes obtaining sufficient knowledge of the Company's business and its internal control as they relate to the preparation of both annual and interim financial information to (1) identify the types of potential material misstatements in the interim financial information and consider the likelihood of their occurrence, and (2) select the inquiries and analytical procedures that will provide us with a basis for communicating whether we are aware of any material modifications that should be made to the interim financial information for it to conform with generally accepted accounting principles. An interim review is not designed to provide assurance on internal control or to identify control deficiencies.

An interim review does not include the performance of any procedures with respect to interim financial information in an interactive data format using XBRL.

An interim review also includes procedures, principally observation and inquiries, relating to management's disclosures about changes in internal control over financial reporting to provide us with a basis for communicating whether we are aware of any modifications that, in our judgment, should be made to such disclosures for management's certifications to be accurate and to comply with the requirements of Section 302 of the Sarbanes-Oxley Act of 2002 and related SEC rules and regulations. These procedures are substantially less in scope than an audit of internal control over financial reporting in accordance with the PCAOB Standards. Accordingly, an interim review cannot be relied on to reveal all significant matters that would be disclosed in an audit of internal control over financial reporting, and we will not express an opinion on the effectiveness of internal control over financial reporting.

**APPENDIX B**

## MANAGEMENT'S RESPONSIBILITIES

This Appendix B is part of the engagement letter dated April 23, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and acknowledged and agreed to by the Audit Committee of Sears Holdings Corporation.

### Financial Statements and the Effectiveness of Internal Control over Financial Reporting

Management is responsible for the preparation, fair presentation, and overall accuracy of the financial statements and interim financial information, including disclosures, in conformity with generally accepted accounting principles. The assessment of the effectiveness of internal control over financial reporting to comply with Section 404 of the Sarbanes-Oxley Act of 2002 and related SEC rules and regulations is also the responsibility of management. In this regard, management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Establishing and maintaining effective internal control over financial reporting and informing D&T of all deficiencies in the design or operation of internal control over financial reporting identified as part of management's evaluation, including separately disclosing to D&T all such deficiencies that management believes to be significant deficiencies or material weaknesses in internal control over financial reporting

- Informing D&T of significant changes in the design or operation of the Company's internal control over financial reporting that occurred during each fiscal quarter or subsequent to the date being reported on

- Identifying and ensuring that the Company complies with the laws and regulations applicable to its activities and informing us of any known or possible material violations of such laws or regulations

- Adjusting the financial statements to correct material misstatements relating to accounts or disclosures, and affirming to D&T in the representation letter that the effects of any uncorrected misstatements aggregated by us are immaterial, both individually and in the aggregate, to the financial statements taken as a whole

- Providing D&T with (1) access to all information of which management and, where appropriate, the Audit Committee are aware that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters, (2) additional information that we may request from management and, where appropriate, the Audit Committee for the purpose of our audit, and (3) unrestricted access to personnel within the Company from whom we determine it necessary to obtain evidence.

## Management's Representations

We will make specific inquiries of the Company's management about the representations embodied in the financial statements and management's assessment of the effectiveness of the Company's internal control over financial reporting. In addition, we will request that management provide us with the written representations the Company is required to provide to its independent registered public accounting firm under the PCAOB Standards. The responses to those inquiries and the written representations of management are part of the evidential matter that D&T will rely on in forming its opinions. We will also request a similar representation letter as part of our interim reviews.

## Process for Obtaining Preapproval of Services

Management is responsible for the coordination of obtaining the preapproval of the Audit Committee, in accordance with the Audit Committee's preapproval process, for any services to be provided by D&T to the Company.

## Program and Subscription Services

D&T makes available to clients and nonclients various educational and informational programs, seminars, tools, and related services, such as live programs, webcasts (including the Dbriefs webcast series), podcasts, websites, database subscriptions (including some that provide access to D&T proprietary information and tools that offer technical support and advice), checklists, research reports, surveys, published books and other materials, applications, local office seminars, Technical Library, and CXO conferences (collectively, "programs and subscriptions"). D&T may provide these programs and subscriptions free of charge, for a nominal fee, or for a fee at prevailing market rates. In some instances, D&T may include complimentary rooms or meals as part of programs or seminars. Any programs and subscriptions requested by the Company or its affiliates and the related fees (if any) would be subject to the mutual agreement of the Company or its affiliates, as applicable, and D&T and may be described in a separate written agreement. The Company hereby confirms that any use or receipt by the Company or its affiliates of these programs and subscriptions is approved by the Audit Committee in accordance with the Audit Committee's established preapproval policies and procedures.

## Independence Matters

In connection with our engagement, D&T, management, and the Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Company is an attest client. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, has policies and procedures in place for the purpose of ensuring that neither the Company nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Mr. Berry.

In connection with the foregoing, the Company agrees to furnish to D&T and keep D&T updated with respect to (1) a corporate tree that identifies the legal names of the Company's affiliates, including affiliates as defined in SEC Rule 2-01(f)(4) of Regulation S-X, (e.g., parents, subsidiaries, investors, or investees), together with the ownership relationship among such entities, and (2) any equity or debt securities of the Company and its affiliates (including, without limitation, tax-advantaged debt of such entities that is issued through governmental authorities) that are available to individual investors (whether through stock, bond, commodity, futures or similar markets in or outside of the United

States, or equity, debt, or any other securities offerings), together with related securities identification information (e.g., ticker symbols or CUSIP®, ISIN®, or Sedol® numbers). The Company acknowledges and consents that such information may be treated by D&T as being in the public domain.

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, also has policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Company for a former or current D&T partner, principal, or professional employee should be discussed with Mr. Berry and approved by the Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent position for the Company or in a comparable position at a significant subsidiary of the Company; (2) on the Company's board of directors; (3) as a member of the Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For purposes of the preceding five paragraphs, "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

**APPENDIX C**

# COMMUNICATIONS WITH THE AUDIT COMMITTEE

This Appendix C is part of the engagement letter dated April 23, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and acknowledged and agreed to by the Audit Committee of Sears Holdings Corporation.

## Independence Communications

We have the responsibility to comply with the rules and standards of the PCAOB and the securities laws and regulations administered by the SEC regarding auditor independence. To demonstrate compliance with those requirements and in accordance with PCAOB Ethics and Independence Rule 3526, *Communication with Audit Committees Concerning Independence* ("Rule 3526"), we will describe to the Audit Committee, in writing, all relationships between D&T and the Company, its affiliates, or persons in "financial reporting oversight roles" (as defined in SEC Rule 2-01 of Regulation S-X) at the Company, that may reasonably be thought to bear on our independence and affirm to the Audit Committee in such communication whether we are independent of the Company within the meaning of the rules and standards of the PCAOB and the securities laws and regulations administered by the SEC. We also will discuss our independence with the Audit Committee in accordance with Rule 3526. For purposes of this paragraph, "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

## Other Communications Arising from the Audit or Interim Reviews

### *Fraud and Illegal Acts*

We will report directly to the Audit Committee any fraud of which we become aware that involves senior management and any fraud (whether caused by senior management or other employees) of which we become aware that causes a material misstatement of the financial statements. We will report to senior management any fraud perpetrated by lower level employees of which we become aware that does not cause a material misstatement of the financial statements; however, we will not report such matters directly to the Audit Committee, unless otherwise directed by the Audit Committee.

We will inform the appropriate level of management of the Company and determine that the Audit Committee is adequately informed with respect to illegal acts that have been detected or have otherwise come to our attention during the course of our audit, unless the illegal acts are clearly inconsequential.

### *Internal Control Matters*

We will communicate in writing to management and the Audit Committee all material weaknesses (as defined in the PCAOB Standards) identified during the audit. We will also communicate in writing to the Audit Committee all significant deficiencies (as defined in the PCAOB Standards) identified during the audit. If we conclude that the oversight of the Company's external financial reporting and internal control over financial reporting by the Audit Committee is ineffective, we will also communicate that conclusion in writing to the Company's board of directors.

In addition, we will communicate to management in writing all deficiencies in internal control over financial reporting (i.e., those deficiencies in internal control over financial reporting that are of a

lesser magnitude than material weaknesses) identified during the audit and inform the Audit Committee when such communication has been made. When making this communication, we will not repeat information about deficiencies that has been included in previously issued written communications, whether those communications were made by us, internal auditors, or others within the Company.

## Other Matters

We will communicate matters required by PCAOB Auditing Standard 1301, *Communications with Audit Committees*, and SEC Rule 2-07 of Regulation S-X prior to the Company filing our report or consent with the SEC.

## Interim Reviews

At the Audit Committee's request, we will not issue a written review report upon completion of our interim reviews; however, we will communicate to management and, if appropriate, the Audit Committee matters that cause us to believe that (1) material modifications should be made to the interim financial information for it to conform with generally accepted accounting principles, (2) modifications to management's disclosures about changes in internal control over financial reporting are necessary for management's certifications to be accurate and to comply with the requirements of Section 302 of the Sarbanes-Oxley Act of 2002 and related SEC rules and regulations, or (3) the Company filed the Form 10-Q before the completion of our review. When conducting our interim reviews, we will also determine whether any other matters required by regulations or the PCAOB Standards as they relate to interim financial information have been identified. If such matters have been identified, we will communicate them to the Audit Committee prior to the filing of interim financial information with the SEC.

<b>APPENDIX D</b>

# GENERAL BUSINESS TERMS

This Appendix D is part of the engagement letter to which these terms are attached (the engagement letter, including its appendices, the "engagement letter") dated April 23, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and acknowledged and agreed to by the Audit Committee of Sears Holdings Corporation.

1.  <u>Independent Contractor</u>. D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Company or the Audit Committee.

2.  <u>Survival</u>. The agreements and undertakings of the Company and the Audit Committee contained in the engagement letter will survive the completion or termination of this engagement.

3.  <u>Assignment and Subcontracting</u>. Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or claims) relating to this engagement without the prior written consent of the other parties. The Company and the Audit Committee hereby consent to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4.  <u>Severability</u>. If any term of the engagement letter is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

5.  <u>Force Majeure</u>. No party shall be deemed to be in breach of the engagement letter as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6.  <u>Confidentiality.</u> To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Company, D&T shall not disclose such information to any third party without the Company's consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Company and the Audit Committee hereby consent to D&T disclosing such information (1) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a source that D&T believes is not prohibited from disclosing such information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by

12

confidentiality obligations similar to those in this paragraph. To the extent that any information obtained by D&T from or on behalf of the Company or its employees in connection with the performance of services under the engagement letter relates to a resident of Massachusetts and constitutes "Personal Information" as defined in 201 CMR 17.02 (as may be amended), D&T shall comply with the obligations of 201 CMR 17.00 et. seq. (as may be amended), entitled "Standards for the Protection of Personal Information of Residents of the Commonwealth," with respect to such information.

7.  <u>Dispute Resolution</u>. Any controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix E and made a part hereof.

**APPENDIX E**

# DISPUTE RESOLUTION PROVISION

This Appendix E is part of the engagement letter dated April 23, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and acknowledged and agreed to by the Audit Committee of Sears Holdings Corporation.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

Mediation: All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

Arbitration Procedures: If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of the Company and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules, and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

Costs: Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

**APPENDIX F**

# BUSINESS ASSOCIATE APPENDIX

This Appendix F is part of the engagement letter dated April 23, 2018 between Deloitte & Touche LLP and Sears Holdings Corporation and approved by the Audit Committee of Sears Holdings Corporation.

If and to the extent, and so long as, required by HIPAA or HITECH (each as defined below), and not otherwise, D&T and the Company hereby agree to the following in connection with D&T's performance of services under the engagement letter to which this Business Associate Appendix is attached (such engagement letter, the "Engagement Letter," together with this Business Associate Appendix and all other attachments, appendices, and exhibits to the Engagement Letter, this "Agreement").

(A) Unless otherwise specified in this Business Associate Appendix, all capitalized terms used in this Business Associate Appendix shall have the meanings established for purposes of HIPAA or HITECH, as applicable. Specific statutory or regulatory citations used in this Business Associate Appendix shall mean such citations as amended and in effect from time to time.

1. "Compliance Date" shall mean, with respect to any applicable provision in this Business Associate Appendix, the later of the date by which compliance with such provision is required under HITECH and the effective date of this Agreement.

2. "Electronic Protected Health Information" shall mean Protected Health Information that is transmitted or maintained in electronic media.

3. "HIPAA" shall mean the Health Insurance Portability and Accountability Act, 42 U.S.C. §§ 1320d through 1320d-8, as amended from time to time, and all associated existing and future implementing regulations, when effective and as amended from time to time.

4. "HITECH" shall mean Subtitle D of the Health Information Technology for Economic and Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009, 42 U.S.C. §§ 17921-17954, as amended from time to time, and all associated existing and future implementing regulations, when effective and as amended from time to time.

5. "Protected Health Information" shall mean the term as defined in 45 C.F.R. § 160.103, and is limited to the Protected Health Information received from, or received or created on behalf of, the Company by D&T pursuant to performance of the Services.

6. "Privacy Rule" shall mean the federal privacy regulations issued pursuant to HIPAA, as amended from time to time, codified at 45 C.F.R. Part 164 (Subparts A and E).

7. "Security Rule" shall mean the federal security regulations issued pursuant to HIPAA, as amended from time to time, codified at 45 C.F.R. Part 164 (Subparts A and C).

8. "Services" shall have the meaning set forth in the attached engagement letter, and, if not therein defined, shall mean the services described in the Engagement Letter to be performed by D&T for the Company.

9. "Unsecured Protected Health Information" shall mean Protected Health Information that is not rendered unusable, unreadable, or indecipherable to unauthorized individuals through the use

15

of a technology or methodology specified by the Secretary in the regulations or guidance issued pursuant to 42 U.S.C. § 17932(h)(2).

(B) With regard to D&T's use and disclosure of Protected Health Information:

1. D&T may use and disclose Protected Health Information as reasonably required or contemplated in connection with the performance of the Services, excluding the use or further disclosure of Protected Health Information in a manner that would violate the requirements of the Privacy Rule, if done by the Company. Notwithstanding the foregoing, D&T may use and disclose Protected Health Information for the proper management and administration of D&T as provided in 45 C.F.R. § 164.504(e)(4).

2. D&T will not use or further disclose Protected Health Information other than as permitted or required by this Business Associate Appendix, and in compliance with each applicable requirement of 45 C.F.R. § 164.504(e), or as otherwise Required by Law.

3. D&T will implement and use appropriate administrative, physical, and technical safeguards to (i) prevent use or disclosure of Protected Health Information other than as permitted or required by this Business Associate Appendix; (ii) reasonably and appropriately protect the confidentiality, integrity, and availability of the Electronic Protected Health Information that D&T creates, receives, maintains, or transmits on behalf of the Company; and (iii) comply with the Security Rule with respect to Electronic Protected Health Information.

4. D&T will, without unreasonable delay, report to the Company (i) any use or disclosure of Protected Health Information not provided for by this Business Associate Appendix of which it becomes aware in accordance with 45 C.F.R. § 164.504(e)(2)(ii)(C); and/or (ii) any Security Incident affecting Electronic Protected Health Information of which D&T becomes aware in accordance with 45 C.F.R. § 164.314(a)(2)(C).

5. D&T will, without unreasonable delay, and in any event no later than sixty (60) calendar days after Discovery, notify the Company of any Breach of Unsecured Protected Health Information. The notification shall include, to the extent possible (and subsequently as the information becomes available), the identification of all individuals whose Unsecured Protected Health Information is reasonably believed by D&T to have been Breached along with any other available information that is required to be included in the notification to the Individual, the Secretary, and/or the media, all in accordance with the data breach notification requirements set forth in 42 U.S.C. § 17932 and 45 C.F.R. Parts 160 and 164 (Subparts A, D, and E).

6. D&T will ensure that any subcontractors or agents to whom D&T provides Protected Health Information agree in writing to the same restrictions and conditions that apply to D&T with respect to such Protected Health Information. To the extent that D&T provides Electronic Protected Health Information to a subcontractor or agent, it will require the subcontractor or agent to implement reasonable and appropriate safeguards to protect the Electronic Protected Health Information consistent with the requirements of this Business Associate Appendix.

7. D&T will, to the extent that Protected Health Information in D&T's possession constitutes a Designated Record Set, make available such Protected Health Information to the Company to permit the Company to respond to a request by an Individual in accordance with 45 C.F.R. § 164.524.

8. In the event that D&T, in connection with the Services, uses or maintains an Electronic Health Record of Protected Health Information of or about an Individual, D&T will provide

16

an electronic copy of such Protected Health Information to the Company to permit the Company to respond to a request by an Individual in accordance with 42 U.S.C. § 17935(e).

9. D&T will, to the extent that Protected Health Information in D&T's possession constitutes a Designated Record Set, make available to the Company such Protected Health Information for amendment and incorporate any amendments to such information as directed by the Company, all in accordance with 45 C.F.R. § 164.526.

10. D&T will document and make available to the Company the information required to provide an accounting of disclosures of Protected Health Information, in accordance with 45 C.F.R. § 164.528.

11. In the event that D&T, in connection with the Services, uses or maintains an Electronic Health Record of Protected Health Information of or about an Individual, D&T will make available to the Company the information required to provide an accounting of disclosures of such Protected Health Information in accordance with the requirements for accounting of disclosures made through an Electronic Health Record in 42 U.S.C. § 17935(c).

12. D&T will make its internal practices, books, and records relating to the use and disclosure of Protected Health Information available to the Secretary for purposes of determining the Company's and D&T's compliance with the Privacy Rule.

13. D&T will limit any request, use or disclosure by D&T of Protected Health Information, to the extent practicable, to the Limited Data Set of such Protected Health Information (as defined in 45 C.F.R. § 164.514(e)(2)), or, if the request, use or disclosure by D&T of Protected Health Information, not in a Limited Data Set, is necessary for D&T's performance of the Services, D&T will limit the amount of such Protected Health Information requested, used or disclosed by D&T to the minimum necessary to accomplish the intended purpose of such request, use or disclosure, respectively; provided, however, that the requirements set forth above in this subsection (13) shall be superseded and replaced by the requirements of the "minimum necessary" regulations or guidance to be issued by the Secretary (pursuant to 42 U.S.C. § 17935(b)(1)(B)) on and after its Compliance Date.

(C) In addition to any other obligation set forth in this Agreement, including this Business Associate Appendix, the Company agrees that it will: (1) not make any disclosure of Protected Health Information to D&T if such disclosure would violate HIPAA, HITECH, or any applicable federal or state law or regulation; (2) not request D&T to use or make any disclosure of Protected Health Information in any manner that would not be permissible under HIPAA, HITECH, or any applicable federal or state law or regulation if such use or disclosure were done by the Company; and (3) limit any disclosure of Protected Health Information to D&T, to the extent practicable, to the Limited Data Set of such Protected Health Information, or, if the disclosure of Protected Health Information that is not in a Limited Data Set is necessary for D&T's performance of the Services, to limit the disclosure of such Protected Health Information to the minimum necessary to accomplish the intended purpose of such disclosure, provided, however, that the requirements set forth above in this subsection (3) shall be superseded and replaced by the requirements of the "minimum necessary" regulations or guidance to be issued by the Secretary (pursuant to 42 U.S.C. § 17935(b)(1)(B)) on and after its Compliance Date.

(D) If either the Company or D&T knows of either a violation of a material term of this Business Associate Appendix by the other party or a pattern of activity or practice of the other party that constitutes a material breach or violation of this Business Associate Appendix, the non-breaching party will provide written notice of the breach or violation to the other party that specifies the

17

nature of the breach or violation. In the event that the breaching party does not cure the breach or end the violation on or before thirty (30) days after receipt of the written notice, the non-breaching party may, if feasible, terminate this Agreement.

(E)  D&T will, at termination of this Agreement, if feasible, return or destroy all Protected Health Information that D&T still maintains in any form and retain no copies of Protected Health Information or, if such return or destruction is not feasible (such as in the event that the retention of Protected Health Information is required for archival purposes to evidence the Services), D&T may retain such Protected Health Information and shall thereupon extend the protections of this Business Associate Appendix to such Protected Health Information and limit further uses and disclosures to those purposes that make the return or destruction of such Protected Health Information infeasible.

(F)  Any other provision of this Agreement that is directly contradictory to one or more terms of this Business Associate Appendix shall be superseded by the terms of this Business Associate Appendix to the extent and only to the extent of the contradiction and only for the purpose of the Company's and D&T's compliance with HIPAA and HITECH. The terms of this Business Associate Appendix, to the extent they are unclear, shall be construed to allow for compliance by the Company and D&T with HIPAA and HITECH.

(G)  Nothing contained in this Business Associate Appendix is intended to confer upon any person (other than the parties hereto) any rights, benefits, or remedies of any kind or character whatsoever, whether in contract, statute, tort (such as negligence), or otherwise, and no person shall be deemed a third-party beneficiary under or by reason of this Business Associate Appendix.

(H)  Nothing contained in this Business Associate Appendix shall be interpreted to mean that D&T will create or transmit Protected Health Information on behalf of the Company. Furthermore, D&T shall not carry out any of the Company's obligations under the Privacy Rule.

**<u>Exhibit 2</u>**

**SPC Audit Engagement Letter**

# Deloitte.

Deloitte & Touche LLP

111 S. Wacker Drive
Chicago, IL 60606-4301
USA

Tel: +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

November 2, 2018

Mr. Robert Riecker
Chief Financial Officer
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Dear Mr. Riecker:

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as independent auditors for Sears Protection Company (PR), Inc. (the "Entity"), which is an indirect, wholly owned subsidiary of Sears Holdings Corporation ("Sears Holdings" or the "Company"). Ms. Kathleen Candela will be responsible for the services that we perform for the Entity hereunder.

In addition to the audit services we are engaged to provide under this engagement letter, we would also be pleased to assist the Entity on issues as they arise throughout the year. Hence, we hope that you will call Ms. Candela whenever you believe D&T can be of assistance. This assistance will require approval by the Audit Committee of Sears Holdings, of which the Entity is a subsidiary in accordance with its preapproval policies and procedures.

The services to be performed by D&T pursuant to this engagement are subject to the terms and conditions set forth herein and in the accompanying appendices. Such terms and conditions shall be effective as of the date of the commencement of such services.

## Audit of Financial Statements – Income Tax Basis

Our engagement is to perform an audit in accordance with auditing standards generally accepted in the United States of America ("generally accepted auditing standards"). The objective of an audit conducted in accordance with generally accepted auditing standards is to express an opinion on whether the Entity's financial statements – income tax basis for the year ended February 3, 2018, are presented fairly, in all material respects, in accordance with the accrual method of accounting used for income tax-reporting purposes, which is a comprehensive basis of accounting other than accounting principles generally accepted in the United States of America.

Appendix A contains a description of the auditor's responsibilities and the scope of an audit in accordance with generally accepted auditing standards.

Supplementary information accompanies the Entity's financial statements – income tax basis. We will subject such supplementary information to the auditing procedures applied to our audit of the financial statements – income tax basis and certain additional procedures with the objective of expressing an opinion on whether such information is fairly stated, in all material respects, in relation to the financial statements – income tax basis as a whole.

## D&T Reports

We expect to issue a written report upon the completion of our audit. Our ability to express an opinion or to issue any report as a result of this engagement and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our report. If, for any reason, we are unable to complete our audit or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue any report as a result of this engagement. If we are unable to complete our audit, or if any report to be issued by D&T as a result of this engagement requires modification, the reasons for this will be discussed with the Board of Directors of the Entity (the "Board of Directors") and management.

## Management's Responsibilities

Appendix B describes management's responsibilities.

## Responsibility of the Sears Holdings Audit Committee

As independent auditors of the Entity, we acknowledge that the Sears Holdings Audit Committee is directly responsible for the appointment, compensation, and oversight of our work. The Sears Holdings Audit Committee has delegated responsibility for the oversight of our work to the Board of Directors and accordingly, except as otherwise specifically noted, we will report directly to the Board of Directors. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Sears Holdings Audit Committee in accordance with the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Communications with the Board of Directors

Appendix C describes various matters that we are required by generally accepted auditing standards to communicate with the Board of Directors and management.

## Fees

We confirm our understanding that the Sears Holdings Audit Committee has the sole authority to approve our fees. Fees have been previously approved at the March 15, 2017, Sears Holdings Audit Committee meeting and the fees for this engagement are estimated to be $74,000, which includes the fee for the audit of the supplementary tax information of $17,000, plus expenses.

Based on the anticipated timing of the work, our fees will be billed in August 2018. Payments are due 45 days from the date of the invoice. Engagement-related expenses, such as technology and administrative-related charges will be billed in addition to the fees and will be billed separately in addition to the fees.

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms. Our estimated fees are based on certain assumptions, including (1) timely and accurate completion of the requested entity participation schedules and additional supporting information, (2) no inefficiencies during the audit process or changes in scope caused by events that are beyond our control, (3) the effectiveness of internal control over financial reporting throughout the period under audit, (4) a minimal level of audit adjustments (recorded or unrecorded), and (5) no changes to the timing or extent of our work plans. We will notify you promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Entity intends to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements – income tax basis (e.g., in a periodic filing with a regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, the Entity agrees that its management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Entity also agrees that its management will notify us and obtain our approval prior to including any of our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Entity. Any request by the Entity or the Company to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Company and D&T.

* * * * *

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should the Entity, or Board of Directors request, and should D&T agree to provide, services (including audit services) beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through E attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*


Accepted and agreed to by Sears Holdings Corporation:



By: Robert A. Riecker
Title: Chief Financial Officer, Sears Holdings Corporation

Date: 11/02/2018


cc: The Audit Committee of Sears Holdings Corporation

The Board of Directors of Sears Protection Company – Puerto Rico

**APPENDIX A**

# AUDITOR'S RESPONSIBILITIES AND SCOPE OF AN AUDIT IN ACCORDANCE WITH GENERALLY ACCEPTED AUDITING STANDARDS

This Appendix A is part of the engagement letter dated November 2, 2018, between Deloitte & Touche LLP and the Entity.

## Auditor's Responsibilities

Our responsibilities under generally accepted auditing standards include forming and expressing an opinion about whether the financial statements - income tax basis that have been prepared by management with the oversight of the Board of Directors are presented fairly, in all material respects, in accordance with the accrual method of accounting used for income tax-reporting purposes. The audit of the financial statements - income tax basis does not relieve management or the Board of Directors of their responsibilities.

## Scope of an Audit

Generally accepted auditing standards require that we plan and perform the audit to obtain reasonable, rather than absolute, assurance about whether the financial statements - income tax basis as a whole are free from material misstatement, whether caused by fraud or error. However, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with generally accepted auditing standards. We have no responsibility to plan and perform the audit to obtain reasonable assurance that misstatements, whether caused by fraud or error, that are not material to the financial statements - income tax basis as a whole are detected.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements - income tax basis. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the financial statements - income tax basis, whether caused by fraud or error. In making those risk assessments, we consider internal control relevant to the Entity's preparation and fair presentation of the financial statements - income tax basis in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of the Entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements - income tax basis.

**APPENDIX B**

# MANAGEMENT'S RESPONSIBILITIES

This Appendix B is part of the engagement letter dated November 2, 2018, between Deloitte & Touche LLP and the Entity.

## Financial Statements – Income Tax Basis

Management is responsible for the preparation, fair presentation, and overall accuracy of the financial statements - income tax basis in accordance with the accrual method of accounting used for income tax- reporting purposes. In this regard, management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Designing, implementing, and maintaining effective internal control relevant to the preparation and fair presentation of financial statements – income tax basis that are free from material misstatement, whether due to fraud or error

- Identifying and ensuring that the Entity complies with the laws and regulations applicable to its activities and informing us of all instances of identified or suspected noncompliance with such laws or regulations

- Providing us with (1) access to all information of which management is aware that is relevant to the preparation and fair presentation of the financial statements – income tax basis, such as records, documentation, and other matters, (2) additional information that we may request from management for the purpose of our audit, and (3) unrestricted access to personnel within the Entity from whom we determine it necessary to obtain audit evidence

- Including all informative disclosures in the financial statements that are appropriate for the accrual method of accounting used for income tax- reporting purposes

Management is also responsible for (1) preparing the supplementary information in accordance with the standards of the AICPA, (2) including our report on the supplementary information in any document that contains the supplementary information and that indicates that D&T has reported on such supplementary information, and (3) presenting the supplementary information with the audited financial statements or, if such information will not be presented with the audited financial statements, to make the audited financial statements readily available to the intended users of such information no later than the date of issuance by the Entity of the supplementary information and our report thereon.

## Management's Representations

We will make specific inquiries of the Entity's management about the representations embodied in the financial statements – income tax basis and supplementary information. In addition, we will request that management provide us with the written representations the Entity is required to provide to its independent auditors under generally accepted auditing standards. The responses to those inquiries and the written representations of management are part of the evidential matter that D&T will rely on in forming its opinion on the Entity's financial statements – income tax basis and supplementary information.

## Process for Obtaining Preapproval of Services

Management is responsible for the coordination of obtaining the preapproval of the Sears Holdings Audit Committee, in accordance with the Sears Holdings Audit Committee's preapproval process, for any services to be provided by D&T to the Entity.

## Program and Subscription Services

D&T makes available to clients and nonclients various educational and informational programs, seminars, tools, and related services, such as live programs, webcasts (including the Dbriefs webcast series), podcasts, websites, database subscriptions (including some that provide access to D&T proprietary information and tools that offer technical support and advice), checklists, research reports, surveys, published books and other materials, applications, local office seminars, Technical Library, and CXO conferences (collectively, "programs and subscriptions"). D&T may provide these programs and subscriptions free of charge, for a nominal fee, or for a fee at prevailing market rates. In some instances, D&T may include complimentary rooms or meals as part of programs or seminars. Any programs and subscriptions requested by the Company and the related fees (if any) would be subject to the mutual agreement of the Company and D&T and may be described in a separate written agreement. The Company hereby confirms that any use or receipt by the Entity of these programs and subscriptions is approved by the Sears Holdings Audit Committee when required by the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Independence Matters

In connection with our engagement, D&T, management, and the Sears Holdings Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Company is an attest client. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, has policies and procedures in place for the purpose of ensuring that neither the Company nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Ms. Candela.

In connection with the foregoing paragraph, the Company agrees to furnish to D&T and keep D&T updated with respect to a corporate tree that identifies the legal names of the Company's affiliates, as defined in AICPA *Code of Professional Conduct* Interpretation No. 101-18 (e.g., parents, subsidiaries, investors, or investees) ("Company Affiliates"), together with the ownership relationship among such entities. Such information will be maintained in a database accessible by D&T in connection with their compliance with AICPA or other applicable independence rules.

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, also has policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Company for a former or current D&T partner, principal, or professional employee should be discussed with Ms. Candela and approved by the Sears Holdings Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent position for the Company or in a comparable position at a significant subsidiary of the Company; (2) on the board of directors of the Company or its subsidiaries; (3) as a member of the Sears Holdings Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For purposes of the preceding sections entitled "Independence Matters", "Process for Obtaining Preapproval of Services," and "Program and Subscription Services", "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

**APPENDIX C**

## COMMUNICATIONS WITH THE BOARD OF DIRECTORS

This Appendix C is part of the engagement letter dated November 2, 2018, between Deloitte & Touche LLP and the Entity.

We are responsible for communicating with the Board of Directors significant matters related to the audit that are, in our professional judgment, relevant to the responsibilities of the Board of Directors in overseeing the financial reporting process.

In connection with the foregoing, we will communicate to the Board of Directors any fraud we identify or suspect that involves (1) management, (2) employees of the Entity who have significant roles in internal control, or (3) other employees of the Entity when the fraud results in a material misstatement of the financial statements – income tax basis. In addition, we will communicate with the Board of Directors any other matters related to fraud that are, in our professional judgment, relevant to their responsibilities. We will communicate to management any fraud perpetrated by lower-level employees of which we become aware that does not result in a material misstatement of the financial statements – income tax basis; however, we will not communicate such matters to the Board of Directors, unless otherwise directed by the Board of Directors.

We will also communicate to the Board of Directors matters involving the Entity's noncompliance with laws and regulations that have come to our attention during the course of our audit, other than when such matters are clearly inconsequential.

We will also communicate in writing to management and the Board of Directors any significant deficiencies or material weaknesses in internal control (as defined in generally accepted auditing standards) that we have identified during the audit, including those that were remediated during the audit.

Generally accepted auditing standards do not require us to design procedures for the purpose of identifying other matters to communicate with the Board of Directors. However, we will communicate to the Board of Directors matters required by AICPA AU-C 260, *The Auditor's Communication with Those Charged with Governance*.

**APPENDIX D**

# GENERAL BUSINESS TERMS

This Appendix D is part of the engagement letter to which these terms are attached (the engagement letter, including its appendices, the "engagement letter") dated November 2, 2018, between Deloitte & Touche LLP and the Entity.

1.  <u>Independent Contractor.</u> D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Entity, Sears Holdings Audit Committee, Sears Holdings, or the Board of Directors.

2.  <u>Survival.</u> The agreements and undertakings of the Entity contained in the engagement letter will survive the completion or termination of this engagement.

3.  <u>Assignment and Subcontracting.</u> Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or claims) relating to this engagement without the prior written consent of the other parties. The Entity consents to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4.  <u>Severability.</u> If any term of the engagement letter is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

5.  <u>Force Majeure</u>. No party shall be deemed to be in breach of the engagement letter as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6.  <u>Confidentiality</u>. To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Entity, D&T shall not disclose such information to any third party without the Entity's consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Entity consents to D&T disclosing such information (1) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a source that D&T believes is not prohibited from disclosing such information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this paragraph.

7.  <u>Dispute Resolution.</u> Any controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix E and made a part hereof.

**APPENDIX E**

# DISPUTE RESOLUTION PROVISION

This Appendix E is part of the engagement letter dated November 2, 2018, between Deloitte & Touche LLP and the Entity.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

<u>Mediation:</u> All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

<u>Arbitration Procedures:</u> If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of the Entity and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

<u>Costs:</u> Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

**<u>Exhibit 3</u>**

**Savings Plan Audit Engagement Letter**

# Deloitte.

**Deloitte & Touche LLP**

111 S. Wacker Drive
Chicago, IL 60606-4301
USA

Tel:  +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

August 22, 2018

Mr. Robert A. Riecker
Chief Financial Officer
Member of Sears Holdings Corporation Administrative Committee
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Dear Mr. Riecker**:**

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as independent auditors for the following plans (each, the "Plan"; collectively, the "Plans" or "you" or "your"):

- Sears Holdings Savings Plan
- Sears Holdings Puerto Rico Savings Plan

Mr. Michael Pipala will be responsible for the services that we perform for the Plans hereunder.

In addition to the audit services we are engaged to provide under this engagement letter, we would also be pleased to assist the Plans on issues as they arise throughout the year. Hence, we hope that you will call Mr. Pipala whenever you believe D&T can be of assistance.

The services to be performed by D&T pursuant to this engagement are subject to the terms and conditions set forth herein and in the accompanying appendices. Such terms and conditions shall be effective as of the date of the commencement of such services.

Please note that this engagement letter supersedes the engagement letter dated and executed June 13, 2018.

## Audits of Financial Statements

Our engagement is to perform audits in accordance with auditing standards generally accepted in the United States of America ("generally accepted auditing standards") for the Plans' reporting to the U.S Department of Labor (DOL) on Forms 5500 as required by the DOL's Rules and Regulations for Reporting and Disclosure under the Employee Retirement Income Security Act of 1974 (ERISA). The objectives of an audit conducted in accordance with generally accepted auditing standards are to (1) express an opinion on whether the Plans' financial statements for the year ended December 31, 2017, are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States of America ("generally accepted accounting principles"), and (2) express an opinion on whether the supplemental schedules required by the DOL that accompany the financial statements are fairly stated, in all material respects, in relation to the financial statements as a whole.

As part of our audits, we will perform certain procedures directed at considering each Plan's compliance with applicable Internal Revenue Code (IRC) requirements for tax-exempt status, including reading each Plan's latest tax determination letter from the Internal Revenue Service (IRS). As we conduct our audits, we may become aware that events affecting the Plans' tax status may have occurred. We will inform management of any instances of tax or ERISA noncompliance that come to our attention during the course of our audits. Management should recognize, however, that our audits are not designed to, nor are they intended to, determine the Plans' overall compliance with applicable provisions of the IRC or ERISA.

Appendix A contains a description of the auditor's responsibilities and the scope of an audit in accordance with generally accepted auditing standards.

**D&T Reports**

We expect to issue written reports upon the completion of our audits. Our ability to express any opinion or to issue any report as a result of this engagement and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our reports. If, for any reason, we are unable to complete any of our audits or are unable to form or have not formed any opinion, we may decline to express any opinion or decline to issue any report as a result of this engagement. If we are unable to complete any of our audits, or if any report to be issued by D&T as a result of this engagement requires modification, the reasons for this will be discussed with the Sears Holdings Corporation Administrative Committee (the "Administrative Committee") and the Plans' management ("management").

**Form 5500**

We will not prepare or review any of the Plan's Form 5500 to be filed with the DOL; however, the audited financial statements of the Plans are required to be filed with Forms 5500. Generally accepted auditing standards require that we read each Plan's Form 5500 prior to its filing. The purpose of this procedure is to consider whether such information or the manner of its presentation is materially inconsistent with the information or the manner of its presentation in the financial statements. This procedure is not sufficient or intended for purposes of ensuring that any of the Plan's Forms 5500 are complete or accurately prepared. In the event that any of our audit reports are issued prior to our having read a Plan's Form 5500, management agrees not to attach any such report to the financial statements included with that Plan's Form 5500 filing until we have read the completed Form 5500.

**Management's Responsibilities**

Appendix B describes management's responsibilities.

**Responsibility of the Administrative Committee**

As independent auditors of the Plans, we acknowledge that the Sears Holdings Corporation Audit Committee (the "Audit Committee") is directly responsible for the appointment and compensation of our work. The Audit Committee has delegated responsibility for the oversight of our work to the Administrative Committee of Sears Holdings Corporation (the "Administrative Committee"), and accordingly, except as otherwise specifically noted, we will report directly to the Administrative Committee. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Audit Committee in accordance with the Audit Committee's established preapproval policies and procedures.

**Communications with the Administrative Committee**

Appendix C describes various matters that we are required by generally accepted auditing standards to communicate with the Administrative Committee and management.

## Fees

We estimate that our fees for this engagement will be $238,000, plus expenses.

| Plan | Fee |
|---|---|
| Sears Holdings Savings Plan | $173,000 |
| Sears Holdings Puerto Rico Savings Plan | 65,000 |

Payments are due 45 days from the date of the invoice. Engagement-related expenses and technology- and administrative-related charges will be billed in addition to the fees and will be stated separately on the invoices.

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms. Our estimated fees are based on certain assumptions, including (1) timely and accurate completion of the requested entity participation schedules and additional supporting information, (2) no inefficiencies during the audit process or changes in scope caused by events that are beyond our control, (3) the effectiveness of internal control over financial reporting throughout the period under audit, (4) a minimal level of audit adjustments (recorded or unrecorded), and (5) no changes to the timing or extent of our work plans. We will notify you promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Plans or Sears Holdings Corporation ("the Plans' Sponsor") intends to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with a regulator, including the electronic filing of Form 5500 to the DOL), thereby associating D&T with such document, the Plans and the Plans' Sponsor agree that their management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Plans and the Plans' Sponsor also agree that their management will notify us and obtain our approval prior to including any of our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Plans or the Plans' Sponsor. Any request by the Plans or the Plans' Sponsor to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Plans and D&T.

## Access to Working Papers by Regulators

We may be requested or required by a regulator of the Plans, including but not limited to the DOL, the IRS (each, a "Regulator") to provide access to working papers related to this engagement. In the event of any such request or requirement, we will notify you prior to providing such access unless applicable law or regulation prohibits such notice. The working papers for this engagement are the property of D&T and constitute D&T's confidential information. We may request confidential treatment

of our working papers. Access to our working papers will be provided under the supervision of D&T's personnel and upon request we may provide copies of working papers to a Regulator. The Plans hereby consent, where consent is required, to D&T providing access to working papers and copies thereof to a Regulator. Fees for professional services relating to such access, plus related expenses, will be billed in addition to the estimated fees outlined herein.

* * * * *

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should any of the Plans request, and should D&T agree to provide, services (including audit services) beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through E attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte + Touche LLP*

Acknowledged and approved on behalf of the
Administrative Committee of Sears Holdings Corporation

By: _____

Title: Member of the Administrative Committee of Sears Holdings Corporation

Date: 08/22/2018 _____

Accepted and agreed to by
Sears Holdings Corporation
Sears Holdings Savings Plan
Sears Holdings Puerto Rico Savings Plan:

By: _____

Title: Chief Financial Officer

Date: 08/22/2018 _____

cc:  The Administrative Committee of Sears Holdings Corporation
     The Audit Committee of Sears Holdings Corporation

- 4 -

**APPENDIX A**

**AUDITOR'S RESPONSIBILITIES AND SCOPE OF AN AUDIT IN ACCORDANCE WITH GENERALLY ACCEPTED AUDITING STANDARDS**

This Appendix A is part of the engagement letter dated August 22, 2018, between Deloitte & Touche LLP, Sears Holdings Savings Plan, Sears Holdings Puerto Rico Savings Plan, and Sears Holdings Corporation and approved by the Administrative Committee of Sears Holdings Corporation.

## Auditor's Responsibilities

Our responsibilities under generally accepted auditing standards include forming and expressing an opinion about whether the financial statements that have been prepared by management with the oversight of the Administrative Committee are presented fairly, in all material respects, in accordance with generally accepted accounting principles. The audits of the financial statements do not relieve management or the Administrative Committee of their responsibilities.

## Scope of an Audit

Generally accepted auditing standards require that we plan and perform the audit to obtain reasonable, rather than absolute, assurance about whether the financial statements as a whole are free from material misstatement, whether caused by fraud or error. However, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with generally accepted auditing standards. We have no responsibility to plan and perform the audit to obtain reasonable assurance that misstatements, whether caused by fraud or error, that are not material to the financial statements as a whole are detected.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the financial statements, whether caused by fraud or error. In making those risk assessments, we consider internal control relevant to the Plans' preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of the Plans' internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

Supplemental schedules required by the DOL accompany the Plans' financial statements.  We will subject such supplemental schedules to the auditing procedures applied to our audits of the financial statements and certain additional procedures with the objective of expressing opinions on whether such schedules are fairly stated, in all material respects, in relation to the financial statements as a whole.

**APPENDIX B**

## MANAGEMENT'S RESPONSIBILITIES

This Appendix B is part of the engagement letter dated August 22, 2018, between Deloitte & Touche LLP, Sears Holdings Savings Plan, Sears Holdings Puerto Rico Savings Plan, and Sears Holdings Corporation and approved by the Administrative Committee of Sears Holdings Corporation.

### Financial Statements

Management is responsible for the preparation, fair presentation, and overall accuracy of the financial statements in accordance with generally accepted accounting principles. In this regard, management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Designing, implementing, and maintaining effective internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error

- Identifying and ensuring that the Plans comply with the laws and regulations applicable to its activities including the tax-qualified status of the Plans and informing us of all instances of identified or suspected noncompliance with such laws or regulations

- Providing us with (1) access to all information of which management is aware that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters, (2) additional information that we may request from management for the purpose of our audits, and (3) unrestricted access to personnel within the Plans and the Plans' Sponsor from whom we determine it necessary to obtain audit evidence.

Management is also responsible for (1) preparing the supplemental schedules in accordance with the DOL's Rules and Regulations for Reporting and Disclosure under ERISA, (2) including our reports on the supplemental schedules in any document that contains such information and that indicates that D&T has reported on such information, and (3) presenting the supplemental schedules with the audited financial statements.

### Management's Representations

We will make specific inquiries of management about the representations embodied in the financial statements and supplemental schedules. In addition, we will request that management provide us with the written representations the Plans are required to provide to their independent auditors under generally accepted auditing standards. The responses to those inquiries and the written representations of management are part of the evidential matter that D&T will rely on in forming its opinions.

### Process for Obtaining Preapproval of Services

Management is responsible for the coordination of obtaining the preapproval of the Audit Committee, in accordance with the Audit Committee's preapproval process, for any services to be provided by D&T to the Plans.

## Program and Subscription Services

D&T makes available to clients and nonclients various educational and informational programs, seminars, tools, and related services, such as live programs, webcasts (including the Dbriefs webcast series), podcasts, websites, database subscriptions (including some that provide access to D&T proprietary information and tools that offer technical support and advice), checklists, research reports, surveys, published books and other materials, applications, local office seminars, Technical Library, and CXO conferences (collectively, "programs and subscriptions"). D&T may provide these programs and subscriptions free of charge, for a nominal fee, or for a fee at prevailing market rates. In some instances, D&T may include complimentary rooms or meals as part of programs or seminars. Any programs and subscriptions requested by the Plans and the related fees (if any) would be subject to the mutual agreement of the Plans, as applicable, and D&T and may be described in a separate written agreement. The Plans hereby confirm that any use or receipt by the Plans of these programs and subscriptions is approved by the Audit Committee in accordance with the Audit Committee's established preapproval policies and procedures.

## Independence Matters

In connection with our engagement, D&T, management, working together with management of the Plans' Sponsor, and the Administrative Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Plans are attest clients. Management, working together with management of the Plans' Sponsor, will ensure that the Plans and the Plans' Sponsor have policies and procedures in place for the purpose of ensuring that the Plans and the Plans' Sponsor will not act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Mr. Pipala.

In connection with the foregoing paragraph, the Plans agree to furnish to D&T and keep D&T updated with respect to a corporate tree that identifies the legal names of each Plan's affiliates, as defined in AICPA *Code of Professional Conduct* Interpretation No. 101-18 (e.g., parents, subsidiaries, investors, or investees) ("Plan Affiliates"), together with the ownership relationship among such entities. Such information will be maintained in a database accessible by D&T in connection with their compliance with AICPA or other applicable independence rules.

Management, working together with management of the Plans' Sponsor, will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management, working together with management of the Plans' Sponsor, will ensure that the Plans, and the Plans' Sponsor also have policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Plans or the Plans' Sponsor for a former or current D&T partner, principal, or professional employee should be discussed with Mr. Pipala and approved by the Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent position for the Plans or the Plans' Sponsor, or in a comparable position at a significant subsidiary of the Plans; (2) on the board of directors of the Plans' Sponsor; (3) as a member of the Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

## Equity or Debt Security Issuances

The Plans also agree to furnish to D&T and keep D&T updated with respect to any equity or debt securities of the Plans and Plan Affiliates (including, without limitation, tax-advantaged debt of such entities that is issued through governmental authorities) that are registered, issued, listed, or traded outside of the United States (whether through stock, bond, commodity, futures or similar markets, or

equity, debt, or any other securities offerings), together with related securities identification information (e.g., ticker symbols or CUSIP®, ISIN®, or Sedol® numbers). The Plans and the Plans' Sponsor acknowledge and consent that such information may be treated by D&T as being in the public domain.

For purposes of the preceding sections entitled "Independence Matters", "Process for Obtaining Preapproval of Services", "Program and Subscription Services", and "Equity and Debt Security Issuances", "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

# APPENDIX C

## COMMUNICATIONS WITH THE ADMINISTRATIVE COMMITTEE

This Appendix C is part of the engagement letter dated August 22, 2018, between Deloitte & Touche LLP, Sears Holdings Savings Plan, Sears Holdings Puerto Rico Savings Plan, and Sears Holdings Corporation and approved by the Administrative Committee of Sears Holdings Corporation.

We are responsible for communicating with the Administrative Committee significant matters related to the audits that are, in our professional judgment, relevant to the responsibilities of the Administrative Committee in overseeing the financial reporting process.

In connection with the foregoing, we will communicate to the Administrative Committee any fraud we identify or suspect that involves (1) management, (2) employees of the Plans who have significant roles in internal control, or (3) other employees of the Plans when the fraud results in a material misstatement of the financial statements. In addition, we will communicate with the Administrative Committee any other matters related to fraud that are, in our professional judgment, relevant to their responsibilities. We will communicate to management any fraud perpetrated by lower-level employees of which we become aware that does not result in a material misstatement of the financial statements; however, we will not communicate such matters to the Administrative Committee, unless otherwise directed by the Administrative Committee.

We will also communicate to the Administrative Committee matters involving the Plans' noncompliance with laws and regulations (including noncompliance with laws and regulations that we believe may be prohibited transactions with parties in interest, or other violations of ERISA rules and regulations) that have come to our attention during the course of our audits, other than when such matters are clearly inconsequential.

In addition, we will communicate in writing to management and the Administrative Committee any significant deficiencies or material weaknesses in internal control (as defined in generally accepted auditing standards) that we have identified during the audits, including those that were remediated during the audits.

Generally accepted auditing standards do not require us to design procedures for the purpose of identifying other matters to communicate with the Administrative Committee. However, we will communicate to the Administrative Committee matters required by AICPA AU-C 260, *The Auditor's Communication with Those Charged with Governance*.

**APPENDIX D**

## GENERAL BUSINESS TERMS

This Appendix D is part of the engagement letter to which these terms are attached (the engagement letter, including its appendices, the "engagement letter") dated August 22, 2018, between Deloitte & Touche LLP, Sears Holdings Savings Plan, Sears Holdings Puerto Rico Savings Plan, and Sears Holdings Corporation and approved by the Administrative Committee of Sears Holdings Corporation.

1. <u>Independent Contractor.</u> D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Plans, the Plans' Sponsor, or the Administrative Committee.

2. <u>Survival.</u> The agreements and undertakings of the Plans, the Plans' Sponsor, and the Administrative Committee contained in the engagement letter will survive the completion or termination of this engagement.

3. <u>Assignment and Subcontracting.</u> Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or claims) relating to this engagement without the prior written consent of the other parties. The Plans, the Plans' Sponsor, and the Administrative Committee hereby consent to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4. <u>Severability.</u> If any term of the engagement letter is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

5. <u>Force Majeure.</u> No party shall be deemed to be in breach of the engagement letter as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6. <u>Confidentiality.</u> To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Plans, D&T shall not disclose such information to any third party without the Plans' and Plans' Sponsor's consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Plans, the Plans' Sponsor, and the Administrative Committee hereby consent to D&T disclosing such information (1) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a source that D&T believes is not prohibited from disclosing such information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this paragraph. To the extent that any information obtained by D&T from or on behalf of the Plans or their participants in connection with the performance of services under the engagement letter relates to a resident of Massachusetts and constitutes "Personal Information" as defined in 201 CMR 17.02 (as may be amended), D&T shall comply with the obligations of 201 CMR 17.00 et. seq. (as may be

amended), entitled "Standards for the Protection of Personal Information of Residents of the Commonwealth," with respect to such information.

7.    <u>Dispute Resolution.</u> Any controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix E and made a part hereof.

**APPENDIX E**

## DISPUTE RESOLUTION PROVISION

This Appendix E is part of the engagement letter dated August 22, 2018, between Deloitte & Touche LLP, Sears Holdings Savings Plan, Sears Holdings Puerto Rico Savings Plan, and Sears Holdings Corporation and approved by the Administrative Committee Sears Holdings Corporation.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

Mediation: All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

Arbitration Procedures: If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. The Plans and the Plans' Sponsor, on the one hand, and Deloitte & Touche LLP, on the other hand, shall each designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

Costs:  Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

**<u>Exhibit 4</u>**

**Parts Direct Audit Engagement Letter**

# Deloitte.

**Deloitte & Touche LLP**

111 S. Wacker Drive
Chicago, IL 60606-4301
USA

Tel: +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

July 9, 2018

Mr. William C. Kunkler
Audit Committee Chair
Audit Committee of Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Mr. Robert A. Riecker
Chief Financial Officer
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Dear Mr. Kunkler and Mr. Riecker:

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as independent auditors for Parts Direct (the "Business"), which is a wholly-owned operating component of Sears Holdings Corporation (the "Company"). Mr. Jim Berry and Mr. Andrew Van Houtte will be responsible for the services that we perform for the Company hereunder.

In addition to the audit services we are engaged to provide under this engagement letter, we would also be pleased to assist the Business and the Company on issues as they arise throughout the year. Hence, we hope that you will call Mr. Berry or Mr. Van Houtte whenever you believe D&T can be of assistance. This assistance will require approval by the Audit Committee of the Company of which the Business is a wholly-owned operating component of (the "Audit Committee"), in accordance with its preapproval policies and procedures.

The services to be performed by D&T pursuant to this engagement are subject to the terms and conditions set forth herein and in the accompanying appendices. Such terms and conditions shall be effective as of the date of the commencement of such services.

## Potential Transaction and Report Distribution

We understand that the Company is considering entering into a transaction with a potential buyer ("Potential Buyer") relating to the Business (the "potential transaction"). The Company and the Business each agrees that the independent auditors' report of D&T to be issued on the Business' financial statements ("D&T's report") will not be included, incorporated by reference, or referred to in any public filings with the Securities and Exchange Commission without D&T's prior written consent. The Company and the Business also each agrees that they will provide a copy of this engagement letter to Potential Buyer for Potential Buyer's information. The Company and the Business also each agrees that, before Potential Buyer will be permitted to obtain or read a copy of D&T's report, the Company and the Business will obtain from Potential Buyer for our benefit and will provide to us Potential Buyer's written agreement (in the form appended to this engagement letter as Appendix F, "Potential Buyer Agreement") regarding the use and distribution of D&T's report.

## Audit of Financial Statements

Our engagement is to perform an audit in accordance with auditing standards generally accepted in the United States of America ("generally accepted auditing standards"). The objective of an audit conducted in accordance with generally accepted auditing standards is to express an opinion on whether the Business' financial statements as of and for the years ended January 30, 2016, January 28, 2017 and February 3, 2018, are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States of America ("generally accepted

accounting principles").

Appendix A contains a description of the auditor's responsibilities and the scope of an audit in accordance with generally accepted auditing standards.

With respect to the conduct of the audit and reporting the results thereof, materiality will be evaluated and determined in the context of the financial statements taken as a whole; consequently, matters may exist or have existed that would be assessed differently by the Company, the Business, or Potential Buyer.

An audit cannot be a substitute for a party's own due diligence investigation, nor is it intended or designed to do so. Likewise, an audit does not comprehend all matters pertinent or necessary to a party's evaluation of a potential transaction, and we make no representation as to the sufficiency of the audits for the Company's, the Business', or Potential Buyer's purposes in connection with the potential transaction.

## D&T Reports

We expect to issue a written report upon the completion of our audit. Our ability to express an opinion or to issue any report as a result of this engagement and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our report. If, for any reason, we are unable to complete our audit or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue any report as a result of this engagement. If we are unable to complete our audit, or if any report to be issued by D&T as a result of this engagement requires modification, the reasons for this will be discussed with the Audit Committee and the Company's and Business' management.

## Management's Responsibilities

Appendix B describes management's responsibilities.

## Responsibility of the Audit Committee

As independent auditors of the Business, we acknowledge that the Audit Committee is directly responsible for the appointment, compensation, and oversight of our work, and accordingly, except as otherwise specifically noted, we will report directly to the Audit Committee. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Audit Committee in accordance with the Audit Committee's established preapproval policies and procedures.

## Communications with the Audit Committee

Appendix C describes various matters that we are required by generally accepted auditing standards to communicate with the Audit Committee and management.

## Fees

We estimate that our professional fees for this engagement will be $600,000 - $800,000, plus expenses. Based on the anticipated timing of the work, our professional fees will be billed approximately as follows:

| Invoice Date | Amount |
|---|---|
| July 16, 2018 | $500,000 |
| July 30, 2018 | $100,000 - $300,000 |

We anticipate sending invoices according to the above schedule, and payments are due upon receipt of the invoice. Engagement-related expenses and technology- and administrative-related charges will be billed in addition to the professional fees and will be stated separately on the invoices.

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms. Our estimated fees are based on certain assumptions, including (1) timely and accurate completion of the requested entity participation schedules and additional supporting information, (2) no inefficiencies during the audit process or changes in scope caused by events that are beyond our control, (3) the effectiveness of internal control over financial reporting throughout the periods under audit, (4) a minimal level of audit adjustments (recorded or unrecorded), and (5) no changes to the timing or extent of our work plans. We will notify you promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary.

Additional services requested beyond the scope of services described herein would be subject to the mutual agreement of the Company and D&T at such time as D&T is engaged to perform the services.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Company or the Business intends to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with a regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, the Company and the Business each agrees that its management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Company and the Business also each agrees that its management will notify us and obtain our approval prior to including any of our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Company or the Business. Any request by the Company or the Business to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Company, the Business and D&T.

## Other Services

Other services, including tax compliance, planning, and advisory services provided by Deloitte Tax LLP to the Company or Business will be billed separately and such services will be pre-approved by the Audit Committee. When appropriate, the terms and conditions of these other services will be subject to separate engagement letters that will be provided to the Company's and Business' management.

* * * * *

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should the Company or the Audit Committee request, and should D&T agree to provide, services (including audit and review services) beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through F attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

Acknowledged and approved on behalf of
the Audit Committee of Sears Holdings Corporation:

By:   Mr. William C. Kunkler
Title:  Audit Committee Chair, Audit Committee of Sears Holdings Corporation

Date:   7-/2-/18

Accepted and agreed to by Sears Holdings Corporation on behalf of itself and Parts Direct, and Sears Holdings Corporation represents and warrants that it has the power and authority to execute this agreement on behalf of, and to bind, Parts Direct:

By:   Mr. Robert A. Riecker
Title:  Chief Financial Officer of Sears Holdings Corporation

Date: 7/11/18

**APPENDIX A**

# AUDITOR'S RESPONSIBILITIES AND SCOPE OF AN AUDIT IN ACCORDANCE WITH GENERALLY ACCEPTED AUDITING STANDARDS

This Appendix A is part of the engagement letter dated July 9, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Parts Direct and approved by the Audit Committee of Sears Holdings Corporation.

## Auditor's Responsibilities

Our responsibilities under generally accepted auditing standards include forming and expressing an opinion about whether the financial statements that have been prepared by management with the oversight of the Audit Committee are presented fairly, in all material respects, in accordance with generally accepted accounting principles. The audit of the financial statements does not relieve management or the Audit Committee of their responsibilities.

## Scope of an Audit

Generally accepted auditing standards require that we plan and perform the audit to obtain reasonable, rather than absolute, assurance about whether the financial statements as a whole are free from material misstatement, whether caused by fraud or error. However, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with generally accepted auditing standards. We have no responsibility to plan and perform the audit to obtain reasonable assurance that misstatements, whether caused by fraud or error, that are not material to the financial statements as a whole are detected.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the financial statements, whether caused by fraud or error. In making those risk assessments, we consider internal control relevant to the Business' preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of the Business' internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

**APPENDIX B**

# MANAGEMENT'S RESPONSIBILITIES

This Appendix B is part of the engagement letter dated July 9, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Parts Direct and approved by the Audit Committee of Sears Holdings Corporation.

## Financial Statements

Management is responsible for the preparation, fair presentation, and overall accuracy of the financial statements in accordance with generally accepted accounting principles. In this regard, management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Designing, implementing, and maintaining effective internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error

- Identifying and ensuring that the Company and Business comply with the laws and regulations applicable to its activities and informing us of all instances of identified or suspected noncompliance with such laws or regulations

- Providing us with (1) access to all information of which management is aware that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters, (2) additional information that we may request from management for the purpose of our audit, and (3) unrestricted access to personnel within the Company and Business from whom we determine it necessary to obtain audit evidence, or of whom we determine it necessary to make inquiries

## Management's Representations

We will make specific inquiries of the Company's and Business' management about the representations embodied in the financial statements. In addition, we will request that management provide us with the written representations the Company and Business are required to provide to its independent auditors under generally accepted auditing standards. The responses to those inquiries and the written representations of management are part of the evidential matter that D&T will rely on in forming its opinion on the Business' financial statements.

## Process for Obtaining Preapproval of Services

Management is responsible for the coordination of obtaining the preapproval of the Audit Committee, in accordance with the Audit Committee's preapproval process, for any services to be provided by D&T to the Company or the Business.

## Program and Subscription Services

D&T makes available to clients and nonclients various educational and informational programs, seminars, tools, and related services, such as live programs, webcasts (including the Dbriefs webcast series), podcasts, websites, database subscriptions (including some that provide access to D&T proprietary information and tools that offer technical support and advice), checklists, research reports, surveys, published books and other materials, applications, local office seminars, Technical Library, and CXO conferences (collectively, "programs and subscriptions"). D&T may provide these programs and subscriptions free of charge, for a nominal fee, or for a fee at prevailing market rates. In some

instances, D&T may include complimentary rooms or meals as part of programs or seminars. Any programs and subscriptions requested by the Company and the Business and the related fees (if any) would be subject to the mutual agreement of the Company, the Business and D&T and may be described in a separate written agreement. The Company and Business hereby confirm that any use or receipt by the Company or the Business of these programs and subscriptions is approved by the Audit Committee when required by the Audit Committee's established preapproval policies and procedures.

## Independence Matters

In connection with our engagement, D&T, management, and the Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Company is an attest client. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the financial statements, has policies and procedures in place for the purpose of ensuring that neither the Company nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Mr. Berry or Mr. Van Houtte.

In connection with the foregoing paragraph, the Company agrees to furnish to D&T and keep D&T updated with respect to a corporate tree that identifies the legal names of the Company's affiliates, as defined in AICPA *Code of Professional Conduct* Interpretation No. 101-18 (e.g., parents, subsidiaries, investors, or investees) ("Company Affiliates"), together with the ownership relationship among such entities. Such information will be maintained in a database accessible by D&T in connection with their compliance with AICPA or other applicable independence rules.

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the financial statements, also has policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Company for a former or current D&T partner, principal, or professional employee should be discussed with Mr. Berry or Mr. Van Houtte and approved by the Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent position for the Company or the Business or in a comparable position at a significant subsidiary of the Company; (2) on the board of directors of the Company; (3) as a member of the Company's Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For purposes of the preceding sections entitled "Independence Matters"*,* "Process for Obtaining Preapproval of Services," and "Program and Subscription Services,", "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

**APPENDIX C**

## COMMUNICATIONS WITH THE AUDIT COMMITTEE

This Appendix C is part of the engagement letter dated July 9, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Parts Direct and approved by the Audit Committee of Sears Holdings Corporation.

We are responsible for communicating with the Audit Committee significant matters related to the audit that are, in our professional judgment, relevant to the responsibilities of the Audit Committee in overseeing the financial reporting process.

In connection with the foregoing, we will communicate to the Audit Committee any fraud we identify or suspect that involves (1) management, (2) employees of the Company or the Business who have significant roles in internal control, or (3) other employees of the Company or the Business when the fraud results in a material misstatement of the financial statements. In addition, we will communicate with the Audit Committee any other matters related to fraud that are, in our professional judgment, relevant to their responsibilities. We will communicate to management any fraud perpetrated by lower-level employees of which we become aware that does not result in a material misstatement of the financial statements; however, we will not communicate such matters to the Audit Committee, unless otherwise directed by the Audit Committee.

We will also communicate to the Audit Committee matters involving the Company's noncompliance with laws and regulations that have come to our attention during the course of our audit, other than when such matters are clearly inconsequential.

We will also communicate in writing to management and the Audit Committee any significant deficiencies or material weaknesses in internal control (as defined in generally accepted auditing standards) that we have identified during the audit, including those that were remediated during the audit.

Generally accepted auditing standards do not require us to design procedures for the purpose of identifying other matters to communicate with the Audit Committee. However, we will communicate to the Audit Committee matters required by AICPA AU-C 260, *The Auditor's Communication with Those Charged with Governance*.

**APPENDIX D**

# GENERAL BUSINESS TERMS

This Appendix D is part of the engagement letter to which these terms are attached (the engagement letter, including its appendices, the "engagement letter") dated July 9, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Parts Direct and approved by the Audit Committee of Sears Holdings Corporation.

1.  <u>Independent Contractor.</u> D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Company or the Audit Committee.

2.  <u>Survival.</u> The agreements and undertakings of the Company, the Business and the Audit Committee contained in the engagement letter will survive the completion or termination of this engagement.

3.  <u>Assignment and Subcontracting.</u> Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or claims) relating to this engagement without the prior written consent of the other parties. The Company, the Business and the Audit Committee hereby consent to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4.  <u>Severability.</u> If any term of the engagement letter is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

5.  <u>Force Majeure</u>. No party shall be deemed to be in breach of the engagement letter as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6.  <u>Confidentiality</u>. To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Company or the Business, D&T shall not disclose such information to any third party without the Company's or the Business' consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Company, the Business and the Audit Committee hereby consent to D&T disclosing such information (1) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a source that D&T believes is not prohibited from disclosing such information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this paragraph. To the extent that any information obtained by D&T from or on behalf of the Company or its employees in connection with the performance of services under the engagement letter relates to a resident of Massachusetts and constitutes "Personal Information" as defined in 201 CMR 17.02 (as may be amended), D&T shall comply with the obligations of 201 CMR 17.00 et. seq. (as may be amended), entitled "Standards for the Protection of Personal Information of

Residents of the Commonwealth," with respect to such information.

7.   <u>Dispute Resolution.</u> Any controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix E and made a part hereof.

**APPENDIX E**

# DISPUTE RESOLUTION PROVISION

This Appendix E is part of the engagement letter dated July 9, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Parts Direct and approved by the Audit Committee of Sears Holdings Corporation.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

<u>Mediation:</u> All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

<u>Arbitration Procedures:</u> If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of the Company and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

<u>Costs:</u> Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

**APPENDIX F**

This Appendix F is part of the engagement letter dated July 9, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Parts Direct and approved by the Audit Committee of Sears Holdings Corporation.

# POTENTIAL BUYER AGREEMENT

Deloitte & Touche LLP ("D&T" or "we" or "us") understands that *[insert name of Potential Buyer]* (the "Potential Buyer") is considering entering into a transaction with Sears Holdings Corporation (the "Company") relating to Parts Direct (the "Business"), which is an operating component of the Company (the "potential transaction").

This Potential Buyer Agreement (the "Agreement") sets forth the acknowledgments and agreements of the Potential Buyer to conditions relating to the receipt and distribution of the independent auditor's report of D&T ("D&T's report") on the Business' balance sheets as of February 3, 2018, January 28, 2017, and January 30, 2016, and the related statements of income, cash flows and divisional equity for the years then ended (the "financial statements").

The financial statements are the responsibility and representations of management of the Company and the Business. We have conducted our audit of the financial statements of the Business in accordance with auditing standards generally accepted in the United States of America ("generally accepted auditing standards"), the objective of which is to form an opinion as to whether the financial statements are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States of America. Generally accepted auditing standards require that we plan and perform our audit to obtain reasonable assurance that the financial statements are free of material misstatement. Because an audit incorporates the concept of selective testing of data, which is judgmental both as to the selection of accounts and the number of transactions to be tested, our audit of the financial statements is subject to the inherent risk that material misstatements which may exist will not be detected. Further, the audit does not address the possibility that material misstatements may occur in the future.

With respect to the conduct of the audit and reporting the results thereof, materiality was evaluated and determined in the context of the financial statements taken as a whole; consequently, matters may exist or have existed that would be assessed differently by the Potential Buyer. In addition, we have not audited any subsequent financial statements of the Business and significant subsequent events may have occurred.

Neither an audit of the financial statements nor access to D&T's report thereon is a substitute for a party's own due diligence investigation, nor are they intended or designed to do so. Likewise, an audit does not comprehend all matters pertinent or necessary to a party's evaluation of a potential transaction, and we make no representation as to the sufficiency or appropriateness for your purposes of our audit or of D&T's report.

D&T is not, by means of permitting the Potential Buyer to have access to D&T's report, rendering accounting, financial, investment, legal, tax, or other professional advice or services to, or acting as a fiduciary, agent, or in any other capacity with respect to, the Potential Buyer. Access to D&T's report is not a substitute for such professional advice or services, and D&T's audit was not, and is not, intended for the benefit of the Potential Buyer. The Potential Buyer acknowledges that it has its own counsel and advisors in connection with any transactions into which it may enter relating to the Business.

The Potential Buyer agrees that D&T's report will not be included, incorporated by reference, or referred to in any public filings with the Securities and Exchange Commission by or on behalf of the Potential Buyer without D&T's prior written consent.

If the Potential Buyer, or those acting on its behalf, intends to publish or otherwise reproduce in any document D&T's report, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with a regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T

with such document, the Potential Buyer agrees that its management will provide D&T with a draft of the document to read and obtain D&T's approval for the inclusion or incorporation by reference of D&T's report, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of D&T's report in any such document would constitute the reissuance of D&T's report. The Potential Buyer also agrees that its management will notify D&T and obtain D&T's approval prior to including D&T's report on an electronic site.

D&T's engagement with the Company to perform the services described in the engagement letter, dated July 9, 2018, between D&T and the Company (the "Engagement Letter"), does not constitute D&T's agreement to be associated with any such documents published or reproduced by or on behalf of the Potential Buyer. Any request by the Potential Buyer for D&T to reissue D&T's report, to consent to its inclusion or incorporation by reference in an offering or other document, or to agree to its inclusion on an electronic site will be considered by D&T based on the facts and circumstances existing at the time of such request.

## OTHER

This Agreement constitutes the entire agreement with respect to its subject matter, and supersedes all other oral or written representations, understandings, or agreements relating to such subject matter, and may not be amended except by written agreement signed by the Potential Buyer and D&T.

THE POTENTIAL BUYER AND D&T IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

This Agreement and all matters relating hereto shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof) and the state and federal courts of New York shall have exclusive jurisdiction over all matters relating to this Agreement. Each of the provisions of this agreement will apply to the fullest extent of the law, whether in contract, statute, tort (such as negligence), or otherwise.

Accepted and agreed to by [*insert name of Potential Buyer*]:

By: _____

Title: _____

Date: _____

**<u>Exhibit 5</u>**

**Kenmore Audit Engagement Letters**

WEIL:\96792963\4\73217.0004

# Deloitte.

**Deloitte & Touche LLP**

111 S. Wacker Drive
Chicago, IL 60606-4301
USA

Tel: +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

June 19, 2018

Mr. William C. Kunkler
Audit Committee Chair
Audit Committee of Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Mr. Robert A. Riecker
Chief Financial Officer
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Dear Mr. Kunkler and Mr. Riecker:

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as independent auditors for
Kenmore (the "Business"), which is a wholly-owned operating unit of Sears Holdings Corporation (the
"Company"). Mr. Jim Berry and Mr. Brian Mallaro will be responsible for the services that we perform
for the Company hereunder.

In addition to the audit services we are engaged to provide under this engagement letter, we would
also be pleased to assist the Business and the Company on issues as they arise throughout the year.
Hence, we hope that you will call Mr. Berry or Mr. Maloney whenever you believe D&T can be of
assistance. This assistance will require approval by the Audit Committee of the Company, ("the Audit
Committee"), of which the Business is a wholly-owned operating unit, in accordance with its
preapproval policies and procedures.

The services to be performed by D&T pursuant to this engagement are subject to the terms and
conditions set forth herein and in the accompanying appendices. Such terms and conditions shall be
effective as of the date of the commencement of such services.

## Potential Transaction and Report Distribution

We understand that the Company is considering entering into a transaction with a potential buyer
("Potential Buyer") relating to the Business (the "potential transaction"). The Company and the
Business each agrees that the independent auditors' report of D&T to be issued on the Business'
financial statements ("D&T's report") will not be included, incorporated by reference, or referred to in
any public filings with the Securities and Exchange Commission without D&T's prior written consent.
The Company and the Business also each agrees that they will provide a copy of this engagement
letter to Potential Buyer for Potential Buyer's information. The Company and the Business also each
agrees that, before Potential Buyer will be permitted to obtain or read a copy of D&T's report, the
Company and the Business will obtain from Potential Buyer for our benefit and will provide to us
Potential Buyer's written agreement (in the form appended to this engagement letter as Appendix F,
"Potential Buyer Agreement") regarding the use and distribution of D&T's report.

## Audits of Financial Statements

Our engagement is to perform audits in accordance with auditing standards generally accepted in the
United States of America ("generally accepted auditing standards"). The objective of an audit
conducted in accordance with generally accepted auditing standards is to express an opinion on
whether the Business' financial statements as of and for the years ended January 28, 2017 and
February 3, 2018, are presented fairly, in all material respects, in accordance with accounting

principles generally accepted in the United States of America ("generally accepted accounting principles").

Appendix A contains a description of the auditor's responsibilities and the scope of an audit in accordance with generally accepted auditing standards.

With respect to the conduct of the audits and reporting the results thereof, materiality will be evaluated and determined in the context of the financial statements taken as a whole; consequently, matters may exist or have existed that would be assessed differently by the Company, the Business, or Potential Buyer.

An audit cannot be a substitute for a party's own due diligence investigation, nor is it intended or designed to do so. Likewise, an audit does not comprehend all matters pertinent or necessary to a party's evaluation of a potential transaction, and we make no representation as to the sufficiency of the audits for the Company's, the Business', or Potential Buyer's purposes in connection with the potential transaction.

## D&T Reports

We expect to issue a written report upon the completion of our audits. Our ability to express an opinion or to issue any report as a result of this engagement and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our report. If, for any reason, we are unable to complete our audits or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue any report as a result of this engagement. If we are unable to complete our audits, or if any report to be issued by D&T as a result of this engagement requires modification, the reasons for this will be discussed with the Audit Committee and the Company's and the Business' management.

## Management's Responsibilities

Appendix B describes management's responsibilities.

## Responsibility of the Audit Committee

As independent auditors of the Company, we acknowledge that the Audit Committee is directly responsible for the appointment, compensation, and oversight of our work, and accordingly, except as otherwise specifically noted, we will report directly to the Audit Committee. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities have been approved by the Audit Committee in accordance with the Audit Committee's established preapproval policies and procedures.

## Communications with the Audit Committee

Appendix C describes various matters that we are required by generally accepted auditing standards to communicate with the Audit Committee and management.

## Fees

We estimate that our fees for this engagement will be $400,000 - $500,000, plus expenses. Based on the anticipated timing of the work, our fees will be billed approximately as follows:

| Invoice Date | Amount |
|---|---|
| June 22, 2018 | $300,000 |
| July 15, 2018 | $100,000-200,000 |

We anticipate sending invoices according to the above schedule, and payments are due upon receipt of the invoice. Engagement-related expenses and technology- and administrative-related charges will be billed in addition to the professional fees and will be stated separately on the invoices.

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms. Our estimated fees are based on certain assumptions, including (1) timely and accurate completion of the requested entity participation schedules and additional supporting information, (2) no inefficiencies during the audit process or changes in scope caused by events that are beyond our control, (3) the effectiveness of internal control over financial reporting throughout the period under audit, (4) a minimal level of audit adjustments (recorded or unrecorded), and (5) no changes to the timing or extent of our work plans.

We will notify you promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary.

Additional services requested beyond the scope of services described herein would be subject to the mutual agreement of the Company and D&T at such time as D&T is engaged to perform the services.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Company or the Business intends to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with a regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, the Company and the Business each agrees that their management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Company and the Business also each agrees that their management will notify us and obtain our approval prior to including any of our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Company or the Business. Any request by the Company or the Business to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Company or the Business and D&T.

## Other Services

Other services, including tax compliance, planning, and advisory services provided by Deloitte Tax LLP to the Company will be billed separately and such services will be pre-approved by the Audit Committee. When appropriate, the terms and conditions of these other services will be subject to separate engagement letters that will be provided to the Company's management.

* * * * *

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should the Company or the Audit Committee request, and should D&T agree to provide, services (including audit services) beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through F attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

Acknowledged and approved on behalf of
The Audit Committee of Sears Holdings Corporation:

By:    Mr. William C. Kunkler

Title: Audit Chair, Audit Committee of Sears Holdings Corporation

Date: _____6/22/18_____

Accepted and agreed to by Sears Holdings Corporation on behalf of itself and Kenmore, and Sears Holdings Corporation represents and warrants that it has the power and authority to execute this agreement on behalf of, and to bind, Kenmore:

By:    Mr. Robert A. Riecker

Title: Chief Financial Officer of Sears Holdings Corporation

Date: 6/20/18

**APPENDIX A**

# AUDITOR'S RESPONSIBILITIES AND SCOPE OF AN AUDIT IN ACCORDANCE WITH GENERALLY ACCEPTED AUDITING STANDARDS

This Appendix A is part of the engagement letter dated June 19, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Kenmore and acknowledged and approved by the Audit Committee of Sears Holdings Corporation.

## Auditor's Responsibilities

Our responsibilities under generally accepted auditing standards include forming and expressing an opinion about whether the financial statements that have been prepared by management with the oversight of the Audit Committee are presented fairly, in all material respects, in accordance with generally accepted accounting principles. The audits of the financial statements does not relieve management or the Audit Committee of their responsibilities.

## Scope of an Audit

Generally accepted auditing standards require that we plan and perform the audits to obtain reasonable, rather than absolute, assurance about whether the financial statements as a whole are free from material misstatement, whether caused by fraud or error. However, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with generally accepted auditing standards. We have no responsibility to plan and perform the audits to obtain reasonable assurance that misstatements, whether caused by fraud or error, that are not material to the financial statements as a whole are detected.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the financial statements, whether caused by fraud or error. In making those risk assessments, we consider internal control relevant to the Business' preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of the Business' internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

**APPENDIX B**

## MANAGEMENT'S RESPONSIBILITIES

This Appendix B is part of the engagement letter dated June 19, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Kenmore and acknowledged and approved by the Audit Committee of Sears Holdings Corporation.

### Financial Statements

Management is responsible for the preparation, fair presentation, and overall accuracy of the financial statements in accordance with generally accepted accounting principles. In this regard, management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Designing, implementing, and maintaining effective internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error

- Identifying and ensuring that the Business and Company comply with the laws and regulations applicable to its activities and informing us of all instances of identified or suspected noncompliance with such laws or regulations

- Providing us with (1) access to all information of which management is aware that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters, (2) additional information that we may request from management for the purpose of our audits, and (3) unrestricted access to personnel within the Business or Company from whom we determine it necessary to obtain audit evidence

### Management's Representations

We will make specific inquiries of the Business' and the Company's management about the representations embodied in the financial statements. In addition, we will request that management provide us with the written representations the Business and the Company are required to provide to its independent auditors under generally accepted auditing standards. The responses to those inquiries and the written representations of management are part of the evidential matter that D&T will rely on in forming its opinion on the Business' financial statements.

### Process for Obtaining Preapproval of Services

Management is responsible for the coordination of obtaining the preapproval of the Audit Committee, in accordance with the Audit Committee's preapproval process, for any services to be provided by D&T to the Company or the Business.

### Program and Subscription Services

D&T makes available to clients and nonclients various educational and informational programs, seminars, tools, and related services, such as live programs, webcasts (including the Dbriefs webcast series), podcasts, websites, database subscriptions (including some that provide access to D&T proprietary information and tools that offer technical support and advice), checklists, research reports, surveys, published books and other materials, applications, local office seminars, Technical Library, and CXO conferences (collectively, "programs and subscriptions"). D&T may provide these programs and subscriptions free of charge, for a nominal fee, or for a fee at prevailing market rates. In some

instances, D&T may include complimentary rooms or meals as part of programs or seminars. Any programs and subscriptions requested by the Business or the Company and the related fees (if any) would be subject to the mutual agreement of the Company, Business and D&T and may be described in a separate written agreement. The Company and the Business hereby confirm that any use or receipt by the Company or the Business of these programs and subscriptions is approved by the Audit Committee when required by the Audit Committee's established preapproval policies and procedures.

## Independence Matters

In connection with our engagement, D&T, management, and the Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Company and the Business are attest clients. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the financial statements, has policies and procedures in place for the purpose of ensuring that neither the Company nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Mr. Mallaro.

In connection with the foregoing paragraph, the Company agrees to furnish to D&T and keep D&T updated with respect to a corporate tree that identifies the legal names of the Company's affiliates, as defined in AICPA *Code of Professional Conduct* Interpretation No. 101-18 (e.g., parents, subsidiaries, investors, or investees) ("Company Affiliates"), together with the ownership relationship among such entities. Such information will be maintained in a database accessible by D&T in connection with their compliance with AICPA or other applicable independence rules.

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the financial statements, also has policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Company for a former or current D&T partner, principal, or professional employee should be discussed with Mr. Mallaro and approved by the Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent position for the Company or in a comparable position at a significant subsidiary of the Company; (2) on the board of directors of the Company; (3) as a member of the Company's Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For purposes of the preceding sections entitled "Independence Matters", "Process for Obtaining Preapproval of Services," and "Program and Subscription Services,", "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

## COMMUNICATIONS WITH THE AUDIT COMMITTEE

This Appendix C is part of the engagement letter dated June 19, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Kenmore and acknowledged and approved by the Audit Committee of Sears Holdings Corporation.

We are responsible for communicating with the Audit Committee significant matters related to the audits that are, in our professional judgment, relevant to the responsibilities of the Audit Committee in overseeing the financial reporting process.

In connection with the foregoing, we will communicate to the Audit Committee any fraud we identify or suspect that involves (1) management, (2) employees of the Company or the Business who have significant roles in internal control, or (3) other employees of the Company or the Business when the fraud results in a material misstatement of the financial statements. In addition, we will communicate with the Audit Committee any other matters related to fraud that are, in our professional judgment, relevant to their responsibilities. We will communicate to management any fraud perpetrated by lower-level employees of which we become aware that does not result in a material misstatement of the financial statements; however, we will not communicate such matters to the Audit Committee, unless otherwise directed by the Audit Committee.

We will also communicate to the Audit Committee matters involving the Business' noncompliance with laws and regulations that have come to our attention during the course of our audits, other than when such matters are clearly inconsequential.

We will also communicate in writing to management and the Audit Committee any significant deficiencies or material weaknesses in internal control (as defined in generally accepted auditing standards) that we have identified during the audits, including those that were remediated during the audits.

Generally accepted auditing standards do not require us to design procedures for the purpose of identifying other matters to communicate with the Audit Committee. However, we will communicate to the Audit Committee matters required by AICPA AU-C 260, *The Auditor's Communication with Those Charged with Governance*.

**APPENDIX D**

# GENERAL BUSINESS TERMS

This Appendix D is part of the engagement letter to which these terms are attached (the engagement letter, including its appendices, the "engagement letter") dated June 19, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Kenmore and acknowledged and approved by the Audit Committee of Sears Holdings Corporation.

1.  <u>Independent Contractor.</u> D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Company or the Audit Committee.

2.  <u>Survival.</u> The agreements and undertakings of the Company, the Business and the Audit Committee contained in the engagement letter will survive the completion or termination of this engagement.

3.  <u>Assignment and Subcontracting.</u> Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or claims) relating to this engagement without the prior written consent of the other parties. The Company, the Business and the Audit Committee hereby consent to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4.  <u>Severability.</u> If any term of the engagement letter is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

5.  <u>Force Majeure</u>. No party shall be deemed to be in breach of the engagement letter as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6.  <u>Confidentiality</u>. To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Company or the Business, D&T shall not disclose such information to any third party without the Company's or the Business' consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Company, the Business and the Audit Committee hereby consent to D&T disclosing such information (1) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a source that D&T believes is not prohibited from disclosing such information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this paragraph. To the extent that any information obtained by D&T from or on behalf of the Company or its employees in connection with the performance of services under the engagement letter relates to a resident of Massachusetts and constitutes "Personal Information" as defined in 201 CMR 17.02 (as may be amended), D&T shall comply with the obligations of 201 CMR 17.00 et. seq. (as may be amended), entitled "Standards for the Protection of Personal Information of

Residents of the Commonwealth," with respect to such information.

7.  <u>Dispute Resolution.</u> Any controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix E and made a part hereof.

**APPENDIX E**

# DISPUTE RESOLUTION PROVISION

This Appendix E is part of the engagement letter dated June 19, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Kenmore and acknowledged and approved by the Audit Committee of Sears Holdings Corporation.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

<u>Mediation:</u> All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

<u>Arbitration Procedures:</u> If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of the Company and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

<u>Costs:</u> Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

# APPENDIX F

This Appendix F is part of the engagement letter dated June 19, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and approved by the Audit Committee of Sears Holdings Corporation.

## POTENTIAL BUYER AGREEMENT

Deloitte & Touche LLP ("D&T" or "we" or "us") understands that [insert name of Potential Buyer] (the "Potential Buyer") is considering entering into a transaction with Sears Holdings Corporation (the "Company") relating to Kenmore (the "Business"), which is an operating unit of the Company (the "potential transaction").

This Potential Buyer Agreement (the "Agreement") sets forth the acknowledgments and agreements of the Potential Buyer to conditions relating to the receipt and distribution of the independent auditor's report of D&T ("D&T's report") on the Business' balance sheets as of January 28, 2017 and February 3, 2018, and the related statements of income, cash flows and divisional equity for the years then ended (the "financial statements").

The financial statements are the responsibility and representations of management of the Company and the Business. We have conducted our audits of the financial statements of the Business in accordance with auditing standards generally accepted in the United States of America ("generally accepted auditing standards"), the objective of which is to form an opinion as to whether the financial statements are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States of America. Generally accepted auditing standards require that we plan and perform our audits to obtain reasonable assurance that the financial statements are free of material misstatement. Because an audit incorporates the concept of selective testing of data, which is judgmental both as to the selection of accounts and the number of transactions to be tested, our audits of the financial statements is subject to the inherent risk that material misstatements which may exist will not be detected. Further, the audit does not address the possibility that material misstatements may occur in the future.

With respect to the conduct of the audits and reporting the results thereof, materiality was evaluated and determined in the context of the financial statements taken as a whole; consequently, matters may exist or have existed that would be assessed differently by the Potential Buyer. In addition, we have not audited any subsequent financial statements of the Business and significant subsequent events may have occurred.

Neither an audit of the financial statements nor access to D&T's report thereon is a substitute for a party's own due diligence investigation, nor are they intended or designed to do so. Likewise, an audit does not comprehend all matters pertinent or necessary to a party's evaluation of a potential transaction, and we make no representation as to the sufficiency or appropriateness for your purposes of our audits or of D&T's report.

D&T is not, by means of permitting the Potential Buyer to have access to D&T's report, rendering accounting, financial, investment, legal, tax, or other professional advice or services to, or acting as a fiduciary, agent, or in any other capacity with respect to, the Potential Buyer. Access to D&T's report is not a substitute for such professional advice or services, and D&T's audit is not, and is not, intended for the benefit of the Potential Buyer. The Potential Buyer acknowledges that it has its own counsel and advisors in connection with any transactions into which it may enter relating to the Business.

The Potential Buyer agrees that D&T's report will not be included, incorporated by reference, or referred to in any public filings with the Securities and Exchange Commission by or on behalf of the Potential Buyer without D&T's prior written consent.

If the Potential Buyer, or those acting on its behalf, intends to publish or otherwise reproduce in any document D&T's report, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with a regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, the Potential Buyer agrees that its management will provide D&T with a draft of

the document to read and obtain D&T's approval for the inclusion or incorporation by reference of D&T's report, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of D&T's report in any such document would constitute the reissuance of D&T's report. The Potential Buyer also agrees that its management will notify D&T and obtain D&T's approval prior to including D&T's report on an electronic site.

D&T's engagement with the Company to perform the services described in the engagement letter, dated June 19, 2018, between D&T and the Company (the "Engagement Letter"), does not constitute D&T's agreement to be associated with any such documents published or reproduced by or on behalf of the Potential Buyer. Any request by the Potential Buyer for D&T to reissue D&T's report, to consent to its inclusion or incorporation by reference in an offering or other document, or to agree to its inclusion on an electronic site will be considered by D&T based on the facts and circumstances existing at the time of such request.

OTHER

This Agreement constitutes the entire agreement with respect to its subject matter, and supersedes all other oral or written representations, understandings, or agreements relating to such subject matter, and may not be amended except by written agreement signed by the Potential Buyer and D&T.

THE POTENTIAL BUYER AND D&T IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

This Agreement and all matters relating hereto shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof) and the state and federal courts of New York shall have exclusive jurisdiction over all matters relating to this Agreement. Each of the provisions of this agreement will apply to the fullest extent of the law, whether in contract, statute, tort (such as negligence), or otherwise.

Accepted and agreed to by [*insert name of Potential Buyer*]:

By: _____

Title: _____

Date: _____

# Deloitte.

**Deloitte & Touche LLP**

111 S. Wacker Drive
Chicago, IL 60606-4301
USA

Tel: +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

August 9, 2018

Mr. William C. Kunkler
Audit Committee Chair
Audit Committee of Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Mr. Robert A. Riecker
Chief Financial Officer
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Dear Mr. Kunkler and Mr. Riecker:

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as independent auditors for
Kenmore Direct (the "Business"), which is a wholly-owned operating component of Sears Holdings
Corporation (the "Company"). Mr. Jim Berry and Mr. Brian Mallaro will be responsible for the services
that we perform for the Company hereunder.

In addition to the audit services we are engaged to provide under this engagement letter, we would
also be pleased to assist the Business and the Company on issues as they arise throughout the year.
Hence, we hope that you will call Mr. Berry or Mr. Mallaro whenever you believe D&T can be of
assistance. This assistance will require approval by the Audit Committee of the Company of which the
Business is a wholly-owned operating component of (the "Audit Committee"), in accordance with its
preapproval policies and procedures.

The services to be performed by D&T pursuant to this engagement are subject to the terms and
conditions set forth herein and in the accompanying appendices. Such terms and conditions shall be
effective as of the date of the commencement of such services.

## Potential Transaction and Report Distribution

We understand that the Company is considering entering into a transaction with a potential buyer
("Potential Buyer") relating to the Business (the "potential transaction"). The Company and the
Business each agrees that the independent auditors' report of D&T to be issued on the Business'
financial statements ("D&T's report") will not be included, incorporated by reference, or referred to in
any public filings with the Securities and Exchange Commission without D&T's prior written consent.
The Company and the Business also each agrees that they will provide a copy of this engagement
letter to Potential Buyer for Potential Buyer's information. The Company and the Business also each
agrees that, before Potential Buyer will be permitted to obtain or read a copy of D&T's report, the
Company and the Business will obtain from Potential Buyer for our benefit and will provide to us
Potential Buyer's written agreement (in the form appended to this engagement letter as Appendix F,
"Potential Buyer Agreement") regarding the use and distribution of D&T's report.

## Audit of Financial Statements

Our engagement is to perform an audit in accordance with auditing standards generally accepted in
the United States of America ("generally accepted auditing standards"). The objective of an audit
conducted in accordance with generally accepted auditing standards is to express an opinion on
whether the Business' financial statements as of and for the years ended January 30, 2016, January
28, 2017 and February 3, 2018, are presented fairly, in all material respects, in accordance with
accounting principles generally accepted in the United States of America ("generally accepted
accounting principles").

Appendix A contains a description of the auditor's responsibilities and the scope of an audit in accordance with generally accepted auditing standards.

With respect to the conduct of the audit and reporting the results thereof, materiality will be evaluated and determined in the context of the financial statements taken as a whole; consequently, matters may exist or have existed that would be assessed differently by the Company, the Business, or Potential Buyer.

An audit cannot be a substitute for a party's own due diligence investigation, nor is it intended or designed to do so. Likewise, an audit does not comprehend all matters pertinent or necessary to a party's evaluation of a potential transaction, and we make no representation as to the sufficiency of the audits for the Company's, the Business', or Potential Buyer's purposes in connection with the potential transaction.

## D&T Reports

We expect to issue a written report upon the completion of our audit. Our ability to express an opinion or to issue any report as a result of this engagement and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our report. If, for any reason, we are unable to complete our audit or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue any report as a result of this engagement. If we are unable to complete our audit, or if any report to be issued by D&T as a result of this engagement requires modification, the reasons for this will be discussed with the Audit Committee and the Company's and Business' management.

## Management's Responsibilities

Appendix B describes management's responsibilities.

## Responsibility of the Audit Committee

As independent auditors of the Business, we acknowledge that the Audit Committee is directly responsible for the appointment, compensation, and oversight of our work, and accordingly, except as otherwise specifically noted, we will report directly to the Audit Committee. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Audit Committee in accordance with the Audit Committee's established preapproval policies and procedures.

## Communications with the Audit Committee

Appendix C describes various matters that we are required by generally accepted auditing standards to communicate with the Audit Committee and management.

## Fees

We estimate that our professional fees for this engagement will be $600,000 - $800,000, plus expenses. Based on the anticipated timing of the work, our professional fees will be billed approximately as follows:

| Invoice Date | Amount |
|---|---|
| August 13, 2018 | $500,000 |
| August 27, 2018 | $100,000 - $300,000 |

We anticipate sending invoices according to the above schedule, and payments are due upon receipt of the invoice. Engagement-related expenses and technology- and administrative-related charges will be billed in addition to the professional fees and will be stated separately on the invoices.

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms. Our estimated fees are based on certain assumptions, including (1) timely and accurate completion of the requested entity participation schedules and additional supporting information, (2) no inefficiencies during the audit process or changes in scope caused by events that are beyond our control, (3) the effectiveness of internal control over financial reporting throughout the periods under audit, (4) a minimal level of audit adjustments (recorded or unrecorded), and (5) no changes to the timing or extent of our work plans. We will notify you promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary.

Additional services requested beyond the scope of services described herein would be subject to the mutual agreement of the Company and D&T at such time as D&T is engaged to perform the services.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Company or the Business intends to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with a regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, the Company and the Business each agrees that its management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Company and the Business also each agrees that its management will notify us and obtain our approval prior to including any of our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Company or the Business. Any request by the Company or the Business to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Company, the Business and D&T.

## Other Services

Other services, including tax compliance, planning, and advisory services provided by Deloitte Tax LLP to the Company or Business will be billed separately and such services will be pre-approved by the Audit Committee. When appropriate, the terms and conditions of these other services will be subject to separate engagement letters that will be provided to the Company's and Business' management.

* * * * *

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should the Company or the Audit Committee request, and should D&T agree to provide, services (including audit and review services) beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through F attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

Acknowledged and approved on behalf of
the Audit Committee of Sears Holdings Corporation:

By:   Mr. William C. Kunkler

Title: Audit Chair, Audit Committee of Sears Holdings Corporation

Date: _____8/13/18_____

Accepted and agreed to by Sears Holdings Corporation on behalf of itself and Kenmore Direct, and Sears Holdings Corporation represents and warrants that it has the power and authority to execute this agreement on behalf of, and to bind, Kenmore Direct:

By:   Mr. Robert A. Riecker

Title: Chief Financial Officer of Sears Holdings Corporation

Date: __08/09/18_____

**APPENDIX A**

# AUDITOR'S RESPONSIBILITIES AND SCOPE OF AN AUDIT IN ACCORDANCE WITH GENERALLY ACCEPTED AUDITING STANDARDS

This Appendix A is part of the engagement letter dated August 9, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Kenmore Direct and approved by the Audit Committee of Sears Holdings Corporation.

## Auditor's Responsibilities

Our responsibilities under generally accepted auditing standards include forming and expressing an opinion about whether the financial statements that have been prepared by management with the oversight of the Audit Committee are presented fairly, in all material respects, in accordance with generally accepted accounting principles. The audit of the financial statements does not relieve management or the Audit Committee of their responsibilities.

## Scope of an Audit

Generally accepted auditing standards require that we plan and perform the audit to obtain reasonable, rather than absolute, assurance about whether the financial statements as a whole are free from material misstatement, whether caused by fraud or error. However, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with generally accepted auditing standards. We have no responsibility to plan and perform the audit to obtain reasonable assurance that misstatements, whether caused by fraud or error, that are not material to the financial statements as a whole are detected.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the financial statements, whether caused by fraud or error. In making those risk assessments, we consider internal control relevant to the Business' preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of the Business' internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

**APPENDIX B**

# MANAGEMENT'S RESPONSIBILITIES

This Appendix B is part of the engagement letter dated August 9, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Kenmore Direct and approved by the Audit Committee of Sears Holdings Corporation.

## Financial Statements

Management is responsible for the preparation, fair presentation, and overall accuracy of the financial statements in accordance with generally accepted accounting principles. In this regard, management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Designing, implementing, and maintaining effective internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error

- Identifying and ensuring that the Company and Business comply with the laws and regulations applicable to its activities and informing us of all instances of identified or suspected noncompliance with such laws or regulations

- Providing us with (1) access to all information of which management is aware that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters, (2) additional information that we may request from management for the purpose of our audit, and (3) unrestricted access to personnel within the Company and Business from whom we determine it necessary to obtain audit evidence, or of whom we determine it necessary to make inquiries

### Management's Representations

We will make specific inquiries of the Company's and Business' management about the representations embodied in the financial statements. In addition, we will request that management provide us with the written representations the Company and Business are required to provide to its independent auditors under generally accepted auditing standards. The responses to those inquiries and the written representations of management are part of the evidential matter that D&T will rely on in forming its opinion on the Business' financial statements.

### Process for Obtaining Preapproval of Services

Management is responsible for the coordination of obtaining the preapproval of the Audit Committee, in accordance with the Audit Committee's preapproval process, for any services to be provided by D&T to the Company or the Business.

### Program and Subscription Services

D&T makes available to clients and nonclients various educational and informational programs, seminars, tools, and related services, such as live programs, webcasts (including the Dbriefs webcast series), podcasts, websites, database subscriptions (including some that provide access to D&T proprietary information and tools that offer technical support and advice), checklists, research reports, surveys, published books and other materials, applications, local office seminars, Technical Library, and CXO conferences (collectively, "programs and subscriptions"). D&T may provide these programs and subscriptions free of charge, for a nominal fee, or for a fee at prevailing market rates. In some

instances, D&T may include complimentary rooms or meals as part of programs or seminars. Any programs and subscriptions requested by the Company and the Business and the related fees (if any) would be subject to the mutual agreement of the Company, the Business and D&T and may be described in a separate written agreement. The Company and Business hereby confirm that any use or receipt by the Company or the Business of these programs and subscriptions is approved by the Audit Committee when required by the Audit Committee's established preapproval policies and procedures.

## Independence Matters

In connection with our engagement, D&T, management, and the Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Company is an attest client. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the financial statements, has policies and procedures in place for the purpose of ensuring that neither the Company nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Mr. Berry or Mr. Van Houtte.

In connection with the foregoing paragraph, the Company agrees to furnish to D&T and keep D&T updated with respect to a corporate tree that identifies the legal names of the Company's affiliates, as defined in AICPA *Code of Professional Conduct* Interpretation No. 101-18 (e.g., parents, subsidiaries, investors, or investees) ("Company Affiliates"), together with the ownership relationship among such entities. Such information will be maintained in a database accessible by D&T in connection with their compliance with AICPA or other applicable independence rules.

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the financial statements, also has policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Company for a former or current D&T partner, principal, or professional employee should be discussed with Mr. Berry or Mr. Van Houtte and approved by the Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent position for the Company or the Business or in a comparable position at a significant subsidiary of the Company; (2) on the board of directors of the Company; (3) as a member of the Company's Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For purposes of the preceding sections entitled "Independence Matters", "Process for Obtaining Preapproval of Services," and "Program and Subscription Services,", "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

**APPENDIX C**

## COMMUNICATIONS WITH THE AUDIT COMMITTEE

This Appendix C is part of the engagement letter dated August 9, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Kenmore Direct and approved by the Audit Committee of Sears Holdings Corporation.

We are responsible for communicating with the Audit Committee significant matters related to the audit that are, in our professional judgment, relevant to the responsibilities of the Audit Committee in overseeing the financial reporting process.

In connection with the foregoing, we will communicate to the Audit Committee any fraud we identify or suspect that involves (1) management, (2) employees of the Company or the Business who have significant roles in internal control, or (3) other employees of the Company or the Business when the fraud results in a material misstatement of the financial statements. In addition, we will communicate with the Audit Committee any other matters related to fraud that are, in our professional judgment, relevant to their responsibilities. We will communicate to management any fraud perpetrated by lower-level employees of which we become aware that does not result in a material misstatement of the financial statements; however, we will not communicate such matters to the Audit Committee, unless otherwise directed by the Audit Committee.

We will also communicate to the Audit Committee matters involving the Company's noncompliance with laws and regulations that have come to our attention during the course of our audit, other than when such matters are clearly inconsequential.

We will also communicate in writing to management and the Audit Committee any significant deficiencies or material weaknesses in internal control (as defined in generally accepted auditing standards) that we have identified during the audit, including those that were remediated during the audit.

Generally accepted auditing standards do not require us to design procedures for the purpose of identifying other matters to communicate with the Audit Committee. However, we will communicate to the Audit Committee matters required by AICPA AU-C 260, *The Auditor's Communication with Those Charged with Governance*.

**APPENDIX D**

# GENERAL BUSINESS TERMS

This Appendix D is part of the engagement letter to which these terms are attached (the engagement letter, including its appendices, the "engagement letter") dated August 9, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Kenmore Direct and approved by the Audit Committee of Sears Holdings Corporation.

1.  Independent Contractor. D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Company or the Audit Committee.

2.  Survival. The agreements and undertakings of the Company, the Business and the Audit Committee contained in the engagement letter will survive the completion or termination of this engagement.

3.  Assignment and Subcontracting. Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or claims) relating to this engagement without the prior written consent of the other parties. The Company, the Business and the Audit Committee hereby consent to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4.  Severability. If any term of the engagement letter is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

5.  Force Majeure. No party shall be deemed to be in breach of the engagement letter as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6.  Confidentiality. To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Company or the Business, D&T shall not disclose such information to any third party without the Company's or the Business' consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Company, the Business and the Audit Committee hereby consent to D&T disclosing such information (1) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a source that D&T believes is not prohibited from disclosing such information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this paragraph. To the extent that any information obtained by D&T from or on behalf of the Company or its employees in connection with the performance of services under the engagement letter relates to a resident of Massachusetts and constitutes "Personal Information" as defined in 201 CMR 17.02 (as may be amended), D&T shall comply with the obligations of 201 CMR 17.00 et. seq. (as may be amended), entitled "Standards for the Protection of Personal Information of

Residents of the Commonwealth," with respect to such information.

7. <u>Dispute Resolution.</u> Any controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix E and made a part hereof.

**APPENDIX E**

# DISPUTE RESOLUTION PROVISION

This Appendix E is part of the engagement letter dated August 9, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Kenmore Direct and approved by the Audit Committee of Sears Holdings Corporation.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

<u>Mediation:</u> All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

<u>Arbitration Procedures:</u> If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of the Company and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

<u>Costs:</u> Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

# APPENDIX F

This Appendix F is part of the engagement letter dated August 8, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and Kenmore Direct and approved by the Audit Committee of Sears Holdings Corporation.

# POTENTIAL BUYER AGREEMENT

Deloitte & Touche LLP ("D&T" or "we" or "us") understands that *[insert name of Potential Buyer]* (the "Potential Buyer") is considering entering into a transaction with Sears Holdings Corporation (the "Company") relating to Kenmore Direct (the "Business"), which is an operating component of the Company (the "potential transaction").

This Potential Buyer Agreement (the "Agreement") sets forth the acknowledgments and agreements of the Potential Buyer to conditions relating to the receipt and distribution of the independent auditor's report of D&T ("D&T's report") on the Business' balance sheets as of February 3, 2018, January 28, 2017, and January 30, 2016, and the related statements of income, cash flows and divisional equity for the years then ended (the "financial statements").

The financial statements are the responsibility and representations of management of the Company and the Business. We have conducted our audit of the financial statements of the Business in accordance with auditing standards generally accepted in the United States of America ("generally accepted auditing standards"), the objective of which is to form an opinion as to whether the financial statements are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States of America. Generally accepted auditing standards require that we plan and perform our audit to obtain reasonable assurance that the financial statements are free of material misstatement. Because an audit incorporates the concept of selective testing of data, which is judgmental both as to the selection of accounts and the number of transactions to be tested, our audit of the financial statements is subject to the inherent risk that material misstatements which may exist will not be detected. Further, the audit does not address the possibility that material misstatements may occur in the future.

With respect to the conduct of the audit and reporting the results thereof, materiality was evaluated and determined in the context of the financial statements taken as a whole; consequently, matters may exist or have existed that would be assessed differently by the Potential Buyer. In addition, we have not audited any subsequent financial statements of the Business and significant subsequent events may have occurred.

Neither an audit of the financial statements nor access to D&T's report thereon is a substitute for a party's own due diligence investigation, nor are they intended or designed to do so. Likewise, an audit does not comprehend all matters pertinent or necessary to a party's evaluation of a potential transaction, and we make no representation as to the sufficiency or appropriateness for your purposes of our audit or of D&T's report.

D&T is not, by means of permitting the Potential Buyer to have access to D&T's report, rendering accounting, financial, investment, legal, tax, or other professional advice or services to, or acting as a fiduciary, agent, or in any other capacity with respect to, the Potential Buyer. Access to D&T's report is not a substitute for such professional advice or services, and D&T's audit was not, and is not, intended for the benefit of the Potential Buyer. The Potential Buyer acknowledges that it has its own counsel and advisors in connection with any transactions into which it may enter relating to the Business.

The Potential Buyer agrees that D&T's report will not be included, incorporated by reference, or referred to in any public filings with the Securities and Exchange Commission by or on behalf of the Potential Buyer without D&T's prior written consent.

If the Potential Buyer, or those acting on its behalf, intends to publish or otherwise reproduce in any document D&T's report, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with a regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T

with such document, the Potential Buyer agrees that its management will provide D&T with a draft of the document to read and obtain D&T's approval for the inclusion or incorporation by reference of D&T's report, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of D&T's report in any such document would constitute the reissuance of D&T's report. The Potential Buyer also agrees that its management will notify D&T and obtain D&T's approval prior to including D&T's report on an electronic site.

D&T's engagement with the Company to perform the services described in the engagement letter, dated August 8, 2018, between D&T and the Company (the "Engagement Letter"), does not constitute D&T's agreement to be associated with any such documents published or reproduced by or on behalf of the Potential Buyer. Any request by the Potential Buyer for D&T to reissue D&T's report, to consent to its inclusion or incorporation by reference in an offering or other document, or to agree to its inclusion on an electronic site will be considered by D&T based on the facts and circumstances existing at the time of such request.

## OTHER

This Agreement constitutes the entire agreement with respect to its subject matter, and supersedes all other oral or written representations, understandings, or agreements relating to such subject matter, and may not be amended except by written agreement signed by the Potential Buyer and D&T.

THE POTENTIAL BUYER AND D&T IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

This Agreement and all matters relating hereto shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof) and the state and federal courts of New York shall have exclusive jurisdiction over all matters relating to this Agreement. Each of the provisions of this agreement will apply to the fullest extent of the law, whether in contract, statute, tort (such as negligence), or otherwise.

Accepted and agreed to by [*insert name of Potential Buyer*]:

By: _____

Title: _____

Date: _____

## **Exhibit 6**

**Affiliate/Subsidiaries' Audit Engagement Letters**

WEIL:\96792963\4\73217.0004

# Deloitte.

Deloitte & Touche LLP

111 S. Wacker Drive
Chicago, IL 60606-4301
USA

Tel: +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

April 26, 2017

Mr. Robert A. Riecker
Chief Financial Officer
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Dear Mr. Riecker:

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as independent auditors for the
following entities (the "Entities"), which are affiliates or subsidiaries of Sears Holdings Corporation
("Sears Holdings" or "the Company").

| Entity | Year End | Relationship |
|---|---|---|
| The Sears-Roebuck Foundation | December 31, 2016 | Affiliate |
| Sears Protection Company and subsidiaries | January 28, 2017 | Subsidiary |
| Sears Protection Company Florida LLC | January 28, 2017 | Subsidiary |
| Sears Reinsurance Company Ltd. | January 28, 2017 | Subsidiary |
| Sears, Roebuck de Puerto Rico, Inc. | January 28, 2017 | Subsidiary |

Ms. Seema Pajula, Ms. Elizabeth Berrill, Mr. Scott Szalony, and Mr. Matt Howard will be responsible for
the services that we perform for the Entities hereunder.

In addition to the audit services we are engaged to provide under this engagement letter, we would also be
pleased to assist the Entities on issues as they arise throughout the year. Hence, we hope that you will call
Ms. Berrill, Mr. Szalony Mr. Howard or Ms. Pajula whenever you believe D&T can be of assistance. This
assistance will require approval by the Sears Holdings Audit Committee in accordance with its
preapproval policies and procedures.

The services to be performed by D&T pursuant to this engagement are subject to the terms and conditions
set forth herein and in the accompanying appendices. Such terms and conditions shall be effective as of
the date of the commencement of such services.

## Audit of Financial Statements

Our engagement is to perform an audit for each of the Entities in accordance with auditing standards
generally accepted in the United States of America ("generally accepted auditing standards"). The
objective of an audit conducted in accordance with generally accepted auditing standards is to express an
opinion on whether each of the Entities' financial statements for the year ending noted above, are
presented fairly, in all material respects, in accordance with accounting principles generally accepted in
the United States of America ("generally accepted accounting principles").

Appendix A contains a description of the auditor's responsibilities and the scope of an audit in accordance with generally accepted auditing standards.

Supplementary information accompanies the Sears, Roebuck de Puerto Rico, Inc. financial statements. We will subject such supplementary information to the auditing procedures applied to our audit of the financial statements and certain additional procedures with the objective of expressing an opinion on whether such information is fairly stated, in all material respects, in relation to the financial statements as a whole.

## D&T Reports

We expect to issue a written report upon the completion of each of the audits. Our ability to express an opinion or to issue any report as a result of this engagement and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our report. If, for any reason, we are unable to complete our audits or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue any report as a result of this engagement. If we are unable to complete any of the audits or if any report to be issued by D&T as a result of this engagement requires modification, the reasons for this will be discussed with the Board of Directors of the respective Entity (collectively, the "Boards") and the respective Entity's management.

## Management's Responsibilities

Appendix B describes management's responsibilities.

## Responsibility of the Sears Holdings Audit Committee

As independent auditors of the Entities, we acknowledge that the Sears Holdings Audit Committee is directly responsible for the appointment, compensation, and oversight of our work. The Sears Holdings Audit Committee has delegated responsibility for the oversight of our work to the Board of Directors of the Entities (collectively, the "Boards") and accordingly, except as otherwise specifically noted, we will report directly to the Boards. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Sears Holdings Audit Committee in accordance with the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Communications with Boards

Appendix C describes various matters that we are required by generally accepted auditing standards to communicate with the Boards and management of each of the Entities.

## Fees

We confirm our understanding that the Sears Holdings Audit Committee has the sole authority to approve our fees. Fees have been previously approved at the March 16, 2016, Sears Holdings Audit Committee meeting and the fees, plus expenses, are estimated to be as follows:

2

| Entity | Fees |
|---|---|
| The Sears-Roebuck Foundation | **No Fee*** |
| Sears Protection Company and subsidiaries | $100,000 |
| Sears Protection Company Florida LLC | $69,000 |
| Sears Reinsurance Company Ltd. (includes US GAAP and statutory audits) | $109,900 |
| Sears, Roebuck de Puerto Rico, Inc. | $101,000^ |

*D&T estimates the fair value of audit services to be $19,000.

^ Includes audit fee for the audit of the supplementary tax information of $17,000.

Based on the anticipated timing of the work, our fees will be billed as the work is performed and payments are due 45 days from the date of the invoice. Engagement-related expenses will be billed separately in addition to the fees.

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms. Our estimated fees are based on certain assumptions, including (1) timely and accurate completion of the requested entity participation schedules and additional supporting information, (2) no inefficiencies during the audit process or changes in scope caused by events that are beyond our control, (3) the effectiveness of internal control over financial reporting throughout the period under audit, (4) a minimal level of audit adjustments (recorded or unrecorded), and (5) no changes to the timing or extent of our work plans. We will notify you promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary.

Additional services requested beyond the scope of services described herein would be subject to the mutual agreement of the Entities and D&T at such time as D&T is engaged to perform the services and would be described in a separate engagement letter.

### Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Entities or the Company intend to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with a regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, the Entities and the Company agree that management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Entities and the Company also agree that management will notify us and obtain our approval prior to including any of our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Entities or the

Company. Any request by the Entities or the Company to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Company and D&T.

* * * * *

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should the Entities, the Boards, or the Company request, and should D&T agree to provide, services (including audit services) beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through E attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

4

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

Accepted and agreed to by Sears Holdings Corporation:

By:    Mr. Robert A. Riecker
Title:    Chief Financial Officer

Date:    4/26/2017

cc: The Audit Committee of Sears Holdings Corporation

    The Board of Directors of the Sears-Roebuck Foundation

    The Board of Directors of Sears Protection Company and subsidiaries

    The Board of Directors of Sears Protection Company Florida LLC

    The Board of Directors of Sears Reinsurance Company Ltd.

    The Board of Directors of Sears, Roebuck de Puerto Rico, Inc.

5

**APPENDIX A**

**AUDITOR'S RESPONSIBILITIES AND SCOPE OF AN AUDIT IN ACCORDANCE WITH GENERALLY ACCEPTED AUDITING**

This Appendix A is part of the engagement letter dated April 26, 2017, between Deloitte & Touche LLP and the Entities.

**Auditor's Responsibilities**

Our responsibilities under generally accepted auditing standards include forming and expressing an opinion about whether the financial statements that have been prepared by management with the oversight of the Boards are presented fairly, in all material respects, in accordance with generally accepted accounting principles. The audit of the financial statements does not relieve management or the Boards of their responsibilities.

**Scope of an Audit**

Generally accepted auditing standards require that we plan and perform the audit to obtain reasonable, rather than absolute, assurance about whether the financial statements as a whole are free from material misstatement, whether caused by fraud or error. However, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with generally accepted auditing standards. We have no responsibility to plan and perform the audit to obtain reasonable assurance that misstatements, whether caused by fraud or error, that are not material to the financial statements as a whole are detected.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the financial statements, whether caused by fraud or error. In making those risk assessments, we consider internal control relevant to the Company's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

**APPENDIX B**

**MANAGEMENT'S RESPONSIBILITIES**

This Appendix B is part of the engagement letter dated April 26, 2017, between Deloitte & Touche LLP and the Entities.

**Financial Statements**

The Entities' management is responsible for the preparation, fair presentation, and overall accuracy of the financial statements in accordance with generally accepted accounting principles. In this regard, management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Designing, implementing, and maintaining effective internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error

- Identifying and ensuring that the Company complies with the laws and regulations applicable to its activities and informing us of all instances of identified or suspected noncompliance with such laws or regulations

- Providing us with (1) access to all information of which management is aware that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters, (2) additional information that we may request from management for the purpose of our audit, and (3) unrestricted access to personnel within the Company from whom we determine it necessary to obtain audit evidence

Management is also responsible for (1) preparing the supplementary information in accordance with generally accepted accounting principles, (2) including our report on the supplementary information in any document that contains the supplementary information and that indicates that D&T has reported on such supplementary information, and (3) presenting the supplementary information with the audited financial statements or, if such information will not be presented with the audited financial statements, to make the audited financial statements readily available to the intended users of such information no later than the date of issuance by the Entity of the supplementary information and our report thereon.

**Management's Representations**

We will make specific inquiries of the Entities' management about the representations embodied in the financial statements and supplementary information. In addition, we will request that the Entities' management provide us with the written representations the Entities' are required to provide to its independent auditors under generally accepted auditing standards. The responses to those inquiries and the written representations of the Entities' management are part of the evidential matter that D&T will rely on in forming its opinion on the Entities' financial statements and supplementary information.

**Process for Obtaining Preapproval of Services**

The Entities' management is responsible for the coordination of obtaining the preapproval of the Sears Holdings Audit Committee, in accordance with the Sears Holdings Audit Committee's preapproval

7

process, for any services to be provided by D&T to the Entities.

## Program and Subscription Services

D&T makes available to clients and nonclients various educational and informational programs, seminars, tools, and related services, such as live programs, webcasts (including the Dbriefs webcast series), podcasts, websites, database subscriptions (including some that provide access to D&T proprietary information and tools that offer technical support and advice), checklists, research reports, surveys, published books and other materials, applications, local office seminars, Technical Library, and CXO conferences (collectively, "programs and subscriptions"). D&T may provide these programs and subscriptions free of charge, for a nominal fee, or for a fee at prevailing market rates. In some instances, D&T may include complimentary rooms or meals as part of programs or seminars. Any programs and subscriptions requested by the Company and the related fees (if any) would be subject to the mutual agreement of the Company and D&T and may be described in a separate written agreement. The Company hereby confirms that any use or receipt by the Company of these programs and subscriptions is approved by the Sears Holdings Audit Committee when required by the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Independence Matters

In connection with our engagement, D&T, management, and the Sears Holdings Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Company is an attest client. Management of the Entities will ensure that the Entities, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, has policies and procedures in place for the purpose of ensuring that neither the Company nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Mr. Howard and Ms. Berrill.

In connection with the foregoing paragraph, the Company agrees to furnish to D&T and keep D&T updated with respect to a corporate tree that identifies the legal names of the Company's affiliates, as defined in AICPA *Code of Professional Conduct* Interpretation No. 101-18 (e.g., parents, subsidiaries, investors, or investees) ("Company Affiliates"), together with the ownership relationship among such entities. Such information will be maintained in a database accessible by D&T in connection with their compliance with AICPA or other applicable independence rules.

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management of the Entities will ensure that the Entities, together with its subsidiaries and other entities that comprise the Entities for purposes of the consolidated financial statements, also has policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Company for a former or current D&T partner, principal, or professional employee should be discussed with Ms. Berrill, Mr. Szalony, Mr. Howard and Ms. Pajula and approved by the Sears Holdings Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent

8

position for the Company or in a comparable position at a significant subsidiary of the Company; (2) on the board of directors of the Company or Entities; (3) as a member of the Sears Holdings Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For the purpose of the preceding sections entitled "Independence Matters," "Process for Obtaining Preapproval of Services" and "Program and Subscription Services", "D&T" shall mean Deloitte & Touche LLP and its subsidiaries, Deloitte Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Tohmatsu Limited, its member firms; and in all cases any successor or assignee.

**APPENDIX C**

**COMMUNICATIONS WITH THE BOARDS**

This Appendix C is part of the engagement letter dated April 26, 2017, between Deloitte & Touche LLP and the Entities.

We are responsible for communicating with the Boards significant matters related to the audit that are, in our professional judgment, relevant to the responsibilities of the Boards in overseeing the financial reporting process.

In connection with the foregoing, we will communicate to the Boards any fraud we identify or suspect that involves (1) management, (2) employees of the Entities who have significant roles in internal control, or (3) other employees of the Entities when the fraud results in a material misstatement of the financial statements. In addition, we will communicate with the Boards any other matters related to fraud that are, in our professional judgment, relevant to their responsibilities. We will communicate to management any fraud perpetrated by lower-level employees of which we become aware that does not result in a material misstatement of the financial statements; however, we will not communicate such matters to the Boards, unless otherwise directed by the Boards.

We will also communicate to the Boards matters involving the Entities' noncompliance with laws and regulations that have come to our attention during the course of our audit, other than when such matters are clearly inconsequential.

We will also communicate in writing to management and the Boards any significant deficiencies or material weaknesses in internal control (as defined in generally accepted auditing standards) that we have identified during the audit, including those that were remediated during the audit.

Generally accepted auditing standards do not require us to design procedures for the purpose of identifying other matters to communicate with the Boards. However, we will communicate to the Boards matters required by AICPA AU-C 260, *The Auditor's Communication with Those Charged with Governance*.

**GENERAL BUSINESS TERMS**

This Appendix D is part of the engagement letter to which these terms are attached (the engagement letter, including its appendices, the "engagement letter") dated April 26, 2017, between Deloitte & Touche LLP and the Entities.

1.  Independent Contractor. D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Company, the Entities, or the Boards.

2.  Survival. The agreements and undertakings of the Boards contained in the engagement letter will survive the completion or termination of this engagement.

3.  Assignment and Subcontracting. Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or claims) relating to this engagement without the prior written consent of the other parties. The Company and the Boards hereby consent to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4.  Severability. If any term of the engagement letter is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

5.  Force Majeure. No party shall be deemed to be in breach of the engagement letter as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6.  Confidentiality. To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Entities, D&T shall not disclose such information to any third party without the Entities' consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Entities and the Boards hereby consent to D&T disclosing such information (1) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a source that D&T believes is not prohibited from disclosing such information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this paragraph.

7.  <u>Dispute Resolution.</u> Any controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix E and made a part hereof.

APPENDIX E

**DISPUTE RESOLUTION PROVISION**

This Appendix E is part of the engagement letter dated April 26, 2017, between Deloitte & Touche LLP and the Entities.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

Mediation: All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

Arbitration Procedures: If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of the Entities and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

Costs: Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

# Deloitte.

**Deloitte & Touche LLP**

111 S. Wacker Drive
Chicago, IL 60606-4301
USA

Tel: +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

May 16, 2018

Mr. Robert A. Riecker
Chief Financial Officer
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Dear Mr. Riecker:

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as independent auditors for the following entities (each the "Entity; collectively, the "Entities" or "you" or "your"), which are affiliates or subsidiaries of Sears Holdings Corporation ("Company").

| Entity | Year End | Relationship |
|---|---|---|
| Sears Protection Company and subsidiaries | February 3, 2018 | Subsidiary |
| Sears Protection Company Florida LLC | February 3, 2018 | Subsidiary |
| Sears Reinsurance Company Ltd. | February 3, 2018 | Subsidiary |
| Sears, Roebuck de Puerto Rico, Inc. | February 3, 2018 | Subsidiary |

Mr. Jim Berry, Ms. Lesley McDonnell, and Ms. Sarah Pinto will be responsible for the services that we perform for the Entities hereunder.

In addition to the audit services we are engaged to provide under this engagement letter, we would also be pleased to assist the Entities on issues as they arise throughout the year. Hence, we hope that you will call Mr. Berry, Ms. McDonnell, or Ms. Pinto whenever you believe D&T can be of assistance. This assistance will require approval by the Audit Committee of Sears Holdings Corporation (the "Sears Holdings Audit Committee") in accordance with its preapproval policies and procedures.

The services to be performed by D&T pursuant to this engagement are subject to the terms and conditions set forth herein and in the accompanying appendices. Such terms and conditions shall be effective as of the date of the commencement of such services.

## Audits of Financial Statements

Our engagement is to perform an audit for each of the Entities in accordance with auditing standards generally accepted in the United States of America ("generally accepted auditing standards"). The objective of an audit conducted in accordance with generally accepted auditing standards is to express an opinion on whether each of the Entities' financial statements for the year ended as mentioned above, are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States of America ("generally accepted accounting principles").

Appendix A contains a description of the auditor's responsibilities and the scope of an audit in accordance with generally accepted auditing standards.

Supplementary information accompanies the Sears, Roebuck de Puerto Rico, Inc. financial statements. We will subject such supplementary information to the auditing procedures applied to our audit of the Sears, Roebuck de Puerto Rico, Inc. financial statements and certain additional procedures with the objective of expressing an opinion on whether such information is fairly stated, in all material

Mr. Robert A. Riecker
May 16, 2018
Page 2

respects, in relation to the financial statements as a whole.

## D&T Reports

We expect to issue a written report upon the completion of each of our audits. Our ability to express any opinion or to issue any report as a result of this engagement and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our reports. If, for any reason, we are unable to complete any of our audits or are unable to form or have not formed any opinion, we may decline to express any opinion or decline to issue any report as a result of this engagement. If we are unable to complete any of our audits, or if any report to be issued by D&T as a result of this engagement requires modification, the reasons for this will be discussed with the Board of Directors of the respective Entity (collectively, the "Boards") and the respective Entities' management ("management").

## Management's Responsibilities

Appendix B describes management's responsibilities.

## Responsibility of the Sears Holdings Audit Committee

As independent auditors of the Entities, we acknowledge that the Sears Holdings Audit Committee is directly responsible for the appointment, compensation, and oversight of our work. The Sears Holdings Audit Committee has delegated responsibility for the oversight of our work to the Boards and accordingly, except as otherwise specifically noted, we will report directly to the Boards. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Sears Holdings Audit Committee in accordance with the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Communications with the Boards

Appendix C describes various matters that we are required by generally accepted auditing standards to communicate with the Boards and management of each of the Entities.

## Fees

We confirm our understanding that the Sears Holdings Audit Committee has the sole authority to approve our fees. Fees have been previously approved at the March 15, 2017 Sears Holdings Audit Committee meeting and the fees, plus expenses, are estimated to be as follows:

| Entity | Fees |
|---|---|
| Sears Protection Company and subsidiaries | $100,000 |
| Sears Protection Company Florida LLC | $69,000 |
| Sears Reinsurance Company Ltd. (includes US GAAP and statutory audits) | $109,900 |
| Sears, Roebuck de Puerto Rico, Inc. | $101,000* |

* Includes audit fee for the audit of the supplementary tax information of $17,000.

Based on the anticipated timing of the work, our fees will be billed as the work is performed and

Mr. Robert A. Riecker
May 16, 2018
Page 3

payments are due 45 days from the date of the invoice. Engagement-related expenses, such as technology and administrative-related charges, will be billed separately in addition to the fees.

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms. Our estimated fees are based on certain assumptions, including (1) timely and accurate completion of the requested entity participation schedules and additional supporting information, (2) no inefficiencies during the audit process or changes in scope caused by events that are beyond our control, (3) the effectiveness of internal control over financial reporting throughout the period under audit, (4) a minimal level of audit adjustments (recorded or unrecorded), and (5) no changes to the timing or extent of our work plans. We will notify you promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Entities intend to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with a regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, the Entities agree that their management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Entities also agree that their management will notify us and obtain our approval prior to including any of our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Entities. Any request by the Entities to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Entities and D&T.

* * * * *

Mr. Robert A. Riecker
May 16, 2018
Page 4

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should the Entities or the Boards request, and should D&T agree to provide, services (including audit services) beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through E attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

Accepted and agreed to by Sears Holdings Corporation:

By: Robert A. Riecker
Title: Chief Financial Officer, Sears Holdings Corporation

Date: _5/16/2018_

cc: The Audit Committee of Sears Holdings Corporation

   The Board of Directors of Sears Protection Company and subsidiaries

   The Board of Directors of Sears Protection Company Florida LLC

   The Board of Directors of Sears Reinsurance Company Ltd.

   The Board of Directors of Sears, Roebuck de Puerto Rico, Inc.

**APPENDIX A**

# AUDITOR'S RESPONSIBILITIES AND SCOPE OF AN AUDIT IN ACCORDANCE WITH GENERALLY ACCEPTED AUDITING STANDARDS

This Appendix A is part of the engagement letter dated May 16, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation.

## Auditor's Responsibilities

Our responsibilities under generally accepted auditing standards include forming and expressing an opinion about whether the financial statements that have been prepared by management with the oversight of the Boards are presented fairly, in all material respects, in accordance with generally accepted accounting principles. The audits of the financial statements do not relieve management or the Boards of their responsibilities.

## Scope of an Audit

Generally accepted auditing standards require that we plan and perform the audit to obtain reasonable, rather than absolute, assurance about whether the financial statements as a whole are free from material misstatement, whether caused by fraud or error. However, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audits are properly planned and performed in accordance with generally accepted auditing standards. We have no responsibility to plan and perform the audits to obtain reasonable assurance that misstatements, whether caused by fraud or error, that are not material to the financial statements as a whole are detected.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the financial statements, whether caused by fraud or error. In making those risk assessments, we consider internal control relevant to each of the Entities' preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of each of the Entities' internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

**APPENDIX B**

# MANAGEMENT'S RESPONSIBILITIES

This Appendix B is part of the engagement letter dated May 16, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation.

## Financial Statements

Management is responsible for the preparation, fair presentation, and overall accuracy of the financial statements in accordance with generally accepted accounting principles. In this regard, management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Designing, implementing, and maintaining effective internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error

- Identifying and ensuring that the Entities comply with the laws and regulations applicable to their activities and informing us of all instances of identified or suspected noncompliance with such laws or regulations

- Providing us with (1) access to all information of which management is aware that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters, (2) additional information that we may request from management for the purpose of our audits, and (3) unrestricted access to personnel within the Entities from whom we determine it necessary to obtain audit evidence

Management is also responsible for (1) preparing the supplementary information in accordance with generally accepted accounting principles, (2) including our report on the supplementary information in any document that contains the supplementary information and that indicates that D&T has reported on such supplementary information, and (3) presenting the supplementary information with the Sears, Roebuck de Puerto Rico, Inc. audited financial statements or, if such information will not be presented with the audited financial statements, to make the Sears, Roebuck de Puerto Rico, Inc. audited financial statements readily available to the intended users of such information no later than the date of issuance by the Entities of the supplementary information and our report thereon.

## Management's Representations

We will make specific inquiries of the Entities' management about the representations embodied in the financial statements and Sears, Roebuck de Puerto Rico, Inc.'s supplementary information. In addition, we will request that management provide us with the written representations the Entities are required to provide to their independent auditors under generally accepted auditing standards. The responses to those inquiries and the written representations of management are part of the evidential matter that D&T will rely on in forming its opinion on the Entities' financial statements and Sears, Roebuck de Puerto Rico, Inc.'s supplementary information.

## Process for Obtaining Preapproval of Services

Management is responsible for the coordination of obtaining the preapproval of the Sears Holdings Audit Committee, in accordance with the Sears Holdings Audit Committee's preapproval process, for any services to be provided by D&T to the Entities.

## Program and Subscription Services

D&T makes available to clients and nonclients various educational and informational programs, seminars, tools, and related services, such as live programs, webcasts (including the Dbriefs webcast series), podcasts, websites, database subscriptions (including some that provide access to D&T proprietary information and tools that offer technical support and advice), checklists, research reports, surveys, published books and other materials, applications, local office seminars, Technical Library, and CXO conferences (collectively, "programs and subscriptions"). D&T may provide these programs and subscriptions free of charge, for a nominal fee, or for a fee at prevailing market rates. In some instances, D&T may include complimentary rooms or meals as part of programs or seminars. Any programs and subscriptions requested by the Entities and the related fees (if any) would be subject to the mutual agreement of the Entities and D&T and may be described in a separate written agreement. The Entities hereby confirm that any use or receipt by the Entities of these programs and subscriptions is approved by the Sears Holdings Audit Committee when required by the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Independence Matters

In connection with our engagement, D&T, management, and the Sears Holdings Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Entities are attest clients. Management of the Entities will ensure that the Entities, together with their subsidiaries and other entities that comprise the Entities for purposes of the consolidated financial statements, have policies and procedures in place for the purpose of ensuring that neither the Entities nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Mr. Berry, Ms. McDonnell, or Ms. Pinto.

In connection with the foregoing paragraph, the Entities agree to furnish to D&T and keep D&T updated with respect to a corporate tree that identifies the legal names of the Entities' affiliates, as defined in AICPA *Code of Professional Conduct* Interpretation No. 101-18 (e.g., parents, subsidiaries, investors, or investees) ("Entities Affiliates"), together with the ownership relationship among such entities. Such information will be maintained in a database accessible by D&T in connection with their compliance with AICPA or other applicable independence rules.

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management of the Entities will ensure that the Entities, together with their subsidiaries and other entities that comprise the Entities for purposes of the consolidated financial statements, also have policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Entities for a former or current D&T partner, principal, or professional employee should be discussed with Mr. Berry, Ms. McDonnell, or Ms. Pinto and approved by the Sears Holdings Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent position for the Entities or in a comparable position at a significant subsidiary of the Entities; (2) on the board of directors of the of the Company or the Entities; (3) as a member of the Sears Holdings Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For purposes of the preceding sections entitled "Independence Matters", "Process for Obtaining Preapproval of Services," and "Program and Subscription Services,", "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

**APPENDIX C**

## COMMUNICATIONS WITH THE BOARDS

This Appendix C is part of the engagement letter dated May 16, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation.

We are responsible for communicating with the Boards significant matters related to the audit that are, in our professional judgment, relevant to the responsibilities of the Boards in overseeing the financial reporting process.

In connection with the foregoing, we will communicate to the Boards any fraud we identify or suspect that involves (1) management, (2) employees of the Entities who have significant roles in internal control, or (3) other employees of the Entities when the fraud results in a material misstatement of the financial statements. In addition, we will communicate with the Boards any other matters related to fraud that are, in our professional judgment, relevant to their responsibilities. We will communicate to management any fraud perpetrated by lower-level employees of which we become aware that does not result in a material misstatement of the financial statements; however, we will not communicate such matters to the Boards, unless otherwise directed by the Boards.

We will also communicate to the Boards matters involving the Entities' noncompliance with laws and regulations that have come to our attention during the course of our audits, other than when such matters are clearly inconsequential.

We will also communicate in writing to management and the Boards any significant deficiencies or material weaknesses in internal control (as defined in generally accepted auditing standards) that we have identified during the audits, including those that were remediated during the audits.

Generally accepted auditing standards do not require us to design procedures for the purpose of identifying other matters to communicate with the Boards. However, we will communicate to the Boards matters required by AICPA AU-C 260, *The Auditor's Communication with Those Charged with Governance*.

<b>APPENDIX D</b>

# GENERAL BUSINESS TERMS

This Appendix D is part of the engagement letter to which these terms are attached (the engagement letter, including its appendices, the "engagement letter") dated May 16, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation.

1.  Independent Contractor. D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Entities, Sears Holdings Corporation, Sears Holdings Audit Committee or the Boards.

2.  Survival. The agreements and undertakings of the Entities contained in the engagement letter will survive the completion or termination of this engagement.

3.  Assignment and Subcontracting. Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or claims) relating to this engagement without the prior written consent of the other parties. The Entities hereby consent to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4.  Severability. If any term of the engagement letter is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

5.  Force Majeure. No party shall be deemed to be in breach of the engagement letter as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6.  Confidentiality. To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Entities, D&T shall not disclose such information to any third party without the Entities' consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Entities hereby consent to D&T disclosing such information (1) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a source that D&T believes is not prohibited from disclosing such information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this paragraph.

7.  Dispute Resolution. Any controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix E and made a part hereof.

**APPENDIX E**

# DISPUTE RESOLUTION PROVISION

This Appendix E is part of the engagement letter dated May 16, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

Mediation: All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

Arbitration Procedures: If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. The Entities, on the one hand, and Deloitte & Touche LLP, on the other hand, shall each designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

Costs: Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

**<u>Exhibit 7</u>**

**Kmart PR and Sears PR Audit Engagement Letters**

# Deloitte.

**Deloitte & Touche LLP**

111 S. Wacker Drive
Chicago, IL 60606-4301
USA

Tel: +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

June 16, 2017

Mr. Joseph F Jordan
Interim Controller
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Dear Mr. Jordan:

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as independent auditors for Kmart Operations LLC - Puerto Rico Division, which is a wholly-owned subsidiary of Sears Holdings Corporation ("Sears Holdings" or the "Company") and for Sears Operations LLC - Puerto Rico Division, which is also a wholly-owned subsidiary of Sears Holdings (collectively, the "Entities").

Ms. Seema Pajula and Mr. Scott Szalony will be responsible for the services that we perform for the Entities hereunder.

In addition to the audit services we are engaged to provide under this engagement letter, we would also be pleased to assist the Entities on issues as they arise throughout the year. Hence, we hope that you will call Ms. Pajula or Mr. Szalony whenever you believe D&T can be of assistance. This assistance will require approval by the Sears Holdings Audit Committee in accordance with its preapproval policies and procedures.

The services to be performed by D&T pursuant to this engagement are subject to the terms and conditions set forth herein and in the accompanying appendices. Such terms and conditions shall be effective as of the date of the commencement of such services.

## Audit of Financial Statements

Our engagement is to perform an audit for each of the Entities in accordance with auditing standards generally accepted in the United States of America ("generally accepted auditing standards"). The objective of an audit conducted in accordance with generally accepted auditing standards is to express an opinion on whether each of the Entities' financial statements as of and for the year ended January 28, 2017, are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States of America ("generally accepted accounting principles").

Appendix A contains a description of the auditor's responsibilities and the scope of an audit in accordance with generally accepted auditing standards.

Supplemental tax information ("supplementary information") accompanies the Entities' financial statements. We will subject such supplementary information to the auditing procedures applied to our audit of the financial statements and certain additional procedures with the objective of expressing an opinion on whether such information is fairly stated, in all material respects, in relation to the financial statements as a whole.

**D&T Reports**

We expect to issue a written report upon the completion of each of the audits. Our ability to express an opinion or to issue any report as a result of this engagement and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our report. If, for any reason, we are unable to complete our audits or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue any report as a result of this engagement. If we are unable to complete any of the audits or if any report to be issued by D&T as a result of this engagement requires modification, the reasons for this will be discussed with the Board of Directors of the respective Entity (collectively, the "Boards") and the respective Entities' management.

## Management's Responsibilities

Appendix B describes management's responsibilities.

## Responsibility of the Sears Holdings Audit Committee

As independent auditors of the Entities, we acknowledge that the Sears Holdings Audit Committee is directly responsible for the appointment, compensation, and oversight of our work. The Sears Holdings Audit Committee has delegated responsibility for the oversight of our work to the Boards and accordingly, except as otherwise specifically noted, we will report directly to the Boards. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Sears Holdings Audit Committee in accordance with the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Communications with the Boards

Appendix C describes various matters that we are required by generally accepted auditing standards to communicate with the Boards and management of each of the Entities.

## Fees

We confirm our understanding that the Sears Holdings Audit Committee has the sole authority to approve our fees. Fees have been previously approved at the March 16, 2016, Sears Holdings Audit Committee meeting and the fees, plus expenses, are estimated to be as follows:

| Entity | Fees |
|---|---|
| Kmart Operations LLC – Puerto Rico Division | $98,000^ |
| Sears Operations LLC – Puerto Rico Division | $98,000^ |

^ Includes audit fee for the audit of the supplementary tax information of $17,000.

Based on the anticipated timing of the work, our fees will be billed as the work is performed and payments are due 45 days from the date of the invoice. Engagement-related expenses will be billed separately in addition to the fees.

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms. Our estimated fees are based on certain assumptions, including (1) timely and accurate completion of the requested entity participation schedules and additional supporting information, (2) no inefficiencies during the audit process or changes in scope caused by events that are beyond our control,

(3) the effectiveness of internal control over financial reporting throughout the period under audit, (4) a minimal level of audit adjustments (recorded or unrecorded), and (5) no changes to the timing or extent of our work plans. We will notify you promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary.

Additional services requested beyond the scope of services described herein would be subject to the mutual agreement of the Entities and D&T at such time as D&T is engaged to perform the services and would be described in a separate engagement letter.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Entities or the Company intend to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with a regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, the Entities and the Company agree that management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Entities and the Company also agree that management will notify us and obtain our approval prior to including any of our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Entities or the Company. Any request by the Entities or the Company to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Company and D&T.

* * * * *

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should the Entities, the Boards, or the Company request, and should D&T agree to provide, services (including audit services) beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through E attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

Deloitte & Touche LLP

Accepted and agreed to by Sears Holdings Corporation:

By:      Mr. Joseph F. Jordan
Title:    Interim Controller

Date:    6/16/17

cc: The Audit Committee of Sears Holdings Corporation

**APPENDIX A**

**AUDITOR'S RESPONSIBILITIES AND SCOPE OF AN AUDIT IN ACCORDANCE WITH GENERALLY ACCEPTED AUDITING STANDARDS**

This Appendix A is part of the engagement letter dated June 16, 2017, between Deloitte & Touche LLP and the Entities.

**Auditor's Responsibilities**

Our responsibilities under generally accepted auditing standards include forming and expressing an opinion about whether the financial statements that have been prepared by management with the oversight of the Boards are presented fairly, in all material respects, in accordance with generally accepted accounting principles. The audit of the financial statements does not relieve management or the Boards of their responsibilities.

**Scope of an Audit**

Generally accepted auditing standards require that we plan and perform the audit to obtain reasonable, rather than absolute, assurance about whether the financial statements as a whole are free from material misstatement, whether caused by fraud or error. However, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with generally accepted auditing standards. We have no responsibility to plan and perform the audit to obtain reasonable assurance that misstatements, whether caused by fraud or error, that are not material to the financial statements as a whole are detected.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the financial statements, whether caused by fraud or error. In making those risk assessments, we consider internal control relevant to the Company's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

**APPENDIX B**

**MANAGEMENT'S RESPONSIBILITIES**

This Appendix B is part of the engagement letter dated June 16, 2017, between Deloitte & Touche LLP and the Entities.

**Financial Statements**

The Entities' management is responsible for the preparation, fair presentation, and overall accuracy of the financial statements in accordance with generally accepted accounting principles. In this regard, management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Designing, implementing, and maintaining effective internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error

- Identifying and ensuring that the Company complies with the laws and regulations applicable to its activities and informing us of all instances of identified or suspected noncompliance with such laws or regulations

- Providing us with (1) access to all information of which management is aware that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters, (2) additional information that we may request from management for the purpose of our audit, and (3) unrestricted access to personnel within the Company from whom we determine it necessary to obtain audit evidence.

Management is also responsible for (1) preparing the supplementary information in accordance with generally accepted accounting principles, (2) including our report on the supplementary information in any document that contains the supplementary information and that indicates that D&T has reported on such supplementary information, and (3) presenting the supplementary information with the audited financial statements or, if such information will not be presented with the audited financial statements, to make the audited financial statements readily available to the intended users of such information no later than the date of issuance by the Entities of the supplementary information and our report thereon.

**Management's Representations**

We will make specific inquiries of the Entities' management about the representations embodied in the financial statements and supplementary information. In addition, we will request that the Entities' management provide us with the written representations the Entities' are required to provide to its independent auditors under generally accepted auditing standards. The responses to those inquiries and the written representations of the Entities' management are part of the evidential matter that D&T will rely on in forming its opinion on the Entities' financial statements and supplementary information.

**Process for Obtaining Preapproval of Services**

The Entities' management is responsible for the coordination of obtaining the preapproval of the Sears Holdings Audit Committee, in accordance with the Sears Holdings Audit Committee's preapproval process, for any services to be provided by D&T to the Entities.

## Program and Subscription Services

D&T makes available to clients and nonclients various educational and informational programs, seminars, tools, and related services, such as live programs, webcasts (including the Dbriefs webcast series), podcasts, websites, database subscriptions (including some that provide access to D&T proprietary information and tools that offer technical support and advice), checklists, research reports, surveys, published books and other materials, applications, local office seminars, Technical Library, and CXO conferences (collectively, "programs and subscriptions"). D&T may provide these programs and subscriptions free of charge, for a nominal fee, or for a fee at prevailing market rates. In some instances, D&T may include complimentary rooms or meals as part of programs or seminars. Any programs and subscriptions requested by the Company and the related fees (if any) would be subject to the mutual agreement of the Company and D&T and may be described in a separate written agreement. The Company hereby confirms that any use or receipt by the Company of these programs and subscriptions is approved by the Sears Holdings Audit Committee when required by the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Independence Matters

In connection with our engagement, D&T, management, and the Sears Holdings Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Company is an attest client. Management of the Entities will ensure that the Entities, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, has policies and procedures in place for the purpose of ensuring that neither the Company nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Mr. Szalony or Ms. Pajula.

In connection with the foregoing paragraph, the Company agrees to furnish to D&T and keep D&T updated with respect to a corporate tree that identifies the legal names of the Company's affiliates, as defined in AICPA *Code of Professional Conduct* Interpretation No. 101-18 (e.g., parents, subsidiaries, investors, or investees) ("Company Affiliates"), together with the ownership relationship among such entities. Such information will be maintained in a database accessible by D&T in connection with their compliance with AICPA or other applicable independence rules.

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management of the Entities will ensure that the Entities, together with its subsidiaries and other entities that comprise the Entities for purposes of the consolidated financial statements, also has policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Company for a former or current D&T partner, principal, or professional employee should be discussed with Mr. Szalony or Ms. Pajula and approved by the Sears Holdings Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent position for the Company or in a comparable position at a significant subsidiary of the Company; (2) on the board of directors of the Company or Entities; (3) as a member of the Sears Holdings Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For the purpose of the preceding sections entitled "Independence matters," "Process for Obtaining
Preapproval of services" and "Program and Subscription Services", "D&T" shall mean Deloitte & Touche
LLP and its subsidiaries, Deloitte Tohmatsu Limited, its member firms, the affiliates of Deloitte &
Touche LLP, Deloitte Tohmatsu Limited, its member firms; and in all cases any successor or assignee.

**APPENDIX C**

## COMMUNICATIONS WITH THE BOARDS

This Appendix C is part of the engagement letter dated June 16, 2017, between Deloitte & Touche LLP and the Entities.

We are responsible for communicating with the Boards significant matters related to the audit that are, in our professional judgment, relevant to the responsibilities of the Boards in overseeing the financial reporting process.

In connection with the foregoing, we will communicate to the Boards any fraud we identify or suspect that involves (1) management, (2) employees of the Entities who have significant roles in internal control, or (3) other employees of the Entities when the fraud results in a material misstatement of the financial statements. In addition, we will communicate with the Boards any other matters related to fraud that are, in our professional judgment, relevant to their responsibilities. We will communicate to management any fraud perpetrated by lower-level employees of which we become aware that does not result in a material misstatement of the financial statements; however, we will not communicate such matters to the Boards, unless otherwise directed by the Boards.

We will also communicate to the Boards matters involving the Entities' noncompliance with laws and regulations that have come to our attention during the course of our audit, other than when such matters are clearly inconsequential.

We will also communicate in writing to management and the Boards any significant deficiencies or material weaknesses in internal control (as defined in generally accepted auditing standards) that we have identified during the audit, including those that were remediated during the audit.

Generally accepted auditing standards do not require us to design procedures for the purpose of identifying other matters to communicate with the Boards. However, we will communicate to the Boards matters required by AICPA AU-C 260, *The Auditor's Communication with Those Charged with Governance*.

**GENERAL BUSINESS TERMS**

This Appendix D is part of the engagement letter to which these terms are attached (the engagement letter, including its appendices, the "engagement letter") dated June 16, 2017, between Deloitte & Touche LLP and the Entities.

1. **Independent Contractor**. D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Company, the Entities, or the Boards.

2. **Survival.** The agreements and undertakings of the Boards contained in the engagement letter will survive the completion or termination of this engagement.

3. **Assignment and Subcontracting.** Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or claims) relating to this engagement without the prior written consent of the other parties. The Company and the Boards hereby consent to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4. **Severability**. If any term of the engagement letter is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

5. **Force Majeure.** No party shall be deemed to be in breach of the engagement letter as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6. **Confidentiality.** To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Entities, D&T shall not disclose such information to any third party without the Entities' consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Entities and the Boards hereby consent to D&T disclosing such information (1) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a source that D&T believes is not prohibited from disclosing such information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this paragraph.

7. **Dispute Resolution.** Any controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a "Dispute") shall be resolved by mediation or binding

arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix E and made a part hereof.

**APPENDIX E**

**DISPUTE RESOLUTION PROVISION**

This Appendix E is part of the engagement letter dated June 16, 2017, between Deloitte & Touche LLP and the Entities.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

<u>**Mediation:**</u> All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

<u>**Arbitration Procedures:**</u> If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of the Entities and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

<u>**Costs:**</u> Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

# Deloitte.

**Deloitte & Touche LLP**

111 S. Wacker Drive
Chicago, IL 60606-4301
USA

Tel: +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

June 13, 2018

Mr. Robert A. Riecker
Chief Financial Officer
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Dear Mr. Riecker:

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as independent auditors for Kmart Operations LLC - Puerto Rico Division, which is a wholly-owned subsidiary of Sears Holdings Corporation ("Sears Holdings" or the "Company") and for Sears Operations LLC - Puerto Rico Division, which is also a wholly-owned subsidiary of Sears Holdings (collectively, the "Entities").

Mr. Jim Berry and Ms. Lesley McDonnell will be responsible for the services that we perform for the Entities hereunder.

In addition to the audit services we are engaged to provide under this engagement letter, we would also be pleased to assist the Entities on issues as they arise throughout the year. Hence, we hope that you will call Mr. Berry or Ms. McDonnell whenever you believe D&T can be of assistance. This assistance will require approval by the Sears Holdings Audit Committee in accordance with its preapproval policies and procedures.

The services to be performed by D&T pursuant to this engagement are subject to the terms and conditions set forth herein and in the accompanying appendices. Such terms and conditions shall be effective as of the date of the commencement of such services.

## Audit of Financial Statements

Our engagement is to perform an audit for each of the Entities in accordance with auditing standards generally accepted in the United States of America ("generally accepted auditing standards"). The objective of an audit conducted in accordance with generally accepted auditing standards is to express an opinion on whether each of the Entities' financial statements as of for the year ended February 3, 2018, are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States of America ("generally accepted accounting principles").

Appendix A contains a description of the auditor's responsibilities and the scope of an audit in accordance with generally accepted auditing standards.

Supplemental tax information ("supplementary information") accompanies the Entities' financial statements. We will subject such supplementary information to the auditing procedures applied to our audit of the financial statements and certain additional procedures with the objective of expressing an opinion on whether such information is fairly stated, in all material respects, in relation to the financial statements as a whole.

## D&T Reports

We expect to issue a written report upon the completion of each of our audits. Our ability to express an opinion or to issue any report as a result of this engagement and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our reports. If, for any reason, we are unable to complete our audits or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue any report as a result of this engagement. If, for any reason, we are unable to complete any of our audits, or if any report to be issued by D&T as a result

of this engagement requires modification, the reasons for this will be discussed with the Board of Directors of the respective Entity (collectively, the "Boards") and the respective Entities' management.

## Management's Responsibilities

Appendix B describes management's responsibilities.

## Responsibility of the Sears Holdings Audit Committee

As independent auditors of the Entities, we acknowledge that the Sears Holdings Audit Committee is directly responsible for the appointment, compensation, and oversight of our work. The Sears Holdings Audit Committee has delegated responsibility for the oversight of our work to the Boards and accordingly, except as otherwise specifically noted, we will report directly to the Boards. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Sears Holdings Audit Committee in accordance with the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Communications with the Boards

Appendix C describes various matters that we are required by generally accepted auditing standards to communicate with the Boards and management of each of the Entities.

## Fees

We confirm our understanding that the Sears Holdings Audit Committee has the sole authority to approve our fees. Fees were previously approved at the March 15, 2017, Sears Holdings Audit Committee meeting and the fees, plus expenses, are estimated to be as follows:

| Entity | Fees |
|---|---|
| Kmart Operations LLC – Puerto Rico Division | $98,000^ |
| Sears Operations LLC – Puerto Rico Division | $98,000^ |

^ Includes audit fee for the audit of the supplementary tax information of $17,000.

Based on the anticipated timing of the work, our fees will be billed as the work is performed and payments are due 45 days from the date of the invoice. Engagement-related expenses, such as technology and administrative related charges, will be billed in addition to the fees and will be stated separately on the invoices.

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms. Our estimated fees are based on certain assumptions, including (1) timely and accurate completion of the requested entity participation schedules and additional supporting information, (2) no inefficiencies during the audit process or changes in scope caused by events that are beyond our control, (3) the effectiveness of internal control over financial reporting throughout the period under audit, (4) a minimal level of audit adjustments (recorded or unrecorded), and (5) no changes to the timing or extent of our work plans. We will notify you promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary.

Additional services requested beyond the scope of services described herein would be subject to the mutual agreement of the Entities and D&T at such time as D&T is engaged to perform the services and would be described in a separate engagement letter.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Entities or the Company intend to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with a regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, the Entities and the Company agree that its management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Entities and the Company also agree that its management will notify us and obtain our approval prior to including any of our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Entities or the Company. Any request by the Entities or the Company to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Company and D&T.

* * * * *

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should the Entities, the Boards, or the Company request, and should D&T agree to provide, services (including audit services) beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through E attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

Deloitte & Touche LLP

Accepted and agreed to by Sears Holdings Corporation:

By: _____

Mr. Robert A. Riecker
Chief Financial Officer

Date: 6/13/2018 _____

cc: the Audit Committee of Sears Holdings Corporation

**APPENDIX A**

# AUDITOR'S RESPONSIBILITIES AND SCOPE OF AN AUDIT IN ACCORDANCE WITH GENERALLY ACCEPTED AUDITING STANDARDS

This Appendix A is part of the engagement letter dated June 13, 2018, between Deloitte & Touche LLP and the Entities.

## Auditor's Responsibilities

Our responsibilities under generally accepted auditing standards include forming and expressing an opinion about whether the financial statements that have been prepared by management with the oversight of the Boards are presented fairly, in all material respects, in accordance with generally accepted accounting principles. The audits of the financial statements do not relieve management or the Boards of their responsibilities.

## Scope of an Audit

Generally accepted auditing standards require that we plan and perform the audit to obtain reasonable, rather than absolute, assurance about whether the financial statements as a whole are free from material misstatement, whether caused by fraud or error. However, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audits are properly planned and performed in accordance with generally accepted auditing standards. We have no responsibility to plan and perform the audits to obtain reasonable assurance that misstatements, whether caused by fraud or error, that are not material to the financial statements as a whole are detected.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the financial statements, whether caused by fraud or error. In making those risk assessments, we consider internal control relevant to each of the Entities' preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of each of the Entities' internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

**APPENDIX B**

# MANAGEMENT'S RESPONSIBILITIES

This Appendix B is part of the engagement letter dated June 13, 2018, between Deloitte & Touche LLP and the Entities.

## Financial Statements

Management is responsible for the preparation, fair presentation, and overall accuracy of the financial statements in accordance with generally accepted accounting principles. In this regard, management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Designing, implementing, and maintaining effective internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error

- Identifying and ensuring that the Entities comply with the laws and regulations applicable to their activities and informing us of all instances of identified or suspected noncompliance with such laws or regulations

- Providing us with (1) access to all information of which management is aware that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters, (2) additional information that we may request from management for the purpose of our audits, and (3) unrestricted access to personnel within the Entities from whom we determine it necessary to obtain audit evidence

Management is also responsible for (1) preparing the supplementary information in accordance with generally accepted accounting principles, (2) including our report on the supplementary information in any document that contains the supplementary information and that indicates that D&T has reported on such supplementary information, and (3) presenting the supplementary information with the audited financial statements or, if such information will not be presented with the audited financial statements, to make the audited financial statements readily available to the intended users of such information no later than the date of issuance by the Entities of the supplementary information and our report thereon.

## Management's Representations

We will make specific inquiries of the Entities' management about the representations embodied in the financial statements and supplementary information. In addition, we will request that management provide us with the written representations the Entities are required to provide to their independent auditors under generally accepted auditing standards. The responses to those inquiries and the written representations of management are part of the evidential matter that D&T will rely on in forming its opinion on the Entities' financial statements and supplementary information.

## Process for Obtaining Preapproval of Services

Management is responsible for the coordination of obtaining the preapproval of the Sears Holdings Audit Committee, in accordance with the Sears Holdings Audit Committee's preapproval process, for any services to be provided by D&T to the Entities.

## Program and Subscription Services

D&T makes available to clients and nonclients various educational and informational programs, seminars, tools, and related services, such as live programs, webcasts (including the Dbriefs webcast series), podcasts, websites, database subscriptions (including some that provide access to D&T proprietary information and tools that offer technical support and advice), checklists, research reports, surveys, published books and other materials, applications, local office seminars, Technical Library, and CXO conferences (collectively, "programs and subscriptions"). D&T may provide these programs and subscriptions free of charge, for a nominal fee, or for a fee at prevailing market rates. In some instances, D&T may include complimentary rooms or meals as part of programs or seminars. Any programs and subscriptions requested by the Entities and the related fees (if any) would be subject to the mutual agreement of the Entities and D&T and may be described in a separate written agreement. The Entities hereby confirm that any use or receipt by the Entities of these programs and subscriptions is approved by the Sears Holdings Audit Committee when required by the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Independence Matters

In connection with our engagement, D&T, management, and the Sears Holdings Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Entities are attest clients. Management of the Entities will ensure that the Entities, together with their subsidiaries and other entities that comprise the Entities for purposes of the consolidated financial statements, have policies and procedures in place for the purpose of ensuring that neither the Entities nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Mr. Berry or Ms. McDonnell.

In connection with the foregoing paragraph, the Entities agree to furnish to D&T and keep D&T updated with respect to a corporate tree that identifies the legal names of the Entities' affiliates, as defined in AICPA *Code of Professional Conduct* Interpretation No. 101-18 (e.g., parents, subsidiaries, investors, or investees) ("Entities Affiliates"), together with the ownership relationship among such entities. Such information will be maintained in a database accessible by D&T in connection with their compliance with AICPA or other applicable independence rules.

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management of the Entities will ensure that the Entities, together with their subsidiaries and other entities that comprise the Entities for purposes of the consolidated financial statements, also have policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Entities for a former or current D&T partner, principal, or professional employee should be discussed with Mr. Berry or Ms. McDonnell and approved by the Sears Holdings Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent position for the Entities or in a comparable position at a significant subsidiary of the Entities; (2) on the board of directors of the Company or the Entities; (3) as a member of the Sears Holdings Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For purposes of the preceding sections entitled "Independence Matters", "Process for Obtaining Preapproval of Services," and "Program and Subscription Services", "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

**APPENDIX C**

## COMMUNICATIONS WITH THE BOARDS

This Appendix C is part of the engagement letter dated June 13, 2018, between Deloitte & Touche LLP and the Entities.

We are responsible for communicating with the Boards significant matters related to the audit that are, in our professional judgment, relevant to the responsibilities of the Boards in overseeing the financial reporting process.

In connection with the foregoing, we will communicate to the Boards any fraud we identify or suspect that involves (1) management, (2) employees of the Entities who have significant roles in internal control, or (3) other employees of the Entities when the fraud results in a material misstatement of the financial statements. In addition, we will communicate with the Boards any other matters related to fraud that are, in our professional judgment, relevant to their responsibilities. We will communicate to management any fraud perpetrated by lower-level employees of which we become aware that does not result in a material misstatement of the financial statements; however, we will not communicate such matters to the Boards, unless otherwise directed by the Boards.

We will also communicate to the Boards matters involving the Entities' noncompliance with laws and regulations that have come to our attention during the course of our audits, other than when such matters are clearly inconsequential.

We will also communicate in writing to management and the Boards any significant deficiencies or material weaknesses in internal control (as defined in generally accepted auditing standards) that we have identified during the audits, including those that were remediated during the audits.

Generally accepted auditing standards do not require us to design procedures for the purpose of identifying other matters to communicate with the Boards. However, we will communicate to the Boards matters required by AICPA AU-C 260, *The Auditor's Communication with Those Charged with Governance*.

APPENDIX D

# GENERAL BUSINESS TERMS

This Appendix D is part of the engagement letter to which these terms are attached (the engagement letter, including its appendices, the "engagement letter") dated June 13, 2018, between Deloitte & Touche LLP and the Entities.

1. Independent Contractor. D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Entities, Sears Holdings Corporation, Sears Holdings Audit Committee, or the Boards.

2. Survival. The agreements and undertakings of the Entities contained in the engagement letter will survive the completion or termination of this engagement.

3. Assignment and Subcontracting. Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or claims) relating to this engagement without the prior written consent of the other parties. The Entities hereby consent to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4. Severability. If any term of the engagement letter is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

5. Force Majeure. No party shall be deemed to be in breach of the engagement letter as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6. Confidentiality. To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Entities, D&T shall not disclose such information to any third party without the Entities' consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Entities and the Boards hereby consent to D&T disclosing such information (1) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a source that D&T believes is not prohibited from disclosing such information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this paragraph.

7. Dispute Resolution. Any controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix E and made a part hereof.

**APPENDIX E**

## DISPUTE RESOLUTION PROVISION

This Appendix E is part of the engagement letter dated June 13, 2018, between Deloitte & Touche LLP and the Entities.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

<u>Mediation:</u> All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

<u>Arbitration Procedures:</u> If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of the Entities and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

<u>Costs:</u> Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

## <u>Exhibit 8</u>

**Kmart PR Audit Engagement Letters**

WEIL:\96792963\4\73217.0004



**Deloitte & Touche LLP**
111 S. Wacker Drive
Chicago, IL 60606-4301
USA

Tel: +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

May 9, 2016

Mr. Robert A. Riecker
Vice President, Controller, and Chief Accounting Officer
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Dear Mr. Riecker:

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as independent auditors for Kmart
Corporation - Puerto Rico Division (the "Entity" or "Division"), which is a division of Kmart Holdings
Corporation (the "Parent Company"), which is a wholly-owned subsidiary of Sears Holdings Corporation
("Sears Holdings" or "the Company"). Ms. Seema Pajula and Ms. Elizabeth Berrill will be responsible for
the services that we perform for the Entity hereunder.

In addition to the audit services we are engaged to provide under this engagement letter, we would also be
pleased to assist the Entity on issues as they arise throughout the year. Hence, we hope that you will call Ms.
Pajula or Ms. Berrill whenever you believe D&T can be of assistance. This assistance will require approval
by the Audit Committee of Sears Holdings, of which the Entity is a subsidiary, in accordance with its
preapproval policies and procedures.

The services to be performed by D&T pursuant to this engagement are subject to the terms and conditions set
forth herein and in the accompanying appendices. Such terms and conditions shall be effective as of the date
of the commencement of such services.

**Audit of Special-Purpose Financial Statements**

We understand that the entity will be preparing Special-Purpose financial statements for submission to the
taxing authorities in the Commonwealth of Puerto Rico, as the taxing authorities do not accept consolidated
financial statements as part of required tax filings.

Our engagement is to perform an audit in accordance with auditing standards generally accepted in the
United States of America ("generally accepted auditing standards"). The objective of an audit conducted in
accordance with generally accepted auditing standards is to express an opinion on whether the Entity's
Special-Purpose financial statements for the year ended January 30, 2016 are presented fairly, in all material
respects, in accordance with accounting principles generally accepted in the United States of America
("generally accepted accounting principles"), except for the accounting for the Division's investment in a
limited partnership, which we understand will be presented using the equity method of accounting as the
taxing authorities in the Commonwealth of Puerto Rico do not accept consolidated financial statements as a
part of required tax filings. We presently anticipate that our report will include a paragraph indicating that the
Entity has accounted for the investment in a limited partnership in accordance with the basis of accounting
the Division uses for income tax purposes, which is a basis of accounting other than accounting principles
generally accepted in the United States of America.

Appendix A contains a description of the auditor's responsibilities and the scope of an audit in accordance
with generally accepted auditing standards.

Supplementary information accompanies the Entity's Special-Purpose financial statements. We will subject
such supplementary information to the auditing procedures applied to our audit of the Special-Purpose

Member of
Deloitte Touche Tohmatsu Limited

financial statements and certain additional procedures with the objective of expressing an opinion on whether such information is fairly stated, in all material respects, in relation to the Special-Purpose financial statements as a whole.

## D&T Reports

We expect to issue a written report upon the completion of our audit. Our ability to express an opinion or to issue any report as a result of this engagement and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our report. If, for any reason, we are unable to complete our audit or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue any report as a result of this engagement. If we are unable to complete our audit, or if any report to be issued by D&T as a result of this engagement requires modification, the reasons for this will be discussed with the Sears Holdings Audit Committee and the Company's management.

## Management's Responsibilities

Appendix B describes management's responsibilities.

## Responsibility of Sears Holdings Audit Committee

As independent auditors of the Company, we acknowledge that the Sears Holdings Audit Committee is directly responsible for the appointment, compensation, and oversight of our work. The Sears Holdings Audit Committee has delegated responsibility for the oversight of our work to the Board of Directors of the Parent Company (the "Board of Directors") and accordingly, except as otherwise specifically noted, we will report directly to the Board of Directors. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Sears Holdings Audit Committee in accordance with the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Communications with the Board of Directors

Appendix C describes various matters that we are required by generally accepted auditing standards to communicate with the Board of Directors and management.

## Fees

We confirm our understanding that the Sears Holdings Audit Committee has the sole authority to approve our fees. Fees have been previously approved at the March 16, 2015 Sears Holdings Audit Committee meeting and the fees for this engagement are estimated to be $84,000 which includes the fees related to the audit of the supplementary tax information of $15,500, plus expenses.

Based on the anticipated timing of the work, our fees will be billed as the work is performed and payments are due 45 days from the date of the invoice. Engagement-related expenses will be billed separately in addition to the fees.

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms.  Our estimated fees are based on certain assumptions, including (1) timely and accurate completion of the requested Entity participation schedules and additional supporting information, (2) no inefficiencies during the audit process or changes in scope caused by events that are beyond our control, (3) the effectiveness of internal control over financial reporting throughout the period under audit, (4) a minimal level of audit adjustments (recorded or unrecorded), and (5) no changes to the timing or extent of

our work plans. We will notify you promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary.

Additional services requested beyond the scope of services described herein would be subject to the mutual agreement of the Company and D&T at such time as D&T is engaged to perform the services and would be described in a separate engagement letter.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Entity intends to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited Special-Purpose financial statements  (e.g., in a periodic filing with a regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, the Entity and the Company agrees that its management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Entity also agrees that its management will notify us and obtain our approval prior to including any of our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Entity. Any request by the Entity or the Company to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Company and D&T.

* * * * *

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should the Entity, the Board of Directors, the Company, or the Sears Holdings Audit Committee request, and should D&T agree to provide, services (including audit) beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through E attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

Accepted and agreed to by Sears Holdings Corporation on behalf of the management of the Entity:

By:    Mr. Robert A. Riecker
Title:   Vice President, Controller, and Chief Accounting Officer

Date:    5/9/2016

cc:    The Audit Committee of Sears Holdings Corporation

The Board of Directors of Kmart Holdings Corporation

**APPENDIX A**

**AUDITOR'S RESPONSIBILITIES AND SCOPE OF AN AUDIT IN ACCORDANCE WITH
GENERALLY ACCEPTED AUDITING STANDARDS**

This Appendix A is part of the engagement letter dated May 9, 2016, between Deloitte & Touche LLP
and the Entity.

**Auditor's Responsibilities**

Our responsibilities under generally accepted auditing standards include forming and expressing an
opinion about whether the Special-Purpose financial statements that have been prepared by management
with the oversight of the Board of Directors are presented fairly, in all material respects, in accordance
with generally accepted accounting principles. The audit of the Special-Purpose financial statements does
not relieve management or the Board of Directors of their responsibilities.

**Scope of an Audit**

Generally accepted auditing standards require that we plan and perform the audit to obtain reasonable,
rather than absolute, assurance about whether the Special-Purpose financial statements as a whole are free
from material misstatement, whether caused by fraud or error. However, because of the inherent
limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists
that some material misstatements may not be detected, even though the audit is properly planned and
performed in accordance with generally accepted auditing standards. We have no responsibility to plan
and perform the audit to obtain reasonable assurance that misstatements, whether caused by fraud or
error, that are not material to the Special-Purpose financial statements as a whole are detected.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in
the Special-Purpose financial statements. The procedures selected depend on our judgment, including the
assessment of the risks of material misstatement of the Special-Purpose financial statements, whether
caused by fraud or error. In making those risk assessments, we consider internal control relevant to the
Company's preparation and fair presentation of the Special-Purpose financial statements in order to
design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an
opinion on the effectiveness of the Company's internal control. An audit also includes evaluating the
appropriateness of accounting policies used and the reasonableness of significant accounting estimates
made by management, as well as evaluating the overall presentation of the Special-Purpose financial
statements.

**APPENDIX B**

## MANAGEMENT'S RESPONSIBILITIES

This Appendix B is part of the engagement letter dated May 9, 2016, between Deloitte & Touche LLP and Entity.

## Special-Purpose Financial Statements

Management is responsible for the preparation, fair presentation, and overall accuracy of the Special-Purpose financial statements in accordance with generally accepted accounting principles. In this regard, management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Designing, implementing, and maintaining effective internal control relevant to the preparation and fair presentation of the Special-Purpose financial statements that are free from material misstatement, whether due to fraud or error

- Identifying and ensuring that the Company complies with the laws and regulations applicable to its activities and informing us of all instances of identified or suspected noncompliance with such laws or regulations

- Providing us with (1) access to all information of which management is aware that is relevant to the preparation and fair presentation of the Special-Purpose financial statements, such as records, documentation, and other matters, (2) additional information that we may request from management for the purpose of our audit and (3) unrestricted access to personnel within the Company from whom we determine it necessary to obtain audit evidence

Management is also responsible for (1) preparing the supplementary information in accordance with the standards of the AICPA, (2) including our report on the supplementary information in any document that contains the supplementary information and that indicates that D&T has reported on such supplementary information, and (3) presenting the supplementary information with the audited Special-Purpose financial statements or, if such information will not be presented with the audited Special-Purpose financial statements, to make the audited Special-Purpose financial statements readily available to the intended users of such information no later than the date of issuance by the Entity of the supplementary information and our report thereon.

## Management's Representations

We will make specific inquiries of the Entity's management about the representations embodied in the Special-Purpose financial statements and supplementary information. In addition, we will request that management provide us with the written representations the Entity is required to provide to its independent auditors under generally accepted auditing standards. The responses to those inquiries and the written representations of management are part of the evidential matter that D&T will rely on in forming its opinion on the Entity's Special-Purpose financial statements and supplementary information.

## Process for Obtaining Preapproval of Services

Management is responsible for the coordination of obtaining the preapproval of the Sears Holdings Audit Committee, in accordance with the Sears Holdings Audit Committee's preapproval process, for any services to be provided by D&T to the Entity.

## Program and Subscription Services

D&T makes available to clients and nonclients various educational and informational programs, seminars, tools, and related services, such as live programs, webcasts (including the Dbriefs webcast series), podcasts, websites, database subscriptions (including some that provide access to D&T proprietary information and tools that offer technical support and advice), checklists, research reports, surveys, published books and other materials, applications, local office seminars, Technical Library, and CXO conferences (collectively, "programs and subscriptions"). D&T may provide these programs and subscriptions free of charge, for a nominal fee, or for a fee at prevailing market rates. In some instances, D&T may include complimentary rooms or meals as part of programs or seminars. Any programs and subscriptions requested by the Company and the related fees (if any) would be subject to the mutual agreement of the Company and D&T and may be described in a separate written agreement. The Company hereby confirms that any use or receipt by the Company of these programs and subscriptions is approved by the Sears Holdings Audit Committee when required by the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Independence Matters

In connection with our engagement, D&T, management, and the Sears Holdings Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Company is an attest client. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, has policies and procedures in place for the purpose of ensuring that neither the Entity nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Ms. Pajula or Ms. Berrill.

In connection with the foregoing paragraph, the Company agrees to furnish to D&T and keep D&T updated with respect to a corporate tree that identifies the legal names of the Company's affiliates, as defined in AICPA *Code of Professional Conduct* Interpretation No. 101-18 (e.g., parents, subsidiaries, investors, or investees) ("Company Affiliates"), together with the ownership relationship among such entities. Such information will be maintained in a database accessible by D&T in connection with their compliance with AICPA or other applicable independence rules.

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management of the Company will ensure that the Company, together with its subsidiaries and other entities, including the Entity, that comprise the Company, also have policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Company for a former or current D&T partner, principal, or professional employee should be discussed with Ms. Pajula or Ms. Berrill and approved by the Sears Holdings Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief

accounting officer, or any equivalent position for the Company or in a comparable position at a significant subsidiary; (2) on the board of directors of the Company or its subsidiaries; (3) as a member of the Sears Holdings Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For purposes of the preceding sections entitled "Independence matters," "Process for Obtaining Preapproval of services" and "Program and Subscription Services", "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

**APPENDIX C**

## COMMUNICATIONS WITH BOARD OF DIRECTORS

This Appendix C is part of the engagement letter dated May 9, 2016, between Deloitte & Touche LLP and Entity.

We are responsible for communicating with the Board of Directors significant matters related to the audit that are, in our professional judgment, relevant to the responsibilities of the Board of Directors in overseeing the financial reporting process.

In connection with the foregoing, we will communicate to the Board of Directors any fraud we identify or suspect that involves (1) management, (2) employees of the Entity who have significant roles in internal control, or (3) other employees of the Entity when the fraud results in a material misstatement of the Special-Purpose financial statements. In addition, we will communicate with the Board of Directors any other matters related to fraud that are, in our professional judgment, relevant to their responsibilities. We will communicate to management any fraud perpetrated by lower-level employees of which we become aware that does not result in a material misstatement of the Special-Purpose financial statements; however, we will not communicate such matters to the Board of Directors, unless otherwise directed by the Board of Directors.

We will also communicate to the Board of Directors matters involving the Entity's noncompliance with laws and regulations that have come to our attention during the course of our audit, other than when such matters are clearly inconsequential.

We will also communicate in writing to management and the Board of Directors any significant deficiencies or material weaknesses in internal control (as defined in generally accepted auditing standards) that we have identified during the audit, including those that were remediated during the audit.

Generally accepted auditing standards do not require us to design procedures for the purpose of identifying other matters to communicate with the Board of Directors. However, we will communicate to the Board of Directors matters required by AICPA AU-C 260, *The Auditor's Communication with Those Charged with Governance*.

**APPENDIX D**

**GENERAL BUSINESS TERMS**

This Appendix D is part of the engagement letter to which these terms are attached (the engagement letter, including its appendices, the "engagement letter") dated May 9, 2016, between Deloitte & Touche LLP and Entity

1. <u>Independent Contractor.</u> D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Entity, the Parent Company, or the Board of Directors.

2. <u>Survival.</u> The agreements and undertakings of the Entity, the Parent Company, and the Board of Directors contained in the engagement letter will survive the completion or termination of this engagement.

3. <u>Assignment and Subcontracting.</u> Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or claims) relating to this engagement without the prior written consent of the other parties. The Entity, the Parent Company, and the Board of Directors hereby consent to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4. <u>Severability.</u> If any term of the engagement letter is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

5. <u>Force Majeure</u>. No party shall be deemed to be in breach of the engagement letter as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6. <u>Confidentiality</u>. To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Entity, D&T shall not disclose such information to any third party without the Entity's consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Entity and the Board of Directors hereby consents to D&T disclosing such information (1) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a source that D&T believes is not prohibited from disclosing such information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this paragraph.

7. <u>Dispute Resolution.</u> Any controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix E and made a part hereof.

**APPENDIX E**

**DISPUTE RESOLUTION PROVISION**

This Appendix E is part of the engagement letter dated May 9, 2016, between Deloitte & Touche LLP and the Entity.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

Mediation: All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

Arbitration Procedures: If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of the Entity and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

Costs: Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

# Deloitte.

Deloitte & Touche LLP

111 S. Wacker Drive
Chicago, IL 60606-4301
USA

Tel:  +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

August 11, 2017

Mr. Joseph F. Jordan
Interim Controller
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Dear Mr. Jordan:

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as independent auditors for Kmart Corporation - Puerto Rico Division (the "Entity" or "Division"), which is a division of Kmart Holdings Corporation (the "Parent Company"), which is a wholly-owned subsidiary of Sears Holdings Corporation ("Sears Holdings" or "the Company").

Ms. Seema Pajula and Mr. Scott Szalony will be responsible for the services that we perform for the Entity hereunder.

In addition to the audit services we are engaged to provide under this engagement letter, we would also be pleased to assist the Entity on issues as they arise throughout the year. Hence, we hope that you will call Ms. Pajula or Mr. Szalony whenever you believe D&T can be of assistance. This assistance will require approval by the Audit Committee of Sears Holdings in accordance with its preapproval policies and procedures.

The services to be performed by D&T pursuant to this engagement are subject to the terms and conditions set forth herein and in the accompanying appendices. Such terms and conditions shall be effective as of the date of the commencement of such services.

## Audit of Financial Statements

We understand that the entity will be preparing financial statements for submission to the taxing authorities in the Commonwealth of Puerto Rico, as the taxing authorities do not accept consolidated financial statements as part of required tax filings.

Our engagement is to perform an audit in accordance with auditing standards generally accepted in the United States of America ("generally accepted auditing standards"). The objective of an audit conducted in accordance with generally accepted auditing standards is to express an opinion on whether the Entity's financial statements as of and for the year ended January 28, 2017 are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States of America ("generally accepted accounting principles").

Appendix A contains a description of the auditor's responsibilities and the scope of an audit in accordance with generally accepted auditing standards.

Supplemental tax information ("supplementary information") accompanies the Entity's financial statements. We will subject such supplementary information to the auditing procedures applied to our audit of the financial statements and certain additional procedures with the objective of expressing an opinion on whether such information is fairly stated, in all material respects, in relation to the financial statements as a whole.

## D&T Reports

We expect to issue a written report upon the completion of our audit. Our ability to express an opinion or to issue any report as a result of this engagement and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our report. If, for any reason, we are unable to complete our audit or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue any report as a result of this engagement. If we are unable to complete our audit, or if any report to be issued by D&T as a result of this engagement requires modification, the reasons for this will be discussed with the Sears Holdings Audit Committee and the Company's management.

## Management's Responsibilities

Appendix B describes management's responsibilities.

## Responsibility of Sears Holdings Audit Committee

As independent auditors of the Company, we acknowledge that the Sears Holdings Audit Committee is directly responsible for the appointment, compensation, and oversight of our work. The Sears Holdings Audit Committee has delegated responsibility for the oversight of our work to the Board of Directors of the Parent Company (the "Board of Directors") and accordingly, except as otherwise specifically noted, we will report directly to the Board of Directors. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Sears Holdings Audit Committee in accordance with the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Communications with the Board of Directors

Appendix C describes various matters that we are required by generally accepted auditing standards to communicate with the Board of Directors and management.

## Fees

We confirm our understanding that the Sears Holdings Audit Committee has the sole authority to approve our fees. Fees have been previously approved at the March 16, 2016 Sears Holdings Audit Committee meeting and the fees for this engagement are estimated to be $91,000 which includes the fees related to the audit of the supplementary tax information of $17,000, plus expenses.

Based on the anticipated timing of the work, our fees were billed on June 19, 2017. Payments are due 45 days from the date of the invoice. Engagement-related expenses will be billed separately in addition to the fees.

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms. Our estimated fees are based on certain assumptions, including (1) timely and accurate completion of the requested Entity participation schedules and additional supporting information, (2) no inefficiencies during the audit process or changes in scope caused by events that are beyond our control, (3) the effectiveness of internal control over financial reporting throughout the period under audit, (4) a minimal level of audit adjustments (recorded or unrecorded), and (5) no changes to the timing or extent of our work plans. We will notify you promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary.

Additional services requested beyond the scope of services described herein would be subject to the mutual agreement of the Company and D&T at such time as D&T is engaged to perform the services and would be described in a separate engagement letter.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Entity or the Company intends to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with a regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, the Entity and the Company agrees that its management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Entity and the Company also agree that its management will notify us and obtain our approval prior to including any of our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Entity or the Company. Any request by the Entity or the Company to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Company and D&T.

* * * * *

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should the Entity, the Board of Directors, or the Company, or the Sears Holdings Audit Committee request, and should D&T agree to provide, services (including audit) beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through E attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

Accepted and agreed to by Sears Holdings Corporation on behalf of the management of the Entity:

By: Mr. Joseph F. Jordan

Title: Interim Controller

Date: 8/11/2017

cc:    The Board of Directors of Kmart Holdings Corporation

**APPENDIX A**

**AUDITOR'S RESPONSIBILITIES AND SCOPE OF AN AUDIT IN ACCORDANCE WITH GENERALLY ACCEPTED AUDITING STANDARDS**

This Appendix A is part of the engagement letter dated August 11, 2017, between Deloitte & Touche LLP and the Entity.

## Auditor's Responsibilities

Our responsibilities under generally accepted auditing standards include forming and expressing an opinion about whether the financial statements that have been prepared by management with the oversight of the Board of Directors are presented fairly, in all material respects, in accordance with generally accepted accounting principles. The audit of the financial statements does not relieve management or the Board of Directors of their responsibilities.

## Scope of an Audit

Generally accepted auditing standards require that we plan and perform the audit to obtain reasonable, rather than absolute, assurance about whether the financial statements as a whole are free from material misstatement, whether caused by fraud or error. However, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with generally accepted auditing standards. We have no responsibility to plan and perform the audit to obtain reasonable assurance that misstatements, whether caused by fraud or error, that are not material to the financial statements as a whole are detected.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the financial statements, whether caused by fraud or error. In making those risk assessments, we consider internal control relevant to the Company's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

**APPENDIX B**

**MANAGEMENT'S RESPONSIBILITIES**

This Appendix B is part of the engagement letter dated August 11, 2017, between Deloitte & Touche LLP and the Entity.

**Financial Statements**

Entity management is responsible for the preparation, fair presentation, and overall accuracy of the financial statements in accordance with generally accepted accounting principles. In this regard, management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Designing, implementing, and maintaining effective internal control relevant to the preparation and fair presentation of the financial statements that are free from material misstatement, whether due to fraud or error

- Identifying and ensuring that the Company complies with the laws and regulations applicable to its activities and informing us of all instances of identified or suspected noncompliance with such laws or regulations

- Providing us with (1) access to all information of which management is aware that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters, (2) additional information that we may request from management for the purpose of our audit and (3) unrestricted access to personnel within the Company from whom we determine it necessary to obtain audit evidence

Management is also responsible for (1) preparing the supplementary information in accordance with generally accepted accounting principles, (2) including our report on the supplementary information in any document that contains the supplementary information and that indicates that D&T has reported on such supplementary information, and (3) presenting the supplementary information with the audited financial statements or, if such information will not be presented with the audited financial statements, to make the audited financial statements readily available to the intended users of such information no later than the date of issuance by the Entity of the supplementary information and our report thereon.

**Management's Representations**

We will make specific inquiries of the Entity's management about the representations embodied in the financial statements and supplementary information. In addition, we will request that Entity management provide us with the written representations the Entity is required to provide to its independent auditors under generally accepted auditing standards. The responses to those inquiries and the written representations of Entity management are part of the evidential matter that D&T will rely on in forming its opinion on the Entity's financial statements and supplementary information.

**Process for Obtaining Preapproval of Services**

Management is responsible for the coordination of obtaining the preapproval of the Sears Holdings Audit Committee, in accordance with the Sears Holdings Audit Committee's preapproval process, for any services to be provided by D&T to the Entity.

## Program and Subscription Services

D&T makes available to clients and nonclients various educational and informational programs, seminars, tools, and related services, such as live programs, webcasts (including the Dbriefs webcast series), podcasts, websites, database subscriptions (including some that provide access to D&T proprietary information and tools that offer technical support and advice), checklists, research reports, surveys, published books and other materials, applications, local office seminars, Technical Library, and CXO conferences (collectively, "programs and subscriptions"). D&T may provide these programs and subscriptions free of charge, for a nominal fee, or for a fee at prevailing market rates. In some instances, D&T may include complimentary rooms or meals as part of programs or seminars. Any programs and subscriptions requested by the Company and the related fees (if any) would be subject to the mutual agreement of the Company and D&T and may be described in a separate written agreement. The Company hereby confirms that any use or receipt by the Company of these programs and subscriptions is approved by the Sears Holdings Audit Committee when required by the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Independence Matters

In connection with our engagement, D&T, management, and the Sears Holdings Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Company is an attest client. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, has policies and procedures in place for the purpose of ensuring that neither the Entity nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Ms. Pajula or Mr. Szalony.

In connection with the foregoing paragraph, the Company agrees to furnish to D&T and keep D&T updated with respect to a corporate tree that identifies the legal names of the Company's affiliates, as defined in AICPA *Code of Professional Conduct* Interpretation No. 101-18 (e.g., parents, subsidiaries, investors, or investees) ("Company Affiliates"), together with the ownership relationship among such entities. Such information will be maintained in a database accessible by D&T in connection with their compliance with AICPA or other applicable independence rules.

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management of the Company will ensure that the Company, together with its subsidiaries and other entities, including the Entity, that comprise the Company, also have policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Company for a former or current D&T partner, principal, or professional employee should be discussed with Ms. Pajula or Mr. Szalony and approved by the Sears Holdings Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent position for the Company or in a comparable position at a significant subsidiary; (2) on the board of directors of the Company or its subsidiaries; (3) as a member of the Sears Holdings Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For purposes of the preceding sections entitled "Independence matters," "Process for Obtaining Preapproval of services" and "Program and Subscription Services", "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

APPENDIX C

**COMMUNICATIONS WITH THE BOARD OF DIRECTORS**

This Appendix C is part of the engagement letter dated August 11, 2017, between Deloitte & Touche LLP and Entity.

We are responsible for communicating with the Board of Directors significant matters related to the audit that are, in our professional judgment, relevant to the responsibilities of the Board of Directors in overseeing the financial reporting process.

In connection with the foregoing, we will communicate to the Board of Directors any fraud we identify or suspect that involves (1) management, (2) employees of the Entity who have significant roles in internal control, or (3) other employees of the Entity when the fraud results in a material misstatement of the financial statements. In addition, we will communicate with the Board of Directors any other matters related to fraud that are, in our professional judgment, relevant to their responsibilities. We will communicate to management any fraud perpetrated by lower-level employees of which we become aware that does not result in a material misstatement of the financial statements; however, we will not communicate such matters to the Board of Directors, unless otherwise directed by the Board of Directors.

We will also communicate to the Board of Directors matters involving the Entity's noncompliance with laws and regulations that have come to our attention during the course of our audit, other than when such matters are clearly inconsequential.

We will also communicate in writing to management and the Board of Directors any significant deficiencies or material weaknesses in internal control (as defined in generally accepted auditing standards) that we have identified during the audit, including those that were remediated during the audit.

Generally accepted auditing standards do not require us to design procedures for the purpose of identifying other matters to communicate with the Boards of Directors. However, we will communicate to the Board of Directors matters required by AICPA AU-C 260, *The Auditor's Communication with Those Charged with Governance*.

**APPENDIX D**

## GENERAL BUSINESS TERMS

This Appendix D is part of the engagement letter to which these terms are attached (the engagement letter, including its appendices, the "engagement letter") dated August 11, 2017, between Deloitte & Touche LLP and Entity

1.  **Independent Contractor**. D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Entity, the Parent Company, or the Boards of Directors.

2.  **Survival**. The agreements and undertakings of the Entity, the Parent Company, and the Board of Directors contained in the engagement letter will survive the completion or termination of this engagement.

3.  **Assignment and Subcontracting**. Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or claims) relating to this engagement without the prior written consent of the other parties. The Entity, the Parent Company, and the Board of Directors hereby consent to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4.  **Severability**. If any term of the engagement letter is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

5.  **Force Majeure**. No party shall be deemed to be in breach of the engagement letter as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6.  **Confidentiality**. To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Entity, D&T shall not disclose such information to any third party without the Entity's consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Entity and the Board of Directors hereby consents to D&T disclosing such information (1) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a source that D&T believes is not prohibited from disclosing such information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this paragraph.

7.  **Dispute Resolution**. Any controversy or claim between the parties arising out of or relating to the

engagement letter or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix E and made a part hereof.

APPENDIX E

**DISPUTE RESOLUTION PROVISION**

This Appendix E is part of the engagement letter dated August 11, 2017, between Deloitte & Touche LLP and the Entity.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

<u>Mediation</u>: All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

<u>Arbitration Procedures</u>: If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of the Entity and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

<u>Costs</u>: Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.



**Deloitte & Touche LLP**

111 S. Wacker Drive
Chicago, IL 60606-4301
USA

Tel:  +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

August 1, 2018

Mr. Robert A. Riecker
Chief Financial Officer
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Dear Mr. Riecker:

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as independent auditors for Kmart Corporation - Puerto Rico Division (the "Entity" or "Division"), which is a division of Kmart Holdings Corporation (the "Parent Company"), which is a wholly-owned subsidiary of Sears Holdings Corporation ("Sears Holdings" or "the Company"). Ms. Lesley A. Weinert McDonnell will be responsible for the services that we perform for the Entity hereunder.

In addition to the audit services we are engaged to provide under this engagement letter, we would also be pleased to assist the Entity on issues as they arise throughout the year. Hence, we hope that you will call Ms. McDonnell whenever you believe D&T can be of assistance. This assistance will require approval by the Audit Committee of Sears Holdings ("Sears Holdings Audit Committee") in accordance with its preapproval policies and procedures.

The services to be performed by D&T pursuant to this engagement are subject to the terms and conditions set forth herein and in the accompanying appendices. Such terms and conditions shall be effective as of the date of the commencement of such services.

## Audit of Financial Statements

Our engagement is to perform an audit in accordance with auditing standards generally accepted in the United States of America ("generally accepted auditing standards"). The objective of an audit conducted in accordance with generally accepted auditing standards is to express an opinion on whether the Entity's financial statements for the year ended February 3, 2018, are presented fairly, in all material respects, in accordance with accounting principles generally accepted in the United States of America ("generally accepted accounting principles").

Appendix A contains a description of the auditor's responsibilities and the scope of an audit in accordance with generally accepted auditing standards.

Supplementary information accompanies the Entity's financial statements. We will subject such supplementary information to the auditing procedures applied to our audit of the financial statements and certain additional procedures with the objective of expressing an opinion on whether such information is fairly stated, in all material respects, in relation to the financial statements as a whole.

## D&T Reports

We expect to issue a written report upon the completion of our audit. Our ability to express an opinion or to issue any report as a result of this engagement and the wording thereof will, of course, be dependent on the facts and circumstances at the date of our report. If, for any reason, we are unable to complete our audit or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue any report as a result of this engagement. If we are unable to complete our audit, or if any report to be issued by D&T as a result of this engagement requires modification, the reasons for this will be discussed with the Sears Holdings Audit Committee and the Company's management.

## Management's Responsibilities

Appendix B describes management's responsibilities.

## Responsibility of the Sears Holdings Audit Committee

As independent auditors of the Entity, we acknowledge that the Sears Holdings Audit Committee is directly responsible for the appointment, compensation, and oversight of our work. The Sears Holdings Audit Committee has delegated responsibility for the oversight of our work to the Board of Directors of the Parent Company (the "Board of Directors") and accordingly, except as otherwise specifically noted, we will report directly to the Board of Directors. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Sears Holdings Audit Committee in accordance with the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Communications with the Board of Directors

Appendix C describes various matters that we are required by generally accepted auditing standards to communicate with the Board of Directors and management.

## Fees

We confirm our understanding that the Sears Holdings Audit Committee has the sole authority to approve our fees. Fees have been previously approved at the March 15, 2017 Sears Holdings Audit Committee meeting and the fees for this engagement are estimated to be $91,000 which includes the fees related to the audit of the supplementary tax information of $17,000, plus expenses. Based on the anticipated timing of the work, our fees will be billed in August 2018.

Based on the anticipated timing of the work, our fees will be billed as the work is performed and payments are due 45 days from the date of the invoice. Engagement-related expenses, such as technology and administrative related charges, will be billed in addition to the fees and will be stated separately on the invoices.

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms. Our estimated fees are based on certain assumptions, including (1) timely and accurate completion of the requested entity participation schedules and additional supporting information, (2) no inefficiencies during the audit process or changes in scope caused by events that are beyond our control, (3) the effectiveness of internal control over financial reporting throughout the period under audit, (4) a minimal level of audit adjustments (recorded or unrecorded), and (5) no changes to the timing or extent of our work plans. We will notify you promptly of any circumstances we encounter that could significantly affect our estimate and discuss with you any additional fees, as necessary.

## Inclusion of D&T Reports or References to D&T in Other Documents or Electronic Sites

If the Entity intends to publish or otherwise reproduce in any document any report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to the audited financial statements (e.g., in a periodic filing with a regulator, in a debt or equity offering circular, or in a private placement memorandum), thereby associating D&T with such document, Entity agrees that its management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of any of our reports, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of any of our reports in any such document would constitute the reissuance of such reports. The Entity also agrees that its management will notify us and obtain our

approval prior to including any of our reports on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Company. Any request by the Entity to reissue any report issued as a result of this engagement, to consent to any such report's inclusion or incorporation by reference in an offering or other document, or to agree to any such report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Company and D&T.

\* \* \* \* \*

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should the Entity, the Board of Directors, or the Company or the Sears Holdings Audit Committee request, and should D&T agree to provide, services (including audit) beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through E attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

If the above terms are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

Accepted and agreed to by Sears Holdings Corporation on behalf of itself and the Entity:

By: _____

Mr. Robert A. Riecker
Chief Financial Officer

Date: _8/1/2018_____

cc: Audit Committee of Sears Holdings

**APPENDIX A**

# AUDITOR'S RESPONSIBILITIES AND SCOPE OF AN AUDIT IN ACCORDANCE WITH GENERALLY ACCEPTED AUDITING STANDARDS

This Appendix A is part of the engagement letter dated August 1, 2018, between Deloitte & Touche LLP and the Entity.

## Auditor's Responsibilities

Our responsibilities under generally accepted auditing standards include forming and expressing an opinion about whether the financial statements that have been prepared by management with the oversight of the Board of Directors are presented fairly, in all material respects, in accordance with generally accepted accounting principles. The audit of the financial statements does not relieve management or the Board of Directors of their responsibilities.

## Scope of an Audit

Generally accepted auditing standards require that we plan and perform the audit to obtain reasonable, rather than absolute, assurance about whether the financial statements as a whole are free from material misstatement, whether caused by fraud or error. However, because of the inherent limitations of an audit, together with the inherent limitations of internal control, an unavoidable risk exists that some material misstatements may not be detected, even though the audit is properly planned and performed in accordance with generally accepted auditing standards. We have no responsibility to plan and perform the audit to obtain reasonable assurance that misstatements, whether caused by fraud or error, that are not material to the financial statements as a whole are detected.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the financial statements, whether caused by fraud or error. In making those risk assessments, we consider internal control relevant to the Entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances but not for the purpose of expressing an opinion on the effectiveness of the Entity's internal control. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

**APPENDIX B**

# MANAGEMENT'S RESPONSIBILITIES

This Appendix B is part of the engagement letter dated August 1, 2018, between Deloitte & Touche LLP and the Entity.

## Financial Statements

Management is responsible for the preparation, fair presentation, and overall accuracy of the financial statements in accordance with generally accepted accounting principles. In this regard, management has the responsibility for, among other things:

- Selecting and applying the accounting policies

- Designing, implementing, and maintaining effective internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error

- Identifying and ensuring that the Entity complies with the laws and regulations applicable to its activities and informing us of all instances of identified or suspected noncompliance with such laws or regulations

- Providing us with (1) access to all information of which management is aware that is relevant to the preparation and fair presentation of the financial statements, such as records, documentation, and other matters, (2) additional information that we may request from management for the purpose of our audit, and (3) unrestricted access to personnel within the Entity from whom we determine it necessary to obtain audit evidence

Management is also responsible for (1) preparing the supplementary information in accordance with generally accepted accounting principles, (2) including our report on the supplementary information in any document that contains the supplementary information and that indicates that D&T has reported on such supplementary information, and (3) presenting the supplementary information with the audited financial statements or, if such information will not be presented with the audited financial statements, to make the audited financial statements readily available to the intended users of such information no later than the date of issuance by the Entity of the supplementary information and our report thereon.

## Management's Representations

We will make specific inquiries of the Entity's management about the representations embodied in the financial statements and supplementary information. In addition, we will request that management provide us with the written representations the Entity is required to provide to its independent auditors under generally accepted auditing standards. The responses to those inquiries and the written representations of management are part of the evidential matter that D&T will rely on in forming its opinion on the Entity's financial statements and supplementary information.

## Process for Obtaining Preapproval of Services

Management is responsible for the coordination of obtaining the preapproval of the Sears Holdings Audit Committee, in accordance with the Sears Holdings Audit Committee's preapproval process, for any services to be provided by D&T to the Entity.

## Program and Subscription Services

D&T makes available to clients and nonclients various educational and informational programs, seminars, tools, and related services, such as live programs, webcasts (including the Dbriefs webcast series), podcasts, websites, database subscriptions (including some that provide access to D&T proprietary information and tools that offer technical support and advice), checklists, research reports, surveys, published books and other materials, applications, local office seminars, Technical Library, and CXO conferences (collectively, "programs and subscriptions"). D&T may provide these programs and subscriptions free of charge, for a nominal fee, or for a fee at prevailing market rates. In some instances, D&T may include complimentary rooms or meals as part of programs or seminars. Any programs and subscriptions requested by the Entity and the related fees (if any) would be subject to the mutual agreement of the Entity and D&T and may be described in a separate written agreement. The Entity hereby confirms that any use or receipt by the Entity of these programs and subscriptions is approved by the Sears Holdings Audit Committee when required by the Sears Holdings Audit Committee's established preapproval policies and procedures.

## Independence Matters

In connection with our engagement, D&T, management, and the Sears Holdings Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence and ensuring compliance with the securities laws and regulations. D&T will communicate to its partners, principals, and employees that the Company is an attest client. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, has policies and procedures in place for the purpose of ensuring that neither the Company nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that either has not been subjected to their preapproval process or that under SEC or other applicable rules would impair D&T's independence. All potential services are to be discussed with Ms. McDonnell.

In connection with the foregoing paragraph, the Company agrees to furnish to D&T and keep D&T updated with respect to a corporate tree that identifies the legal names of the Company's affiliates, as defined in AICPA *Code of Professional Conduct* Interpretation No. 101-18 (e.g., parents, subsidiaries, investors, or investees) ("Company Affiliates"), together with the ownership relationship among such entities. Such information will be maintained in a database accessible by D&T in connection with their compliance with AICPA or other applicable independence rules.

Management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees for certain positions. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company, also has policies and procedures in place for purposes of ensuring that D&T's independence will not be impaired by hiring a former or current D&T partner, principal, or professional employee in an accounting role or financial reporting oversight role that would cause a violation of securities laws and regulations. Any employment opportunities with the Company for a former or current D&T partner, principal, or professional employee should be discussed with Ms. McDonnell and approved by the Sears Holdings Audit Committee before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee, if such opportunity relates to serving (1) as chief executive officer, controller, chief financial officer, chief accounting officer, or any equivalent position for the Company or in a comparable position at a significant subsidiary of the Company; (2) on the board of directors of the Company, Entity, or Parent Company (3) as a member of the Board of Directors or Sears Holdings' Audit Committee; or (4) in any other position that would cause a violation of securities laws and regulations.

For purposes of the preceding sections entitled "Independence Matters", "Process for Obtaining Preapproval of Services," and "Program and Subscription Services,", "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

**APPENDIX C**

## COMMUNICATIONS WITH THE BOARD OF DIRECTORS

This Appendix C is part of the engagement letter dated August 1, 2018, between Deloitte & Touche LLP and the Entity.

We are responsible for communicating with the Board of Directors significant matters related to the audit that are, in our professional judgment, relevant to the responsibilities of the Board of Directors in overseeing the financial reporting process.

In connection with the foregoing, we will communicate to the Board of Directors any fraud we identify or suspect that involves (1) management, (2) employees of the Entity who have significant roles in internal control, or (3) other employees of the Entity when the fraud results in a material misstatement of the financial statements. In addition, we will communicate with the Board of Directors any other matters related to fraud that are, in our professional judgment, relevant to their responsibilities. We will communicate to management any fraud perpetrated by lower-level employees of which we become aware that does not result in a material misstatement of the financial statements; however, we will not communicate such matters to the Board of Directors, unless otherwise directed by the Board of Directors.

We will also communicate to the Board of Directors matters involving the Company's noncompliance with laws and regulations that have come to our attention during the course of our audit, other than when such matters are clearly inconsequential.

We will also communicate in writing to management and the Board of Directors any significant deficiencies or material weaknesses in internal control (as defined in generally accepted auditing standards) that we have identified during the audit, including those that were remediated during the audit.

Generally accepted auditing standards do not require us to design procedures for the purpose of identifying other matters to communicate with the Board of Directors. However, we will communicate to the Board of Directors matters required by AICPA AU-C 260, *The Auditor's Communication with Those Charged with Governance*.

**APPENDIX D**

# GENERAL BUSINESS TERMS

This Appendix D is part of the engagement letter to which these terms are attached (the engagement letter, including its appendices, the "engagement letter") dated August 1, 2018, between Deloitte & Touche LLP and the Entity.

1.  <u>Independent Contractor.</u> D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, or representative of the Entity, Sears Holdings Audit Committee, Sears Holdings, the Parent Company, or the Board of Directors.

2.  <u>Survival.</u> The agreements and undertakings of the Entity contained in the engagement letter will survive the completion or termination of this engagement.

3.  <u>Assignment and Subcontracting.</u> Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or claims) relating to this engagement without the prior written consent of the other parties. The Entity hereby consents to D&T subcontracting a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

4.  <u>Severability.</u> If any term of the engagement letter is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

5.  <u>Force Majeure</u>. No party shall be deemed to be in breach of the engagement letter as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

6.  <u>Confidentiality</u>. To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Entity, D&T shall not disclose such information to any third party without the Entity's consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Entity hereby consents to D&T disclosing such information (1) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a source that D&T believes is not prohibited from disclosing such information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this paragraph.

7.  <u>Dispute Resolution.</u> Any controversy or claim between the parties arising out of or relating to the engagement letter or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as Appendix E and made a part hereof.

**APPENDIX E**

## DISPUTE RESOLUTION PROVISION

This Appendix E is part of the engagement letter dated August 1, 2018, between Deloitte & Touche LLP and the Entity.

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of Disputes and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

<u>Mediation:</u> All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

<u>Arbitration Procedures:</u> If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of the Entity and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

<u>Costs:</u> Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

## **Exhibit 9**

**System Services Engagement Letter**



**Deloitte & Touche LLP**
111 S. Wacker Drive
Chicago, IL 60606
USA

Tel:  +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

July 9, 2018

Mr. William C. Kunkler
Audit Committee Chair
Audit Committee of Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Mr. Robert A. Riecker
Chief Financial Officer
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Dear Mr. Kunkler and Mr. Riecker**:**

Deloitte & Touche LLP ("D&T" or "we" or "us") is pleased to serve as service auditors for Sears
Holdings Corporation (the "Company" or "you" or "your" or "SHC").

The services to be performed by D&T pursuant to this engagement are subject to the terms and
conditions set forth herein and in the accompanying appendices. Such terms and conditions shall
be effective as of the date of the commencement of such services.

**ENGAGEMENT TEAM MEMBERS**

Ms. Maureen Berggren, Managing Director will be the Engagement Leader and will be
responsible for our service auditors' examination, while Mr. Jim Berry, Lead Client Service
Partner will continue to coordinate all services we perform for the Company.

**ENGAGEMENT SCOPE AND OBJECTIVES**

The purpose of our engagement is to examine the Company's description of the system related to
the Financial Reporting, Inventory, Procurement, and Revenue Transactions Processing Services
and related General Computer Controls at the Company (collectively, the 'description of the
system'), which will be drafted by the Company's management.

Our examination will include those procedures that we consider necessary under the
circumstances to obtain a reasonable basis for rendering our opinion on the following:

- Whether the description fairly presents the Financial Reporting, Inventory, Procurement,
  and Revenue Transactions Processing and the general computer controls of SHC that was
  designed and implemented throughout the specific period from February 4, 2018 through
  December 1, 2018.

- Whether the controls related to the control objectives stated in the description were suitably designed to provide reasonable assurance that the control objectives would be achieved if the controls operated effectively throughout the specific period from February 4, 2018 through December 1, 2018  and subservice organizations applied complementary subservice organization controls and user entities applied the complementary user entity controls assumed in the design of the company's controls throughout the specific period from February 4, 2018 through December 1, 2018 . Such control objectives are described in Appendix F.

- Whether the controls operated effectively to provide reasonable assurance that the control objectives stated in the Company's management description of the system were achieved throughout the specified period from February 4, 2018 through December 1, 2018 if complementary subservice organization controls and complementary user entity controls assumed in the design of service organization's controls operated effectively throughout the period February 4, 2018 through December 1, 2018.

Our examination will be conducted in accordance with the Statement on Standards for Attestation Engagements No. 18, Attestation Standards: *Clarification and Recodification* ("SSAE 18"), which encompasses (1) AT-C 105, *Concepts Common to All Attestation Engagements;* (2) AT-C 205, *Examination Engagements;* and (3) AT-C 320*, Reporting on an Examination of Controls at a Service Organization Relevant to User Entities' Internal Control Over Financial Reporting*, established by the American Institute of Certified Public Accountants (AICPA) ("AICPA standards"). A Service Organization Controls ("SOC 1") report will be issued as part of this examination.

## EXAMINATION OF THE DESCRIPTION OF THE SYSTEM

An examination includes examining, on a test basis, evidence supporting the description of the system and performing such other procedures as D&T considers necessary in the circumstances. An examination conducted in accordance with AICPA standards is designed to obtain reasonable, rather than absolute, assurance about the description of the system. The objective of the examination is the expression of an opinion on whether the description of the system is presented fairly and the controls related to the control objectives stated in the description of the system are suitably designed in all material respects, based on suitable criteria and specified by the Company (the "Criteria"), which represent the Company's controls likely to be relevant to user entities' internal control over financial reporting.

Our examination will include assessing whether management has used suitable Criteria in:

- Preparing its description of the service organization's system.

- Evaluating whether controls were suitably designed to achieve the control objectives stated in the description.

- Evaluating whether controls operated effectively throughout the specified period to achieve the control objectives stated in the description of the service organization's system.

Our ability to express an opinion, and the wording thereof, will, of course, be dependent on the facts and circumstances at the date of our attest report. If, for any reason, we are unable to complete the examination or are unable to form or have not formed an opinion, we may decline to express an opinion or decline to issue a report as a result of this engagement. If we are unable to complete our examination or if the attest report to be issued by D&T as a result of this engagement requires modification, the reasons for this will be discussed with the Audit Committee and the Company's management.

We understand that Wipro Limited ("Wipro") provides accounting process controls services including reconciliations and general accounting administration and, RGIS LLC ("RGIS") for inventory controls related to store counts (Wipro and RGIS collectively "subservice organizations"). Additionally, we understand that the description also indicates that certain control objectives specified by the Company can be achieved only if complementary subservice organization controls assumed in the design of the Company's controls are suitably designed and operating effectively, along with the related controls at the subservice organization. However, it is our understanding that the complementary subservice organization controls and the control objectives and related controls of the subservice organizations will not be subject to our examination performed hereunder.

## FORM AND CONTENT OF THE DESCRIPTION OF THE SYSTEM

It is our understanding that the Company's management has committed to preparing the description of the system, and that such description will present how the Company's system was designed and implemented, including the following information about the system:

- The types of services provided including, as appropriate, the classes of transactions processed.

- The procedures, within both automated and manual systems, by which services are provided, including, as appropriate, procedures by which transactions are initiated, authorized, recorded, processed, corrected as necessary, and transferred to the reports and other information prepared for user entities.

- The information used in the performance of the procedures, including, if applicable, related accounting records, whether electronic or manual, and supporting information involved in initiating, authorizing, recording, processing, and reporting transactions. This includes the correction of incorrect information and how information is transferred to the reports and other information prepared for user entities.

- How the system captures and addresses significant events and conditions other than transactions.

- The process used to prepare reports and other information for user entities.

- Services performed by a subservice organization, if any, including whether the carve-out method or the inclusive method has been used in relation to them.

- The specified control objectives and controls designed to achieve those objectives, including, as applicable, complementary subservice organization controls and

3

complementary user entity controls contemplated in the design of controls.

- Other aspects of the Company's control environment, risk assessment process, information and communication systems (including the related business processes), control activities, and monitoring controls that are relevant to the services provided.

- Relevant details of changes to the service organization's system during the period covered by the description.

As part of our procedures, we will consider whether the Company's management's description of the system, in our professional judgment, is sufficiently comprehensive and accurate to meet the needs of user auditors. If, as a result of this consideration, we identify possible omissions or inaccuracies, we will discuss these matters with the Company's management, and the Company's management will arrange for the Company's personnel to modify the description of the system, as necessary.

## TESTS OF OPERATING EFFECTIVENESS

We will test the operating effectiveness of selected controls for the period from February 4, 2018 through December 1, 2018. The controls that we test will be those controls whose operating effectiveness is necessary, in our opinion, to provide reasonable assurance of achieving the specified control objectives. If, for any reason, we conclude that the design of the Company's controls does not provide reasonable assurance of achieving certain control objectives, we may decline to test the controls for such control objectives.

## OTHER RESPONSIBILITIES OF THE COMPANY'S MANAGEMENT

In connection with our examination, Company's management has committed to preparing the description of the system and for assigning individuals to assist with the logistical aspects of the examination (e.g., identifying the Company's personnel to contact, scheduling meetings for the D&T engagement team, following up on responses from the Company's management to requests for information or preliminary findings).

The Company's management has the responsibility for providing us with (1) access to all information of which management is aware that is relevant to the description of its system and assertion, such as records, documentation, and other matters; (2) additional information that we may request from management for the purpose of our examination; and (3) unrestricted access to personnel within the organization from whom we determine it is necessary to obtain evidence relevant to this engagement.

All word processing related to the *Description of the System (Section Three)* and, if applicable, *Other Information Provided by the Service Organization (Section Five)* will be performed by the Company. Should the Company desire our assistance in the documenting or editing of the description of the system, we would be pleased to discuss this with you.

As we have discussed previously, the Company's management is responsible for establishing and maintaining appropriate controls relating to the processing of transactions for user entities. The determination of the control objectives and related controls to be included in the Company's description of the system is also the responsibility of the Company. The Company's management

4

is responsible for providing us an assertion that is attached to the description of the system, which includes its completeness, accuracy, and method of presentation. Appendix B contains information regarding the Company's assertion.

At the conclusion of our examination, we will request that the Company's management provide us with a representation letter acknowledging the Company's management's responsibility for its assertion, the description of the system, including the design and operating effectiveness of controls, confirming certain representations made to us during our examination, and other matters, as described in Appendix A.

## INHERENT LIMITATIONS OF INTERNAL CONTROL

Because of the inherent limitations of internal control, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may occur and not be detected. Also, projections of any evaluation of the internal control to future periods are subject to the risk that the internal control may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

## RESPONSIBILITY OF THE AUDIT COMMITTEE

As the independent service auditors of the Company, we acknowledge that the Audit Committee is directly responsible for the appointment, compensation, and oversight of our work and, accordingly, except as otherwise specifically noted, we will report directly to the Audit Committee. You have advised us that the services to be performed under this engagement letter, including, where applicable, the use by D&T of affiliates or related entities as subcontractors in connection with this engagement, have been approved by the Audit Committee in accordance with the Audit Committee's established preapproval policies and procedures.

## PROCESS FOR OBTAINING PREAPPROVAL OF SERVICES

The Company's management is responsible for the coordination of obtaining the preapproval of the Audit Committee, in accordance with the Audit Committee's preapproval process, for any services to be provided by D&T to the Company.

## INDEPENDENCE MATTERS

In connection with our engagement, D&T, the Company's management, and the Audit Committee will assume certain roles and responsibilities in an effort to assist D&T in maintaining independence. D&T will communicate to its partners, principals, and employees that the Company is an attest client. Management of the Company will ensure that the Company, together with its subsidiaries and other entities that comprise the Company for purposes of the consolidated financial statements, has policies and procedures in place for the purpose of ensuring that neither the Company nor any such subsidiary or other entity will act to engage D&T or accept from D&T any service that under AICPA, or other applicable rules would impair D&T's independence. All potential services are to be discussed with Mr. Jim Berry.

The Company's management will coordinate with D&T to ensure that D&T's independence is not impaired by hiring former or current D&T partners, principals, or professional employees in a

key position, as defined in the AICPA Code of Professional Conduct that would cause a violation of such code or other applicable independence rules. Any employment opportunities with the Company for a former or current D&T partner, principal, or professional employee should be discussed with Mr. Jim Berry before entering into substantive employment conversations with the former or current D&T partner, principal, or professional employee.

For the purposes of the preceding sections entitled "Independence Matters", "and Process for Obtaining Preapproval of Services", "D&T" shall mean Deloitte & Touche LLP and its subsidiaries; Deloitte Touche Tohmatsu Limited, its member firms, the affiliates of Deloitte & Touche LLP, Deloitte Touche Tohmatsu Limited and its member firms; and, in all cases, any successor or assignee.

## RESTRICTION ON REPORT USE

The Company agrees that it will not, in each case, unless the Company first obtains our specific written permission (1) publish or otherwise reproduce, include, or incorporate our attest report issued hereunder, any portion or draft thereof, or any information included in the section entitled "Information Provided by the Service Auditor" included in the report issued (in final or draft form) by D&T, within documents that the Company may publish or make available to others, or (2) except as otherwise specifically provided herein, circulate, quote, disclose, or distribute our attest report issued hereunder or any information included in the section entitled "Information Provided by the Service Auditor" included in the report issued (in final or draft form) by D&T to others.

Except as set forth below, the Company agrees that the distribution and use of our attest report, whether in hard copy, electronic format (e.g., Adobe Acrobat or PDF file format) or otherwise, prepared hereunder will be limited to management of the Company, its user entities, and the independent auditors of such user entities. Notwithstanding the foregoing, the Company may provide prospective customers access to our attest report as part of a document on the description of the system of the Company in situations where the prospective customer (1) is engaged in active negotiations with the Company for the Company to provide some or all of the services described in our attest report and (2) specifically requests access to our attest report as a condition prior to executing an agreement between the prospective customer and the Company to contract for such services (a "prospective customer"); provided, however, that (a) the document on the description of the system of the Company is only distributed in electronic PDF file format, (b) the disclaimer language set forth in Appendix D will be conspicuously printed on the cover of any such document containing the description of the system of the Company that contains our attest report that the Company may electronically distribute to such prospective customers, and (c) the click-through agreement set forth in Appendix E will be electronically indivisibly affixed to any such document on the description of the system of the Company that contains our attest report in such a way that the only means through which access to the electronic PDF copy of such document on the description of the system of the Company that contains our attest report is possible, is by electronically accepting the terms of such click-through agreement. The Company agrees that it will obtain from D&T the electronic PDF copy of the document containing the description of the system of the Company that contains our attest report that the Company will electronically distribute to such prospective customers as permitted hereunder prior to the Company distributing such Company-created electronic PDF version of such document. The Company agrees that it will only distribute our attest report to such prospective customers as set

forth in this paragraph. Notwithstanding the foregoing, the Company agrees that it will not use our attest report for general marketing or other sales activities of the Company.

The Company agrees that it will keep complete and accurate written records of the entities and the personnel of such entities to whom the Company provides the SOC 1 report and will promptly provide copies of such records to D&T upon request.

## INCLUSION OF D&T REPORTS OR REFERENCES TO D&T IN OTHER DOCUMENTS OR ELECTRONIC SITES

If the Company intends to publish or otherwise reproduce in any document our attest report issued as a result of this engagement, or otherwise make reference to D&T in a document that contains other information in addition to our attest report (e.g., in a press release), thereby associating D&T with such document, the Company agrees that its management will provide D&T with a draft of the document to read and obtain our approval for the inclusion or incorporation by reference of our attest report, or the reference to D&T, in such document before the document is printed and distributed. The inclusion or incorporation by reference of our attest report in any such document would constitute the reissuance of such attest report. The Company also agrees that its management will notify us and obtain our approval prior to including our attest report on an electronic site.

Our engagement to perform the services described herein does not constitute our agreement to be associated with any such documents published or reproduced by or on behalf of the Company. Any request by the Company to reissue any report issued as a result of this engagement, to consent to any such attest report's inclusion or incorporation by reference in any other document, or to agree to any such attest report's inclusion on an electronic site will be considered based on the facts and circumstances existing at the time of such request. The estimated fees outlined herein do not include any procedures that would need to be performed in connection with any such request. Should D&T agree to perform such procedures, fees for such procedures would be subject to the mutual agreement of the Company and D&T.

## LIMITATION ON LIABILITY, RELEASE, AND INDEMNIFICATION

D&T, its subsidiaries and subcontractors, and their respective personnel will not be liable to the Company and the Audit Committee for any claims, liabilities, or expenses relating to this engagement ("Claims") for an aggregate amount in excess of the fees paid by the Company to D&T pursuant to this engagement, except to the extent resulting from the bad faith or intentional misconduct of D&T or its subcontractors. In no event will D&T, its subsidiaries or subcontractors, or their respective personnel be liable to the Company and the Audit Committee for any loss of use, data, goodwill, revenues, or profits (whether or not deemed to constitute a direct Claim), or any consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense relating to this engagement.

The Company agrees to release and indemnify D&T, its subsidiaries and subcontractors, and their respective personnel from all Claims attributable to any misrepresentation by the Company's management.

The Company agrees to indemnify and hold harmless D&T, its subsidiaries and subcontractors,

and their respective personnel from all Claims, except to the extent resulting from the bad faith or intentional misconduct of D&T or its subcontractors.

In circumstances where all or any portion of the provisions of the previous three paragraphs are unavailable, the aggregate liability of D&T, its subsidiaries and subcontractors, and their respective personnel for any Claim shall not exceed an amount that is proportional to the relative fault that D&T's or its subcontractors' conduct bears to all other conduct giving rise to such Claim.

## INDEPENDENT CONTRACTOR

D&T is an independent contractor and D&T is not, and will not be considered to be, an agent, partner, fiduciary, joint venturer, or representative of the Company or the Audit Committee.

## SURVIVAL

The agreements and undertakings of the Company and the Audit Committee contained in the engagement letter (including its appendices), will survive the completion or termination of this engagement.

## SEVERABILITY

If any term of the engagement letter (including its appendices) is unenforceable, such term shall not affect the other terms, but such unenforceable term shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

## ASSIGNMENT AND SUBCONTRACTING

Except as provided below, no party may assign any of its rights or obligations (including, without limitation, interests or Claims) relating to this engagement without the prior written consent of the other party. The Company and the Audit Committee hereby consent to D&T subcontracting or assigning a portion of its services under this engagement to any affiliate or related entity, whether located within or outside of the United States. D&T agrees that it will be responsible to the Company for the acts and omissions of its subcontractors, if any, in the course of their performance of services hereunder to the same extent that D&T would be responsible to the Company if it had performed such acts or omissions. Professional services performed hereunder by any of D&T's affiliates or related entities shall be invoiced as professional fees, and any related expenses shall be invoiced as expenses, unless otherwise agreed.

No affiliated or related entity of D&T, or such entity's personnel shall have any liability hereunder to the Company and the Audit Committee and the Company and the Audit Committee will not bring any action against any such affiliated or related entity or such entity's personnel in connection with this engagement. Without limiting the foregoing, such affiliated and related entities are intended third-party beneficiaries of these terms and may in their own right enforce such terms.

## FORCE MAJEURE

No party shall be deemed to be in breach of this engagement letter (including its appendices) as a result of any delays or non-performance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order or requirement of any governmental agency or authority.

## CONFIDENTIALITY

To the extent that, in connection with this engagement, D&T comes into possession of any confidential information of the Company, D&T shall not disclose such information to any third party without the Company's consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The Company and the Audit Committee hereby consent to D&T disclosing such information (1) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; (2) to the extent such information (i) is or becomes publicly available other than as the result of a disclosure in breach hereof, (ii) becomes available to D&T on a nonconfidential basis from a source that D&T believes is not prohibited from disclosing such information to D&T, (iii) is already known by D&T without any obligation of confidentiality with respect thereto, or (iv) is developed by D&T independently of any disclosures made to D&T hereunder; or (3) to contractors providing administrative, infrastructure, and other support services to D&T and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this paragraph. To the extent that any information obtained by D&T from or on behalf of the Company or its employees in connection with the performance of services under the engagement letter relates to a resident of Massachusetts and constitutes "Personal Information" as defined in 201 CMR 17.02 (as may be amended), D&T shall comply with the obligations of 201 CMR 17.00 et. seq. (as may be amended), entitled "Standards for the Protection of Personal Information of Residents of the Commonwealth," with respect to such information.

## DISPUTE RESOLUTION

Any controversy or claim between the parties arising out of or relating to this engagement letter (including its appendices) or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth below and shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

## MEDIATION

All Disputes shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution (CPR), at the written request of a party, shall designate a mediator.

## ARBITRATION PROCEDURES

If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this section entitled "Dispute Resolution" (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of the Company and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of this engagement letter (including its appendices) and to abide by the terms of this section entitled "Dispute Resolution." Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the laws of the State of New York (without giving effect to its choice of law principles) in connection with the Dispute. The arbitrators shall have no power to award damages inconsistent with the terms of this engagement letter (including its appendices), including, without limitation, the limitation on liability, release, and indemnification provisions contained herein. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

## COSTS

Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

## ENGAGEMENT TIMING

Appendix C attached hereto and made part hereof describes the planned timing of our examination in more detail. Timely completion of all tasks identified in the schedule as the Company's responsibility will facilitate the completion of our engagement. If, at any time, you wish to change this schedule, please contact Mr. Phani Vajhala and Mr. Joseph (JT) Staige to discuss the feasibility of the desired change(s) and the effect of such changes on other aspects of the examination performed hereunder.

## PROFESSIONAL FEES AND BILLING

Our total professional fees for this examination will be $155,000 plus any expenses we incur related to this engagement (e.g., travel, postage, printing). Based on the anticipated timing of the

work as indicated in Appendix C, our fees for this examination will be billed approximately as follows:

| Engagement Milestone | Estimated Invoice Date | Amount |
|---|---|---|
| Engagement letter signed | August 1, 2018 | $80,000 |
| Complete Interim testing | November 1, 2018 | $50,000 |
| Completion of engagement | February 1, 2018 | $25,000 |

We anticipate sending invoices for this engagement according to the above schedule, and payments are due 30 days from the date of the invoice. Engagement-related expenses (such as airfare, hotel, etc.), will be billed in addition to the fees and will be stated separately on the invoices.

Our continued service on this engagement is dependent upon payment of our invoices in accordance with these terms. Our fees are based on certain assumptions, including (1) timely and accurate completion of the requested Company participation schedules and additional supporting information, including substantially comprehensive and accurate description of the system; (2) no inefficiencies during the examination or changes in scope caused by events that are beyond our control; and (3) no changes to the timing or extent of our work plans. If, due to omissions or inaccuracies in the description of the system, additional services are required to complete this part of our procedures, or if we are asked to assist in making modifications, the fees for such additional services will be in addition to the fees described above. We will notify you promptly of any circumstances we encounter that could significantly affect our estimates and discuss with you any additional fees, as necessary.

* * * * * *

The parties acknowledge and agree that D&T is being engaged under this engagement letter to provide only the services described herein. Should the Company or the Audit Committee request, and should D&T agree to provide, services beyond those described herein, such services will constitute a separate engagement and will be governed by a separate engagement letter.

This engagement letter, including Appendices A through F attached hereto and made a part hereof, constitutes the entire agreement between the parties with respect to this engagement and supersedes any other prior or contemporaneous agreements or understandings between the parties, whether written or oral, relating to this engagement.

The sections entitled Limitation on Liability, Release, and Indemnification, Assignment and Subcontracting, and Dispute Resolution shall apply to the fullest extent of the law, whether in contract, statute, tort (such as negligence), or otherwise, notwithstanding the failure of the essential purpose of any remedy.

If the above terms and conditions are acceptable and the services described are in accordance with your understanding, please sign the copy of this engagement letter in the space provided and return it to us.

Yours truly,

*Deloitte & Touche LLP*

**Acknowledged and approved on behalf of
the Audit Committee of Sears Holdings Corporation:**

**By:**    Mr. William C. Kunkler
**Title:**   Audit Committee Chair

**Date:**    7 - 12 - 18

**Acknowledged and agreed to by
Sears Holdings Corporation:**

**By:**    Robert A. Riecker
**Title:**   Chief Financial Officer

**Date:**    7/11/18

12

**APPENDIX A**

This Appendix A is part of the engagement letter dated July 9, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation.

## ILLUSTRATIVE REPRESENTATION LETTER FOR MANAGEMENT OF A SERVICE ORGANIZATION FOR A SOC 1 REPORT

In connection with your engagement to report on the description of the system of Sears Holdings Corporation (the "Company") relating to the Financial Reporting, Inventory, Procurement, and Revenue Transactions Processing Services and related General Computer Controls at the Company throughout the period February 4, 2018 through December 1, 2018  (the "Description of the System") and the suitability of the design and operating effectiveness of the controls to achieve the related control objectives stated in the description, based on the criteria identified in our assertion, we recognize that obtaining representations from us concerning the information contained in this letter is a significant procedure in enabling you to form an opinion about whether the description fairly presents the system that was designed and implemented throughout the period February 4, 2018 through December 1, 2018 , and whether the controls related to the control objectives stated in the description were suitably designed and operating effectively throughout the period February 4, 2018 through December 1, 2018  to achieve those control objectives, based on the criteria described in our assertion.

We acknowledge responsibility for our assertion and for:

a.   The fairness of the presentation of the description and the suitability of the design and operating effectiveness of the controls to achieve the related control objectives stated in the description.

b.   Selecting the criteria stated in our assertion and determining that the criteria are appropriate for our purposes.

We confirm, to the best of our knowledge and belief, as of the date of your report, the following representations made to you during your examination:

a.   We reaffirm our assertion, attached hereto as an appendix, that is attached as a separate section to the Description of the System.

b.   We have evaluated the fairness of the presentation of the description and the suitability of the design and operating effectiveness of the controls to achieve the related control objectives stated in the description, and all relevant matters have been considered and reflected in our evaluation and in our assertion.

c.   We have disclosed to you any misstatements including omissions in the description.

d.   There were no instances in which controls were not suitably designed and implemented.

e.   There were no instances when our controls have not operated as described.

f.   We have disclosed to you any communications from regulatory agencies, user entities, or others affecting the fairness of the presentation of our description or the suitability of the design or operating effectiveness of our controls as described, including communications received between the end of the period addressed in our assertion and the date of your report.

g.   We have disclosed to you all other known matters contradicting the fairness of the presentation of our description, the suitability of the design or operating effectiveness of our controls as described, or our assertion.

h.   There were no events subsequent to the examination period that would have a material effect on the fairness of the presentation of the description, the suitability of the design or operating effectiveness of the controls to achieve the related control objectives stated in the description, or our assertion.

i.   We have disclosed to you any changes in our controls that are likely to be relevant to user entities' internal control over financial reporting occurring through the date of this letter.

j.   We have provided you with all information and access that is relevant to your examination and to our assertion.

k.   We believe the effects of uncorrected misstatements, if any, are immaterial, individually and in the aggregate, to the fairness of the presentation of the description or the suitability of the design or operating effectiveness of the controls to achieve the related control objectives stated in the description.

l.   We have responded fully to all inquiries made to us by you during the examination.

m.   There were no instances of actual, suspected, or alleged fraud or noncompliance with laws or regulations affecting the fairness of the presentation of the description or the suitability of the design or operating effectiveness of the controls to achieve the related control objectives stated in the description.

n.   There were no instances of noncompliance with laws and regulations or uncorrected misstatements attributable to the service organization that may affect one or more user entities.

o.   We have no knowledge of any actual, suspected, or alleged fraud by management or the service organization's employees that could adversely affect the fairness of the presentation of the description of the service organization's system or the completeness or achievement of the control objectives stated in the description.

p.   We are responsible for the information included in the report document in Section V, and understand that such information is not covered by your examination. We believe that such information is accurate.

q.   We agree that the use of the examination report whether in hard copy or Adobe Acrobat format (i.e., PDF file format) or otherwise, prepared hereunder will be limited to management of the Company, the user entities of the Company, and the independent auditors of such user entities.

r.  The Company may provide prospective customers access to the SOC 1 report in situations in which the prospective customer (1) is engaged in active negotiations with the Company to provide some or all of the services described in your attest report and (2) specifically requests access to your attest report as a condition prior to executing an agreement between the prospective customer and the Company to contract for such services. In such situations, we acknowledge and agree to distribute such SOC 1 report as described in the engagement letter dated July 9, 2018.

s.  We understand that your examination was conducted in accordance with attestation standards established by the American Institute of Certified Public Accountants and International Standards on Assurance Engagements as established by the International Auditing and Assurance Standards Board and was designed for the purpose of expressing an opinion on the fairness of the presentation of the description and on the suitability of the design and operating effectiveness of the controls to achieve the related control objectives stated in the description, based on your examination, and that your procedures were limited to those that you considered necessary for that purpose.

_____
Name, Title, Service Provider legal entity name

_____
Name, Title, Service Provider legal entity name

**APPENDIX B**

This Appendix B is part of the engagement letter dated July 9, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation.

## ILLUSTRATIVE ASSERTION BY MANAGEMENT OF A SERVICE ORGANIZATION FOR A SOC 1 REPORT

We have prepared the description of the system of Sears Holdings Corporation ("SHC") relating to the Financial Reporting, Inventory, Procurement, and Revenue Transactions Processing Services and related General Computer Controls at the Company (description) for user entities during some or all of the period February 4, 2018 to December 1, 2018, and their user auditors who have a sufficient understanding to consider it, along with other information, including information about controls implemented by user entities of the system themselves, when assessing the risks of material misstatements of user entities' financial statements.

Sears Holdings Corporation uses Wipro Limited ("Wipro") for accounting process controls services including reconciliations, and general accounting administration, RGIS LLC ("RGIS") for inventory controls related to store counts. The description includes only the control objectives and related controls of SHC and excludes the control objectives and related controls of the subservice organizations. The description also indicates that certain control objectives specified by SHC can be achieved only if complementary subservice organization controls assumed in the design of SHC's controls are suitably designed and operating effectively, along with the related controls at SHC. The description does not extend to controls of the subservice organizations.

The description indicates that certain control objectives specified in the description can be achieved only if complementary user entity controls assumed in the design of SHC's controls are suitably designed and operating effectively, along with related controls at the service organization. The description does not extend to controls of the user entities.

**Description Criteria**

We confirm, to the best of our knowledge and belief, that:

1. The description fairly presents the system related to the Company's Financial Reporting, Inventory, Procurement, and Revenue Transactions Processing Services and related General Computer Controls made available to user entities of the system during some or all of the period February 4, 2018 to December 1, 2018 for processing their transactions. The criteria we used in making this assertion were that the description:

   a. Presents how the system made available to user entities was designed and implemented to process relevant transactions, including, if applicable:

      i. The types of services provided including, as appropriate, the classes of transactions processed.

      ii. The procedures, within both automated and manual systems, by which those services are provided, including, as appropriate, procedures by which transactions are

initiated, authorized, recorded, processed, corrected as necessary, and transferred to the reports and other information prepared for user entities of the system.

   iii.  The information used in the performance of procedures, including, if applicable, related accounting records, whether electronic or manual, and supporting information involved in initiating, authorizing, recording, processing, and reporting transactions; this includes the correction of incorrect information and how information is transferred to the reports and other information prepared for user entities.

   iv.  How the system captures and addresses significant events and conditions.

   v.  The process used to prepare reports or other information provided to user entities of the system.

   vi.  Services performed by a subservice organization, if any, including whether the carve-out method or the inclusive method has been used in relation to them.

   vii. The specified control objectives and controls designed to achieve those objectives, including, as applicable, complementary user entity controls assumed in the design of the subservice organization's controls.

   viii.Other aspects of our control environment, risk assessment process, information and communications (including the related business processes), control activities, and monitoring activities that are relevant to the services provided.

b.  The description includes relevant details of changes to the Company's system during the period covered by the description when the description covers a period of time.

c.  The description does not omit or distort information relevant to the service organization's system, while acknowledging that the description is prepared to meet the common needs of a broad range of user entities of the system and their user auditors and may not, therefore, include every aspect of the system that each individual user entity of the system and its auditor may consider important in its own particular environment.

2.  The controls related to the control objectives stated in the description were suitably designed and operated effectively throughout the period February 4, 2018 to December 1, 2018 to achieve those control objectives provided that subservice organizations and user entities applied the controls contemplated in the design of the service organization's controls. The criteria we used in making this assertion were that:

a.  The risks that threaten the achievement of the control objectives stated in the description have been identified by the Company.

b.  Controls identified in our description would, if operating as described, provide reasonable assurance that those risks would not prevent the control objectives stated in our description from being achieved.

c.  The controls were consistently applied as designed, including whether manual controls were applied by individuals who have the appropriate competence and authority.

**APPENDIX C**

## SERVICE AUDITORS' PLANNED EXAMINATION TIMETABLE

This Appendix C is part of the engagement letter dated July 9, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and approved by the Audit Committee of Sears Holdings Corporation.

We will plan the performance of our examination in accordance with the following estimated timetable:

| Task/Deliverable | Responsibility | Planned Timing |
|---|---|---|
| Draft Management Assertion provided | The Company | October 2018 |
| Control objectives drafted | The Company | October 2018 |
| Description of the system drafted | The Company | October 2018 |
| Perform procedures to test whether the controls are suitably designed | D&T | October 2018 |
| Perform procedures to test whether the Company's controls were operating effectively | D&T | October - November 2018 |
| Review draft service auditors' report with senior management | D&T and The Company | December 2018 |
| Review draft management letter with management | D&T and The Company | December 2018 |
| Issue management letter | The Company | February 16, 2019 |
| Issue report | D&T | February 16, 2019 |

**APPENDIX D**

**DISCLAIMER LANGUAGE FOR DISTRIBUTION TO PROSPECTIVE CUSTOMERS**

This Appendix D is part of the engagement letter dated July 9, 2018, between Deloitte & Touche LLP and the Company and approved by the Audit Committee of Sears Holdings Corporation

<u>NOTICE</u>: You and your company have obtained access to this report on the description of the system of Sears Holdings Corporation (this "SOC 1 report") by accepting the terms of the Access Agreement that was attached to this SOC 1 Report and acknowledging that your company is a prospective customer of Sears Holdings Corporation (the "Company"). The terms of the Access Agreement include, among other things, an agreement by you and your company not to further disclose, distribute, quote, or reference this SOC 1 Report and an agreement to release and indemnify Deloitte & Touche LLP ("Deloitte & Touche"), its subsidiaries and its subcontractors, and their respective personnel. By reading this SOC 1 Report, you reconfirm your agreement to the terms of such Access Agreement. If you are not a prospective customer of the Company then you are not authorized to possess, read, or have access to this SOC 1 Report and should immediately return this SOC 1 Report to the Company.

This SOC 1 Report is intended only to be used by the Company's existing clients during the period from February 4, 2018 to December 1, 2018, and their external auditors (i.e., "user entities" during the period from February 4, 2018 to December 1, 2018, and the "user auditors," respectively, as stated in the independent service auditors' report contained in this SOC 1 Report and defined in the American Institute of Certified Public Accountants' Statement on Standards for Attestation Engagements No. 18 ("Permitted Users"). Deloitte & Touche, the entity that issued the independent service auditors' report contained in this SOC 1 Report, its subsidiaries and subcontractors, and their respective personnel shall have no liability, duties, responsibilities or other obligations to any entity who may obtain this SOC 1 Report who is not a Permitted User, including, without limitation, any entity who obtains this SOC 1 Report in contemplation of contracting for services with the Company.

Deloitte & Touche, its subsidiaries and subcontractors, and their respective personnel have no responsibility for the description of the system of the Company, including the control objectives and the controls. Nor do Deloitte & Touche, its subsidiaries and subcontractors, and their respective personnel have any obligation to advise or consult with any entity regarding their access to this SOC 1 Report. Any use of this SOC 1 Report by a party other than a Permitted User ("Other Third Party") is at the sole and exclusive risk of such Other Third Party and such Other Third Party cannot and shall not rely on this SOC 1 Report. This SOC 1 Report is not to be further disclosed, distributed, quoted, or referenced to any third party or included or incorporated by reference in any other document, including any securities filings.

**APPENDIX E**

**ACCESS AGREEMENT**

This Appendix E is part of the engagement letter dated July 9, 2018, between Deloitte & Touche LLP and the Company and approved by the Audit Committee of Sears Holdings Corporation.

<u>**NOTICE**</u>

<u>**RESTRICTED USE REPORT**</u>

<u>**ACCESS AGREEMENT**</u>

The attached report on the description of the system of Sears Holdings Corporation (the "Company") relating to the Financial Reporting, Inventory, Procurement, and Revenue Transactions Processing and related General Computer Controls at the Company for the period February 4, 2018 to December 1, 2018 (the "SOC 1 Report") is intended only to be used by the Company's existing clients during the period February 4, 2018 to December 1, 2018, and their external auditors (i.e., "user entities" during the period February 4, 2018 to December 1, 2018 and the "user auditors," respectively, as stated in the independent service auditors' report contained in the SOC 1 Report and defined by the American Institute of Certified Public Accountants' Statement on Standards for Attestation Engagements No. 18 ("Permitted Users"). You are an authorized representative of a company (with the authority to contractually bind the company) that is (1) a prospective customer of the Company seeking access to the SOC 1 Report for its own internal business purposes solely in connection with your company's contemplation of contracting for services with the Company or (2) a service provider accessing the SOC 1 Report, engaged solely to provide vendor selection services to a prospective customer of the Company in connection with such prospective customer's contemplation of contracting for services with the Company. You and your company (collectively, "Recipient") may only obtain access to the SOC 1 Report by agreeing to comply with the terms set forth below. Such terms should be read carefully as they affect the legal rights of you and your company. Agreement to these terms shall be legally binding upon you and your company. Your agreement and your company's agreement to this Access Agreement by clicking the "I Agree to the Terms Above" icon below is just as effective as if such agreement was evidenced by a manual signature on a written document and shall be deemed to satisfy any writings requirements prescribed by law.

The SOC 1 Report will be provided solely to you and your company only as set forth herein. Recipient agrees not to disclose, distribute, quote, or reference the SOC 1 Report (or any part thereof) to any third party or include or incorporate by reference the SOC 1 Report (or any part thereof) in any public document, including any securities filings.

Recipient acknowledges that Deloitte & Touche LLP ("Deloitte & Touche"), which prepared certain aspects of the SOC 1 Report, including the independent service auditors' report and the description of tests of operating effectiveness and results of such tests, has no responsibility for the description of the system of the Company, including the control objectives and the controls. Nor does Deloitte & Touche have any obligation to advise or consult with Recipient regarding Recipient's access to the SOC 1 Report or the contents of such report. Any use of this SSAE 18

20

Report by a party other than a Permitted User ("Other Third Party") is strictly prohibited. Any access to this SOC 1 Report by any Other Third Party is restricted to a Recipient who has acknowledged and agreed to the terms hereof. Any use of the SOC 1 Report is at Recipient's sole responsibility and judgment and is done so at Recipient's sole and exclusive risk and such Recipient agrees that it cannot and shall not rely on the SOC 1 Report. Recipient agrees that, in consideration of Deloitte & Touche's permission to allow access to the SOC 1 Report by Recipient as a prospective customer of the Company, Recipient hereby (1) releases Deloitte & Touche, its subsidiaries and subcontractors, and their respective personnel from all claims, liabilities, and expenses arising out of access to, use of or reliance on the SOC 1 Report, and (2) indemnifies Deloitte & Touche, its subsidiaries and subcontractors, and their respective personnel from all claims, liabilities, and expenses relating to a breach of any provision of this Access Agreement by Recipient or any of Recipient's personnel, including, without limitation, the restrictions on use and distribution of the SOC 1 Report, or relating to any assertion of reliance by Recipient or any of Recipient's personnel. The release and indemnification provisions of this Access Agreement will apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise, and Recipient agrees that Deloitte & Touche will not in any case be liable for any indirect, special, incidental, consequential, punitive, or exemplary damages. Recipient also agrees that by permitting Recipient access to the SOC 1 Report, Recipient does not acquire any rights as a result of such access and Deloitte & Touche has not assumed any duties or obligations that it would not otherwise have had.

The release from liability, indemnity, and the other provisions of this Access Agreement shall survive the execution of any contract Recipient may enter with the Company. If any provision of this Access Agreement is found by a court of competent jurisdiction to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth in this Access Agreement. This Access Letter constitutes the entire agreement of the parties hereto with respect to its subject matter, and supersedes all other oral or written representations, understandings or agreements relating to such subject matter, and may not be amended except by written agreement signed by the parties. DELOITTE & TOUCHE AND THE RECIPIENT HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM (WHETHER IN CONTRACT, STATUTE, TORT (SUCH AS NEGLIGENCE), OR OTHERWISE) RELATING TO THIS ACCESS AGREEMENT. This Access Agreement and all matters arising under or relating hereto (whether in contract, statute, tort (such as negligence), or otherwise) shall be governed by, and construed in accordance with, the laws of the State of New York (without regard to its conflicts of laws principles).

I agree that (1) I am an authorized representative of my company (with the authority to contractually bind the company); (2) my company is a prospective customer of the Company seeking access to the SOC 1 Report for its own internal business purposes solely in connection with its contemplation of contracting for services with the Company or I am a service provider accessing the SOC 1 Report, engaged to provide vendor selection services to a prospective customer of the Company in connection with such prospective customer's contemplation of contracting for services with the Company; and (3) I and my company shall comply with the terms set forth above.

**[I Agree to the Terms Above]**

21

*Double-click icon above to access the SOC 1 Report.*

**[I Do Not Agree to the Terms Above]**

*At this point, please close this document. The SOC 1 Report may not be viewed.*

<b>APPENDIX F</b>

**CONTROL OBJECTIVES STATED IN THE DESCRIPTION OF THE SYSTEM**

This Appendix F is part of the engagement letter dated July 9, 2018, between Deloitte & Touche LLP and Sears Holdings Corporation and approved by the Audit Committee of Sears Holdings Corporation. Note that the objectives below are subject to change based on the nature and procedures of the engagement, along with changes within Sears Holdings Corporation control environment.

### BUSINESS PROCESS CONTROLS

1. Controls provide reasonable assurance that financial systems are reconciled in a timely and complete manner to the general ledger.

2. Controls provide reasonable assurance that revenue is recorded in a complete, accurate and timely manner.

3. Controls provide reasonable assurance that sales tax rates applied to sales are accurate.

4. Controls provide reasonable assurance that merchandise expenditures are recorded and processed in a complete, accurate and timely manner.

5. Controls provide reasonable assurance that inventory cost and quantity is accurately recorded.

### GENERAL COMPUTER CONTROLS

6. Controls provide reasonable assurance that changes made to application systems are authorized, tested, documented and approved prior to implementation.

7. Controls provide reasonable assurance that changes made to the operating system software and hardware infrastructure components are authorized, tested, documented, and approved prior to implementation.

8. Controls provide reasonable assurance that logical access to applications is restricted to authorized and appropriate personnel.

9. Controls provide reasonable assurance that logical access to operating systems and databases is restricted to authorized and appropriate personnel.

10. Controls provide reasonable assurance that application and system processing are authorized and executed in a complete, accurate, and timely manner, and exceptions, problems, and errors are identified, tracked, recorded, and resolved in a complete, accurate, and timely manner.

11. Controls provide reasonable assurance that applications and data are backed up and stored.

12. Controls provide reasonable assurance that physical access to the data center is restricted to authorized personnel

13. Controls provide reasonable assurance that environmental protection mechanisms located within the data center are in place and are maintained.

**<u>Exhibit 10</u>**

**Project Sasset Engagement Letters**

WEIL:\96792963\4\73217.0004

# Deloitte.

**Deloitte & Touche LLP**
M&A Transaction Services
111 S. Wacker Drive
Chicago, IL 60606-4301
USA
Tel:   1 312 486 1000
Fax:  1 312 486 1486
www.deloitte.com

July 13, 2018

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Attention: Mr. Robert A. Riecker, CFO

Dear Mr. Riecker:

This letter, effective June 14, 2018, confirms the engagement of  Deloitte & Touche LLP ("Consultant") by Sears Holdings Corporation ("Client") to perform certain services in connection with Client's evaluation of a proposed divestiture of a business unit code-named Project Sasset - SHIP (the "Business") (the "Proposed Transaction").

## SERVICES

This engagement will be conducted in accordance with the terms and conditions hereof and in accordance with the *Statement on Standards for Consulting Services* established by the American Institute of Certified Public Accountants ("AICPA"). Subject to applicable professional standards or rules, including applicable preapproval requirements of the audit committee or board of directors of Client, if any, the specific services to be performed by us (collectively, the "Services") will be established based on discussions with you as the Proposed Transaction progresses and additional information is obtained during the course of the engagement. Based upon our discussions with you to date, Appendix B attached hereto describes our initial understanding of the Services you have requested us to perform and we have agreed to perform. These Services may be changed or modified by mutual agreement of the parties if, for example, unforeseen circumstances arise. We will promptly discuss any such circumstances with you and, likewise, you agree to notify us promptly if modifications to the Services are requested.

## LIMITATIONS OF SERVICES

We will provide our observations, advice, and recommendations arising from the performance of the Services to Client. However, the Services will not result in the issuance of any written or oral communications by the Deloitte Entities (as defined in the attached General Business Terms) to Client or any third parties expressing any opinion, conclusion, or any other form of assurance with respect to, accounting policies; financial data; financial statements and related footnotes; appropriate application of generally accepted accounting principles; disclosure, operating, or internal controls; compliance with the rules and regulations of the Securities and Exchange Commission; compliance with the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") or related rules or regulations; or any other matters.

The Deloitte Entities will not perform any management functions, make management decisions, assume any management responsibilities, or otherwise perform in a capacity equivalent to that of management or an employee of Client or the Business, including assuming any financial reporting oversight role; authorizing, executing, or consummating any transactions, or otherwise exercising authority on behalf of Client or the Business or having the authority to do so; preparing source documents or originating data, in electronic or other form, evidencing the occurrence of any transactions; recording of any amounts in books and records of Client or the Business; supervising employees of Client or the Business in the performance of their activities; reporting to the board of directors on behalf of management of Client or the Business; or providing any legal advice with respect to, or conducting a legal review of, any documents, records, or policies of Client or the Business. Client agrees that the Services may include advice and recommendations, but no Deloitte Entity will make any decision on behalf of Client in connection with the implementation of such advice and recommendations. Furthermore, Client shall be

solely responsible for, among other things: (1) designating a competent management member to actively oversee the Services and to sustain meaningful and substantial involvement in all phases of this engagement; (2) evaluating the adequacy and results of the Services; (3) accepting responsibility for results of the Services (including, among other things, agreeing to the nature, objective, scope, and timing of delivery of the Services, providing general direction and monitoring the engagement as it progresses, and making all the management decisions relating to the Services (including evaluating the adequacy of the results and ensuring that the resulting work product meets the agreed-upon specifications and making judgments on behalf of Client)); (4) establishing and maintaining internal controls, including monitoring ongoing activities; and (5) any forward-looking information (including any models, projections, forecasts, budgets, synergies, feasibility analyses, assumptions, estimates, methodologies, or bases for support). For the avoidance of doubt, Consultant will be responsible for the performance of the Services.

The Services may include access to the work of Client's or the Business's advisors, including public accounting firms, or to financial statements, financial information, or data reported on by such advisors. Client agrees that such access is not for the purpose of affirming or evaluating the procedures or professional standards used by such other advisors. In this regard, we call your attention to the possibility that advisors may perform procedures concerning the same information or data, and perhaps the same accounts and records, and reach different observations than the Deloitte Entities for a variety of reasons, including the possibilities that additional or different information or data might be provided to them that was not provided to the Deloitte Entities; that they might perform different procedures from the Deloitte Entities; or that professional judgments concerning, among other things, complex, unusual, or poorly documented matters may differ.

## COMMUNICATIONS — USE AND DISTRIBUTION

The nature of the Proposed Transaction will require prompt communication to Client of our findings that result from performing the Services as those Services are performed. Therefore, it will not be possible for all of our communications to be in the form of written reports. Accordingly, any information, documents, or other communications provided by the Deloitte Entities, whether in writing or otherwise, including any reports (including our final written report, if any, on the Services) or memoranda issued by any of the Deloitte Entities, should be considered by Client in the context of the nature of the Services that we have agreed to provide. Such information, documents, communications, Subject Tax Planning Advice (as defined in the attached General Business Terms), if any, and any drafts thereof, including any draft or final reports or memoranda, whether in writing or otherwise, are herein referred to collectively as the "Client Communications."

All Client Communications are solely for Client's benefit, and are not intended to be relied upon by any person or entity (including prospective buyers, investors, or other parties considering a transaction involving the Business) other than Client. Client shall not disclose or refer to any of the Client Communications to any person or entity except to (1) an employee (with a need to know), a member of management, or a member of the board of directors of Client, who may use the Client Communications solely for purposes of Client's evaluation or consummation of the Proposed Transaction; (2) an employee, a member of management, or a member of the board of directors of a Client Affiliate (as defined below), each with a need to know such Client Communications or the information contained therein in connection with the Proposed Transaction, who may use the Client Communications solely for purposes of Client's evaluation or consummation of the Proposed Transaction; or (3) any legal or other professional advisor of Client (including Client's investment banking advisors and accountants) acting strictly in an advisory capacity to Client, who may use the Client Communications solely to assist Client in connection with Client's evaluation or consummation of the Proposed Transaction; provided that Client shall ensure that the persons or entities referred to in clauses (2) and (3) of this paragraph do not further disclose any of the Client Communications, or refer to the Deloitte Entities in connection with the Proposed Transaction or any related transaction or any of the Client Communications. Notwithstanding the foregoing, the

disclosure restriction set forth in this paragraph shall not apply to the extent disclosure is required by a valid subpoena, an order of a court of competent jurisdiction, a regulatory authority asserting jurisdiction over the business or financial affairs of Client, or other legal process (provided that in such event, to the extent permitted by law or regulation, Client provides us with prior written notice of such requirement so that we may object, seek a protective order or confidential treatment, or take such other action as we deem appropriate). Without limiting the generality of the provisions of this paragraph, in no event will any professional advisor (including Client's investment banking advisors and accountants) be permitted to use the Client Communications in connection with any (a) fairness, solvency, or other opinion; (b) credit enhancement or credit rating; (c) brokering or underwriting, including of any type of security or M&A insurance; or (d) financing (including in the role of investor, agent, intermediary, underwriter, syndicator, lender, or other similar capacity). Client may, however, create its own materials based on information contained in the Client Communications and use and disclose such Client-created materials for external purposes, provided that Client does not in any way, expressly or by implication, attribute such materials to the Deloitte Entities. For the avoidance of doubt, the persons or entities referred to in clauses (1) through (3) of this paragraph may disclose the Client Communications or refer to the Deloitte Entities solely to the other persons or entities referred to in clauses (1) through (3) of this paragraph solely to assist Client in connection with Client's evaluation or consummation of the Proposed Transaction. For purposes of this letter, the term "Client Affiliate" shall mean an entity controlled by, under common control with, or controlling, Client.

In addition, Client agrees that it will not refer, generically, by name or otherwise to the Deloitte Entities or the Services in any written materials relating to the Proposed Transaction (other than as provided in clauses (1) through (3) in the preceding paragraph), including any publicly filed documents, offering memoranda, or sale, purchase, financing, or other transaction-related agreements (provided, however, that, as part of Client's disclosure of audit-related fees in the fee disclosure section of its proxy statement under the Securities Exchange Act of 1934, as amended, Client may include the following (or a substantially similar) reference in such section: "Deloitte & Touche LLP performed due diligence services related to mergers and acquisitions"), without our prior written consent for each requested use or reference. Without limiting the generality of this paragraph, Client acknowledges and agrees that the Deloitte Entities are not, and will not agree to be named as, experts under the Securities Act of 1933, as amended, or any other state or federal securities laws.

Notwithstanding anything to the contrary contained in this letter, Client may provide the Client Communications to other third parties, provided that prior to such disclosure (1) Consultant consents in writing to disclosure to such third party; and (2) in the case of third parties considering a transaction involving the Business, (a) Client has executed an agreement in the form of Appendix D to this letter, authorizing, among other things, the Deloitte Entities to disclose information to such third party; (b) such third party has executed an agreement in the form of Appendix E to this letter; and (c) the applicable members of management of Client and the Business, including those individuals in key financial oversight roles, have (i) read a draft written communication of our detailed findings and observations and (ii) confirmed in writing the completeness and accuracy of the information, explanations, and representations provided or made to us by or on behalf of Client and the Business during the course of the engagement in the form of Appendix F to this letter. Client acknowledges and agrees that it and such third party shall be solely responsible for the determination of whether and what information is provided by Client to such third party and the Deloitte Entities shall have no responsibility therefor.

**FEES**

Professional fees for this engagement will be based on the amount of time our professional personnel devote to performing the Services at our hourly rates outlined in Appendix C. However, these rates may be subject to modification, as agreed upon by the parties, for this engagement depending on the

complexity, time, and effort required. The final determination of the professional fees relating to this engagement will be completed shortly after our work on this engagement is completed or otherwise ends, and shall be paid within 30 days of such determination. In addition to professional fees, we will also bill for expenses, such as postage, photocopying, telephone, travel, transportation, lodging, and meals, reasonably incurred by us.

Our preliminary estimate of our professional fees are included in Appendix C to this letter, which provides further details regarding this estimate and the related assumptions and key drivers that may change our estimate. However, it is difficult to more definitively estimate the total hours and fees for this engagement because due diligence services can vary significantly depending upon, among other things, the following: (1) the individual judgment of each prospective seller and the scope of the services that you ask us to perform, (2) unforeseen circumstances that may develop, (3) the quality and quantity of the Business's applicable records and related internal controls, and (4) the type of transaction and/or its complexity. Consultant will provide prompt notification to you if our estimated fees are expected to exceed the high end of our range. If less time is required than estimated, our professional fees will be lower.

We will invoice you following the end of each monthly period for professional fees accrued and expenses incurred by us during that respective period in performing the Services. All invoices shall be due within 30 days of receipt.

In addition, we will be compensated by Client for any time and expenses (including reasonable legal fees and expenses) that the Deloitte Entities may incur in considering or responding to discovery requests or other requests for documents or information, or in participating as a witness or otherwise in any legal, regulatory, arbitration, or other proceedings as a result of or in connection with this engagement; provided that this provision shall not apply (1) where we are the defendant and Client is the plaintiff in such proceedings or (2) to the extent such proceedings resulted from the bad faith or intentional misconduct of the Deloitte Entities.

**ACKNOWLEDGEMENT**

It is understood that any member firm of Deloitte Touche Tohmatsu Limited or any of their respective affiliates (including Consultant) may have been or may be engaged to provide audit, tax, consulting, or other services to, or may have other business relationships with, Client, the Business, or their respective affiliates. In addition, our engagement team providing Services to Client hereunder may include certain personnel who possess information related to such services or other relationships, if any. The Deloitte Entities and their respective personnel will have no responsibility to Client relating to such services or other relationships, if any, in connection with the Proposed Transaction, nor any responsibility to Client in connection with the Proposed Transaction to use or disclose information that any of the member firms of Deloitte Touche Tohmatsu Limited or their respective affiliates (including Consultant) possess by reason of such services or other relationships, if any, whether or not such information might be considered material by Client or any third party. Client should not expect to obtain additional reliance regarding the Business by virtue of any of the member firms of Deloitte Touche Tohmatsu Limited or any of their respective affiliates (including Consultant) having performed professional services for, or having any other business relationships with, Client, the Business, or their respective affiliates.

**OTHER**

Client may terminate all or a portion of this engagement for convenience at any time by giving notice to Consultant not less than one (1) day before the effective date of termination. Consultant may terminate all or a portion of this engagement if it determines that the performance of any part of the Services would be in conflict with law, or independence or professional standards or rules, and Consultant shall provide Client with as much advance notice as reasonably practicable under the circumstances.

This letter, together with Appendix A, "General Business Terms," and the other Appendices attached hereto and incorporated herein by reference, constitutes the entire agreement of the parties hereto with respect to this engagement; supersedes all other oral or written representations, understandings, or agreements relating to this engagement; and may not be amended except by written agreement signed by the parties. In making its determination to proceed with this engagement, neither party has relied on any representations of the other party except as expressly set forth in this letter, together with the General Business Terms and the other Appendices attached hereto.

If the above terms are acceptable to you and the Services are in accordance with your understanding, please sign the copy of this letter in the space provided and return it to us.

We appreciate the opportunity to serve you, and we look forward to a continuing relationship.

Very truly yours,

Deloitte & Touche LLP

By: Jack Koenigsknecht, Partner

Accepted and Agreed to this _16th_ day of _August_, 2018:

Sears Holdings Corporation:

By: _____

Name: _ROBERT A RIECKER_

Title: _CFO, SEARS HOLDINGS CORPORATION_

**Appendix A**

**GENERAL BUSINESS TERMS**

1.    **Services.** Client agrees that:

    a)  In connection with the Services, the Deloitte Entities shall be entitled to rely on all decisions and approvals of Client.

    b)  With respect to the data and information provided by Client to any of the Deloitte Entities for the performance of the Services, Client shall have all rights required to provide such data and information, and shall do so only in accordance with applicable law and with any procedures agreed upon in writing. In addition, Client is responsible for obtaining all necessary authorizations and consents from its and the Business's advisors, including Client's and the Business's independent accountants and other representatives, in order to permit the Deloitte Entities to perform the Services, including disclosure of confidential information of Client and the Business to the Deloitte Entities in connection with this engagement on behalf of Client.

    c)  The Services are limited in nature, and do not comprehend all matters relating to the Business that might be pertinent or necessary to Client's evaluation or consummation of the Proposed Transaction. Accordingly, the Services should not be taken to supplant other inquiries and procedures that Client should undertake for the purpose described above. The sufficiency of the Services to be performed hereunder by the Deloitte Entities is solely the responsibility of Client. Consequently, the Deloitte Entities will make no representation as to the sufficiency of the Services for Client's purposes. In addition, the Deloitte Entities have no responsibility for performing any services or procedures beyond those agreed to by Client and Consultant or for updating the Services performed.

    d)  The performance of the Services does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of or any other form of assurance with respect to internal controls, or other attestation, review, or compilation services in accordance with standards or rules established by the AICPA, the Public Company Accounting Oversight Board ("PCAOB"), or other regulatory body, in each case with respect to the Business or any other entity. Such audit or other attestation or review services, if any, are not covered by the engagement letter to which these terms are attached (the "Engagement Letter"). Neither the Deloitte Entities nor the Client Communications will express an opinion or any other form of assurance with respect to any matters as a result of the performance of the Services, including concerning (i) the financial statements of any entity or any financial or other information, or operating or internal controls of any entity, taken as a whole, for any date or period; (ii) the merits of any transaction, including the consideration to be paid; (iii) the future operations of any entity; (iv) the fairness of the contemplated terms of any transaction; or (v) any forward-looking information (including any models, projections, forecasts, budgets, synergies, feasibility analyses, assumptions, estimates, methodologies, or bases for support) or the feasibility or achievability of such forward-looking information.

    e)  In the performance of the Services, the Deloitte Entities will not perform any evaluation of internal controls and procedures for financial reporting upon which Client's or the Business's management can base its assertions in connection with Sarbanes-Oxley or related rules or regulations. The Deloitte Entities will make no representations or warranties and will provide no assurances that any entity's disclosure controls and procedures are compliant with the certification requirements of, or any entity's internal controls and procedures for financial

reporting are effective as required by, Sarbanes-Oxley or any other standards, rules, or regulations, including Sections 302 and 404 of Sarbanes-Oxley.

f)   The Business's financial statements, footnotes, and accounting policies and procedures, including the application of generally accepted accounting principles ("GAAP") to record the effects of the Proposed Transaction, are the responsibility of management of the Business. Accordingly, any comments made by the Deloitte Entities relating to the accounting or tax treatment of selected balances or transactions or the application of GAAP or the technical merits of the tax positions and planning strategies related to the Proposed Transaction as a whole are intended to serve only as general guidance to assist Client to better understand certain accounting or tax matters related to the Business and the effects of the Proposed Transaction. Such comments are necessarily based on the preliminary understanding of the Deloitte Entities of the pertinent facts and circumstances and on current authoritative literature and are, therefore, subject to change. Such comments do not constitute the rendering of a tax opinion or a report on the application of accounting principles in accordance with standards or rules established by the AICPA, the PCAOB, or other regulatory body.

g)   The performance of the Services does not constitute (i) a recommendation regarding any transaction, including the divestiture or financing of any business, assets, liabilities, or securities; (ii) a market or financial feasibility study; (iii) a fairness or solvency opinion; or (iv) an examination or compilation of, or the performance of agreed upon procedures with respect to, prospective financial information in accordance with standards or rules established by the AICPA, the PCAOB, or other regulatory body. The Services and the Client Communications are not intended to be, and shall not be construed to be, "investment advice" within the meaning of the Investment Advisers Act of 1940. It is understood that the Deloitte Entities will not provide, nor will the Deloitte Entities be responsible for providing, legal advice hereunder. In addition, any forward-looking information is the responsibility of management of Client or the Business, as the case may be. In this regard, management of Client or the Business, as the case may be, is responsible for representations about its plans and expectations and for disclosure of significant information that might affect the ultimate realization of such forward-looking information and the Deloitte Entities have no responsibility therefor. There will usually be differences between forward-looking information and actual results because events and circumstances frequently do not occur as expected, and those differences may be material.

h)   The performance of the Services is heavily dependent upon (i) Client's timely and effective satisfaction of its responsibilities hereunder and timely decisions and approvals in connection with the Services, and (ii) Client, the Business, and their respective advisors providing the Deloitte Entities with reasonable facilities and timely access to accurate and complete versions of relevant materials and information, including materials and information requested by the Deloitte Entities, and answering the Deloitte Entities' questions fully and accurately. The Deloitte Entities have no responsibility for the accuracy or completeness of the information provided by, or on behalf of, Client or the Business. This engagement cannot be relied upon to disclose errors or fraud should they exist.

i)   It is understood that any member firm of Deloitte Touche Tohmatsu Limited or any of their respective affiliates (including Consultant) may be engaged to provide services to parties other than Client considering a transaction involving the Business. Consultant has established ethical walls and confidentiality safeguards so that the engagement team providing the Services to Client hereunder would be separate from any engagement team providing services to such other parties, if any. Confidential information, including the identity of Client, obtained in the performance of the Services will not, without Client's prior written permission, be disclosed to

such other parties, if any. Similarly, the Deloitte Entities will have no responsibility to Client to use or disclose information, including the identity of such other parties, if any, that any member firm of Deloitte Touche Tohmatsu Limited or any of their respective affiliates (including Consultant) possess by reason of such services for such other parties, if any, whether or not such information might be considered material by Client. Consultant believes that any such relationships will not impair the objectivity of the Deloitte Entities in the performance of the Services. However, the possibility of these relationships is being brought to Client's attention to avoid any misunderstanding.

2.    **Confidentiality.**

a)    To the extent that, in connection with the performance of the Services, the Deloitte Entities come into possession of any confidential information of Client, the Deloitte Entities will not use or disclose such information to any third party without Client's prior written consent, using at least the same degree of care as they employ in maintaining in confidence their own confidential information of a similar nature, but in no event less than a reasonable degree of care. Client hereby consents to the Deloitte Entities disclosing such information (i) to persons or entities permitted to receive Client Communications under the Engagement Letter; (ii) to contractors providing administrative, infrastructure, and other support services to any of the Deloitte Entities and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this Section 2; (iii) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation pertaining hereto; or (iv) to the extent such information (a) is or becomes publicly available other than as the result of a disclosure in breach hereof, (b) becomes available to a Deloitte Entity on a non-confidential basis from a source which such Deloitte Entity reasonably believes after due inquiry is not prohibited from disclosing such information to such Deloitte Entity, (c) is already known by a Deloitte Entity without any obligation of confidentiality with respect thereto, or (d) is developed by a Deloitte Entity independently of any disclosures made to such Deloitte Entity hereunder. In addition, any such information may be used by Deloitte & Touche LLP or any member firm of Deloitte Touche Tohmatsu Limited or their respective affiliates in the context of responding to any such entity's professional obligations as the independent accountants for Client and the Business.

b)    In the event of a required disclosure pursuant to Section 2(a)(iii), the applicable Deloitte Entity shall, to the extent permitted by applicable law or regulation, promptly provide Client with prior written notice of such requirement so that Client may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, the applicable Deloitte Entity shall only disclose that portion of the information that is required to be disclosed and shall use its commercially reasonable efforts to preserve the confidentiality of such information (including by seeking an appropriate protective order or other reliable assurance that confidential treatment will be accorded such information). The Deloitte Entities shall not oppose any action (and shall, if and to the extent requested by Client, reasonably cooperate with, assist, and join with Client in any reasonable action) by Client to seek an appropriate protective order or other reliable assurance that confidential treatment will be accorded such information.

3.    **Limitations on Damages and Indemnification.**

a)    The Deloitte Entities and their respective personnel will not be liable to Client for any claims, liabilities, or expenses ("Claims") relating to this engagement or the Proposed Transaction for an aggregate amount in excess of the fees paid by Client to us pursuant to this engagement, except to

the extent resulting from the bad faith or intentional misconduct of the Deloitte Entities. In no event will the Deloitte Entities or their respective personnel be liable to Client for any loss of use, data, goodwill, revenues, or profits (whether or not deemed to constitute a direct Claim), or any consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense relating to this engagement or the Proposed Transaction.

b) Client will indemnify and hold harmless the Deloitte Entities and their respective personnel from all Claims attributable to claims of third parties relating to (i) this engagement or the Proposed Transaction, except to the extent resulting from the  bad faith or intentional misconduct of the Deloitte Entities; (ii) a breach by Client or any of its personnel of any provision of these terms or the Engagement Letter, including the restrictions on use and distribution of the Client Communications; (iii) the use of or reliance on any Subject Tax Planning Advice by any person or entity other than Client; and (iv) the access to or use of the Client Communications by any person or entity authorized hereunder.

c) In circumstances where any limitation on damages or indemnification provision hereunder is unavailable, the aggregate liability of the Deloitte Entities and their respective personnel for any Claims relating to this engagement or the Proposed Transaction shall not exceed an amount that is proportional to the relative fault that the conduct of the Deloitte Entities bears to all other conduct giving rise to such Claims.

4. **Third Parties and Internal Use of Subject Tax Planning Advice.** No provision of these terms or the Engagement Letter is or is to be construed as a condition of confidentiality within the meaning of Rule 3501(c)(i) of PCAOB Release 2005-014, Internal Revenue Code Sections 6011 and 6111 or the regulations thereunder, any related Internal Revenue Service guidance, or any other similar law, with respect to any Services, Client Communications, or other materials of any kind provided hereunder relating to tax treatment or tax structure (collectively referred to as "Subject Tax Planning Advice"). Notwithstanding anything herein to the contrary, no provision of these terms or the Engagement Letter shall place any limitation on Client's disclosure of any Subject Tax Planning Advice. Client acknowledges that none of its other tax advisors have imposed or will impose any conditions of confidentiality with respect to the tax treatment or tax structure associated with the tax Services or the Proposed Transaction. The Services and Client Communications shall be solely for Client's benefit, and this engagement does not create privity between any Deloitte Entity and any person or entity other than Client ("third party"). Neither the Services nor any Client Communications are intended for the express or implied benefit of any third party. Unless otherwise agreed to in writing by Consultant, no third party is entitled to rely in any manner or for any purpose on the Services or Client Communications.

5. **Force Majeure.** Neither the Deloitte Entities nor Client shall be liable for any delays or nonperformance directly or indirectly resulting from circumstances or causes beyond their reasonable control, including acts or omissions or the failure to cooperate by the Deloitte Entities, Client, the Business, or any other third party; fire, epidemic or other casualty; act of God; strike or labor dispute; war or other violence; or any law, order, or requirement of any governmental agency or authority.

6. **Independent Contractor.** Each party hereto is an independent contractor and neither party is, nor shall be considered to be, nor shall purport to act as, the other's agent, partner, fiduciary, joint venturer, or representative.

7. **Survival and Interpretation.** All provisions which are intended by their nature to survive performance of the Services shall survive such performance, or the expiration or termination of this engagement and consummation of the Proposed Transaction. For purposes of these terms and the

Engagement Letter, the "Deloitte Entities" shall mean Consultant and its subsidiaries; to the extent that, as a subcontractor, they agree to provide any of the services under or in connection with the Engagement Letter, the member firms of Deloitte Touche Tohmatsu Limited, and the affiliates of Consultants and such member firms; and in all cases any successor or permitted assignee. None of the Deloitte Entities, other than Consultant, or such entities' personnel, shall have any liability hereunder to Client and Client will not bring any action against such other entities, or such other entities' personnel, in connection with this engagement or the Proposed Transaction. Without limiting the foregoing, the Deloitte Entities are intended third-party beneficiaries of these terms, and may in their own right enforce such terms. **Each of the provisions of these terms shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.** Any references herein or in the Engagement Letter to the term "including" shall be deemed to be followed by "without limitation."

8.   **Assignment and Subcontracting.** Except as provided below, neither party may assign any of its rights or obligations (including interests or Claims) relating to this engagement or the Services without the prior written consent of the other party. Client hereby consents to Consultant assigning or subcontracting any portion of the Services to any affiliate or related entity, whether located within or outside of the United States, provided that, any such assignment or subcontracting shall not relieve Consultant of its obligations hereunder. Services performed hereunder by Consultant's subcontractors shall be invoiced as professional fees on the same basis as Services performed by Consultant's personnel, unless otherwise agreed.

9.   **Waiver of Jury Trial**. **THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS ENGAGEMENT.**

10.   **Governing Law, Jurisdiction and Venue, and Severability.** These terms, the Engagement Letter, including attachments, and all matters relating to this engagement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof). Any action based on or arising out of this engagement or the Services shall be brought and maintained exclusively in any state or federal court, in each case located in New York County, the State of New York. Each of the parties hereby expressly and irrevocably submits to the jurisdiction of such courts for the purposes of any such action and expressly and irrevocably waives, to the fullest extent permitted by law, any objection which it may have or hereafter may have to the laying of venue of any such action brought in any such court and any claim that any such action has been brought in an inconvenient forum. If any provision of these terms or the Engagement Letter is unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

**Appendix B**

**SCOPE OF SERVICES**

1.      **Engagement Scope.** The nature and scope of due diligence and other M&A services can vary significantly depending upon the individual judgment of Client (including, but not limited to, the level of risk that Client is willing to accept) and the type of transaction that is being contemplated. We believe that the scope of such services should be adaptable and scalable so that Client can react to additional information learned that may have significant implications to Client.

2.      **Summary of Significant Categories of Services to Be Provided.** Based upon our initial discussions with Client and our limited knowledge of the Proposed Transaction, we understand that Client has requested that we provide the following Services (see Section 5 herein for a more-detailed description):

| M&A Due Diligence Areas | Other M&A Services |
|---|---|
| • Accounting and financial (Quality of Earnings only) | Optional M&A Services (available as requested; at hourly rates noted in **Appendix C**):<br><br>- Analysis of Net Working Capital and Net Debt<br><br>- Unbranded Excel Databook supporting the Quality of Earnings analysis (and Net Working Capital and Net Debt, if requested)<br><br>- Tax (US federal and state)<br><br>- Tax structuring, potentially including structure development, tax attribute planning, as needed<br><br>- Data Analytics – Additional transactional / visualization analyses as necessitated / mutually agreed<br><br>- TSA and/or Stand Alone Cost Analysis<br><br>- Read and comment on related transaction agreements<br><br>- Read and comment on client model<br><br>- Tax integration, risk mitigation planning, and other transaction execution support<br><br>- Additional due diligence related to Human Capital, IT, Insurance, etc.<br><br>- Non-US support for due diligence or other M&A services<br><br>- Participating in buyer calls |

|  | – Provide consultative advice regarding financial data to be included in the virtual dataroom |
|---|---|

**3.      Summary of Services Not Provided.** Although not intended to be an all-inclusive list of services that will not be provided, based upon your request, the following services, among other things, are specifically excluded from the scope of this engagement:

- Review of business operations
- Assessment of the commercial merits of the Proposed Transactions
- Evaluation of management information systems
- Certification of physical inventory observations
- Environmental assessments
- Analysis of potential synergies
- Design, configure or implement systems
- Act as a manager or employee
- Communicate to or negotiate with personnel or third parties on behalf of company management
- Identify specific personnel for specific jobs

- Valuation and appraisal services
- Integration assistance
- Background investigations
- Legal and regulatory
- Preparation of US GAAP basis carve-out financial statements
- Internal accounting and disclosure controls
- Foreign Corrupt Practices Act and Anti-Bribery Procedures
- Host, administer or operate the client's systems or data rooms
- Project revenue, cost savings, cash flow or other estimates/projections or develop models to do so
- Provide services for a direct or indirect contingent fee

**4.      Tailored and Highly Focused Approach.** Our approach will be highly focused on priority deal issues identified by you.  Our approach is designed to facilitate us providing you, early in the due diligence process, with significant, preliminary issues related to significant accounting, financial, tax, employee benefit, and insurance matters (as applicable to our scope).

Please note that at this stage we are uncertain as to the quality and quantity of the information that the Client will make available, as well as the Client's timeliness in providing such information. Also please note that the scope of our Services may be impacted by the Client's willingness to share information. These factors will impact the nature, timing, and extent of the Services, as well as influence the Services that can be completed within the planned services. However, based upon the information that we have received to date and our discussions with you, the Services will primarily be comprised of the following:

| Reading and Analyzing | High-Level Inquiries of | Participating as an Advisor In |
|---|---|---|
| • Information publicly available and provided by Client relevant to our scope<br><br>• Information made available in Client's data room relevant to our scope and provided by Client based upon our information request list<br><br>• Audit working papers prepared by Client auditors, as available and applicable to our scope | • Client management<br><br>• Audit advisors of the Client to the extent possible | • Initial meetings with Client to discuss scope<br><br>• Meetings with Client to discuss progress and issues identified |

We estimate that the Services (related to the Services detailed in Section 5) will take approximately 3 to 4 weeks to complete. However, our ability to achieve the objectives of the Services within this timeframe is highly dependent upon the quality, quantity, and timeliness of the data provided, as well as the extent and the level of cooperation by Client and their respective advisors. Also, see Appendix C for further discussion regarding our fee estimate and assumptions.

**5. Overall Objectives.** As mutually agreed upon with Client, our overall objectives for the Services will be to focus on the areas noted below. In an effort to be responsive to your stated timetable, we will endeavor to surface significant issues (and, in particular, those that Client may consider to be potential "deal breakers") as early as possible in the process.  Subject to further discussions with Client, our tentative focus will be advising Client on the following (unless otherwise specified, our due diligence analyses relate to the last two fiscal years (FY16 and FY17) and most recent interim period (and corresponding period of the prior year):

Our work will include analysis of all areas identified below as appropriate;  however, note that procedures may be added or deleted as the  Proposed Transaction proceeds to further meet your needs.

### *Financial Due Diligence*

**Preliminary Analysis**

1. Read and analyze the Business's FY16 and FY17 audited financial statements (as available), reporting packages, and any other relevant information for the most recent year and interim financial statements and endeavor to identify major issues and risk areas for further consideration;

2. Analyze organizational structure and perform high level inquiry regarding the nature of operations of major business lines, entities, intercompany transactions, and consolidation processes.

3. With an emphasis on the implications for cash flows and earnings, inquire about the general history of current operations and recent or planned changes in the Business, including:

   − Services provided

- Environment in which the company operates, markets served, and competitive conditions;

- Customers and suppliers;

- Support functions (information technology, human resources, finance, treasury, risk management, tax, etc.), including those functions provided by Business's parent; and

- Any unusual business practices inherent within the industry or the locations where the company operates, such as arrangements with labor organizations, local authorities, major clients, etc.

4. Read and analyze information on significant acquisitions, start-up of operations, and disposals of property and businesses, considering the impact on reported and projected earnings and cash flows;

5. Read and analyze the Business's consolidating internal financial statements and related management discussion and analysis. Inquire about:

- Reconciliation between the external and the internal financial statements;

- Consistency of interim financial reporting policies and procedures compared to those used in the annual reviewed financial statements;

- Process and timing of periodic closing/consolidation cycle and consolidation entries;

- Internal accounting control environment, including any significant out-of-balance conditions, unreconciled differences or reportable conditions;

- Significant accounting policies, with a focus on revenue recognition and cost capitalization;

- Changes in accounting or reporting practices or procedures that could affect comparability or trends in earnings or cash flows; and

- Events subsequent to the most recent balance sheet date that could have a significant impact on current financial position, future earnings or cash flows.

**Independent Auditors**

1. Read the independent auditors' working papers for the FY16 and FY17 audits (as available).

2. Inquire of the Business's independent auditors about:

- Major issues and audit risk areas, significant judgments or estimates, unusual transactions and any disagreements with management;

- Assessment of quality of earnings and whether management's approach to accounting and financial reporting would be characterized as conservative or aggressive;

- History of audit adjustments proposed and their disposition;

- Accounting systems and internal controls, material weaknesses or reportable conditions;

- Recent or prospective changes in accounting and reporting policies or procedures; and

3. Read management letters for the most recent audit; inquire of the Business's independent auditors as to matters identified for inclusion for the current year and the status of corrective actions taken by management

**Quality of Earnings**

1. Analysis of management provided normalized EBITDA to factually explain the impact of:

- Management proposed adjustments;

14

- Transactions conducted on a non-arm's length basis, including related party transactions with Business's parent (e.g. report services for products sold by parent, commissions from parent, maintenance of service vehicles, etc.);

- Recently acquired or discontinued customers/ contracts;

- One time, extraordinary, and non-recurring items, including out of period adjustments and other potential adjustments identified from our due diligence or as advised by management;

- Impacts of reduction in workforce initiatives (if applicable);

2. Analyze monthly operating data (with a focus on management provided EBITDA) including:

- Management's reconciliation between gross and net revenue;

- Variances and trends in revenues, expenses, profitability, and key operating metrics by service category (HVAC, Exteriors, Interiors, Doors)

- Seasonality of revenue and EBITDA;

- Analyzing growth between organic growth and acquisition-related growth;

- Cost saving or restructuring initiatives;

- Contribution by top customers/contracts/service and trends in pricing and concentration;

- Reliance on Business's Parent to provide leads or revenue generation

- Composition of account balances;

- Direct expenses by major cost components

- SG&A by type;

- Any discretionary or temporary reductions or deferrals of certain expenses;

- Significant non-recurring, unusual or out-of-period charges and credits

3. Analyze costs allocated to Business from its parent and related allocation methodologies, as well as services provided from its parent (e.g. insurance programs, legal services, "Shop Your Way" loyalty program, shared corporate services, and rent)

4. Analysis of balance sheet accounts and trends for purposes of identifying Quality of Earnings matters, for management's consideration.


**Net Working Capital and Net Debt (As Requested; Not included in Preliminary Fee Estimate)**

1. Working Capital Analysis & Quality of Assets

- Analyze historical working capital trends, identifying seasonality, high/low points and average run rate over past 24 months

- Analyze inventory, including aging and adequacy of reserve balances.  Inquire about costing methodology, valuation and adequacy of reserves for excess, obsolete or slow-moving items, pledged inventories, inventory sold on consignment or bill-and-hold, frequency and experience of physical inventory counts, and purchase commitments.

- Analyze accounts receivable, including aging and adequacy of reserve balances. Inquire about billing and credit policies, collectability of large overdue balances and amounts due from related parties

- Analyze prepaid expenses and other current assets. Inquire about the realizability of the carrying values and the timing of the conversion of these amounts into cash

- Analyze a summary of accounts payables, including aging statistics. Inquire about normal and special credit terms (including rebates), significant past-due payables and disputes with suppliers and trade payable payment policies

- Analyze accrued liabilities and other current liabilities. Inquire about the basis for and adequacy of accruals for such items as customer deposits, warranties, deferred revenue, bonuses, deferred compensation, severance, workers compensation, commissions, vacation pay, employment benefits, litigation, sales allowances and credits and self-insurance and impact on earnings of significant accrued liabilities and reserves, payment practices and timing of related cash outflows

2. Other balance sheet considerations

- Analysis of net debt and debt-like items

- Analysis of fixed asset components and depreciation policies

3. Commitments and Contingencies

- Analyze capital expenditure history and projections broken down between maintenance vs. growth. Inquire about individually significant current capital projects and needed capital expenditures to reach sales growth targets. Inquire on the nature of any internally capitalized software costs

- Analyze capital/operating leases. Inquire about change of control, prepayment or other significant provisions, terms of significant capital and operating leases, future payment requirements, expiration dates and sublease income

- Inquire and analyze contingent liabilities (e.g., unasserted claims, litigation, environmental matters, guarantees, earn-outs, contingent payments)

- Inquire significant long-term purchase commitments (e.g. take-or-pay contracts)

**6.    Deliverables.** We will endeavor to communicate to you our significant issues and findings as they arise so that you can, as you deem appropriate, address the related business and deal issues as soon as possible. It will not always be possible for all of our communications to be in the form of written reports; however, we will endeavor to provide significant observations in written form prior to the completion of the engagement. As agreed with you, our deliverables will include the following:

- ***Issue Summary Memorandum*** — A written communication of our Quality of Earnings findings and observations with respect to the Business will be provided upon completion of fieldwork. Our draft memorandum will typically contain certain outstanding matters that may require further clarification by or information from management. As additional information is received, we may issue additional versions of our memorandum.

As applicable, for Client's consideration, we will provide listings of (a) additional document request items and questions for management and its advisors and (b) additional descriptions of due diligence and other M&A services that may be performed as part of a subsequent phase, if any.

**7.    Coordination of Due Diligence**. We will endeavor to perform the Services such that we generally will not duplicate the items that would be addressed by legal counsel, tax advisors, or any other professionals (including, but not, limited to environmental, regulatory, and management information systems) engaged by you or your affiliates to perform due diligence or other M&A services. As a result of similar information needing to be analyzed by different professional disciplines, we recommend that you consider an integrated approach whereby information is shared timely among the various parties

performing due diligence or other M&A services on your or any of your affiliate's behalf. At a minimum, if Client's legal counsel is performing due diligence or other M&A services with respect to agreements or contracts, we request that you or they inform us as to the scope of their work and, where possible, permit us to read their summaries (abstracts) of these documents if there are items with possible accounting or tax implications (e.g., leases, employment contracts, supply contracts, licensing contracts).

**Appendix C**

**Preliminary Fee Estimate**

To date, we have received limited information with respect to the Proposed Transaction. Accordingly, we have provided the following preliminary fee estimate based upon the Services described in Appendix B. Below we have listed some of our more-significant assumptions and critical information to be obtained in an effort to provide a more specific and accurate estimate of total professional fees:

| Services<br><br>In US$ | Preliminary Fee Estimate – Low-Range | Preliminary Fee Estimate – High-Range |
|---|---|---|
| Total Estimated Fees - Financial / Accounting Vendor Due Diligence Services (Quality of Earnings Only) | 125,000 | 175,000 |
| **Optional (or additional phase) M&A Services** *(available as requested; at the rates noted below)* | TBD | TBD |

**Important Notes**

- Fee amounts above do not include any estimates for travel and other expenses that may be incurred in connection with this engagement.

- As stated, our fees for this engagement will be based on the amount of time required at the following rates, plus expenses:

| Level | Hourly Rate (in US$) |
|---|---|
| Partner / Principal | $925 |
| Managing Director | $900 |
| Senior Manager | $775 |
| Manager | $650 |
| Senior Consultant | $550 |
| Consultant | $400 |

- Our involvement and our total fees are heavily dependent upon the quality, organization, and volume of content in the data room, the auditor working papers, the cooperation by the Client, and availability and access to Client information. As such, our fees may increase beyond those outlined in the fee range above.

- Additional services provided beyond those Services described in Appendix B will be billed separately.

**Circumstances Affecting Timing and Assumptions for Fee Estimate**

- Our estimated fee range is based upon an estimated amount of hours to be incurred over a 3 to 4 week period related to the Services noted in Appendix B. Any additional time beyond this time period may be billed separately at agreed-upon hourly rates noted previously. Further, any requested changes in timing or timeline may significantly affect our targeted completion times and fee estimates.  Significant changes to the timing of the engagement frequently cause us to incur significant unanticipated costs.

- Our fee range assumes a certain level of "administrative tasks" (e.g. status update meetings, formalized reporting of findings) will be performed by our professionals. Excessive administrative tasks requested by Client may cause us to incur additional fees to what is outlined in the fee ranges above.

- Only the Services specifically described herein are reflected in our quoted fees; any significant changes in the Services discussed herein could significantly alter fee estimates.

- The Client's management or any of the Client's advisors will use their reasonable efforts to be available and have prompt and accurate level of involvement in this engagement.

- Information requested by us will be made available to us in electronic, downloadable format on a timely basis and the data provided will be in good order.

- There will be effective coordination of efforts among the various parties performing due diligence and other M&A Services on your behalf.

- Timely payment of our invoices as they are rendered.

**Appendix D**

**PROSPECTIVE BUYER ACCESS – CLIENT AUTHORIZATION LETTER**

[*Letterhead of Deloitte & Touche LLP*]

[*Date*]

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Attention: Mr. Robert A. Riecker, CFO

Dear Mr. Riecker:

Deloitte & Touche LLP ("Consultant") was engaged on behalf of Sears Holdings Corporation ("Client") to provide certain services solely for Client in connection with Client's evaluation of the proposed disposition of a business unit code-named Project [*insert code name*] (the "Business") (the "Proposed Transaction").

In connection with the Proposed Transaction, you have informed us that you have been requested by [*insert name of entity seeking access*] (the "Purchaser") to provide it with paper copies or portable document format, agreed upon by Client and the Purchaser, of certain materials and information issued or prepared by any of the Deloitte Entities (as defined below) for Client with respect to the services described in the engagement letter, dated [date] (the "Engagement Letter"), between Consultant and Client (collectively, the "Information") for informational purposes. Notwithstanding anything to the contrary contained in the Engagement Letter, we hereby authorize you to provide the Purchaser with one paper copy or portable document format of the Information for such purpose provided that, we obtain a separate letter from the Purchaser in the form attached hereto prior to such access. Client and the Purchaser are solely responsible for the determination of whether and what information is provided by Client to the Purchaser, and the Deloitte Entities shall have no responsibility therefor. In addition, Client hereby authorizes the Deloitte Entities to respond to inquiries, if any, from or on behalf of, the Purchaser and to provide the Purchaser and its affiliates, their respective co-investors and lenders, and each of their respective accounting, tax, legal, and other professional advisors (acting solely in an advisory capacity to such entities) ("Other Third Parties") with information, whether in writing or otherwise, relating to the services described in the Engagement Letter, the Information, the Proposed Transaction, or any related transactions (the "Communications").

Client represents and warrants that it has received all necessary authorizations and consents from its and the Business's advisors, including, without limitation, its and the Business's independent accountants and other representatives, in order to permit the Purchaser and any Other Third Parties to have access to the Information and the Communications, including permission from such advisors to disclose confidential information to the Purchaser and such Other Third Parties. In addition, the Deloitte Entities shall have no responsibility to Client with respect to the provision of the Information or the Communications to the Purchaser or any Other Third Parties or with respect to their contents, whether or not the Information or the Communications contain information that might be considered confidential or material by Client, including in connection with its evaluation of the Proposed Transaction or any related transaction.

Client further represents and warrants that any offer or sale of securities by Client to the Purchaser, its affiliates, or their co-investors made in connection with the Proposed Transaction does not constitute a

public offering of securities, was not effected pursuant to a general solicitation or advertisement, and is not otherwise subject to registration under the Securities Act of 1933, as amended, or other state securities statutes or regulations. Client reasonably believes, based upon representations provided by the Purchaser, its affiliates, or their co-investors, and other information available to Client, that none of the Purchaser, its affiliates, or their co-investors is a natural person or is buying securities on behalf, or for the account, of a natural person.

One or more of the Deloitte Entities has provided, is currently providing, and may in the future provide, services, such as audit, tax, and consulting services to the Purchaser and/or any Other Third Parties, and the Deloitte Entities and their personnel shall have no responsibility to Client relating to such services, nor any responsibility to use or disclose information that any of the Deloitte Entities possesses by reason of such services or otherwise, whether or not such information might be considered material by Client. In addition, one or more of the Deloitte Entities may have other business relationships with the Purchaser and/or any Other Third Parties.

Consultant's engagement on behalf of Client is limited in nature and may not comprehend any or all matters that might be pertinent or necessary to the evaluation of the Proposed Transaction or any other transaction relating to Client, the Business, or any other entity. The Information and the Communications will not address all the questions that the Purchaser or any Other Third Party may have. The Information and the Communications also may contain sensitive and candid comments about Client, the Business, the Proposed Transaction, or any other transaction that may be subject to interpretation.

Client hereby (1) releases the Deloitte Entities and their personnel from all claims, liabilities, and expenses relating to the access to, or use of, the Information or the Communications by the Purchaser or any Other Third Parties, including, without limitation, in connection with any transaction involving the Purchaser or any Other Third Parties relating to the Proposed Transaction and any claims, liabilities, and expenses resulting from the termination of, or change in, the Proposed Transaction or any such transaction, and (2) indemnifies and holds harmless the Deloitte Entities and their personnel from all claims, liabilities, and expenses relating to the access to, or use of, the Information or the Communications by the Purchaser or any Other Third Parties or any assertion of reliance by any person or entity relating thereto; provided that the foregoing shall not apply to the extent any such claim, liability, or expense resulted from the bad faith or intentional misconduct of the Deloitte Entities.

In circumstances where all or any portion of the provisions of the immediately preceding paragraph are unavailable, in no event will the Deloitte Entities or their personnel be liable for consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense. For purposes of this letter, the "Deloitte Entities" shall mean Consultant and its subsidiaries; to the extent that, as a subcontractor, they provide or provided any of the services under or in connection with the Engagement Letter, the member firms of Deloitte Touche Tohmatsu Limited and the affiliates of Consultant and such member firms; and in all cases any successor or permitted assignee; provided, however, that for purposes of the fifth paragraph of this letter, the "Deloitte Entities" shall mean Consultant, the member firms of Deloitte Touche Tohmatsu Limited, and the affiliates of Consultant and such member firms.

This letter and all matters relating hereto shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof) and the state and federal courts of New York shall have exclusive jurisdiction over all matters relating to this letter.

Each of the provisions of this letter will apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

Please confirm your understanding and agreement with the foregoing by signing and dating a copy of this letter and returning it to us.

Very truly yours,

[*DELOITTE & TOUCHE LLP*]  [*to be signed manually*]

By: Jack Koenigsknecht, Partner

Accepted and Agreed to this _____ day of _____, 201_:

Sears Holdings Corporation

By: _____

Name: _____

Title: _____

**Appendix E**

**PROSPECTIVE BUYER ACCESS – LENDER ACCESS LETTER**

[*Letterhead of Deloitte & Touche LLP*]

[*Date*]

[*Insert name of entity seeking access*]
[*Address*]
[*City*], [*State*] [*ZIP code*]

Attention: [*Name*]

Dear [*Name*]:

As you are aware, pursuant to the engagement letter dated [date] (the "Engagement Letter"), between Deloitte & Touche LLP ("Consultant") and Sears Holdings Corporation ("Client"), we have been engaged to perform certain services solely for Client (the "Services") in connection with Client's evaluation of a proposed disposition of a business unit code-named Project [*insert code name*] (the "Business") (the "Proposed Transaction").

Such engagement did not and does not constitute an engagement to perform an audit in accordance with generally accepted auditing standards, an examination of internal controls, or other attestation or review services in accordance with standards or rules established by the American Institute of Certified Public Accountants (AICPA), the Public Company Accounting Oversight Board (PCAOB), or other regulatory body. Any such audit, examination, or other attestation or review services with respect to Client or the Business are not covered by the Engagement Letter and would be the subject of a separate engagement. Accordingly, this letter does not apply to such audit, examination, or other attestation or review services, if any, performed by any of the Deloitte Entities (as defined below) with respect to Client or the Business.

Client has requested that it be permitted to comply with the request of [*insert name of entity seeking access*] (the "Purchaser") for access to a paper copy or portable document format, agreed upon by Client and the Purchaser, of certain materials and information issued or prepared by any of the Deloitte Entities for Client with respect to the Services (collectively, the "Information") solely for the Purchaser's informational purposes in connection with the Proposed Transaction. In consideration of our permitting Client to provide the Purchaser with a copy of the Information, and for other good and valuable consideration the receipt and sufficiency of which is acknowledged, the Purchaser, intending to be legally bound, is executing and delivering to us this letter.

## ACKNOWLEDGMENTS AND AGREEMENTS

The Purchaser acknowledges and agrees to the following:

- The Information was prepared solely for the benefit and use of Client and is being provided to the Purchaser at its request solely for the Purchaser's information and cannot and shall not be relied upon by the Purchaser, any Purchaser Entity (as defined below), or any of their respective legal or other advisors. The Purchaser acknowledges that it has the appropriate expertise and experience to evaluate the risks inherent in the Proposed Transaction or any related transaction and has retained its own legal and other advisors in connection with the Proposed Transaction or any related transaction. The Purchaser agrees that access to the

Information is not a substitute for the Purchaser undertaking appropriate inquiries and procedures in relation to any such transaction and agrees that it has been provided with access to information and the opportunity to ask questions sufficient to perform its own evaluation of the risks of any such transaction. The Information does not constitute in any way a recommendation by the Deloitte Entities or Client to participate in the Proposed Transaction or any related transaction and is not part of or being made available in connection with any prospectus, offering circular, or otherwise part of any soliciting, promoting, marketing, underwriting, recommending, or selling of securities or other interests.

- The determination of whether and which Information to provide to the Purchaser is solely the responsibility of Client and the Purchaser, and the Deloitte Entities shall have no responsibility therefor, whether or not the Information provided to the Purchaser is incomplete or inaccurate.

- The Services are subject to the limitations set forth herein and in the attached Appendix, such as the nature, extent, and purpose of the Services. Consultant's engagement on behalf of Client to perform the Services was conducted in accordance with the *Statement on Standards for Consulting Services* established by the AICPA, and the performance of the Services, including, without limitation, the preparation of the Information, does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of or any other form of assurance with respect to internal controls, or other attestation or review services in accordance with standards or rules established by the AICPA, the PCAOB, or other regulatory body. Neither the Deloitte Entities, nor the Information, nor the Communications (as defined below) will express an opinion or any other form of assurance with respect to any matters as a result of the performance of the Services. The Services performed may have been, and may in the future be, changed or modified by mutual agreement of Client and Consultant subsequent to the date of the Engagement Letter. The Purchaser is not a third-party beneficiary of the Engagement Letter and the Purchaser has no rights thereunder or with respect to the Services.

- The Information and any communications, whether in writing or otherwise, made by a Deloitte Entity to the Purchaser relating to the Proposed Transaction or any related transaction (the "Communications"), do not address all matters that the Deloitte Entities are or may become aware of, or all communications, whether in writing or otherwise, made by a Deloitte Entity to Client or any other person or entity, in connection with the Proposed Transaction, such other transaction, or otherwise, whether or not such matters or communications might be considered material by the Purchaser or any other third party.

- The Deloitte Entities have no responsibility to advise the Purchaser of other services or procedures that might be performed and make no representations as to the sufficiency of the Information or the Communications for the purposes of the Purchaser. In addition, the Deloitte Entities have no responsibility for updating the Information, the Communications, or the Services performed or for performing any additional services or procedures.

- The Information was prepared as of the applicable dates noted in such materials. Events and circumstances affecting the Business have occurred since such dates. Such events or circumstances might be considered material by the Purchaser. The Deloitte Entities have no responsibility to advise the Purchaser regarding such events or circumstances, whether or not the Deloitte Entities are aware of or become aware of any such events or circumstances.

- The Deloitte Entities have assumed the completeness and accuracy of all information and materials provided to the Deloitte Entities by or on behalf of Client, the Business, or their respective advisors, and the Information and the Communications are based upon this

assumption. Consultant has not been engaged to detect errors or fraud and the Information and the Communications may not disclose or fraud should they exist.

- Client may have participated in the preparation of the Information, including, without limitation, by reviewing and commenting on prior drafts of the Information and the Communications, and such participation may have resulted in the addition, modification, or deletion of information that might be considered material by the Purchaser or any other third party.

- One or more of the Deloitte Entities has provided, is currently providing, and may in the future provide, services, such as audit, tax, and consulting services, including services in connection with the Proposed Transaction and related financing arrangements, to Client, the Business, or their respective affiliates, and the Purchaser agrees that the Deloitte Entities and their personnel shall have no responsibility to the Purchaser relating to such services in connection with the Proposed Transaction, nor any responsibility to the Purchaser in connection with the Proposed Transaction to use or disclose information that any of the Deloitte Entities possesses by reason of such services or otherwise, whether or not such information might be considered material by the Purchaser or any other third party.

- One or more of the Deloitte Entities has provided, is currently providing, and may in the future provide, services, such as audit, tax, and consulting services to the Purchaser or its affiliates, and the Purchaser agrees that the Deloitte Entities and their personnel shall have no responsibility to the Purchaser relating to such services in connection with the Proposed Transaction, nor any responsibility to the Purchaser in connection with the Proposed Transaction to use or disclose information that any of the Deloitte Entities possesses by reason of such services or otherwise, whether or not such information might be considered material by the Purchaser or any other third party.

- One or more of the Deloitte Entities may be engaged to provide services to parties other than Client considering a transaction involving the Business. The Deloitte Entities and their personnel will have no responsibility to use or disclose information, including the identity of such other parties, if any, that any of the Deloitte Entities possesses by reason of its services for such other parties, if any, whether or not such information might be considered material by the Purchaser or any other third party.

## NO RIGHTS AS A RESULT OF ACCESS

The Purchaser does not acquire any rights as a result of access to the Information and the Communications, and the Deloitte Entities do not assume any duties or obligations as a result of such access to the Information or the Communications. The Deloitte Entities are not, by means of permitting Client to provide the Purchaser with a copy of the Information or by means of the Communications, rendering accounting, financial, investment, legal, tax, or other professional advice or services to, or acting as a fiduciary or agent of, or in any other capacity with respect to, the Purchaser. The Information and the Communications are not a substitute for such professional advice or services, nor should they be used as a basis for any decision or action that may affect the Purchaser or its business.

The Purchaser shall not disclose the Information or the Communications, or refer to the Deloitte Entities in connection with the Proposed Transaction, any related transaction, the Information, or the Communications to any person or entity except (1) to an employee or a member of management [, the investment manager, the investment committee,] or the board of directors of the Purchaser, using the Information and the Communications for informational purposes solely in their capacity as such; (2) to an

employee or a member of management or the board of directors of a Purchaser Entity, using the Information and the Communications for informational purposes solely in their capacity as such, provided that such Purchaser Entity does not further disclose any of the Information or the Communications, or refer to the Deloitte Entities in connection with the Proposed Transaction, any related transaction, the Information, or the Communications; (3) to an accounting, tax, or legal advisor of the Purchaser, using the Information and the Communications for informational purposes solely in its capacity as an advisor to the Purchaser, provided that such accounting, tax, or legal advisor does not further disclose any of the Information or the Communications, or refer to the Deloitte Entities in connection with the Proposed Transaction, any related transaction, the Information, or the Communications; (4) to any other professional advisor of the Purchaser, who may use the Information and the Communications solely in its capacity as an advisor to the Purchaser and who has agreed in writing not to further disclose any of the Information or the Communications, or refer to the Deloitte Entities in connection with the Proposed Transaction, any related transaction, the Information, or the Communications; or (5) to the extent required by a valid subpoena, an order of a court of competent jurisdiction, a regulatory authority asserting jurisdiction over the business or financial affairs of the Purchaser or a Purchaser Entity, or other legal process, provided that the Purchaser, to the extent permitted by applicable law or regulation, provides Consultant with prior written notice of such requirement. Without limiting the generality of the provisions of this paragraph, in no event will the Purchaser, any Purchaser Entity, or any "professional advisor," "accounting advisor," or "tax advisor" be permitted access to the Information or the Communications in connection with any (a) fairness, solvency, or other opinion; (b) credit enhancement or credit rating; (c) brokering or underwriting of any type of security or any M&A insurance; or (d) financing (including, without limitation, in the role of investor, agent, intermediary, underwriter, syndicator, lender, or other similar capacity). For purposes of this letter, the term "Purchaser Entity" shall mean any entity controlled by, under common control with, or controlling the Purchaser.

Notwithstanding anything to the contrary contained in this letter, the Purchaser may provide the Information and the Communications to co-investors or lenders acceptable to us, provided that prior to such disclosure such third party has executed a letter with Consultant similar to this letter. In no event will any co-investor or lender be permitted access to the Information or the Communications for use, whether on its own behalf or as an agent, in connection with any borrowing, securities, or instrument other than equity or bank or institutional indebtedness provided by such third party at closing to fund the Proposed Transaction. The Purchaser acknowledges and agrees that it and such third party shall be solely responsible for the determination of whether and what information is provided by the Purchaser to such third party and the Deloitte Entities shall have no responsibility therefor.

The Purchaser represents and warrants that any offer or sale of securities by the Purchaser to any co-investor made in connection with the Proposed Transaction does not constitute a public offering of securities, was not effected pursuant to a general solicitation or advertisement, and is not otherwise subject to registration under the Securities Act of 1933, as amended, or other state securities statutes or regulations. The Purchaser reasonably believes, based upon representations provided by any such co-investor and other information available to Client, that any such co-investor is not a natural person and is not buying securities on behalf, or for the account, of a natural person.

## RELEASE AND INDEMNIFICATION

The Purchaser (1) releases the Deloitte Entities and their personnel from all claims, liabilities, and expenses relating to the Proposed Transaction, the services provided by the Deloitte Entities in connection with the Proposed Transaction, the Services, the Information, or the Communications or any assertion of reliance in relation thereto; (2) indemnifies and holds harmless the Deloitte Entities and their personnel from all claims, liabilities, and expenses relating to the access to or use of the Information or the Communications by any person or entity authorized hereunder, including, without limitation, any

Purchaser Entity, any accounting, tax, legal, or other professional advisor, or any co-investor or lender, or any assertion of reliance in relation thereto; and (3) indemnifies and holds harmless the Deloitte Entities and their personnel from all claims, liabilities, and expenses relating to a breach or any assertion of reliance by the Purchaser or any of its personnel of any provision of this letter, including, without limitation, the restrictions on use and disclosure of the Information and the Communications.

In circumstances where all or any portion of the provisions of this section of this letter are unavailable, the aggregate liability of the Deloitte Entities for any claims, liabilities, or expenses relating to the Proposed Transaction, the services provided by the Deloitte Entities in connection with the Proposed Transaction, the Services, the Information, the Communications, or the access to or use of the Information or the Communications by the Purchaser or any other person or entity authorized hereunder shall not exceed an amount that is proportional to the relative fault that the conduct of the Deloitte Entities bears to all other conduct giving rise to such claims, liabilities, or expenses; provided, however, that in no event shall the Deloitte Entities' aggregate liability therefor exceed the fees paid to Consultant by Client under the Engagement Letter with respect to the Proposed Transaction, and in no event shall the Deloitte Entities or their personnel be liable for consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense.

## OTHER

The agreements and undertakings of the Purchaser contained in this letter, such as those pertaining to restrictions on the use and disclosure of the Information and the Communications, release from liability, and indemnification, will survive delivery of the Information and the Communications to the Purchaser and consummation of the Proposed Transaction.

For purposes of this letter, the "Deloitte Entities" shall mean Consultant and its subsidiaries; to the extent that, as a subcontractor, they provide or provided any of the Services, the member firms of Deloitte Touche Tohmatsu Limited and the affiliates of Consultant and such member firms; and in all cases any successor or permitted assignee; provided, however, that for purposes of the last three Acknowledgments and Agreements set forth above, the "Deloitte Entities" shall mean Consultant, the member firms of Deloitte Touche Tohmatsu Limited, and the affiliates of Consultant and such member firms.

If any provision of this letter is found by a court of competent jurisdiction to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth in this letter.

This letter and the attached Appendix constitute the entire agreement of the parties hereto with respect to its subject matter; supersede all other oral or written representations, understandings, or agreements relating to such subject matter; and may not be amended except by written agreement signed by the parties.

The Purchaser may not assign, transfer, or delegate any of its rights or obligations hereunder (including, without limitation, interests or claims relating to this letter or any of the transactions contemplated hereby) by operation of law or otherwise without the prior written consent of Consultant; provided, however, that the Purchaser may assign all of its rights and obligations hereunder to (1) an acquiror of all or substantially all of the assets of the Purchaser so long as such acquiror agrees in writing to be bound by the terms hereof as if it were the Purchaser, or (2) any successor by merger of the Purchaser so long as such successor is bound by the terms hereof by operation of law as if it were the Purchaser.

THE PARTIES HERETO IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY

LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS LETTER OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

This letter and all matters relating hereto shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof), and the state and federal courts of New York shall have exclusive jurisdiction over all matters relating to this letter.

Each of the provisions of this letter will apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

Please confirm your agreement with the foregoing by signing and dating a copy of this letter and returning it to us.

Very truly yours,

[*DELOITTE & TOUCHE LLP*] [*to be signed manually*]

By: Jack Koenigsknecht, Partner

Accepted and Agreed to this _____ day of _____, 201_:

[*Insert name of Purchaser*]:

By: _____

Name: _____

Title: _____

**APPENDIX**

**LIMITATIONS ON SERVICES**

(a) The nature of the Proposed Transaction necessitates prompt communication to Client of our findings that result from performing the Services as those Services are performed. Therefore, it is not possible for all of our communications to be in the form of written reports. Accordingly, any information, documents, or other communications provided by the Deloitte Entities, whether in writing or otherwise, including, without limitation, any reports (including, without limitation, the Deloitte Entities' final written report, if any, on the Services) or memoranda that the Deloitte Entities may issue, should be considered in the context of the nature of the Services that we have agreed to provide.

(b) The Deloitte Entities shall have no responsibility for obtaining any necessary authorizations or consents from Client's or the Business's advisors, including without limitation, Client's or the Business's independent accountants and other representatives, in order to permit the Deloitte Entities to perform its engagement on behalf of Client, including disclosure of confidential information of Client and the Business to the Deloitte Entities or the Purchaser in connection with the Proposed Transaction.

(c) The Services may include advice and recommendations, but the Deloitte Entities shall have no responsibility regarding any decisions in connection with the implementation of such advice and recommendations. Furthermore, Client shall be solely responsible for, among other things: (i) making all management decisions and performing all management functions; (ii) designating a competent employee, preferably within senior management, to oversee the Services on behalf of Client; (iii) evaluating on behalf of Client the adequacy and results of the Services; (iv) accepting responsibility for results of the Services; and (v) any forward-looking information (including any models, projections, forecasts, budgets, synergies, feasibility analyses, assumptions, estimates, methodologies, or bases for support). In connection with the Services, the Deloitte Entities shall be entitled to rely on all decisions and approvals of Client.

(d) The Services are limited in nature and do not comprehend all matters relating to the Business that might be pertinent or necessary to the evaluation of the Proposed Transaction. Accordingly, the Services should not be taken to supplant other inquiries and procedures that an investor or any third party should undertake. The Deloitte Entities have no responsibility for the sufficiency of the Services and make no representation as to the sufficiency of the Services for any purpose. In addition, the Deloitte Entities have no responsibility for performing any services or procedures beyond those agreed to by Client and Consultant or for updating the Services performed, the Information, or the Communications.

(e) Neither the Deloitte Entities, nor the Information, nor the Communications will express an opinion or any other form of assurance with respect to any matters as a result of the performance of the Services, including, without limitation, concerning (i) the financial statements of any entity or any financial or other information, or operating or internal controls of any entity, taken as a whole, for any date or period; (ii) the merits of any transaction, including, without limitation, the consideration to be paid; (iii) the future operations of any entity; (iv) the fairness of the contemplated terms of any transaction; or (v) any forward-looking information (including, but not limited to, any models, projections, forecasts, budgets, synergies, feasibility analyses, assumptions, estimates, methodologies, or bases for support) or the feasibility or achievability of such forward-looking information.

(f) In the performance of the Services, the Deloitte Entities will not perform any evaluation of internal controls and procedures for financial reporting upon which Client's or the Business's management can base its assertions in connection with the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") or related rules or regulations. The Deloitte Entities will make no representations or warranties and will provide no assurances that any entity's disclosure controls and procedures are compliant with the certification requirements of, or any entity's internal controls and procedures for financial reporting are effective as required by, Sarbanes-Oxley or any other standards, rules, or regulations, including, without limitation, Sections 302 and 404 of Sarbanes-Oxley.

(g) The Business's financial statements, footnotes, and accounting policies and procedures, including, without limitation, the application of generally accepted accounting principles (GAAP) to record the effects of the Proposed Transaction, are the responsibility of management of the Business. Accordingly, any comments made by the Deloitte Entities relating to the accounting or tax treatment of selected balances or transactions or the application of GAAP or the technical merits of the tax positions and planning strategies related to the Acquisition as a whole are intended to serve only as general guidance to assist Client to better understand certain accounting or tax matters related to the Business and the potential effects of the Proposed Transaction. Such comments are necessarily based on the Deloitte Entities' preliminary understanding of the pertinent facts and circumstances and on current authoritative literature, and are therefore subject to change. Such comments do not constitute the rendering of a tax opinion or a report on the application of accounting principles in accordance with standards or rules established by the AICPA, the PCAOB, or other regulatory body.

(h) The performance of the Services does not constitute (i) a recommendation (implied or otherwise) regarding any transaction, including, without limitation, the acquisition, disposition, or financing of any business, assets, liabilities, or securities; (ii) a market or financial feasibility study; (iii) a fairness or solvency opinion; or (iv) an examination or compilation of, or the performance of agreed upon procedures with respect to, prospective financial information in accordance with standards or rules established by the AICPA, the PCAOB, or other regulatory body. The Services, the Information, and the Communications are not intended to be, and shall not be construed to be, "investment advice" within the meaning of the Investment Advisers Act of 1940. It is understood that the Deloitte Entities will not provide, nor will the Deloitte Entities be responsible for providing, legal advice. In addition, any forward-looking information is the responsibility of applicable management. In this regard, applicable management is responsible for representations about its plans and expectations and for disclosure of significant information that might affect the ultimate realization of its forward-looking information, and the Deloitte Entities have no responsibility therefor. There will usually be differences between forward-looking information and actual results because events and circumstances frequently do not occur as expected, and those differences may be material.

(i) The performance of the Services is heavily dependent upon the Deloitte Entities being provided not only timely access to accurate and complete versions of materials and information requested by the Deloitte Entities, but also upon the Deloitte Entities being provided with all relevant materials and information, complete and accurate answers to questions, and timely decisions and approvals of Client in connection with the Services. The Deloitte Entities have no responsibility for the accuracy or completeness of the information provided by, or on behalf of, Client, the Business, or any other person or entity.

**Appendix F**

**MANAGEMENT REPRESENTATION LETTER**

[Client's letterhead]

[Date]

Deloitte & Touche LLP
M&A Transaction Services
111 S. Wacker Drive
Chicago, IL 60606-4301

Dear Jack Koenigsknecht, Partner:

We are providing this letter in connection with Deloitte & Touche LLP's engagement to perform certain due diligence services in connection with Sears Holdings Corporation's evaluation of a proposed disposition of [*insert business unit name*] (the "Business"), pursuant to the engagement letter dated [date]. We refer to your written due diligence communication on the Business, which you provided to us on [*insert date*] (the "Memorandum").

We have read the Memorandum and the information contained therein, and understand that we are responsible for such information. We further understand that Deloitte & Touche LLP has not verified the accuracy of the information we have provided. To the best of our knowledge and belief, we represent that: (i) all of the facts as stated in the Memorandum are accurate in all material respects; (ii) any observations attributable to us in the Memorandum are fair and reasonable; (iii) we have made available to you all significant information relevant to the Memorandum; and (iv) no material matters that that are relevant to our proposed disposition of the business have been excluded from the Memorandum.

The above representations are made on the basis of inquiries of management and staff and, where appropriate, review of the materials provided to you, sufficient to satisfy ourselves that we can properly make each of the above representations to you.

[*Individual name*], authorised by and on behalf of Sears Holdings Corporation

_____

(Name and title of member of management)

# Deloitte.

**Deloitte & Touche LLP**
M&A Transaction Services
111 S. Wacker Drive
Chicago, IL 60606-4301
USA
Tel:  1 312 486 1000
Fax:  1 312 486 1486
www.deloitte.com

July 23, 2018

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Attention: Mr. Robert A. Riecker, CFO

Dear Mr. Riecker:

This letter, effective June 14, 2018, confirms the engagement of  Deloitte & Touche LLP ("Consultant") by Sears Holdings Corporation ("Client") to perform certain services in connection with Client's evaluation of a proposed divestiture of a business unit code-named Project Sasset - Kenmore (the "Business") (the "Proposed Transaction").

## SERVICES

This engagement will be conducted in accordance with the terms and conditions hereof and in accordance with the *Statement on Standards for Consulting Services* established by the American Institute of Certified Public Accountants ("AICPA"). Subject to applicable professional standards or rules, including applicable preapproval requirements of the audit committee or board of directors of Client, if any, the specific services to be performed by us (collectively, the "Services") will be established based on discussions with you as the Proposed Transaction progresses and additional information is obtained during the course of the engagement. Based upon our discussions with you to date, Appendix B attached hereto describes our initial understanding of the Services you have requested us to perform and we have agreed to perform. These Services may be changed or modified by mutual agreement of the parties if, for example, unforeseen circumstances arise. We will promptly discuss any such circumstances with you and, likewise, you agree to notify us promptly if modifications to the Services are requested.

## LIMITATIONS OF SERVICES

We will provide our observations, advice, and recommendations arising from the performance of the Services to Client. However, the Services will not result in the issuance of any written or oral communications by the Deloitte Entities (as defined in the attached General Business Terms) to Client or any third parties expressing any opinion, conclusion, or any other form of assurance with respect to, accounting policies; financial data; financial statements and related footnotes; appropriate application of generally accepted accounting principles; disclosure, operating, or internal controls; compliance with the rules and regulations of the Securities and Exchange Commission; compliance with the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") or related rules or regulations; or any other matters.

The Deloitte Entities will not perform any management functions, make management decisions, assume any management responsibilities, or otherwise perform in a capacity equivalent to that of management or an employee of Client or the Business, including assuming any financial reporting oversight role; authorizing, executing, or consummating any transactions, or otherwise exercising authority on behalf of Client or the Business or having the authority to do so; preparing source documents or originating data, in electronic or other form, evidencing the occurrence of any transactions; recording of any amounts in books and records of Client or the Business; supervising employees of Client or the Business in the performance of their activities; reporting to the board of directors on behalf of management of Client or the Business; or providing any legal advice with respect to, or conducting a legal review of, any documents, records, or policies of Client or the Business. Client agrees that the Services may include advice and recommendations, but no Deloitte Entity will make any decision on behalf of Client in connection with the implementation of such advice and recommendations. Furthermore, Client shall be

solely responsible for, among other things: (1) designating a competent management member to actively oversee the Services and to sustain meaningful and substantial involvement in all phases of this engagement; (2) evaluating the adequacy and results of the Services; (3) accepting responsibility for results of the Services (including, among other things, agreeing to the nature, objective, scope, and timing of delivery of the Services, providing general direction and monitoring the engagement as it progresses, and making all the management decisions relating to the Services (including evaluating the adequacy of the results and ensuring that the resulting work product meets the agreed-upon specifications and making judgments on behalf of Client)); (4) establishing and maintaining internal controls, including monitoring ongoing activities; and (5) any forward-looking information (including any models, projections, forecasts, budgets, synergies, feasibility analyses, assumptions, estimates, methodologies, or bases for support). For the avoidance of doubt, Consultant will be responsible for the performance of the Services.

The Services may include access to the work of Client's or the Business's advisors, including public accounting firms, or to financial statements, financial information, or data reported on by such advisors. Client agrees that such access is not for the purpose of affirming or evaluating the procedures or professional standards used by such other advisors. In this regard, we call your attention to the possibility that advisors may perform procedures concerning the same information or data, and perhaps the same accounts and records, and reach different observations than the Deloitte Entities for a variety of reasons, including the possibilities that additional or different information or data might be provided to them that was not provided to the Deloitte Entities; that they might perform different procedures from the Deloitte Entities; or that professional judgments concerning, among other things, complex, unusual, or poorly documented matters may differ.

## COMMUNICATIONS — USE AND DISTRIBUTION

The nature of the Proposed Transaction will require prompt communication to Client of our findings that result from performing the Services as those Services are performed. Therefore, it will not be possible for all of our communications to be in the form of written reports. Accordingly, any information, documents, or other communications provided by the Deloitte Entities, whether in writing or otherwise, including any reports (including our final written report, if any, on the Services) or memoranda issued by any of the Deloitte Entities, should be considered by Client in the context of the nature of the Services that we have agreed to provide. Such information, documents, communications, Subject Tax Planning Advice (as defined in the attached General Business Terms), if any, and any drafts thereof, including any draft or final reports or memoranda, whether in writing or otherwise, are herein referred to collectively as the "Client Communications."

All Client Communications are solely for Client's benefit, and are not intended to be relied upon by any person or entity (including prospective buyers, investors, or other parties considering a transaction involving the Business) other than Client. Client shall not disclose or refer to any of the Client Communications to any person or entity except to (1) an employee (with a need to know), a member of management, or a member of the board of directors of Client, who may use the Client Communications solely for purposes of Client's evaluation or consummation of the Proposed Transaction; (2) an employee, a member of management, or a member of the board of directors of a Client Affiliate (as defined below), each with a need to know such Client Communications or the information contained therein in connection with the Proposed Transaction, who may use the Client Communications solely for purposes of Client's evaluation or consummation of the Proposed Transaction; or (3) any legal or other professional advisor of Client (including Client's investment banking advisors and accountants) acting strictly in an advisory capacity to Client, who may use the Client Communications solely to assist Client in connection with Client's evaluation or consummation of the Proposed Transaction; provided that Client shall ensure that the persons or entities referred to in clauses (2) and (3) of this paragraph do not further disclose any of the Client Communications, or refer to the Deloitte Entities in connection with the Proposed Transaction or any related transaction or any of the Client Communications. Notwithstanding the foregoing, the

disclosure restriction set forth in this paragraph shall not apply to the extent disclosure is required by a valid subpoena, an order of a court of competent jurisdiction, a regulatory authority asserting jurisdiction over the business or financial affairs of Client, or other legal process (provided that in such event, to the extent permitted by law or regulation, Client provides us with prior written notice of such requirement so that we may object, seek a protective order or confidential treatment, or take such other action as we deem appropriate). Without limiting the generality of the provisions of this paragraph, in no event will any professional advisor (including Client's investment banking advisors and accountants) be permitted to use the Client Communications in connection with any (a) fairness, solvency, or other opinion; (b) credit enhancement or credit rating; (c) brokering or underwriting, including of any type of security or M&A insurance; or (d) financing (including in the role of investor, agent, intermediary, underwriter, syndicator, lender, or other similar capacity). Client may, however, create its own materials based on information contained in the Client Communications and use and disclose such Client-created materials for external purposes, provided that Client does not in any way, expressly or by implication, attribute such materials to the Deloitte Entities. For the avoidance of doubt, the persons or entities referred to in clauses (1) through (3) of this paragraph may disclose the Client Communications or refer to the Deloitte Entities solely to the other persons or entities referred to in clauses (1) through (3) of this paragraph solely to assist Client in connection with Client's evaluation or consummation of the Proposed Transaction. For purposes of this letter, the term "Client Affiliate" shall mean an entity controlled by, under common control with, or controlling, Client.

In addition, Client agrees that it will not refer, generically, by name or otherwise to the Deloitte Entities or the Services in any written materials relating to the Proposed Transaction (other than as provided in clauses (1) through (3) in the preceding paragraph), including any publicly filed documents, offering memoranda, or sale, purchase, financing, or other transaction-related agreements (provided, however, that, as part of Client's disclosure of audit-related fees in the fee disclosure section of its proxy statement under the Securities Exchange Act of 1934, as amended, Client may include the following (or a substantially similar) reference in such section: "Deloitte & Touche LLP performed due diligence services related to mergers and acquisitions"), without our prior written consent for each requested use or reference. Without limiting the generality of this paragraph, Client acknowledges and agrees that the Deloitte Entities are not, and will not agree to be named as, experts under the Securities Act of 1933, as amended, or any other state or federal securities laws.

Notwithstanding anything to the contrary contained in this letter, Client may provide the Client Communications to other third parties, provided that prior to such disclosure (1) Consultant consents in writing to disclosure to such third party; and (2) in the case of third parties considering a transaction involving the Business, (a) Client has executed an agreement in the form of Appendix D to this letter, authorizing, among other things, the Deloitte Entities to disclose information to such third party; (b) such third party has executed an agreement in the form of Appendix E to this letter; and (c) the applicable members of management of Client and the Business, including those individuals in key financial oversight roles, have (i) read a draft written communication of our detailed findings and observations and (ii) confirmed in writing the completeness and accuracy of the information, explanations, and representations provided or made to us by or on behalf of Client and the Business during the course of the engagement in the form of Appendix F to this letter. Client acknowledges and agrees that it and such third party shall be solely responsible for the determination of whether and what information is provided by Client to such third party and the Deloitte Entities shall have no responsibility therefor.

**FEES**

Professional fees for this engagement will be based on the amount of time our professional personnel devote to performing the Services at our hourly rates outlined in Appendix C. However, these rates may be subject to modification, as agreed upon by the parties, for this engagement depending on the

complexity, time, and effort required. The final determination of the professional fees relating to this engagement will be completed shortly after our work on this engagement is completed or otherwise ends, and shall be paid within 30 days of such determination. In addition to professional fees, we will also bill for expenses, such as postage, photocopying, telephone, travel, transportation, lodging, and meals, reasonably incurred by us.

Our preliminary estimate of our professional fees are included in Appendix C to this letter, which provides further details regarding this estimate and the related assumptions and key drivers that may change our estimate. However, it is difficult to more definitively estimate the total hours and fees for this engagement because due diligence services can vary significantly depending upon, among other things, the following: (1) the individual judgment of each prospective seller and the scope of the services that you ask us to perform, (2) unforeseen circumstances that may develop, (3) the quality and quantity of the Business's applicable records and related internal controls, and (4) the type of transaction and/or its complexity. Consultant will provide prompt notification to you if our estimated fees are expected to exceed the high end of our range. If less time is required than estimated, our professional fees will be lower.

We will invoice you following the end of each monthly period for professional fees accrued and expenses incurred by us during that respective period in performing the Services. All invoices shall be due within 30 days of receipt.

In addition, we will be compensated by Client for any time and expenses (including reasonable legal fees and expenses) that the Deloitte Entities may incur in considering or responding to discovery requests or other requests for documents or information, or in participating as a witness or otherwise in any legal, regulatory, arbitration, or other proceedings as a result of or in connection with this engagement; provided that this provision shall not apply (1) where we are the defendant and Client is the plaintiff in such proceedings or (2) to the extent such proceedings resulted from the bad faith or intentional misconduct of the Deloitte Entities.

## ACKNOWLEDGEMENT

It is understood that any member firm of Deloitte Touche Tohmatsu Limited or any of their respective affiliates (including Consultant) may have been or may be engaged to provide audit, tax, consulting, or other services to, or may have other business relationships with, Client, the Business, or their respective affiliates. In addition, our engagement team providing Services to Client hereunder may include certain personnel who possess information related to such services or other relationships, if any. The Deloitte Entities and their respective personnel will have no responsibility to Client relating to such services or other relationships, if any, in connection with the Proposed Transaction, nor any responsibility to Client in connection with the Proposed Transaction to use or disclose information that any of the member firms of Deloitte Touche Tohmatsu Limited or their respective affiliates (including Consultant) possess by reason of such services or other relationships, if any, whether or not such information might be considered material by Client or any third party. Client should not expect to obtain additional reliance regarding the Business by virtue of any of the member firms of Deloitte Touche Tohmatsu Limited or any of their respective affiliates (including Consultant) having performed professional services for, or having any other business relationships with, Client, the Business, or their respective affiliates.

## OTHER

Client may terminate all or a portion of this engagement for convenience at any time by giving notice to Consultant not less than one (1) day before the effective date of termination. Consultant may terminate all or a portion of this engagement if it determines that the performance of any part of the Services would be in conflict with law, or independence or professional standards or rules, and Consultant shall provide Client with as much advance notice as reasonably practicable under the circumstances.

This letter, together with Appendix A, "General Business Terms," and the other Appendices attached hereto and incorporated herein by reference, constitutes the entire agreement of the parties hereto with respect to this engagement; supersedes all other oral or written representations, understandings, or agreements relating to this engagement; and may not be amended except by written agreement signed by the parties. In making its determination to proceed with this engagement, neither party has relied on any representations of the other party except as expressly set forth in this letter, together with the General Business Terms and the other Appendices attached hereto.

If the above terms are acceptable to you and the Services are in accordance with your understanding, please sign the copy of this letter in the space provided and return it to us.

We appreciate the opportunity to serve you, and we look forward to a continuing relationship.

Very truly yours,

Deloitte & Touche LLP

By: Jack Koenigsknecht, Partner

Accepted and Agreed to this _16th_ day of _AUGUST_, 2018:

Sears Holdings Corporation:

By: _____

Name: _ROBERT A. RIECKER_

Title: _CFO, SEARS HOLDINGS CORPORATION_

5

**Appendix A**

**GENERAL BUSINESS TERMS**

1.  **Services.** Client agrees that:

    a)  In connection with the Services, the Deloitte Entities shall be entitled to rely on all decisions and approvals of Client.

    b)  With respect to the data and information provided by Client to any of the Deloitte Entities for the performance of the Services, Client shall have all rights required to provide such data and information, and shall do so only in accordance with applicable law and with any procedures agreed upon in writing. In addition, Client is responsible for obtaining all necessary authorizations and consents from its and the Business's advisors, including Client's and the Business's independent accountants and other representatives, in order to permit the Deloitte Entities to perform the Services, including disclosure of confidential information of Client and the Business to the Deloitte Entities in connection with this engagement on behalf of Client.

    c)  The Services are limited in nature, and do not comprehend all matters relating to the Business that might be pertinent or necessary to Client's evaluation or consummation of the Proposed Transaction. Accordingly, the Services should not be taken to supplant other inquiries and procedures that Client should undertake for the purpose described above. The sufficiency of the Services to be performed hereunder by the Deloitte Entities is solely the responsibility of Client. Consequently, the Deloitte Entities will make no representation as to the sufficiency of the Services for Client's purposes. In addition, the Deloitte Entities have no responsibility for performing any services or procedures beyond those agreed to by Client and Consultant or for updating the Services performed.

    d)  The performance of the Services does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of or any other form of assurance with respect to internal controls, or other attestation, review, or compilation services in accordance with standards or rules established by the AICPA, the Public Company Accounting Oversight Board ("PCAOB"), or other regulatory body, in each case with respect to the Business or any other entity. Such audit or other attestation or review services, if any, are not covered by the engagement letter to which these terms are attached (the "Engagement Letter"). Neither the Deloitte Entities nor the Client Communications will express an opinion or any other form of assurance with respect to any matters as a result of the performance of the Services, including concerning (i) the financial statements of any entity or any financial or other information, or operating or internal controls of any entity, taken as a whole, for any date or period; (ii) the merits of any transaction, including the consideration to be paid; (iii) the future operations of any entity; (iv) the fairness of the contemplated terms of any transaction; or (v) any forward-looking information (including any models, projections, forecasts, budgets, synergies, feasibility analyses, assumptions, estimates, methodologies, or bases for support) or the feasibility or achievability of such forward-looking information.

    e)  In the performance of the Services, the Deloitte Entities will not perform any evaluation of internal controls and procedures for financial reporting upon which Client's or the Business's management can base its assertions in connection with Sarbanes-Oxley or related rules or regulations. The Deloitte Entities will make no representations or warranties and will provide no assurances that any entity's disclosure controls and procedures are compliant with the certification requirements of, or any entity's internal controls and procedures for financial

reporting are effective as required by, Sarbanes-Oxley or any other standards, rules, or regulations, including Sections 302 and 404 of Sarbanes-Oxley.

f)    The Business's financial statements, footnotes, and accounting policies and procedures, including the application of generally accepted accounting principles ("GAAP") to record the effects of the Proposed Transaction, are the responsibility of management of the Business. Accordingly, any comments made by the Deloitte Entities relating to the accounting or tax treatment of selected balances or transactions or the application of GAAP or the technical merits of the tax positions and planning strategies related to the Proposed Transaction as a whole are intended to serve only as general guidance to assist Client to better understand certain accounting or tax matters related to the Business and the effects of the Proposed Transaction. Such comments are necessarily based on the preliminary understanding of the Deloitte Entities of the pertinent facts and circumstances and on current authoritative literature and are, therefore, subject to change. Such comments do not constitute the rendering of a tax opinion or a report on the application of accounting principles in accordance with standards or rules established by the AICPA, the PCAOB, or other regulatory body.

g)    The performance of the Services does not constitute (i) a recommendation regarding any transaction, including the divestiture or financing of any business, assets, liabilities, or securities; (ii) a market or financial feasibility study; (iii) a fairness or solvency opinion; or (iv) an examination or compilation of, or the performance of agreed upon procedures with respect to, prospective financial information in accordance with standards or rules established by the AICPA, the PCAOB, or other regulatory body. The Services and the Client Communications are not intended to be, and shall not be construed to be, "investment advice" within the meaning of the Investment Advisers Act of 1940. It is understood that the Deloitte Entities will not provide, nor will the Deloitte Entities be responsible for providing, legal advice hereunder. In addition, any forward-looking information is the responsibility of management of Client or the Business, as the case may be. In this regard, management of Client or the Business, as the case may be, is responsible for representations about its plans and expectations and for disclosure of significant information that might affect the ultimate realization of such forward-looking information and the Deloitte Entities have no responsibility therefor. There will usually be differences between forward-looking information and actual results because events and circumstances frequently do not occur as expected, and those differences may be material.

h)    The performance of the Services is heavily dependent upon (i) Client's timely and effective satisfaction of its responsibilities hereunder and timely decisions and approvals in connection with the Services, and (ii) Client, the Business, and their respective advisors providing the Deloitte Entities with reasonable facilities and timely access to accurate and complete versions of relevant materials and information, including materials and information requested by the Deloitte Entities, and answering the Deloitte Entities' questions fully and accurately. The Deloitte Entities have no responsibility for the accuracy or completeness of the information provided by, or on behalf of, Client or the Business. This engagement cannot be relied upon to disclose errors or fraud should they exist.

i)    It is understood that any member firm of Deloitte Touche Tohmatsu Limited or any of their respective affiliates (including Consultant) may be engaged to provide services to parties other than Client considering a transaction involving the Business. Consultant has established ethical walls and confidentiality safeguards so that the engagement team providing the Services to Client hereunder would be separate from any engagement team providing services to such other parties, if any. Confidential information, including the identity of Client, obtained in the performance of the Services will not, without Client's prior written permission, be disclosed to

such other parties, if any. Similarly, the Deloitte Entities will have no responsibility to Client to use or disclose information, including the identity of such other parties, if any, that any member firm of Deloitte Touche Tohmatsu Limited or any of their respective affiliates (including Consultant) possess by reason of such services for such other parties, if any, whether or not such information might be considered material by Client. Consultant believes that any such relationships will not impair the objectivity of the Deloitte Entities in the performance of the Services. However, the possibility of these relationships is being brought to Client's attention to avoid any misunderstanding.

**2.    Confidentiality.**

a)    To the extent that, in connection with the performance of the Services, the Deloitte Entities come into possession of any confidential information of Client, the Deloitte Entities will not use or disclose such information to any third party without Client's prior written consent, using at least the same degree of care as they employ in maintaining in confidence their own confidential information of a similar nature, but in no event less than a reasonable degree of care. Client hereby consents to the Deloitte Entities disclosing such information (i) to persons or entities permitted to receive Client Communications under the Engagement Letter; (ii) to contractors providing administrative, infrastructure, and other support services to any of the Deloitte Entities and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this Section 2; (iii) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation pertaining hereto; or (iv) to the extent such information (a) is or becomes publicly available other than as the result of a disclosure in breach hereof, (b) becomes available to a Deloitte Entity on a non-confidential basis from a source which such Deloitte Entity reasonably believes after due inquiry is not prohibited from disclosing such information to such Deloitte Entity, (c) is already known by a Deloitte Entity without any obligation of confidentiality with respect thereto, or (d) is developed by a Deloitte Entity independently of any disclosures made to such Deloitte Entity hereunder. In addition, any such information may be used by Deloitte & Touche LLP or any member firm of Deloitte Touche Tohmatsu Limited or their respective affiliates in the context of responding to any such entity's professional obligations as the independent accountants for Client and the Business.

b)    In the event of a required disclosure pursuant to Section 2(a)(iii), the applicable Deloitte Entity shall, to the extent permitted by applicable law or regulation, promptly provide Client with prior written notice of such requirement so that Client may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, the applicable Deloitte Entity shall only disclose that portion of the information that is required to be disclosed and shall use its commercially reasonable efforts to preserve the confidentiality of such information (including by seeking an appropriate protective order or other reliable assurance that confidential treatment will be accorded such information). The Deloitte Entities shall not oppose any action (and shall, if and to the extent requested by Client, reasonably cooperate with, assist, and join with Client in any reasonable action) by Client to seek an appropriate protective order or other reliable assurance that confidential treatment will be accorded such information.

**3.    Limitations on Damages and Indemnification.**

a)    The Deloitte Entities and their respective personnel will not be liable to Client for any claims, liabilities, or expenses ("Claims") relating to this engagement or the Proposed Transaction for an aggregate amount in excess of the fees paid by Client to us pursuant to this engagement, except to

the extent resulting from the bad faith or intentional misconduct of the Deloitte Entities. In no event will the Deloitte Entities or their respective personnel be liable to Client for any loss of use, data, goodwill, revenues, or profits (whether or not deemed to constitute a direct Claim), or any consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense relating to this engagement or the Proposed Transaction.

b) Client will indemnify and hold harmless the Deloitte Entities and their respective personnel from all Claims attributable to claims of third parties relating to (i) this engagement or the Proposed Transaction, except to the extent resulting from the  bad faith or intentional misconduct of the Deloitte Entities; (ii) a breach by Client or any of its personnel of any provision of these terms or the Engagement Letter, including the restrictions on use and distribution of the Client Communications; (iii) the use of or reliance on any Subject Tax Planning Advice by any person or entity other than Client; and (iv) the access to or use of the Client Communications by any person or entity authorized hereunder.

c) In circumstances where any limitation on damages or indemnification provision hereunder is unavailable, the aggregate liability of the Deloitte Entities and their respective personnel for any Claims relating to this engagement or the Proposed Transaction shall not exceed an amount that is proportional to the relative fault that the conduct of the Deloitte Entities bears to all other conduct giving rise to such Claims.

4. **Third Parties and Internal Use of Subject Tax Planning Advice.** No provision of these terms or the Engagement Letter is or is to be construed as a condition of confidentiality within the meaning of Rule 3501(c)(i) of PCAOB Release 2005-014, Internal Revenue Code Sections 6011 and 6111 or the regulations thereunder, any related Internal Revenue Service guidance, or any other similar law, with respect to any Services, Client Communications, or other materials of any kind provided hereunder relating to tax treatment or tax structure (collectively referred to as "Subject Tax Planning Advice"). Notwithstanding anything herein to the contrary, no provision of these terms or the Engagement Letter shall place any limitation on Client's disclosure of any Subject Tax Planning Advice. Client acknowledges that none of its other tax advisors have imposed or will impose any conditions of confidentiality with respect to the tax treatment or tax structure associated with the tax Services or the Proposed Transaction. The Services and Client Communications shall be solely for Client's benefit, and this engagement does not create privity between any Deloitte Entity and any person or entity other than Client ("third party"). Neither the Services nor any Client Communications are intended for the express or implied benefit of any third party. Unless otherwise agreed to in writing by Consultant, no third party is entitled to rely in any manner or for any purpose on the Services or Client Communications.

5. **Force Majeure.** Neither the Deloitte Entities nor Client shall be liable for any delays or nonperformance directly or indirectly resulting from circumstances or causes beyond their reasonable control, including acts or omissions or the failure to cooperate by the Deloitte Entities, Client, the Business, or any other third party; fire, epidemic or other casualty; act of God; strike or labor dispute; war or other violence; or any law, order, or requirement of any governmental agency or authority.

6. **Independent Contractor.** Each party hereto is an independent contractor and neither party is, nor shall be considered to be, nor shall purport to act as, the other's agent, partner, fiduciary, joint venturer, or representative.

7. **Survival and Interpretation.** All provisions which are intended by their nature to survive performance of the Services shall survive such performance, or the expiration or termination of this engagement and consummation of the Proposed Transaction. For purposes of these terms and the

Engagement Letter, the "Deloitte Entities" shall mean Consultant and its subsidiaries; to the extent that, as a subcontractor, they agree to provide any of the services under or in connection with the Engagement Letter, the member firms of Deloitte Touche Tohmatsu Limited, and the affiliates of Consultants and such member firms; and in all cases any successor or permitted assignee. None of the Deloitte Entities, other than Consultant, or such entities' personnel, shall have any liability hereunder to Client and Client will not bring any action against such other entities, or such other entities' personnel, in connection with this engagement or the Proposed Transaction. Without limiting the foregoing, the Deloitte Entities are intended third-party beneficiaries of these terms, and may in their own right enforce such terms. **Each of the provisions of these terms shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.** Any references herein or in the Engagement Letter to the term "including" shall be deemed to be followed by "without limitation."

8.    **Assignment and Subcontracting.** Except as provided below, neither party may assign any of its rights or obligations (including interests or Claims) relating to this engagement or the Services without the prior written consent of the other party. Client hereby consents to Consultant assigning or subcontracting any portion of the Services to any affiliate or related entity, whether located within or outside of the United States, provided that, any such assignment or subcontracting shall not relieve Consultant of its obligations hereunder. Services performed hereunder by Consultant's subcontractors shall be invoiced as professional fees on the same basis as Services performed by Consultant's personnel, unless otherwise agreed.

9.    **Waiver of Jury Trial**. **THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS ENGAGEMENT.**

10.    **Governing Law, Jurisdiction and Venue, and Severability.** These terms, the Engagement Letter, including attachments, and all matters relating to this engagement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof). Any action based on or arising out of this engagement or the Services shall be brought and maintained exclusively in any state or federal court, in each case located in New York County, the State of New York. Each of the parties hereby expressly and irrevocably submits to the jurisdiction of such courts for the purposes of any such action and expressly and irrevocably waives, to the fullest extent permitted by law, any objection which it may have or hereafter may have to the laying of venue of any such action brought in any such court and any claim that any such action has been brought in an inconvenient forum. If any provision of these terms or the Engagement Letter is unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

**Appendix B**

**SCOPE OF SERVICES**

1.      **Engagement Scope.** The nature and scope of due diligence and other M&A services can vary significantly depending upon the individual judgment of Client (including, but not limited to, the level of risk that Client is willing to accept) and the type of transaction that is being contemplated. We believe that the scope of such services should be adaptable and scalable so that Client can react to additional information learned that may have significant implications to Client.

2.      **Summary of Significant Categories of Services to Be Provided.** Based upon our initial discussions with Client and our limited knowledge of the Proposed Transaction, we understand that Client has requested that we provide the following Services (see Section 5 herein for a more-detailed description):

| M&A Due Diligence Areas | Other M&A Services |
|---|---|
| Accounting and financial (Quality of Earnings only) | Optional M&A Services (available as requested; at hourly rates noted in **Appendix C**): <br><br> - Analysis of Net Working Capital and Net Debt <br><br> - Unbranded Excel Databook supporting the Quality of Earnings analysis (and Net Working Capital and Net Debt, if requested) <br><br> - Tax structuring, potentially including structure development, tax attribute planning, as needed <br><br> - Data Analytics – Additional transactional / visualization analyses as necessitated / mutually agreed <br><br> - TSA and/or Stand Alone Cost Analysis <br><br> - Review and comment on related transaction agreements <br><br> - Read and comment on client model <br><br> - Tax integration, risk mitigation planning, and other transaction execution support <br><br> - Additional due diligence related to Human Capital, IT, Insurance, etc. <br><br> - Non-US support for due diligence or other M&A services <br><br> - Participating in buyer calls <br><br> - Provide consultative advice regarding financial data to be included in the virtual dataroom |

3.      **Summary of Services Not Provided.** Although not intended to be an all-inclusive list of services that will not be provided, based upon your request, the following services, among other things, are specifically excluded from the scope of this engagement:

- Review of business operations
- Assessment of the commercial merits of the Proposed Transactions
- Evaluation of management information systems
- Certification of physical inventory observations
- Environmental assessments
- Analysis of potential synergies
- Design, configure or implement systems
- Act as a manager or employee
- Communicate to or negotiate with personnel or third parties on behalf of company management
- Identify specific personnel for specific jobs

- Valuation and appraisal services
- Integration assistance
- Background investigations
- Legal and regulatory
- Preparation of US GAAP basis carve-out financial statements
- Internal accounting and disclosure controls
- Foreign Corrupt Practices Act and Anti-Bribery Procedures
- Host, administer or operate the client's systems or data rooms
- Project revenue, cost savings, cash flow or other estimates/projections or develop models to do so
- Provide services for a direct or indirect contingent fee

4.      **Tailored and Highly Focused Approach.** Our approach will be highly focused on priority deal issues identified by you. Our approach is designed to facilitate us providing you, early in the due diligence process, with significant, preliminary issues related to significant accounting, financial, tax, employee benefit, and insurance matters (as applicable to our scope).

Please note that at this stage we are uncertain as to the quality and quantity of the information that the Client will make available, as well as the Client's timeliness in providing such information. Also please note that the scope of our Services may be impacted by the Client's willingness to share information. These factors will impact the nature, timing, and extent of the Services, as well as influence the Services that can be completed within the planned services. However, based upon the information that we have received to date and our discussions with you, the Services will primarily be comprised of the following:

| Reading and Analyzing | High-Level Inquiries of | Participating as an Advisor In |
|---|---|---|
| • Information publicly available and provided by Client relevant to our scope<br><br>• Information made available in Client's data room relevant to our scope and provided by Client based upon our information request list<br><br>• Audit working papers prepared by Client auditors, as available and applicable to our scope | • Client management<br><br>• Audit advisors of the Client to the extent possible | • Initial meetings with Client to discuss scope<br><br>• Meetings with Client to discuss progress and issues identified |

We estimate that the Services (related to the Services detailed in Section 5) will take approximately 3 to 4 weeks to complete. However, our ability to achieve the objectives of the Services within this timeframe is highly dependent upon the quality, quantity, and timeliness of the data provided, as well as the extent and the level of cooperation by Client and their respective advisors. Also, see Appendix C for further discussion regarding our fee estimate and assumptions.

**5.    Overall Objectives.** As mutually agreed upon with Client, our overall objectives for the Services will be to focus on the areas noted below. In an effort to be responsive to your stated timetable, we will endeavor to surface significant issues (and, in particular, those that Client may consider to be potential "deal breakers") as early as possible in the process.  Subject to further discussions with Client, our tentative focus will be advising Client on the following (unless otherwise specified, our due diligence analyses relate to the last two fiscal years (FY16 and FY17) and most recent interim period (and corresponding period of the prior year):

Our work will include analysis of all areas identified below as appropriate;  however, note that procedures may be added or deleted as the  Proposed Transaction proceeds to further meet your needs.

## *Financial Due Diligence*

**Preliminary Analysis**

1.  Read and analyze the Business's FY16 and FY17 audited financial statements (as available), reporting packages, and any other relevant information for the most recent year and interim financial statements and endeavor to identify major issues and risk areas for further consideration;

2.  Analyze organizational structure and perform high level inquiry regarding the nature of operations of major business lines, entities, intercompany transactions, and consolidation processes.

3.  With an emphasis on the implications for cash flows and earnings, inquire about the general history of current operations and recent or planned changes in the Business, including:

    −  Services provided

- Environment in which the company operates, markets served, and competitive conditions;

- Customers and suppliers;

- Support functions (information technology, human resources, finance, treasury, risk management, tax, etc.), including those functions provided by Business's parent; and

- Any unusual business practices inherent within the industry or the locations where the company operates, such as arrangements with labor organizations, local authorities, major clients, etc.

4. Read and analyze information on significant acquisitions, start-up of operations, and disposals of property and businesses, considering the impact on reported and projected earnings and cash flows;

5. Read and analyze the Business's consolidating internal financial statements and related management discussion and analysis. Inquire about:

- Reconciliation between the external and the internal financial statements;

- Consistency of interim financial reporting policies and procedures compared to those used in the annual reviewed financial statements;

- Process and timing of periodic closing/consolidation cycle and consolidation entries;

- Internal accounting control environment, including any significant out-of-balance conditions, unreconciled differences or reportable conditions;

- Significant accounting policies, with a focus on revenue recognition and cost capitalization;

- Changes in accounting or reporting practices or procedures that could affect comparability or trends in earnings or cash flows; and

- Events subsequent to the most recent balance sheet date that could have a significant impact on current financial position, future earnings or cash flows.

**Independent Auditors**

1. Read the independent auditors' working papers for the FY16 and FY17 audits (as available).

2. Inquire of the Business's independent auditors about:

- Major issues and audit risk areas, significant judgments or estimates, unusual transactions and any disagreements with management;

- Assessment of quality of earnings and whether management's approach to accounting and financial reporting would be characterized as conservative or aggressive;

- History of audit adjustments proposed and their disposition;

- Accounting systems and internal controls, material weaknesses or reportable conditions;

- Recent or prospective changes in accounting and reporting policies or procedures; and

3. Read management letters for the most recent audit; inquire of the Business's independent auditors as to matters identified for inclusion for the current year and the status of corrective actions taken by management

**Quality of Earnings**

1. Analysis of management provided normalized EBITDA to factually explain the impact of:

- Management proposed adjustments;

- Transactions conducted on a non-arm's length basis, including related party transactions;

- Recently acquired or discontinued customers/ contracts (including any significant changes in licensing or wholesale arrangements);

- One time, extraordinary, and non-recurring items, including out of period adjustments and other potential adjustments identified from our due diligence or as advised by management;

- Impacts of reduction in workforce initiatives;

2. Analyze monthly operating data (with a focus on management provided EBITDA) including:

- Management's reconciliation between gross and net revenue;

- Variances and trends in revenues, expenses, profitability, and key operating metrics by channel (e.g. licensing and wholesale) and product (e.g. refrigeration, cooking, dishwasher and laundry)

- Seasonality of revenue and EBITDA;

- Cost saving or restructuring initiatives;

- Contribution by top customers/ contracts and trends in pricing and concentration;

- Composition of account balances;

- Direct expenses by major cost components

- SG&A by type;

- Any discretionary or temporary reductions or deferrals of certain expenses;

- Significant non-recurring, unusual or out-of-period charges and credits

3. Analyze costs allocated to Business from its parent and related allocation methodologies, as well as services provided from its parent (e.g. shared corporate services, inventory sourcing, warehousing, logistics, IT services, online project services, rent, and pension)

4. Analysis of balance sheet accounts and trends for purposes of identifying Quality of Earnings matters, for management's consideration.


**Net Working Capital and Net Debt (As Requested; Not included in Preliminary Fee Estimate)**

1. Working Capital Analysis & Quality of Assets

- Analyze historical working capital trends, identifying seasonality, high/low points and average run rate over past 24 months

- Analyze accounts receivable, including aging and adequacy of reserve balances. Inquire about billing and credit policies, collectability of large overdue balances and amounts due from officers, employees and owners

- Analyze a summary of trade payables, including aging statistics (if applicable). Inquire about normal and special credit terms (including rebates), significant past-due payables and disputes with suppliers and trade payable payment policies

- Analyze accrued liabilities (if applicable). Inquire about the basis for and adequacy of accruals for such items as deferred revenue, bonuses, deferred compensation, severance, workers compensation, commissions, vacation pay, employment benefits, litigation, sales allowances and credits and self-insurance and impact on earnings of significant accrued liabilities and reserves, payment practices and timing of related cash outflows

2. Other balance sheet considerations

- − Analysis of net debt and debt-like items
- − Analysis of fixed asset components and depreciation policies (if applicable)

3. Commitments and Contingencies

- − Analyze capital/operating leases. Inquire about change of control, prepayment or other significant provisions, terms of significant capital and operating leases, future payment requirements, expiration dates and sublease income
- − Inquire and analyze contingent liabilities (e.g., unasserted claims, litigation, environmental matters, guarantees, earn-outs, contingent payments)
- − Inquire significant long-term purchase commitments (e.g. take-or-pay contracts)

**6**.    **Deliverables.** We will endeavor to communicate to you our significant issues and findings as they arise so that you can, as you deem appropriate, address the related business and deal issues as soon as possible. It will not always be possible for all of our communications to be in the form of written reports; however, we will endeavor to provide significant observations in written form prior to the completion of the engagement. As agreed with you, our deliverables will include the following:

- ● *Issue Summary Memorandum* — A written communication of our Quality of Earnings findings and observations with respect to the Business will be provided upon completion of fieldwork. Our draft memorandum will typically contain certain outstanding matters that may require further clarification by or information from management. As additional information is received, we may issue additional versions of our memorandum.

As applicable, for Client's consideration, we will provide listings of (a) additional document request items and questions for management and its advisors and (b) additional descriptions of due diligence and other M&A services that may be performed as part of a subsequent phase, if any.

**7**.    **Coordination of Due Diligence**. We will endeavor to perform the Services such that we generally will not duplicate the items that would be addressed by legal counsel, tax advisors, or any other professionals (including, but not, limited to environmental, regulatory, and management information systems) engaged by you or your affiliates to perform due diligence or other M&A services. As a result of similar information needing to be analyzed by different professional disciplines, we recommend that you consider an integrated approach whereby information is shared timely among the various parties performing due diligence or other M&A services on your or any of your affiliate's behalf. At a minimum, if Client's legal counsel is performing due diligence or other M&A services with respect to agreements or contracts, we request that you or they inform us as to the scope of their work and, where possible, permit us to read their summaries (abstracts) of these documents if there are items with possible accounting or tax implications (e.g., leases, employment contracts, supply contracts, licensing contracts).

**Appendix C**

**Preliminary Fee Estimate**

To date, we have received limited information with respect to the Proposed Transaction. Accordingly, we have provided the following preliminary fee estimate based upon the Services described in Appendix B. Below we have listed some of our more-significant assumptions and critical information to be obtained in an effort to provide a more specific and accurate estimate of total professional fees:

| Services<br><br>In US$ | Preliminary Fee Estimate – Low-Range | Preliminary Fee Estimate – High-Range |
|---|---|---|
| Total Estimated Fee - Financial / Accounting Vendor Due Diligence Services (Quality of Earnings Only) | 75,000 | 125,000 |
| **Optional (or additional phase) M&A Services** *(available as requested; at the rates noted below)* | TBD | TBD |

**Important Notes**

- Fee amounts above do not include any estimates for travel and other expenses that may be incurred in connection with this engagement.

- As stated, our fees for this engagement will be based on the amount of time required at the following rates, plus expenses:

| Level | Hourly Rate (in US$) |
|---|---|
| Partner / Principal | $925 |
| Managing Director | $900 |
| Senior Manager | $775 |
| Manager | $650 |
| Senior Consultant | $550 |
| Consultant | $400 |

- Our involvement and our total fees are heavily dependent upon the quality, organization, and volume of content in the data room, the auditor working papers, the cooperation by the Client, and availability and access to Client information. As such, our fees may increase beyond those outlined in the fee range above.

- Additional services provided beyond those Services described in Appendix B will be billed separately.

**Circumstances Affecting Timing and Assumptions for Fee Estimate**

- Our estimated fee range is based upon an estimated amount of hours to be incurred over a 3 to 4 week period related to the Services noted in Appendix B. Any additional time beyond this time period may be billed separately at agreed-upon hourly rates noted previously. Further, any requested changes in timing or timeline may significantly affect our targeted completion times and fee estimates.  Significant changes to the timing of the engagement frequently cause us to incur significant unanticipated costs.

- Our fee range assumes a certain level of "administrative tasks" (e.g. status update meetings, formalized reporting of findings) will be performed by our professionals. Excessive administrative tasks requested by Client may cause us to incur additional fees to what is outlined in the fee ranges above.

- Only the Services specifically described herein are reflected in our quoted fees; any significant changes in the Services discussed herein could significantly alter fee estimates.

- The Client's management or any of the Client's advisors will use their reasonable efforts to be available and have prompt and accurate level of involvement in this engagement.

- Information requested by us will be made available to us in electronic, downloadable format on a timely basis and the data provided will be in good order.

- There will be effective coordination of efforts among the various parties performing due diligence and other M&A Services on your behalf.

- Timely payment of our invoices as they are rendered.

**Appendix D**

**PROSPECTIVE BUYER ACCESS – CLIENT AUTHORIZATION LETTER**

[*Letterhead of Deloitte & Touche LLP*]

[*Date*]

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Attention: Mr. Robert A. Riecker, CFO

Dear Mr. Riecker:

Deloitte & Touche LLP ("Consultant") was engaged on behalf of Sears Holdings Corporation ("Client") to provide certain services solely for Client in connection with Client's evaluation of the proposed disposition of a business unit code-named Project [*insert code name*] (the "Business") (the "Proposed Transaction").

In connection with the Proposed Transaction, you have informed us that you have been requested by [*insert name of entity seeking access*] (the "Purchaser") to provide it with paper copies or portable document format, agreed upon by Client and the Purchaser, of certain materials and information issued or prepared by any of the Deloitte Entities (as defined below) for Client with respect to the services described in the engagement letter, dated [date] (the "Engagement Letter"), between Consultant and Client (collectively, the "Information") for informational purposes. Notwithstanding anything to the contrary contained in the Engagement Letter, we hereby authorize you to provide the Purchaser with one paper copy or portable document format of the Information for such purpose provided that, we obtain a separate letter from the Purchaser in the form attached hereto prior to such access. Client and the Purchaser are solely responsible for the determination of whether and what information is provided by Client to the Purchaser, and the Deloitte Entities shall have no responsibility therefor. In addition, Client hereby authorizes the Deloitte Entities to respond to inquiries, if any, from, or on behalf of, the Purchaser and to provide the Purchaser and its affiliates, their respective co-investors and lenders, and each of their respective accounting, tax, legal, and other professional advisors (acting solely in an advisory capacity to such entities) ("Other Third Parties") with information, whether in writing or otherwise, relating to the services described in the Engagement Letter, the Information, the Proposed Transaction, or any related transactions (the "Communications").

Client represents and warrants that it has received all necessary authorizations and consents from its and the Business's advisors, including, without limitation, its and the Business's independent accountants and other representatives, in order to permit the Purchaser and any Other Third Parties to have access to the Information and the Communications, including permission from such advisors to disclose confidential information to the Purchaser and such Other Third Parties. In addition, the Deloitte Entities shall have no responsibility to Client with respect to the provision of the Information or the Communications to the Purchaser or any Other Third Parties or with respect to their contents, whether or not the Information or the Communications contain information that might be considered confidential or material by Client, including in connection with its evaluation of the Proposed Transaction or any related transaction.

Client further represents and warrants that any offer or sale of securities by Client to the Purchaser, its affiliates, or their co-investors made in connection with the Proposed Transaction does not constitute a

public offering of securities, was not effected pursuant to a general solicitation or advertisement, and is not otherwise subject to registration under the Securities Act of 1933, as amended, or other state securities statutes or regulations. Client reasonably believes, based upon representations provided by the Purchaser, its affiliates, or their co-investors, and other information available to Client, that none of the Purchaser, its affiliates, or their co-investors is a natural person or is buying securities on behalf, or for the account, of a natural person.

One or more of the Deloitte Entities has provided, is currently providing, and may in the future provide, services, such as audit, tax, and consulting services to the Purchaser and/or any Other Third Parties, and the Deloitte Entities and their personnel shall have no responsibility to Client relating to such services, nor any responsibility to use or disclose information that any of the Deloitte Entities possesses by reason of such services or otherwise, whether or not such information might be considered material by Client. In addition, one or more of the Deloitte Entities may have other business relationships with the Purchaser and/or any Other Third Parties.

Consultant's engagement on behalf of Client is limited in nature and may not comprehend any or all matters that might be pertinent or necessary to the evaluation of the Proposed Transaction or any other transaction relating to Client, the Business, or any other entity. The Information and the Communications will not address all the questions that the Purchaser or any Other Third Party may have. The Information and the Communications also may contain sensitive and candid comments about Client, the Business, the Proposed Transaction, or any other transaction that may be subject to interpretation.

Client hereby (1) releases the Deloitte Entities and their personnel from all claims, liabilities, and expenses relating to the access to, or use of, the Information or the Communications by the Purchaser or any Other Third Parties, including, without limitation, in connection with any transaction involving the Purchaser or any Other Third Parties relating to the Proposed Transaction and any claims, liabilities, and expenses resulting from the termination of, or change in, the Proposed Transaction or any such transaction, and (2) indemnifies and holds harmless the Deloitte Entities and their personnel from all claims, liabilities, and expenses relating to the access to, or use of, the Information or the Communications by the Purchaser or any Other Third Parties or any assertion of reliance by any person or entity relating thereto; provided that the foregoing shall not apply to the extent any such claim, liability, or expense resulted from the bad faith or intentional misconduct of the Deloitte Entities.

In circumstances where all or any portion of the provisions of the immediately preceding paragraph are unavailable, in no event will the Deloitte Entities or their personnel be liable for consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense. For purposes of this letter, the "Deloitte Entities" shall mean Consultant and its subsidiaries; to the extent that, as a subcontractor, they provide or provided any of the services under or in connection with the Engagement Letter, the member firms of Deloitte Touche Tohmatsu Limited and the affiliates of Consultant and such member firms; and in all cases any successor or permitted assignee; provided, however, that for purposes of the fifth paragraph of this letter, the "Deloitte Entities" shall mean Consultant, the member firms of Deloitte Touche Tohmatsu Limited, and the affiliates of Consultant and such member firms.

This letter and all matters relating hereto shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof) and the state and federal courts of New York shall have exclusive jurisdiction over all matters relating to this letter.

Each of the provisions of this letter will apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

Please confirm your understanding and agreement with the foregoing by signing and dating a copy of this letter and returning it to us.

Very truly yours,

[*DELOITTE & TOUCHE LLP*]  [*to be signed manually*]

By: Jack Koenigsknecht, Partner

Accepted and Agreed to this _____ day of _____, 201_:

Sears Holdings Corporation

By: _____

Name: _____

Title: _____

**Appendix E**

**PROSPECTIVE BUYER ACCESS – LENDER ACCESS LETTER**

[*Letterhead of Deloitte & Touche LLP*]

[*Date*]

[*Insert name of entity seeking access*]
[*Address*]
[*City*], [*State*] [*ZIP code*]

Attention: [*Name*]

Dear [*Name*]:

As you are aware, pursuant to the engagement letter dated [date] (the "Engagement Letter"), between Deloitte & Touche LLP ("Consultant") and Sears Holdings Corporation ("Client"), we have been engaged to perform certain services solely for Client (the "Services") in connection with Client's evaluation of a proposed disposition of a business unit code-named Project [*insert code name*] (the "Business") (the "Proposed Transaction").

Such engagement did not and does not constitute an engagement to perform an audit in accordance with generally accepted auditing standards, an examination of internal controls, or other attestation or review services in accordance with standards or rules established by the American Institute of Certified Public Accountants (AICPA), the Public Company Accounting Oversight Board (PCAOB), or other regulatory body. Any such audit, examination, or other attestation or review services with respect to Client or the Business are not covered by the Engagement Letter and would be the subject of a separate engagement. Accordingly, this letter does not apply to such audit, examination, or other attestation or review services, if any, performed by any of the Deloitte Entities (as defined below) with respect to Client or the Business.

Client has requested that it be permitted to comply with the request of [*insert name of entity seeking access*] (the "Purchaser") for access to a paper copy or portable document format, agreed upon by Client and the Purchaser, of certain materials and information issued or prepared by any of the Deloitte Entities for Client with respect to the Services (collectively, the "Information") solely for the Purchaser's informational purposes in connection with the Proposed Transaction. In consideration of our permitting Client to provide the Purchaser with a copy of the Information, and for other good and valuable consideration the receipt and sufficiency of which is acknowledged, the Purchaser, intending to be legally bound, is executing and delivering to us this letter.

## ACKNOWLEDGMENTS AND AGREEMENTS

The Purchaser acknowledges and agrees to the following:

- The Information was prepared solely for the benefit and use of Client and is being provided to the Purchaser at its request solely for the Purchaser's information and cannot and shall not be relied upon by the Purchaser, any Purchaser Entity (as defined below), or any of their respective legal or other advisors. The Purchaser acknowledges that it has the appropriate expertise and experience to evaluate the risks inherent in the Proposed Transaction or any related transaction and has retained its own legal and other advisors in connection with the Proposed Transaction or any related transaction. The Purchaser agrees that access to the

Information is not a substitute for the Purchaser undertaking appropriate inquiries and procedures in relation to any such transaction and agrees that it has been provided with access to information and the opportunity to ask questions sufficient to perform its own evaluation of the risks of any such transaction. The Information does not constitute in any way a recommendation by the Deloitte Entities or Client to participate in the Proposed Transaction or any related transaction and is not part of or being made available in connection with any prospectus, offering circular, or otherwise part of any soliciting, promoting, marketing, underwriting, recommending, or selling of securities or other interests.

- The determination of whether and which Information to provide to the Purchaser is solely the responsibility of Client and the Purchaser, and the Deloitte Entities shall have no responsibility therefor, whether or not the Information provided to the Purchaser is incomplete or inaccurate.

- The Services are subject to the limitations set forth herein and in the attached Appendix, such as the nature, extent, and purpose of the Services. Consultant's engagement on behalf of Client to perform the Services was conducted in accordance with the *Statement on Standards for Consulting Services* established by the AICPA, and the performance of the Services, including, without limitation, the preparation of the Information, does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of or any other form of assurance with respect to internal controls, or other attestation or review services in accordance with standards or rules established by the AICPA, the PCAOB, or other regulatory body. Neither the Deloitte Entities, nor the Information, nor the Communications (as defined below) will express an opinion or any other form of assurance with respect to any matters as a result of the performance of the Services. The Services performed may have been, and may in the future be, changed or modified by mutual agreement of Client and Consultant subsequent to the date of the Engagement Letter. The Purchaser is not a third-party beneficiary of the Engagement Letter and the Purchaser has no rights thereunder or with respect to the Services.

- The Information and any communications, whether in writing or otherwise, made by a Deloitte Entity to the Purchaser relating to the Proposed Transaction or any related transaction (the "Communications"), do not address all matters that the Deloitte Entities are or may become aware of, or all communications, whether in writing or otherwise, made by a Deloitte Entity to Client or any other person or entity, in connection with the Proposed Transaction, such other transaction, or otherwise, whether or not such matters or communications might be considered material by the Purchaser or any other third party.

- The Deloitte Entities have no responsibility to advise the Purchaser of other services or procedures that might be performed and make no representations as to the sufficiency of the Information or the Communications for the purposes of the Purchaser. In addition, the Deloitte Entities have no responsibility for updating the Information, the Communications, or the Services performed or for performing any additional services or procedures.

- The Information was prepared as of the applicable dates noted in such materials. Events and circumstances affecting the Business have occurred since such dates. Such events or circumstances might be considered material by the Purchaser. The Deloitte Entities have no responsibility to advise the Purchaser regarding such events or circumstances, whether or not the Deloitte Entities are aware of or become aware of any such events or circumstances.

- The Deloitte Entities have assumed the completeness and accuracy of all information and materials provided to the Deloitte Entities by or on behalf of Client, the Business, or their respective advisors, and the Information and the Communications are based upon this

assumption. Consultant has not been engaged to detect errors or fraud and the Information and the Communications may not disclose errors or fraud should they exist.

- Client may have participated in the preparation of the Information, including, without limitation, by reviewing and commenting on prior drafts of the Information and the Communications, and such participation may have resulted in the addition, modification, or deletion of information that might be considered material by the Purchaser or any other third party.

- One or more of the Deloitte Entities has provided, is currently providing, and may in the future provide, services, such as audit, tax, and consulting services, including services in connection with the Proposed Transaction and related financing arrangements, to Client, the Business, or their respective affiliates, and the Purchaser agrees that the Deloitte Entities and their personnel shall have no responsibility to the Purchaser relating to such services in connection with the Proposed Transaction, nor any responsibility to the Purchaser in connection with the Proposed Transaction to use or disclose information that any of the Deloitte Entities possesses by reason of such services or otherwise, whether or not such information might be considered material by the Purchaser or any other third party.

- One or more of the Deloitte Entities has provided, is currently providing, and may in the future provide, services, such as audit, tax, and consulting services to the Purchaser or its affiliates, and the Purchaser agrees that the Deloitte Entities and their personnel shall have no responsibility to the Purchaser relating to such services in connection with the Proposed Transaction, nor any responsibility to the Purchaser in connection with the Proposed Transaction to use or disclose information that any of the Deloitte Entities possesses by reason of such services or otherwise, whether or not such information might be considered material by the Purchaser or any other third party.

- One or more of the Deloitte Entities may be engaged to provide services to parties other than Client considering a transaction involving the Business. The Deloitte Entities and their personnel will have no responsibility to use or disclose information, including the identity of such other parties, if any, that any of the Deloitte Entities possesses by reason of its services for such other parties, if any, whether or not such information might be considered material by the Purchaser or any other third party.

## NO RIGHTS AS A RESULT OF ACCESS

The Purchaser does not acquire any rights as a result of access to the Information and the Communications, and the Deloitte Entities do not assume any duties or obligations as a result of such access to the Information or the Communications. The Deloitte Entities are not, by means of permitting Client to provide the Purchaser with a copy of the Information or by means of the Communications, rendering accounting, financial, investment, legal, tax, or other professional advice or services to, or acting as a fiduciary or agent of, or in any other capacity with respect to, the Purchaser. The Information and the Communications are not a substitute for such professional advice or services, nor should they be used as a basis for any decision or action that may affect the Purchaser or its business.

The Purchaser shall not disclose the Information or the Communications, or refer to the Deloitte Entities in connection with the Proposed Transaction, any related transaction, the Information, or the Communications to any person or entity except (1) to an employee or a member of management [, the investment manager, the investment committee,] or the board of directors of the Purchaser, using the Information and the Communications for informational purposes solely in their capacity as such; (2) to an

employee or a member of management or the board of directors of a Purchaser Entity, using the Information and the Communications for informational purposes solely in their capacity as such, provided that such Purchaser Entity does not further disclose any of the Information or the Communications, or refer to the Deloitte Entities in connection with the Proposed Transaction, any related transaction, the Information, or the Communications; (3) to an accounting, tax, or legal advisor of the Purchaser, using the Information and the Communications for informational purposes solely in its capacity as an advisor to the Purchaser, provided that such accounting, tax, or legal advisor does not further disclose any of the Information or the Communications, or refer to the Deloitte Entities in connection with the Proposed Transaction, any related transaction, the Information, or the Communications; (4) to any other professional advisor of the Purchaser, who may use the Information and the Communications solely in its capacity as an advisor to the Purchaser and who has agreed in writing not to further disclose any of the Information or the Communications, or refer to the Deloitte Entities in connection with the Proposed Transaction, any related transaction, the Information, or the Communications; or (5) to the extent required by a valid subpoena, an order of a court of competent jurisdiction, a regulatory authority asserting jurisdiction over the business or financial affairs of the Purchaser or a Purchaser Entity, or other legal process, provided that the Purchaser, to the extent permitted by applicable law or regulation, provides Consultant with prior written notice of such requirement. Without limiting the generality of the provisions of this paragraph, in no event will the Purchaser, any Purchaser Entity, or any "professional advisor," "accounting advisor," or "tax advisor" be permitted access to the Information or the Communications in connection with any (a) fairness, solvency, or other opinion; (b) credit enhancement or credit rating; (c) brokering or underwriting of any type of security or any M&A insurance; or (d) financing (including, without limitation, in the role of investor, agent, intermediary, underwriter, syndicator, lender, or other similar capacity). For purposes of this letter, the term "Purchaser Entity" shall mean any entity controlled by, under common control with, or controlling the Purchaser.

Notwithstanding anything to the contrary contained in this letter, the Purchaser may provide the Information and the Communications to co-investors or lenders acceptable to us, provided that prior to such disclosure such third party has executed a letter with Consultant similar to this letter. In no event will any co-investor or lender be permitted access to the Information or the Communications for use, whether on its own behalf or as an agent, in connection with any borrowing, securities, or instrument other than equity or bank or institutional indebtedness provided by such third party at closing to fund the Proposed Transaction. The Purchaser acknowledges and agrees that it and such third party shall be solely responsible for the determination of whether and what information is provided by the Purchaser to such third party and the Deloitte Entities shall have no responsibility therefor.

The Purchaser represents and warrants that any offer or sale of securities by the Purchaser to any co-investor made in connection with the Proposed Transaction does not constitute a public offering of securities, was not effected pursuant to a general solicitation or advertisement, and is not otherwise subject to registration under the Securities Act of 1933, as amended, or other state securities statutes or regulations. The Purchaser reasonably believes, based upon representations provided by any such co-investor and other information available to Client, that any such co-investor is not a natural person and is not buying securities on behalf, or for the account, of a natural person.

## RELEASE AND INDEMNIFICATION

The Purchaser (1) releases the Deloitte Entities and their personnel from all claims, liabilities, and expenses relating to the Proposed Transaction, the services provided by the Deloitte Entities in connection with the Proposed Transaction, the Services, the Information, or the Communications or any assertion of reliance in relation thereto; (2) indemnifies and holds harmless the Deloitte Entities and their personnel from all claims, liabilities, and expenses relating to the access to or use of the Information or the Communications by any person or entity authorized hereunder, including, without limitation, any

Purchaser Entity, any accounting, tax, legal, or other professional advisor, or any co-investor or lender, or any assertion of reliance in relation thereto; and (3) indemnifies and holds harmless the Deloitte Entities and their personnel from all claims, liabilities, and expenses relating to a breach or any assertion of reliance by the Purchaser or any of its personnel of any provision of this letter, including, without limitation, the restrictions on use and disclosure of the Information and the Communications.

In circumstances where all or any portion of the provisions of this section of this letter are unavailable, the aggregate liability of the Deloitte Entities for any claims, liabilities, or expenses relating to the Proposed Transaction, the services provided by the Deloitte Entities in connection with the Proposed Transaction, the Services, the Information, the Communications, or the access to or use of the Information or the Communications by the Purchaser or any other person or entity authorized hereunder shall not exceed an amount that is proportional to the relative fault that the conduct of the Deloitte Entities bears to all other conduct giving rise to such claims, liabilities, or expenses; provided, however, that in no event shall the Deloitte Entities' aggregate liability therefor exceed the fees paid to Consultant by Client under the Engagement Letter with respect to the Proposed Transaction, and in no event shall the Deloitte Entities or their personnel be liable for consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense.

## OTHER

The agreements and undertakings of the Purchaser contained in this letter, such as those pertaining to restrictions on the use and disclosure of the Information and the Communications, release from liability, and indemnification, will survive delivery of the Information and the Communications to the Purchaser and consummation of the Proposed Transaction.

For purposes of this letter, the "Deloitte Entities" shall mean Consultant and its subsidiaries; to the extent that, as a subcontractor, they provide or provided any of the Services, the member firms of Deloitte Touche Tohmatsu Limited and the affiliates of Consultant and such member firms; and in all cases any successor or permitted assignee; provided, however, that for purposes of the last three Acknowledgments and Agreements set forth above, the "Deloitte Entities" shall mean Consultant, the member firms of Deloitte Touche Tohmatsu Limited, and the affiliates of Consultant and such member firms.

If any provision of this letter is found by a court of competent jurisdiction to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth in this letter.

This letter and the attached Appendix constitute the entire agreement of the parties hereto with respect to its subject matter; supersede all other oral or written representations, understandings, or agreements relating to such subject matter; and may not be amended except by written agreement signed by the parties.

The Purchaser may not assign, transfer, or delegate any of its rights or obligations hereunder (including, without limitation, interests or claims relating to this letter or any of the transactions contemplated hereby) by operation of law or otherwise without the prior written consent of Consultant; provided, however, that the Purchaser may assign all of its rights and obligations hereunder to (1) an acquiror of all or substantially all of the assets of the Purchaser so long as such acquiror agrees in writing to be bound by the terms hereof as if it were the Purchaser, or (2) any successor by merger of the Purchaser so long as such successor is bound by the terms hereof by operation of law as if it were the Purchaser.

THE PARTIES HERETO IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY

LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS LETTER OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

This letter and all matters relating hereto shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof), and the state and federal courts of New York shall have exclusive jurisdiction over all matters relating to this letter.

Each of the provisions of this letter will apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

Please confirm your agreement with the foregoing by signing and dating a copy of this letter and returning it to us.

Very truly yours,

[*DELOITTE & TOUCHE LLP*] [*to be signed manually*]

By: Jack Koenigsknecht, Partner

Accepted and Agreed to this _____ day of _____, 201_:

[*Insert name of Purchaser*]:

By: _____

Name: _____

Title: _____

**APPENDIX**

**LIMITATIONS ON SERVICES**

(a) The nature of the Proposed Transaction necessitates prompt communication to Client of our findings that result from performing the Services as those Services are performed. Therefore, it is not possible for all of our communications to be in the form of written reports. Accordingly, any information, documents, or other communications provided by the Deloitte Entities, whether in writing or otherwise, including, without limitation, any reports (including, without limitation, the Deloitte Entities' final written report, if any, on the Services) or memoranda that the Deloitte Entities may issue, should be considered in the context of the nature of the Services that we have agreed to provide.

(b) The Deloitte Entities shall have no responsibility for obtaining any necessary authorizations or consents from Client's or the Business's advisors, including without limitation, Client's or the Business's independent accountants and other representatives, in order to permit the Deloitte Entities to perform its engagement on behalf of Client, including disclosure of confidential information of Client and the Business to the Deloitte Entities or the Purchaser in connection with the Proposed Transaction.

(c) The Services may include advice and recommendations, but the Deloitte Entities shall have no responsibility regarding any decisions in connection with the implementation of such advice and recommendations. Furthermore, Client shall be solely responsible for, among other things: (i) making all management decisions and performing all management functions; (ii) designating a competent employee, preferably within senior management, to oversee the Services on behalf of Client; (iii) evaluating on behalf of Client the adequacy and results of the Services; (iv) accepting responsibility for results of the Services; and (v) any forward-looking information (including any models, projections, forecasts, budgets, synergies, feasibility analyses, assumptions, estimates, methodologies, or bases for support). In connection with the Services, the Deloitte Entities shall be entitled to rely on all decisions and approvals of Client.

(d) The Services are limited in nature and do not comprehend all matters relating to the Business that might be pertinent or necessary to the evaluation of the Proposed Transaction. Accordingly, the Services should not be taken to supplant other inquiries and procedures that an investor or any third party should undertake. The Deloitte Entities have no responsibility for the sufficiency of the Services and make no representation as to the sufficiency of the Services for any purpose. In addition, the Deloitte Entities have no responsibility for performing any services or procedures beyond those agreed to by Client and Consultant or for updating the Services performed, the Information, or the Communications.

(e) Neither the Deloitte Entities, nor the Information, nor the Communications will express an opinion or any other form of assurance with respect to any matters as a result of the performance of the Services, including, without limitation, concerning (i) the financial statements of any entity or any financial or other information, or operating or internal controls of any entity, taken as a whole, for any date or period; (ii) the merits of any transaction, including, without limitation, the consideration to be paid; (iii) the future operations of any entity; (iv) the fairness of the contemplated terms of any transaction; or (v) any forward-looking information (including, but not limited to, any models, projections, forecasts, budgets, synergies, feasibility analyses, assumptions, estimates, methodologies, or bases for support) or the feasibility or achievability of such forward-looking information.

(f) In the performance of the Services, the Deloitte Entities will not perform any evaluation of internal controls and procedures for financial reporting upon which Client's or the Business's management can base its assertions in connection with the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") or related rules or regulations. The Deloitte Entities will make no representations or warranties and will provide no assurances that any entity's disclosure controls and procedures are compliant with the certification requirements of, or any entity's internal controls and procedures for financial reporting are effective as required by, Sarbanes-Oxley or any other standards, rules, or regulations, including, without limitation, Sections 302 and 404 of Sarbanes-Oxley.

(g) The Business's financial statements, footnotes, and accounting policies and procedures, including, without limitation, the application of generally accepted accounting principles (GAAP) to record the effects of the Proposed Transaction, are the responsibility of management of the Business. Accordingly, any comments made by the Deloitte Entities relating to the accounting or tax treatment of selected balances or transactions or the application of GAAP or the technical merits of the tax positions and planning strategies related to the Acquisition as a whole are intended to serve only as general guidance to assist Client to better understand certain accounting or tax matters related to the Business and the potential effects of the Proposed Transaction. Such comments are necessarily based on the Deloitte Entities' preliminary understanding of the pertinent facts and circumstances and on current authoritative literature, and are therefore subject to change. Such comments do not constitute the rendering of a tax opinion or a report on the application of accounting principles in accordance with standards or rules established by the AICPA, the PCAOB, or other regulatory body.

(h) The performance of the Services does not constitute (i) a recommendation (implied or otherwise) regarding any transaction, including, without limitation, the acquisition, disposition, or financing of any business, assets, liabilities, or securities; (ii) a market or financial feasibility study; (iii) a fairness or solvency opinion; or (iv) an examination or compilation of, or the performance of agreed upon procedures with respect to, prospective financial information in accordance with standards or rules established by the AICPA, the PCAOB, or other regulatory body. The Services, the Information, and the Communications are not intended to be, and shall not be construed to be, "investment advice" within the meaning of the Investment Advisers Act of 1940. It is understood that the Deloitte Entities will not provide, nor will the Deloitte Entities be responsible for providing, legal advice. In addition, any forward-looking information is the responsibility of applicable management. In this regard, applicable management is responsible for representations about its plans and expectations and for disclosure of significant information that might affect the ultimate realization of its forward-looking information, and the Deloitte Entities have no responsibility therefor. There will usually be differences between forward-looking information and actual results because events and circumstances frequently do not occur as expected, and those differences may be material.

(i) The performance of the Services is heavily dependent upon the Deloitte Entities being provided not only timely access to accurate and complete versions of materials and information requested by the Deloitte Entities, but also upon the Deloitte Entities being provided with all relevant materials and information, complete and accurate answers to questions, and timely decisions and approvals of Client in connection with the Services. The Deloitte Entities have no responsibility for the accuracy or completeness of the information provided by, or on behalf of, Client, the Business, or any other person or entity.

**Appendix F**

**MANAGEMENT REPRESENTATION LETTER**

[Client's letterhead]

[Date]


Deloitte & Touche LLP
M&A Transaction Services
111 S. Wacker Drive
Chicago, IL 60606-4301

Dear Jack Koenigsknecht, Partner:

We are providing this letter in connection with Deloitte & Touche LLP's engagement to perform certain due diligence services in connection with Sears Holdings Corporation's evaluation of a proposed disposition of [*insert business unit name*] (the "Business"), pursuant to the engagement letter dated [date]. We refer to your written due diligence communication on the Business, which you provided to us on [*insert date*] (the "Memorandum").

We have read the Memorandum and the information contained therein, and understand that we are responsible for such information. We further understand that Deloitte & Touche LLP has not verified the accuracy of the information we have provided. To the best of our knowledge and belief, we represent that: (i) all of the facts as stated in the Memorandum are accurate in all material respects; (ii) any observations attributable to us in the Memorandum are fair and reasonable; (iii) we have made available to you all significant information relevant to the Memorandum; and (iv) no material matters that that are relevant to our proposed disposition of the business have been excluded from the Memorandum.

The above representations are made on the basis of inquiries of management and staff and, where appropriate, review of the materials provided to you, sufficient to satisfy ourselves that we can properly make each of the above representations to you.

[*Individual name*], authorised by and on behalf of Sears Holdings Corporation


_____

(Name and title of member of management)

# Deloitte.

**Deloitte & Touche LLP**
M&A Transaction Services
111 S. Wacker Drive
Chicago, IL 60606-4301
USA
Tel:   1 312 486 1000
Fax: 1 312 486 1486
www.deloitte.com

September 13, 2018

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Attention: Mr. Robert A. Riecker, CFO

Dear Mr. Riecker:

This letter, effective August 27, 2018, confirms the engagement of  Deloitte & Touche LLP ("Consultant") by Sears Holdings Corporation ("Client") to perform certain services in connection with Client's evaluation of a proposed divestiture of a business unit code-named Project Sasset – Kenmore Commercial / Kenmore Direct (the "Business") (the "Proposed Transaction").

## SERVICES

This engagement will be conducted in accordance with the terms and conditions hereof and in accordance with the *Statement on Standards for Consulting Services* established by the American Institute of Certified Public Accountants ("AICPA"). Subject to applicable professional standards or rules, including applicable preapproval requirements of the audit committee or board of directors of Client, if any, the specific services to be performed by us (collectively, the "Services") will be established based on discussions with you as the Proposed Transaction progresses and additional information is obtained during the course of the engagement. Based upon our discussions with you to date, Appendix B attached hereto describes our initial understanding of the Services you have requested us to perform and we have agreed to perform. These Services may be changed or modified by mutual agreement of the parties if, for example, unforeseen circumstances arise. We will promptly discuss any such circumstances with you and, likewise, you agree to notify us promptly if modifications to the Services are requested.

## LIMITATIONS OF SERVICES

We will provide our observations, advice, and recommendations arising from the performance of the Services to Client. However, the Services will not result in the issuance of any written or oral communications by the Deloitte Entities (as defined in the attached General Business Terms) to Client or any third parties expressing any opinion, conclusion, or any other form of assurance with respect to, accounting policies; financial data; financial statements and related footnotes; appropriate application of generally accepted accounting principles; disclosure, operating, or internal controls; compliance with the rules and regulations of the Securities and Exchange Commission; compliance with the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") or related rules or regulations; or any other matters.

The Deloitte Entities will not perform any management functions, make management decisions, assume any management responsibilities, or otherwise perform in a capacity equivalent to that of management or an employee of Client or the Business, including assuming any financial reporting oversight role; authorizing, executing, or consummating any transactions, or otherwise exercising authority on behalf of Client or the Business or having the authority to do so; preparing source documents or originating data, in electronic or other form, evidencing the occurrence of any transactions; recording of any amounts in books and records of Client or the Business; supervising employees of Client or the Business in the performance of their activities; reporting to the board of directors on behalf of management of Client or the Business; or providing any legal advice with respect to, or conducting a legal review of, any documents, records, or policies of Client or the Business. Client agrees that the Services may include advice and recommendations, but no Deloitte Entity will make any decision on behalf of Client in connection with the implementation of such advice and recommendations. Furthermore, Client shall be

solely responsible for, among other things: (1) designating a competent management member to actively oversee the Services and to sustain meaningful and substantial involvement in all phases of this engagement; (2) evaluating the adequacy and results of the Services; (3) accepting responsibility for results of the Services (including, among other things, agreeing to the nature, objective, scope, and timing of delivery of the Services, providing general direction and monitoring the engagement as it progresses, and making all the management decisions relating to the Services (including evaluating the adequacy of the results and ensuring that the resulting work product meets the agreed-upon specifications and making judgments on behalf of Client)); (4) establishing and maintaining internal controls, including monitoring ongoing activities; and (5) any forward-looking information (including any models, projections, forecasts, budgets, synergies, feasibility analyses, assumptions, estimates, methodologies, or bases for support). For the avoidance of doubt, Consultant will be responsible for the performance of the Services.

The Services may include access to the work of Client's or the Business's advisors, including public accounting firms, or to financial statements, financial information, or data reported on by such advisors. Client agrees that such access is not for the purpose of affirming or evaluating the procedures or professional standards used by such other advisors. In this regard, we call your attention to the possibility that advisors may perform procedures concerning the same information or data, and perhaps the same accounts and records, and reach different observations than the Deloitte Entities for a variety of reasons, including the possibilities that additional or different information or data might be provided to them that was not provided to the Deloitte Entities; that they might perform different procedures from the Deloitte Entities; or that professional judgments concerning, among other things, complex, unusual, or poorly documented matters may differ.

## COMMUNICATIONS — USE AND DISTRIBUTION

The nature of the Proposed Transaction will require prompt communication to Client of our findings that result from performing the Services as those Services are performed. Therefore, it will not be possible for all of our communications to be in the form of written reports. Accordingly, any information, documents, or other communications provided by the Deloitte Entities, whether in writing or otherwise, including any reports (including our final written report, if any, on the Services) or memoranda issued by any of the Deloitte Entities, should be considered by Client in the context of the nature of the Services that we have agreed to provide. Such information, documents, communications, Subject Tax Planning Advice (as defined in the attached General Business Terms), if any, and any drafts thereof, including any draft or final reports or memoranda, whether in writing or otherwise, are herein referred to collectively as the "Client Communications."

All Client Communications are solely for Client's benefit, and are not intended to be relied upon by any person or entity (including prospective buyers, investors, or other parties considering a transaction involving the Business) other than Client. Client shall not disclose or refer to any of the Client Communications to any person or entity except to (1) an employee (with a need to know), a member of management, or a member of the board of directors of Client, who may use the Client Communications solely for purposes of Client's evaluation or consummation of the Proposed Transaction; (2) an employee, a member of management, or a member of the board of directors of a Client Affiliate (as defined below), each with a need to know such Client Communications or the information contained therein in connection with the Proposed Transaction, who may use the Client Communications solely for purposes of Client's evaluation or consummation of the Proposed Transaction; or (3) any legal or other professional advisor of Client (including Client's investment banking advisors and accountants) acting strictly in an advisory capacity to Client, who may use the Client Communications solely to assist Client in connection with Client's evaluation or consummation of the Proposed Transaction; provided that Client shall ensure that the persons or entities referred to in clauses (2) and (3) of this paragraph do not further disclose any of the Client Communications, or refer to the Deloitte Entities in connection with the Proposed Transaction or any related transaction or any of the Client Communications. Notwithstanding the foregoing, the

2

disclosure restriction set forth in this paragraph shall not apply to the extent disclosure is required by a valid subpoena, an order of a court of competent jurisdiction, a regulatory authority asserting jurisdiction over the business or financial affairs of Client, or other legal process (provided that in such event, to the extent permitted by law or regulation, Client provides us with prior written notice of such requirement so that we may object, seek a protective order or confidential treatment, or take such other action as we deem appropriate). Without limiting the generality of the provisions of this paragraph, in no event will any professional advisor (including Client's investment banking advisors and accountants) be permitted to use the Client Communications in connection with any (a) fairness, solvency, or other opinion; (b) credit enhancement or credit rating; (c) brokering or underwriting, including of any type of security or M&A insurance; or (d) financing (including in the role of investor, agent, intermediary, underwriter, syndicator, lender, or other similar capacity). Client may, however, create its own materials based on information contained in the Client Communications and use and disclose such Client-created materials for external purposes, provided that Client does not in any way, expressly or by implication, attribute such materials to the Deloitte Entities. For the avoidance of doubt, the persons or entities referred to in clauses (1) through (3) of this paragraph may disclose the Client Communications or refer to the Deloitte Entities solely to the other persons or entities referred to in clauses (1) through (3) of this paragraph solely to assist Client in connection with Client's evaluation or consummation of the Proposed Transaction. For purposes of this letter, the term "Client Affiliate" shall mean an entity controlled by, under common control with, or controlling, Client.

In addition, Client agrees that it will not refer, generically, by name or otherwise to the Deloitte Entities or the Services in any written materials relating to the Proposed Transaction (other than as provided in clauses (1) through (3) in the preceding paragraph), including any publicly filed documents, offering memoranda, or sale, purchase, financing, or other transaction-related agreements (provided, however, that, as part of Client's disclosure of audit-related fees in the fee disclosure section of its proxy statement under the Securities Exchange Act of 1934, as amended, Client may include the following (or a substantially similar) reference in such section: "Deloitte & Touche LLP performed due diligence services related to mergers and acquisitions"), without our prior written consent for each requested use or reference. Without limiting the generality of this paragraph, Client acknowledges and agrees that the Deloitte Entities are not, and will not agree to be named as, experts under the Securities Act of 1933, as amended, or any other state or federal securities laws.

Notwithstanding anything to the contrary contained in this letter, Client may provide the Client Communications to other third parties, provided that prior to such disclosure (1) Consultant consents in writing to disclosure to such third party; and (2) in the case of third parties considering a transaction involving the Business, (a) Client has executed an agreement in the form of Appendix D to this letter, authorizing, among other things, the Deloitte Entities to disclose information to such third party; (b) such third party has executed an agreement in the form of Appendix E to this letter; and (c) the applicable members of management of Client and the Business, including those individuals in key financial oversight roles, have (i) read a draft written communication of our detailed findings and observations and (ii) confirmed in writing the completeness and accuracy of the information, explanations, and representations provided or made to us by or on behalf of Client and the Business during the course of the engagement in the form of Appendix F to this letter. Client acknowledges and agrees that it and such third party shall be solely responsible for the determination of whether and what information is provided by Client to such third party and the Deloitte Entities shall have no responsibility therefor.

**FEES**

Professional fees for this engagement will be based on the amount of time our professional personnel devote to performing the Services at our hourly rates outlined in Appendix C. However, these rates may be subject to modification, as agreed upon by the parties, for this engagement depending on the

complexity, time, and effort required. The final determination of the professional fees relating to this engagement will be completed shortly after our work on this engagement is completed or otherwise ends, and shall be paid within 30 days of such determination. In addition to professional fees, we will also bill for expenses, such as postage, photocopying, telephone, travel, transportation, lodging, and meals, reasonably incurred by us.

Our preliminary estimate of our professional fees are included in Appendix C to this letter, which provides further details regarding this estimate and the related assumptions and key drivers that may change our estimate. However, it is difficult to more definitively estimate the total hours and fees for this engagement because due diligence services can vary significantly depending upon, among other things, the following: (1) the individual judgment of each prospective seller and the scope of the services that you ask us to perform, (2) unforeseen circumstances that may develop, (3) the quality and quantity of the Business's applicable records and related internal controls, and (4) the type of transaction and/or its complexity. Consultant will provide prompt notification to you if our estimated fees are expected to exceed the high end of our range. If less time is required than estimated, our professional fees will be lower.

We will invoice you following the end of each monthly period for professional fees accrued and expenses incurred by us during that respective period in performing the Services. All invoices shall be due within 30 days of receipt.

In addition, we will be compensated by Client for any time and expenses (including reasonable legal fees and expenses) that the Deloitte Entities may incur in considering or responding to discovery requests or other requests for documents or information, or in participating as a witness or otherwise in any legal, regulatory, arbitration, or other proceedings as a result of or in connection with this engagement; provided that this provision shall not apply (1) where we are the defendant and Client is the plaintiff in such proceedings or (2) to the extent such proceedings resulted from the bad faith or intentional misconduct of the Deloitte Entities.

## ACKNOWLEDGEMENT

It is understood that any member firm of Deloitte Touche Tohmatsu Limited or any of their respective affiliates (including Consultant) may have been or may be engaged to provide audit, tax, consulting, or other services to, or may have other business relationships with, Client, the Business, or their respective affiliates. In addition, our engagement team providing Services to Client hereunder may include certain personnel who possess information related to such services or other relationships, if any. The Deloitte Entities and their respective personnel will have no responsibility to Client relating to such services or other relationships, if any, in connection with the Proposed Transaction, nor any responsibility to Client in connection with the Proposed Transaction to use or disclose information that any of the member firms of Deloitte Touche Tohmatsu Limited or their respective affiliates (including Consultant) possess by reason of such services or other relationships, if any, whether or not such information might be considered material by Client or any third party. Client should not expect to obtain additional reliance regarding the Business by virtue of any of the member firms of Deloitte Touche Tohmatsu Limited or any of their respective affiliates (including Consultant) having performed professional services for, or having any other business relationships with, Client, the Business, or their respective affiliates.

## OTHER

Client may terminate all or a portion of this engagement for convenience at any time by giving notice to Consultant not less than one (1) day before the effective date of termination. Consultant may terminate all or a portion of this engagement if it determines that the performance of any part of the Services would be in conflict with law, or independence or professional standards or rules, and Consultant shall provide Client with as much advance notice as reasonably practicable under the circumstances.

This letter, together with Appendix A, "General Business Terms," and the other Appendices attached hereto and incorporated herein by reference, constitutes the entire agreement of the parties hereto with respect to this engagement; supersedes all other oral or written representations, understandings, or agreements relating to this engagement; and may not be amended except by written agreement signed by the parties. In making its determination to proceed with this engagement, neither party has relied on any representations of the other party except as expressly set forth in this letter, together with the General Business Terms and the other Appendices attached hereto.

If the above terms are acceptable to you and the Services are in accordance with your understanding, please sign the copy of this letter in the space provided and return it to us.

We appreciate the opportunity to serve you, and we look forward to a continuing relationship.

Very truly yours,

_Deloitte & Touche LLP_

By: Jack Koenigsknecht, Partner

Accepted and Agreed to this _14th_ day of _September_, 2018:

Sears Holdings Corporation:

By: _[signature]_

Name: _ROBERT A. RIECKER_

Title: _CFO, SEARS HOLDINGS CORPORATION_

5

**Appendix A**

**GENERAL BUSINESS TERMS**

1.    **Services.** Client agrees that:

    a) In connection with the Services, the Deloitte Entities shall be entitled to rely on all decisions and approvals of Client.

    b) With respect to the data and information provided by Client to any of the Deloitte Entities for the performance of the Services, Client shall have all rights required to provide such data and information, and shall do so only in accordance with applicable law and with any procedures agreed upon in writing. In addition, Client is responsible for obtaining all necessary authorizations and consents from its and the Business's advisors, including Client's and the Business's independent accountants and other representatives, in order to permit the Deloitte Entities to perform the Services, including disclosure of confidential information of Client and the Business to the Deloitte Entities in connection with this engagement on behalf of Client.

    c) The Services are limited in nature, and do not comprehend all matters relating to the Business that might be pertinent or necessary to Client's evaluation or consummation of the Proposed Transaction. Accordingly, the Services should not be taken to supplant other inquiries and procedures that Client should undertake for the purpose described above. The sufficiency of the Services to be performed hereunder by the Deloitte Entities is solely the responsibility of Client. Consequently, the Deloitte Entities will make no representation as to the sufficiency of the Services for Client's purposes. In addition, the Deloitte Entities have no responsibility for performing any services or procedures beyond those agreed to by Client and Consultant or for updating the Services performed.

    d) The performance of the Services does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of or any other form of assurance with respect to internal controls, or other attestation, review, or compilation services in accordance with standards or rules established by the AICPA, the Public Company Accounting Oversight Board ("PCAOB"), or other regulatory body, in each case with respect to the Business or any other entity. Such audit or other attestation or review services, if any, are not covered by the engagement letter to which these terms are attached (the "Engagement Letter"). Neither the Deloitte Entities nor the Client Communications will express an opinion or any other form of assurance with respect to any matters as a result of the performance of the Services, including concerning (i) the financial statements of any entity or any financial or other information, or operating or internal controls of any entity, taken as a whole, for any date or period; (ii) the merits of any transaction, including the consideration to be paid; (iii) the future operations of any entity; (iv) the fairness of the contemplated terms of any transaction; or (v) any forward-looking information (including any models, projections, forecasts, budgets, synergies, feasibility analyses, assumptions, estimates, methodologies, or bases for support) or the feasibility or achievability of such forward-looking information.

    e) In the performance of the Services, the Deloitte Entities will not perform any evaluation of internal controls and procedures for financial reporting upon which Client's or the Business's management can base its assertions in connection with Sarbanes-Oxley or related rules or regulations. The Deloitte Entities will make no representations or warranties and will provide no assurances that any entity's disclosure controls and procedures are compliant with the certification requirements of, or any entity's internal controls and procedures for financial

reporting are effective as required by, Sarbanes-Oxley or any other standards, rules, or regulations, including Sections 302 and 404 of Sarbanes-Oxley.

f)   The Business's financial statements, footnotes, and accounting policies and procedures, including the application of generally accepted accounting principles ("GAAP") to record the effects of the Proposed Transaction, are the responsibility of management of the Business. Accordingly, any comments made by the Deloitte Entities relating to the accounting or tax treatment of selected balances or transactions or the application of GAAP or the technical merits of the tax positions and planning strategies related to the Proposed Transaction as a whole are intended to serve only as general guidance to assist Client to better understand certain accounting or tax matters related to the Business and the effects of the Proposed Transaction. Such comments are necessarily based on the preliminary understanding of the Deloitte Entities of the pertinent facts and circumstances and on current authoritative literature and are, therefore, subject to change. Such comments do not constitute the rendering of a tax opinion or a report on the application of accounting principles in accordance with standards or rules established by the AICPA, the PCAOB, or other regulatory body.

g)   The performance of the Services does not constitute (i) a recommendation regarding any transaction, including the divestiture or financing of any business, assets, liabilities, or securities; (ii) a market or financial feasibility study; (iii) a fairness or solvency opinion; or (iv) an examination or compilation of, or the performance of agreed upon procedures with respect to, prospective financial information in accordance with standards or rules established by the AICPA, the PCAOB, or other regulatory body. The Services and the Client Communications are not intended to be, and shall not be construed to be, "investment advice" within the meaning of the Investment Advisers Act of 1940. It is understood that the Deloitte Entities will not provide, nor will the Deloitte Entities be responsible for providing, legal advice hereunder. In addition, any forward-looking information is the responsibility of management of Client or the Business, as the case may be. In this regard, management of Client or the Business, as the case may be, is responsible for representations about its plans and expectations and for disclosure of significant information that might affect the ultimate realization of such forward-looking information and the Deloitte Entities have no responsibility therefor. There will usually be differences between forward-looking information and actual results because events and circumstances frequently do not occur as expected, and those differences may be material.

h)   The performance of the Services is heavily dependent upon (i) Client's timely and effective satisfaction of its responsibilities hereunder and timely decisions and approvals in connection with the Services, and (ii) Client, the Business, and their respective advisors providing the Deloitte Entities with reasonable facilities and timely access to accurate and complete versions of relevant materials and information, including materials and information requested by the Deloitte Entities, and answering the Deloitte Entities' questions fully and accurately. The Deloitte Entities have no responsibility for the accuracy or completeness of the information provided by, or on behalf of, Client or the Business. This engagement cannot be relied upon to disclose errors or fraud should they exist.

i)   It is understood that any member firm of Deloitte Touche Tohmatsu Limited or any of their respective affiliates (including Consultant) may be engaged to provide services to parties other than Client considering a transaction involving the Business. Consultant has established ethical walls and confidentiality safeguards so that the engagement team providing the Services to Client hereunder would be separate from any engagement team providing services to such other parties, if any. Confidential information, including the identity of Client, obtained in the performance of the Services will not, without Client's prior written permission, be disclosed to

such other parties, if any. Similarly, the Deloitte Entities will have no responsibility to Client to use or disclose information, including the identity of such other parties, if any, that any member firm of Deloitte Touche Tohmatsu Limited or any of their respective affiliates (including Consultant) possess by reason of such services for such other parties, if any, whether or not such information might be considered material by Client. Consultant believes that any such relationships will not impair the objectivity of the Deloitte Entities in the performance of the Services. However, the possibility of these relationships is being brought to Client's attention to avoid any misunderstanding.

**2.    Confidentiality.**

a)    To the extent that, in connection with the performance of the Services, the Deloitte Entities come into possession of any confidential information of Client, the Deloitte Entities will not use or disclose such information to any third party without Client's prior written consent, using at least the same degree of care as they employ in maintaining in confidence their own confidential information of a similar nature, but in no event less than a reasonable degree of care. Client hereby consents to the Deloitte Entities disclosing such information (i) to persons or entities permitted to receive Client Communications under the Engagement Letter; (ii) to contractors providing administrative, infrastructure, and other support services to any of the Deloitte Entities and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this Section 2; (iii) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation pertaining hereto; or (iv) to the extent such information (a) is or becomes publicly available other than as the result of a disclosure in breach hereof, (b) becomes available to a Deloitte Entity on a non-confidential basis from a source which such Deloitte Entity reasonably believes after due inquiry is not prohibited from disclosing such information to such Deloitte Entity, (c) is already known by a Deloitte Entity without any obligation of confidentiality with respect thereto, or (d) is developed by a Deloitte Entity independently of any disclosures made to such Deloitte Entity hereunder. In addition, any such information may be used by Deloitte & Touche LLP or any member firm of Deloitte Touche Tohmatsu Limited or their respective affiliates in the context of responding to any such entity's professional obligations as the independent accountants for Client and the Business.

b)    In the event of a required disclosure pursuant to Section 2(a)(iii), the applicable Deloitte Entity shall, to the extent permitted by applicable law or regulation, promptly provide Client with prior written notice of such requirement so that Client may seek a protective order or other appropriate remedy. If such protective order or other remedy is not obtained, the applicable Deloitte Entity shall only disclose that portion of the information that is required to be disclosed and shall use its commercially reasonable efforts to preserve the confidentiality of such information (including by seeking an appropriate protective order or other reliable assurance that confidential treatment will be accorded such information). The Deloitte Entities shall not oppose any action (and shall, if and to the extent requested by Client, reasonably cooperate with, assist, and join with Client in any reasonable action) by Client to seek an appropriate protective order or other reliable assurance that confidential treatment will be accorded such information.

**3.    Limitations on Damages and Indemnification.**

a)    The Deloitte Entities and their respective personnel will not be liable to Client for any claims, liabilities, or expenses ("Claims") relating to this engagement or the Proposed Transaction for an aggregate amount in excess of the fees paid by Client to us pursuant to this engagement, except to

the extent resulting from the bad faith or intentional misconduct of the Deloitte Entities. In no event will the Deloitte Entities or their respective personnel be liable to Client for any loss of use, data, goodwill, revenues, or profits (whether or not deemed to constitute a direct Claim), or any consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense relating to this engagement or the Proposed Transaction.

b) Client will indemnify and hold harmless the Deloitte Entities and their respective personnel from all Claims attributable to claims of third parties relating to (i) this engagement or the Proposed Transaction, except to the extent resulting from the bad faith or intentional misconduct of the Deloitte Entities; (ii) a breach by Client or any of its personnel of any provision of these terms or the Engagement Letter, including the restrictions on use and distribution of the Client Communications; (iii) the use of or reliance on any Subject Tax Planning Advice by any person or entity other than Client; and (iv) the access to or use of the Client Communications by any person or entity authorized hereunder.

c) In circumstances where any limitation on damages or indemnification provision hereunder is unavailable, the aggregate liability of the Deloitte Entities and their respective personnel for any Claims relating to this engagement or the Proposed Transaction shall not exceed an amount that is proportional to the relative fault that the conduct of the Deloitte Entities bears to all other conduct giving rise to such Claims.

4.   **Third Parties and Internal Use of Subject Tax Planning Advice.** No provision of these terms or the Engagement Letter is or is to be construed as a condition of confidentiality within the meaning of Rule 3501(c)(i) of PCAOB Release 2005-014, Internal Revenue Code Sections 6011 and 6111 or the regulations thereunder, any related Internal Revenue Service guidance, or any other similar law, with respect to any Services, Client Communications, or other materials of any kind provided hereunder relating to tax treatment or tax structure (collectively referred to as "Subject Tax Planning Advice"). Notwithstanding anything herein to the contrary, no provision of these terms or the Engagement Letter shall place any limitation on Client's disclosure of any Subject Tax Planning Advice. Client acknowledges that none of its other tax advisors have imposed or will impose any conditions of confidentiality with respect to the tax treatment or tax structure associated with the tax Services or the Proposed Transaction. The Services and Client Communications shall be solely for Client's benefit, and this engagement does not create privity between any Deloitte Entity and any person or entity other than Client ("third party"). Neither the Services nor any Client Communications are intended for the express or implied benefit of any third party. Unless otherwise agreed to in writing by Consultant, no third party is entitled to rely in any manner or for any purpose on the Services or Client Communications.

5.   **Force Majeure.** Neither the Deloitte Entities nor Client shall be liable for any delays or nonperformance directly or indirectly resulting from circumstances or causes beyond their reasonable control, including acts or omissions or the failure to cooperate by the Deloitte Entities, Client, the Business, or any other third party; fire, epidemic or other casualty; act of God; strike or labor dispute; war or other violence; or any law, order, or requirement of any governmental agency or authority.

6.   **Independent Contractor.** Each party hereto is an independent contractor and neither party is, nor shall be considered to be, nor shall purport to act as, the other's agent, partner, fiduciary, joint venturer, or representative.

7.   **Survival and Interpretation.** All provisions which are intended by their nature to survive performance of the Services shall survive such performance, or the expiration or termination of this engagement and consummation of the Proposed Transaction. For purposes of these terms and the

Engagement Letter, the "Deloitte Entities" shall mean Consultant and its subsidiaries; to the extent that, as a subcontractor, they agree to provide any of the services under or in connection with the Engagement Letter, the member firms of Deloitte Touche Tohmatsu Limited, and the affiliates of Consultants and such member firms; and in all cases any successor or permitted assignee. None of the Deloitte Entities, other than Consultant, or such entities' personnel, shall have any liability hereunder to Client and Client will not bring any action against such other entities, or such other entities' personnel, in connection with this engagement or the Proposed Transaction. Without limiting the foregoing, the Deloitte Entities are intended third-party beneficiaries of these terms, and may in their own right enforce such terms. **Each of the provisions of these terms shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.** Any references herein or in the Engagement Letter to the term "including" shall be deemed to be followed by "without limitation."

8.    **Assignment and Subcontracting.** Except as provided below, neither party may assign any of its rights or obligations (including interests or Claims) relating to this engagement or the Services without the prior written consent of the other party. Client hereby consents to Consultant assigning or subcontracting any portion of the Services to any affiliate or related entity, whether located within or outside of the United States, provided that, any such assignment or subcontracting shall not relieve Consultant of its obligations hereunder. Services performed hereunder by Consultant's subcontractors shall be invoiced as professional fees on the same basis as Services performed by Consultant's personnel, unless otherwise agreed.

9.    **Waiver of Jury Trial**. **THE PARTIES IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS ENGAGEMENT.**

10.    **Governing Law, Jurisdiction and Venue, and Severability.** These terms, the Engagement Letter, including attachments, and all matters relating to this engagement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof). Any action based on or arising out of this engagement or the Services shall be brought and maintained exclusively in any state or federal court, in each case located in New York County, the State of New York. Each of the parties hereby expressly and irrevocably submits to the jurisdiction of such courts for the purposes of any such action and expressly and irrevocably waives, to the fullest extent permitted by law, any objection which it may have or hereafter may have to the laying of venue of any such action brought in any such court and any claim that any such action has been brought in an inconvenient forum. If any provision of these terms or the Engagement Letter is unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

**Appendix B**

**SCOPE OF SERVICES**

**1.      Engagement Scope.** The nature and scope of due diligence and other M&A services can vary significantly depending upon the individual judgment of Client (including, but not limited to, the level of risk that Client is willing to accept) and the type of transaction that is being contemplated. We believe that the scope of such services should be adaptable and scalable so that Client can react to additional information learned that may have significant implications to Client.

**2.      Summary of Significant Categories of Services to Be Provided.** Based upon our initial discussions with Client and our limited knowledge of the Proposed Transaction, we understand that Client has requested that we provide the following Services (see Section 5 herein for a more-detailed description):

| **M&A Due Diligence Areas** | **Other M&A Services** |
|---|---|
| Accounting and financial (Quality of Earnings only) | Optional M&A Services (available as requested; at hourly rates noted in **Appendix C**): |
| | – Analysis of Net Working Capital and Net Debt |
| | – Unbranded Excel Databook supporting the Quality of Earnings analysis (and Net Working Capital and Net Debt, if requested) |
| | – Tax structuring, potentially including structure development, tax attribute planning, as needed |
| | – Data Analytics – Additional transactional / visualization analyses as necessitated / mutually agreed |
| | – TSA and/or Stand Alone Cost Analysis |
| | – Review and comment on related transaction agreements |
| | – Read and comment on client model |
| | – Tax integration, risk mitigation planning, and other transaction execution support |
| | – Additional due diligence related to Human Capital, IT, Insurance, etc. |
| | – Non-US support for due diligence or other M&A services |
| | – Participating in buyer calls |
| | – Provide consultative advice regarding financial data to be included in the virtual dataroom |

3.    **Summary of Services Not Provided.** Although not intended to be an all-inclusive list of services that will not be provided, based upon your request, the following services, among other things, are specifically excluded from the scope of this engagement:

- Review of business operations
- Assessment of the commercial merits of the Proposed Transactions
- Evaluation of management information systems
- Certification of physical inventory observations
- Environmental assessments
- Analysis of potential synergies
- Design, configure or implement systems
- Act as a manager or employee
- Communicate to or negotiate with personnel or third parties on behalf of company management
- Identify specific personnel for specific jobs

- Valuation and appraisal services
- Integration assistance
- Background investigations
- Legal and regulatory
- Preparation of US GAAP basis carve-out financial statements
- Internal accounting and disclosure controls
- Foreign Corrupt Practices Act and Anti-Bribery Procedures
- Host, administer or operate the client's systems or data rooms
- Project revenue, cost savings, cash flow or other estimates/projections or develop models to do so
- Provide services for a direct or indirect contingent fee

4.    **Tailored and Highly Focused Approach.** Our approach will be highly focused on priority deal issues identified by you. Our approach is designed to facilitate us providing you, early in the due diligence process, with significant, preliminary issues related to significant accounting, financial, tax, employee benefit, and insurance matters (as applicable to our scope).

Please note that at this stage we are uncertain as to the quality and quantity of the information that the Client will make available, as well as the Client's timeliness in providing such information. Also please note that the scope of our Services may be impacted by the Client's willingness to share information. These factors will impact the nature, timing, and extent of the Services, as well as influence the Services that can be completed within the planned services. However, based upon the information that we have received to date and our discussions with you, the Services will primarily be comprised of the following:

| Reading and Analyzing | High-Level Inquiries of | Participating as an Advisor In |
|---|---|---|
| • Information publicly available and provided by Client relevant to our scope<br><br>• Information made available in Client's data room relevant to our scope and provided by Client based upon our information request list<br><br>• Audit working papers prepared by Client auditors, as available and applicable to our scope | • Client management<br><br>• Audit advisors of the Client to the extent possible | • Initial meetings with Client to discuss scope<br><br>• Meetings with Client to discuss progress and issues identified |

We estimate that the Services (related to the Services detailed in Section 5) will take approximately 3 to 4 weeks to complete. However, our ability to achieve the objectives of the Services within this timeframe is highly dependent upon the quality, quantity, and timeliness of the data provided, as well as the extent and the level of cooperation by Client and their respective advisors. Also, see Appendix C for further discussion regarding our fee estimate and assumptions.

**5.** **Overall Objectives.** As mutually agreed upon with Client, our overall objectives for the Services will be to focus on the areas noted below. In an effort to be responsive to your stated timetable, we will endeavor to surface significant issues (and, in particular, those that Client may consider to be potential "deal breakers") as early as possible in the process. Subject to further discussions with Client, our tentative focus will be advising Client on the following (unless otherwise specified, our due diligence analyses relate to the last two fiscal years (FY16 and FY17) and most recent interim period (and corresponding period of the prior year):

Our work will include analysis of all areas identified below as appropriate; however, note that procedures may be added or deleted as the Proposed Transaction proceeds to further meet your needs.

## *Financial Due Diligence*

**Preliminary Analysis**

1. Read and analyze the Business's FY16 and FY17 audited financial statements (as available), reporting packages, and any other relevant information for the most recent year and interim financial statements and endeavor to identify major issues and risk areas for further consideration;

2. Analyze organizational structure and perform high level inquiry regarding the nature of operations of major business lines, entities, intercompany transactions, and consolidation processes.

3. With an emphasis on the implications for cash flows and earnings, inquire about the general history of current operations and recent or planned changes in the Business, including:

   − Services provided

- Environment in which the company operates, markets served, and competitive conditions;

- Customers and suppliers;

- Support functions (information technology, human resources, finance, treasury, risk management, tax, etc.), including those functions provided by Business's parent; and

- Any unusual business practices inherent within the industry or the locations where the company operates, such as arrangements with labor organizations, local authorities, major clients, etc.

4. Read and analyze information on significant acquisitions, start-up of operations, and disposals of property and businesses, considering the impact on reported and projected earnings and cash flows;

5. Read and analyze the Business's consolidating internal financial statements and related management discussion and analysis. Inquire about:

- Reconciliation between the external and the internal financial statements;

- Consistency of interim financial reporting policies and procedures compared to those used in the annual reviewed financial statements;

- Process and timing of periodic closing/consolidation cycle and consolidation entries;

- Internal accounting control environment, including any significant out-of-balance conditions, unreconciled differences or reportable conditions;

- Significant accounting policies, with a focus on revenue recognition and cost capitalization;

- Changes in accounting or reporting practices or procedures that could affect comparability or trends in earnings or cash flows; and

- Events subsequent to the most recent balance sheet date that could have a significant impact on current financial position, future earnings or cash flows.

**Independent Auditors**

1. Read the independent auditors' working papers for the FY16 and FY17 audits (as available).

2. Inquire of the Business's independent auditors about:

- Major issues and audit risk areas, significant judgments or estimates, unusual transactions and any disagreements with management;

- Assessment of quality of earnings and whether management's approach to accounting and financial reporting would be characterized as conservative or aggressive;

- History of audit adjustments proposed and their disposition;

- Accounting systems and internal controls, material weaknesses or reportable conditions;

- Recent or prospective changes in accounting and reporting policies or procedures; and

3. Read management letters for the most recent audit; inquire of the Business's independent auditors as to matters identified for inclusion for the current year and the status of corrective actions taken by management

**Quality of Earnings**

1. Analysis of management provided normalized EBITDA to factually explain the impact of:

- Management proposed adjustments;

- Transactions conducted on a non-arm's length basis, including related party transactions;

- Recently acquired or discontinued customers/ contracts (including any significant changes in licensing or wholesale arrangements);

- One time, extraordinary, and non-recurring items, including out of period adjustments and other potential adjustments identified from our due diligence or as advised by management;

- Impacts of reduction in workforce initiatives;

2. Analyze monthly operating data (with a focus on management provided EBITDA) including:

- Management's reconciliation between gross and net revenue;

- Variances and trends in revenues, expenses, profitability, and key operating metrics by channel (e.g. wholesale) and product (e.g. refrigeration, cooking, dishwasher and laundry)

- Seasonality of revenue and EBITDA;

- Cost saving or restructuring initiatives;

- Contribution by top customers/ contracts and trends in pricing and concentration;

- Composition of account balances;

- Direct expenses by major cost components

- SG&A by type;

- Any discretionary or temporary reductions or deferrals of certain expenses;

- Significant non-recurring, unusual or out-of-period charges and credits

3. Analyze costs allocated to Business from its parent and related allocation methodologies, as well as services provided from its parent (e.g. shared corporate services, inventory sourcing, warehousing, logistics, IT services, online project services, rent, and pension)

4. Analysis of balance sheet accounts and trends for purposes of identifying Quality of Earnings matters, for management's consideration.


**Net Working Capital and Net Debt (As Requested; Not included in Preliminary Fee Estimate)**

1. Working Capital Analysis & Quality of Assets

- Analyze historical working capital trends, identifying seasonality, high/low points and average run rate over past 24 months

- Analyze accounts receivable, including aging and adequacy of reserve balances. Inquire about billing and credit policies, collectability of large overdue balances and amounts due from officers, employees and owners

- Analyze a summary of trade payables, including aging statistics (if applicable). Inquire about normal and special credit terms (including rebates), significant past-due payables and disputes with suppliers and trade payable payment policies

- Analyze accrued liabilities (if applicable). Inquire about the basis for and adequacy of accruals for such items as deferred revenue, bonuses, deferred compensation, severance, workers compensation, commissions, vacation pay, employment benefits, litigation, sales allowances and credits and self-insurance and impact on earnings of significant accrued liabilities and reserves, payment practices and timing of related cash outflows

2. Other balance sheet considerations

- Analysis of net debt and debt-like items
- Analysis of fixed asset components and depreciation policies (if applicable)

3. Commitments and Contingencies

- Analyze capital/operating leases. Inquire about change of control, prepayment or other significant provisions, terms of significant capital and operating leases, future payment requirements, expiration dates and sublease income
- Inquire and analyze contingent liabilities (e.g., unasserted claims, litigation, environmental matters, guarantees, earn-outs, contingent payments)
- Inquire significant long-term purchase commitments (e.g. take-or-pay contracts)

**6**.    **Deliverables.** We will endeavor to communicate to you our significant issues and findings as they arise so that you can, as you deem appropriate, address the related business and deal issues as soon as possible. It will not always be possible for all of our communications to be in the form of written reports; however, we will endeavor to provide significant observations in written form prior to the completion of the engagement. As agreed with you, our deliverables will include the following:

- ***Issue Summary Memorandum*** — A written communication of our Quality of Earnings findings and observations with respect to the Business will be provided upon completion of fieldwork. Our draft memorandum will typically contain certain outstanding matters that may require further clarification by or information from management. As additional information is received, we may issue additional versions of our memorandum.

As applicable, for Client's consideration, we will provide listings of (a) additional document request items and questions for management and its advisors and (b) additional descriptions of due diligence and other M&A services that may be performed as part of a subsequent phase, if any.

**7.**    **Coordination of Due Diligence**. We will endeavor to perform the Services such that we generally will not duplicate the items that would be addressed by legal counsel, tax advisors, or any other professionals (including, but not, limited to environmental, regulatory, and management information systems) engaged by you or your affiliates to perform due diligence or other M&A services. As a result of similar information needing to be analyzed by different professional disciplines, we recommend that you consider an integrated approach whereby information is shared timely among the various parties performing due diligence or other M&A services on your or any of your affiliate's behalf. At a minimum, if Client's legal counsel is performing due diligence or other M&A services with respect to agreements or contracts, we request that you or they inform us as to the scope of their work and, where possible, permit us to read their summaries (abstracts) of these documents if there are items with possible accounting or tax implications (e.g., leases, employment contracts, supply contracts, licensing contracts).

**Appendix C**

**Preliminary Fee Estimate**

To date, we have received limited information with respect to the Proposed Transaction.  Accordingly, we have provided the following preliminary fee estimate based upon the Services described in Appendix B. Below we have listed some of our more-significant assumptions and critical information to be obtained in an effort to provide a more specific and accurate estimate of total professional fees:

| Services<br><br>In US$ | Preliminary Fee Estimate – Low-Range | Preliminary Fee Estimate – High-Range |
|---|---|---|
| Total Estimated Fee - Financial / Accounting Vendor Due Diligence Services (Quality of Earnings Only) | 100,000 | 150,000 |
| **Optional (or additional phase) M&A Services** *(available as requested; at the rates noted below)* | TBD | TBD |

**Important Notes**

- Fee amounts above do not include any estimates for travel and other expenses that may be incurred in connection with this engagement.

- As stated, our fees for this engagement will be based on the amount of time required at the following rates, plus expenses:

| Level | Hourly Rate (in US$) |
|---|---|
| Partner / Principal | $925 |
| Managing Director | $900 |
| Senior Manager | $775 |
| Manager | $650 |
| Senior Consultant | $550 |
| Consultant | $400 |

- Our involvement and our total fees are heavily dependent upon the quality, organization, and volume of content in the data room, the auditor working papers, the cooperation by the Client, and availability and access to Client information.  As such, our fees may increase beyond those outlined in the fee range above.

- Additional services provided beyond those Services described in Appendix B will be billed separately.

**Circumstances Affecting Timing and Assumptions for Fee Estimate**

- Our estimated fee range is based upon an estimated amount of hours to be incurred over a 3 to 4 week period related to the Services noted in Appendix B. Any additional time beyond this time period may be billed separately at agreed-upon hourly rates noted previously. Further, any requested changes in timing or timeline may significantly affect our targeted completion times and fee estimates.  Significant changes to the timing of the engagement frequently cause us to incur significant unanticipated costs.

- Our fee range assumes a certain level of "administrative tasks" (e.g. status update meetings, formalized reporting of findings) will be performed by our professionals. Excessive administrative tasks requested by Client may cause us to incur additional fees to what is outlined in the fee ranges above.

- Only the Services specifically described herein are reflected in our quoted fees; any significant changes in the Services discussed herein could significantly alter fee estimates.

- The Client's management or any of the Client's advisors will use their reasonable efforts to be available and have prompt and accurate level of involvement in this engagement.

- Information requested by us will be made available to us in electronic, downloadable format on a timely basis and the data provided will be in good order.

- There will be effective coordination of efforts among the various parties performing due diligence and other M&A Services on your behalf.

- Timely payment of our invoices as they are rendered.

**Appendix D**

**PROSPECTIVE BUYER ACCESS – CLIENT AUTHORIZATION LETTER**

[*Letterhead of Deloitte & Touche LLP*]

[*Date*]

Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Attention: Mr. Robert A. Riecker, CFO

Dear Mr. Riecker:

Deloitte & Touche LLP ("Consultant") was engaged on behalf of Sears Holdings Corporation ("Client") to provide certain services solely for Client in connection with Client's evaluation of the proposed disposition of a business unit code-named Project [*insert code name*] (the "Business") (the "Proposed Transaction").

In connection with the Proposed Transaction, you have informed us that you have been requested by [*insert name of entity seeking access*] (the "Purchaser") to provide it with paper copies or portable document format, agreed upon by Client and the Purchaser, of certain materials and information issued or prepared by any of the Deloitte Entities (as defined below) for Client with respect to the services described in the engagement letter, dated [date] (the "Engagement Letter"), between Consultant and Client (collectively, the "Information") for informational purposes. Notwithstanding anything to the contrary contained in the Engagement Letter, we hereby authorize you to provide the Purchaser with one paper copy or portable document format of the Information for such purpose provided that, we obtain a separate letter from the Purchaser in the form attached hereto prior to such access. Client and the Purchaser are solely responsible for the determination of whether and what information is provided by Client to the Purchaser, and the Deloitte Entities shall have no responsibility therefor. In addition, Client hereby authorizes the Deloitte Entities to respond to inquiries, if any, from or on behalf of, the Purchaser and to provide the Purchaser and its affiliates, their respective co-investors and lenders, and each of their respective accounting, tax, legal, and other professional advisors (acting solely in an advisory capacity to such entities) ("Other Third Parties") with information, whether in writing or otherwise, relating to the services described in the Engagement Letter, the Information, the Proposed Transaction, or any related transactions (the "Communications").

Client represents and warrants that it has received all necessary authorizations and consents from its and the Business's advisors, including, without limitation, its and the Business's independent accountants and other representatives, in order to permit the Purchaser and any Other Third Parties to have access to the Information and the Communications, including permission from such advisors to disclose confidential information to the Purchaser and such Other Third Parties. In addition, the Deloitte Entities shall have no responsibility to Client with respect to the provision of the Information or the Communications to the Purchaser or any Other Third Parties or with respect to their contents, whether or not the Information or the Communications contain information that might be considered confidential or material by Client, including in connection with its evaluation of the Proposed Transaction or any related transaction.

Client further represents and warrants that any offer or sale of securities by Client to the Purchaser, its affiliates, or their co-investors made in connection with the Proposed Transaction does not constitute a

public offering of securities, was not effected pursuant to a general solicitation or advertisement, and is not otherwise subject to registration under the Securities Act of 1933, as amended, or other state securities statutes or regulations. Client reasonably believes, based upon representations provided by the Purchaser, its affiliates, or their co-investors, and other information available to Client, that none of the Purchaser, its affiliates, or their co-investors is a natural person or is buying securities on behalf, or for the account, of a natural person.

One or more of the Deloitte Entities has provided, is currently providing, and may in the future provide, services, such as audit, tax, and consulting services to the Purchaser and/or any Other Third Parties, and the Deloitte Entities and their personnel shall have no responsibility to Client relating to such services, nor any responsibility to use or disclose information that any of the Deloitte Entities possesses by reason of such services or otherwise, whether or not such information might be considered material by Client. In addition, one or more of the Deloitte Entities may have other business relationships with the Purchaser and/or any Other Third Parties.

Consultant's engagement on behalf of Client is limited in nature and may not comprehend any or all matters that might be pertinent or necessary to the evaluation of the Proposed Transaction or any other transaction relating to Client, the Business, or any other entity. The Information and the Communications will not address all the questions that the Purchaser or any Other Third Party may have. The Information and the Communications also may contain sensitive and candid comments about Client, the Business, the Proposed Transaction, or any other transaction that may be subject to interpretation.

Client hereby (1) releases the Deloitte Entities and their personnel from all claims, liabilities, and expenses relating to the access to, or use of, the Information or the Communications by the Purchaser or any Other Third Parties, including, without limitation, in connection with any transaction involving the Purchaser or any Other Third Parties relating to the Proposed Transaction and any claims, liabilities, and expenses resulting from the termination of, or change in, the Proposed Transaction or any such transaction, and (2) indemnifies and holds harmless the Deloitte Entities and their personnel from all claims, liabilities, and expenses relating to the access to, or use of, the Information or the Communications by the Purchaser or any Other Third Parties or any assertion of reliance by any person or entity relating thereto; provided that the foregoing shall not apply to the extent any such claim, liability, or expense resulted from the bad faith or intentional misconduct of the Deloitte Entities.

In circumstances where all or any portion of the provisions of the immediately preceding paragraph are unavailable, in no event will the Deloitte Entities or their personnel be liable for consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense. For purposes of this letter, the "Deloitte Entities" shall mean Consultant and its subsidiaries; to the extent that, as a subcontractor, they provide or provided any of the services under or in connection with the Engagement Letter, the member firms of Deloitte Touche Tohmatsu Limited and the affiliates of Consultant and such member firms; and in all cases any successor or permitted assignee; provided, however, that for purposes of the fifth paragraph of this letter, the "Deloitte Entities" shall mean Consultant, the member firms of Deloitte Touche Tohmatsu Limited, and the affiliates of Consultant and such member firms.

This letter and all matters relating hereto shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof) and the state and federal courts of New York shall have exclusive jurisdiction over all matters relating to this letter.

Each of the provisions of this letter will apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

Please confirm your understanding and agreement with the foregoing by signing and dating a copy of this letter and returning it to us.

Very truly yours,

[*DELOITTE & TOUCHE LLP*]  [*to be signed manually*]

By: Jack Koenigsknecht, Partner

Accepted and Agreed to this _____ day of _____, 201_:

Sears Holdings Corporation

By: _____

Name: _____

Title: _____

**Appendix E**

**PROSPECTIVE BUYER ACCESS – LENDER ACCESS LETTER**

[*Letterhead of Deloitte & Touche LLP*]

[*Date*]

[*Insert name of entity seeking access*]
[*Address*]
[*City*], [*State*] [*ZIP code*]

Attention: [*Name*]

Dear [*Name*]:

As you are aware, pursuant to the engagement letter dated [date] (the "Engagement Letter"), between Deloitte & Touche LLP ("Consultant") and Sears Holdings Corporation ("Client"), we have been engaged to perform certain services solely for Client (the "Services") in connection with Client's evaluation of a proposed disposition of a business unit code-named Project [*insert code name*] (the "Business") (the "Proposed Transaction").

Such engagement did not and does not constitute an engagement to perform an audit in accordance with generally accepted auditing standards, an examination of internal controls, or other attestation or review services in accordance with standards or rules established by the American Institute of Certified Public Accountants (AICPA), the Public Company Accounting Oversight Board (PCAOB), or other regulatory body. Any such audit, examination, or other attestation or review services with respect to Client or the Business are not covered by the Engagement Letter and would be the subject of a separate engagement. Accordingly, this letter does not apply to such audit, examination, or other attestation or review services, if any, performed by any of the Deloitte Entities (as defined below) with respect to Client or the Business.

Client has requested that it be permitted to comply with the request of [*insert name of entity seeking access*] (the "Purchaser") for access to a paper copy or portable document format, agreed upon by Client and the Purchaser, of certain materials and information issued or prepared by any of the Deloitte Entities for Client with respect to the Services (collectively, the "Information") solely for the Purchaser's informational purposes in connection with the Proposed Transaction. In consideration of our permitting Client to provide the Purchaser with a copy of the Information, and for other good and valuable consideration the receipt and sufficiency of which is acknowledged, the Purchaser, intending to be legally bound, is executing and delivering to us this letter.

## ACKNOWLEDGMENTS AND AGREEMENTS

The Purchaser acknowledges and agrees to the following:

- The Information was prepared solely for the benefit and use of Client and is being provided to the Purchaser at its request solely for the Purchaser's information and cannot and shall not be relied upon by the Purchaser, any Purchaser Entity (as defined below), or any of their respective legal or other advisors. The Purchaser acknowledges that it has the appropriate expertise and experience to evaluate the risks inherent in the Proposed Transaction or any related transaction and has retained its own legal and other advisors in connection with the Proposed Transaction or any related transaction. The Purchaser agrees that access to the

Information is not a substitute for the Purchaser undertaking appropriate inquiries and procedures in relation to any such transaction and agrees that it has been provided with access to information and the opportunity to ask questions sufficient to perform its own evaluation of the risks of any such transaction. The Information does not constitute in any way a recommendation by the Deloitte Entities or Client to participate in the Proposed Transaction or any related transaction and is not part of or being made available in connection with any prospectus, offering circular, or otherwise part of any soliciting, promoting, marketing, underwriting, recommending, or selling of securities or other interests.

- The determination of whether and which Information to provide to the Purchaser is solely the responsibility of Client and the Purchaser, and the Deloitte Entities shall have no responsibility therefor, whether or not the Information provided to the Purchaser is incomplete or inaccurate.

- The Services are subject to the limitations set forth herein and in the attached Appendix, such as the nature, extent, and purpose of the Services. Consultant's engagement on behalf of Client to perform the Services was conducted in accordance with the *Statement on Standards for Consulting Services* established by the AICPA, and the performance of the Services, including, without limitation, the preparation of the Information, does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of or any other form of assurance with respect to internal controls, or other attestation or review services in accordance with standards or rules established by the AICPA, the PCAOB, or other regulatory body. Neither the Deloitte Entities, nor the Information, nor the Communications (as defined below) will express an opinion or any other form of assurance with respect to any matters as a result of the performance of the Services. The Services performed may have been, and may in the future be, changed or modified by mutual agreement of Client and Consultant subsequent to the date of the Engagement Letter. The Purchaser is not a third-party beneficiary of the Engagement Letter and the Purchaser has no rights thereunder or with respect to the Services.

- The Information and any communications, whether in writing or otherwise, made by a Deloitte Entity to the Purchaser relating to the Proposed Transaction or any related transaction (the "Communications"), do not address all matters that the Deloitte Entities are or may become aware of, or all communications, whether in writing or otherwise, made by a Deloitte Entity to Client or any other person or entity, in connection with the Proposed Transaction, such other transaction, or otherwise, whether or not such matters or communications might be considered material by the Purchaser or any other third party.

- The Deloitte Entities have no responsibility to advise the Purchaser of other services or procedures that might be performed and make no representations as to the sufficiency of the Information or the Communications for the purposes of the Purchaser. In addition, the Deloitte Entities have no responsibility for updating the Information, the Communications, or the Services performed or for performing any additional services or procedures.

- The Information was prepared as of the applicable dates noted in such materials. Events and circumstances affecting the Business have occurred since such dates. Such events or circumstances might be considered material by the Purchaser. The Deloitte Entities have no responsibility to advise the Purchaser regarding such events or circumstances, whether or not the Deloitte Entities are aware of or become aware of any such events or circumstances.

- The Deloitte Entities have assumed the completeness and accuracy of all information and materials provided to the Deloitte Entities by or on behalf of Client, the Business, or their respective advisors, and the Information and the Communications are based upon this

assumption. Consultant has not been engaged to detect errors or fraud and the Information and the Communications may not disclose errors or fraud should they exist.

- Client may have participated in the preparation of the Information, including, without limitation, by reviewing and commenting on prior drafts of the Information and the Communications, and such participation may have resulted in the addition, modification, or deletion of information that might be considered material by the Purchaser or any other third party.

- One or more of the Deloitte Entities has provided, is currently providing, and may in the future provide, services, such as audit, tax, and consulting services, including services in connection with the Proposed Transaction and related financing arrangements, to Client, the Business, or their respective affiliates, and the Purchaser agrees that the Deloitte Entities and their personnel shall have no responsibility to the Purchaser relating to such services in connection with the Proposed Transaction, nor any responsibility to the Purchaser in connection with the Proposed Transaction to use or disclose information that any of the Deloitte Entities possesses by reason of such services or otherwise, whether or not such information might be considered material by the Purchaser or any other third party.

- One or more of the Deloitte Entities has provided, is currently providing, and may in the future provide, services, such as audit, tax, and consulting services to the Purchaser or its affiliates, and the Purchaser agrees that the Deloitte Entities and their personnel shall have no responsibility to the Purchaser relating to such services in connection with the Proposed Transaction, nor any responsibility to the Purchaser in connection with the Proposed Transaction to use or disclose information that any of the Deloitte Entities possesses by reason of such services or otherwise, whether or not such information might be considered material by the Purchaser or any other third party.

- One or more of the Deloitte Entities may be engaged to provide services to parties other than Client considering a transaction involving the Business. The Deloitte Entities and their personnel will have no responsibility to use or disclose information, including the identity of such other parties, if any, that any of the Deloitte Entities possesses by reason of its services for such other parties, if any, whether or not such information might be considered material by the Purchaser or any other third party.

## NO RIGHTS AS A RESULT OF ACCESS

The Purchaser does not acquire any rights as a result of access to the Information and the Communications, and the Deloitte Entities do not assume any duties or obligations as a result of such access to the Information or the Communications. The Deloitte Entities are not, by means of permitting Client to provide the Purchaser with a copy of the Information or by means of the Communications, rendering accounting, financial, investment, legal, tax, or other professional advice or services to, or acting as a fiduciary or agent of, or in any other capacity with respect to, the Purchaser. The Information and the Communications are not a substitute for such professional advice or services, nor should they be used as a basis for any decision or action that may affect the Purchaser or its business.

The Purchaser shall not disclose the Information or the Communications, or refer to the Deloitte Entities in connection with the Proposed Transaction, any related transaction, the Information, or the Communications to any person or entity except (1) to an employee or a member of management [, the investment manager, the investment committee,] or the board of directors of the Purchaser, using the Information and the Communications for informational purposes solely in their capacity as such; (2) to an

employee or a member of management or the board of directors of a Purchaser Entity, using the Information and the Communications for informational purposes solely in their capacity as such, provided that such Purchaser Entity does not further disclose any of the Information or the Communications, or refer to the Deloitte Entities in connection with the Proposed Transaction, any related transaction, the Information, or the Communications; (3) to an accounting, tax, or legal advisor of the Purchaser, using the Information and the Communications for informational purposes solely in its capacity as an advisor to the Purchaser, provided that such accounting, tax, or legal advisor does not further disclose any of the Information or the Communications, or refer to the Deloitte Entities in connection with the Proposed Transaction, any related transaction, the Information, or the Communications; (4) to any other professional advisor of the Purchaser, who may use the Information and the Communications solely in its capacity as an advisor to the Purchaser and who has agreed in writing not to further disclose any of the Information or the Communications, or refer to the Deloitte Entities in connection with the Proposed Transaction, any related transaction, the Information, or the Communications; or (5) to the extent required by a valid subpoena, an order of a court of competent jurisdiction, a regulatory authority asserting jurisdiction over the business or financial affairs of the Purchaser or a Purchaser Entity, or other legal process, provided that the Purchaser, to the extent permitted by applicable law or regulation, provides Consultant with prior written notice of such requirement. Without limiting the generality of the provisions of this paragraph, in no event will the Purchaser, any Purchaser Entity, or any "professional advisor," "accounting advisor," or "tax advisor" be permitted access to the Information or the Communications in connection with any (a) fairness, solvency, or other opinion; (b) credit enhancement or credit rating; (c) brokering or underwriting of any type of security or any M&A insurance; or (d) financing (including, without limitation, in the role of investor, agent, intermediary, underwriter, syndicator, lender, or other similar capacity). For purposes of this letter, the term "Purchaser Entity" shall mean any entity controlled by, under common control with, or controlling the Purchaser.

Notwithstanding anything to the contrary contained in this letter, the Purchaser may provide the Information and the Communications to co-investors or lenders acceptable to us, provided that prior to such disclosure such third party has executed a letter with Consultant similar to this letter. In no event will any co-investor or lender be permitted access to the Information or the Communications for use, whether on its own behalf or as an agent, in connection with any borrowing, securities, or instrument other than equity or bank or institutional indebtedness provided by such third party at closing to fund the Proposed Transaction. The Purchaser acknowledges and agrees that it and such third party shall be solely responsible for the determination of whether and what information is provided by the Purchaser to such third party and the Deloitte Entities shall have no responsibility therefor.

The Purchaser represents and warrants that any offer or sale of securities by the Purchaser to any co-investor made in connection with the Proposed Transaction does not constitute a public offering of securities, was not effected pursuant to a general solicitation or advertisement, and is not otherwise subject to registration under the Securities Act of 1933, as amended, or other state securities statutes or regulations. The Purchaser reasonably believes, based upon representations provided by any such co-investor and other information available to Client, that any such co-investor is not a natural person and is not buying securities on behalf, or for the account, of a natural person.

## RELEASE AND INDEMNIFICATION

The Purchaser (1) releases the Deloitte Entities and their personnel from all claims, liabilities, and expenses relating to the Proposed Transaction, the services provided by the Deloitte Entities in connection with the Proposed Transaction, the Services, the Information, or the Communications or any assertion of reliance in relation thereto; (2) indemnifies and holds harmless the Deloitte Entities and their personnel from all claims, liabilities, and expenses relating to the access to or use of the Information or the Communications by any person or entity authorized hereunder, including, without limitation, any

Purchaser Entity, any accounting, tax, legal, or other professional advisor, or any co-investor or lender, or any assertion of reliance in relation thereto; and (3) indemnifies and holds harmless the Deloitte Entities and their personnel from all claims, liabilities, and expenses relating to a breach or any assertion of reliance by the Purchaser or any of its personnel of any provision of this letter, including, without limitation, the restrictions on use and disclosure of the Information and the Communications.

In circumstances where all or any portion of the provisions of this section of this letter are unavailable, the aggregate liability of the Deloitte Entities for any claims, liabilities, or expenses relating to the Proposed Transaction, the services provided by the Deloitte Entities in connection with the Proposed Transaction, the Services, the Information, the Communications, or the access to or use of the Information or the Communications by the Purchaser or any other person or entity authorized hereunder shall not exceed an amount that is proportional to the relative fault that the conduct of the Deloitte Entities bears to all other conduct giving rise to such claims, liabilities, or expenses; provided, however, that in no event shall the Deloitte Entities' aggregate liability therefor exceed the fees paid to Consultant by Client under the Engagement Letter with respect to the Proposed Transaction, and in no event shall the Deloitte Entities or their personnel be liable for consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense.

## OTHER

The agreements and undertakings of the Purchaser contained in this letter, such as those pertaining to restrictions on the use and disclosure of the Information and the Communications, release from liability, and indemnification, will survive delivery of the Information and the Communications to the Purchaser and consummation of the Proposed Transaction.

For purposes of this letter, the "Deloitte Entities" shall mean Consultant and its subsidiaries; to the extent that, as a subcontractor, they provide or provided any of the Services, the member firms of Deloitte Touche Tohmatsu Limited and the affiliates of Consultant and such member firms; and in all cases any successor or permitted assignee; provided, however, that for purposes of the last three Acknowledgments and Agreements set forth above, the "Deloitte Entities" shall mean Consultant, the member firms of Deloitte Touche Tohmatsu Limited, and the affiliates of Consultant and such member firms.

If any provision of this letter is found by a court of competent jurisdiction to be unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth in this letter.

This letter and the attached Appendix constitute the entire agreement of the parties hereto with respect to its subject matter; supersede all other oral or written representations, understandings, or agreements relating to such subject matter; and may not be amended except by written agreement signed by the parties.

The Purchaser may not assign, transfer, or delegate any of its rights or obligations hereunder (including, without limitation, interests or claims relating to this letter or any of the transactions contemplated hereby) by operation of law or otherwise without the prior written consent of Consultant; provided, however, that the Purchaser may assign all of its rights and obligations hereunder to (1) an acquiror of all or substantially all of the assets of the Purchaser so long as such acquiror agrees in writing to be bound by the terms hereof as if it were the Purchaser, or (2) any successor by merger of the Purchaser so long as such successor is bound by the terms hereof by operation of law as if it were the Purchaser.

THE PARTIES HERETO IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY

LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS LETTER OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

This letter and all matters relating hereto shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof), and the state and federal courts of New York shall have exclusive jurisdiction over all matters relating to this letter.

Each of the provisions of this letter will apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise.

Please confirm your agreement with the foregoing by signing and dating a copy of this letter and returning it to us.

Very truly yours,

[*DELOITTE & TOUCHE LLP*] [*to be signed manually*]

By: Jack Koenigsknecht, Partner

Accepted and Agreed to this _____ day of _____, 201_:

[*Insert name of Purchaser*]:

By: _____

Name: _____

Title: _____

27

## APPENDIX

## LIMITATIONS ON SERVICES

(a) The nature of the Proposed Transaction necessitates prompt communication to Client of our findings that result from performing the Services as those Services are performed. Therefore, it is not possible for all of our communications to be in the form of written reports. Accordingly, any information, documents, or other communications provided by the Deloitte Entities, whether in writing or otherwise, including, without limitation, any reports (including, without limitation, the Deloitte Entities' final written report, if any, on the Services) or memoranda that the Deloitte Entities may issue, should be considered in the context of the nature of the Services that we have agreed to provide.

(b) The Deloitte Entities shall have no responsibility for obtaining any necessary authorizations or consents from Client's or the Business's advisors, including without limitation, Client's or the Business's independent accountants and other representatives, in order to permit the Deloitte Entities to perform its engagement on behalf of Client, including disclosure of confidential information of Client and the Business to the Deloitte Entities or the Purchaser in connection with the Proposed Transaction.

(c) The Services may include advice and recommendations, but the Deloitte Entities shall have no responsibility regarding any decisions in connection with the implementation of such advice and recommendations. Furthermore, Client shall be solely responsible for, among other things: (i) making all management decisions and performing all management functions; (ii) designating a competent employee, preferably within senior management, to oversee the Services on behalf of Client; (iii) evaluating on behalf of Client the adequacy and results of the Services; (iv) accepting responsibility for results of the Services; and (v) any forward-looking information (including any models, projections, forecasts, budgets, synergies, feasibility analyses, assumptions, estimates, methodologies, or bases for support). In connection with the Services, the Deloitte Entities shall be entitled to rely on all decisions and approvals of Client.

(d) The Services are limited in nature and do not comprehend all matters relating to the Business that might be pertinent or necessary to the evaluation of the Proposed Transaction. Accordingly, the Services should not be taken to supplant other inquiries and procedures that an investor or any third party should undertake. The Deloitte Entities have no responsibility for the sufficiency of the Services and make no representation as to the sufficiency of the Services for any purpose. In addition, the Deloitte Entities have no responsibility for performing any services or procedures beyond those agreed to by Client and Consultant or for updating the Services performed, the Information, or the Communications.

(e) Neither the Deloitte Entities, nor the Information, nor the Communications will express an opinion or any other form of assurance with respect to any matters as a result of the performance of the Services, including, without limitation, concerning (i) the financial statements of any entity or any financial or other information, or operating or internal controls of any entity, taken as a whole, for any date or period; (ii) the merits of any transaction, including, without limitation, the consideration to be paid; (iii) the future operations of any entity; (iv) the fairness of the contemplated terms of any transaction; or (v) any forward-looking information (including, but not limited to, any models, projections, forecasts, budgets, synergies, feasibility analyses, assumptions, estimates, methodologies, or bases for support) or the feasibility or achievability of such forward-looking information.

(f)   In the performance of the Services, the Deloitte Entities will not perform any evaluation of internal controls and procedures for financial reporting upon which Client's or the Business's management can base its assertions in connection with the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") or related rules or regulations. The Deloitte Entities will make no representations or warranties and will provide no assurances that any entity's disclosure controls and procedures are compliant with the certification requirements of, or any entity's internal controls and procedures for financial reporting are effective as required by, Sarbanes-Oxley or any other standards, rules, or regulations, including, without limitation, Sections 302 and 404 of Sarbanes-Oxley.

(g)   The Business's financial statements, footnotes, and accounting policies and procedures, including, without limitation, the application of generally accepted accounting principles (GAAP) to record the effects of the Proposed Transaction, are the responsibility of management of the Business. Accordingly, any comments made by the Deloitte Entities relating to the accounting or tax treatment of selected balances or transactions or the application of GAAP or the technical merits of the tax positions and planning strategies related to the Acquisition as a whole are intended to serve only as general guidance to assist Client to better understand certain accounting or tax matters related to the Business and the potential effects of the Proposed Transaction. Such comments are necessarily based on the Deloitte Entities' preliminary understanding of the pertinent facts and circumstances and on current authoritative literature, and are therefore subject to change. Such comments do not constitute the rendering of a tax opinion or a report on the application of accounting principles in accordance with standards or rules established by the AICPA, the PCAOB, or other regulatory body.

(h)   The performance of the Services does not constitute (i) a recommendation (implied or otherwise) regarding any transaction, including, without limitation, the acquisition, disposition, or financing of any business, assets, liabilities, or securities; (ii) a market or financial feasibility study; (iii) a fairness or solvency opinion; or (iv) an examination or compilation of, or the performance of agreed upon procedures with respect to, prospective financial information in accordance with standards or rules established by the AICPA, the PCAOB, or other regulatory body. The Services, the Information, and the Communications are not intended to be, and shall not be construed to be, "investment advice" within the meaning of the Investment Advisers Act of 1940. It is understood that the Deloitte Entities will not provide, nor will the Deloitte Entities be responsible for providing, legal advice. In addition, any forward-looking information is the responsibility of applicable management. In this regard, applicable management is responsible for representations about its plans and expectations and for disclosure of significant information that might affect the ultimate realization of its forward-looking information, and the Deloitte Entities have no responsibility therefor. There will usually be differences between forward-looking information and actual results because events and circumstances frequently do not occur as expected, and those differences may be material.

(i)   The performance of the Services is heavily dependent upon the Deloitte Entities being provided not only timely access to accurate and complete versions of materials and information requested by the Deloitte Entities, but also upon the Deloitte Entities being provided with all relevant materials and information, complete and accurate answers to questions, and timely decisions and approvals of Client in connection with the Services. The Deloitte Entities have no responsibility for the accuracy or completeness of the information provided by, or on behalf of, Client, the Business, or any other person or entity.

**Appendix F**

**MANAGEMENT REPRESENTATION LETTER**

[Client's letterhead]

[Date]

Deloitte & Touche LLP
M&A Transaction Services
111 S. Wacker Drive
Chicago, IL 60606-4301

Dear Jack Koenigsknecht, Partner:

We are providing this letter in connection with Deloitte & Touche LLP's engagement to perform certain due diligence services in connection with Sears Holdings Corporation's evaluation of a proposed disposition of [*insert business unit name*] (the "Business"), pursuant to the engagement letter dated [date]. We refer to your written due diligence communication on the Business, which you provided to us on [*insert date*] (the "Memorandum").

We have read the Memorandum and the information contained therein, and understand that we are responsible for such information. We further understand that Deloitte & Touche LLP has not verified the accuracy of the information we have provided. To the best of our knowledge and belief, we represent that: (i) all of the facts as stated in the Memorandum are accurate in all material respects; (ii) any observations attributable to us in the Memorandum are fair and reasonable; (iii) we have made available to you all significant information relevant to the Memorandum; and (iv) no material matters that that are relevant to our proposed disposition of the business have been excluded from the Memorandum.

The above representations are made on the basis of inquiries of management and staff and, where appropriate, review of the materials provided to you, sufficient to satisfy ourselves that we can properly make each of the above representations to you.

[*Individual name*], authorised by and on behalf of Sears Holdings Corporation

_____

(Name and title of member of management)

30

**<u>Exhibit 11</u>**

**SAM Engagement Letter**

# Deloitte.

**Deloitte & Touche LLP**

225 W Santa Clara St
San Jose, CA 95113
USA

Tel:  408 704-4000
www.deloitte.com

September 7, 2017

Mr. Joseph F. Jordan
Vice President, Controller
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, IL 60179

Dear Mr. Jordan,

This Engagement Letter is to confirm the engagement of Deloitte Advisory[1] ("**Advisor**" or "**D&T**" or "**we**" or "**our**") to provide Sears Holdings Corporation (the "**Company**" or "**Client**" or "**Sears**" or "**you**") with the Software Asset Management services described herein (the "**Services**").

The term of this Engagement Letter shall commence on the date of execution of this Engagement Letter.

In the event that the Services require to be extended to incorporate additional work, these will be included under separate change orders.

## SCOPE, APPROACH, AND RESPONSIBILITIES

The nature of the Services. Advisor is to advise management on their use of the following software vendors / products (the "Software Vendors") effective licensing positions for these vendors:

- Microsoft
- HP
- Oracle
- Veritas
- Symantec
- VMWare
- Attachmate / Micro Focus
- IBM

Advisor will perform the following software license analysis services for each Software Vendor:

- Conduct license entitlement and software deployment analysis of vendor software
- Identify potential compliance gaps or unused software
- Provide advice and recommendations for management consideration on potential cost effective methods to close compliance gaps and optimize license costs with current footprint.
- Provide recommendations for tools and processes for management's consideration to utilize to conduct self-audits

---

[1] As used in this engagement letter, "Deloitte Advisory" means Deloitte & Touche LLP

Responsibilities for this engagement include:

- The parties agree that the scope of the analysis will include workstation/laptop/server/mainframe environments
- The Company will provide access to software, server and database administrators to provide information about the environment and support the Services as needed
- The Company's server administrators are available to provide technical information on IT environments as needed. (This may or may not involve the running of scripts).
- Completion of Questionnaires and data requests provided to the Company to enable our architectural understanding and returned to Advisor in a timely manner as agreed to by the parties
- All proof of license and maintenance entitlement documentation will be made available by Company at the commencement of the engagement
- Company technical resources will be provided throughout the course of this engagement
- The Services will be performed by Advisor in accordance with the Statement on Standards for Consulting Services issued by the American Institute of Certified Public Accountants (AICPA)

We will not provide any legal advice regarding our Services nor will we provide any assurance regarding the outcome of any future audit or regulatory examination or other regulatory action; the responsibility for all legal issues with respect to these matters, such as reviewing all deliverables and work product for any legal implications to the Company, will be the Company's.

## DELIVERABLES

The following Deliverables (as such is defined in Exhibit A) will be produced by Advisor and delivered to Company during the course of this engagement for Sears' review and consideration, for each Software Vendor:

- A Software Vendor Effective License Position for management's review, including:

  - An analysis of software vendor product use and product licensing

  - Observations and recommendations for management's consideration for software vendor licensing optimization and suggestions to address any potential license overuse (if applicable), inclusive of changes to current infrastructure

  - Advice and recommendations for management's consideration on future use of software products

- Effective License Position "ELP" tables for management's review and consideration, including detailed product tables (with licenses listed by product deployment) used to create a Software Asset Management Effective License Position.

## ENGAGEMENT STAFFING

Advisor has structured the following engagement team for the performance of the Services:

- Kevin Fried, Principal, Deloitte & Touche LLP, will participate as Engagement Leader, maintaining overall responsibility for the engagement on behalf of Advisor.

- Eric Lape, Senior Manager, Deloitte & Touche LLP, will coordinate daily management of this engagement.

2

Additional support will also be provided by other locally staffed professionals who will be identified during the course of this engagement.

## FEES, TIMING, AND OTHER SERVICES

Based on the scope of Services and activities described above, we estimate that our fees for the analysis of each license from each Software Vendor will be:

| Software Vendor | Estimated Total Fees |
|---|---|
| Microsoft | $200,000 |
| Oracle | $150,000 |
| HP | $150,000 |
| Veritas | $125,000 |
| Symantec | $125,000 |
| VMWare | $125,000 |
| Attachmate / Micro Focus | $125,000 |
| IBM Re-assessment | $100,000 |

Our hourly rate table for the Services is as follows:

| Level | Hourly Rate |
|---|---|
| Partner/Principal | $450.00 |
| Senior Manager | $375.00 |
| Manager | $325.00 |
| Senior Consultant | $275.00 |
| Consultant | $225.00 |
| Offshore Consultant | $92.00 |

Our fees will be billed on a time and material basis. The estimates are based upon understanding of the engagement requirements, proposed scope, proposed approach, estimate of the level of the effort required, active participation of Company management and personnel and responsibilities.

We will invoice actual time and expenses incurred on a monthly basis, broken down, by Software Vendor. Payments will be paid in accordance with Section 2 (Payment of Invoices) of Exhibit A. Engagement-related expenses will be billed in addition to the fees and will be stated separately on the invoices.

We will leverage local resources to the extent possible, however please note that the fees noted above are exclusive of travel costs. In addition to our professional fees, we understand you will reimburse us for travel expenses, which will be shown separately on our invoice. Travel expenses are typically 10-15% of our professional fees and will be in accordance with Sears' Third-Party Service Provider Travel Requirements & Expense Reporting Policy at Exhibit B.

 In addition, we will be compensated for any time and expenses (including, without limitation, reasonable legal fees and expenses) that we may incur in responding to discovery requests or other requests for documents or information, or in participating as a fact witness or otherwise in any legal, regulatory, or other proceedings; provided, however, that Advisor will, to the extent permitted by applicable law or regulation, promptly provide the Client notice in writing of any such requests for documents, information, or participation and will cooperate with the Client in responding to such requests. In the event the Client

requests and Advisor agrees to assist the Client in resolving questions related to its Deliverables or Services that were not contemplated at the time of the execution of this Engagement Letter, including those questions that may relate to third parties, Advisor will provide these Services and be compensated for any time and expense that it may incur while responding to requests for information, clarifications, additional procedures, documents, or other tasks or activities.

Any such additional tasks or activities described in the two immediately preceding paragraphs will be performed at the rate per the hourly rate table and will be performed subject to the terms of this Engagement Letter unless a new engagement letter is entered into by the parties for such tasks or activities.

Our fees are based upon Advisor's current understanding of the engagement requirements, the proposed approach, the estimate of the level of effort required, Advisor and Company's roles and responsibilities set forth herein, and active participation of the Company's management and other personnel, as described in this Engagement Letter. Based on the complexity and duration of this engagement and in Advisor's experience, issues sometimes arise that require procedures beyond what was initially anticipated. If this should occur, we will discuss the level of additional effort and obtain all required approvals to proceed beyond the estimated efforts.

## ACKNOWLEDGMENTS AND AGREEMENTS

The Company specifically acknowledges and agrees to the following:

- Substantial and meaningful involvement of Company subject matter experts of the environment being reviewed including expertise in its software vendor product portfolio is critical to the success of this engagement. The Company shall be responsible for ensuring that the identified Company personnel actively participate in both the planning and execution of this engagement.

- Advisor will not make any management decisions, perform any management functions, or assume any management responsibilities.

- The Services will not constitute an engagement to provide audit, compilation, review, or attestation services as described in the pronouncements on professional standards issued by the AICPA, the Public Company Accounting Oversight Board, or other regulatory body and, therefore, we will not express an opinion or any other form of assurance as a result of performing the Services.

- Our Services will not include any negotiations/negotiations assistance with respect to the Software Vendors. Our Services will not include any evaluation of Software Vendors contractual performance.

- The Client is, and will continue to be, solely responsible for establishing and maintaining an effective internal control system, including, without limitation, systems designed to assure compliance with policies, procedures, and applicable laws and regulations. Management is responsible for communicating in a timely manner to the Client's auditors and the audit committee of the Company's Board of Directors all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the Client's ability to record, process, summarize, or report financial information, and any fraud, whether or not material, that involves management or other employees who have a significant role in the Client's internal control over financial reporting. It is also understood and agreed that D&T personnel performing services hereunder may be

4

required by professional standards to communicate any findings and information with personnel of D&T or its affiliates performing services as the independent accountants for Client.

- D&T is not being engaged to provide, and D&T shall have no responsibility for providing, legal or financial accounting advice. The Client agrees that the responsibility for the preparation, negotiation, review, and execution of all documentation with respect to any matter shall be solely that of the Client in consultation with its legal counsel.

- In connection with Services related to this Engagement Letter, if it is reasonably believed by either D&T or the Client that litigation may occur regarding the subject matter of this engagement, the parties agree that D&T or the Client may terminate such Services.

- The performance of the Services hereunder by D&T is contingent upon the preapproval of this Engagement Letter by the audit committee of the Client in accordance with its preapproval requirements. Management is responsible for the coordination of obtaining the preapproval of the Audit Committee, in accordance with the Audit Committee's preapproval process, for any Services to be provided by D&T to the Client.

## CONFLICTS AND OTHER

Prior to beginning work on a specific Service, the Client agrees to provide Advisor with the opportunity to accept or decline any request by the Client to conduct the specific Service for any reason based upon Advisor's business practices, professional standards, or otherwise. The Client acknowledges that in order to determine whether to accept or decline any such request, Advisor may, among other things, (1) conduct an internal search for potential conflicts or independence-impairing situations with respect to any of the parties involved, and (2) engage in internal discussions or discussions with Advisor's affiliates or related entities regarding the requested work and any other matters deemed appropriate by us under the circumstances. Such discussions may include sensitive or confidential information related to the specific Service, and the Client hereby consents to us having such discussions.

The Client acknowledges that given the size and number of the affiliated and related entities that Advisor has, Advisor may not identify all potential conflicts. However, should a potential conflict or independence-impairing situation come to the attention of Advisor's personnel responsible for any services after beginning work on the specific Service, Advisor will so advise the Client promptly. In the event of a potential conflict, the Client will, at its option, promptly request, in writing, (1) Advisor not to proceed with the services hereunder in connection with such conflict or (2) Advisor to proceed with such services, provided that Advisor also agrees to proceed. In the event of a potential independence-impairing situation, Advisor reserves the right to suspend work until such issue is remedied or cured.

Client acknowledges that (i) D&T and its affiliated and related entities may have relationships with the Software Vendors, and (ii) D&T is prohibited from, and is not expected to, disclose any Software Vendor confidential information to Client.

* * * * * *

During the term of this engagement, the Company may request that Advisor perform additional services that are not encompassed by this Engagement Letter. Advisor may perform such additional services upon receipt of a separate signed engagement letter with terms and conditions that are mutually acceptable to Advisor and the Company and approved by the Audit Committee.

This Engagement Letter, together with the General Business Terms attached hereto as Exhibit A and made a part hereof, constitute the entire agreement between the Company and Advisor with respect to this engagement; supersede all other oral and written representations, understandings, or agreements relating to this engagement; and may not be amended except by the mutual written agreement of the Company and Advisor.

Please indicate your acceptance of this agreement by signing in the space provided below and returning this Engagement Letter to us. A duplicate of this Engagement Letter is provided for your records.

Very truly yours,

Deloitte & Touche LLP

By: *Kevin Fried*

Kevin Fried, Principal

Accepted and agreed to by Sears Holdings Corporation:

By:        Mr. Joseph F. Jordan
Title:     Vice President, Controller

Date: 9/8/2017

**EXHIBIT A — GENERAL BUSINESS TERMS**

**1.    Services.**  The services provided by Deloitte Advisory (the "Services") under the engagement letter to which these terms are attached (the "Engagement Letter") may include advice and recommendations, but Deloitte Advisory will not make any decisions on behalf of Client in connection with the implementation of such advice and recommendations.  For purposes of these terms and the Engagement Letter, "Client" shall mean the entity as defined in the Engagement Letter.

**2.    Payment of Invoices.**  Client will compensate Deloitte Advisory under the terms of the Engagement Letter for the Services performed and expenses incurred, through the term or effective date of termination of this engagement.  Deloitte Advisory's invoices are due upon receipt.  If payment is not received within sixty (60) days of receipt of a correct invoice, Deloitte Advisory may suspend or terminate the Services.  Client shall be responsible for any taxes imposed on the Services or on this engagement, other than taxes imposed by employment withholding for Deloitte Advisory personnel or on Deloitte Advisory's income or property.

**3.    Term.**  Unless terminated sooner as set forth below, this engagement shall terminate upon the completion of the Services.  Either party may terminate this engagement, with or without cause or penalty, by giving thirty (30) days' prior written notice to the other party.  In the event of any termination, Company shall be liable to D&T for fees and expenses incurred through the date of termination. In the event of a termination for cause, the breaching party shall have the right to cure the breach within the notice period.  Deloitte Advisory may terminate this engagement upon written notice to Client if Deloitte Advisory determines that the performance of any part of the Services would be in conflict with law, or independence or professional rules.

**4.    Deliverables.**

a)    Deloitte Advisory has rights in, and may, in connection with the performance of the Services, use, create, modify, or acquire rights in, works of authorship, materials, information, and other intellectual property (collectively, the "Deloitte Advisory Technology").

b)    Upon full payment to Deloitte Advisory hereunder, and subject to the terms and conditions contained herein, (i) the tangible items specified as deliverables or work product in the Engagement Letter (the "Deliverables") shall become the property of Client, and (ii) Deloitte Advisory hereby grants Client a royalty-free, fully paid-up, worldwide, nonexclusive license to use the Deloitte Advisory Technology contained in the Deliverables in connection with the use of such Deliverables.  Except for the foregoing license grant, Deloitte Advisory or its licensors retain all rights in and to all Deloitte Advisory Technology.

c)    To the extent any Deloitte Advisory Technology provided to Client hereunder constitutes inventory within the meaning of section 471 of the Internal Revenue Code, such Deloitte Advisory Technology is licensed to Client by Deloitte Advisory as agent for Deloitte & Touche Products Company LLC on the terms and conditions contained herein.  The rights granted in this Section 4 do not apply to any Deloitte Advisory Technology that is subject to a separate license agreement between Client and any third party (including Deloitte Advisory's affiliates).

**5.    Limitation on Warranties.**  This is a services engagement.  Deloitte Advisory warrants that it shall perform the Services in good faith and with due professional care.  **DELOITTE ADVISORY DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

**6.    Limitation on Damages and Indemnification.**

a)    Each party, its subsidiaries and subcontractors, and their respective personnel shall not be liable to the other party for any claims, liabilities, or expenses relating to this engagement ("Claims") for an aggregate amount in excess of (i) in the case of Deloitte Advisory, 12 months of fees paid by Client to Deloitte Advisory pursuant to this engagement or (ii) in the case of Client, the fees paid and payable by Client to Deloitte Advisory hereunder, except to the extent resulting from their bad faith, or intentional misconduct.  In no event shall either party, its subsidiaries or subcontractors, or their respective personnel be liable to the other party for any loss of use, data, goodwill, revenues, or profits (whether or not deemed to constitute a direct Claim), or any consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense relating to this engagement. The provisions of this Section 6(a) shall not apply to any Claim for which one party has an express obligation to indemnify the other hereunder.

b)    (i) Client shall indemnify and hold harmless Deloitte Advisory, its subsidiaries and subcontractors, and their respective personnel from all Claims arising from Client's disclosure of the Services or Deliverables to any third party, including the software vendors, except to the extent Deloitte Advisory is obligated to indemnify Client under Section 6(b)(ii) for such Claims.

    (ii) D&T shall indemnify, defend, and hold harmless Company, its affiliates and its  personnel from all Claims attributable to third party claims for infringement by a Deliverable of any U.S. patent existing at the time of delivery and known to D&T or copyright or any unauthorized use of any trade secret, except to the extent that such infringement or unauthorized use arises from, or could have been avoided except for (i) modification of such Deliverable other than by D&T or its subcontractors or use thereof in a manner not contemplated hereunder, (ii) the failure of the indemnified party to use any corrections or modifications made available by D&T, (iii) information, materials, instructions, specifications, requirements or designs provided by or on behalf of the indemnified party, or (iv) the use of such Deliverable in combination with any platform, product, network or data not provided or approved in writing by D&T.  If Client's use of any such Deliverable, or any portion thereof, is or is likely to be enjoined by order of a court of competent jurisdiction as such an infringement or unauthorized use, D&T, at its option and expense, shall have the right to (x) procure for Client the continued use of such Deliverable, (y) replace such Deliverable with a non-infringing Deliverable, or (z) modify such Deliverable so it becomes non-infringing; provided that, if (y) or (z) is the option chosen by D&T, the replacement or modified Deliverable is capable of performing substantially the same function.  In the event D&T cannot reasonably procure, replace or modify such Deliverable in accordance with the immediately preceding sentence, D&T may require Client to cease use of such Deliverable and refund the professional fees paid to D&T with respect to the Services giving rise to such Deliverable. The foregoing provisions of this Section constitute the sole and exclusive remedy of the indemnified parties, and the sole and exclusive obligation of D&T, relating to a claim that any of D&T's Deliverables infringes any patent, copyright or other intellectual property rights of third parties.

c)    In circumstances where any limitation on damages or indemnification provision hereunder is unavailable, the aggregate liability of each party, its subsidiaries and subcontractors, and their respective personnel for any Claim shall not exceed an amount that is proportional to the relative fault that their conduct bears to all other conduct giving rise to such Claim.

**7.    Client Responsibilities.**  Client shall cooperate with Deloitte Advisory in the performance of the Services, including providing Deloitte Advisory with reasonable facilities and timely access to data, information, and personnel of Client.  With respect to the data and information provided by Client to Deloitte Advisory or its subcontractors for the performance of the Services, Client shall have all rights required to provide such data and information, and shall do so only in accordance with applicable law and with any procedures agreed upon in writing.  Client shall be solely responsible for, among other things (a) the performance of its personnel and agents; (b) the accuracy and completeness of all data and

information provided to Deloitte Advisory for purposes of the performance of the Services; (c) making all management decisions, performing all management functions, and assuming all management responsibilities; (d) designating a competent management member to oversee the Services; (e) evaluating the adequacy and results of the Services; (f) accepting responsibility for the results of the Services; and (g) establishing and maintaining internal controls, including monitoring ongoing activities. Deloitte Advisory's performance is dependent upon the timely and effective satisfaction of Client's responsibilities hereunder and timely decisions and approvals of Client in connection with the Services. Deloitte Advisory shall be entitled to rely on all decisions and approvals of Client.

**8.    Force Majeure.**  Neither party shall be liable for any delays or nonperformance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order, or requirement of any governmental agency or authority.

**9.    Limitation on Actions.**  No action, regardless of form, relating to this engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for nonpayment may be brought by a party not later than one year following the due date of the last payment owing to the party bringing such action.

**10.    Independent Contractor.**  Each party hereto is an independent contractor and neither party is, nor shall be considered to be, nor shall purport to act as, the other's agent, partner, fiduciary, joint venturer, or representative.

**11.    Confidentiality and Internal Use.**

a)    All Services and Deliverables shall be solely for Client's benefit, and are not intended to be relied upon by any person or entity other than Client.  Client shall not disclose the Services or Deliverables, or refer to the Services or Deliverables in any communication, to any person or entity except (i) as specifically set forth in the Engagement Letter, or (ii) to Client's contractors solely for the purpose of their providing services to Client relating to the subject matter of this engagement, provided that such contractors comply with the restrictions on disclosure set forth in this sentence.  Client, however, may create its own materials based on the content of such Services and Deliverables and use and disclose such Client-created materials for external purposes, provided that, Client does not in any way, expressly or by implication, attribute such materials to Deloitte Advisory or its subcontractors.

b)    To the extent that, in connection with this engagement, either party (each, the "receiving party") comes into possession of any confidential information of the other (the "disclosing party"), it will not disclose such information to any third party without the disclosing party's consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care.  The disclosing party hereby consents to the receiving party disclosing such information: (i) as expressly permitted in the Engagement Letter; (ii) to contractors providing administrative, infrastructure, and other support services to the receiving party and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this Section 11(b); (iii) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; or (iv) to the extent such information (a) is or becomes publicly available other than as the result of a disclosure in breach hereof, (b) becomes available to the receiving party on a nonconfidential basis from a source that the receiving party believes is not prohibited from disclosing such information to the receiving party, (c) is already known by the receiving party without any obligation of confidentiality with respect thereto, or (d)

is developed by the receiving party independently of any disclosures made to the receiving party hereunder.  In addition, any such information may be used by Deloitte & Touche LLP or any related entity of Deloitte Advisory in the context of responding to its professional obligations as the independent accountants for Client.  Nothing in this Section 11(b) shall alter Client's obligations under Section 11(a).  Deloitte Advisory, however, may use and disclose any knowledge and ideas acquired in connection with the Services to the extent they are retained in the unaided memory of its personnel.

**12.    Survival and Interpretation.**  All provisions that are intended by their nature to survive performance of the Services shall survive such performance, or the expiration or termination of this engagement. For purposes of these terms and the Engagement Letter, "Deloitte Advisory" or "Advisor" shall mean Deloitte & Touche LLP. No affiliated or related entity of Deloitte Advisory, or such entity's personnel, shall have any liability hereunder to Client and Client will not bring any action against any such affiliated or related entity or such entity's personnel in connection with this engagement.  Without limiting the foregoing, such affiliated and related entities are intended third-party beneficiaries of these terms, and may in their own right enforce such terms. **Each of the provisions of these terms shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise, notwithstanding the failure of the essential purpose of any remedy.**  Any references herein to the term "including" shall be deemed to be followed by "without limitation."

**13.    Assignment and Subcontracting.**  Except as provided below, neither party may assign any of its rights or obligations (including interests or Claims) relating to this engagement or the Services, without the prior written consent of the other party.  Client hereby consents to Deloitte Advisory subcontracting or assigning any portion of the Services to any affiliate or related entity, whether located within or outside of the United States.   Services performed hereunder by Deloitte Advisory's subcontractors shall be invoiced as professional fees on the same basis as Services performed by Deloitte Advisory's personnel unless otherwise agreed.

**14.    Waiver of Jury Trial.  THE PARTIES HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY LAW, ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM RELATING TO THIS ENGAGEMENT.**

**15.    Non-exclusivity.**  Deloitte Advisory may (a) provide any services to any person or entity, and (b) develop for itself, or for others, any materials or processes, including those that may be similar to those produced as a result of the Services, provided that Deloitte Advisory complies with its obligations of confidentiality set forth hereunder.

**16.    Non-solicitation.**  During the term of this engagement and for a period of one (1) year thereafter, each party agrees that its personnel (in their capacity as such) who had substantive contact with personnel of the other party in the course of this engagement shall not, without the other party's consent, directly or indirectly employ, solicit, engage, or retain the services of such personnel of the other party.  This provision shall not restrict the right of either party to solicit or recruit generally in the media.

**17.    Entire Agreement, Amendment, and Notices.**  These terms, and the Engagement Letter, including attachments, constitute the entire agreement between the parties with respect to this engagement; supersede all other oral and written representations, understandings, or agreements relating to this engagement; and may not be amended except by a written agreement signed by the parties.  In the event of any conflict or ambiguity between these terms and the Engagement Letter, these terms shall control.  All notices hereunder shall be (a) in writing; (b) delivered to the representatives of the parties at the addresses set forth in the Engagement Letter, unless changed by either party by notice to the other party; and (c) effective upon receipt.

**18.    Governing Law, Jurisdiction and Venue, and Severability.**  These terms, the Engagement Letter, including attachments, and all matters relating to this engagement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof).  Any action based on or arising out of this engagement or the Services shall be brought and maintained exclusively in any state or federal court, in each case located in New York County, the State of New York.  Each of the parties hereby expressly and irrevocably submits to the jurisdiction of such courts for the purposes of any such action and expressly and irrevocably waives, to the fullest extent permitted by law, any objection that it may have or hereafter may have to the laying of venue of any such action brought in any such court and any claim that any such action has been brought in an inconvenient forum.  If any provision of these terms or the Engagement Letter is unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

**EXHIBIT B — THIRD-PARTY SERVICE PROVIDER TRAVEL REQUIREMENTS & EXPENSE REPORTING POLICY**

This establishes Sears Holdings minimum requirements for reimbursement of third party out-of-pocket travel expenses, where required by contractual agreement.  This applies to consultants, contractors and other service providers who submit authorized, reimbursable travel expenses to Sears Holdings.  Future reference to these individuals is made collectively as "service providers".

All service providers subject to reimbursement of third-party out-of-pocket travel expenses have the responsibility to ensure that their expenses are appropriate, reasonable, and documented.  All expenses are subject to Sears Holdings' approval and adherence to the following.  In the event of a conflict between the contract and these requirements, the terms of the contract shall prevail.

**A.  Invoice Processing**

Reasonable supporting documentation for such expenses shall be available for review by Sears Holding during the term of the engagement and during normal business hours at the offices of Deloitte Advisory upon at least thirty (30) days' advance written notice.

**B.  Receipt Requirements**

Copies of receipts, redacted credit card statements and/or other supporting documentation are required to be maintained by Deloitte Advisory for all transactions greater than $75 and for all airline ticket purchases/changes.  Records for expenses submitted for payment to Sears Holding must be retained by the supplier (hard copy or scanned image) for a period up to three years following the date of the expense and will be provided to Sears Holding during the term of the engagement promptly upon written request.

| C. | Reimbursable | Not Reimbursable |
|---|---|---|
| **Air Travel** | | |
| | o  Economy Class Travel<br>o  Reasonable baggage fees | o  First Class Travel<br>o  Airline Upgrade Charges<br>o  Early Boarding<br>o  Airport Club Lounges<br>o  Stand-by or Same-day Change fees (refer to section D)<br>o  Any other airline offerings, i.e. purchase miles, seats, etc. |
| **Lodging** | | |
| | o  Room & tax at moderately-priced hotels, such as Hampton Inn, Holiday Inn Express or the like<br>o  Health Club/Fitness Center fees not to exceed $10 per day | o  Luxury/premium hotel expenses<br>o  Personal incidentals i.e. in-room movies, etc.,<br>o  No show charges |
| **Ground Transportation** | | |
| | o  Taxi, Uber, Lyft or shared limousine to/from the airport<br>o  Compact rental car is required unless the size of group requires a larger vehicle | o  Private car limousine or limousine service rented on an hourly or hourly-plus basis<br>o  Luxury/Premium rental cars<br>o  Rental car insurance on domestic rentals |

| | |
|---|---|
| o  Vehicle damage insurance and liability insurance on **international** rentals only<br>o  Rental car refueling prior to returning the vehicle<br>o  Personal Car Mileage consistent with SHC reimbursement rates, as updated from time to time (available through your SHC business contact at http://operations.searshc.com/procurement/Sourcing/Travel/tabid/3263/Default.aspx | o  GPS rental<br>o  Convenience refueling when returning rental car<br>o  Mileage for normal daily commute |

**Meals**

| | |
|---|---|
| o  Meals while on overnight travel status<br>  o  Actuals up to $50 (inclusive of tax & gratuity) per day<br>  o  Up to $60 (inclusive of tax & gratuity) per day in Boston, Chicago (downtown only), Honolulu, Los Angeles, NY, San Diego, San Francisco, Seattle, Washington, D.C., all international destinations | o  Meals for day trips<br>o  Meals in excess of daily limits<br>o  Meals for local staff or SHC associates |

**Miscellaneous**

| | |
|---|---|
| o  Airport parking – SHC negotiated off-site or Long term<br>o  SHC business related telephone expenses<br>o  Internet service fees (e.g., hotel, airport wireless, in-flight, Hot Spot) required for SHC business – up to $13 per day | o  Personal travel insurance<br>o  Personal entertainment, i.e. movies<br>o  Theft or loss of personal property<br>o  Valet service, Laundry or dry cleaning<br>o  Any unreasonable, unaccounted for, or unexplained expenses |

**D. Air Transportation**

o  When possible, providers should plan business trips at least 14 days in advance to secure reduced fares.

o  Providers are strongly encouraged to accept the lowest priced flight available within a 2 hour window.  This includes alternate airports, connections, one-stop flights, etc.  If lowest fares are not utilized, reimbursement may be subject to further review, resulting in partial reimbursement.

o  When non-refundable tickets are the least expensive airfare, they must be utilized (unless such tickets would result in greater costs for ground transportation).

o  If a trip is cancelled or postponed, airline tickets must be cancelled before the time of departure to the extent possible.

o  Additional airfares, and other fees due to changes, will be reimbursed only if the change was requested by Sears Holdings, and the additional expense was approved in advance by Sears Holdings.

o  Only a reasonable number of providers will be reimbursed.  This is subject to pre-approval.

**E. Ground Transportation**

o Providers should use courtesy or other scheduled services provided by the hotel (if available) for travel between the hotel and airport.

o Economy or compact cars should be rented unless the size of the group makes them impractical. Rental cars should be shared whenever feasible.

**F. Lodging**

o Providers within reasonable travel distance from their daily workplace are expected to return to their daily workplace. Individual circumstances will determine what is reasonable but generally a trip of 100 miles or less one-way does not require an overnight stay.

o Providers must stay in a SHC Preferred Hotels for Contractors whenever possible. In the event no preferred hotel is available, reserve a room at a moderately-priced hotel.

o If a reserved room will not be used, it is the traveler's responsibility to notify the hotel directly, prior to the hotel's cancellation deadline. Failure to cancel a hotel reservation will result in a "no-show" charge that will not be reimbursed. Same applies to departure date changes not made prior to check-in which result in early check-out fees.

o Use of corporate apartments or extended stay properties is acceptable if the cost is the same or less than staying in a SHC preferred/approved hotel and approved by the Sears Holdings business contact for the project.

**G. Meals**

o Meal expense limits:
   o Actuals up to $50 (inclusive of tax & gratuity)
      ▪ Individual meal limit of $10 breakfast, $15 lunch and $25 dinner applies when the travel schedule includes partial travel days.
o Exceptions:
   o $60 (inclusive of tax & gratuity) in Boston, Chicago (Downtown only), Honolulu, Los Angeles, New York, San Diego, San Francisco, Seattle, Washington,  D. C., and International destinations including Puerto Rico and Canada
      ▪ Individual meal limit of $7 breakfast, $13 lunch and $30 dinner applies when the travel schedule includes partial travel days.

| Meal Reimbursement Times | | | |
|---|---|---|---|
| **Trip** | **Breakfast** | **Lunch** | **Dinner** |
| Overnight | Depart home/workplace prior to 6:30 am | Depart home/workplace before 11:00am or return home/workplace after 1:00pm | Return home/workplace after 7:00pm or depart from home/workplace before 5:00pm |

For questions contact:  Sears Holdings Corporation at (847) 286-2500, and request the Travel Department

## <u>Exhibit 12</u>

**Restructuring Accounting Advisory Engagement Letter**

# Deloitte.

**Deloitte & Touche LLP**
111 South Wacker Drive
Chicago, IL 60606-4301
USA

Tel: +1 312 486 1000
Fax: +1 312 486 1486
www.deloitte.com

October 29, 2018

Mr. Robert Riecker
Chief Financial Officer
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, Illinois 60179

Dear Mr. Riecker:

This engagement letter is to confirm the engagement of Deloitte & Touche LLP ("D&T" or "we" or "our") to provide Sears Holdings Corporation and its subsidiaries (collectively, the "Client" or "you" or "your") accounting advisory services in connection with the Client's filing for bankruptcy protection and planned reorganization, described below (the "Services").

## SCOPE OF SERVICES

The Services provided by D&T are expected to consist of, as requested by the Client and agreed to by D&T:

- Providing training to Client personnel in the accounting and financial reporting department on accounting and reporting matters including an introduction to accounting and reporting considerations related to the commencement of a chapter 11 case and reorganization thereunder.
- Reading relevant documentation (e.g., policies and procedures, existing agreements and/or contracts, transaction documentation selected by the Client) for accounting and financial reporting areas impacted by the Client's filing for bankruptcy protection and planned reorganization.
- Researching and communicating relevant accounting literature and guidance under U.S. GAAP and SEC rules and regulations related to the Client's filing for bankruptcy protection and planned reorganization.
- Providing advice and recommendations for consideration by Client's management on (i) the Client's proposed accounting treatment for planned transactions, (ii) existing accounting and reporting matters impacted by the Client's filing for bankruptcy protection and planned reorganization and (iii) the Client's draft Form 10-Q and 10-K disclosures through November 2019 by comparing to publicly available disclosure examples and related requirements.
- Provide advice and recommendations on the required financial statement disclosures in the Form 10-Qs and 10-Ks through November 2019, reliance on systems, and related relevant controls.
- Providing advice and recommendations as to how new internal controls over financial reporting related to the reorganization might be integrated into Client Management's internal control assessment process.

The Services will be performed in accordance with the *Statement on Standards for Consulting Services* issued by the American Institute of Certified Public Accountants (AICPA).

Mr. Robert Riecker
October 29, 2018
Page 2

## DELIVERABLES

The deliverables anticipated for this engagement will, if requested by the Client and agreed to by D&T, consist of:

- Generic guidance summaries and training materials for accounting and reporting matters relevant to either the commencement of the Client's bankruptcy case or planned reorganization.

The above deliverables, as well as other verbal or written comments and observations provided by D&T in connection with the Services shall merely represent the results of the engagement team's research and understanding of similar transactions in the industry and shall not represent an opinion or conclusion of D&T on any accounting position, implementation strategy, or other topic related to the Services.

Client management will be solely responsible for reviewing and making all decisions with respect to potential implementation of any advice or recommendations made by D&T in connection with the Services including in connection with any deliverables provided by D&T.

Under no circumstance shall D&T prepare original documentation (e.g., accounting policies, journal entry support, and accounting whitepapers) that becomes part of the Client's accounting records.

## ENGAGEMENT TEAM

Our engagement team will be composed of practitioners with experience in accounting for transactions under U.S. GAAP and SEC rules and regulations and has been selected to align the team's skills with the technical and practical necessities of the engagement.

The engagement team will, as they consider necessary, call on other individuals with specialized knowledge and experience to assist in the performance of the Services.

## FEES AND TIMING

The Services are expected to be performed at the Client's office in Hoffman Estates, Illinois. Our engagement is expected to start in November 2018 and will not exceed one year from the date of the letter.

Our hourly rates and professional fees reflect the complex and technical nature of the work to be performed. The professional fees for the engagement will be based on actual time incurred by each individual on the project and the respective rate for that level in the following table:

| Resource Level | Hourly Rate |
| --- | --- |
| Partner/Principal/Managing Director | $775- 925 |
| Senior Manager | $625 |
| Manager | $525 |
| Senior | $450 |
| Staff | $295 |

Mr. Robert Riecker
October 29, 2018
Page 3

Should specialists be required, such applicable rates will also be discussed and agreed upon in advance.

You will reimburse us for all reasonable expenses incurred in performing our Services on this engagement (including, but not limited to, our reasonable travel, meals, lodging, and mileage expenses as well as technology- and administrative-related charges). Engagement-related expenses will be billed in addition to the fees and will be stated separately on the invoices.

Fees for this engagement will be billed monthly as the work progresses for fees accrued and expenses incurred by us since our last invoice in performing our Services, subject to any applicable Bankruptcy Court (as defined below) orders, rules and procedures.

The Client agrees that it will promptly seek the Bankruptcy Court's approval of this engagement in its chapter 11 bankruptcy proceeding (the "Case"). The application, proposed order and other supporting documents submitted to the Bankruptcy Court (as defined below) seeking its approval of this engagement must be satisfactory to D&T in all respects.

In addition to D&T's other rights or remedies, D&T may, in its sole discretion and without any liability arising therefrom, terminate this engagement in the event that (a) a third party objects or threatens to object, or D&T believes that a third party may object, in the form of an objection or otherwise, to D&T's retention by the Client in the Case on the terms and conditions set forth in this engagement letter, (b) a final order authorizing the employment of D&T under this engagement letter is not issued by the Bankruptcy Court in the Case on or before sixty (60) days from the date hereof on the terms and conditions set forth herein or on such other terms and conditions as are satisfactory to D&T in its sole discretion, or (c) the application of the Client seeking such order is denied by the Bankruptcy Court in the Case. In any such event, the Client hereby agrees to withdraw or amend, promptly upon D&T's request, any application filed or to be filed with the Bankruptcy Court to retain D&T to provide the Services in the Case.

For purposes of this letter, "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York.

## ACKNOWLEDGMENTS AND AGREEMENTS

Client management acknowledges and agrees to the following:

- Client management is responsible for the coordination of obtaining the preapproval of the audit committee (the "Audit Committee") of Client's board of directors (the "Board of Directors"), in accordance with the Audit Committee's preapproval process, for the Services to be provided by D&T to the Client.

- We will not perform in a capacity equivalent to that of management or an employee of the Client, including assuming any financial reporting oversight role; authorizing, executing, or consummating any transactions, or otherwise exercising authority on behalf of the Client or having the authority to do so; supervising employees of the Client in the performance of their activities; reporting to the board of directors on behalf of management of the Client; or providing any legal advice with respect to, or conducting a legal review of, any documents, records, or policies of the Client; preparing source documents or originating data, in electronic or other form, evidencing the occurrence of any transactions; or recording of any amounts in books and records of the Client.

- The Client agrees that the Services may include advice and recommendations, but agrees that the Client will be solely responsible for the financial statements and all decisions regarding the accounting treatment of any item or transaction (including decisions regarding its compliance with U.S. GAAP and SEC rules and regulations. Furthermore, the Client shall be solely responsible for, among other things (1) designating a member of management with appropriate technical accounting and reporting knowledge to oversee the Services and to sustain meaningful and substantial involvement in all phases of this engagement; and (2) any forward-looking information

Mr. Robert Riecker
October 29, 2018
Page 4

- (including any models, projections, forecasts, budgets, synergies, feasibility analyses, assumptions, estimates, methodologies, or bases for support). For the avoidance of doubt, we will be responsible for the performance of the Services.

- We will not provide any assurance regarding the outcome of any future audit or regulatory examination or other regulatory action, and we will not provide any assurance regarding U.S. Securities and Exchange Commission clearance of any Securities Act of 1933 or Securities Exchange Act of 1934 filings. The responsibility for all legal issues with respect to these matters, such as reviewing all deliverables and work product for any legal implications to the Client, will be the Client's.

- The Services will not constitute an engagement to provide audit, compilation, review, or attest services as described in the pronouncements on professional standards issued by the AICPA, the U.S. Public Company Accounting Oversight Board, or other regulatory body and, therefore, we will not express an opinion or any other form of assurance as a result of performing the Services.

- The Client will not seek our opinion, and we will not provide any such opinion, on the application of accounting principles in connection with this engagement. Furthermore, Client management agrees that it will not represent to any third parties that it has obtained such opinion from us under this engagement. If such opinion is requested under the requirements of AU 625, *Reports on the Application of Accounting Principles,* any such services requested of us would be subject to (1) a determination by us as to whether such services can be rendered, (2) additional client acceptance procedures, and (3) a separate, signed engagement letter with terms and conditions that are acceptable to us and the Client. We are under no obligation to perform such an engagement, if requested.

- We will not be responsible for the accuracy or completeness of any data made available to us through any third-party tool, database, or software application. The Client further acknowledges and agrees that D&T will have no responsibility for evaluating the functionality of such third-party tool, database, or software application, nor for any results obtained by D&T through the use of such third-party tool, database, or software application.

- Because of the inherent limitations of internal control over financial reporting, including the possibility of collusion or improper management override of controls, material misstatements due to error or fraud may occur and not be detected.

- The Services provided under this engagement letter should not be used as the sole basis for management's assertion in connection with the Sarbanes-Oxley Act. D&T will make no representations or warranties nor provide any assurances that (1) the Client's disclosure controls and procedures and the internal control and procedures for financial reporting are compliant with the certification requirement and internal control reporting requirement of the Sarbanes-Oxley Act, or (2) the Client's plans are sufficient to address and correct any shortcomings that would prohibit the Client from making the required certification or from reporting under the Sarbanes-Oxley Act.

- Management is responsible for informing D&T and the Audit Committee of the Board of Directors of all deficiencies in the design or operation of internal control over financial reporting, including separately disclosing all such deficiencies that management believes to be significant deficiencies or material weaknesses in internal control over financial reporting.

- The Client agrees that any deliverables provided to the Client hereunder by D&T may be disclosed to the Board of Directors and the Audit Committee only for their informational purposes and solely in their capacity as a member of such Board or Committee.

* * * * * *

During this engagement, the Client may request that D&T perform additional services that are not encompassed by this engagement letter. D&T may perform such additional services upon receipt of a separate signed engagement letter with terms and conditions that are acceptable to D&T and the Client.

This engagement letter, incorporating by reference the attached General Business Terms in Exhibit A, constitutes the entire agreement between the Client and D&T with respect to this engagement;

Mr. Robert Riecker
October 29, 2018
Page 5

supersedes all other oral and written representations, understandings, or agreements relating to this engagement; and may not be amended except by the mutual written agreement of the Client and D&T.

Please indicate your acceptance of this agreement by signing in the space provided below and returning this engagement letter to us. A duplicate of this engagement letter is provided for your records.

Yours truly,

Deloitte & Touche LLP

Accepted and Agreed to by Sears Holdings Corporation on behalf of itself and its subsidiaries:

By: _____

Title: _CFO_____

Date: _11-8-2018_____

## EXHIBIT A —GENERAL BUSINESS TERMS

1. **Services.** The services provided by D&T (the "Services") under the engagement letter to which these terms are attached (the "Engagement Letter") may include advice and recommendations, but D&T will not make any decisions on behalf of Client in connection with the implementation of such advice and recommendations. For purposes of these terms and the Engagement Letter, "Client" shall mean the entities as defined in the Engagement Letter. Sears Holdings Corporation represents and warrants that it has the power and authority to execute this agreement on behalf of, and to bind, itself and its subsidiaries.

2. **Payment of Invoices.** Subject to any applicable Bankruptcy Court orders, rules or procedures, Client will compensate D&T under the terms of the Engagement Letter for the Services performed and expenses incurred, through the term or effective date of termination of this engagement. D&T's invoices are due upon receipt. If payment is not received within thirty (30) days of receipt of an invoice (a) such invoice shall accrue a late charge equal to the lesser of (i) 1½% per month or (ii) the highest rate allowable by law, in each case compounded monthly to the extent allowable by law, and (b) D&T may also suspend or terminate the Services. Client shall be responsible for any taxes imposed on the Services or on this engagement, other than taxes imposed by employment withholding for D&T's personnel or on D&T's income or property.

3. **Term.** Unless terminated sooner as set forth below, this engagement shall terminate upon the completion of the Services. Either party may terminate this engagement, with or without cause, by giving thirty (30) days' prior written notice to the other party. In the event of a termination for cause, the breaching party shall have the right to cure the breach within the notice period. D&T may terminate this engagement upon written notice to Client if D&T determines that the performance of any part of the Services would be in conflict with law, or independence or professional rules.

4. **Deliverables.**

    **(a)** D&T has rights in, and may, in connection with the performance of the Services, use, create, modify, or acquire rights in, works of authorship, materials, information, and other intellectual property (collectively, the "D&T Technology").

    **(b)** Upon full payment to D&T hereunder, and subject to the terms and conditions contained herein, (i) the tangible items specified as deliverables or work product in the Engagement Letter (the "Deliverables") shall become the property of Client, and (ii) D&T hereby grants Client a royalty-free, fully paid-up, worldwide, nonexclusive license to use the D&T Technology contained in the Deliverables in connection with the use of such Deliverables. Except for the foregoing license grant, D&T or its licensors retain all rights in and to all D&T Technology.

    **(c)** To the extent any D&T Technology provided to Client hereunder constitutes inventory within the meaning of section 471 of the Internal Revenue Code, such D&T Technology is licensed to Client by D&T as agent for Deloitte & Touche Products Company LLC on the terms and conditions contained herein. The rights granted in this Section 4 do not apply to any D&T Technology that is subject to a separate license agreement between Client and any third party (including D&T's affiliates).

5. **Limitation on Warranties.** This is a services engagement. D&T warrants that it shall perform the Services in good faith and with due professional care. **D&T DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

6. **Limitation on Damages and Indemnification.**

    **(a)** D&T, its subsidiaries and subcontractors, and their respective personnel shall not be liable to Client for any claims, liabilities, or expenses relating to this engagement ("Claims") for an aggregate amount in excess of the fees paid by Client to D&T pursuant to this engagement, except to the extent resulting from the recklessness, bad faith, or intentional misconduct of D&T or its subcontractors. In no event shall D&T, its subsidiaries or subcontractors, or their respective personnel be liable to Client for any loss of use, data, goodwill, revenues, or profits (whether or not deemed to constitute a direct Claim), or any consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense relating to this engagement.

    **(b)** Client shall indemnify and hold harmless D&T, its subsidiaries and subcontractors, and their respective personnel from all Claims, except to the extent resulting from the recklessness, bad faith, or intentional misconduct of D&T or its subcontractors.

    **(c)** In circumstances where any limitation on damages or indemnification provision hereunder is unavailable, the aggregate liability of D&T, its subsidiaries and subcontractors, and their respective personnel for any Claim shall not exceed an amount that is proportional to the relative fault that the conduct of D&T and its subcontractors bears to all other conduct giving rise to such Claim.

7. **Client Responsibilities.** Client shall cooperate with D&T in the performance of the Services, including providing D&T with reasonable facilities and timely access to data, information, and personnel of Client. With respect to the data and information provided by Client to D&T or its subcontractors for the performance of the Services, Client shall have all rights required to provide such data and information, and shall do so only in accordance with applicable law and with any procedures agreed upon in writing. Client shall be solely responsible for, among other things (a) the performance of its personnel, contractors and agents; (b) the accuracy and completeness of all data and information provided to D&T for purposes of the performance of the Services; (c) making all management decisions, performing all management functions, and assuming all management responsibilities; (d) designating a competent management member to oversee the Services; (e) evaluating the adequacy and results of the Services; (f) accepting responsibility for the results of the Services; and (g) establishing and maintaining internal controls, including monitoring ongoing activities. D&T's performance is dependent upon the timely and effective satisfaction of Client's responsibilities hereunder and timely decisions and approvals of Client in connection with the Services. D&T shall be entitled to rely on all decisions and approvals of Client.

8. **Force Majeure.** Neither party shall be liable for any delays or nonperformance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order, or requirement of any governmental agency or authority.

9. **Limitation on Actions.** No action, regardless of form, relating to this engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for nonpayment may be brought by a party not later than one year following the due date of the last payment owing to the party bringing such action.

10. **Independent Contractor.** Each party hereto is an independent contractor and neither party is, nor shall be considered to be, nor shall purport to act as, the other's agent, partner, fiduciary, joint venturer, or representative.

11. **Confidentiality and Internal Use.**

    **(a)** All Services and Deliverables shall be solely for Client's benefit, and are not intended to be relied upon by any person or entity other than Client. Client shall not disclose the Services or

Deliverables, or refer to the Services or Deliverables in any communication, to any person or entity except (i) as specifically set forth in the Engagement Letter, or (ii) to Client's contractors solely for the purpose of their providing services to Client relating to the subject matter of this engagement, provided that such contractors comply with the restrictions on disclosure set forth in this sentence. Client, however, may create its own materials based on the content of such Services and Deliverables and use and disclose such Client-created materials for external purposes, provided that, Client does not in any way, expressly or by implication, attribute such materials to D&T or its subcontractors.

**(b)** To the extent that, in connection with this engagement, either party (each, the "receiving party") comes into possession of any confidential information of the other (the "disclosing party"), it will not disclose such information to any third party without the disclosing party's consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care. The disclosing party hereby consents to the receiving party disclosing such information: (i) as expressly permitted in the Engagement Letter; (ii) to contractors providing administrative, infrastructure, and other support services to the receiving party and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this Section 11(b); (iii) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; or (iv) to the extent such information (a) is or becomes publicly available other than as the result of a disclosure in breach hereof, (b) becomes available to the receiving party on a nonconfidential basis from a source that the receiving party believes is not prohibited from disclosing such information to the receiving party, (c) is already known by the receiving party without any obligation of confidentiality with respect thereto, or (d) is developed by the receiving party independently of any disclosures made to the receiving party hereunder. In addition, any such information may be used by Deloitte & Touche LLP or any related entity of D&T in the context of responding to its professional obligations as the independent accountants for Client. Nothing in this Section 11(b) shall alter Client's obligations under Section 11(a). D&T, however, may use and disclose any knowledge and ideas acquired in connection with the Services to the extent they are retained in the unaided memory of its personnel.

**(c)** No provision of these terms or the Engagement Letter is or is to be construed as a condition of confidentiality within the meaning of PCAOB Release 2005-014, Internal Revenue Code Sections 6011 and 6111 or the regulations thereunder, any related Internal Revenue Service guidance, or any other similar law, with respect to any Services, Deliverables, or other materials of any kind provided hereunder relating to tax treatment or tax structure (collectively referred to as "Subject Tax Planning Advice"). Notwithstanding anything herein to the contrary, no provision of these terms or the Engagement Letter shall place any limitation on Client's disclosure of any Subject Tax Planning Advice. The Services and Deliverables shall be solely for Client's benefit, and this engagement does not create privity between D&T and any person or party other than Client ("third party"). Neither the Services nor any Deliverables are intended for the express or implied benefit of any third party. Unless otherwise agreed to in writing by D&T, no third party is entitled to rely in any manner or for any purpose on the Services or Deliverables. In the event of any unauthorized reliance on any Subject Tax Planning Advice, Client agrees to indemnify and hold harmless D&T, its subcontractors, and their respective personnel from all third-party claims, liabilities, costs, and expenses.

**12. Survival and Interpretation.** All provisions that are intended by their nature to survive performance of the Services shall survive such performance, or the expiration or termination of this engagement. For purposes of these terms and the Engagement Letter, "D&T" shall mean Deloitte & Touche LLP. No affiliated or related entity of D&T, or such entity's personnel, shall have any liability hereunder to Client and Client will not bring any action against any such affiliated or related entity or such entity's personnel in connection with this engagement. Without limiting the foregoing, such affiliated and related entities are intended third-party beneficiaries of these terms, and may in their own right enforce such terms. Each of the provisions of these terms shall apply to

8

the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise, notwithstanding the failure of the essential purpose of any remedy. Any references herein to the term "including" shall be deemed to be followed by "without limitation."

13. **Assignment and Subcontracting.** Except as provided below, neither party may assign any of its rights or obligations (including interests or Claims) relating to this engagement or the Services, without the prior written consent of the other party. Client hereby consents to D&T subcontracting or assigning any portion of the Services to any affiliate or related entity, whether located within or outside of the United States.

14. **Dispute Resolution.** Any controversy or claim between the parties arising out of or relating to these terms, the Engagement Letter, or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth below.

   **(a) Mediation.** All Disputes shall first be submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

   **(b) Arbitration Procedures.** If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Section 14 (the "Rules").

   The arbitration shall be conducted before a panel of three arbitrators. Each of Client and D&T shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the Engagement Letter (and its appendices) and to abide by the terms of this Section 14. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the governing law set forth in Section 18 in connection with the Dispute. The arbitrators shall have no power to award damages inconsistent with these terms or the Engagement Letter, including the limitation on liability and indemnification provisions contained herein. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

   All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

   **(c) Costs.** Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

15. **Non-exclusivity.** D&T may (a) provide any services to any person or entity, and (b) develop for itself, or for others, any materials or processes, including those that may be similar to those produced as a result of the Services, provided that D&T complies with its obligations of confidentiality set forth hereunder.

16. **Non-solicitation.** During the term of this engagement and for a period of one (1) year thereafter, each party agrees that its personnel (in their capacity as such) who had substantive contact with personnel of the other party in the course of this engagement shall not, without the other party's consent, directly or indirectly employ, solicit, engage, or retain the services of such personnel of the other party. In the event a party breaches this provision, the breaching party shall be liable to the aggrieved party for an amount equal to thirty percent (30%) of the annual base compensation of the relevant personnel in his or her new position. Although such payment shall be the aggrieved party's exclusive means of monetary recovery from the breaching party for breach of this provision, the aggrieved party shall be entitled to seek injunctive or other equitable relief. This provision shall not restrict the right of either party to solicit or recruit generally in the media.

17. **Entire Agreement, Amendment, and Notices.** These terms, and the Engagement Letter, including attachments, constitute the entire agreement between the parties with respect to this engagement; supersede all other oral and written representations, understandings, or agreements relating to this engagement; and may not be amended except by a written agreement signed by the parties. In the event of any conflict or ambiguity between these terms and the Engagement Letter, these terms shall control. All notices hereunder shall be (a) in writing; (b) delivered to the representatives of the parties at the addresses set forth in the Engagement Letter, unless changed by either party by notice to the other party; and (c) effective upon receipt.

18. **Governing Law and Severability.** These terms, the Engagement Letter, including attachments, and all matters relating to this engagement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof). If any provision of these terms or the Engagement Letter is unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

## <u>Exhibit 13</u>

**New Standards Accounting Advisory Engagement Letter**

# Deloitte.

**Deloitte & Touche LLP**
Suite 400
1601 Wewatta St.
Denver, CO 80202
USA

Tel:  1 303 292 5400
Fax: 1 303 312 4000
www.deloitte.com

April 3, 2018

Mr. Joseph F. Jordan
Vice President, Controller
Sears Holdings Corporation
3333 Beverly Road
Hoffman Estates, Illinois 60179

Dear Mr. Jordan:

This engagement letter is to confirm the engagement of Deloitte & Touche LLP ("D&T" or "we" or "our") to provide Sears Holdings Corporation and its subsidiaries (collectively, the "Client" or "you") accounting advisory services in connection with Phase II through Phase III of the Client's assessment of the New Revenue Standard[1] and Phase II through Phase V of the Client's assessment of the New Leases Standard[2] described below (the "Services").

## SCOPE OF SERVICES

The Services to be provided by D&T in Phase II for the New Revenue Standard are expected to consist of the following:

- Providing advice and recommendations to management's designated project management office as they perform project management functions.

- Providing advice, recommendations, and leading practices to management for their consideration as they undertake the implementation of the New Revenue Standard.

- Providing advice and recommendations as management decides on and documents the Client's accounting positions and controls for manual and automated processes. This may include benchmarking information and an understanding of how accounting positions conform to standards.

- Assisting management in identifying pros and cons or other qualitative factors it should consider in the implementation process.

- Advise management as they determine their adoption method by discussing options and considerations and walkthrough approach of calculating the retrospective restatement and cumulative catch-up adjustments.

- Reading and commenting on the reasonableness of adjustments proposed by management.

- Provide advice and recommendations on management's initial thoughts on policy matters (including transition elections) and its draft policies, as management documents accounting positions and assumptions and compiles the information required to develop the financial statements and disclosures required by the New Revenue Standard.

---

[1] The New Revenue Standard has the meaning of Financial Accounting Standards Board Accounting Standards Codification 606 – *Revenue from Contracts with Customers*.
[2] The New Leases Standard has the meaning of Financial Accounting Standards Board Accounting Standards Codification 842 – *Leases*.

Mr. Joseph F. Jordan
Vice President, Controller
Sears Holdings Corporation
April 3, 2018
Page 2

- Providing advice and recommendations regarding the Client's internal control environment over related data and systems (considering changes in data and systems requirements under the New Revenue Standard).

- Providing advice and recommendations to the Client for improvements in the design of both direct and indirect internal controls (in consideration of new processes or policies resulting from the New Revenue Standard), including recommendations regarding:

  - Management's potential need to identify and implement separate controls for the transition period to the New Revenue Standard.

  - Management's potential need to implement specific controls to monitor scoping decisions, accounting conventions, and practical expedients used as part of the adoption process.

- Advising management as it evaluates tax filings and related reporting implications of revenue changes, and provide related advice and recommendations on their tax positions.

The Services to be provided by D&T in Phase II for the New Leases Standard are expected to consist of the following:

- Providing advice and recommendations to management's designated project management office as they perform project management functions.

- Enhancing our understanding of current leases systems, processes, procedures and controls and providing advice and recommendations on expected areas of change or impact.

- Reviewing and provide commentary with respect to the Client's data gap analysis. Providing insight to additional data elements that need to be gathered.

- Reviewing management's lease data abstraction plan and provide advice and recommendations.

- Provide insight and recommendations while reviewing the decision framework and process developed by management to identify embedded leases.

- Providing education to management on the adoption transition package and sharing insights on transition alternatives.

- Providing advice and recommendations on management's initial thoughts on policy matters (including transition elections) and its draft policies, as management:

  - Documents accounting positions and assumptions.

  - Identifies and defines potential accounting, tax, system, and operational implications, documents the system requirements, identifies key systems considerations (including potential key system impacts and reporting options to meet the requirements of the New Leases Standard).

- Advising management as it evaluates tax filings and related reporting implications of lease changes, and provide related recommendations on their tax positions.

- Providing advice and recommendations on tax method changes and revisions needed to tax processes, systems, and filings.

Mr. Joseph F. Jordan
Vice President, Controller
Sears Holdings Corporation
April 3, 2018
Page 3

- Providing insights on Client process-flow diagrams and narratives, specifically focusing on risks and controls throughout the updated processes.

- Providing advice and recommendations to the Client for improvements in the design of both direct and indirect internal controls (in consideration of new processes or policies resulting from the New Leases Standard), including recommendations regarding:

  - Management's consideration of controls related to each of the components of internal control (the control environment, risk assessment, control activities, information and communication, and monitoring).

  - Management's potential need to identify and implement separate controls for the transition period to the New Leases Standard and additional or different controls after the standard is fully implemented and operational.

  - Management's potential need to implement specific controls to monitor scoping decisions, accounting conventions, and practical expedients used as part of the adoption process.

  - Client's internal control environment over related data and systems (considering changes in data and systems requirements under the New Leases Standard).

- Providing advice and recommendations as to how new controls might be integrated into management's internal control assessment process.

- Providing management with examples of generic disclosure checklists, examples of publicly available financial statements, and related disclosures to use as a guide.

- Advising management on its analysis and determination of disclosure requirements, contemplating:

  - Implementation impact under SAB Topic 11.M.

  - Requirements under the New Leases Standard and related SEC reporting.

- Providing advice and observations on relevant matters management should consider as it develops its quantitative analysis related to the implementation of the New Leases Standard.

- Providing advice and recommendations on disclosures drafted by management (including tax disclosures) by comparing to publicly available disclosure examples and related requirements to identify if any potential gaps exist.

- Obtain an understanding and discuss with management the source of numbers that they will disclose, including how the numbers will be generated, reliance on systems, and related relevant controls.

- Providing advice and recommendations regarding management's IT risk assessments and management's design of new or modified IT systems.

- Providing advice and recommendations on business requirements and questions to ask vendors on both interim and long term solutions.

- Providing insights and suggestions of leading practices in vendor evaluation and selection.

- Providing advice and recommendations to management regarding the potential timing and suggested high-level activities that may be undertaken to implement the New Leases

Mr. Joseph F. Jordan
Vice President, Controller
Sears Holdings Corporation
April 3, 2018
Page 4

Standard, including activities related to technical accounting, data and systems development, process/close and reporting, readiness and training, tax, and project management, to be used in the development of management's implementation roadmap.

The Services to be provided by D&T in Phase III for the New Revenue Standard are expected to consist of the following:

- Providing advice and recommendations to management's designated project management office as they perform project management functions.

- Providing advice and recommendations on the following activities and considerations of management:

  - Management's plans for moving from project management/implementation to an integrated ongoing process.

  - Management's consideration of the potential need for additional education and communication based on the implementation process.

  - Management's ongoing accounting and policy assessments.

  - Management's ongoing internal control monitoring and assessments.

- Providing insights on client-updated process-flow diagrams and narratives, specifically focusing on risks and controls throughout the updated process.

- Providing recommendations as to how new controls might be integrated into management's internal control assessment process.

- Providing management with:

  - Examples of generic disclosure checklists, examples of publicly available financial statements, and related disclosures to use as a guide.

  - Advise management on its analysis and determination of disclosure requirements, contemplating:

    - Implementation impact under SAB Topic 11.M.

    - Requirements under the New Revenue Standard and related SEC reporting.

- Providing advice and observations on (or assisting with the identification of) relevant matters management should consider as it develops its quantitative analysis related to the implementation of the New Revenue Standard.

- Providing recommendations on disclosures drafted by management (including tax disclosures) by comparing to example disclosures publicly available and related requirements to identify if any potential gaps exist.

- Obtain an understanding and discuss with management the source of numbers they will disclose, including how the numbers will be generated, reliance on systems, and related relevant controls.

- Providing advice to management on potentially and appropriately including other functions in the organization (e.g., investor relations) in management's development and review of the new revenue recognition disclosures.

Mr. Joseph F. Jordan
Vice President, Controller
Sears Holdings Corporation
April 3, 2018
Page 5

The Services to be provided by D&T in Phase III for the New Leases Standard are expected to consist of the following:

- Providing advice and recommendations to management's designated project management office as they perform project management functions.

- Providing advice, recommendations, and leading practices to management for their consideration as they engage a third party to undertake the data abstraction process and mapping of data from existing systems to new system.

- Providing advice and recommendations in management's execution of data abstraction and migration, if necessary

- Assisting management in identifying pros and cons or other qualitative factors it should consider in the implementation process.

- Providing insights on internal controls and processes.

- Reading and providing recommendations on the draft tax provision calculations prepared by management.

The Services to be provided by D&T in Phase IV for the New Leases Standard are expected to consist of the following:

- Providing advice and recommendations to management's designated project management office as they perform project management functions.

- Providing advice, recommendations, and leading practices to management for their consideration as they undertake the implementation of the New Leases Standard.

- Providing advice and recommendations as management decides on and documents the Client's accounting positions and controls for manual and automated processes. This may include benchmarking information and an understanding of how accounting positions conform to standards.

- Advising management as they implement suggestions provided in the assessment process.

The Services to be provided by D&T in Phase V for the New Leases Standard are expected to consist of the following:

- Providing advice and recommendations to management's designated project management office as they perform project management functions.

- Provide advice and recommendations on the following activities and considerations of management:

  - Management's plans for moving from project management/implementation to an integrated ongoing process.

  - Management's consideration of the potential need for additional education and communication based on the implementation process.

  - Management's ongoing accounting and policy assessments.

  - Management's ongoing internal control monitoring and assessments.

Mr. Joseph F. Jordan
Vice President, Controller
Sears Holdings Corporation
April 3, 2018
Page 6

The Services will be performed in accordance with the *Statement on Standards for Consulting Services* issued by the American Institute of Certified Public Accountants (AICPA).

## DELIVERABLES

The revenue recognition deliverables anticipated for Phase II of the engagement consist of:

- High-level, illustrative transaction use-case scenarios (using hypothetical numbers) to illustrate the impact to selected revenue streams under the New Revenue Standard identified in Phase I, comparing current and prospective accounting.

- Draft and present key findings presentation for stakeholders, as deemed necessary.

The leasing deliverables anticipated for Phase II of the engagement consist of:

- Up to 100 high-level, illustrative scenarios (using hypothetical numbers) to illustrate the impact to selected lease agreement features under the New Leases Standard, comparing current and prospective accounting.

- Generic templates for requests for information and requests for proposals for review and approval by Client management.

- Generic vendor selection scorecard templates for lease technology solution and lease abstraction.

- Draft summary of responses on requests for information and requests for proposals for review and approval by Client management.

- Generic high-level data template for use by Client's management to prepare its data gap analysis.

- Draft meeting minutes and notes, critical accounting issues, and relevant accounting guidance for review and approval by Client management.

- Sample illustrative training materials.

- Generic high-level process flow and internal control recommendations related to transition to the New Leases Standard.

- Present key findings presentation based on the services we performed to the Company stakeholders, as deemed necessary.

The leasing deliverables anticipated for Phases III - V of the engagement consist of:

- Present key findings presentation based on the services we performed to the Company stakeholders, as deemed necessary.

The above deliverables, as well as other verbal or written comments and observations provided by D&T in connection with the Services shall merely represent the results of the engagement team's research and understanding of similar transactions in the industry and shall not represent an opinion or conclusion of D&T on any accounting policies, implementation strategy, or other topic related to the Services.

Mr. Joseph F. Jordan
Vice President, Controller
Sears Holdings Corporation
April 3, 2018
Page 7

Client management will be solely responsible to review and make all decisions with respect to potential modifications and ultimate approval and acceptance of any comments or observations made, or deliverables provided, by D&T.

Under no circumstance shall D&T prepare original documentation (e.g. accounting policies, journal entry support, or accounting position papers) that becomes part of the Client's accounting records.

**ENGAGEMENT TEAM**

Our engagement team will be composed of practitioners with experience in accounting for transactions under the New Revenue Standard and the New Leases Standard and has been selected to align the team's skills with the technical and practical necessities of the engagement.

| Name | Engagement Role | Title |
|---|---|---|
| Derek Bradfield | Lead Engagement Partner | Partner |
| Sean Torr | Engagement Advisor | Managing Director |
| Kaya Arda | Engagement Advisor | Senior Manager |
| Kyle Lauret | Engagement Team Lead | Senior Manager |
| Lauren Pesa | Lease Team Lead | Senior Manager |
| Zach Stiltz | Revenue Team Lead | Manager |

The engagement team will, as they consider necessary, call on other individuals with specialized knowledge and experience to assist in the performance of our services. The engagement team and all engagement activities will be overseen by Liz Berrill, Audit Partner.

**FEES AND TIMING**

The services are expected to be performed at the Client's offices in Hoffman Estates, Illinois. The Phase II services shall commence on or around December 1, 2017 and are anticipated to be completed in February 2018. The Phase III – V services shall commence on or around February 2018 and are anticipated to be completed in May 2019

Our preliminary estimate of professional fees for Phase II – V Services (excluding expenses) ranges from $650,000 to $850,000. Please note this is only an estimate, as actual fees may vary. We will review our estimates periodically and inform you if there is a significant change in our estimate.   Based on the anticipated timing of the Services, our fees will be billed approximately as follows:

Mr. Joseph F. Jordan
Vice President, Controller
Sears Holdings Corporation
April 3, 2018
Page 8

| INVOICE DATE | AMOUNT |
|---|---|
| April 4, 2018 | $350,000 |
| June 6, 2018 | $50,000 - $125,000 |
| August 8, 2018 | $75,000 - $100,000 |
| October 10, 2018 | $75,000 - $100,000 |
| December 12, 2018 | $50,000 - $100,000 |
| May 2, 2019 | $50,000 - $75,000 |

We understand that you will reimburse us for all reasonable expenses incurred in performing our Services on this engagement (including, but not limited to, our reasonable travel, meals, lodging, mileage expenses and technology- and administrative-related charges). Engagement-related expenses will be billed in addition to the fees and will be stated separately on the invoices.

## ACKNOWLEDGMENTS AND AGREEMENTS

Client management acknowledges and agrees to the following:

- Client management is responsible for the coordination of obtaining the preapproval of the Audit Committee, in accordance with the Audit Committee's preapproval process, for the Services to be provided by D&T to the Client.

- We will not perform in a capacity equivalent to that of management or an employee of the Client, including assuming any financial reporting oversight role; authorizing, executing, or consummating any transactions, or otherwise exercising authority on behalf of the Client or having the authority to do so; supervising employees of the Client in the performance of their activities; reporting to the board of directors on behalf of management of the Client; or providing any legal advice with respect to, or conducting a legal review of, any documents, records, or policies of the Client; preparing source documents or originating data, in electronic or other form, evidencing the occurrence of any transactions; or recording of any amounts in books and records of the Client.

- The Client agrees that the Services may include advice and recommendations, but agrees that the Client will be solely responsible for the financial statements and all decisions regarding the accounting treatment of any item or transaction (including decisions regarding its compliance with U.S. GAAP and SEC rules and regulations. Furthermore, the Client shall be solely responsible for, among other things (1) designating a member of management with appropriate technical accounting and reporting knowledge to oversee the Services and to sustain meaningful and substantial involvement in all phases of this engagement; and (2) any forward-looking information (including any models, projections, forecasts, budgets, synergies, feasibility analyses, assumptions, estimates, methodologies, or bases for support). For the avoidance of doubt, we will be responsible for the performance of the Services.

- We will not provide any assurance regarding the outcome of any future audit or regulatory examination or other regulatory action, and we will not provide any assurance regarding U.S. Securities and Exchange Commission clearance of any Securities Act of 1933 or

Mr. Joseph F. Jordan
Vice President, Controller
Sears Holdings Corporation
April 3, 2018
Page 9

Securities Exchange Act of 1934 filings. The responsibility for all legal issues with respect to these matters, such as reviewing all deliverables and work product for any legal implications to the Client, will be the Client's.

• The Services will not constitute an engagement to provide audit, compilation, review, or attest services as described in the pronouncements on professional standards issued by the AICPA, the U.S. Public Company Accounting Oversight Board, or other regulatory body and, therefore, we will not express an opinion or any other form of assurance as a result of performing the Services.

• The Client will not seek our opinion, and we will not provide any such opinion, on the application of accounting principles in connection with this engagement. Furthermore, Client management agrees that it will not represent to any third parties that it has obtained such opinion from us under this engagement. If such opinion is requested under the requirements of AU 625, *Reports on the Application of Accounting Principles,* any such services requested of us would be subject to (1) a determination by us as to whether such services can be rendered, (2) additional client acceptance procedures, and (3) a separate, signed engagement letter with terms and conditions that are acceptable to us and the Client. We are under no obligation to perform such an engagement, if requested.

• We will not be responsible for the accuracy or completeness of any data made available to us through any third-party tool, database, or software application. The Company further acknowledges and agrees that D&T will have no responsibility for evaluating the functionality of such third-party tool, database, or software application, nor for any results obtained by D&T through the use of such third-party tool, database, or software application.

• The assignment of any ranking or rating and resulting prioritization of recommendations is subjective; others, utilizing the same information, may arrive at different results. Client management is responsible for the final determination of the appropriate scale to be utilized for rankings, the definitions for each ranking on the scale, and the assignment of prioritization to each recommended action item. Deliverables that include any prioritization, categorization or rating ranking will not be considered an opinion expressed by D&T.

• The Client agrees that any deliverables provided to the Client hereunder by D&T may be disclosed to the Board of Directors and the Audit Committee of the Client only for their informational purposes and solely in their capacity as a member of such Board or Committee.

* * * * * *

Mr. Joseph F. Jordan
Vice President, Controller
Sears Holdings Corporation
April 3, 2018
Page 10

During this engagement, the Client may request that D&T perform additional services that are not encompassed by this engagement letter. D&T may perform such additional services upon receipt of a separate signed engagement letter with terms and conditions that are acceptable to D&T and the Client.

This engagement letter, incorporating by reference the attached General Business Terms in Exhibit A, constitutes the entire agreement between the Client and D&T with respect to this engagement; supersedes all other oral and written representations, understandings, or agreements relating to this engagement; and may not be amended except by the mutual written agreement of the Client and D&T.

Please indicate your acceptance of this agreement by signing in the space provided below and returning this engagement letter to us. A duplicate of this engagement letter is provided for your records.

Yours truly,

*Deloitte & Touche LLP*

Accepted and Agreed to by Sears Holdings Corporation, on behalf of itself and its subsidiaries:

By: _____

Title: *VICE PRESIDENT, CONTROLLER*

Date: *04/03/2018*

**EXHIBIT A — GENERAL BUSINESS TERMS**

**1.    Services.**    The services provided by D&T (the "Services") under the engagement letter to which these terms are attached (the "Engagement Letter") may include advice and recommendations, but D&T will not make any decisions on behalf of Client in connection with the implementation of such advice and recommendations. For purposes of these terms and the Engagement Letter, "Client" shall mean the entity as defined in the Engagement Letter**.** Sears Holdings Corporation and its subsidiaries represents and warrants that it has the power and authority to execute this agreement on behalf of, and to bind, itself and its subsidiaries.

**2.    Payment of Invoices.**    Client will compensate D&T under the terms of the Engagement Letter for the Services performed and expenses incurred, through the term or effective date of termination of this engagement.  D&T's invoices are due upon receipt.  Client shall be responsible for any taxes imposed on the Services or on this engagement, other than taxes imposed by employment withholding for D&T's personnel or on D&T's income or property.

**3.    Term.**    Unless terminated sooner as set forth below, this engagement shall terminate upon the completion of the Services.  Either party may terminate this engagement, with or without cause, by giving thirty (30) days' prior written notice to the other party.  In the event of a termination for cause, the breaching party shall have the right to cure the breach within the notice period.  D&T may terminate this engagement upon written notice to Client if D&T determines that the performance of any part of the Services would be in conflict with law, or independence or professional rules.

**4.    Deliverables.**

a)    D&T has rights in, and may, in connection with the performance of the Services, use, create, modify, or acquire rights in, works of authorship, materials, information, and other intellectual property (collectively, the "D&T Technology").

b)    Upon full payment to D&T hereunder, and subject to the terms and conditions contained herein, (i) the tangible items specified as deliverables or work product in the Engagement Letter (the "Deliverables") shall become the property of Client, and (ii) D&T hereby grants Client a royalty-free, fully paid-up, worldwide, nonexclusive license to use the D&T Technology contained in the Deliverables in connection with the use of such Deliverables.  Except for the foregoing license grant, D&T or its licensors retain all rights in and to all D&T Technology.

**5.    Limitation on Warranties.**  This is a services engagement.  D&T warrants that it shall perform the Services in good faith and with due professional care.  **D&T DISCLAIMS ALL OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.**

**6.    Limitation on Damages and Indemnification.**

a)    D&T, its subsidiaries and subcontractors, and their respective personnel shall not be liable to Client for any claims, liabilities, or expenses relating to this engagement

- 11 -

("Claims") for an aggregate amount in excess of the fees paid by Client to D&T pursuant to this engagement, except to the extent resulting from the recklessness, bad faith, or intentional misconduct of D&T or its subcontractors.  In no event shall D&T, its subsidiaries or subcontractors, or their respective personnel be liable to Client for any loss of use, data, goodwill, revenues, or profits (whether or not deemed to constitute a direct Claim), or any consequential, special, indirect, incidental, punitive, or exemplary loss, damage, or expense relating to this engagement.

b)     Client shall indemnify and hold harmless D&T, its subsidiaries and subcontractors, and their respective personnel from all Claims, except to the extent resulting from the recklessness, bad faith, or intentional misconduct of D&T or its subcontractors.

c)     In circumstances where any limitation on damages or indemnification provision hereunder is unavailable, the aggregate liability of D&T, its subsidiaries and subcontractors, and their respective personnel for any Claim shall not exceed an amount that is proportional to the relative fault that the conduct of D&T and its subcontractors bears to all other conduct giving rise to such Claim.

**7.     Client Responsibilities.**  Client shall cooperate with D&T in the performance of the Services, including providing D&T with reasonable facilities and timely access to data, information, and personnel of Client.  With respect to the data and information provided by Client to D&T or its subcontractors for the performance of the Services, Client shall have all rights required to provide such data and information, and shall do so only in accordance with applicable law and with any procedures agreed upon in writing.  Client shall be solely responsible for, among other things (a) the performance of its personnel and agents; (b) the accuracy and completeness of all data and information provided to D&T for purposes of the performance of the Services; (c) making all management decisions, performing all management functions, and assuming all management responsibilities; (d) designating a competent management member to oversee the Services; (e) evaluating the adequacy and results of the Services; (f) accepting responsibility for the results of the Services; and (g) establishing and maintaining internal controls, including monitoring ongoing activities. D&T's performance is dependent upon the timely and effective satisfaction of Client's responsibilities hereunder and timely decisions and approvals of Client in connection with the Services.  D&T shall be entitled to rely on all decisions and approvals of Client.

**8.     Force Majeure.**  Neither party shall be liable for any delays or nonperformance directly or indirectly resulting from circumstances or causes beyond its reasonable control, including fire, epidemic or other casualty, act of God, strike or labor dispute, war or other violence, or any law, order, or requirement of any governmental agency or authority.

**9.     Limitation on Actions.**  No action, regardless of form, relating to this engagement, may be brought by either party more than one year after the cause of action has accrued, except that an action for nonpayment may be brought by a party not later than one year following the due date of the last payment owing to the party bringing such action.

**10.    Independent Contractor.**  Each party hereto is an independent contractor and neither party is, nor shall be considered to be, nor shall purport to act as, the other's agent, partner, fiduciary, joint venturer, or representative.

**11.    Confidentiality and Internal Use.**

a)      All Services and Deliverables shall be solely for Client's benefit, and are not intended to be relied upon by any person or entity other than Client.  Client shall not disclose the Services or Deliverables, or refer to the Services or Deliverables in any communication, to any person or entity except (i) as specifically set forth in the Engagement Letter, or (ii) to Client's contractors solely for the purpose of their providing services to Client relating to the subject matter of this engagement, provided that such contractors comply with the restrictions on disclosure set forth in this sentence.  Client, however, may create its own materials based on the content of such Services and Deliverables and use and disclose such Client-created materials for external purposes, provided that, Client does not in any way, expressly or by implication, attribute such materials to D&T or its subcontractors.

b)      To the extent that, in connection with this engagement, either party (each, the "receiving party") comes into possession of any confidential information of the other (the "disclosing party"), it will not disclose such information to any third party without the disclosing party's consent, using at least the same degree of care as it employs in maintaining in confidence its own confidential information of a similar nature, but in no event less than a reasonable degree of care.  The disclosing party hereby consents to the receiving party disclosing such information: (i) as expressly permitted in the Engagement Letter; (ii) to contractors providing administrative, infrastructure, and other support services to the receiving party and subcontractors providing services in connection with this engagement, in each case, whether located within or outside of the United States, provided that such contractors and subcontractors have agreed to be bound by confidentiality obligations similar to those in this Section 11(b); (iii) as may be required by law or regulation, or to respond to governmental inquiries, or in accordance with applicable professional standards or rules, or in connection with litigation or arbitration pertaining hereto; or (iv) to the extent such information (a) is or becomes publicly available other than as the result of a disclosure in breach hereof, (b) becomes available to the receiving party on a non-confidential basis from a source that the receiving party believes is not prohibited from disclosing such information to the receiving party, (c) is already known by the receiving party without any obligation of confidentiality with respect thereto, or (d) is developed by the receiving party independently of any disclosures made to the receiving party hereunder. In addition, any such information may be used by Deloitte & Touche LLP or any related entity of D&T in the context of responding to its professional obligations as the independent accountants for Client. Nothing in this Section 11(b) shall alter Client's obligations under Section 11(a).  D&T, however, may use and disclose any knowledge and ideas acquired in connection with the Services to the extent they are retained in the unaided memory of its personnel

c)      No provision of these terms or the Engagement Letter is or is to be construed as a condition of confidentiality within the meaning of PCAOB Release 2005-014, Internal Revenue Code Sections 6011 and 6111 or the regulations thereunder, any related Internal Revenue Service guidance, or any other similar law, with respect to any Services, Deliverables, or other materials of any kind provided hereunder relating

to tax treatment or tax structure (collectively referred to as "Subject Tax Planning Advice"). Notwithstanding anything herein to the contrary, no provision of these terms or the Engagement Letter shall place any limitation on Client's disclosure of any Subject Tax Planning Advice. The Services and Deliverables shall be solely for Client's benefit, and this engagement does not create privity between D&T and any person or party other than Client ("third party"). Neither the Services nor any Deliverables are intended for the express or implied benefit of any third party. Unless otherwise agreed to in writing by D&T, no third party is entitled to rely in any manner or for any purpose on the Services or Deliverables. In the event of any unauthorized reliance on any Subject Tax Planning Advice, Client agrees to indemnify and hold harmless D&T, its subcontractors, and their respective personnel from all third-party claims, liabilities, costs, and expenses.]

**12.    Survival and Interpretation.** All provisions that are intended by their nature to survive performance of the Services shall survive such performance, or the expiration or termination of this engagement. For purposes of these terms and the Engagement Letter, "D&T" shall mean Deloitte & Touche LLP. No affiliated or related entity of D&T, or such entity's personnel, shall have any liability hereunder to Client and Client will not bring any action against any such affiliated or related entity or such entity's personnel in connection with this engagement. Without limiting the foregoing, such affiliated and related entities are intended third-party beneficiaries of these terms, and may in their own right enforce such terms. **Each of the provisions of these terms shall apply to the fullest extent of the law, whether in contract, statute, tort (such as *negligence*), or otherwise, notwithstanding the failure of the essential purpose of any remedy.** Any references herein to the term "including" shall be deemed to be followed by "without limitation."

**13.    Assignment and Subcontracting.** Except as provided below, neither party may assign any of its rights or obligations (including interests or Claims) relating to this engagement or the Services, without the prior written consent of the other party. Client hereby consents to D&T subcontracting or assigning any portion of the Services to any affiliate or related entity, whether located within or outside of the United States.

**14.    Dispute Resolution.** Any controversy or claim between the parties arising out of or relating to these terms, the Engagement Letter, or this engagement (a "Dispute") shall be resolved by mediation or binding arbitration as set forth below.

a) **Mediation.** All Disputes shall first be submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions. If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("CPR"), at the written request of a party, shall designate a mediator.

b) **Arbitration Procedures.** If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York. The arbitration shall be conducted in accordance with the CPR Rules for Non-

- 14 -

Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Section 14 (the "Rules").

The arbitration shall be conducted before a panel of three arbitrators. Each of Client and D&T shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules. No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the Engagement Letter (and its appendices) and to abide by the terms of this Section 14. Except with respect to the interpretation and enforcement of these arbitration procedures (which shall be governed by the Federal Arbitration Act), the arbitrators shall apply the governing law set forth in Section 18 in connection with the Dispute. The arbitrators shall have no power to award damages inconsistent with these terms or the Engagement Letter, including the limitation on liability and indemnification provisions contained herein. The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition. Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules. Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests. Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

c) **Costs.** Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.]

**15.    Non-exclusivity.** D&T may (a) provide any services to any person or entity, and (b) develop for itself, or for others, any materials or processes, including those that may be similar to those produced as a result of the Services, provided that D&T complies with its obligations of confidentiality set forth hereunder.

**16.    Non-solicitation.** During the term of this engagement and for a period of one (1) year thereafter, each party agrees that its personnel (in their capacity as such) who had substantive contact with personnel of the other party in the course of this engagement shall not, without the other party's consent, directly or indirectly employ, solicit, engage, or retain the services of such personnel of the other party. In the event a party breaches this provision, the breaching party shall be liable to the aggrieved party for an amount equal to thirty percent (30%) of the annual base compensation of the relevant personnel in his or her new position. Although such payment shall be the aggrieved party's exclusive means of monetary recovery from the breaching party for breach of this provision, the aggrieved party shall be entitled to seek injunctive or other equitable relief. This provision shall not restrict the right of either party to solicit or recruit generally in the media.

**17.    Entire Agreement, Amendment, and Notices.** These terms, and the Engagement Letter, including attachments, constitute the entire agreement between the parties with respect to this engagement; supersede all other oral and written

representations, understandings, or agreements relating to this engagement; and may not be amended except by a written agreement signed by the parties.  In the event of any conflict or ambiguity between these terms and the Engagement Letter, these terms shall control.  All notices hereunder shall be (a) in writing; (b) delivered to the representatives of the parties at the addresses set forth in the Engagement Letter, unless changed by either party by notice to the other party; and (c) effective upon receipt.

**18.      Governing Law and Severability.**   These terms, the Engagement Letter, including attachments, and all matters relating to this engagement shall be governed by, and construed in accordance with, the laws of the State of New York (without giving effect to the choice of law principles thereof).  If any provision of these terms or the Engagement Letter is unenforceable, such provision shall not affect the other provisions, but such unenforceable provision shall be deemed modified to the extent necessary to render it enforceable, preserving to the fullest extent permissible the intent of the parties set forth herein.

**<u>Exhibit B</u>**

**Proposed Order**

WEIL:\96792963\4\73217.0004

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                                :

In re                            :        **Chapter 11**
                                  :

**SEARS HOLDINGS CORPORATION**, *et al.*,  :        **Case No. 18-23538 (RDD)**
                                  :

            Debtors.[1]             :        **(Jointly Administered)**
                                  :

---------------------------------------------------------------x

### ORDER AUTHORIZING DEBTORS TO RETAIN DELOITTE & TOUCHE LLP FOR INDEPENDENT AUDIT AND ADVISORY SERVICES *NUNC PRO TUNC* TO THE COMMENCEMENT DATE

Upon the application, dated [__] (ECF No. [__]) (the "**Application**")[2] of Sears Holdings Corporation and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), pursuant to section 327(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2014-1 and 2016-1 of the Local

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Sears Holdings Corporation (0798); Kmart Holding Corporation (3116); Kmart Operations LLC (6546); Sears Operations LLC (4331); Sears, Roebuck and Co. (0680); ServiceLive Inc. (6774); SHC Licensed Business LLC (3718); A&E Factory Service, LLC (6695); A&E Home Delivery, LLC (0205); A&E Lawn & Garden, LLC (5028); A&E Signature Service, LLC (0204); FBA Holdings Inc. (6537); Innovel Solutions, Inc. (7180); Kmart Corporation (9500); MaxServ, Inc. (7626); Private Brands, Ltd. (4022); Sears Development Co. (6028); Sears Holdings Management Corporation (2148); Sears Home & Business Franchises, Inc. (6742); Sears Home Improvement Products, Inc. (8591); Sears Insurance Services, L.L.C. (7182); Sears Procurement Services, Inc. (2859); Sears Protection Company (1250); Sears Protection Company (PR) Inc. (4861); Sears Roebuck Acceptance Corp. (0535); Sears, Roebuck de Puerto Rico, Inc. (3626); SYW Relay LLC (1870); Wally Labs LLC (None); SHC Promotions LLC (9626); Big Beaver of Florida Development, LLC (None); California Builder Appliances, Inc. (6327); Florida Builder Appliances, Inc. (9133); KBL Holding Inc. (1295); KLC, Inc. (0839); Kmart of Michigan, Inc. (1696); Kmart of Washington LLC (8898); Kmart Stores of Illinois LLC (8897); Kmart Stores of Texas LLC (8915); MyGofer LLC (5531); Sears Brands Business Unit Corporation (4658); Sears Holdings Publishing Company, LLC. (5554); Sears Protection Company (Florida), L.L.C. (4239); SHC Desert Springs, LLC (None); SOE, Inc. (9616); StarWest, LLC (5379); STI Merchandising, Inc. (0188); Troy Coolidge No. 13, LLC (None); BlueLight.com, Inc. (7034); Sears Brands, L.L.C. (4664); Sears Buying Services, Inc. (6533); Kmart.com LLC (9022); and Sears Brands Management Corporation (5365). The location of the Debtors' corporate headquarters is 3333 Beverly Road, Hoffman Estates, Illinois 60179.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Application.

Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), for an order (i) authorizing the Debtors to retain and employ Deloitte & Touche LLP ("**Deloitte & Touche**") to provide independent audit and advisory services for the Debtors, effective as of the Commencement Date, and upon the declaration of Jim Berry, a partner at Deloitte & Touche, annexed to the Application as **Exhibit A** (the "**Berry Declaration**"); and (ii) granting related relief, all as more fully set forth in the Application; and the Court being satisfied, based on the representations made in the Application and the Berry Declaration, that Deloitte & Touche is "disinterested" as such term is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code, and as required under section 327(a) of the Bankruptcy Code, and that Deloitte & Touche neither represents nor holds an interest adverse to the Debtors' estates with respect to the matters upon which it is to be engaged; and the Court having jurisdiction to decide the Application and the relief requested therein pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Application and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief requested in the Application having been provided in accordance with the Amended Case Management Order; such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Application on January 18, 2019 (the "**Hearing**"); and upon the record of the Hearing, and upon all of the proceedings had before the Court; and the Court having determined that the legal and factual bases set forth in the Application establish just cause for the

2

relief granted herein; and is in the best interests of the Debtors, their estates, their creditors, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

## IT IS HEREBY ORDERED THAT:

1.      The Application is granted as provided herein.

2.      In accordance with section 327(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(a), and Local Rules 2014-1 and 2016-1, the Debtors are authorized to employ and retain Deloitte & Touche as the Debtors' independent auditor and advisor in accordance with the terms and conditions set forth in the Engagement Agreements, effective *nunc pro tunc* to the Commencement Date, and to pay fees and reimburse expenses to Deloitte & Touche on the terms set forth in the Engagement Agreements as modified by this Order.

3.      The terms and conditions of the Engagement Agreements are reasonable and, as modified by this Order, are approved.

4.      Deloitte & Touche shall use reasonable efforts to cooperate with the Debtors to avoid any unnecessary duplication of services provided by any of the Debtors' other retained professionals in these chapter 11 cases.

5.      Deloitte & Touche shall file interim and final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred in accordance with the applicable provisions of the Bankruptcy Code, the applicable Bankruptcy Rules, the Local Rules, and any applicable orders of this Court (including the Interim Compensation Order).

6.      Deloitte & Touche shall include in its fee applications, among other things, time records setting forth a description of the services rendered on behalf of the Debtors, and the amount of time spent on each date by each such individual in rendering services on

3

behalf of the Debtors.  Deloitte & Touche will perform services under the following Engagement Agreements during the chapter 11 cases but because as of the Commencement Date, Deloitte & Touche received payment in full for such services, such services performed under these Engagement Agreements will not be included in any fee application submitted by Deloitte & Touche in these cases:  the SPC Audit Engagement Letter; the Savings Plan Audit Engagement Letter; the Parts Direct Audit Engagement Letter; the Kenmore Audit Engagement Letters; the Subsidiaries' Audit Engagement Letter; the Affiliate/Subsidiaries' Audit Engagement Letter; the Kmart PR and Sears PR Audit Engagement Letters; the Kmart PR Audit Engagement Letter; the Project Sasset Engagement Letters; the SAM Engagement Letter.  For the avoidance of doubt, Deloitte & Touche will perform services for the Debtors under the following Engagement Agreements during these chapter 11 cases for which Deloitte & Touche will request compensation and expense reimbursement through the submission of fee applications:  the Base Audit Engagement Letter, the Restructuring Accounting Advisory Engagement Letter, the System Services Engagement Letters, and the New Standards Accounting Advisory Engagement Letter.

7.      Deloitte & Touche shall provide reasonable notice to the Debtors, the Office of the United States Trustee, and any statutory committee appointed in these chapter 11 cases of any increase of Deloitte & Touche's hourly rates from those set forth in the Berry Declaration, and such notice will be filed on the docket of these cases.

8.      The Indemnification Provisions, set forth in the appendices to certain of the Engagement Agreements, are approved subject to the following modifications with respect to services performed thereunder after the Commencement Date and prior to the effective date of any chapter 11 plan of the Debtors:

4

a.     All requests for payment of indemnity, contribution, or otherwise pursuant to the Indemnification Provisions shall be made by means of a final fee application and shall be subject to the approval of, and review by, the Court to ensure that such payment conforms to the terms of the Indemnification Provisions, the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and other orders of this Court and is reasonable based on the circumstances of the litigation or settlement in respect of which indemnity is sought; provided, however, that in no event shall an indemnified party be indemnified or receive contribution to the extent that any claim arose or expense has resulted for any such losses finally judicially determined by a court of competent jurisdiction to have primarily resulted from the breach of contract, gross negligence, willful misconduct, or fraud of any indemnified parties;

b.     In no event shall any indemnified parties be indemnified or receive contribution or other payment under the Indemnification Provisions if the Debtors or a representative of the Debtors' estates asserts a claim for, and a court determines by a final order that such claims primarily arose out of, such person's breach of contract, gross negligence, willful misconduct, or fraud of any Indemnified Parties;

c.     In the event an indemnified party seeks reimbursement of attorneys' fees from the Debtors pursuant to the indemnification provisions, the invoices and supporting time records from such attorneys shall be attached to Deloitte & Touche's own interim and final fee applications, and such invoices and time records shall be subject to the applicable United States Trustee guidelines and the approval of the Bankruptcy Court under the standards of section 330 of the Bankruptcy Code without regard to whether such attorneys have been retained under section 327 of the Bankruptcy Code and without regard to whether such attorneys' services satisfy section 330(a)(3)(C) of the Bankruptcy Code; and

d.     Any provision of the Engagement Agreements relating to expense policies and reimbursements shall be subject to the applicable guidelines set forth in the Local Rules and general orders of this Court.

9.     The Engagement Agreements are further modified with respect to the services provided thereunder from the Commencement Date through the effective date of any chapter 11 plan of the Debtors, as follows:

5

a. The following sentences relating to "Limitation on Liability" shall be deemed deleted:

    i. The second sentence in Section 3(a) of the general business terms attached to the Project Sasset Engagement Letters.

    ii. The second sentence in Section 6(a) of the general business terms attached to the SAM Engagement Letter, Restructuring Accounting Advisory Engagement Letter, and the New Standards Accounting Advisory Engagement Letter.

    iii. The second sentence of the first paragraph of the "Limitation on Liability, Release, and Indemnification" section on page 7 of the System Services Engagement Letter.

b. The "Independent Contractor" provision set forth in:

    i. Paragraph 1 of Appendix D to the Base Audit Engagement Letter, the SPC Audit Engagement Letter, the Savings Plan Audit Engagement Letter, the Parts Direct Audit Engagement Letter, the Kenmore Audit Engagement Letters, the Affiliate/Subsidiaries' Audit Engagement Letter, the Kmart PR and Sears PR Audit Engagement Letters, the Kmart PR Audit Engagement Letters, and the System Services Engagement Letter;

    ii. Paragraph 6 of the general business terms attached as Appendix A to the Project Sasset Engagement Letters;

    iii. Paragraph 10 of the general business terms attached as Exhibit A to the SAM Engagement Letter, the Restructuring Accounting Advisory Engagement Letter, and the New Standards Accounting Advisory Engagement Letter; and

    iv. Page 8 of the System Services Engagement Letter shall be deleted and replaced with the following:

Nothing contained in this agreement shall alter in any way the duties imposed by law on Deloitte & Touche LLP in respect of the Services provided under the agreement. It is understood and agreed that each of Sears Holdings Corporation, the Entity (or Entities, as applicable), the Audit Committee of Sears Holdings Corporation, and the Board of Directors, as may be applicable (collectively, the "**Client-Related Parties**"), and Deloitte & Touche LLP is an independent contractor and that neither the Client-Related Parties nor Deloitte & Touche LLP is, nor shall be considered to be, the other's agent, distributor, partner, joint venture, co-owner or representative.

6

      c.  The language in (i) Paragraph 7 of the general business terms attached as Appendix D to the Base Audit Engagement Letter, the SPC Audit Engagement Letter, the Savings Plan Audit Engagement Letter, the Parts Direct Audit Engagement Letter, the Kenmore Audit Engagement Letters, the Affiliate/Subsidiaries' Audit Engagement Letter, the Kmart PR and Sears PR Audit Engagement Letters, the Kmart PR Audit Engagement Letters, and (ii) the "Dispute Resolution" provision on page 9 of the System Services Engagement Letter shall be deemed deleted and replaced with the following:

Any Dispute (as defined below) arising out of or relating to services performed under this engagement letter after the commencement of a bankruptcy case by the Company and prior to the effective date of (a) a plan of reorganization of the Company or (b) a court order dismissing the Company's chapter 11 case or cases (the "**Effective Date**") shall be brought in the Bankruptcy Court (or the District Court) (each as defined below), if such District Court withdraws the reference to the Bankruptcy Court. All other Disputes, including, without limitation, Disputes arising out of or relating to services performed after the Effective Date and Disputes over which the Bankruptcy Court (or the District Court) does not have, retain or exercise jurisdiction, shall be resolved by mediation or binding arbitration as set forth in the Dispute Resolution Provision attached hereto as the immediately following appendix and made a part hereof (the "**Dispute Resolution Provision**"). The parties each hereby irrevocably waive, to the fullest extent permitted by law, all rights to trial by jury in any Dispute. Except with respect to the interpretation and enforcement of the arbitration procedures set forth in the Dispute Resolution Provision (which shall be governed by the Federal Arbitration Act), the laws of the State of New York (without giving effect to its choice of law principles) shall apply in arbitration or any other forum in connection with any Dispute. The foregoing shall be binding up on the parties and any and all of their respective permitted successors and assigns. This paragraph and the Dispute Resolution Provision shall apply to the fullest extent of the law, whether in contract, statute, tort (such as negligence), or otherwise.

For purposes of the foregoing, (a) "Dispute" shall mean any controversy or claim between the parties arising out of or relating to the engagement letter, including its appendices, or this engagement, (b) "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York, and (c) "District Court" shall mean the United States District Court of which the Bankruptcy Court constitutes a unit.

      d.  The language in (i) the Dispute Resolution Provision attached as Appendix E to the Base Audit Engagement Letter, the SPC Audit Engagement Letter, the Savings Plan Audit Engagement Letter, the Parts Direct Audit Engagement Letter, the Kenmore Audit Engagement Letters, the Affiliate/Subsidiaries' Audit Engagement Letter, the Kmart PR and Sears PR Audit Engagement Letters, the Kmart PR Audit Engagement Letters, and (ii) the "Mediation", "Arbitration Procedures" and "Costs" provisions on pages 9 through 10 of the System Services Engagement Letter shall be

WEIL:\96792963\4\73217.0004

deemed deleted and replaced with the following:

This Dispute Resolution Provision sets forth the dispute resolution process and procedures applicable to the resolution of certain Disputes as set forth in the immediately preceding appendix.

All Disputes not heard by the Bankruptcy Court or the District Court as set forth in the immediately preceding appendix shall be first submitted to nonbinding confidential mediation by written notice to the parties, and shall be treated as compromise and settlement negotiations under the standards set forth in the Federal Rules of Evidence and all applicable state counterparts, together with any applicable statutes protecting the confidentiality of mediations or settlement discussions.  If the parties cannot agree on a mediator, the International Institute for Conflict Prevention and Resolution ("**CPR**"), at the written request of a party, shall designate a mediator.

If a Dispute has not been resolved within 90 days after the effective date of the written notice beginning the mediation process (or such longer period, if the parties so agree in writing), the mediation shall terminate and the Dispute shall be settled by binding arbitration to be held in New York, New York.  The arbitration shall be solely between the parties and shall be conducted in accordance with the CPR Rules for Non-Administered Arbitration that are in effect at the time of the commencement of the arbitration, except to the extent modified by this Dispute Resolution Provision (the "**Rules**").

The arbitration shall be conducted before a panel of three arbitrators.  Each of the Company and Deloitte & Touche LLP shall designate one arbitrator in accordance with the "screened" appointment procedure provided in the Rules and the two party-designated arbitrators shall jointly select the third in accordance with the Rules.  No arbitrator may serve on the panel unless he or she has agreed in writing to enforce the terms of the engagement letter (including its appendices) to which this Dispute Resolution Provision is attached and to abide by the terms of this Dispute Resolution Provision.  The arbitrators may render a summary disposition relative to all or some of the issues, provided that the responding party has had an adequate opportunity to respond to any such application for such disposition.  Discovery shall be conducted in accordance with the Rules.

All aspects of the arbitration shall be treated as confidential, as provided in the Rules.  Before making any disclosure permitted by the Rules, a party shall give written notice to all other parties and afford such parties a reasonable opportunity to protect their interests.  Further, judgment on the arbitrators' award may be entered in any court having jurisdiction.

Each party shall bear its own costs in both the mediation and the arbitration; however, the parties shall share the fees and expenses of both the mediators and the arbitrators equally.

10.    To the extent that there may be any inconsistency between the terms of the

Application, the Engagement Agreements, the Berry Declaration, and the express terms of this

8

Order, the terms of this Order shall govern.

11.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order.

12.     Notwithstanding anything to the contrary in the Engagement Agreements, during the pendency of these chapter 11 cases, the Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, and/or enforcement of this Order.

Dated: _____, 2019
        White Plains, New York

_____
THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE

WEIL:\96792963\4\73217.0004